1  VENABLE LLP
    Angel A. Garganta (163957)
2     agarganta@venable.com
    Jessica L. Grant (178138)
3     jgrant@venable.com
    Amit Rana (291912)
4     arana@venable.com
    Yuhan Chi (324072)
5     achi@venable.com
    101 California Street, Suite 3800
6   San Francisco, CA 94111
    Telephone:    (415) 653-3750
7   Facsimile:    (415) 653-3755

8   Attorneys for Defendant
    PREMIER NUTRITION CORPORATION
9   f/k/a JOINT JUICE, INC.

10                    **UNITED STATES DISTRICT COURT**

11                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13  VINCENT D. MULLINS, individually and on behalf of all others similarly situated, | Lead Case No. 3:13-cv-01271-RS |
| 14              Plaintiff, | Related to:<br>3:16-cv-06685-RS (Caiazzo-FL)<br>3:16-cv-06703-RS (Lux-CT) |
| 15       v. | 3:16-cv-06704-RS (Ravinsky-PA)<br>3:16-cv-06708-RS (Sandoval-NM) |
| 16  PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC., | 3:16-cv-06721-RS (Dent-IL)<br>3:16-cv-07078-RS (Simmons-MI) |
| 17              Defendant. | 3:16-cv-07090-RS (Spencer-MD)<br>3:16-cv-06980-RS (Fishon-NY) |
| 18  [**THIS DOCUMENT APPLIES TO ALL RELATED ACTIONS**] | 3:17-cv-00054-RS (Schupp-MA)<br>3:19-cv-00875-RS (Bland-CA) |
| 19 | **DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |
| 20 | |
| 21 | <u>CLASS ACTION</u> |
| 22 | Date:            August 22, 2019 |
| 23 | Time:            1:30 p.m.<br>District Judge:  Hon. Richard Seeborg |
| 24 | Courtroom:       3, 17th Floor, SF |

25
26
27
28

DEFENDANT'S REPLY ISO MOTION FOR JUDGMENT ON THE PLEADINGS

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT .........................................................................................................................3

    A. The Challenged Claims are Structure/Function Claims.........................................3

        1. Courts Routinely Determine Whether Challenged Statements Are Structure/Function Claims as a Matter of Law, and This Court Should as Well............................................................................................................3

        2. Plaintiffs Misapply the "Intended Use" Standard ......................................5

    B. Plaintiffs' Claims Are Preempted ...........................................................................11

III. CONCLUSION....................................................................................................................14

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Athena Costmetics, Inc.*,
  2012 U.S. Dist. LEXIS 200296 (C.D. Cal. Dec 20, 2012) ..........................................................9

*Capital Partners Int'l Ventures, Inc. v. Danzas Corp.*,
  309 F. Supp. 2d 1138 (N.D. Cal. 2004) ....................................................................................7

*Dachauer v. NBTY, Inc.*,
  913 F.3d 844 (9th Cir. 2019) ............................................................................................*passim*

*Farar v. Bayer AG*,
  2019 U.S. Dist. LEXIS 117600 (N.D. Cal. Feb 5, 2019) ...........................................................1

*Franz v. Beiersdorf, Inc.*,
  2019 U.S. Dist. LEXIS 85684 (S.D. Cal. May 20, 2019) ......................................................4, 5

*Gallagher v. Bayer AG*,
  14-cv-04601-WHO, 2015 WL 1056480 (N.D. Cal. Mar. 10, 2015) ...............................3, 4, 6, 7

*Gallagher v. Bayer AG*,
  14-cv-04601-WHO, 2015 WL 4932292 (N.D. Cal. Aug. 18, 2015) ...............................*passim*

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ..................................................................................4, 5

*Hazlin v. Botanical Labs, Inc.*,
  2012 U.S. Dist. LEXIS 143663 (S.D. Cal. Aug 8, 2013) ........................................................11

*Hughes v. Ester C. Co.*,
  99 F. Supp. 3d 278 (E.D.N.Y. March 27, 2015) ......................................................................9

*Knoles v. Teva Pharmaceuticals USA, Inc.*,
  17-cv-06580-BLF, 2019 WL 295258 (N.D. Cal. Jan. 23, 2019) ................................................7

*Korolshteyn v. Costco Wholesale Corp.*,
  2019 WL 2617043, at *1 (S.D. Cal. June. 25, 2019) ..............................................................12

*Kroessler v. CVS Health Co.*,
  2019 WL 2164054 (S.D. Cal. May 16, 2019) ...................................................................*passim*

*Min Shook Shin v. Umeken*,
  __Fed. App'x __, 2019 WL 2338467 (9th Cir. June 3, 2019) ..............................................3, 5

*Min Shook Shin v. Umeken, U.S.A.*,
  2017 U.S. Dist. LEXIS 222372 (C.D. Cal June 1, 2017) .........................................................3

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

*Trujillo v. Walgreens Co.*,
    2013 U.S. Dist. LEXIS 112404 (N.D. Ill. Aug 9, 2013) .................................................................. 4

