1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  THOMAS J. O'REARDON II (247952)
   501 West Broadway, Suite 1490
3  San Diego, CA  92101
   Tel: 619/338-1100
4  619/338-1101 (fax)
   tblood@bholaw.com
5  toreardon@bholaw.com

6  Attorneys for Plaintiffs

7  [Additional Counsel Appear on Signature Page]

8                  **UNITED STATES DISTRICT COURT**

9        **NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

10 | VINCENT D. MULLINS, individually and on behalf of all others similarly situated, | Lead Case No. 3:13-cv-01271-RS |

Related to:
3:16-cv-06685-RS (Caiazzo-FL)
3:16-cv-06703-RS (Lux-CT)
3:16-cv-06704-RS (Ravinsky-PA)
3:16-cv-06708-RS (Sandoval-NM)
3:16-cv-06721-RS (Dent-IL)
3:16-cv-07078-RS (Avery-MI)
3:16-cv-07090-RS (Spencer-MD)
3:16-cv-06980-RS (Fishon-NY)
3:17-cv-00054-RS (Trudeau-MA)

Plaintiff,

v.

PREMIER NUTRITION CORPORATION
f/k/a JOINT JUICE, INC.,

Defendant.

**[THIS DOCUMENT APPLIES TO ALL RELATED ACTIONS]**

**PLAINTIFFS' NOTICE OF MOTION AND MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION**

CLASS ACTION

Date:           November 7, 2019
Time:           1:30 p.m.
District Judge: Hon. Richard Seeborg
Courtroom:      3, 17th Floor, SF

Comp. Filed:    March 21, 2013
Trial Date (*Mullins*):  TBD

**REDACTED VERSION**

*(left vertical margin)* BLOOD HURST & O' REARDON, LLP

All Related Actions

00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

PLEASE TAKE NOTICE that on November 7, 2019, at 1:30 p.m., in Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, in accordance with Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), Plaintiffs Susan Caiazzo, Donna Lux, Annette Ravinsky, Arthur Sandoval, Sandra Dent, Beverly Avery, Marilyn Spencer, Eric Fishon, and Mary Trudeau will and hereby do move for an order certifying the following nine Classes and appointing each respective Plaintiff as Class representative for his or her state. The Classes to be certified are defined as:

> All persons who purchased Joint Juice in the States of Connecticut, Florida, Illinois, Maryland, Massachusetts, Michigan, New Mexico, New York, and Pennsylvania from March 1, 2009 up to and including the date class notice is disseminated.

Excluded from each Class are: the Defendant, its parents, subsidiaries, affiliates, officers, and directors; those who purchased the Joint Juice Products for the purpose of resale; all persons who make a timely election to be excluded from the Class; the judge to whom this case is assigned and any immediate family members thereof; and those who assert claims for personal injury.

Pursuant to Rule 23(g), Plaintiffs move for an order appointing Timothy G. Blood of the law firm of Blood Hurst & O'Reardon, LLP as class counsel for each Class.

This motion is based upon this notice of motion, the accompanying memorandum of law, the evidentiary submissions, including the declarations of Timothy G. Blood and Dr. Timothy McAlindon, and such other evidence and argument as may be presented at or before the hearing on this motion.

Respectfully submitted,

Dated: August 29, 2019                    BLOOD HURST & O'REARDON, LLP

By:          *s/ Timothy G. Blood*
             TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP

00153423

i                                                         All Related Actions

1

## TABLE OF CONTENTS

2

**Page**

3    I.      INTRODUCTION .................................................................................................1

4    II.     THE TYPE OF FACTS AND CLASSWIDE EVIDENCE PLAINTIFF WILL
             INTRODUCE IN A CLASS TRIAL ....................................................................2

5            A.      The Defendant and Joint Juice ................................................................2

6            B.      Premier's Nationwide Marketing Campaign...........................................4

7                    1.      Joint Juice Advertising Messages ................................................4

8                    2.      Premier's Marketing Campaign Successfully Conveyed the Intended
                             Message ........................................................................................8

9

10           C.      Premier's Marketing Campaign Resulted in Large Sales .....................11

11           D.      Whether Joint Juice Advertising Message Is Deceptive Presents a Classwide
                     Question .................................................................................................11

12
13                   1.      The Well-Conducted Clinical Studies and Meta-Analyses Disprove
                             the Joint Juice Claims................................................................11

14                   2.      The Evidenced-Based Professional Guidelines Reject the Joint Juice
                             Claims.........................................................................................15

15

16   III.    THE CLAIMS PLAINTIFFS SEEK TO CERTIFY .........................................16

             A.      The Consumer Protection Causes of Action .........................................16

17           B.      Other Causes of Action .........................................................................17

18                   1.      Pennsylvania: Breach of Express Warranty ..............................17

19
20                   2.      Michigan: The Breach of Implied Warranty of Merchantability and
                             Violation of the Magnuson-Moss Warranty Act ........................18

21                   3.      Michigan: Unjust Enrichment ....................................................19

22   IV.     ARGUMENT ....................................................................................................19

23           A.      Definite and Ascertainable Classes Exists ...........................................19

24           B.      Plaintiffs Satisfy the Rule 23(a) Prerequisites......................................20

25                   1.      Numerosity .................................................................................20

26                   2.      Commonality...............................................................................20

27                   3.      Typicality ....................................................................................21

28                   4.      Adequacy of Representation .......................................................22

BLOOD HURST & O' REARDON, LLP

1

C.    23(b)(3) Is Satisfied .................................................................................22

2

1.    Common Issues Predominate ......................................................22

3

a.    Determination of Reliance/Causation Does Not Undermine
Predominance ..................................................................23

4

5

b.    Relief Can Be Determined on a Classwide Basis ............................23

2.    A Class Action Is Superior to Other Methods of Adjudication ..................24

6

V.    CONCLUSION ..................................................................................................25

7

8

9

10

11

BLOOD HURST & O' REARDON, LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lead Case No. 3:13-cv-01271-RS
And All Related Actions

00153423

MEMORANDUM IN SUPPORT OF PLAINTIFFS' OMNIBUS MOTION FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Holiday Universal*,
249 F.R.D. 166 (E.D. Pa. 2008) ................................................................16

*Allen v. Hyland's Inc.*,
300 F.R.D. 643 (C.D. Cal. 2014) ..............................................................19

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................22

*Am/Pm Franchisee Ass'n v. Atl. Richfield Co.*,
25 Phila. 39 (1992) ...................................................................................18

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*,
947 A.2d 320 (Conn. 2008) ......................................................................17

*Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*,
822 F. Supp. 2d 505 (D. Md. 2011) ..........................................................23

*Barden v. Hurd Millwork Co.*,
249 F.R.D. 316 (E.D. Wis. 2008) .............................................................18

*Bednarski v. Hideout Homes & Realty, Inc.*,
709 F. Supp. 90 (M.D. Pa. 1988) .............................................................18

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ..................................................................19

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001)............................................................19

*Chapman v. Tristar Prods.*,
No. 1:16-CV-1114, 2017 U.S. Dist. LEXIS 61767
(N.D. Ohio Apr. 24, 2017) ........................................................................18

*Clay v. Cytosport, Inc.*,
No. 3:15-cv-00165-L-AGS, 2018 U.S. Dist. LEXIS 153124
(S.D. Cal. Sep. 7, 2018)........................................................................2, 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ....................................................................................24

*Daye v. Cmty. Fin. Serv. Ctrs., LLC*,
313 F.R.D. 147 (D.N.M. 2016) ................................................................17

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

00153423

BLOOD HURST & O' REARDON, LLP

*Donovan v. Philip Morris USA, Inc.*,
   268 F.R.D. 1 (D. Mass. 2010) ...................................................................17

*Fitzpatrick v. Gen. Mills, Inc.*,
   635 F.3d 1279 (11th Cir. 2011) .....................................................2, 16, 21

*Gold v. Lumber Liquidators, Inc.*,
   323 F.R.D. 280 (N.D. Cal 2017) .........................................................2, 16

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
   317 F.R.D. 374 (S.D.N.Y. 2016)........................................................2, 16, 21

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................................................20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)...........................................20, 22, 23, 25

