BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com

Attorneys for Plaintiff

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ERIC FISHON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:16-cv-06980<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>Judge:       Honorable Richard Seeborg<br>Courtroom:   Courtroom 3, 17th Floor<br><br>Complaint Filed:   December 5, 2016<br>Trial Date:        None<br><br>**JURY TRIAL DEMANDED** |

BLOOD HURST & O'REARDON, LLP

00176564

Plaintiff Eric Fishon alleges causes of action against Defendant Premier Nutrition Corporation f/k/a Joint Juice, Inc. ("Joint Juice" or "Defendant"), on behalf of himself and all others similarly situated, and complains and alleges upon personal knowledge as to his acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.[1]

**NATURE OF THE ACTION**

1.      This is a consumer protection class action brought pursuant to Fed. R. Civ. Proc. 23 arising out of Defendant's false advertising its "Joint Juice" Products. Defendant claims Joint Juice provides significant health benefits for the joints of all consumers who drink its Products. These claimed health benefits are the only reason a consumer would purchase Joint Juice. Defendant's advertising claims, however, are false, misleading, and reasonably likely to deceive the public.

2.      Defendant markets, sells, and distributes Joint Juice, a line of joint health dietary supplements.[2] Through an extensive, integrated, and widespread nationwide marketing campaign, Defendant promises that Joint Juice will support and nourish cartilage, lubricate joints, and improve joint comfort. Defendant asserts that the ingredient glucosamine hydrochloride will provide these significant health benefits.

3.      The same promise is made on all of the subject Joint Juice Products and throughout the Joint Juice marketing materials. For example, the Joint Juice six-bottle packaging prominently states that the Product "helps keep cartilage lubricated and flexible," and that consumers should "drink daily for healthy, flexible joints."

4.      Throughout its advertising and marketing, Defendant communicated the same substantive message on all of the Products' packaging and labeling: that the Products will improve the health of joints and relieve joint pain. As a result, the joint health benefit message

---

[1]      This First Amended Class Action Complaint is filed with the written consent of Defendant pursuant to Fed. R. Civ. P. 15(a)(2).

[2]      The Joint Juice line consists of: (1) Joint Juice ready-to-drink supplement drink; (2) Joint Juice On-The-Go Drink Mix; and (3) Joint Juice Easy Shot Supplement (collectively, "Joint Juice" or the "Products"). Plaintiff reserves the right to include other Products as a result of discovery.

BLOOD HURST & O' REARDON, LLP

00176564

on the packaging of Defendant's Products will be collectively referred to as Defendant's "joint health benefit representations."

5.     Defendant's advertising and marketing campaign is designed to induce consumers to purchase Joint Juice because of their reliance upon the accuracy of the deceptive health benefits message. As a result of its extensive marketing campaign (in 2009, Defendant spent a reported $3.5 million advertising Joint Juice), since 2009 Defendant has sold over $156 million dollars of the Joint Juice Products.

6.     Defendant, however, has sold products that do not perform as advertised. As a result of the misleading messages conveyed by its marketing campaign, Defendant has caused consumers to purchase products that do not perform as advertised.

7.     Plaintiff brings this action individually and on behalf of all other similarly situated consumers to halt Defendant's dissemination of this false and misleading advertising message, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased Joint Juice.

## JURISDICTION AND VENUE

8.     The Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and is a class action in which there are in excess of 100 class members, and some of the members of the Class are citizens of a state different from Defendant.

9.     This Court has personal jurisdiction over Defendant because Defendant is authorized to and does conduct business in California. Defendant has marketed, promoted, distributed, and sold Joint Juice in California, and Defendant's primary place of business is in California, rendering exercise of jurisdiction by California courts permissible.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District and is a resident of this District.

BLOOD HURST & O' REARDON, LLP

11.     Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c)-(d), and 3-5(b), this action arises in San Francisco County and Defendant is headquartered in Alameda County, and it is therefore appropriate to assign this action to the San Francisco Division.

## PARTIES

### Plaintiff

12.     Eric Fishon is a citizen of the State of New York. At all times relevant to this action, he resided in Hauppauge, New York. Beginning in 2013, Plaintiff Fishon was exposed to and saw Defendant's representations by reading the label of Joint Juice Products at a Walmart store located in Centereach, New York. Plaintiff Fishon also saw Joint Juice Products advertised on television. In reliance on the joint health benefit representations Plaintiff purchased Joint Juice from Walmart in Centereach, New York on numerous occasions beginning in 2013 up to approximately 2014. By purchasing the falsely advertised Product, Plaintiff suffered injury-in-fact and lost money.

