BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ERIC FISHON, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>    v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>              Defendant. | Case No. 3:16-CV-06980 RS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE, Ph.D.; MEMORANDUM IN SUPPORT THEREOF**<br><br>**DATE:**     April 21, 2022<br>**TIME:**     1:30 p.m.<br><br>**CLASS ACTION**<br><br>Judge:         Honorable Richard Seeborg<br>Courtroom:   Courtroom 3, 17th Floor<br><br>Complaint Filed:   December 5, 2016<br>Trial Date:        May 23, 2022 |

*Sidebar:* BLOOD HURST & O' REARDON, LLP

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 21, 2022, at 1:30 p.m. in Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, in accordance with Rules 401, 403, and 702 of the Federal Rules of Evidence, Plaintiff will and hereby does move this Court for an order excluding the opinions and testimony of Defendant's designated science expert, Daniel A. Grande, Ph.D. ("Grande"). Grande's opinions are irrelevant, prejudicial, and fail to follow or apply any acceptable methodology including widely accepted principles of clinical research and interpretation of clinical research, and are unsupported. Accordingly, pursuant to Federal Rules of Evidence 401, 403, and 702, and Federal Rule of Civil Procedure 26(a)(2)(B), Grande's opinions should be stricken and excluded.

This motion is based upon this notice of motion, the accompanying memorandum of law, the declaration of Timothy G. Blood, and such other evidence and argument as may be presented at or before the hearing on this motion.

Respectfully submitted,

Dated: March 21, 2022

BLOOD HURST & O'REARDON, LLP

By:      *s/ Timothy G. Blood*
         TIMOTHY G. BLOOD

1

**TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION ............................................................................................1

4   II.    LEGAL STANDARD .....................................................................................2

5   III.   ARGUMENT ..................................................................................................3

6         A.    Remarkably Grande Offers Many of the Same Opinions This Court Previously Struck ..............................................................................3

7         B.    Grande's CTX-II Biomarker Study Opinions Should Be Excluded .......................4

8         C.    Grande's Opinion Regarding "Potential Reasons for Variability in Clinical Trials" Should Be Excluded ...............................................8

9         D.    Grande Relies on and Misinterprets Irrelevant Studies, With "Too Great a Gap" Between His Opinion and the Science ...........................11

10

11

12   IV.   CONCLUSION .............................................................................................16

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

Case No. 3:16-cv-06980-RS

00187728

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

1
2

# TABLE OF AUTHORITIES

3

**Page(s)**

4

**Cases**

5

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011) ................................................................................ 3

6
7

*Alliance for Nat. Health US v. Sebelius*,
   786 F. Supp. 2d 1 (D.D.C. 2011) ............................................................................... 5

8
9

*Daniels-Feasel v. Forest Pharms., Inc.*,
   No. 17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292
   (S.D.N.Y. Sept. 3, 2021) ......................................................................................... 12

10
11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .........................................................................................*passim*

12
13

*Davis v. McKesson Corp.*,
   No. CV-18-1157-PHX-DGC, 2019 U.S. Dist. LEXIS 129369
   (D. Ariz. Aug. 2, 2019) .......................................................................................... 11

14
15

*Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) .................................................................................... 4

16

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................................ 15

17
18

*Mukhtar v. Cal. State Univ.*,
   299 F.3d 1053 (9th Cir. 2002) .................................................................................. 4

19
20

*Mullins v. Premier Nutrition Corp.*,
   178 F. Supp. 3d 867 (N.D. Cal. 2016) ............................................................. 1, 3, 4

21

*Porter v. Whitehall Labs., Inc.*,
   9 F.3d 607 (7th Cir. 1993) ...................................................................................... 11

22
23

*In re Rezulin Prods. Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) .................................................................... 15

24
25

*In re Roundup Prods. Liab. Litig.*,
   390 F. Supp. 3d 1102 (N.D. Cal. 2018) ................................................................. 14

26

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ................................................................................... 15

27
28

BLOOD HURST & O' REARDON, LLP

iii       Case No. 3:16-cv-06980-RS

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

*In re Trasylol Prods. Liab. Litig.*,
   No. 08-MD-01928, 2010 U.S. Dist. LEXIS 52409
   (S.D. Fla. Mar. 5, 2010) .......................................................................................... 7

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) .................................................................................. 9

*Young v. Barton*,
   567 F. Supp. 2d 121 (D.D.C. 2008) ................................................................. 4, 7

**Rules**

Fed. R. Evid 702 ....................................................................................................... 1, 2, 4

**Secondary Sources**

Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011) ............... *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O' REARDON, LLP

00187728

MOTION TO EXCLUDE EXPERT OPINIONS OF DEFENDANT'S EXPERT DANIEL A. GRANDE

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2    Pursuant to Federal Rule of Evidence 702, Plaintiff submits this memorandum in support of

3 her request to exclude the reports and opinions of Daniel A. Grande, Ph.D., an expert proffered by

4 defendant Premier Nutrition Corporation ("Premier").