*U.S. v. Undetermined Quantities of Bottles*,
    22 F.3d 235 (10th Cir. 1994) ........................................................................................................ 9

*United States v. Kasz Enters.*,
    855 F.Supp. 534 (D.R.I. 1994) ..................................................................................................... 8

*United States v. Storage Spaces Designated Nos "8" and "49"*,
    777 F.2d. 1363 (9th Cir. 1985) ................................................................................................. 8, 9

*Vasic v. Paten Health, LLC*,
    2014 U.S. Dist. LEXIS 33181 (S.D. Cal. March 10, 2014) ........................................................ 11

**Statutes**

21 U.S.C. § 321(g)(1) ............................................................................................................................ 4

**Other Authorities**

21 C.F.R. 101.93(g) .............................................................................................................................. 2

21 C.F.R. § 101.14 ................................................................................................................................ 5

21 C.F.R. § 201.128 .............................................................................................................................. 5

Regulations on Statements Made for Dietary Supplements Concerning the Effect
    of the Product on the Structure or Function of the Body, 65 Fed. Reg. 1000-01
    (Jan. 6, 2000) ........................................................................................................................ *passim*

Defendant Premier Nutrition Corporation respectfully submits this Reply in support of its Motion for Judgment on the Pleadings.

## I. INTRODUCTION

Plaintiffs have failed to show why their cases are not preempted under *Dachauer*. The Opposition does not contest that Plaintiffs' theory of the case is that Joint Juice does not relieve "joint pain" and other symptoms of arthritis. Nor does it actually refute that Premier's structure/function claims for Joint Juice do not imply treatment or prevention of joint pain or any symptom of arthritis. Contrary to Plaintiffs' claim, this Court did *not* consider this issue in *Mullins*. It "matters very much" now because *Dachauer* (decided earlier this year) held that precisely the type of mismatch between claims and proof presented in these cases requires dismissal. *Dachauer v. NBTY, Inc.*, 913 F.3d 844, 848 (9th Cir. 2019). Under *Dachauer*, Plaintiffs cannot try to prove that Joint Juice's claims are false or misleading by citing to evidence they contend shows that the product does not treat/prevent diseases (*e.g.*, joint pain or arthritis). Yet that is exactly what they are attempting to do. Under Ninth Circuit authority, and the facts alleged in these cases, dismissal is required for several reasons.

First, the Opposition incorrectly claims that this Court cannot determine, as a matter of law, whether the challenged claims are permissible structure/function claims. However, courts, including the Ninth Circuit, routinely rely on applicable FDA regulations and guidance to determine, as a matter of law, whether challenged claims are structure/function claims. As Judge Orrick recently explained in a similar case, "[t]he jury is not required to determine the type of claims plaintiffs are making; that is the province of the Court." *Farar v. Bayer AG*, 2019 U.S. Dist. LEXIS 117600, *3 (N.D. Cal. Feb 5, 2019). To the extent the Court may have found that there were issues of fact in *Mullins*, it did so without the benefit of *Dachauer*'s interpretation of governing regulations and guidance and without the benefit of other district courts that have dismissed similar cases based on *Dachauer*. Prior to *Dachauer*, it was not at all clear that FDA regulations and guidance preempted Plaintiffs' claims. But it is now, as shown in Premier's Motion.

Second, the Opposition relies on law and regulations pertaining to everything from cocaine to cereal in an effort to avoid what courts and the FDA have specifically said about *dietary supplements* in this context, and to argue (wrongly) that Joint Juice makes "disease" claims. As the FDA has explained, the "DSHEA, generally, and section 403(r)(6) of the Act, specifically, <u>*apply only to dietary supplements for human consumption*</u> and were enacted to provide a <u>*unique*</u> regulatory regime for these products. Thus, this rule is neither intended to apply to products other than dietary supplements for human consumption nor to interpret other provisions of the act."[1] Accordingly, the Opposition's reliance on inapposite law and regulations does not change the fact that the regulatory regime enacted *specifically for dietary supplements* confirms that the challenged statements are structure/function claims. And in any event, Plaintiffs have disclaimed their disease claim theories by stating unambiguously, that they "do[] not allege violations of federal regulatory provisions, including regulations prohibiting the making of 'disease claims,' as those claims are defined by 21 C.F.R. 101.93(g)."[2]

Plaintiffs also submit hundreds of pages of extraneous evidence that is neither appropriate for consideration on a motion for judgment on the pleadings nor probative of their misapplied "intended use" argument. Moreover, Plaintiffs' improper evidence relates to internal marketing strategies that no consumer ever saw and could not support any implied disease claim that supposedly "misled" or "deceived" anyone.

Finally, the Opposition misrepresents Premier's preemption argument to contend that controlling Ninth Circuit authority does not apply. (*See* Plaintiffs' Opposition at 18.) Contrary to the Opposition, Premier does not suggest that a structure/function claim can never be challenged under state consumer protection statutes. However, where, as here, Plaintiffs attempt to rely on disease claim level proof to show that structure/function claims are false or misleading, that constitutes precisely the type of claim that *Dachauer* instructs is preempted. *See Dachauer*, 913

---

[1] *See* Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body, 65 Fed. Reg. 1000-01 (Jan. 6, 2000) (the "FDA Final Rule") (emphasis added).