*Hasemann v. Gerber Prods. Co.*,
   No. 15-CV-2995 (MKB) (RER), 2019 U.S. Dist. LEXIS 57311
   (E.D.N.Y. Mar. 31, 2019) ...............................................................2, 17

*Hoving v. Lawyers Title Ins. Co.*,
   256 F.R.D. 555 (E.D. Mich. 2009)............................................................19

*Incubadora Mexicana, SA De CV v. Zoetis, Inc.*,
   310 F.R.D. 166 (E.D. Pa. 2015) ..............................................................17

*Johns v. Bayer Corp.*,
   280 F.R.D. 551 (S.D. Cal. 2012)...............................................................23

*Kurtz v. Kimberly-Clark Corp.*,
   321 F.R.D. 482 (E.D.N.Y. 2017) ..............................................................21

*Lackowski v. Twinlab Corp.*,
   No. 00-75058, 2001 U.S. Dist. LEXIS 25634
   (E.D. Mich. Dec. 28, 2001) .....................................................................18

*Lambert v. Nutraceutical Corp.*,
   870 F.3d 1170 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710 (2019) ........................24

*McKee v. GM LLC*,
   376 F. Supp. 3d 751 (E.D. Mich. 2019) ....................................................18

*McPhee v. Depuy Orthopedics, Inc.*,
   989 F. Supp. 2d 451 (W.D. Pa. 2012) .......................................................17

*Mikos v. Chrysler Corp.*,
   404 N.W.2d 783 (Mich. Ct. App. 1987) ...................................................18

v

00153423

*Morris Pumps v. Centerline Piping, Inc.*,
   729 N.W.2d 898 (Mich. Ct. App. 2006) ............................................... 19

*Mullins v. Direct Dig., LLC*,
   795 F.3d 654 (7th Cir. 2015) ............................................... 1, 16

*Mullins v. Direct Dig., LLC*,
   No. 13 CV 1829, 2014 U.S. Dist. LEXIS 155018
   (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015) ............... 24

*Mullins v. Premier Nutrition Corp.*,
   178 F. Supp. 3d 867 (N.D. Cal. 2016) ............................................... *passim*

*Nelson v. Mead Johnson Nutrition Co.*,
   270 F.R.D. 689 (S.D. Fla. 2010) ............................................... 21

*O'Keefe v. Mercedes-Benz U.S., LLC*,
   214 F.R.D. 266 (E.D. Pa. 2003) ............................................... 18

*POM Wonderful, LLC v. FTC*,
   777 F.3d 478 (D.C. Cir. 2015) ............................................... 21

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015), *cert. denied*, 195 L. Ed. 2d 780 (2016) .......... 23

*Rikos v. P&G*,
   799 F.3d 497 (6th Cir. 2015) ............................................... *passim*

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ............................................... 22

*Samuel-Bassett v. Kia Motors Am., Inc.*,
   34 A.3d 1 (Pa. 2011) ............................................... 17, 18

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ............................................... 24

*Seegert v. Rexall Sundown, Inc.*,
   No. 3:17-cv-1243-JAH-JLB, 2018 U.S. Dist. LEXIS 99581
   (S.D. Cal. June 13, 2018) ............................................... 14

*Senne v. Kansas City Royals Baseball*,
   __ F.3d __, No. 17-16245, 2019 U.S. App. LEXIS 24459
   (9th Cir. Aug. 16, 2019) ............................................... 23

*Skelton v. Gen. Motors Corp.*,
   No. 79 C 1243, 1985 U.S. Dist. LEXIS 18649
   (N.D. Ill. June 21, 1985) ............................................... 19

BLOOD HURST & O' REARDON, LLP

vi

Lead Case No. 3:13-cv-01271-RS
And All Related Actions

00153423

*Sonner v. Schwabe N. Am., Inc.*,
  No. 5:15-cv-01358 VAP, 2019 U.S. Dist. LEXIS 117623
  (C.D. Cal. July 2, 2019) (California)................................................2, 24

*In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV TV Litig.*,
  758 F. Supp. 2d 1077 (S.D. Cal. 2010) ................................................18

*Stearns v. Tickemaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011)................................................23

*Suchanek v. Sturm Foods, Inc.*,
  311 F.R.D. 239 (S.D. Ill. 2015)................................................2, 16

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ................................2, 16, 19, 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................20

*Yamagata v. Reckitt Benckiser LLC*,
  No. 17-cv-03529-VC, 2019 U.S. Dist. LEXIS 117599
  (N.D. Cal. June 5, 2019)................................................2, 24

*Yeldo v. MusclePharm Corp.*,
  290 F. Supp. 3d 702 (E.D. Mich. 2017) ................................................19

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001)................................................24, 25

**Statutes and Rules**

15 U.S.C. § 2310(d)(1)(A) ................................................17, 18

Mich. Comp. Laws § 440.2314(2)(f) ................................................18

13 Pa. Cons. Stat. § 2313(a)(1) ................................................17

Fed. R. Civ. P. 23 ................................................19, 20, 21, 24

**Secondary Sources**

Federal Judicial Center, National Research Council, *Reference Manual on Scientific Evidence* ................................................13

BLOOD HURST & O' REARDON, LLP

00153423

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Joint Juice is a glucosamine and chondroitin drink manufactured by Premier Nutrition Corporation. Joint Juice is sold, as the name suggests, to improve joint health.

The actions should each be certified as class actions because the primary issues in each are classwide questions that will be resolved by classwide evidence. There are two overarching common questions. The first is: what is the message or messages conveyed by Premier's advertising of Joint Juice? Identification of advertising messages – express or implied – is an objective classwide question that when answered for one Class member is answered for all. Here, as the Court already found and as abundant evidence shows, the advertising promises that Joint Juice helps joints by addressing the cardinal symptoms of arthritis regardless of whether one has diagnosed arthritis: joint pain, comfort, mobility, and flexibility. *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 891 (N.D. Cal. 2016).

The second overarching common question is whether Joint Juice actually provides the promised joint health benefits. Plaintiffs contend Joint Juice does nothing of clinical significance; it neither supports the functioning of healthy joints nor helps with the pain, discomfort, flexibility or mobility of arthritic joints. Premier contests this fact. The point here, however, is that resolution of this common question – which is one of science – will be answered Classwide using common evidence.

False advertising cases, including those involving glucosamine and chondroitin, are routinely certified and certification upheld by circuit courts. The Seventh Circuit affirmed certification of a ten-state class in glucosamine/chondroitin case involving similar advertisements. *Mullins v. Direct Dig., LLC*, 795 F.3d 654 (7th Cir. 2015) ("*Direct Dig.*"). The *Direct Dig.* certification covered Illinois, Florida, Massachusetts, Michigan, and New York, five of the states at issue here.[1] The Sixth Circuit affirmed certification of a five-state class in a probiotic false advertising case. *Rikos v. P&G*, 799 F.3d 497 (6th Cir. 2015). *Rikos* covered Florida and Illinois,

---

[1]      *See* concurrently filed Declaration of Timothy Blood ("Blood Decl."), ¶ 11.

BLOOD HURST & O' REARDON, LLP

two of the states at issue here. And the Eleventh Circuit upheld certification of a Florida class in a supplement false advertising case. *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011).

Indeed, this Court has already certified a California class based on the exact same set of facts. *Mullins v. Premier Nutrition Corp.*, ECF No. 134. Other district courts also readily certify single and multi-state false advertising supplement cases. *See, e.g.*, *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239 (S.D. Ill. 2015) (eight state classes, including Illinois and New York); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374 (S.D.N.Y. 2016) (Florida and New York); *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280 (N.D. Cal 2017) (Florida, Illinois and Pennsylvania); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012) (Illinois, Maryland and New York); *Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995 (MKB) (RER), 2019 U.S. Dist. LEXIS 57311 (E.D.N.Y. Mar. 31, 2019) (Florida and New York); *Clay v. Cytosport, Inc.*, No. 3:15-cv-00165-L-AGS, 2018 U.S. Dist. LEXIS 153124 (S.D. Cal. Sep. 7, 2018) (Florida and Michigan); *Yamagata v. Reckitt Benckiser LLC*, No. 17-cv-03529-VC, 2019 U.S. Dist. LEXIS 117599 (N.D. Cal. June 5, 2019) (California and New York); *Sonner v. Schwabe N. Am., Inc.* (*Schwabe*), No. 5:15-cv-01358 VAP (SPx), 2019 U.S. Dist. LEXIS 117623 (C.D. Cal. July 2, 2019) (California).