13.     The Product does not provide the promised benefits. Had Plaintiff Fishon known the truth about Defendant's misrepresentations and omissions at the time of his purchase, Plaintiff would not have purchased the Product.

### Defendant

14.     Premier Nutrition Corporation ("Premier") f/k/a Joint Juice, Inc. is a corporation organized and existing under the laws of the state of Delaware. Premier's current headquarters is at 5905 Christie Avenue, Emeryville, California, 94608. Prior to Emeryville, Premier was headquartered at 188 Spear Street, Suite 600, San Francisco, California 94105. As of August 2013, Premier became a wholly-owned subsidiary of Post Holdings, Inc. Premier is a manufacturer of high-protein nutrition products, including ready-to-drink shakes, bars, powders, and cookies. Premier's primary brands are Premier Protein and Joint Juice. Premier manufactures, advertises, markets, distributes, and/or sells the Joint Juice Products to tens of thousands of consumers in California and throughout the United States. The conduct at issue substantially emanates from California. From its headquarters and offices in California, Defendant creates the false and deceptive advertising campaign at issue, and promotes,

FIRST AMENDED CLASS ACTION COMPLAINT – FISHON

markets, distributes, and sells the Products to many thousands of consumers throughout the United States, including through its retail website. Defendant's CEO, President, Chief Financial Officer, Chief Operating Officer, marketing employees, research and development, and customer service personnel have also been located in California. Defendant's retail distribution vendor has been located in California, and its outside advertising agency was located in San Francisco.

15.     Joint Juice, Inc. n/k/a Premier Nutrition Corporation was a San Francisco-based corporation organized and existing under the laws of the state of California. Joint Juice, Inc. was headquartered at 120 Howard Street, Suite 600, San Francisco, California 94105. Joint Juice, Inc. was a leading provider of ready-to-drink glucosamine supplements. Up until its acquisition by Premier in October 2011, and from its headquarters and offices in California, Joint Juice, Inc. manufactured, advertised, marketed, distributed, and/or sold the Joint Juice Products to tens of thousands of consumers in New York, California, and throughout the United States. On October 12, 2011, Joint Juice, Inc. announced the acquisition of Premier Nutrition.

16.     Upon information and belief, Joint Juice's employees with decision-making authority relevant to this litigation, including Joint Juice's executives and marketing employees, have been located in California. For example, Mr. Ritterbush, who worked out of San Francisco, was the former CEO of Premier and former CEO of Joint Juice. The current President and General Manager of Premier (and former Vice President of Marketing) also works from Emeryville, California. The outside advertising agency used by Joint Juice was located in San Francisco. Further, Joint Juice represents that the Products were created by its founder, Dr. Kevin Stone, at the Stone Clinic in San Francisco.

## FACTUAL ALLEGATIONS

### *The Joint Juice Products*

17.     Since 1999, on a nationwide basis, Defendant has distributed, marketed, and sold the Joint Juice Products.

18.     The Joint Juice Products are sold by a variety of third-party retailers, including Costco, Sam's Club, Walgreens, Walmart, and Target. Defendant also sells Joint Juice directly to consumers through its website.

19.     The Joint Juice Products are available in: (1) drink mix packets, which retailed for approximately $22 for a thirty-count box; (2) eight-ounce beverage bottles, which retailed for approximately $30 for a thirty-pack, or approximately $6 for a six-pack; and (3) Easy Shot™ bottles, which retailed for approximately $15 for a twenty-ounce bottle containing sixteen servings.

20.     According to Defendant, and as stated on the Products' packaging, the Joint Juice Products contain 1,500 mg per serving of glucosamine hydrochloride and chondroitin sulfate.

21.     Glucosamine hydrochloride is a combination of glucosamine (an amino sugar compound produced by the body, and which can be isolated from shellfish) where the glucosamine is combined with hydrochloric acid.

22.     Unlike the Products at issue, other glucosamine-infused products often contain glucosamine sulfate, which is a combination of glucosamine and sulfur molecules.

23.     Glucosamine is one the most abundant monosaccharides (sugars) in the body.

24.     Glucosamine hydrochloride is less expensive than glucosamine sulfate.

25.     According to a 2006 study published by the New England Journal of Medicine (discussed below), at least 20 million Americans are affected by osteoarthritis – a number that is expected to double over the next two decades.