5 **I.    INTRODUCTION**

6    This Court has already found Grande to be a non-credible expert and has struck some of the

7 very same opinions Defendant offers again. In 2016, Plaintiff's counsel moved to exclude several

8 opinions Grande previously offered. This Court granted the motion in part and otherwise found

9 plaintiff "presented significant arguments to disbelieve or discredit Grande's opinions." *See Mullins*

10 *v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 903–05 (N.D. Cal. 2016). Remarkably, Grande

11 included the very same opinions the Court previously struck. For the others, his approach in reaching

12 the opinions has worsened.

13    First, Grande incorporated by reference the same opinions this Court previously struck.

14 Since they were stricken, Grande has done nothing different, or even tried. Accordingly, the Court

15 should again strike Grande's opinions regarding: (1) "treatment protocols or clinical and veterinary

16 practice;" (2) whether the statement "originally developed for pro athletes by orthopedic surgeon

17 Kevin R. Stone" is not misleading; and (3) whether daily consumption of Joint Juice keeps joints

18 healthy and flexible. *Id.* at 904.

19    Second, for the rest of his opinions, Grande now relies heavily on two small biomarker

20 studies of a few dozen college athletes in Japan – two of the same studies on which Premier's

21 Dr. Silverman focuses. Grande admitted in deposition that the biomarkers analyzed in those studies

22 have no correlation to any validated therapeutic effect, including the prevention or treatment of joint

23 pain or stiffness.

24    Third, rather than directly address the many high-quality clinical trials and meta-analysis of

25 those clinical trials, Grande attempts to explain them away with wholly made-up arguments about

26 individual "bioavailability" levels and "gut microbiota" compositions. These opinions are not at all

27 rooted in science, but instead conjecture and unproven hypotheses. Grande concedes he is not an

28 expert on the microbiome or on prebiotics. The few studies he relies on, which have no demonstrated

1

clinical significance, are irrelevant to the issues in this case, but risk confusing the jury. The arguments also ignore the very purpose of the high-quality scientific evidence that is available – to control for individual variation to determine whether a substance works. Grande's inability to rebut this overwhelming amount of scientific evidence does not mean he gets to make up scientific sounding nonsense. He ignores the accepted methodology in favor of ipse dixit, which is not permitted.

Finally, Grande's opinions stemming from pre-clinical animal and in vitro studies are not reliable because there is "too great a gap" between his opinions and the science behind "mechanisms of action" following application of massive doses of glucosamine and chondroitin. One cannot reach the conclusions Grande reaches from these limited basic science studies. Rather than use massive dose animal and in vitro studies to hypothesize indirectly about how glucosamine and chondroitin might work biologically in humans, there is a wealth of high-quality meta-analyses and human clinical studies that directly measure their effect on pain and stiffness. In accordance with the Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011) ("Reference Manual on Scientific Evidence"), when this is the case, the opinions based on indirect measures should not be considered in favor of the studies that directly measure an agent's clinical effect.

Grande's opinions should be stricken because they do not meet the criteria under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, the court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In so doing, "[t]he trial judge must determine whether the testimony has a reliable basis in the knowledge

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1   and experience of [the relevant] discipline." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,

2   276 F.R.D. 364, 370 (C.D. Cal. 2011).[1]

3       If a "court finds that the proposed witness qualifies as an expert, it must determine whether

4   the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.*

5   Here, the "concern is not with what the experts say, but, rather what basis they have for saying it."

6   *Id.* "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of

7   his methodology." *Id.* at 370-71.

8       When these standards are applied to Grande's report, exclusion is warranted.

9   **III.    ARGUMENT**

10       **A.    Remarkably Grande Offers Many of the Same Opinions This Court Previously
              Struck**

11

12       At summary judgment this Court previously excluded several of Dr. Grande's expert

13   opinions. *See Mullins*, 178 F. Supp. 3d at 903–05. Nonetheless, Grande again offers up those same

14   excluded opinions exactly as he presented them previously. He has done nothing different. In fact,

15   he incorporates the stricken opinions into his 2022 supplemental expert report. Ex. 1[2] (Grande

16   Supplemental Report) at 2 ("My opinions that are stated in my prior report attached as Exhibit 1 are

17   incorporated by reference herein.").[3] Rather than repeat the same arguments here why exclusion is

18   appropriate, Plaintiff incorporates them by reference. *See Mullins*, Case No. 3:13-cv-1271-RS, ECF

19   No. 100 (Motion to Exclude Testimony of Grande) at §§ III.C., III.D., III.E., and III.F.

20       Accordingly, as before, Dr. Grande's opinions should be excluded again regarding:

21   (1) "treatment protocols or clinical and veterinary practice;" (2) whether the statement "originally

22   developed for pro athletes by orthopedic surgeon Kevin R. Stone" is not misleading; and (3) drink

23   _____

24   [1]     Internal quotation marks, brackets, citations and footnotes are omitted unless otherwise
        noted.