[2] *See* Declaration of Angel A. Garganta ("Garganta Decl.") Exs. 1-9.

F.3d at 848.  Because Plaintiffs have failed to establish that *Dachauer* does not apply to their cases, their claims are preempted and should be dismissed.

## II. ARGUMENT

### A. The Challenged Claims are Structure/Function Claims

The Opposition wrongly contends that the Court cannot determine whether the challenged claims are structure/function or disease claims on the pleadings.  Plaintiffs also invite the Court to ignore FDA regulations and guidance *that apply specifically to dietary supplements*, and instead consider inapposite law and inapplicable regulations.  Neither argument has any merit.

#### 1. Courts Routinely Determine Whether Challenged Statements Are Structure/Function Claims as a Matter of Law, and This Court Should as Well

The Opposition asserts, *without authority*, that whether labeling or advertising statements constitute implied disease claims is a question of fact.  (Opp. At 7.)  That is wrong.  Ninth Circuit authority (and even the cases cited by Plaintiffs) confirm that courts routinely rely on FDA regulations regarding dietary supplements to determine that labeling and advertising statements are structure/function claims, as a matter of law.

In *Min Shook Shin v. Umeken, U.S.A.*, for example, plaintiffs challenged the labelling of a dietary supplement.  2017 U.S. Dist. LEXIS 222372 (C.D. Cal June 1, 2017).  In granting defendant's motion to dismiss, the court explained that the FDA has issued specific regulations regarding statements made on dietary supplements and held, as a matter of law, that the "claims about [the products] are not disease claims. Rather they are permissible structure/function claims." *Id*. at *16 (citing FDA Final Rule).  On appeal, the Ninth Circuit affirmed and held, as a matter of law, "[t]he skin health-related statements concerning [the products] are not 'disease' claims but permissible 'structure/function' statements" and relied on the specific examples provided by the FDA Final Rule. *Min Shook Shin v. Umeken*, __Fed. App'x __, 2019 WL 2338467, at *2-3 (9th Cir. June 3, 2019).

Similarly, in *Gallagher v. Bayer AG*, 14-cv-04601-WHO, 2015 WL 1056480 (N.D. Cal. Mar. 10, 2015) ("*Bayer I*") and *Gallagher v. Bayer AG*, 14-cv-04601-WHO, 2015 WL 4932292 (N.D. Cal. Aug. 18, 2015) ("*Bayer II*"), a case cited in the Opposition, Judge Orrick determined

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

whether certain challenged claims were structure/function claims as a matter of law. *See Bayer I*, 2015 WL 1056480, at *21 (holding, as a matter of law, that "plaintiffs' challenge to 'supports heart health,' and Bayer's use of 'supports immunity' [are] structure/function claim[s] [because] the FDA has approved [such statements] as examples of structure/function claims"). Judge Orrick granted leave to amend, and on a renewed motion to dismiss, confirmed once again – on a pleading challenge – that claims such as "supports heart health" and "supports immunity" "may be treated only as structure/function claims." *Bayer II*, 2015 WL 4932292, at 11.[3] Other courts are also in accord. *See e.g.*, *Kroessler v. CVS Health Co.*, 2019 WL 2164054, at *5 (S.D. Cal. May 16, 2019) (holding, as a matter of law, that challenged representations are "proper structure/function claims according to the federal requirements" and dismissing complaint); *Trujillo v. Walgreens Co.*, 2013 U.S. Dist. LEXIS 112404 (N.D. Ill. Aug 9, 2013) (holding, as a matter of law, that challenged claims were structure/function claims and dismissing complaint).

The cases upon which Plaintiffs rely are inapposite. For instance, Plaintiffs cite to *Franz v. Beiersdorf, Inc.*, 2019 U.S. Dist. LEXIS 85684, at *7-8 (S.D. Cal. May 20, 2019) and *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017), but *neither of these cases has anything to do with dietary supplements*, for which the FDA has promulgated *specific* regulations and guidance distinguishing structure/function and disease claims.[4] Indeed, the lack of such regulation was dispositive in *Franz*. The court in that case held that it was "bound by the language of the FDCA [and] likewise bound by the FDA's promulgated regulations." *Franz*, 2019 U.S. Dist. LEXIS 85684, at *7. But because "the parties have not identified a provision of the FDCA or any applicable agency regulation [internal cite omitted] that would exclude a product that 'affects the structure or function of the body' from the definition of a 'drug[,]'" the claims "clear the relatively low bar of plausibility."[5] *Id.* And the allegations in *Hadley* pertained to

---

[3] As discussed below, in *Bayer I* and *Bayer II*, Judge Orrick allowed certain claims to proceed past the motion to dismiss stage, but dismissed claims based on the same preempted theories of liability present here: "Plaintiffs' argument that Bayer's 'supports heart health' statement is instead, as interpreted by a reasonable consumer, an impermissible disease claim, is preempted." *Id*.