Certification of the nine state classes should be granted because the core questions can be resolved at class trials for the same reasons detailed in *Mullins*.

## II.   THE TYPE OF FACTS AND CLASSWIDE EVIDENCE PLAINTIFF WILL INTRODUCE IN A CLASS TRIAL

### A.   The Defendant and Joint Juice

Premier is a subsidiary of Post Holdings, Inc., the multi-billion dollar processed food conglomerate. It manufactures and markets Joint Juice, a glucosamine and chondroitin drink sold in liquid or powdered drink mix form. The Joint Juice products at issue are: (1) Joint Juice Ready-To-Drink 8-ounce bottles ("RTD"); (2) Joint Juice "On The Go" Drink Mix; (3) Joint Juice Easy Shot Supplement; (4) Joint Juice Extra Strength Easy Shot; and (5) Joint Juice Extra Strength RTD (collectively, "Joint Juice"). The ready-to-drink version accounts for most of the brand's sales. Ex.

BLOOD HURST & O' REARDON, LLP

00154649

1 at 56374.[2] Joint Juice has been sold nationally since 2004. Ex. 2 at 29491. Nationwide, about ██

of all Joint Juice sales occur at Costco, Walmart and Sam's Club. Ex. 3 at 119:2-23; Ex. 4 at 15.

Joint Juice products contain 1,500 mg of glucosamine hydrochloride and 200 mg of chondroitin sulfate per serving, except Joint Juice Extra Strength, which contains 1,200 mg of chondroitin. Ex. 3 at 33:22-34:3. Premier includes both glucosamine and chondroitin because its competitors do so and because Premier knows consumers associate glucosamine and chondroitin with joint health benefits. *Id*. at 126:11-19; Ex. 5 at 74:3-75:22; Ex. 6 at 62312 ("████████████ ████████████████████████████████████████████."); Ex. 7 at 1415 ("████ ████████████████████████████████████████████████."); Ex. 8 at 31820; Ex. 9 at 29906.

As Premier announces, Joint Juice is intended as a medicinal product for the joints, and not anything else:

> Joint Juice® supplement is not a *beverage* . . . it is not a (1) soft drink, (2) sport drink, or (3) fruit drink. Joint Juice supplement was developed and is currently marketed as a medical supplement specifically for its joint health attributes. While Joint Juice is packaged in an 8-ounce container, the only reason to purchase Joint Juice® supplement is for the medicinal value of the glucosamine and chondroitin it contains.

Ex. 10 at 131440 (italics in original); Ex. 89 at 1; *see also* Ex. 11 at 132533.

Premier's market research shows "████████████████████████████████████████" with "███████████████████" because "████████████████████████." Ex. 9 at 29906. "████████████████████████████████████████████." *Id*.

Premier capitalized on the public's association of glucosamine/chondroitin with joint pain health by marketing Joint Juice to consumers who suffer from or seek a preventative solution for joint pain and arthritis and want a liquid alternative to glucosamine pills. According to Premier, "████████████████████████████████████." Ex. 12 at 5; *see also* Ex. 13 at 101642 ("██ ████████████████████████████████████████████████████

---

[2]     Unless otherwise noted, all references to "Ex(s)." are to the Blood Decl.

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

00154649

BLOOD HURST & O' REARDON, LLP

1   ████████████████).”).  Premier states "███████████████████

2   ██████████." Ex. 3 at 126:11-19; *see also id.* at 29:17-30:6, 134:20-135:15 (same).

3       **B.      Premier's Nationwide Marketing Campaign**

4           Since its nationwide launch, Premier's advertising messaging has been consistent. It

5   promised consumers that Joint Juice can maintain joint health by keeping their joints "happy" and

6   flexible. Its advertising also intentionally conveys the implied message that Joint Juice treats or

7   prevents joint pain and the other cardinal signs of osteoarthritis. Premier itself touts its advertising

8   objective is to trigger "████████████████████████████████." Ex. 14 at

9   27185.

10              **1.      Joint Juice Advertising Messages**

11          The product's marketing starts with its name – Joint Juice. According to Premier, the name

12  communicates the intended message that Joint Juice is "████████████████." Ex. 5 at 155:7-

13  9; Ex. 15 at 614465 (████████████████████████████████████

14  ████████"). The product's name delivered a consistent marketing message across print, online,

15  in-store, and direct mail advertising, highlighting the product's primary attribute, joint health. Ex.

16  16 at 8, 19-20.

17          Since 2010, Joint Juice ready-to-drink packaging has remained materially identical: "A

18  bottle a day keeps your joints in play," "**Drink Daily for Healthy, Flexible Joints**," "**HELPS**

19  **KEEP CARTILAGE LUBRICATED AND FLEXIBLE**," and "For Healthy, Flexible Joints:"



Ex. 55 at 87 (emphasis in original).

B LOOD  H URST  &  O'  R EARDON , LLP

4

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

Joint Juice's extensive marketing campaign also reinforced the Joint Juice implied message of relieving joint pain and stiffness through common taglines such as: "Drink Daily for Healthy, Flexible Joints" and "a bottle a day keeps your joints in play," and "Keep your joints happy™." Ex. 55; Ex. 56 at 22, 25-28.

The ready-to-drink version is by far the biggest seller, but the advertising for all versions – Joint Juice On-The-Go Drink Mix, Joint Juice Easy Shot Supplement, Joint Juice Extra Strength Easy Shot package, and ready-to-drink Extra Strength - promote the same message. Ex. 55; *see also* Ex. 17 at 60001 (███████████████████████████████████████████████████" ██████████████████████████"). As the Court previously ruled, "[t]he record is quite clear: Joint Juice advertisements consistently made the same general health claims." ECF No. 134 at 8.

Premier's advertisements repeat and reinforce the joint health claims, touting that it even soothes Joe Montana's aged and battered joints. In nationwide television commercials, Joint Juice spokesman Joe Montana says:

> My joints have gotten a little stiff lately and at first I thought I had to live with it because of pro-football and just getting older. Then my doctor told me about Joint Juice. Now I drink it every morning and it's much easier to swallow than those big pills. Just a bottle each day lets me keep doing the things I love, no matter what I'm up to. See, the glucosamine and chondroitin lubricates and cushions the cartilage in my joints, so I can move more easily all day long. It was originally developed by an orthopedic surgeon for pro-athletes, but it works great for anyone who likes to keep moving. It just took a little while to start kicking in for me and that's when I started feeling really great! So join me for the Joint Juice challenge and get back to doing what you love. Start the Joint Juice challenge today . . . .

Ex. 57 (60-second commercial); *see also* Ex. 58 (30-second). Premier's radio ads repeat the same message. Ex. 53 at e.g., 202 ("████████████████████████████████████████████ ██████████") and 204 ("████████████████████████████████████████████ ██████████").

When searching for a celebrity endorser, Premier prioritized "████████████████████ ██████████████████" and "██████████████████████████████████████████." Ex. 19 at 22799. Defendant reported the "██████████████████████████████████████████." Ex. 20 at 5.

BLOOD HURST & O' REARDON, LLP

00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

Throughout its print and Internet ads, including coupons, Premier reiterates the joint benefit promise. Ex. 56. For example, one print ad states "Dean Karnazes' joints are happy to run forever. Learn how you can keep on running at jointjuice.com/healthyjoints. Keep your joints happy." *Id.* at 22; *id.* at 44 (coupon: "[Joint Juice] lubricates and cushions your joints"); *id.* at 26 ("Joint Juice knees are happy to take stairs."). Premier's Joint Juice website also repeats the joint health message. Exs. 59-61.