26.     According to the Mayo Clinic, the signs and symptoms of osteoarthritis include joint pain, joint tenderness, joint stiffness, and the inability to move your joint through its full range of motion.[3]

///

///

---

[3]     http://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/dxc-20198250 (last visited November 16, 2016).

BLOOD HURST & O' REARDON, LLP

*Defendant's False and Deceptive Advertising for the Joint Juice Products*

27.    Since the Products' launch, Defendant, through its advertisements including on the Products' packaging and labeling, has consistently conveyed the message to consumers throughout the United States that Joint Juice helps to support and nourish cartilage, "lubricate" joints, and help with "joint comfort," simply by consuming the Products.

28.    Defendant claims that glucosamine hydrochloride is the Products' primary active ingredient, and that chondroitin sulfate is an active ingredient.

29.    Specifically, Defendant states on the Products' packaging and in its marketing materials that Joint Juice helps: to support and nourish cartilage, "lubricate" joints, and improve joint comfort without any limitation on which joints, for adults of *all* ages and without any limitation on what stages of joint related ailments.

30.    In its marketing materials, including on its packaging and labeling, Defendant also represents that Joint Juice was "originally developed for pro athletes by orthopedic surgeon Kevin R. Stone, M.D. to keep joints healthy and flexible."

31.    Defendant's marketing representations repeat and reinforce the claims made on the packaging and labeling for the Products. For example, on its website, Defendant represents that "Research indicates that you should take a minimum of 1,500 mg of glucosamine daily for joint health. That's why we put 1,500 mg in every Joint Juice® product" and "Glucosamine works to lubricate your joints by helping cartilage tissue absorb water. This helps cartilage perform its job of cushioning and mobility."[4]

32.    Defendant's advertising deceptively reinforces the health benefits message through references to "expert stories," including from Dr. Kevin Stone, Joint Juice's founder and co-owner. According to an article written by Dr. Stone and posted on Defendant's website, "[t]aking glucosamine and chondroitin together – in the liquid formula found only in Joint Juice® products – ensure that you get a full day's supply of glucosamine (1,500 mg) and chondroitin to maintain healthy and happy joints."

---

[4]      http://www.jointjuice.com/faq/general-information (last visited November 16, 2016).

BLOOD HURST & O' REARDON, LLP

33.     Defendant's website also contains a prominent link to a "Joint Juice® joint health assessment." This marketing gimmick further reinforces the false and misleading representation that Joint Juice will provide the significant, advertised health benefits.

34.     Likewise, in a 60-second, nationwide television commercial, Joint Juice spokesman Joe Montana, who states that "my joints have gotten a little stiff lately and at first I thought I had to live with it because of pro football and just getting older," makes the false and deceptive representations that "the glucosamine and chondroitin lubricates and cushions the cartilage in my joints so I can move more easily . . . it works great for anyone who likes to keep moving!" Further adding unfounded credibility to the deceptive claim, the Joint Juice advertisement also states that Joint Juice "was originally developed by an orthopedic surgeon for pro athletes."[5] According to Defendant, "glucosamine and chondroitin have been proven to help maintain joint function and mobility."[6]

35.     The Joint Juice packaging also prominently features the Arthritis Foundation logo because it attracts purchasers who suffer from arthritis and joint pain. To reinforce the message, the labels state "Joint Juice is proud to support the Arthritis Foundation's efforts to help people take control of arthritis" or that Defendant "will donate a portion of the proceeds to the Arthritis Foundation . . . to help people take control of arthritis."

36.     Since 2010, Joint Juice ready-to-drink packaging has remained materially identical, always focused on the promised joint health benefits: "A bottle a day keeps your joints in play," "**Drink Daily for Healthy, Flexible Joints**," "**HELPS KEEP CARTILAGE LUBRICATED AND FLEXIBLE**," and "For Healthy, Flexible Joints."

37.     The Products' packaging appears as follows:

---

[5]     "Extraordinary Joe," available at http://www.youtube.com/watch?v=9qOqK_GjoUM (last visited March 15, 2013); *see also* http://www.youtube.com/watch?v=EYN-hoTYELE (30 second version of the "Extraordinary Joe" television ad makes the same representations) (last visited Nov. 10, 2016).