25   [2]     "Ex." references are to documents attached to the concurrently filed Declaration of Timothy

26   G. Blood.

27   [3]     Technically, Grande's 2022 Supplemental Report incorporates his 2017 Expert Report from
        *Mullins*. This 2017 *Mullins* expert report is identical to Grande's 2014 report that this Court
        discussed in *Mullins*, 178 F. Supp. 3d 867. *Compare* Ex. 2 (Grande 2017 Report) *with Mullins*, ECF

28   No. 85-23 (Grande 2014 Report).

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

daily for healthy, flexible joints. *Mullins*, 178 F. Supp. 3d at 904. While several years have passed, Grande has not become a veterinarian, clinician, or marketing expert, and he does nothing more to support these stricken opinions. Exclusion is again warranted.

### B.     Grande's CTX-II Biomarker Study Opinions Should Be Excluded

Expert opinion must be relevant to be admissible. "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002). Further, the proposed expert must follow accepted methodology and apply that methodology reliably. *Domingo v. T.K.*, 289 F.3d 600, 605–06 (9th Cir. 2002). Grande meets none of these requirements. For his opinion that Joint Juice works as advertised, Grande heavily relies on two small "biomarker" studies involving 20-year-old men in Japan: Yoshimura (2009) and Tsuruta (2018). Ex. 1 (Grande Supplemental Report) at 3 and 7 (citing Tsuruta 2018), and 8 (citing Yoshimura 2009).[4]

A biomarker study does not examine any clinically meaningful endpoints such as how a patient feels or functions. Instead, it examines something else, like a level of a molecule that may or may not serve as a reliable substitute for a clinically meaningful endpoint. Ex. 3 (Hunter 2010) at 3 ("relatively few biomarkers will meet the stringent criteria that are needed for them to serve as reliable substitutes for clinical endpoints").[5] For this reason, courts exclude expert testimony under the same circumstances present here that makes clinical effect conclusions based on studies of unproven biomarkers. *See Young v. Barton*, 567 F. Supp. 2d 121, 136 (D.D.C. 2008) (excluding testimony, noting "[t]he first, and most fundamental flaw in Dr. Shoemaker's Tier 2 analysis is that not one of his Tier 2 biomarker tests is generally accepted or clinically-validated for the purpose of diagnosing 'mold illness'" and because the biomarker "can only show that an inflammatory response

---

[4]     Plaintiff has concurrently moved to exclude the testimony of Defendant's other science expert, Dr. Stuart Silverman, specifically relating to the CTX-II biomarker studies. Illustrative of the lack of these experts' methodologies, while Grande cites two Japanese athlete studies on CTX-II, Silverman cites four studies.

[5]     Grande testified that valid biomarkers are an "indirect measure" using "a surrogate molecule that one may use to try and determine a certain level of a process." Ex. 4 (Grande 2017 Depo.) at 46:8–16.

BLOOD HURST & O' REARDON, LLP

00187728

1  is present in the patient, which says nothing about the cause of that response"); *see also Alliance for*

2  *Nat. Health US v. Sebelius*, 786 F. Supp. 2d 1, 21–22 (D.D.C. 2011) (holding FDA's rejection of

3  studies was "rationally justifiable based on the nature of the studies" that "measured effects that are

4  not considered 'validated surrogate endpoints…'").

5  Grande concedes that "clinical significance is not the subject" of these two studies, which

6  observed changes in just one biomarker – urinary excretion levels of collagen type II or "CTX-II."

7  Ex. 5 (Grande 2022 Depo.) at 162:8–23, 163:24–164:11. Joint Juice is not advertised to "change

8  your CTX-II" in 20-year-old Japanese men. Therefore, to be relevant, Grande would have to explain

9  why the relevant randomized controlled human clinical trials ("RCTs") directly examining joint

10  pain and mobility should be disregarded in place of the small CTX-II biomarker studies conducted

11  on a population other than Joint Juice purchasers **and** why the measured outcome of these small

12  studies – observed changes in CTX-II levels – tells the factfinder anything since CTX-II levels do

13  not correlate with clinically meaningful outcomes at issue—improvements in joint pain and

14  mobility. *See* Ex. 3 (Hunter 2010) at 4 ("Validation of a biomarker is a necessary component to

15  delivery of high-quality research data necessary for effective use of biomarkers.").

16  Grande does none of this, nor does he even try. To the contrary, even Grande admits CTX-

17  II "has never been validated as a biomarker for OA progression" and questioned whether "urinary

18  CTX-II excretion can show any benefit." Ex. 2 (Grande 2017 Report) at 19–20; *see also* Ex. 4

19  (Grande 2017 Depo.) at 58:21–60:15 (explaining it has "been hard [] to gauge exactly the disease

20  state" with osteoarthritis in order to validate any biomarker).

21  In fact, in one of the few areas where a Grande opinion enjoys widespread consensus is that

22  CTX-II is not a validated biomarker related to any patient-important outcomes. Ex. 6 (McAlindon

23  Expert Report), ¶ 89; *see also* Ex. 7 (McAlindon Rebuttal Report), ¶ 45 ("[T]hese biomarkers

24  [including CTX-II] provide no clinically meaningful information about joint health in humans, nor

25  did they include any other outcome validated as an indicator of joint health."); Ex. 8 (Guilak Rebuttal

26  Report), ¶ 21 ("None of these biomarkers have been shown to be indicative of actual clinical

27  outcomes or changes in cartilage function, and thus measured in isolation, are not clinically

28  relevant.").