[4] *Franz* pertained to a skin care moisturizer, and *Hadley* pertained to a cereal product.

[5] Unlike dietary supplements, if a cosmetic product makes a structure/function claim, it is considered a drug for certain purposes. 21 U.S.C. § 321(g)(1).

1  whether the cereal product at issue impermissibly linked dietary fiber and cardiovascular disease
2  in violation of a specific regulation prohibiting such a link in food products. *Hadley*, 243 F.
3  Supp. 3d at 1096 (analyzing 21 C.F.R. § 101.14, which prohibits labeling that links fiber and
4  cardiovascular disease).

5  But unlike the cosmetic product at issue in *Franz* and the cereal products in *Hadley*, the
6  FDA has issued *specific* regulations regarding what structure/function claims are permissible on
7  *dietary supplements*. Accordingly, the Court can determine as a matter of law whether Premier's
8  challenged statements conform to FDA regulations as permissible structure/function claims. *See*
9  *Min Shook Shin v. Umeken*, __Fed. App'x __, 2019 WL 2338467, at *2-3; *Kroessler*, 2019 WL
10 2164054, at *5.

### 2.  **Plaintiffs Misapply the "Intended Use" Standard**

12 The labeling and advertising challenged by Plaintiffs are classic structure/function claims.
13 (Mot. at 8-10.) The FDA so clearly intended the challenged claims to be structure/function
14 claims, that it used "support cartilage and joint function" and "maintenance or support of joints"
15 as examples of permissible structure/function claims when issuing the FDA Final Rule. *See* FDA
16 Final Rule, 65 Fed Reg. at 1016-17, 1030. Every representation at issue here is virtually identical
17 to those explicitly defined as structure function claims in the FDA Final Rule and applicable case
18 law. (Mot. 9-10.)

19 The Opposition, however, suggests the Court should disregard the specific regulatory
20 regime governing *dietary supplement* structure/function claims, ignore the cases that actually
21 pertain to structure/function claims for *dietary supplements*, and instead rely on inapplicable law
22 and inapposite regulations. (Opp. at 8-10.) For example, the Opposition repeatedly cites to 21
23 C.F.R. § 201.128 for the proposition that "if a manufacturer knows, or has knowledge of facts that
24 . . . [it] is []be[ing] . . . used for conditions, purposes, or uses other than the ones for which he
25 offers it, he is required to provide adequate labeling." (Opp. at 9 (brackets in original).) But that
26 regulation applies to labeling for *unapproved new uses of approved prescription and over the*
27 *counter drugs*. *See* 21 C.F.R. § 201.128. It specifically states that it applies to limited code
28 sections related to *new uses of prescription drugs and medical devices* (and, hence, obviously

5
DEFENDANT'S REPLY ISO MOTION FOR JUDGMENT ON THE PLEADINGS

1   does not apply to the dietary supplements at issue here).  Moreover, Plaintiffs' application of the
2   regulation does not make any sense.  Dietary supplements are not drugs.  The regulatory regime
3   applicable to drugs could only apply (if ever) where a dietary supplement makes impermissible
4   disease claims.  The Opposition, however, asks the Court to put the cart before the horse, and
5   apply regulatory definitions that interpret code sections for drugs to rule on the preliminary
6   inquiry of whether a product is a drug in the first place.  The argument is as circular as it is
7   misguided.

8   In addition, as shown in the Motion and not actually rebutted in the Opposition, the FDA Final Rule *rejects* Plaintiffs' attempt to transmute a permissible structure/function claim into a disease claim based on nothing more than a consumer's subjective belief or actual use.  The FDA Final Rule contemplated that some consumers may misunderstand a claim, but that should not transform a permissible structure/function claim into a disease claim: "the criteria will not satisfy everyone. For example, some of the claims considered to be structure/function claims may imply specific disease prevention to some consumers."  *See* FDA Final Rule, 65 Fed Reg. at 1011; *see also id*. at 1006 ("[t]he fact that some consumers used a dietary supplement for medicinal purposes would not by itself be sufficient to establish intended use as a drug.").  The FDA also clarified that consumer recognition or consumer surveys are "not required" and would be "impractical and inefficient" in the determination of whether a claim is a structure/function claim or a disease claim.  *See* 65 Fed. Reg. at 1007-08.  The *proposed* rule sought to include such subjective indicia but the *final* rule eliminated "reference to recognition of signs and symptoms by consumers or health professionals because many comments objected that this standard would appear to require consumer testing. FDA has replaced the recognition standard with an objective standard." *Id*.