Joint Juice packaging prominently features the Arthritis Foundation logo and its website address because Premier knows the logo attracts purchasers who suffer from arthritis and joint pain. Ex. 10 at 131443; Ex. 89 at 4. To target this key demographic, all labels "prominently carry the endorsement of the Arthritis Foundation"



Ex. 55. Each label states "Joint Juice is proud to support the Arthritis Foundation's efforts to help people take control of arthritis" or Premier "will donate a portion of the proceeds to the Arthritis Foundation … to help people take control of arthritis." *See id.* The labels "carry the endorsement of the Arthritis Foundation … for those who have issues with joints." Ex. 10 at 131443; *see also* Ex. 89 at 4; Ex. 21 at 10 (Joint Juice advertising ████████████████").

As Premier intends, the advertising conveys the implied message that Joint Juice helps treat or prevent joint pain and the other signs and symptoms of joint disease, which is primarily osteoarthritis. The evidence on this implied message is abundant. ECF No 134 at 8. In addition to evidence cited above, Premier itself states that Joint Juice is "████████████████████████ ████████." Ex. 22 at 264274. It knows that "████████████████████████████ ████████████." Ex. 10 at 131442.

BLOOD HURST & O' REARDON, LLP

All Related Actions

00154649

1    To make sure its intended message gets to its target audience, Premier strategically chooses

2    ██████ ███████ ██████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████." Ex. 23; *see also* Ex. 24.

4    Likewise, Premier overtly advertises Joint Juice on websites that explicitly concern ████

5    █████████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████." Ex. 25 at

7    133420. It advertises Joint Juice on a "████████████████████████████████████████████

8    ████████████████████████████████████████████████") *id.* at 133422;

9    *see also* Ex. 26 at 83768 (Joint Juice advertisement on ██████████████████).

10   Leaving no stone unturned, Joint Juice is also advertised in AARP's *The Magazine* and the

11   Arthritis Foundation's *Arthritis Today*. Ex. 27 at 267-68. Premier makes sure Joint Juice is

12   advertised and associated ████████████████████████████████████████████████████████

13   ████████████████████████████████████. Ex. 16 at 19, 23-25; Ex. 14 at 27186; Ex. 16

14   at 19 ("████████████████████████████████") (emphasis original); Ex. 16

15   at 23-24, 29. Premier partners with the Arthritis Foundation to ████████████████████████

16   ██████████████████████████." Ex. 28 at 20826.

17   Premier also uses doctor testimonials to add credibility to its message that Joint Juice treats

18   arthritis and arthritis-like symptoms. The testimonials primarily come from Premier's founder, Dr.

19   Kevin Stone. Ex. 55 (packaging and labeling states: "Originally developed for pro athletes by

20   orthopedic surgeon Kevin R. Stone, M.D."); Ex. 19 at 22799 (a "████████████████████████

21   ██████████████████"). As Premier explains in internal marketing documents:

22   ████████████████████████████████████████████████

23   ███████ ██ ██ █████ ██ ████ ██ █████ ████ ████████

24   ████████████████████████████████████████████████

25   ██████████████████████████████████████████.

26   Ex. 29 at 71437.

27   ─────────────────

28   [3]    Google AdWords is an online advertising service that enables advertisers to bid on specific keywords that trigger their ads when these keywords are searched.

BLOOD HURST & O' REARDON, LLP

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

1    Not missing a trick, Premier positions Joint Juice on store shelves in the same location as

2    other over-the-counter medicines. Ex. 10 at 131443; Ex. 89 at 4. It does this because the

3    ██████████████████████████████████████████████████████. Ex. 30 at 7 ("██████████

4    ██████████████████████████████████████████████████"). According to Premier,

5    "[t]his OTC location reinforces its market appeal as a method for comfortably delivering

6    glucosamine to the body, not a soft drink or fruit drink." Ex. 10 at 131443; Ex. 89 at 4; *see also* Ex.

7    31 at 133531 (targeting consumers "██████████████████████████████").

8    The Joint Juice advertisements were intentionally designed to convey ██████████

9    ██████████████████████████████████. Ex. 32 at 27204 (██████████████

10   ███████████████████████████████████████████"); Ex. 14 at

11   27185-86 ("██████████████████████████████████████████████

12   ██████████████████████████████.").

### 2. Premier's Marketing Campaign Successfully Conveyed the Intended Message

15   From before the start of and throughout its nationwide advertising campaign, Premier

16   conducted extensive market research to ensure its intended advertising message was successfully

17   communicated to consumers. Premier commissioned a range of marketing studies to assess

18   consumer perceptions about Joint Juice and how effectively consumers receive the advertised joint

19   health messages. Ex. 8 at 31820 (██████████████████████████████████").

20   As the Court previously found in *Mullins*, Premier knows "that consumers consistently buy

21   and use Joint Juice because they have joint pain, raising the reasonable inference that consumers

22   believe the product would provide a remedy for such afflictions." *Mullins*, 178 F. Supp. 3d at 876.

23   Premier also purposely chose to place glucosamine in Joint Juice and on the packaging because

24   consumer's associate it as a "remedy for joint discomfort and arthritis." *Id*. at 878. Even its study of

25   consumer usage found that most users purchase glucosamine products because they "suffered

26   arthritis and joint pain [or] stiffness." *Id*. at 891; *see also id.* (survey of Joint Juice purchasers found

27   95% experience joint pain).

28

BLOOD HURST & O' REARDON, LLP

8                                                                                                 All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O' REARDON, LLP

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

00154649

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16 Ex. 10 at 131442; Ex. 37 at 276215 (

17

18

19

20          At the summary judgment stage in *Mullins*, this Court answered the question "Why do

21 people buy Joint Juice?" 178 F. Supp. 3d at 879-80. The answer was clear – consumers purchase

22 Joint Juice because they have joint pain. *Id.* at 876 ("Marketing research shows that consumers

23 consistently buy and use Joint Juice because they have joint pain"), *id.* at 880 ("Premier's internal

24 customer data further confirm that a significant majority of Joint Juice users purchase the product

25 because they have joint pain."), *id.* at 891 ("Premier cannot run from the fact that it sells *Joint*

26 *Juice*.") (emphasis in original), *id.* at 892 (Plaintiff has "presented sufficient circumstantial evidence

27 that consumers understood and acted upon the implied [joint pain] claims."); *see also* ECF No. 134

28 at 8 ("Premier's own marketing research provides further circumstantial evidence that a substantial

BLOOD HURST & O' REARDON, LLP

All Related Actions

00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

majority (over 90%) of Joint Juice users believed the product would relieve their joint pain and stiffness.").

**C.      Premier's Marketing Campaign Resulted in Large Sales**

Since 2009, Premier has spent ███████████████████████████. Ex. 38 at 241:14-24. █████████████████████████████████████████████████████████████████

████████████████████████. Ex. 39 at 30033; Ex. 40 at 31101. ███████████████

███████████████████████████████████████████████████████████████████████████

████    Ex. 41. For the nine states at issue, Premier sold nearly ███████ in net sales of Joint Juice. *See* Ex. 42. ███████████████████    Joint Juice ready-to-drink variety, which retail for ███████ for each 30-count package. Ex. 43 at 788; Ex. 4 at 14 (██████████████████████████).

**D.      Whether Joint Juice Advertising Message Is Deceptive Presents a Classwide Question**

The question of whether Joint Juice provides the advertised joint health benefits is a question of science that can be answered at a class trial using expert testimony, the guidelines from professional medical societies for treatment of joint pain and arthritis symptoms and the extensive body of clinical and other research conducted on glucosamine and chondroitin. *See* Declaration of Timothy McAlindon ("McAlindon Decl."), ¶ 213.

Premier agrees that the central issue in this case – whether Joint Juice provides the promised joint health benefits – can be determined on a classwide basis by using scientific studies, including studies involving people with osteoarthritis. Ex. 62 at Nos. 1-2; Ex. 44 at 61899-900. Some of Plaintiffs' evidence on this common question is briefly summarized below.