[6]     "Joe Montana Partners with Joint Juice, Inc. to Get American on a Health Joint Regimen," available at http://www.bevnet.com/news/2011/joe-montana-partners-with-joint-juice-inc-to-get-americans-on-a-healthy-joint-regimen (last visited Nov. 10, 2016).

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O' REARDON, LLP

EasyShot™ (Front)

EasyShot™ (Back)





FIRST AMENDED CLASS ACTION COMPLAINT – FISHON

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Drink Mix Box (Front)        Drink Mix Box (Back)

  

Ready-to-Drink Beverage Bottle Six-Pack



BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13



14   ***Scientific Studies Confirm that Joint Juice Is Not Effective and Defendant's Health***
15   ***Benefits Message Is False and Deceptive***

16       38.    Despite Defendant's representations, glucosamine, alone or in combination
17   with other ingredients including chondroitin sulfate, is not effective in providing the
18   represented joint health benefits.

19       39.    All of the meta-analysis studies conclude that glucosamine and chondroitin do
20   nothing. Meta-analysis is at the top of the hierarchy of medical evidence. *See* Reference
21   Manual on Scientific Evidence at 607. "Meta-analysis is a method of pooling study results to
22   arrive at a single figure to represent the totality of the studies reviewed." *Id*. At least ten meta-
23   analyses on the clinical effects of glucosamine and/or chondroitin have been performed, and
24   all ten found that the pooled results from the well-conducted, non-industry studies demonstrate
25   glucosamine, alone or in combination with chondroitin, does not work. These ten meta-
26   analyses, which collectively reviewed the results from tens of clinical studies involving
27   thousands of people, are: Towheed, 2005 (20 studies, 2,570 subjects); Towheed, 2009
28   (25 studies, 4,963 subjects); Vlad, 2007 (15 studies); McAlindon, 2000 (15 studies); Eriksen,

Case No. 3:16-cv-06980

FIRST AMENDED CLASS ACTION COMPLAINT – FISHON

2014 (25 studies, 3,458 subjects); Wandel, 2010 (10 studies, 3,803 subjects); Reichenbach, 2007 (20 studies, 3,846 subjects); Wu, 2013 (19 studies, 3,159 subjects); Singh, 2015 (43 studies, 4,962 subjects); and Kongtharvonskul, 2015 (31 studies).

40.     For example, in their 2007 meta-analysis, Vlad, et al. reviewed all studies involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not effective." *Glucosamine for Pain in Osteoarthritis*, 56:7 Arthritis Rheum. 2267-77 (2007); *see also id.* at 2275 ("we believe that there is sufficient information to conclude that glucosamine hydrochloride lacks efficacy for pain in OA").

41.     The 2010 meta-analysis by Wandel, et al., entitled *Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee: Network Meta-Analysis*, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. The study authors reported that glucosamine and chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

42.     Eriksen, 2014, is a meta-analysis published in a journal of the American College of Rheumatology. It examined 25 placebo-controlled clinical studies involving glucosamine, including GAIT, concluding "We are confident that glucosamine by and large has no clinically important effect." Eriksen, Patrick, Else M. Bartels, Roy D. Altman, Henning Bliddal, Carsten Juhl, and Robin Christensen, *Risk of Bias and Brand Explain the Observed Inconsistency in Trials on Glucosamine for Symptomatic Relief of Osteoarthritis: A Meta-Analysis of Placebo-Controlled Trials*, ARTHRITIS CARE & RESEARCH 66, no. 12 (2014) at 1844-1855; *see also id.* ("[o]ur meta-analysis provides high-quality evidence that glucosamine in forms other than the one made by Rottapharm[] consistently does not reduce pain more than placebo").

BLOOD HURST & O' REARDON, LLP

43.     Towheed 2009, a prestigious Cochrane Collaboration publication, reviewed 25 clinical studies with 4,963 subjects and found no benefits from glucosamine. *See* Towheed T., et al., Glucosamine therapy for treating osteoarthritis. Cochrane Database of Systematic Reviews 2005, Issue 2. Art. No.: CD002946 (Updated and Published in Issue 4, 2009). Dr. Towheed and co-authors concluded, "The high quality studies showed that pain improved about the same whether people took glucosamine or fake pills." *Id.* at 2.

44.     The findings of the gold standard, individual clinical studies confirm the meta-analyses' conclusion that glucosamine and chondroitin do not work.