5

Case No. 3:16-cv-06980-RS

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

Further, a closer look at these two low quality Japanese biomarker studies reveals their significant limitations in providing reliable scientific evidence, including any evidence probative of the issues in this lawsuit. Indeed, Grande merely states these studies show glucosamine is a "potential candidate" for joint health benefits and the results "suggest a chondroprotective action in athletes." Ex. 1 (Grande Supplemental Report) at 3, 7–8. These studies fail to meet the rigors required by *Daubert* and the Reference Manual on Scientific Evidence, especially when there is a large amount of high quality RCTs, meta-analysis and other scientific evidence directly on point.

The first study, Yoshimura (2009) is a non-controlled study of 21 Japanese male college soccer players administered glucosamine hydrochloride 1,500 mg or 3,000 mg per day for three months. Ex. 9 (Yoshimura 2009). The study only analyzed urine levels of five biomarkers. Joint symptoms (pain, stiffness, mobility, flexibility) were ***not*** analyzed. Further, the biomarker results were not compared to any group that consumed a control – placebo or otherwise (i.e., there are no "between group" results). Thus, the study's biomarker results are just "within group" changes. The absence of a placebo comparison is a red flag because "data from a treatment group without a control group generally reveal very little and can be misleading." *See* Reference Manual on Scientific Evidence at 220.

The second study, Tsuruta (2018), involved 43 Japanese male collegiate soccer players who for 16-weeks received either placebo or a proprietary combination product containing 2,000 mg glucosamine hydrochloride, 1,800 mg arginine, 600 mg lysine hydrochloride, 400 mg alanine 400 mg glycine, 10 mg hesperidin, 0.2 mg β-cryptoxanthin and a vehicle consisting of 14 g maltodextrin, 4 g fructose, 4 g glucose and 5 g sucrose, vs 'placebo' diet (180 g) consisting of 14 g maltodextrin, 5 g fructose, 4 g glucose and 11 g sucrose. Ex. 10 (Tsuruta 2018). As with Yoshimura 2009, the authors of Tsuruta 2018 only examined urinary biomarker levels, and no joint symptoms (pain, stiffness, mobility, flexibility). The authors reported that only one of the four biomarkers was statistically significantly different between groups after 16 weeks – CTX-II. However, the CTX-II results from Tsuruta (2018) are entirely unreliable. The values for CTX-II ***were already*** statistically significantly different at baseline (i.e., pre-administration) between those in the placebo group and those in the glucosamine group. Ex. 10 (Tsuruta 2018) at Table 1. That means the study started off

6

Case No. 3:16-cv-06980-RS

00187728

1    with differences before anything was given to anybody and ended up different. This failure to

2    randomize means the "differences that existed before treatment may contribute to differences in the

3    outcomes that otherwise would become manifest." *See* Reference Manual on Scientific Evidence at

4    220; *see also* Ex. 7 (McAlindon Rebuttal Report), ¶ 45 (discussing the failure to randomize and the

5    consequent errors in the reported results). Without successful randomization and balancing, these

6    "confounding" factors often contribute to "an apparent (yet false) association" between the

7    intervention being tested and the outcome being examined. *See* Reference Manual on Scientific

8    Evidence at 592–93. Here, the problem of confounding is at its apex because the study was

9    statistically imbalanced for CTX-II from the beginning.

10    The two small Japanese biomarker studies on a population that is very different from those

11    Defendant targets for Joint Juice sales are junk science: Yoshimura (2009) lacked a placebo group,

12    and the only "positive" result from Tsuruta (2018) was with the one marker imbalanced at baseline.

13    Grande admits these CTX-II results in Japanese male college athletes have not been replicated in

14    any other clinical setting or population. Ex. 5 (Grande 2022 Depo.) at 171:9–172:3. At most these

15    studies suggested a possible difference in a biochemical marker that Grande himself testified has

16    not been validated and has nothing to do with the joint health promises at issue. Thus, Grande's

17    opinions about Yoshimura (2009) and Tsuruta (2018) are irrelevant, prejudicial, and will only

18    confuse the jury. *See In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 U.S. Dist. LEXIS

19    52409, at *147–48 (S.D. Fla. Mar. 5, 2010) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

20    (1997), and excluding biomarker opinions because "there is simply too great an analytical gap

21    between the data and the opinion proffered" and "the three biomarker studies, when closely

22    analyzed, do not support [the expert's] causation opinion"); *Young*, 567 F. Supp. 2d at 136 (same:

23    unaccepted biomarkers).