Courts also agree that the inquiry into whether a dietary supplement makes a disease claim is focused on the actual labeling and advertising to which consumers were exposed.  *Bayer I* and *Bayer II,* discussed *supra* and cited in the Opposition, confirm that a consumer's actual use of the product does not inform whether statements constitute implied disease claims.  *Bayer I* held, as a matter of law, that the terms "supports heart health" and "supports immunity" were

6
DEFENDANT'S REPLY ISO MOTION FOR JUDGMENT ON THE PLEADINGS

structure/function statements "as defined by the FDCA." *Bayer I*, 2015 WL 1056480, at *6. The court acknowledged that a permissible structure/function claim could nonetheless impermissibly imply the treatment or prevention of a disease.[6] *Id* at *7. The court expressly noted, however, that the allegations in the complaint "pointed to no specific language <u>on the packaging, websites, or advertisements</u> of the Supplements that would take the 'supports heart health' language and move it towards a disease claim." *Id.* at *7 (emphasis added). In an amended complaint, the *Bayer* plaintiffs attempted to re-plead an implied disease claim by (1) citing to additional legal contexts in which implied disease claims might be found; and (2) submitting a consumer survey.[7] *Bayer II*, 2015 WL 4932292, at *3. *Id.* Judge Orrick correctly held that neither could form the basis of an implied disease claim because the new allegations "pointed to no specific language <u>on the packaging, websites, or advertisements</u> that illustrates how 'supports heart health' or 'supports immunity' have been linked to the treatment or prevention of cardiovascular disease." *Id*. Accordingly, the "[c]laims may be treated only as structure/function claims." *Id*. at *4.

Just as in *Bayer II*, Plaintiffs here attempt to rely on internal marketing documents, including surveys, to support their claims. (Opp. at 14-16.) Plaintiffs' approach is exactly what was determined in *Bayer II* to be improper, and it is here as well. For instance, Plaintiffs submit over 200 pages of extraneous evidence to allege that Premier "intended Joint Juice be used by arthritis and joint pain sufferers." (Opp. at 10-11; *see also* Declaration of Timothy Blood ("Blood Decl.") Exs. 1-19.) As an initial matter, the extraneous evidence, none of which is included or referenced in the Complaints, should not be considered on a motion for judgment on the

---

[6] Plaintiffs incorrectly state that Premier "would have the Court conclude that manufacturer statements regarding supplements are by definition structure/function claims, and not disease claims." (Opp. at 4.) Premier has never made such an argument. As stated in the Motion, Premier acknowledges that "[i]mplied disease claims do not mention the name of a specific disease, but refer to identifiable characteristics of a disease from which the disease itself may be inferred." (Mot. at 10.)

[7] The *Bayer* plaintiffs relied on consumer surveys that "concluded that many of Bayer's consumers . . . interpret 'supports heart health' as a disease prevention claim [and] shows many of Bayer's consumers will interpret 'supports immunity' as a disease prevention claim." *Bayer II*, 2015 WL 4932292, at *3.

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

pleadings.[8]  More fundamentally, however, the evidence presented does not show that Joint Juice is intended to prevent, cure, mitigate, or treat a disease.  As the FDA Final Rule and the case law on dietary supplements confirm, the relevant inquiry is ***what consumers actually saw on the labeling and advertising*** in making their purchase decisions. *See Bayer II*, 2015 WL 4932292, at *4.  None of Plaintiffs' extraneous evidence speaks to that issue.

Indeed, the FTC Advertising Guide that Plaintiffs cite specifically references "product <u>labeling</u>, including packaging, inserts, and other promotional material distributed at the point of sale . . .[and] <u>advertising</u>, including print and broadcast ads, infomercials, catalogs, and similar direct marketing materials."  (Pltfs. RJN, Ex. B (emphases in original).)[9]  Again, what matters is what consumers *see*, not what a particular defendant may have intended *internally*.

The Small Entity Compliance Guide on Structure/Function Claims cited by Plaintiffs actually undermines their claim, because it focuses (correctly) on the consumer facing labels. (Pltfs. RJN, Ex A.) ("[Q.] How do I determine if a Claim is a Structure/Function Claims or Disease Claims? [A.] . . . You should look at the objective evidence <u>in your labeling</u> to assess whether a claim explicitly or implicitly is a disease claim . . . It is important that you keep in mind two things. First, th<u>e context of the statement, decided from information on the label and in other labeling</u>, will determine if the statement is considered to be a disease claim.") (emphasis added).

The cases cited in the Opposition do not suggest otherwise. (Opp at 8-9.) In *United States v. Storage Spaces Designated Nos "8" and "49,"* a 1985 case about the illegal sale and transfer of cocaine, the court concluded the product was a drug, based on "2000 leaflets entitled 'Cocaine' . . .[that] contained directions for mailing an order" and "catalogs and advertisements . . . which

---

[8] *Knoles v. Teva Pharmaceuticals USA, Inc.*, 17-cv-06580-BLF, 2019 WL 295258, at * 1 (N.D. Cal. Jan. 23, 2019) (explaining that "a district court generally may not consider materials outside the pleadings in deciding a motion under either Rule 12(b)(6) or Rule 12(c)," and declining to consider a declaration that is neither attached nor referenced by the complaint in ruling on the motion for judgment on the pleadings); *Capital Partners Int'l Ventures, Inc. v. Danzas Corp.*, 309 F. Supp. 2d 1138, 1143 (N.D. Cal. 2004) ("This Court may look only to the pleadings when granting a motion to dismiss [sic] under Rule 12(c).")