**1.      The Well-Conducted Clinical Studies and Meta-Analyses Disprove the Joint Juice Claims**

For the scientific community, the question has been answered. Oral consumption of glucosamine and chondroitin provides no clinical benefit. Over and again, the well-conducted studies find glucosamine, chondroitin or a combination of both do nothing for people ***with or without*** arthritis: Clegg (2006) (GAIT I); Messier (2007); Rozendaal (2008); Sawitzke (2008) (GAIT II); Sawitzke (2010) (GAIT III); Wilkens (2010); Fransen (2014); Kwoh (2014); Yang

BLOOD HURST & O' REARDON, LLP

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

00154649

1  (2015); Lugo (2016); Runhaar (2015); de Vos (2017); and Roman-Blas (2017). Exs. 63-75; *see also*

2  McAlindon Decl., ¶¶ 77, 79, 94, 97, 105, 106-109, 113, 135, 149-50, 162, 164, 167-72.

3    Even more compelling, ten separate meta-analyses (the strongest scientific evidence) found

4  the same - glucosamine and chondroitin do not work. The meta-analyses include: Vlad (2007);

5  Towheed (2009); Wandel (2010); and Runhaar (2017). Exs. 76-79; McAlindon Decl., ¶¶ 113-118,

6  121.

7    Briefly, and beginning with the clinical studies on persons with osteoarthritis, in the late

8  1990s, the National Institutes of Health ("NIH") funded a $12.5 million multicenter study known as

9  GAIT. GAIT was the first large-scale multicenter glucosamine clinical trial in the United States.

10  Three GAIT glucosamine/chondroitin clinical studies were conducted.

11    GAIT I is a randomized placebo-controlled study on 1,583 subjects. It found glucosamine

12  and chondroitin were no better than placebo in reducing joint pain or stiffness or in impacting

13  physical function. Ex. 63 at 795, Table 2; McAlindon Decl., ¶¶ 105, 149, 168. The GAIT II study

14  reported no difference in impacting joint structure between those receiving glucosamine and

15  chondroitin or placebo. Ex. 66 at 11195; McAlindon Decl., ¶¶ 105, 150, 170. GAIT III also

16  concluded glucosamine and chondroitin are no more effective in relieving joint pain or impacting

17  physical function than placebo. Ex. 67 at 2; McAlindon Decl., ¶ 105, 171. Premier knows the GAIT

18  trials ████████████████████████. It wrote: "█████████████████████████████████████

19  ██████████." Ex. 45 at 11.

20    Other randomized, placebo-controlled trials found the same. *See*, *e.g.*

21  • Roman-Blas (2017): six-month study found glucosamine and chondroitin
22  combination was inferior to placebo at reducing global pain, and no different than
   placebo for impacting joint pain, mobility, or global assessment. Ex. 75 at 77;
23  McAlindon Decl., ¶ 162;

24  • Yang (2015): 1,625 participant four-year study found glucosamine and chondroitin
   in combination has no effect on pain, stiffness, or decreased mobility or OA
25  progression. Ex. 71 at 714; McAlindon Decl., ¶ 79;

26  • Wilkens (2010), six-month study found "glucosamine is not associated with a
   significant difference in pain-related disability, low back and leg pain, health-related
27  quality of life, global perceived effect of treatment." Ex. 68 at 29-30; McAlindon
   Decl., ¶ 107;

28

All Related Actions

BLOOD HURST & O' REARDON, LLP

00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

- Rozendaal (2008), two-year study found no difference between glucosamine or placebo for any outcomes, including joint pain, function and stiffness. Ex. 65 at 7350; McAlindon Decl., ¶ 106.

In fact, no well-conducted clinical study has ever found that the type of glucosamine found in Joint Juice (glucosamine hydrochloride) does anything at all. McAlindon Decl., ¶¶ 110-11.

And then there are the meta-analyses. Meta-analyses are at the top of the hierarchy of scientific evidence. They are the strongest scientific evidence because meta-analysis are systematic reviews of data accumulated from individual clinical trials. The accumulation of data in meta-analyses increases the statistical power to detect effects of the tested element. Federal Judicial Center, National Research Council, *Reference Manual on Scientific Evidence,* Third Edition (2011) at 723-25.[4]

Vlad (2007) is a meta-analysis that reviewed the accumulated data from 15 well-conducted studies. Ex. 76 at 2267. Vlad's meta-analysis found "[g]lucosamine hydrochloride is not effective" and "glucosamine hydrochloride lacks efficacy for pain in [osteoarthritis]"). *Id.* at 2267 and 2275. Vlad also was able to identify why some studies, such as those relied on by Premier, found a statistically significant difference between glucosamine and placebo – it was because they were industry funded or conducted. *Id.* at 2274 ("markers of industry involvement appear to be the most potent predictors of trial results."); McAlindon Decl., ¶ 113.

Three subsequent meta-analysis came to the same conclusion. Towheed (2009), a prestigious Cochrane Collaboration publication, reviewed 25 clinical studies and found no benefits from glucosamine. "The high quality studies showed that pain improved about the same whether people took glucosamine or fake pills." Ex. 77 at 23-24; McAlindon Decl., ¶ 113. Wandel (2010) analyzed accumulated data from ten clinical trials involving 3,803 subjects. The study found "glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." Ex. 78 at 87987; McAlindon Decl., ¶ 121. Similarly,

---

[4]     Federal Judicial Center, National Research Council, *Reference Manual on Scientific Evidence,* Third Edition (2011).

All Related Actions

BLOOD HURST & O' REARDON, LLP

00154649

Runhaar (2017) concluded that "[g]lucosamine was no better than placebo for pain or function at short (3 months) and long-term (24 months) follow-up." Ex. 79 at 1; McAlindon Decl., ¶ 114-17.

Glucosamine and chondroitin work no better on healthy joints. Clinical studies, including on persons without diagnosed arthritis, confirm glucosamine is ineffective at providing joint health benefits to healthy joints.[5] There are at least three clinical studies on the ability of glucosamine to provide comfort and increased mobility and flexibility as Joint Juice advertises. Each found glucosamine does nothing.

- de Vos (2017), a six to seven-year study on people without arthritis found glucosamine had "no preventative effect" on the incidence of osteoarthritis, joint pain or quality of life. Ex. 74 at 1, 4; McAlindon Decl., ¶ 77;

- Runhaar (2015), a two and one-half year randomized controlled test found glucosamine had no effect on knee pain, mobility, overall quality of life or the incidence of knee arthritis. Ex. 73 at 1; McAlindon Decl., ¶ 94; and

- Kwoh (2014), a randomized controlled clinical study on 201 individuals with and without arthritis found no effects on joint pain, mobility or joint space width. Ex. 70 at 930. Researchers "did not find any evidence that glucosamine is more effective than placebo in improving joint health[.]"). *Id.* at 935; McAlindon Decl., ¶ 108.

Premier knows that its glucosamine ███████████████████████ ████████████████████████████████████:

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
█████████

BLOOD HURST & O' REARDON, LLP

---

[5]    The parties agree OA studies are also relevant evidence on glucosamine/chondroitin's ability to provide joint health benefits in either "healthy" or diseased joints. Premier itself relies on OA studies as substantiation for all its advertising claims. Ex. 44 at 61899-900 (████████████████████); Ex. 62 at Nos. 1-2 (citing to numerous OA studies). *See also Mullins*, 178 F. Supp. 3d at 895; *Seegert v. Rexall Sundown, Inc.,* No. 3:17-cv-1243-JAH-JLB, 2018 U.S. Dist. LEXIS 99581, at *16 (S.D. Cal. June 13, 2018).

All Related Actions
00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

1    Ex. 46 at 34046; *see also* Ex. 47 at 42164 ("███████████████████████

2    ███████████████████████████████████████████████████████████████

3    ██████████████████").

4         Plaintiffs' expert, Dr. Timothy McAlindon, DM, MPH, a rheumatologist at Tufts Medical

5    Center and one of the foremost arthritis researchers explains why glucosamine/chondroitin has no

6    effect on healthy joints. A healthy joint does not need exogenous glucosamine or chondroitin

7    because it maintains its structure and function from the body's abundant sources of glucose and

8    proteoglycan synthesis. Further, given how cartilage molecules are made, neither glucosamine nor

9    chondroitin has any direct role in the synthesis or repair of cartilage molecules in the amounts that

10   would be available to joint tissues following oral ingestion. McAlindon Decl., ¶¶ 24-25; *see also*

11   *id.,* ¶¶ 14-23. Based on Dr. McAlindon's extensive research on the efficacy of glucosamine and

12   chondroitin and his extensive review of the scientific evidence, whether for healthy or damaged

13   joints, Dr. McAlindon concludes: "the joint health benefit advertising claims for Joint Juice are not

14   true." *Id.*, ¶ 213.