45.     In the late 1990s, the National Institutes of Health ("NIH") funded the $12.5 million multicenter GAIT study. GAIT was the first large-scale multicenter clinical trial in the United States on glucosamine and chondroitin. The first GAIT publication examined results from 1,583 subjects randomized to receive one of five treatments over 6 months: (1) 1500 mg glucosamine hydrochloride, (2) 1200 mg chondroitin, (3) glucosamine plus chondroitin, (4) celecoxib, or (5) placebo. The GAIT I publication, published in 2006 in the New England Journal of Medicine (the "2006 GAIT Study"), reported that glucosamine and chondroitin were not effective in reducing pain. *See* Clegg, D., et al., *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, 354 New England J. of Med. 795, 806 (2006) ("The analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious.").

46.     Subsequent GAIT studies in 2008 and 2010 reported that glucosamine and chondroitin did not rebuild cartilage and were otherwise ineffective – even in patients with moderate to severe knee pain for which the 2006 reported results were inconclusive. *See* Sawitzke, A.D., et al., *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report*, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008) ("GAIT II"). The GAIT II publication, which was based on 572 subjects across nine sites, reported no difference in joint space width between those receiving glucosamine and chondroitin or placebo.

BLOOD HURST & O' REARDON, LLP

47.     The 2010 GAIT III publication, with 662 subjects, also concluded glucosamine and chondroitin are no more effective in relieving pain than placebo. *See* Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee*: 2-Year Results From GAIT, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010) ("GAIT III").

48.     The GAIT studies are consistent with the reported results of prior and subsequent studies. For example, a 1999 study involving 100 subjects by Houpt, et al., entitled *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee*, 26(11) J. Rheumatol. 2423-30 (1999), found that glucosamine hydrochloride performed no better than placebo at reducing pain at the conclusion of the eight week trial.

49.     Likewise, a 2004 study by McAlindon, et al., entitled *Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial*, 117(9) Am. J. Med. 649-9 (Nov. 2004), concluded that "glucosamine was no more effective than placebo in treating symptoms of knee osteoarthritis" – in short, that glucosamine is ineffective. *Id.* at 646 ("we found no difference between the glucosamine and placebo groups in any of the outcome measures, at any of the assessment time points").

50.     Many studies have also confirmed there is a significant "placebo" effect with respect to consumption of products represented to be effective in providing joint health benefits such as Defendant's Products.

51.     Indeed, more than 30% of persons who took placebos in these studies believed that they were experiencing joint health benefits when all they were taking was a placebo.

52.     A 2004 study by Cibere, et al., entitled *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who had claimed to have experienced at least moderate improvement after starting glucosamine. These patients were divided into two groups – one that continued using glucosamine and one that was given a placebo. For six months, the primary outcome observed was the proportion of disease flares in

BLOOD HURST & O' REARDON, LLP

the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo. The authors concluded that the study provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and not glucosamine. *Id.* at 743 ("In this study, we found that knee OA disease flare occurred as frequently, as quickly, and as severely in patients who were randomized to continue receiving glucosamine compared with those who received placebo. As a result, the efficacy of glucosamine as a symptom-modifying drug in knee OA is not supported by our study.").

53.     To similar effect, in the "Joints on Glucosamine" or "JOG" study, Dr. Kwoh and co-authors concluded that glucosamine was not effective in preventing the worsening of cartilage damage. *See* Kwoh CK et al., *Effect of Oral Glucosamine on Joint Structure in Individuals With Chronic Knee Pain: A Randomized, Placebo-Controlled Clinical Trial*, 66(4) Arthritis Rheumatol., 930-9 (2014). JOG was a 201-person, randomized clinical trial comparing those who consumed the same type of glucosamine in Joint Juice and those consuming a placebo. JOG examined subjects without arthritis. The JOG study found: "There was no difference between the two groups" in terms of cartilage loss and "[t]here were no significant differences between the glucosamine and control groups from baseline to the 12-week assessment, the 12-week to 24-week assessment, or from baseline to 24 weeks for the WOMAC pain or function subscales or the total WOMAC score." *Id.* at 935.