24    Relatedly, Grande opines that given Yoshimura (2009), the results from a study of horses

25    (Much 2020) are "translatable to humans." Ex. 1 (Grande Supplemental Report) at 8. Grande claims

26    the animal study shows a beneficial impact in horses from an "oral joint supplement containing

27    glucosamine and chondroitin sulfate." *Id.* The product studied was administered to 10 horses. It was

28    not Joint Juice, but a combination of glucosamine, chondroitin, hyaluronic acid,

BLOOD HURST & O' REARDON, LLP

7                                              Case No. 3:16-cv-06980-RS

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

methylsulfonylmethane, turmeric, resveratrol, collagen, silica, and boron. Ex. 11 (Much 2020) at 1. Grande claims the study showed positive results on the kinematics of the horses' gaits and horse cartilage metabolism biomarkers that are translatable to humans – citing the Yoshimura (2009) CTX-II biomarker study. Much (2020) did not examine the CTX-II biomarker. If they were translatable, then under Grande's logic Joint Juice does not work because the results from Much (2020) were entirely negative. There was "no influence of dietary treatment" on any biomarkers (Ex. 11 at 4 and Tables 4-5), stride length "did not differ between dietary treatments" (*id.* at 5 and Table 6), and "[t]here was no effect of treatment for knee [range of motion]" (*id.*).

This Court should exclude Grande's irrelevant and unreliable opinions regarding Yoshimura (2009), Tsuruta (2018), and Much (2020).

**C.      Grande's Opinion Regarding "Potential Reasons for Variability in Clinical Trials" Should Be Excluded**

As commonly occurs, there are occasionally different outcomes between low-quality research on glucosamine and chondroitin and high-quality research, although there are no differences in outcome for the type of glucosamine in Joint Juice. Grande treats all glucosamine and chondroitin the same, and then attempts to explain away the "variable clinical outcomes" in the clinical research results. Grande opines that "differences in the pharmacokinetics of glucosamine between individuals (bioavailability)" may "at least in part" be the reason. Ex. 1 (Grande Supplemental Report) at 9–10. Grande then speculates that individuality in glucosamine absorption "has a lot to do with the – the intestinal milieu and – and the microbiome." Ex. 5 (Grande 2022 Depo.) at 193:2–22. He states maybe the supposed absorption (bioavailability) and gut microbiota "interindividual differences" are "potential reasons" that explain away the many human clinical studies finding glucosamine and chondroitin do not work. Ex. 1 (Grande Supplemental Report) at 9; Ex. 5 (Grande 2022 Depo.) at 223:15–224:15.

Grande's opinions are made-up nonsense. They ignore the scientific method embraced in the Research Manual. The very purpose of clinical research is to control for variations in individuals to determine whether an agent works. The overwhelming amount of scientific evidence is that glucosamine and chondroitin do not work. Making up scientific-sounding opinions that "may"

8

Case No. 3:16-cv-06980-RS

1  provide a reason to disregard the high-quality studies applying universally accepted methodologies

2  is the very type of junk science a Court must preclude under *Daubert*.

3         Grande basis his opinions on just three studies.

4         The first two studies are "bioavailability" studies. A bioavailability study measures how well

5  a substance is absorbed and distributed throughout the body. *See* Reference Manual on Scientific

6  Evidence at 545, 667 n.92. A bioavailability study does not measure whether a substance works;

7  that is, whether it reduces the incidence of disease or affects a surrogate endpoint. Grande postulates

8  that Joint Juice may work for some people but not others because of differences among people in

9  the bioavailability of glucosamine and chondroitin bioavailable.

10        Grande's two bioavailability studies are by the same authors: Asthana (2020) and Asthana

11  (2021). Ex. 1 (Grande Supplemental Report) at 9; Ex. 5 (Grande 2022 Depo.) at 193:23–194:1.

12  Asthana (2020) is a bioavailability "pilot study" that did not attempt to examine and did not make

13  any findings about whether differences in glucosamine absorption correlate with effects on joint

14  pain, mobility, stiffness, or flexibility. *Id.* at 223:8–25. Asthana (2021) involved only 14 study

15  subjects. It also did not attempt to examine and did not make any findings about whether differences

16  in glucosamine absorption correlate with effects on joint pain, mobility, stiffness, or flexibility. *Id.*

17  at 225:5–25.

18        Grande also references a review article about the gut microbiome. Ex. 1 (Grande

19  Supplemental Report) at 9 (citing Shmagel 2019). However, Grande concedes he is not an expert in

20  this field. He has not studied the gut microbiome in general or the impact of any dietary supplements

21  on gut microbiota in particular. Ex. 5 (Grande 2022 Depo.) at 217:7–218:1, 219:11–17. Grande's

22  background relates to cartilage biology. He does not have technical expertise in the gut microbiome.

23  *Id.* Accordingly, his discussion of Shmagel (2019) and opinion that "studies have shed additional

24  light on how oral ingestion of [glucosamine and chondroitin] effect gut microbiota" is outside the

25  scope of his expertise. *See* Ex. 1 (Grande Supplemental Report) at 2; *White v. Ford Motor Co.*, 312

26  F.3d 998, 1008–09 (9th Cir. 2002) ("A layman, which is what an expert is when testifying outside

27  his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert

28

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1   witness for what is essentially a lay opinion."). On this basis alone, this portion of Grande's opinion

2   should be stricken because he is not qualified to render this opinion.

3       Moreover, the one study Grande cites about the microbiome is not just irrelevant, but Grande

4   misinterprets it. This review article, Shamgel (2019), examined 8 studies that reported the effects of

5   glucosamine or chondroitin on the gut microbial diversity in adults (4 studies) or mice (4 studies).