[9] Plaintiffs rely on the FTC guidance to cite the example of a hypothetical product "Arthicure," which depicts a woman using a walker on the product label.  In contrast, the challenged claims for Joint Juice do not contain a disease coupled with the word "cure" in its product name or picture debilitated or diseased humans on the label.  This FTC hypothetical has nothing to do with the claims at issue here.

suggest to persons interested in using cocaine or cocaine substitutes that the items are similar to or related to cocaine." 777 F.2d 1363 (9th Cir. 1985). In *United States v. Kasz Enters.*, an out of circuit district court case regarding a hair growth shampoo, the court determined the product was a drug because the defendant was "selling [the product] in conjunction with advertising and promotional literature that made hair growth and hair loss prevention claims for the products . . .[and] incorporate[ed] opinions and testimonials supposedly obtained from third party users.") 855 F.Supp. 534 (D.R.I. 1994).[10] None of these cases pertain to dietary supplements and more fundamentally, none of these cases stand for the proposition that knowledge of consumers' actual use can convert a permissible structure/function claim into an implied disease claim.

In contrast to Plaintiffs' inapposite cases dealing with products that are not dietary supplements, the relevant inquiry under FDA regulations and FDA and FTC guidance on dietary supplements focuses on the challenged *labeling* and *advertising*. Like the consumer survey rejected in *Bayer II*, the Premier documents cited in the Opposition (Opp. at 14-16) are irrelevant to whether Joint Juice makes implied disease claims. *Bayer II* 2015 WL 4932292, at *6; *accord Hughes v. Ester C. Co.*, 99 F. Supp. 3d 278, 285 (E.D.N.Y. March 27, 2015) (permissible claims were nudged beyond structure/function claim based on "language on the packaging, website, or in advertisements") (citing *Bayer II*) (internal quotes omitted).

Tellingly, the Opposition fails to address the chart on pages 9-10 of Premier's Motion that ties each challenged Joint Juice representation specifically to FDA regulations that permit its use as a structure/function claim. The Opposition also fails to meaningfully rebut Premier's cases

---

[10] Plaintiffs other cited cases similarly do not support the proposition that customers' actual use can prove an implied disease claim. *See e.g., Allergan, Inc. v. Athena Costmetics, Inc.*, 2012 U.S. Dist. LEXIS 200296, at *12 (C.D. Cal. Dec 20, 2012) (cosmetic product affected structure/function of body and thus was a drug because "an abundance of <u>advertising and promotional materials</u> for LiLash have made claims about making one's eyelashes longer"); *U.S. v. Undetermined Quantities of Bottles*, 22 F.3d 235, 239 (10th Cir. 1994) (pet deodorant was drug because it was <u>advertised</u> to stop odors).

that confirm that virtually identical claims are structure/function claims.[11] *See Kroessler,* 2019 WL 2164054.

In the end, the only "specific language on the packaging, websites, or advertisements" that Plaintiffs allege conveys an implied disease claim is: (1) that Joint Juice was developed by an orthopedic surgeon; and (2) that a portion of Joint Juice's proceeds supports the Arthritis Foundation. (Related Actions Compls ¶¶ 30, 35; Bland Compl. ¶¶ 21, 25.) But Plaintiffs do not explain (let alone cite any authority) why Joint Juice's development by an orthopedic surgeon would imply that consuming the product would treat, cure, prevent, or mitigate a disease. Nor does the Opposition cite any authority holding that an endorsement logo would somehow convey the message that a product treats or cures a disease. If Plaintiffs' theory was proper, then it would mean that every product label that includes a pink ribbon implies it treats breast cancer, or every product that includes a red ribbon implies it cures AIDS. Clearly, Plaintiffs' theory lacks merit, which is why Plaintiffs have not cited a single case in support of it.

Although it is improper on this Motion, if the Court is going to consider any of Plaintiffs' extraneous evidence, it should also review the discovery responses, by which Plaintiffs *expressly deny alleging that Premier makes disease claims in these cases*. *See* Garganta Decl. Exs 1-9. Premier propounded interrogatories to Plaintiffs asking if they "contend that any Joint Juice Products were advertised for their ability to treat or prevent a Disease?" *Id.* Plaintiffs refused to answer, on the ground that the interrogatories were irrelevant because they "do[] not allege violations of federal regulatory provisions, including regulations prohibiting the making of 'disease claims[.]'" *Id.* Not only do Plaintiffs' discovery responses contradict their arguments in

---

[11] Plaintiffs also cite to FDA warning letters that state that "improves joint mobility" or "joint mobility" imply disease claims. (Opp. at 13.) But Joint Juice does not purport to "improve" anything and no alleged Joint Juice statement includes the words "joint mobility" in isolation. Joint Juice advertises that it can help "*maintain* joint function and mobility." (Related Action Compls ¶ 37 (emphasis added).) The FDA Final Rule confirms that such statements are permissible structure/function claims. 65 Fed Reg at 1016-17 ("maintaining normal function" is permissible structure/function statement); *see also Kroessler*, 2019 WL 2164054, at *14 ("FDA has issued warning letters to advertisers of glucosamine supplements who advertise their products will do things like 'improve joint mobility.' [internal cite] However, the Representations do not purport to 'reduce' or 'improve' anything, nor do they mention 'joint pain.'").