15        **2.**       **The Evidenced-Based Professional Guidelines Reject the Joint Juice**

16                **Claims**

17        In line with the scientific studies and meta-analysis, professional medical societies

18   recommend against using glucosamine or chondroitin, separately or in combination, because they

19   do not work. In 2008 and again in 2013, the American Academy of Orthopaedic Surgeons

20   ("AAOS") made a "strong" recommendation that neither glucosamine nor chondroitin be used for

21   patients with symptomatic osteoarthritis of the knee. Ex. 80 (2013 AAOS) at 6-7; McAlindon Decl.,

22   ¶¶ 49. "Twenty-one studies were included as evidence for this recommendation." Ex. 80 (2013

23   AAOS) at 6-7; *see also* Ex. 81 (2008 AAOS) at 102; McAlindon Decl., ¶¶ 49.

24        The American College of Rheumatology ("ACR"), the American Academy of Family

25   Physicians ("AAFP"), the American Board of Internal Medicine Foundation ("ABIM"), the Royal

26   Australian College of General Practitioners ("RACGP"), and the United Kingdom National Institute

27   for Health and Care Excellence ("NICE") each published clinical guidelines for the treatment of

28   osteoarthritis based on a thorough and critical review and analysis of published clinical research,

BLOOD HURST & O' REARDON, LLP

including that for glucosamine and chondroitin. All these professional groups recommend against using glucosamine and/or chondroitin for treating the pain and inflammation of osteoarthritis. Ex. 82 (ACR) at 470-72; Ex. 83 (AAFP) at 526 ("glucosamine with or without chondroitin does not appear to be effective in well-designed trials."); Ex. 84 (ABIM Foundation) at 1 ("Don't use glucosamine and chondroitin to treat patients"); Ex. 85 (RACGP) at 3 (glucosamine and chondroitin "should not be offered"); Ex. 86 (NICE) at 14. Similarly, the National Health Service in England (2017) ("NHS England") "recommends that the Secretary of State formally consider blacklisting" glucosamine and chondroitin, and the Department of Veterans Affairs, U.S. Department of Defense (2014) ("VA/DoD") recommends that "clinicians should not prescribe chondroitin sulfate, glucosamine, and/or any combination of the two, to treat joint pain or improve function." Ex. 87 at (NHS England) at 2; Ex. 88 (VA/DoD) at 5; *see also* McAlindon Decl., ¶¶ 49, 126.

## III.    THE CLAIMS PLAINTIFFS SEEK TO CERTIFY

### A.    The Consumer Protection Causes of Action

Each Plaintiff seeks certification of the consumer protection statute applicable to his or her state. These statutes are substantially the same as each other and as to the California causes of action this Court certified in *Mullins* – the UCL and CLRA. For the Court's convenience, a chart listing the consumer protection statutes, their key elements and authority for each is provided as Ex. 54.

Like the UCL and CLRA, each of the consumer protection statutes at issue prohibits false or deceptive advertising. *Id.* Also, like California law, each of the consumer protection statutes either does not require reliance (like the UCL), or reliance/causation can be proven classwide if the misrepresentations are material (like the CLRA). *Id.* In granting class certification of the CLRA claim in *Mullins*, the Court found that a presumption of reliance applies. ECF No. 134 at 6.

Classes are readily certified under each of the consumer protection statutes for which Plaintiffs seek certification here. *Direct Dig.,* 795 F.3d 654 (Illinois, Florida, Massachusetts, Michigan, and New York); *Rikos*, 799 F.3d 497 (Florida and Illinois); *Fitzpatrick.*, 635 F.3d 1279 (Florida); *Suchanek*, 311 F.R.D. 239 (Illinois and New York); *Goldemberg*, 317 F.R.D. 374 (Florida and New York); *Gold*, 323 F.R.D. 280 (Florida, Illinois and Pennsylvania); *Allen v. Holiday Universal*, 249 F.R.D. 166, 193 (E.D. Pa. 2008) (Pennsylvania); *Tait*, 289 F.R.D. 466 (Illinois,

BLOOD HURST & O' REARDON, LLP

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

Maryland, and New York); *Donovan v. Philip Morris USA, Inc*., 268 F.R.D. 1, 4 (D. Mass. 2010) (Massachusetts); *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 313 F.R.D. 147 (D.N.M. 2016) (New Mexico); *Hasemann*, 2019 U.S. Dist. LEXIS 57311 (Florida and New York); *Clay,* 2018 U.S. Dist. LEXIS 153124 (Florida and Michigan); *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co*., 947 A.2d 320 (Conn. 2008) (Connecticut).

### B.    Other Causes of Action

In addition to certification of each state's consumer protection statutes, Plaintiff Ravinsky (Pennsylvania) seeks certification of a claim for breach of express warranty and Plaintiff Avery (Michigan) seeks certification of breach of implied warranty, violation of the Magnuson-Moss Warranty Act and unjust enrichment.

### 1.    Pennsylvania: Breach of Express Warranty

Breach of express warranty requires (1) defendant breached or failed to meet its warranty promise, (2) the breach was the proximate cause of the harm, and (3) there were ensuing damages. *Samuel-Bassett v. Kia Motors Am., Inc*., 34 A.3d 1, 35 (Pa. 2011). An express warranty is "some form of promise o[r] affirmative statement." *McPhee v. Depuy Orthopedics, Inc.*, 989 F. Supp. 2d 451, 466 (W.D. Pa. 2012).  "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 13 Pa. Cons. Stat. § 2313(a)(1). Likewise, "[a]ny description of the goods which is made a part of the bargain creates an express warranty that the goods shall conform to the description." *Id*. at § 2313(a)(2).

A promise is a basis of the bargain if plaintiff "read, heard, saw or knew of the advertisement containing the affirmation of fact or promise." *Incubadora Mexicana, SA De CV v. Zoetis, Inc*., 310 F.R.D. 166, 173 (E.D. Pa. 2015).[6] Here, that can be shown classwide because the contested representations are on the Joint Juice bottles and labels and were necessarily read, seen or known of by the purchaser Class members. Finally, the filing of the complaint constitutes notice to the seller

---

[6]    Here, as throughout, all citations and internal quotations are omitted unless otherwise noted.

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

BLOOD HURST & O' REARDON, LLP

00154649

that the goods were not in compliance with the promises. *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90, 93 (M.D. Pa. 1988).

Pennsylvania courts regularly certify breach of warranty claims. *See*, *e.g.*, *Samuel-Bassett*, 34 A.3d at 11 (supreme court affirmed certification of breach of express warranty class); *Barden v. Hurd Millwork Co.*, 249 F.R.D. 316, 322 (E.D. Wis. 2008) (granting certification of multi-state breach of express warranty class including Pennsylvania); *O'Keefe v. Mercedes-Benz U.S., LLC*, 214 F.R.D. 266, 270 (E.D. Pa. 2003) (certifying settlement class under Pennsylvania's breach of express warranty law); *Am/Pm Franchisee Ass'n v. Atl. Richfield Co.*, 25 Phila. 39, 53 (1992) (certifying breach of express warranty class); *Chapman v. Tristar Prods.*, No. 1:16-CV-1114, 2017 U.S. Dist. LEXIS 61767, at *30 (N.D. Ohio Apr. 24, 2017) (certifying express warranty class for Pennsylvania purchasers).

### 2. Michigan: The Breach of Implied Warranty of Merchantability and Violation of the Magnuson-Moss Warranty Act

As a matter of law in Michigan, Premier warrants that Joint Juice is fit for the ordinary purposes for which it is sold, namely to "conform to the promises or affirmations of fact made on the container or label if any." Mich. Comp. Laws § 440.2314(2)(f). If a good "fail[s] to provide the promised benefits," then there is a *per se* breach of an implied warranty of merchantability. *Mikos v. Chrysler Corp.*, 404 N.W.2d 783, 785 (Mich. Ct. App. 1987).