54.     The uniform consensus of clinical treatment protocols, sometimes referred to as clinical practice guidelines, is that glucosamine and chondroitin do not work, should not be used, and are not cost effective. Clinical treatment protocols are evidence-based, developed from an in-depth cross-review of studies and meta-analyses by experts in the field. For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, *Osteoarthritis National Clinical Guideline for Care and Management of Adults*, Royal College of Physicians,

London 2008. Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

55.     In December 2008, the American Academy of Orthopaedic Surgeons ("AAOS") published clinical practice guidelines for the *Treatment of osteoarthritis of the knee (nonarthroplasty)*, and made a "strong" recommendation that "glucosamine and sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee." Richmond, et al., *Treatment of osteoarthritis of the knee (nonarthroplasty)*, J. Am. Acad. Orthop. Surg. Vol. 17 No. 9 591-600 (2009). This AAOS recommendation was based on a 2007 report from the Agency for Healthcare Research and Quality (AHRQ), which states that "the best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination did not have any clinical benefit in patients with primary OA of the knee." Samson, et al., *Treatment of Primary and Secondary Osteoarthritis of the Knee, Agency for Healthcare Research and Quality*, 2007 Sep. 1. Report No. 157.

56.     In 2013, the AAOS published updated clinical practice guidelines, and based on its review of twenty-one human studies, again made a "strong" recommendation that neither glucosamine nor chondroitin be used for patients with symptomatic osteoarthritis of the knee. *See* Treatment of Osteoarthritis of the Knee, Evidence-Based Guideline (2d Ed.), American Academy of Orthopaedic Surgeons (2013) at 262.

57.     The American College of Rheumatology, and the United Kingdom National Institute for Health and Care Excellence ("NICE") also recommend against using glucosamine or chondroitin. *See* Hochberg, M.C., et al., American College of Rheumatology 2012 *Recommendations for the Use of Nonpharmacologic and Pharmacologic Therapies in Osteoarthritis of the Hand, Hip, and Knee*. Arthritis Care & Research 2012; 64(4):465-474; National Institute for Health and Care Excellence, Clinical Guidelines: Osteoarthritis Care and management in adults (February 2014).

58.     In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin, concluded that, "[t]he cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in

BLOOD HURST & O' REARDON, LLP

15

FIRST AMENDED CLASS ACTION COMPLAINT – FISHON

North America." Miller, K. and Clegg, D., *Glucosamine and Chondroitin Sulfate*, Rheum. Dis. Clin. N. Am. 37 103-118 (2011).

59.     Even studies not concerning the type of glucosamine in the Joint Juice Products demonstrate that glucosamine does not provide the joint health benefits that Defendant represents. For example, a study by Rozendaal, et al., entitled *Effect of Glucosamine Sulfate on Hip Osteoarthritis*, 148 Ann. of Intern. Med. 268-77 (2008), assessing the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during two years of treatment, concluded that glucosamine was no better than placebo in reducing symptoms and progression of hip osteoarthritis.

60.     In 2012, a report by Rovati, et al. entitled *Crystalline glucosamine sulfate in the management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv Musculoskel Dis 4(3):167-180 (2012), noted that glucosamine hydrochloride "ha[s] never been shown to be effective."

61.     On July 7, 2010, Wilkens, et al., reported that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also concluded that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens, et al., *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, 304(1) JAMA 45-52 (July 7, 2010).

62.     In 2009, a panel of scientists from the European Food Safety Authority ("EFSA") (a panel established by the European Union to provide independent scientific advice to improve food safety and consumer protection), reviewed nineteen studies submitted by an applicant, and concluded that "a cause and effect relationship has not been established between the consumption of glucosamine hydrochloride and a reduced rate of cartilage degeneration in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine*

BLOOD HURST & O' REARDON, LLP

*hydrochloride and reduced rate of cartilage degeneration and reduced risk of osteoarthritis*, EFSA Journal (2009), 7(10):1358.

63.     In a separate opinion from 2009, an EFSA panel examined the evidence for glucosamine (either hydrochloride or sulfate) alone or in combination with chondroitin sulfate and maintenance of joints. The claimed effect was "joint health," and the proposed claims included "helps to maintain healthy joint," "supports mobility," and "helps to keep joints supple and flexible." Based on its review of eleven human intervention studies, three meta-analyses, 21 reviews and background papers, two animal studies, one in vitro study, one short report, and one case report, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine (either as glucosamine hydrochloride or as glucosamine sulphate), either alone or in combination with chondroitin sulphate, and the maintenance of normal joints." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of health claims related to glucosamine alone or in combination with chondroitin sulphate and maintenance of joints and reduction of inflammation*, EFSA Journal (2009), 7(9):1264.