6   Ex. 12 (Shmagel 2019) at 1. The "[h]uman studies were more heterogenous [than the mice studies],

7   with three of four performed in vitro using fecal material from healthy volunteers and [chondroitin

8   sulfate] growth media [.]" The "fourth human study was a clinical trial of [glucosamine sulfate] vs.

9   [chondroitin sulfate]-containing supplement in a knee osteoarthritis population." *Id.* at 3.

10       That is, just one of the four human studies did not use an in vitro (petri dish) model. This

11   one study "showed no significant change in overall diversity of [gut microbial] species after

12   [chondroitin sulfate] supplementation." *Id.* at 3. That same study was also the only human study that

13   examined glucosamine, and it "found no significant differences in the total gut microbial diversity

14   after [glucosamine sulfate] supplementation, but reported a decreased absolute abundance of

15   *Staphylococcus*, *Enterococcus*, and *Clostridium* genera after supplementation." *Id.* at 4. But even

16   that change was not statistically significant. *Id.* at 7, Table 2. Regardless, Joint Juice is not advertised

17   to possibly decrease the absolute abundance of *Staphylococcus*, *Enterococcus*, and *Clostridium*

18   bacteria in your gut, which has absolutely nothing to do with joints, joint health, joint pain or joint

19   stiffness.

20       Admissible expert scientific opinion must be based on properly designed and conducted,

21   well-powered, properly randomized, placebo-controlled studies that account for relevant biological

22   variations among individuals. Once these criteria are met, the studies can reach statistically reliable,

23   population-based conclusions about whether a treatment works or does not.[6] Grande ignores this

24   basic precept of reliable clinical research, while also lacking the qualifications to reliably analyze

25   issues about the microbiome. In fact, he misinterprets the one gut microbiome study he cites.

26

27

28       [6]    Indeed, if anything, individual variability calls into question the reliability of all the small studies that Silverman cites. *See* Section III.A.3.a above.

1   Grande offers nothing other than an unproved hypothesis to try to explain away all of the
2   direct high-quality scientific evidence that shows Joint Juice to be snake oil. Grande does not apply
3   any accepted methodology to analyze the large amount of relevant scientific evidence. His opinion
4   is not the result of reliable scientific analysis and therefore must be excluded. *See Porter v. Whitehall*
5   *Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993) (holding that *Daubert* requires exclusion of "unproved
6   hypotheses"); *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 U.S. Dist. LEXIS
7   129369, at *33–34 (D. Ariz. Aug. 2, 2019) (same).

8   **D.    Grande Relies on and Misinterprets Irrelevant Studies, With "Too Great a**
9   **Gap" Between His Opinion and the Science**

10   Grande cites and discusses preclinical in vitro and animal studies that can have no bearing
11   on the issues in this action. These studies solely aimed to elucidate biological plausibility or potential
12   mechanisms of action of glucosamine and chondroitin. By their very nature, these types of studies
13   do not attempt to determine clinical effects (e.g., joint pain relief or mobility benefits). Nonetheless,
14   Grande uses those studies to reach conclusions about Joint Juice. There is too great a gap between
15   Grande's conclusions and the data on which he relies. Therefore, the opinions in Sections III.A. and
16   III.B of Grande's Supplemental Report and the "In Vitro Studies" and "Preclinical In Vivo Studies"
17   opinions located at pages 9-11 of his 2017 Report must be excluded.

18   Grande's section on "Animal Studies" cites one animal study (Akman 2017), and one in
19   vitro study (Ma 2018). Ex. 1 (Grande Supplemental Report) at 3–4. Akman (2017) is a rat study of
20   an injectable hydrogel combination of hyaluronic acid, chondroitin sulfate, and n-acetyl
21   glucosamine, which is not the type of glucosamine used in Joint Juice. Grande admits that direct
22   injection into the joint "is a completely different route" than with Joint Juice, which one drinks. Ex.
23   13 (Akman 2017); Ex. 5(Grande 2022 Depo.) at 184:19–185:20. He also admits the results from
24   Akman (2017) are on "a defect model in cartilage repair, a completely different set of circumstances
25   and not directly transferrable" to oral consumption of glucosamine and chondroitin. *Id.* at 194:2–
26   196:9.

27   Grande also cites Ma (2018), an in vitro study involving rat chondroctyes (cartilage cells).
28   The concentration of glucosamine used in Ma (2018) is 50-150 times greater than can be achieved

11   Case No. 3:16-cv-06980-RS

in humans following oral consumption of 1500 mg glucosamine. Ex. 7 (McAlindon Rebuttal Report), ¶ 5(c); Ex. 8 (Guilak Rebuttal Report), ¶ 7. That amount is irrelevant to examining the effect of Joint Juice on the reasonable consumer and is likely toxic in humans. *Id.* Even Grande admits that a person cannot consume the amount of glucosamine used in these rat studies. Ex. 5 (Grande 2022 Depo.) at 114:2–25 (ten bottles of Joint Juice "is probably not a good idea" – "it is a sugar so you don't want to overdose on a sugar."); *see also id.* at 112:10–16 (glucosamine is a sugar so it would "make sense" if it was used to mimic diabetes in cell models). Given the relevant RCTs that exist in this field that used physiologic amounts of glucosamine and chondroitin and directly measured impact on joint health symptoms, reliance on or discussion of these studies constitutes a prejudicial and misleading diversion.