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415-653-3750

the Opposition, they also evidence the same semantic gamesmanship rejected by *Dachauer*.[12]

*Dachauer*, 913 F.3d at 848 ("Plaintiff argues that it does not matter whether he categorizes Defendants' claims as structure/function claims or as disease claims, because he addressed the falsity of the labels' text. To the contrary, it matters very much. Plaintiff's argument would vitiate the FDCA's distinction between disease claims and structure/function claims").

The applicable case law, FDA regulations (which reference, almost verbatim, the statements challenged here), and relevant FDA and FTC guidance, all confirm that Joint Juice's claims are permissible structure/function claims.[13]

### B. Plaintiffs' Claims Are Preempted

The Opposition misrepresents Premier's argument and misapplies *Dachauer*. Premier has never suggested that a "structure/function claim cannot be challenged as misleading or false under state consumer protection laws." (*See* Opp. at 19.) However, what Premier does argue, and *Dachauer* confirms, is that Premier's structure/function claims for Joint Juice cannot be challenged on the ground that Joint Juice does not treat or prevent disease (*e.g.*, joint pain or arthritis). *Dachauer*, 913 F.3d at 848.

The Opposition does not dispute that the entire premise of Plaintiffs' case is that Joint Juice does not relieve joint pain or characteristic symptoms of arthritis. Nor could it. As shown in Premier's Motion, Plaintiffs allege that the "joint health benefits" that were not obtained from Joint Juice include relief from "joint pain" (a characteristic symptom of arthritis). (Mot. at 13 (citing Related Action Compls. ¶ 4; Bland Compl. ¶ 17-18)) Moreover, more than twenty-five

---

[12] And the procedural gamesmanship exhibited by Plaintiffs' lawyers in *Mullins*.

[13] To the extent this Court, in *Mullins*, may have ruled on any of the issues presented here, that decision did not have the benefit of *Dachauer* and its progeny's reading of FDA regulations regarding structure/function claims. The issues are ripe now because *Dachauer* clarified that a mismatch between claims and proof requires dismissal, a concept cases decided prior to *Dachauer* misunderstood. For example, the Opposition cites several **pre**-*Dachauer* cases regarding scientific studies. (Opp. at 18, FN 10.) Rather than support Plaintiffs, these cases show why many pre-*Dachauer* decisions are inconsistent with and thus abrogated by the Ninth Circuit's holding. *Compare, e.g.*, *Vasic v. Paten Health, LLC*, 2014 U.S. Dist. LEXIS 33181, at *20 (S.D. Cal. March 10, 2014) ("the FAC does not require the Court to differentiate between [structure/function claims or disease claims]") *and Hazlin v. Botanical Labs, Inc.*, 2012 U.S. Dist. LEXIS 143663, at *11-12 (S.D. Cal. Aug 8, 2013) (claims not preempted because court "disagrees with that characterization [between structure/function and disease claims]); *with Dachauer*, 913 F.3d at 848 (the distinction between structure/function and disease claims "matters very much").

paragraphs of the Complaints are devoted to listing the "evidence" Plaintiffs contend shows that glucosamine (and/or chondroitin) are not effective for the treatment or prevention of <u>arthritis</u> and <u>joint pain</u>.  (Mot. at 14 (citing Related Action Compls. ¶¶ 39-64; Bland Compl. ¶¶ 29-60))  This is precisely the mismatch of claim and proof that *Dachauer* holds is preempted.  *Dachauer*, 913 F.3d at 848 (requirement that structure/function claims "made on a supplement's label require proof that the supplement treats or prevents [disease]" is preempted"); *Bayer II*, 2015 WL 4932292, at *4 ("I agree with Bayer that structure/function claims cannot be proven false by pointing only to evidence of a product's ability to treat or prevent disease . . ."); *Kroessler*, 2019 WL 2164054, at *9 (allegations that general joint health statements are false and misleading because they don't treat and provide relief from symptoms of osteoarthritis, including joint pain and stiffness are preempted); *see also Korolshteyn v. Costco Wholesale Corp.*, 2019 WL 2617043, at *1 (S.D. Cal. June 25, 2019). Plaintiffs do not meaningfully argue otherwise.[14]

      Instead, Plaintiffs assert that even if Premier's claims are structure/function claims, they "have alleged there is evidence that [Joint Juice] is not effective."[15]  (Opp. at 18.)  Plaintiffs cite to three studies referenced in the Complaints, which they contend show Joint Juice's structure/function claims are false.[16]  (*Id.*)  The first study referred to as the "JOG" study by Plaintiffs (Mot. 18), is actually titled "Effect of Oral Glucosamine on Joint Structure in Individuals with ***Chronic Knee Pain***."  (Defendant's Request for Judicial Notice ("RJN"), Ex. A (emphasis added).)  As shown by the title, the study analyzed the effect of oral glucosamine on

---

[14] Plaintiffs wrongly assert that Premier's post-*Dachauer* district court cases "were incorrectly decided." (Opp. at 21.)  Those cases correctly apply the holding from *Dachauer* that the Opposition fails to address: "Manufacturers need not also have evidence that those structural or functional effects reduce the risk of developing a certain disease."  *Dachauer*, 913 F.3d at 848; *see also Korolshteyn.* 2019 WL 2617043, at *1; *Kroessler*, 2019 WL 2164054, at *4.