If Premier has breached the implied warranty of merchantability, then it has also violated the Magnuson-Moss Warranty Act ("MMWA"). *In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV TV Litig.*, 758 F. Supp. 2d 1077, 1101 (S.D. Cal. 2010) (the MMWA "provides a federal cause of action for state law express and implied warranty claims."); *see also McKee v. GM LLC*, 376 F. Supp. 3d 751, 760 (E.D. Mich. 2019) ("The MMWA lacks substantive requirements but provides a federal remedy for breach of warranties under state law."); 15 U.S.C. § 2310(d)(1)(A) (if a consumer is damaged by the failure of a seller to comply with an implied warranty she is entitled to damages and equitable relief under the MMWA).

MMWA and implied warranty claims are regularly certified. *Lackowski v. Twinlab Corp.*, No. 00-75058, 2001 U.S. Dist. LEXIS 25634, at *28-29 (E.D. Mich. Dec. 28, 2001) (certifying

BLOOD HURST & O' REARDON, LLP

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

Michigan implied warranty claim class); *Skelton v. Gen. Motors Corp.*, No. 79 C 1243, 1985 U.S. Dist. LEXIS 18649, at *1 (N.D. Ill. June 21, 1985) (certifying multi-state MMWA breach of implied warranty class including Michigan); *Tait*, 289 F.R.D. at 485 (granting certification of MMWA classes and noting "courts routinely certify implied warranty classes"); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 672 (C.D. Cal. 2014) (certifying MMWA class of purchasers of homeopathic products where packaging contained alleged misrepresentations).

### 3.    Michigan: Unjust Enrichment

Unjust enrichment, requires "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006). Unjust enrichment is appropriate when the defendant receives a financial benefit and plaintiff "cannot realize the represented benefits" of a falsely advertised product. *Yeldo v. MusclePharm Corp.*, 290 F. Supp. 3d 702, 712 (E.D. Mich. 2017). The "plaintiff does not need to specify that he ingested the product. Financial injury is sufficient." *Id.*

Unjust enrichment claims are particularly appropriate for class certification because "particular facts of the individual" plaintiff's case are irrelevant. *Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555, 570 (E.D. Mich. 2009); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 352 (E.D. Mich. 2001) (certifying Michigan class unjust enrichment claim).

## IV.    ARGUMENT

### A.    Definite and Ascertainable Classes Exists

The proposed Classes are ascertainable because the Classes are defined with the objective criteria of having purchased Joint Juice in a particular state during the class period. A virtually identical class definition was held to be definite and ascertainable by the Ninth Circuit. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). The Ninth Circuit further held that "ascertainability" does ***not*** require plaintiffs to identify individual class members for class certification and that such a made-up requirement is incompatible with Rule 23. *Id.* at 1123.

BLOOD HURST & O' REARDON, LLP

00154649

**B.      Plaintiffs Satisfy the Rule 23(a) Prerequisites**

**1.      Numerosity**

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. Between January 2009 and January 2013, more than ███████ units of Joint Juice were sold throughout the country. Ex. 43 at 787; Ex. 41 ($███████ in retail sales between ███ ███████). At Costco alone, class-period sales for each state range from ███████ ███ dollars. *See* Ex. 18. As the Court ruled in *Mullins*, "the total number of Joint Juice consumers is substantial, and thus the numerosity requirement is satisfied." ECF No. 134 at 4.

**2.      Commonality**

To satisfy Rule 23(a)'s commonality requirement the common issues "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id.* at 359. The key consideration in assessing commonality is not the number of common questions "but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (emphasis in original). "Commonality" is satisfied by "[t]he existence of shared legal issues with divergent factual predicates" or a "common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998).

The two common questions driving resolution of the litigation for all Class members are: (1) what message(s) does Premier's advertising convey? (2) Is that message(s) false or likely to deceive a reasonable consumer? In *Mullins*, the Court found these same two questions were central to resolution of the claims and could be resolved using common proof. ECF No. 134 at 4-6.

Here, as well, both questions will be answered with common evidence and generate classwide answers. First, the message or messages conveyed is determined using an objective standard and will be answered based on common classwide evidence, as this Court previously found. ECF No. 134 at 8 ("[w]hether an ordinary consumer reasonably believes Premier advertises Joint Juice as a way to improve joint health is amenable to common proof"); *see also Hadley v. Kellogg*

B LOOD H URST & O' R EARDON, LLP

All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

BLOOD HURST & O' REARDON, LLP

1 | *Sales Co.*, 243 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017) (whether advertising implies treatment of

2 | disease is a factual question that depends on "objective sources"); *POM Wonderful, LLC v. FTC*,

3 | 777 F.3d 478, 490 (D.C. Cir. 2015) (message convey by advertising determined using objective

4 | standard and whether "at least a significant minority of reasonable consumers" would interpret the

5 | ad to convey the message). The classwide evidence will include marketing and consumer surveys,

6 | Premier's internal marketing strategies and goals, and consumers actual use of Joint Juice. The

7 | message conveyed by Joint Juice's advertising when determined for one reasonable consumer will

8 | be determined for all.

9 | Second, the truth or falsity of the advertising is a common question to be proven with

10 | classwide scientific studies and expert testimony. Plaintiffs are ready with expert testimony and

11 | scientific studies proving that Joint Juice does not provided the promised benefits. Premier no doubt

12 | will attempt to rebut Plaintiffs' evidence with their own evidence that Joint Juice works. But the

13 | point for this motion is whether Plaintiffs prevail or Premier, this common question when answered

14 | for one Class member will be answered for all.[7]

15 | The commonality requirement is met.

16 | **3.   Typicality**

17 | Rule 23(a)(3) requires that the class representatives show the "claims or defenses of the

18 | representative parties are typical of the claims or defenses of the class." *Id.* Class members' claims

19 | are typical if their claims "arise[] from the same course of events, and each class member makes

---

[7]   *See also Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 693 (S.D. Fla. 2010) (common questions included "whether Defendant's representations about Enfamil® LIPIL® were true"); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 531 (E.D.N.Y. 2017) (the "proposed classes present common questions seeking common answers" such as "[w]hat do defendants' 'flushable' representations mean to a reasonable consumer?"); *Rikos*, 799 F.3d at 506 (commonality satisfied because "If Align does not provide any such [advertised] benefits, then every class member was injured in the sense that he or she spent money on a product that does not work as advertised."); *Fitzpatrick*, 263 F.R.D. at 697 ("The evidence necessary to resolve this question [whether the product works as advertised] is the same for each plaintiff and therefore common to the class."); *Goldemberg*, 317 F.R.D. at 399 (common questions include "what does the marketing combination mean to a reasonable consumer?").

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

00154649

similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

Class members' claim arise from the same course of events – the alleged false advertising of Joint Juice – and each Class member makes the same legal arguments to prove Premier's liability. Typicality is met as the Court found in *Mullins*. ECF No. 134 at 6-7.

### 4.    Adequacy of Representation

For adequacy, the issue is whether "the named plaintiffs and their counsel have any conflicts of interest with other class members," and whether "the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. The interests of Plaintiffs and the Classes they seek to represent are fully aligned in determining whether Premier's advertising of Joint Juice is false or likely to deceive. There are no conflicts of interest between any Plaintiff and any Class member. In addition, the Plaintiffs have fulfilled their obligations to the Class to date and are able and eager to continue working on behalf of absent Class members. Exs. 90-98; Ex. 99 at 36:10-23, 37:6-11, 37:18-21, 37:25-38:4, 38:7-10, 38:16-20, 39:1-21, 39:24-25, 43:1-2, 43:10-14, 43:18-44:4, 44:8-13, 44:21-22, 45:9, 45:12-21; Ex. 100 at 9:3-5, 9:12-16, 9:21-23, 76:25-77:2, 77:6-9, 77:20-25, 78:2, 78:16-18, 80:18-20, 81:4-6, 81:10-16, 81:24-82:3, 82:8-15, 82:21-83:3, 83:11-14, 84:5-6, 84:9-24; Blood Decl., ¶ 8.

Plaintiffs also retained counsel with significant experience prosecuting large consumer fraud class actions who should be appointed Class counsel, as they were in *Mullins*. The Court has first-hand experience regarding the ability and tenacity of Blood Hurst & O'Reardon, LLP to pursue as the Class claims and they are prepared to continue this work. Blood Decl., ¶¶ 2-4, 7, 10.