64.     In 2012, EFSA examined the evidence glucosamine sulphate or glucosamine hydrochloride, and a claimed effect of "contributes to the maintenance of normal joint cartilage." Based on its review of 61 references provided by Merck Consumer Healthcare, the EFSA panel concluded that "a cause and effect relationship has not been established between the consumption of glucosamine and maintenance of normal joint cartilage in individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine and maintenance of normal joint cartilage*, EFSA Journal 2012, 10(5): 2691.

**The Impact of Defendant's Wrongful Conduct**

65.     Despite clinical studies that show the ingredients in Defendant's Joint Juice Products are ineffective, Defendant conveyed and continues to convey one uniform health benefits message: Joint Juice supports and nourishes cartilage, "lubricates" joints, and

improves joint comfort in all joints in the human body, for adults of all ages and for all manner and stages of joint-related ailments.

66.     As the inventor, manufacturer, and distributor of Joint Juice, Defendant possesses specialized knowledge regarding the content and effects of the ingredients contained in Joint Juice and Defendant is in a superior position to know whether its Products work as advertised.

67.     Specifically, Defendant knew, but failed to disclose, that Joint Juice does not provide the joint health benefits represented and that well-conducted, clinical studies have found the ingredients in Joint Juice to be ineffective in providing the joint health benefits represented by Defendant.

68.     Plaintiff has been and will continue to be deceived or misled by Defendant's false and deceptive joint health benefit representations. Plaintiff purchased Joint Juice during the Class period and in doing so, read and considered the Product's label and based his decision to purchase the Product on the joint health benefit representations on the Product packaging. Defendant's joint health benefit representations and omissions were a material factor in influencing Plaintiff's decision to purchase the Product.

69.     The only purpose for purchasing Joint Juice is to obtain the represented joint health benefits. Although it does not provide the represented, significant health benefits, Joint Juice retails for approximately $6 per six-pack.[7]

### CLASS DEFINITION AND ALLEGATIONS

70.     Plaintiff asserts his respective counts on behalf of a class of New York purchasers pursuant to Fed. R. Civ. P. 23(b)(2) and (3) defined as:

> All persons who purchased in New York any Joint Juice Product.

Excluded from the Class are the Defendant, its parents, subsidiaries, affiliates, officers, and directors; those who purchased the Joint Juice Products for the purpose of resale; all persons

---

[7]     At Walmart's online store, a six-pack of 8-ounce bottles costs $4.42. http://www.walmart.com/ip/Joint-Juice-Glucosamine-Chondroitin-Blend-Blueberry-Acai-4-6pk-8oz/14292593 (last visited Nov. 10, 2016); *see also* http://shop.jointjuice.com/Joint-Juice-ReadytoDrink-Supplement--Blueberry-Acai/p/JTJ-042203&c=JointJuice@Drinks (6-pack of 8 ounce bottles retails for $8.94 on jointjuice.com).

BLOOD HURST & O' REARDON, LLP

1   who make a timely election to be excluded from the Class; the judge to whom this case is

2   assigned and any immediate family members thereof; and those who assert claims for personal

3   injury.

4       71.   Certification of Plaintiff's claims for classwide treatment is appropriate because

5   Plaintiff can prove the elements of his respective claims on a classwide basis using the same

6   evidence as would be used to prove those elements in individual actions alleging the same

7   claims.

8       72.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the

9   Class are so numerous that individual joinder of all Class members is impracticable. Defendant

10   has sold many thousands of units of Products to Class members.

11       73.   **Commonality and Predominance – Federal Rule of Civil Procedure**

12   **23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which

13   predominate over any questions affecting individual Class members, including, without

14   limitation:

15       (a)   Whether the representations discussed herein that Defendant made

16       about its Joint Juice Products were or are true, or are misleading, or

17       likely to deceive;

18       (b)   Whether Defendant's conduct violates public policy;

19       (c)   Whether Defendant engaged in false or misleading advertising;

20       (d)   Whether Defendant's conduct constitutes violations of the laws asserted

21       herein;

22       (e)   Whether Plaintiff and the other Class members have been injured and

23       the proper measure of their losses as a result of those injuries; and

24       (f)   Whether Plaintiff and the other Class members are entitled to injunctive,

25       declaratory, or other equitable relief.