Grande cites more preclinical studies that examine the impact of mega-doses of glucosamine or chondroitin on biomarkers, the purpose of which is to help elucidate biologic mechanism or plausibility to "assist researchers in framing hypotheses and in developing study designs" for clinical trials. *See* Reference Manual on Scientific Evidence at 563. These studies, none of which examined joint pain, stiffness, mobility or flexibility, have no relevance to Joint Juice's advertised efficacy and are likely to mislead or confuse the jury. Grande is unable to explain why or how these pathological mechanism, mega-dose studies would apply to human consumption of Joint Juice and whether it actually provides the advertised joint health benefits. *See Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292, at *44–48 (S.D.N.Y. Sept. 3, 2021) (collecting cases about the "methodological difficulties in applying animal data to humans" and excluding expert testimony on biologic plausibility that cited animal studies on "high doses").

- At page 5 of his Supplemental Report, Grande cites Phitak (2010), which examined biomarkers using a range of glucosamine concentrations on cartilage explants or cells that are ***1000 times or greater*** than those measured in humans after ingesting standard doses of glucosamine and exceed the levels shown to be deleterious in vivo. *See* Ex. 8 (Guilak Rebuttal Report), ¶ 7.

BLOOD HURST & O' REARDON, LLP

12                                            Case No. 3:16-cv-06980-RS

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

- At page 10 of his 2017 report and page 4 of his Supplemental Report, Dr. Grande cites an in vitro biomarker study (Imagawa 2011) that tested concentrations of glucosamine representing *several hundred times* the peak concentrations of glucosamine measured in humans. *See* Ex. 8 (Guilak Rebuttal Report), ¶ 8.

- At page 10 of his 2017 Report, Dr. Grande cites Stoppolini (2015), an in vitro chondrocyte (cartilage cell) study on biomarkers which involved glucosamine concentrations of *more than 100 times* peak levels in vivo. *See* Ex. 8 (Guilak Rebuttal Report), ¶ 8.

- At page 10 of his 2017 Report, Dr. Grande also cites Lippiello (2000), a rabbit model study, which examined "a daily dose approximately 20 times the human dose." Ex. 14 (Lippiello 2000) at 237. Study authors made clear the purpose of using such large dosage was not to examine if joint health benefits would be seen in humans: "the goal in the current study was to maximize the therapeutic effect and test for safety in other organs." *Id.* at 238. Even still, the mega-dose of glucosamine did not impact healthy cartilage. *Id.* at 238 (noting a "lack of an effect … on normal cartilage metabolism").

- Taniguchi (2012) is cited by Grande at page 6 of his Supplemental Report. This study in guinea pigs on histological and biomarker changes used 10 times the amount of glucosamine in a standard oral human dose. *See* Ex. 8 (Guilak Rebuttal Report), ¶ 15.

- Chiu (2019), which is cited at page 4 of Grande's Supplemental Report involved *1000 times* more glucosamine than is in Joint Juice. Maldonado (2021), also cited at page 4 of Grande's Supplemental Report, involved 16 times the glucosamine and 150 times the chondroitin in Joint Juice. *See* Ex. 7 (McAlindon Rebuttal Report), ¶¶ 47(a)(i)-(ii).

The mega-dosage matters. For example, at page 8 of his Supplemental Report, Grande cites an equine cartilage study (Dechant 2005) that examined 4 hyper physiologic doses of glucosamine and only the highest dose had any effect on the examined biomarkers. *See* Ex. 8 (Guilak Rebuttal Report), ¶ 8. This observation is consistent with the Reference Manual's warning that one "significant disadvantage…with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose-response relationship …

BLOOD HURST & O' REARDON, LLP

00187728

BLOOD HURST & O' REARDON, LLP

1    [which is] almost always fraught with considerable, and currently unresolvable, uncertainty."

2    Reference Manual on Scientific Evidence at 563. The authors of Stoppolini (2015) (cited at page 10

3    of Grande's 2017 Report) acknowledge that the results of these mega-dose studies are for a limited

4    purpose and do not attempt to measure any clinically meaningful, patient-important symptom effects

5    of glucosamine: "Although these concentrations, upon oral administration, cannot be achieved in

6    joints [], we used them in order to gain insight into the potential mechanisms of [glucosamine] when

7    injected intra-articularly." Ex. 15 (Stoppolini 2015) at 110. By 2010, scientists had determined the

8    literature on the bioavailability of oral glucosamine in humans is "remarkably consistent" such that

9    "it seems reasonable that no further research is necessary in this area" and "any future use of animal

10    models [] without [this same amount of glucosamine] seems unlikely to yield useful information

11    about GlcN [glucosamine] effects in humans." Ex. 17 (Block 2010) at 7.[7]

12      Whether these massive dose studies in animals and cell models demonstrate that "in the

13    abstract" glucosamine or chondroitin can impact biomarkers of joint health is a "waste of time" and

14    "too far afield from the ultimate question" whether Joint Juice actually provides the advertised joint

15    health benefits. *See In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1113 (N.D. Cal. 2018)

16    (focusing on studies "at the kinds of massive doses, administered in the kinds of ways, that

17    laboratory animals alone have experienced" "would be a waste of time" because "it is not enough

18    for the plaintiffs merely to present evidence that glyphosate is capable of causing cancer in the

19    abstract").