[15] Plaintiffs also state they need not "provide evidence in support of their claims" (Opp. at 18, FN 10.) That is incorrect.  Plaintiffs must plead allegations to plausibly support the conclusion that the structure/function claims are false and misleading and cannot rely on "evidence that those structural or function effects reduce the risk of developing a certain disease."  *Dachauer*, 913 F.3d at 848; *see also Korolshteyn* 2019 WL 2617043, at *10 (conflicting scientific evidence may create a genuine dispute of material fact for the fact-finder but "does not foreclose a finding that Plaintiff's claims are preempted under the NLEA and <u>the Court must first address the issue of preemption</u>.") (emphasis added).

[16] As the Opposition points out, one of the cited studies is alleged in all Related Actions Complaints but two of the cited studies appear only in the *Bland* Complaint. (*See* Opp. at 18.)

subjects who "had symptoms of mild to moderate chronic, frequent **knee pain typical of OA**." (*Id*. (emphasis added).)  The second study referenced in the Opposition, the Runhaar et al. study (Mot. 18), is titled "***Prevention of Knee Osteoarthritis** in Overweight Females: The First Preventative Randomized Controlled Trial in **Osteoarthritis***."  (RJN, Ex. B (emphasis added).)  The study stated that "[t]he objective of the present study was to evaluate the effect of a tailored diet-and-exercise program, aimed to reduce weight, and of oral crystalline glucosamine sulfate on incidence of *knee osteoarthritis* in a high-risk group of overweight women between 50 and 60 years of age, free of clinical knee osteoarthritis at baseline" (*Id*. (emphasis added).)  The third study, by de Vos et al. (Mot. 18), is titled "Long-term effects of a lifestyle intervention and oral glucosamine sulphate in primary care on *incident knee OA* in overweight women."  (RJN, Ex. C (emphasis added).)  Like the Runhaar study, the de Vos study examined the impact of oral glucosamine in <u>prevention</u> of OA. (*Id*. ("The objective of the present study was to evaluate the long-term effectiveness of a tailor-made weight-loss intervention, using diet and exercise, and of oral glucosamine on the incidence of knee OA in a high-risk population of overweight, middle-aged women without knee OA at baseline").)

Instead of supporting Plaintiffs' claims, these three studies show why they are preempted. They, like all the studies cited in the Complaints, would at most, show that Joint Juice is not effective at treating or preventing ***joint pain or osteoarthritis***.  But that is disease-level proof, and attempting to challenge structure/function claims based on such disease-level proof is precisely what *Dachauer* and its progeny hold is preempted. [17]

Plaintiffs' challenge to Premier's claims for Joint Juice is accordingly preempted, and

---

[17] Challenges to structure/function claims have survived where plaintiffs alleged studies that showed products had a negative or adverse impact on health. *See Dachauer*, 913 F.3d at 849 (not preempted are Plaintiff's claims that "Defendants' structure/function claim about immune health is misleading because their supplements *increase* the risk of all-cause mortality") (emphasis in original); *Bayer II*, 2015 WL 4932292, at *4 (complaint cites studies "that include a section that discusses health *risk* from excessive intake of such vitamins) (emphasis added).  Plaintiffs make no such allegation in the cases at bar.

13
DEFENDANT'S REPLY ISO MOTION FOR JUDGMENT ON THE PLEADINGS

their Complaints should be dismissed. [18]

## III.  CONCLUSION

The Court should enter judgment on the pleadings against Plaintiffs and dismiss the Complaints in the above-captioned related actions without leave to amend.

Dated:  July 8, 2019

VENABLE LLP

By:  */s/ Angel A. Garganta*

Angel A. Garganta (163957)
Jessica L. Grant (178138)
Amit Rana (291912)
Yuhan Chi (324072)
101 California Street, Suite 3800
San Francisco, CA  94111
Tel: (415) 653-3750

*Attorneys for Defendant*

---

[18] Plaintiffs' claims for breach of express warranty, breach of implied warranty or merchantability, violation of the Magnusson-Moss Act, and unjust enrichment are premised on the same defective theory and must fail for the same reasons discussed herein and in Premier's Motion. (Mot. at 16, FN 14.)

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2019.

*/s/ Angel A. Garganta*
ANGEL A. GARGANTA

VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA  94111
Tel:  (415) 653-3750
Fax:  (415)653-3755
agarganta@venable.com