### C.    23(b)(3) Is Satisfied

### 1.    Common Issues Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud …." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on

1    an individual basis." *Hanlon*, 150 F.3d at 1022. The requirement demands only predominance of

2    common questions, not exclusivity or unanimity of them. Fed. R. Civ. P. 23(b)(3).

3        Here, the common questions of whether the Joint Juice advertising message or messages are

4    false or deceptive predominates over any individual issues. *Johns v. Bayer Corp.*, 280 F.R.D. 551,

5    558 (S.D. Cal. 2012) ("when plaintiffs are exposed to a common advertising campaign, common

6    issues predominate."). Similarly, the question whether the Classes are entitled to restitution and

7    damages also predominates. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985-86 (9th

8    Cir. 2015), *cert. denied*, 195 L. Ed. 2d 780 (2016); *see also Rikos*, 799 F.3d at 523-24.

9                    **a.    Determination of Reliance/Causation Does Not Undermine**
10                           **Predominance**

11       Reliance is not an element for most all of the causes of action Plaintiffs seek to certify and

12   causation requires only the purchase of the deceptively advertised product. Ex. 54. Only the

13   Maryland consumer protection statute requires reliance to establish proximate cause. And even then,

14   reliance is presumed if the misrepresentations are material. *Id.; see also Bank of Am., N.A. v. Jill P.*

15   *Mitchell Living Tr.*, 822 F. Supp. 2d 505, 535 (D. Md. 2011) (reliance is satisfied by showing a

16   reasonable consumer would have acted differently); *Tait*, 289 F.R.D. at 484 (certifying Maryland

17   consumer protection claim; reliance presumed where representation was material). *See also* ECF

18   No. 134 at 10 (materiality is a common question resolved using the objective reasonable person

19   standard).

20                    **b.    Relief Can Be Determined on a Classwide Basis**

21       The Ninth Circuit has held time and again: "Damages may well vary, and may require

22   individualized calculations. But 'the rule is clear: the need for individual damages calculations does

23   not, alone, defeat class certification.'" *Senne v. Kansas City Royals Baseball*, __ F.3d __, No. 17-

24   16245, 2019 U.S. App. LEXIS 24459, at *54-55 (9th Cir. Aug. 16, 2019) (quoting *Vaquero v. Ashley*

25   *Furniture Indus., Inc*., 824 F.3d 1150, 1155 (9th Cir. 2016)); *Stearns v. Tickemaster Corp.*, 655 F.3d

26   1013, 1026 (9th Cir. 2011) ("[T]he mere fact that there might be differences in damage calculations

27   is not sufficient to defeat class certification.").

28

1    Rule 23(b) requires only that Plaintiffs show that "damages are capable of measurement on

2    a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). If Joint Juice does not

3    provide the promised joint health benefits, then purchasers did not receive what they thought they

4    were buying – a product that provides joint health benefits.

5    As the Court previously ruled: "Because Sonner has provided a model of damages that traces

6    the harm (the full amount of the purchase) to Premier's allegedly improper conduct (claiming that

7    Joint Juice will benefit joints), she has satisfied *Comcast's* requirement." ECF No. 134 at 12; *see*

8    *also Lambert v. Nutraceutical Corp*., 870 F.3d 1170, 1174 (9th Cir. 2017), *rev'd on other grounds*,

9    139 S. Ct. 710 (2019) (holding full refund model meets Rule 23(b)(3)'s predominate requirement);

10   *Rikos*, 799 F.3d at 523 ("Plaintiffs' damages model – a full refund of the purchase price for each

11   class member – satisfies *Comcast*"); *Mullins v. Direct Dig., LLC*, No. 13 CV 1829, 2014 U.S. Dist.

12   LEXIS 155018, at *8-9 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015) ("Plaintiff's

13   theory of damages – a full refund and statutory consumer fraud fines – matches his theory of

14   liability – Instaflex does not perform as advertised."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397,

15   412 (S.D.N.Y. 2015) (full refund "model matches plaintiffs' first theory of liability – that EZ Seed

16   does not grow grass, and is thus valueless"); *Yamagata*, 2019 U.S. Dist. LEXIS 117599, at *4-5

17   (full refund model appropriate in glucosamine/chondroitin false advertising case); *Schwabe*, 2019

18   U.S. Dist. LEXIS 117623, at *20 (same). This amount can be determined in the aggregate from

19   Premier's records, cross-checked by retailer records, and a jury can render a judgment in the

20   aggregate amounts for each Class. Ex. 41.[8]

21   ### 2.   A Class Action Is Superior to Other Methods of Adjudication

22   Rule 23(b)(3) sets forth the relevant factors for determining whether "a class action is

23   superior to other available methods for the fair and efficient adjudication of the controversy." *Zinser*

24   *v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). "[C]onsideration of these

---

[8]   Plaintiffs can obtain transaction and customer contact data from the large retailers that sell approximately ███ of all Joint Juice nationwide (Walmart, Sam's Club and Costco). Exs. 48-49 (Costco, Walmart and Sam's ████████████████████████); *see also* Ex. 50 (Walgreens); Ex. 51 (Kroger); Ex. 52 (Target, Albertsons and Supervalu).

1   factors requires the court to focus on the efficiency and economy elements of the class action so that

2   cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a

3   representative basis." *Id*. at 1190.

4       The "superiority" factors weigh heavily in favor of class certification because liability will

5   turn on whether the Joint Juice message is false or misleading. Establishing this for one Class

6   member is the same as for any other. Thus, judicial efficiency weighs in favor of a class action.

7   Likewise, it is not economically feasible for Class members to pursue claims individually given the

8   amount in controversy of about $5-$20 per unit, when compared to the expense of establishing these

9   claims. *Hanlon*, 150 F.3d at 1023. As the Court found in *Mullins*, these cases "are paradigmatic

10  examples of those well-suited for classwide prosecution." ECF No. 134 at 14-15.

11  **V.    CONCLUSION**

12      For each of the foregoing reasons, Plaintiffs' motion for class certification should be granted,

13  Plaintiffs should be appointed the representatives of the respective Classes, and Timothy G. Blood

14  should be appointed class counsel.

15                                              Respectfully Submitted,

16  Dated: August 29, 2019                       BLOOD HURST & O'REARDON, LLP
                                                 TIMOTHY G. BLOOD (149343)
17                                               THOMAS J. O'REARDON II (247952)

18
                                                 By:        *s/ Timothy G. Blood*
19                                                       TIMOTHY G. BLOOD

20                                               501 West Broadway, Suite 1490
                                                 San Diego, CA  92101
21                                               Tel: 619/338-1100
                                                 619/338-1101 (fax)
22                                               tblood@bholaw.com
                                                 toreardon@bholaw.com
23                                               ALTAIR LAW
                                                 CRAIG M. PETERS (1840180)
24                                               465 California Street, 5th Floor
                                                 San Francisco, CA  94104-3313
25                                               Tel: 415/988-9828
                                                 cpeters@altairlaw.us
26
                                                 CARLSON LYNCH LLP
27                                               TODD D. CARPENTER (234464)
                                                 1350 Columbia Street, Suite 603
28                                               San Diego, CA  92101

BLOOD HURST & O' REARDON, LLP

1

Tel: 619/762-1910
619/756-6991 (fax)
tcarpenter@carlsonlynch.com

2

3

*Attorneys for Plaintiffs*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

All Related Actions

00154649

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION

1

### CERTIFICATE OF SERVICE

2

   I hereby certify that on August 29, 2019, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the

5

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6

indicated on the Electronic Mail Notice List.

7

   I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on August 29, 2019.

9

10

                                                      *s/  Timothy G. Blood*
                                                      TIMOTHY G. BLOOD

11

                                              BLOOD HURST & O'REARDON, LLP

12

                                              501 West Broadway, Suite 1490
                                              San Diego, CA  92101

13

                                              Tel: 619/338-1100
                                              619/338-1101 (fax)

14

                                              tblood@bholaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

27                                                      All Related Actions

MEMORANDUM IN SUPPORT OF OMNIBUS MOTION FOR CLASS CERTIFICATION