26       74.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are

27   typical of the other Class members' claims because, among other things, all Class members

28   were comparably injured through the uniform prohibited conduct described above.

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

75.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by the Plaintiff and his counsel.

76.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

77.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

## COUNT I

### Violation of the New York General Business Law §§ 349 and 350

78.    Plaintiff Fishon incorporates the preceding paragraphs as if fully set forth herein.

79.     Plaintiff and other members of the Class are persons within the meaning of New York General Business Law ("GBL") § 349(h). Defendant engaged in business, trade or commerce within the meaning of GBL §§ 349(a) and 350.

80.     GBL § 349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York State]."

81.     GBL § 350 declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

82.     Defendant's advertising of Joint Juice, as described above and throughout, is "false advertising" under GBL § 350-a.

83.     As described herein, Defendant engaged in consumer-oriented conduct that was misleading and directed at the consuming public.

84.     As a result of the deceptive and misleading promises and omissions made by Defendant on the Joint Juice labels and throughout the Joint Juice marketing campaign, as described above, Defendant has deceived Plaintiff Fishon and the Class members.

85.     Plaintiff and the other members of the Class have been injured by Defendant's deceptive acts and practices in that they purchased Joint Juice reasonably believing it would provide the promised benefits.

86.     Defendant's deceptive conduct occurred in the course of engaging in trade or commerce.

87.     Defendant willfully, with disregard and/or maliciously violated GBL §§ 349 and 350.

88.     Plaintiff Fishon and the Class have purchased Joint Juice and suffered actual damages, proximately caused by Defendant's unfair and deceptive acts and practices.

89.     The damages suffered by Plaintiff and the other members of the Class were directly and proximately caused by the materially misleading acts and/or practices of Defendant, as more fully described herein.

90.     Plaintiff Fishon and the Class make claims for damages, attorneys' fees and costs pursuant to GBL §§ 349(h) and 350-e. Additionally, pursuant to GBL §§ 349(h) and 350-

BLOOD HURST & O' REARDON, LLP

e, Plaintiff Fishon and the Class seek injunctive relief to stop the ongoing deceptive advertising and for a corrective advertising campaign.

**JURY DEMAND**

Plaintiff demands trial by jury of all claims in this Complaint so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.      Ordering Defendant to pay actual damages to Plaintiff and the other members of the Class;

C.      Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D.      Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E.      Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

F.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

///

///

///

///

BLOOD HURST & O' REARDON, LLP

1      H.      Ordering such other and further relief as may be just and proper.

2                                          Respectfully Submitted,

3    Dated: April 21, 2021                 BLOOD HURST & O'REARDON, LLP
                                           TIMOTHY G. BLOOD (149343)
4                                          THOMAS J. O'REARDON II (247952)

5
                                           By:         s/ Timothy G. Blood
6                                               TIMOTHY G. BLOOD

7                                          501 West Broadway, Suite 1490
                                           San Diego, CA  92101
8                                          Tel: 619/338-1100
                                           619/338-1101 (fax)
9                                          tblood@bholaw.com
                                           toreardon@bholaw.com
10                                         ALTAIR LAW
                                           CRAIG M. PETERS (184018)
11                                         465 California Street, 5th Floor
                                           San Francisco, CA  94104-3313
12                                         Tel: 415/988-9828
                                           cpeters@altairlaw.us
13
                                           CARLSON LYNCH LLP
14                                         TODD D. CARPENTER (234464)
                                           1350 Columbia Street, Suite 603
15                                         San Diego, CA  92101
                                           Tel: 619/762-1910
16                                         619/756-6991 (fax)
                                           tcarpenter@carlsonlynch.com
17
                                           *Attorneys for Plaintiffs*
18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT – FISHON

00176564

BLOOD HURST & O'REARDON, LLP

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on April 21, 2021, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-

6  CM/ECF participants indicated on the Electronic Mail Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that

8  the foregoing is true and correct. Executed on April 21, 2021.

9

10                                        s/ *Timothy G. Blood*
                                        _____
                                        TIMOTHY G. BLOOD

11                                        BLOOD HURST & O'REARDON, LLP
                                        501 West Broadway, Suite 1490
12                                        San Diego, CA 92101
                                        Tel: 619/338-1100
13                                        619/338-1101 (fax)
                                        tblood@bholaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

00176564

24

Case No. 3:16-cv-06980

FIRST AMENDED CLASS ACTION COMPLAINT – FISHON