20      Another study cited by Grande that is simply too attenuated is Artuzi (2020). Ex. 1 (Grande

21    Supplemental Report) at 8–9. Citing only Artuzi (2020), Grande opines that "[p]reclinical studies

22    have also indicated the possible structure modifying effects of glucosamine and chondroitin, which

23

---

24    [7]    The other animal and in vitro studies upon which Grande relies all suffer from the same
massive dosage defect, which makes them "not physiologically relevant" in this field (Ex. 17 (Block

25    2010) at 6), and misleading for purposes of this litigation. *See* Ex. 2 (Grande 2017 Report) at 9–11
(citing Adebowale (2002) (dogs with 4 times the maximum concentration of glucosamine in

26    humans); Bassleer (1998) (in vitro concentration 10 to 100 times the amount found in humans);
Lippiello (2003) (cattle cartilage with 12 to 200 times the amount found in humans); Chan (2007)

27    (two to five times the amount found in humans); Gibson (2014) (rats with 175 times the amount
found in humans); Naito (2010) (rats consuming over 40 times the amount consumed by humans);

28    and Jomphe (2007) (in vitro concentration 40 times greater than found in humans)).

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

have been borne out in human studies." *Id.* at 8. Artuzi has no relevance to Joint Juice or the advertising at issue. There, authors observed mixed effects on TMJ (jaw joint) osteoarthritis in rabbits that received subcutaneous injections of glucosamine and chondroitin every three days. Ex. 16 (Artuzi 2020) at 3. Leaving out the word "rabbit" and then copying a sentence from the paper's abstract, Grande states this study "indicate[s] that glucosamine and chondroitin sulfate may have a structure modifying effects on tissues of the TMJ altered by OA." Ex. 1 (Grande Supplemental Report) at 8–9. However, as noted by the study authors, TMJ cartilage "differs structurally and functionally from" the articular cartilage covering the knee joint. *Id.* at 2. Observing this limitation, Artuzi and co-authors cited another rabbit study that examined oral administration of glucosamine and chondroitin and found "no reduction in disease severity" on knee osteoarthritis. *Id.* at 10 (citing Roman-Blas 2017). Grande's reliance on data from the rabbit TMJ study, Artuzi (2020), and the conclusions he derives from it are irrelevant and likely to confuse the issues.

"A court may conclude that there is simply too great a ... gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. In *Joiner*, the Supreme Court found that the animal studies on which experts relied, which involved "massive doses" of the purported carcinogen, "were so dissimilar to the facts presented" in the litigation that it was not improper to reject the experts' reliance on them. *Id.* at 144; *see also* Reference Manual on Scientific Evidence at 563 ("The second difficulty with inferring human causation from animal studies is that the high doses customarily used in animal studies require consideration of the dose-response relationship and whether a threshold no-effect dose relationship exists."); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 438 (S.D.N.Y. 2005) (excluding testimony based on animal studies failing to "approximate[] the doses to which clinically relevant quantities of cells in the human liver are exposed"). "[S]uch an opinion will be excluded not because it is necessarily incorrect, but because it is not sufficiently reliable and therefore too likely to lead the factfinder to an erroneous conclusion." *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999). As in *Joiner*, there is too great a gap between Grande's opinions about Joint Juice working as advertised in humans and the data he cites.

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE

BLOOD HURST & O'REARDON, LLP

00187728

## IV.   CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that Grande's reports and opinions be excluded.

Respectfully submitted,

Dated: March 21, 2022

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)

By:          *s/  Timothy G. Blood*
                 TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

IREDALE & YOO, APC
EUGENE G. IREDALE (75292)
GRACE JUN (287973)
105 W. F Street, Floor 4
San Diego, CA 92101
Tel: 619/233-1525
619/233-3221 (fax)
egiredale@iredalelaw.com
gjun@iredalelaw.com

LYNCH CARPENTER, LLP
TODD D. CARPENTER (234464)
1350 Columbia Street, Suite 603
San Diego, CA  92101
Tel: 619/762-1910
619/756-6991 (fax)
todd@lcllp.com

*Additional Attorneys for Plaintiff*

BLOOD HURST & O' REARDON, LLP

00187728

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on March 21, 2022, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the

5 foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6 indicated on the Electronic Mail Notice List.

7    Executed on March 21, 2022.

8

9               s/ *Timothy G. Blood*

               TIMOTHY G. BLOOD

10             BLOOD HURST & O'REARDON, LLP

11             501 West Broadway, Suite 1490

             San Diego, CA 92101

12             Tel: 619/338-1100

             619/338-1101 (fax)

13             tblood@bholaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

00187728

MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S EXPERT DANIEL A. GRANDE