BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>  Defendant. | Case No. 3:16-CV-06980 RS<br><br>**DECLARATION OF TIMOTHY G. BLOOD IN SUPPORT OF PLAINTIFF'S MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARD FOR CLASS REPRESENTATIVE**<br><br>DATE:<br>TIME:<br><br>**CLASS ACTION**<br><br>Judge:  Honorable Richard Seeborg<br>Courtroom:  Courtroom 3, 17th Floor<br><br>Complaint Filed:  December 5, 2016<br>Trial Date:  May 23, 2022 |

BLOOD HURST & O' REARDON, LLP

Case No. 3:16-cv-06980-RS
DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

I, TIMOTHY G. BLOOD, declare:

1.     I am the managing partner of the law firm Blood Hurst & O'Reardon, LLP, one of counsel for Plaintiff in this action. I am court-appointed Class Counsel pursuant to Federal Rule of Civil Procedure 23(g) in the above-entitled matter. I have personal knowledge of the matters set forth in this declaration or believe them to be true based on facts and events made available to me and would be competent to testify as to them.

## I.     INTRODUCTION

2.     I submit this declaration in support of Plaintiff's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Award for the Class Representative. Pursuant to Local Rule 54-5(a) the parties met and conferred for the purpose of resolving any disputed issues relating to attorneys' fees. The parties were not able to come to an agreement.

3.     I believe the requested fees and costs are fair and reasonable under controlling law, particularly considering the results realized for the Class and the time and expense spent by Plaintiff's Counsel to achieve the results. I also believe the requested service award is fair compensation for the services rendered by the Class Representative, Mary Beth Montera, who was an exemplary class representative whose dedication, hard work and helpfulness was exceptional. Ms. Montera provided feedback to Plaintiff's Counsel while in San Francisco and provided valuable input from a layperson's perspective. The Declaration of Ms. Montera in support of the application for a service award is filed concurrently.

4.     The outstanding result at trial was reached after extensive litigation spanning nearly ten years from the start of pre-filing investigation. The motion practice was substantial and included motions for class certification, a motion for summary judgment, motions to exclude expert declarations in connection with class certification and summary judgment, a motion for judgment on the pleadings, two motions for decertification, motions in limine, and numerous *Daubert* motions to exclude expert testimony in connection with class certification, summary judgment, and at trial. All the motions were heavily contested and fully briefed, with some involving multiple rounds of briefing. The litigation also involves substantial discovery. Plaintiff's Counsel (1) conducted and defended 49 depositions, including those of Defendant's corporate designees, its CEO, current and

BLOOD HURST & O' REARDON, LLP

00193761

former marketing, operations, and science employees, and scientific, marketing and damages-related experts; (2) reviewed over 500,000 pages of documents produced by Defendant; and (3) served 23 subpoenas on third parties with involvement in marketing and retail sales issues who produced thousands of pages of documents. Plaintiff's Counsel also responded to discovery served on Plaintiff, defended the deposition of Ms. Montera and eleven other named plaintiffs whose testimony was used throughout the litigation, and worked with more than eleven of their own expert witnesses and additional consultants to prepare for class certification, summary judgment, and trial, including preparing and exchanging expert reports and conducting and defending expert depositions. 43 expert reports or declarations were exchanged by the parties at various stages of the litigation. After a nine-day trial the jury came back after just 2.5 hours and awarded Plaintiff and the Class full recovery on both consumer fraud claims.

5.      Given the protracted nature of the litigation and the sophistication of counsel involved, the litigation also changed, refined, and became more challenging over time as defense counsel adjusted and responded to our positions and as we adjusted and responded to theirs.

## II.      SUMMARY OF LITIGATION HISTORY

6.      In 2012, primarily my firm began investigating whether the advertising claims about Joint Juice were false or misleading. We are a small contingency-only plaintiffs firm and are very selective in the cases we bring. We carefully research them before filing. The work from the beginning was used in the *Montera* trial, which was tried as a type of bellwether for the overall litigation. Despite the number of cases, the litigation was mostly treated as one matter, except for some notable exceptions, because of the shared facts, common science, and very similar legal claims. The investigation included a review of the scientific evidence analyzing Joint Juice's ingredients, glucosamine hydrochloride, chondroitin sulfate, and several vitamins. There was a large amount of science cutting both ways, but Plaintiff's Counsel determined that the better science showed that Joint Juice did not work. We also obtained as much advertising as possible and informally sought out various opinions about the implicit meaning of the advertising.

7.      On March 21, 2013, the initial complaint was filed on behalf of a nationwide class. Dkt. No. 1 at 15. Premier answered on May 21, 2013. Dkt. No. 21. Soon after, Plaintiff's Counsel

BLOOD HURST & O' REARDON, LLP

00193761

began formal discovery and prepared and proposed a detailed ESI protocol, but Premier refused to discuss it. *See* Dkt. No. 42. The parties discussed the possibility of settlement and exchanged limited discovery related to the scientific studies Premier relied on to support its advertising claims and Joint Juice sales data in advance of a November 2013 mediation held in San Francisco. We analyzed Premier's science in preparation for the mediation. Despite a full day of mediation, it went nowhere.

8.      Discovery then began in earnest. Pursuant to the parties' later agreement, all of the discovery taken in the initial part of the litigation could be and was used in the bellwether case. In 2014, Plaintiff's Counsel subpoenaed documents from Eleven Inc. and R2C Group to obtain market research and other marketing-related documents about Joint Juice and Premier's marketing strategy. The documents from these third-parties were used by experts throughout the litigation, including at trial. Plaintiff's Counsel also subpoenaed ten retailers that sold Joint Juice. From these subpoenas, Plaintiff's Counsel received over 2,000 pages of valuable marketing documents and comprehensive retail sales data for the Joint Juice products.

9.      Starting in June 2014, Plaintiff's Counsel deposed six Premier employees. The depositions included CEO Darcy Horn, Joint Juice Brand Manager Lance Palumbo, and Dr. Kevin Stone, the creator of Joint Juice. Premier also designated Mr. Palumbo as a Rule 30(b)(6) witness. Given the number of topics and amount of testimony, his deposition took place over three days. These depositions were used in preparing the *Montera* trial and to impeach the Premier executives and employees at trial.

10.     Also in 2014, Plaintiff's Counsel retained various expert consultants to help guide them in the case. These include Dr. Jeremiah Silbert, Dr. Steven R. Graboff, Dr. Lynn R. Willis, and Mark Keegan. Each of these experts helped Plaintiff's Counsel understand various aspects of the case to allow them to formulate theories and arguments used throughout the litigation. They also gave us the foundation to adapt, change and refine theories as both sides approach to the litigation became for sophisticated and nuanced. They further led us to additional experts that were ultimately used in connection with trial.

11.     In the first part of 2015, the parties retained experts and exchanged expert reports to be used for class certification, summary judgment, and the first scheduled trial. The parties each

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

BLOOD HURST & O' REARDON, LLP

retained science, marketing, survey, and damages experts. In April 2015, the parties participated in a second mediation in San Francisco. Once again, the mediation failed. Expert discovery continued with the depositions of five expert witnesses.

12.     Premier then filed a motion for summary judgment (Dkt No. 85), and Plaintiff moved for class certification (Dkt. No. 88). Both motions were heavily briefed and involved a large amount of evidence. The orders resulting from these motions have been repeatedly used by the parties and the Court, including in connection with motions filed shortly before, during and after the *Montera* trial. Plaintiff's motion sought a nationwide class or alternatively, a multi-state class which included the New York class here. Premier opposed a nationwide class and any grouping for a multistate class. Dkt. No. 98. Each party also filed *Daubert* motions to exclude aspects of the other side's expert opinions.

13.     On April 15, 2016, the Court issued its order denying Premier's motion for summary judgment and granting portions of plaintiff's motions to exclude Premier's marketing and science experts. *See Mullins*, 178 F. Supp. 3d 867 (N.D. Cal. 2016). The Court found that the full refund damages model was appropriate, found that Premier targeted arthritis sufferers and utilized Dr. Stone in advertisements to add credibility to the Joint Juice advertising message, and noted that Plaintiff's Counsel had "identified many significant issues to address during cross-examination" with Premier's outside survey expert. *Id.* at 876, 878, 906. The Court excluded Premier's expert's opinions related to treatment protocols and injectable glucosamine. *Id.* at 904. Plaintiff has continually relied on this order throughout the litigation, including to exclude certain opinion testimony of Premier's Dr. Grande, whose testimony was so limited by the time of the *Montera* trial that Premier did not call him as a witness. *See* Dkt. No. 180 at 16-18. The Court granted class certification of the California class and requested further briefing from the parties related to the multi-state class. *See Mullins*, 2016 U.S. Dist. LEXIS 51140 (N.D. Cal. Apr. 15, 2016).

14.     The experts and consultants retained by Plaintiff's Counsel in the litigation were crucial in developing Plaintiff's litigation and trial strategy and combating the convincing pseudo-science Premier developed. For example, Dr. Silbert was retained to show that physiologically the active ingredients never made it to one's joints. Dr. Silbert was the world's leading researcher in

BLOOD HURST & O' REARDON, LLP

00193761

this area. He passed away last year. Even then, Dr. McAlindon used Dr. Silbert's research and insights in his trial testimony. *See e.g.*, Trial Tr. 109. Dr. Silbert's assistance also was the genesis of Plaintiff's Counsel presentation at trial about the misleading nature of Premier's advertisements that showed or implied that Joint Juice was absorbed into the joint.  Premier's summary judgment motion was so thoroughly repudiated that aspects of it have been used throughout the litigation and that was the only summary judgment motion Premier brought.

15.     Dr. Graboff also helped Plaintiff's Counsel develop the facts and arguments about the hierarchy for treating osteoarthritis and professional medical societies' guidelines recommending against the use of glucosamine and chondroitin supplements for osteo-arthritis, which also was used at trial. His testimony was cited in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 885, 893 (N.D. Cal. 2016).

16.     Dr. Willis helped Plaintiff's Counsel understand and formulate arguments used throughout the litigation about clinical research, meta-analyses, treatment protocols, and in vitro and animal study research. He helped counsel find additional experts used in the litigation and was cited extensively by the Court in the order denying Defendant's motion for summary judgment: *Id*. at 883-86, 895.

17.     Mr. Keegan helped Plaintiff's Counsel understand Premier's consumer research, the Joint Juice advertising message, and the faults with Premier's survey expert's, Hal Poret, opinions. Mr. Keegan's expert testimony was cited in the orders granting class certification and denying Defendant's motion for summary judgment *See, e.g*., *Id*. at 867, 879-82 and 2016 U.S. Dist. LEXIS 51140, at *9 (N.D. Cal. Apr. 15, 2016).

18.     The summary judgment and class certification orders have been central to the litigation and extensively relied upon by the parties in *Montera*. *See e.g*., Dkt.  No. 290 at 7-8, 13-14, 16, 18 (Plaintiff's opposition to decertification motion); (Plaintiff's opposition to decertification motion); Dkt. No. 264 at 6 (Plaintiff's objections to final jury instructions); Dkt No. 227 (Premier's opposition to motion in limine); Dkt No. 224 at 1-2, 9-10 (Plaintiff's motion in limine); Dkt No. 222 at 5 (Plaintiff's trial brief); Dkt No 208 at 3, 7 (Plaintiff's opposition to motion in limine); Dkt. No. 190 at 2-3 (same); Dkt. No. 166 (same); Dkt. 165 at 1, 2-3 (same); Dkt No. 188 at 1 (same);

BLOOD HURST & O' REARDON, LLP

00193761

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

Dkt. No. 184 at 1, 5, 11 (Plaintiff's opposition to the motion to exclude opinions of Dr. Dennis at trial); Dkt. No. 166 at 2 (Plaintiff's motion in limine); Dkt No. 165 at 1, 2, 3 (same); Dkt No. 145 at 1 (Premier's opposition to motion to exclude Dr. Grande's testimony at trial); Dkt No. 129 at 1, 3-4 (Plaintiff's motion to exclude Dr. Grande's testimony at trial); Dkt No. 124 at 4 (Plaintiff's motion to exclude e Dr. Silverman's testimony at trial); Dkt. No. 193 at 53 (Plaintiff's proposed jury instructions).

19.    As a result of positions taken by Premier and consistent with the Court's class certification ruling, between November 18, 2016, and January 5, 2017, Plaintiff's Counsel filed the additional state-only class actions, including the New York action that became *Montera*.

20.    At the February 9, 2017, case management conference, Premier made an oral motion to stay the related actions until after the *Mullins* trial. *Montera*, Dkt. No. 170. Counsel for plaintiffs objected, but the Court granted the motion to stay. *Id.* Premier then requested a continuance of the expert disclosures deadline, which was granted. *Id.*

21.    As a result of the passage of time and as the case developed because of the hard-fought and protracted nature of this litigation, Plaintiff retained additional experts because others were no longer able to testify or people with different backgrounds became more useful given the posture of the litigation, the positions we wanted to advance, and our responses to positions taken by Premier, its lawyers, and their experts. These included retaining Dr. McAlindon, one of the world's leading scientific experts on osteoarthritis, in 2016. Picking up on work done by earlier experts, Dr. McAlindon provided extensive analysis of the scientific evidence behind the Joint Juice ingredients. Dr. McAlindon systematically reviewed the applicable scientific studies and produced an expert report exceeding one-hundred pages. He also developed detailed rebuttal reports to refute the assertions of Premier's experts, Drs. Grande, Lippiello, and Silverman. These reports provided the framework for his trial testimony and were utilized in developing several of the trial demonstratives used with the jury.

22.    Plaintiff also retained Colin Weir in 2017 to rebut expert opinions of Premier's economics expert, Dr. William Choi, as defendant developed its theme that Joint Juice provided multiple benefits and people purchased Joint Juice for multiple reasons. Because of this rebuttal

BLOOD HURST & O' REARDON, LLP

00193761

work, Dr. Choi substantially limited the related expert report done shortly before the *Montera* trial. Although Plaintiff's Counsel also retained Mr. Weir to rebut Dr. Choi, given the weakness of Dr. Choi's opinions, Plaintiff's Counsel decided the rebuttal testimony was not needed. Instead, Mr. Weir's trial testimony was limited to the retail sales data analysis he performed.

23.     Plaintiff's Counsel are not including the trial work performed in connection with the then-anticipated May 10, 2018, trial on the matter that became known as *Sonner*, plaintiff's claim for injunctive relief which was eventually dismissed for lack of personal jurisdiction, or work performed in the subsequent *Bland* and *Sonner* state court actions (currently pending in Alameda County Superior Court) relating to the complaints in those actions, removal, remand, the 2020 and 2021 state court motions for class certification, Premier's motion to stay in *Sonner*, class notice in *Bland*, or third-party retailer subpoenas served this month in *Bland*. Plaintiff also is not seeking reimbursement for fees or expenses related to the work pertaining to the various *Sonner* appeals, as that work did not benefit the New York Class in *Montera*.

24.     In September 2018, the Court lifted the stay in the related actions, including the New York action, and shortly thereafter, Premier answered the ten complaints. *Montera*, Dkt. No. 36. Because the actions are all based on the same facts and assert similar state statutory consumer protection claims presenting largely the same issues, the parties agreed to streamline discovery by sharing the discovery obtained up to that date. *Montera*, Dkt. No. 28. All of the work done up to this time was used in *Montera*, other than the time excluded as described above, for the work unique to *Sonner*.

25.     On July 18, 2019, Premier moved for judgment on the pleadings again arguing the FDA preempted the state law claims because Joint Juice was not advertised to treat or prevent arthritis or joint pain. *See Montera*, Dkt. No. 48. The Court denied the motion noting that "the prior order denying summary judgment in *Mullins* found that plaintiff had successfully raised triable issues of fact regarding both [implied prevention and treatment of arthritis] claims." *Mullins*, 2019 U.S. Dist. LEXIS 153698, at *12 (N.D. Cal. Aug. 29, 2019). Premier deposed the other named plaintiffs. The testimony from these named plaintiffs has been used throughout the litigation,

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

BLOOD HURST & O' REARDON, LLP

00193761

1    including by Plaintiff and the Court in connection with the motion for leave to substitute Ms.

2    Montera as the Class Representative. *Montera*, Dkt. No. 134 at 5-6.

3        26.    On August 29, 2019, Plaintiffs filed an omnibus motion for class certification after

4    Premier refused to stipulate that the class certification requirements were met. *See Montera*, Dkt

5    No. 60-3. Despite its refusal that required us to fully brief class certification again, in the end, and

6    given the work we did in obtaining the prior order granting class certification of the California class,

7    Premier did not oppose the motion other than on a minor issue about the length of some of the class

8    periods. *See Mullins*, 2019 U.S. Dist. LEXIS 229365, at *2-3 (N.D. Cal. Dec. 17, 2019) ("In light

9    of the class of California consumers previously certified in this action, [citation] Premier does not

10   substantively oppose class certification."). The Court also acknowledged that "Plaintiffs have

11   provided hundreds of pages of factual discovery demonstrating that Premier engaged in a

12   coordinated advertising campaign which caused customers to buy Joint Juice because of its

13   purported health benefits." *Id*. at *4.

14       27.    Next, from June 2019 to December 2021, Drs. Guilak, Dennis, and Rucker were

15   retained to consult, prepare Rule 26 reports, and testify as needed. Dr. Guilak, an expert in basic

16   science research on osteoarthritis, tissue engineering, and biomechanics, was retained to refute one

17   of Premier's central science experts, Dr. Grande and address topics previously addressed by Dr.

18   Silbert. Dr. Guilak was also retained to rebut another of Premier's former science experts, Dr.

19   Lippiello, whom Premier ultimately chose to not use.

20       28.    Plaintiff retained Dr. Dennis to conduct a consumer survey concerning the

21   advertising message conveyed by Joint Juice. The Court noted that Dr. Dennis' survey "bolstered"

22   the evidence that Plaintiff developed in the prior class certification briefing. *See* 2019 U.S. Dist.

23   LEXIS 229365, at *4. Dr. Rucker, a highly published researcher in the science of marketing,

24   advertising, and psychology, described the marketing elements which are implemented by brands

25   and analyzed Premier's marketing documents to analyze Premier's strategy and conclude that a

26   reasonable consumer purchases Joint Juice to address their joint issues such as joint pain and

27   stiffness. *See* Dkt. No. 127-2 at 35. Drs. Guilak, Dennis, and Rucker also scrutinized Premier's

28   experts in their rebuttal reports. On September 24, 2020, a third all-day mediation session was held.

BLOOD HURST & O' REARDON, LLP

The mediator, Judge Layne Phillips, concluded after half a day that continuing further would not result in a resolution.

29.     In April 2021, the Court directed the parties to propose trial dates and selected a first case for trial. *See Montera*, Dkt. No. 96. The parties reached agreement on possible trial dates but not on the first case to try. *Montera*, Dkt No. 97. In November 2021, the Court issued an order setting the trial date in *Montera* for May 23, 2022. Dkt. No. 98. Class Notice was disseminated on December 28, 2021. The parties prepared for trial, worked with the science, marketing, survey, and damages consultants and experts, completed expert discovery, and plaintiffs requested and received updated fact discovery related to sales data.

30.     While preparing for trial, Class Counsel learned that the original named plaintiff had been found to be an inadequate class representative in another action. *See Montera*, Dkt. No. 106. Class Counsel believed that ethically they had no choice but to seek to substitute the class representative, even though the named plaintiff had done an excellent job in this case. Accordingly, despite the risk of doing so at that late stage, on February 28, 2022, Class Counsel moved for leave to substitute Ms. Montera and requested that the Court appoint her as the new Class Representative. *Id.* Premier opposed the motion and requested that the Class be decertified or alternatively, that the trial be delayed. *Montera*, Dkt. No. 111. The Court granted the motion for leave, appointed Ms. Montera as the Class Representative, and held firm on the trial date. *Montera*, Dkt No. 134. We made Ms. Montera available for deposition on May 4, 2022.

31.     On March 24, 2022, Premier again sought to decertify the Class, arguing causation was lacking because consumers purchase Joint Juice for "many reasons having nothing to do with Premier's advertising" and a full refund was not available because Joint Juice provides non-joint health benefits such as taste and hydration. *Montera*, Dkt. No. 130 at 1, 3, and 8.

32.     From January 12, 2022, to February 14, 2022, the parties designated 12 experts and exchanged 20 expert reports. The parties prepared and took 11 expert witness depositions. *Id.* Thereafter, the parties collectively filed eleven *Daubert* motions, with corresponding opposition and reply briefs to each.

BLOOD HURST & O' REARDON, LLP

33.     On April 26, 2022, the Court denied another of Premier's motions to decertify the class and granted in part and denied in part the parties *Daubert* motions. *Montera*, 2022 U.S. Dist. LEXIS 75843 (N.D. Cal. Apr. 26, 2022). As a result of the years of work done, the strategic positions we took, and our efforts to impact the positions Premier's experts were forced to take, the order was overwhelmingly favorable to Plaintiff. The Court agreed with Plaintiff that statutory damages under the GBL are to be assessed on a "per transaction" basis. *Id*. at *21. The Court excluded Premier's lead scientific expert, Dr. Silverman, from testifying on the human microbiome and the bioavailability of the active ingredients in Joint Juice, personal observations about his patients' use of glucosamine, the importance of alternative osteoarthritis treatments, and regulatory matters. *Id*. at *22-26. The Court also precluded Premier's other science expert, Dr. Grande, from testifying about bioavailability because it was based on "speculation." *Id*. at *26-28. Plaintiff's Counsel were able to limit and truncate Dr. Grande's testimony so much that Premier never called him at trial, even though it kept saying it would so Plaintiff's Counsel would have to spend time preparing the cross-examination. The Court also found that the consumer survey conducted by Premier's expert has "limited probative value" and "numerous shortcomings" which could be addressed on cross-examination. *Id*. at *31-32. The Court precluded Premier's two non-retained experts, Dr. Stone and Palumbo, from providing expert testimony. *Id.* at *34-36. Premier's motion to decertify the class was also denied. *Id*. at *37-44 (holding "Plaintiff has presented common evidence that Premier's marketing statements caused class members to purchase Joint Juice," and "Plaintiffs may pursue a full refund theory of liability.").

34.     After a nine-day class trial, the jury reached a unanimous verdict in just two and half hours. *See Montera*, 2022 U.S. Dist. LEXIS 144491, at *7-8 (N.D. Cal. Aug. 12, 2022). The jury found that Premier engaged in deceptive acts and practices in violation of GBL § 349 and that Joint Juice was falsely advertised in violation of GBL § 350. *Id.* The jury found that full refunds should be awarded to Ms. Montera and the Class, rejecting Premier's applicable arguments and expert opinion testimony. *Id*. at *8.

35.     Thereafter, Premier filed an unsuccessful motion for judgment as a matter of law. *Id.* The Court also granted Plaintiff's motion for entry of judgment, awarding $50 for each purchase of

BLOOD HURST & O' REARDON, LLP

00193761

Joint Juice in the amount of $8,312,450 in statutory damages and $4,583,004.90 in prejudgment interest, for a total of $12,895,454.90. *See id.* at *26.

36.     This case was the bellwether trial for this litigation. In all, Plaintiff's Counsel took 25 depositions, defended and prepared witnesses for 24 depositions, and served 23 subpoenas; eleven sets of discovery requests were exchanged by the parties, well-over half a million pages of ESI were produced by Premier, and 43 expert reports or declarations were exchanged by the parties at various stages of the litigation; Plaintiff's Counsel successfully opposed  a summary judgment motion, a motion for judgment on the pleadings, a motion for judgment as a matter of law, two motions to decertify the class, and brought two class certification motions; the parties brought 29 written motions *in limine* and 17 *Daubert* motions; the Court issued nearly 100 orders over the course of the litigation; and the trial transcript consisted of 1,705 pages of trial proceedings. While more work lies ahead, to date Plaintiff's Counsel has expended an enormous amount of resources to achieve an outstanding result.

## III.    THE REQUESTED FEES AND EXPENSES ARE FAIR AND REASONABLE

37.     My firm prosecuted this litigation on a pure contingent basis with no guarantee of recovery. Primarily my firm, but also along with co-counsel, incurred 100% of the risk in pursuing the litigation. Over the course of nearly ten years, my firm advanced well over a million dollars in expenses with the understanding that we would be paid a fee and receive reimbursement for expenses only if successful. We took on and prevailed against a publicly traded, billion-dollar company that was supported by a team of a highly experienced class action and trial attorneys from three AmLaw 100 law firms: Arnold & Porter, Venable, and Morrison & Foerster.

38.     My firm passed on other employment opportunities to devote the time and resources necessary to pursue this litigation.

39.     My firm has been involved in every aspect of the litigation from inception through the present. I oversaw each aspect of the litigation and had primary responsibility for overall litigation strategy. I was personally involved in drafting every substantive pleading in this litigation, including class certification, summary judgment and *Daubert* motions, taking the lead role at all oral arguments, closely coordinating with Thomas O'Reardon, Paula Brown, and Craig Straub about

BLOOD HURST & O' REARDON, LLP

00193761

discovery and expert strategy to efficiently delegate and allocate responsibilities based on seniority, billing rate and expertise, defended three depositions of Plaintiff's experts, worked with Plaintiff's retained experts, assisted with trial preparation, and took a lead role at trial where I cross-examined one of Defendant's primary consumer survey experts.

40.    My partner, Thomas O'Reardon also played a primary role in prosecuting this litigation and was responsible for day-to-day litigation activity, including pursuing discovery from Defendant and third parties, responding to and drafting motions, including at the summary judgment, class certification and *Daubert* stages, and working with each of Plaintiff's experts in preparing declarations and Rule 26 reports. Mr. O'Reardon took a lead role on thirty-three (33) depositions of party and non-party witnesses and outside experts. Mr. O'Reardon took the depositions of Defendant's current and former employees and Rule 30(b)(6) designee who played various roles in the marketing, sales, scientific substantiation of Joint Juice, taking the depositions of Defendant's outside experts on matters of science, damages, marketing, and consumer surveys, and defending the depositions of experts on matters of marketing, consumer surveys, damages and science. Mr. O'Reardon also took the lead role on subpoenas to 17 third parties (with many receiving multiple subpoenas), and negotiating with each of their in-house or outside counsel to obtain relevant information. The information obtained from the third parties was utilized in connection with fact witness and expert depositions, expert reports, class certification, summary judgment, and trial. Mr. O'Reardon has substantial experience litigating consumer product false advertising cases, including over fifteen years working with scientific experts on matters of the scientific veracity of health benefit claims. As a result of this experience, which includes years of experience litigating deceptively labeled dietary supplement cases in general and glucosamine product cases in particular, Mr. O'Reardon was able to litigate this matter efficiently and effectively from the filing of the complaint, through discovery, class certification, summary judgment, expert retention and workup of their reports and the review of opposing expert work, trial preparation, and the class trial itself.

41.    My partner, Leslie Hurst, is an appellate attorney who has authored numerous trial and appellate briefs on relevant issues relating to scientific substantiation and efficacy, structure / function and implied disease claims, the scope of preemption under the Dietary Supplement Health

BLOOD HURST & O' REARDON, LLP

and Education Act of 1994 ("DSHEA"), and rights to pursue equitable relief in federal courts. For instance, Ms. Hurst argued before the Ninth Circuit Court of Appeals in *Sonner v. Schwabe North America, Inc.*, No. 17-55261 (argued May 16, 2018; op. filed Dec. 26, 2018), *Sonner v. Premier Nutrition Corp.*, No. 18-15890 (argued Dec. 3, 2019; amended op. filed Aug. 20, 2020), *Kroessler v. CVS Health Corp.*, No. 19-55671 (argued July 8, 2020; op. filed Oct. 9, 2020), *Seegert v. Rexall Sundown, Inc.*, No. 20-55486 (argued Sept. 3, 2021; op. filed Feb. 1, 2022), *Sonner v. Premier Nutrition Corp.*, No. 21-15526 (argued May 23, 2022). Here, besides taking the lead role on the appeals in *Sonner*, Ms. Hurst worked on the briefing relating to Defendant's summary judgment, Defendant's motion for judgment on the pleadings, and the motion for class certification.

42.     Paula Brown is a partner at BHO. Ms. Brown has significant experience litigating false advertising cases relating to dietary supplements. Ms. Brown's experience also includes trying certified class actions. In this litigation, Ms. Brown played a central role in prosecuting this litigation including defending or taking eight depositions including defending six named plaintiff depositions which took place around the country, taking the deposition of one of Defendant's primary expert witnesses, and defending one of Plaintiff's experts, preparing the named plaintiffs for their depositions, drafting motions in limine before trial, at the summary judgment stage, and as the rest of the team was working simultaneously at the class trial, worked on the summary judgment-related briefing, including as primary drafter of motions to exclude the testimony of Defendant's experts, and worked on trial-related briefing, including as the primary drafter of the jury instructions, verdict form, and motions to exclude expert testimony of Defendant's expert William Choi and others.

43.     Jennifer MacPherson is Of Counsel at BHO where she works as a full-time salaried attorney. Before joining BHO in 2012, Ms. MacPherson spent years litigating class actions, including at the law firm Milberg Weiss (now Robbins Geller Rudman & Dowd, LLP). Ms. MacPherson's work on this litigation included assisting with obtaining discovery from subpoenaed retailers of Joint Juice (a unique task she has experience with from other consumer product class actions), drafting briefing relating to evidence submitted at summary judgment, and assisting Ms. Hurst in the two appeals and with class certification briefing.

BLOOD HURST & O' REARDON, LLP

44.    Craig Straub is an associate at BHO. Mr. Straub, along with Mr. O'Reardon, were the attorneys at BHO responsible for the day-to-day litigation of these cases. In these actions, Mr. Straub was tasked with reviewing and analyzing the hundreds of thousands of pages of documents produced by Defendant and third parties. Mr. Straub had primary responsibility for organizing this large volume of data and identifying "hot" documents in connection with class certification, summary judgment, fact and expert depositions, expert review, focus groups, and trial preparation including drafting the trial exhibit list. Mr. Straub drafted numerous memoranda about these key documents and other factual and evidentiary issues he identified and met with the other attorneys on the team throughout the litigation to apprise them of these facts. Since joining my firm in 2016, Mr. Straub was also the primary attorney tasked with organizing and preparing potential exhibits for nearly every deposition conducted by my firm and co-counsel in this litigation. Mr. Straub assisted as second chair for eleven depositions throughout the litigation. Mr. Straub assisted with propounding subpoenas and discovery requests, meeting and conferring to obtain relevant discovery from Defendant and third parties, speaking with dozens of Class Members including retaining Ms. Montera and other Class Representatives in the related actions, working with Plaintiff's retained experts on matters of science, sales and marketing, analyzing data for trial purposes, attending a mediation session, drafting the class certification and judgment on the pleadings briefing including compiling all exhibits in support thereof, briefing motions to exclude Defendant's non-retained experts and several motions in limine in connection with the jury trial, drafting the oppositions to Defendant's motions for decertification, and attending trial where he created trial demonstratives, prepared trial exhibits, and developed memorandum, binders, and strategy for direct and cross-examination of the trial witnesses. At BHO, Mr. Straub has spent most of his time litigating class actions involving the health benefit advertising of consumer products in general and glucosamine supplements in particular. Thus, while Mr. Straub had a significant load of responsibility in this litigation, I believe his knowledge, background and experience, and by closely working with my partner, Thomas O'Reardon to identify issues and avoid duplicative efforts, allowed him to accomplish these tasks efficiently and effectively.

BLOOD HURST & O' REARDON, LLP

00193761

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

45.     The services rendered and work performed by my firm's attorneys and staff covered every aspect of this extensive, hard-fought litigation. My firm took the lead at every stage of the action from working up the case including analysis of hundreds of scientific manuscripts, propounding and pursing discovery, class certification, summary judgment, motion for judgment on the pleadings, fact depositions, document review, third-party subpoenas, discovery motions, expert declarations and reports, trial preparation, and the jury trial. The motion practice in this litigation was substantial and related to, *inter alia*, motions to compel discovery responses, Plaintiff's motions for class certification in the related actions, cross-motions to exclude expert testimony submitted by the parties in connection with class certification, summary judgment, and before trial, and eight motions in limine to exclude evidence to be presented at trial. Even as to the sealing of evidence and scheduling matters, these motions were heavily contested. This litigation also involved substantial discovery. Plaintiff's counsel conducted significant pre-suit investigation and analysis of the scientific basis for Defendant's advertising claims; conducted and defended 48 depositions, including those of Defendant's corporate designee, current and former marketing, science and regulatory employees, scientific experts, and third-party scientists; reviewed over 500,000 pages of documents produced by Defendant; and subpoenaed documents and testimony from 17 third parties who produced thousands of pages of documents. Plaintiff's counsel also responded to extensive discovery served on Plaintiffs, defended the depositions of eleven Plaintiffs and worked with more than seven of their own expert witnesses and additional consultants to prepare for class certification, summary judgment, and trial, including preparing and exchanging expert reports and conducting and defending expert depositions.

46.     I also took the lead on mediation efforts. There were numerous formal and informal attempts to reach a settlement before and after class certification and while engaging in substantial discovery and motion practice. These attempts included use of three separate mediators, but all were unsuccessful.

47.     I am thoroughly familiar with the quality and quantity of work done in this case by all lawyers representing Plaintiff and the Class. I have endeavored to ensure there was no unnecessary work or duplication of effort.

BLOOD HURST & O' REARDON, LLP

00193761

48.     I believe the time expended by my firm in this litigation was reasonable and necessary considering the amount of work required to litigate and try to *Montera* action. My firm was lead counsel and played the primary role in briefing and arguing every motion, pursuing discovery, working with experts, preparing for trial, and conducting the class trial. There has been no unreasonable duplication of services for which my firm and my co-counsel now seek compensation. In the situations in which two or more attorneys participated in any matter, the participation was reasonable because of the complexity of the issues involved and the time constrains which existed. I believe tasks were delegated appropriately among senior attorneys, junior attorneys, and paralegals according to their complexity.

49.     The following information regarding my firm's time and out-of-pocket expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. The time records were prepared daily or shortly thereafter by each attorney or paralegal working on the litigation. The expense records are prepared from receipts, expense vouchers, check records and other documents, and are an accurate record of the expenses. Throughout the litigation I reviewed and approved for payment all out-of-pocket expenses.

50.     The schedule below provides a summary of the hours expended by timekeepers from my firm who performed work in this litigation. The schedule includes the name of each person who worked on the case, hourly billing rates, the number of hours expended, the resulting lodestar, and the bar passage year for each timekeeper. The backgrounds and qualifications of the BHO attorneys who worked on the matter are set forth in the Firm Resume, a true and correct copy is attached as **Exhibit 1** to this declaration.

51.     In addition to BHO attorneys listed in the Firm Resume, BHO's senior paralegal, Dafne Maytorena, has extensive experience. Prior to joining BHO in 2018, Ms. Maytorena spent six years with the law firm Kessler Topaz Meltzer & Check LLP, focusing on class action litigation. Before that, Ms. Maytorena gained additional experience as a paralegal at several other law firms that also specialize in class action litigation: Robbins Arroyo, LLP, Faruqi & Faruqi, LLP, and Bernstein, Litowitz, Berger & Grossman, LLP. Ms. Maytorena earned her Paralegal Certificate from

BLOOD HURST & O' REARDON, LLP

the University of San Diego in 2002, and her bachelor's degree from the University of California, San Diego in 2002.

52.      Michelle M. Chaseton is the former senior paralegal at BHO. Ms. Chaseton received her paralegal certificate from the University of San Diego, a Bachelor of Arts in Criminal Justice from University of Nevada, and a professional certificate in intellectual property from the University of California, San Diego. Ms. Chaseton gained significant experience as a paralegal at Milberg Weiss Bershad Hynes & Lerach, a firm that specialized in class actions.

53.      Bethany C. Maxwell is a former paralegal at BHO. Prior to joining BHO, Ms. Maxwell spent ten years with the law office of Buchalter Nemer, P.C. in San Francisco, focusing on litigation. Ms. Maxwell earned her Paralegal Certificate at San Francisco State University, where she was awarded Highest Honors and the Delmar Legal Studies Award for excellence in legal research. She also holds a dual Bachelor's degree from Smith College. Ms. Maxwell handled document management, prepared pleadings, discovery, and correspondence, and obtained documents to respond to discovery. Ms. Maxwell was also responsible for preparing the billing and expenses for the litigation and profiling and organizing court filings.

54.      Aleksandr J. Yarmolinets was an associate at BHO. Mr. Yarmolinets earned his B.S., magna cum laude from Embry Riddle Aeronautical University, his J.D. cum laude from California Western School of Law, his LLM from Georgetown University Law Center, and was admitted to the State Bar of California in 2011. Mr. Yarmolinets' primary responsibilities were obtaining discovery from third parties, including drafting third-party subpoenas, and meeting and conferring with the retailers' counsel to obtain sales data for this litigation.

55.      Camille Bass is a former associate at BHO. Ms. Bass earned her B.S. from Arizona State University, her J.D. from St. John's University School of Law, and she was admitted to the State Bar of California in 2014. Ms. Bass was responsible for researching discrete legal issues, communicating with absent class members and synthesizing those communications for the team.

56.      Geoffrey Drew La Val is a former staff attorney at BHO. Mr. La Val earned his B.A., cum laude, from the University of California, Berkely, his J.D. from California Western School of Law, and he was admitted to the State Bar of California in 2011. He was primarily responsible for

document review and analysis and assisting in deposition preparation. Mr. La Val played an important in formulating search terms for the collection of ESI, coding and identifying relevant documents which were utilized throughout the litigation. Mr. La Val also developed in-depth memorandum on specific topics while working with my partner, Mr. O'Reardon, which included analysis of the foreign regulations relating to glucosamine, timelines of relevant events and people with citations to specific documents produced by Defendant, and summaries of scientific articles related to the ingredients in Joint Juice.

57.     Colette N. Menaldino is a former staff attorney at BHO. Ms. Menaldino earned her B.A. and J.D. from the University of Pittsburgh. She was admitted to the State Bar of Pennsylvania in November 2013, and the State Bar of California in August 2015. Ms. Menaldino was primarily responsible for document review and analysis, preparing exhibits for motions, and assisting in deposition preparation.

58.     The lodestar calculation is based on the firm's current billing rates, other than those no longer employed by the firm, in which event their billing rate at the time they stopped working at the firm is used. These rates have been determined to be reasonable by numerous other courts in class action litigation. A sample of courts that have approved BHO's standard billing rates and attorneys' fees as reasonable include:

- *Yamagata v. Reckitt Benckiser Llc,* No. 3:17-cv-03529-VC, 2021 U.S. Dist. LEXIS 244276, at *12 (N.D. Cal. Oct. 28, 2021) (approving BHO rates as "reasonable, and that the hours expended were reasonable");

- *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171 FMO (FFMx), 2017 U.S. Dist. LEXIS 77576, at *42-43 (C.D. Cal. May 21, 2017) (approving BHO rates as reasonable given "the prevailing rates in the community for lawyers of comparable skill, experience, and reputation");

- *In re Hydroxycut Mktg. & Sales Practices Litig.*, MDL No. 2087, 2014 U.S. Dist. LEXIS 162106, at *192 (S.D. Cal. Nov. 18, 2014) (approving hourly rates of Blood Hurst & O'Reardon, LLP as "typical rates for attorneys of comparable experience");

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

- *Hartless v. Clorox Company*, 273 F.R.D. 630, 644 (S.D. Cal. 2011) (overruling objections to hourly rates, stating that BHO's hourly rates "have been accepted in other class action cases and are comparable to rates approved by other district courts in class action litigation");

- *In re Skechers Toning Shoe Prods. Liab. Litig.*, MDL No. 2308, 2013 U.S. Dist. LEXIS 67441, at *51-52 (W.D. Ky. May 13, 2013) (approving BHO's hourly rates, stating that "a lodestar cross-check demonstrates the reasonableness of the fees award");

- *Dennis v. Kellogg Co.*, No. 09-cv-1786-L (WMC), 2013 U.S. Dist. LEXIS 163118, at *22-23 (S.D. Cal. Nov. 14, 2013) (approving BHO's hourly rates as "fall[ing] within typical rates for attorneys of comparable experience");

- *Johnson v. General Mills, Inc.*, No. SACV 10-00061-CJC(ANx), 2013, U.S. Dist. LEXIS 90338, at *19-21 (C.D. Cal. June 17, 2013) (approving hourly rates and time spent by BHO, stating "[t]he Court has considered class counsel's rates and finds they are reasonable because of the experience of the attorneys and prevailing market rates") (citing BHO firm resume);

- *Blessing v. Sirius XM Radio, Inc.*, No. 09 CV 10035 (HB), 2011 U.S. Dist. LEXIS 94723, at *17 (S.D.N.Y. Aug. 24, 2011) (approving fee award as "reasonable under both the lodestar and percentage method of calculation");

- *In re Adobe Systems Inc. Privacy Litig.*, No. 5:13-cv-05226-LHK, Doc. No. 107 (N.D. Cal. Aug. 13, 2015) (approving hourly rates and time spent by BHO, finding "counsel's hourly rates to be reasonable and in line with the prevailing rates in the community for complex litigation").

59.     Further, based on my knowledge of the class action plaintiff's bar nationwide, the rates charged by my firm are in line with or lower than the rates charged by other firms that handle class actions of similar size and complexity. *See Orthopaedic Hosp. v. Encore Med., L.P.*, No. 3:19-cv-00970-JLS-AHG, 2021 U.S. Dist. LEXIS 225014, at *40 (S.D. Cal. Nov. 19, 2021) (2020 and 2021 partner rates of $925-$1,225, associate rates of $770-$1,065); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 U.S. Dist. LEXIS 213045, at *38 (N.D. Cal. Dec. 17, 2018) (approving rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *In re*

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1  *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC),

2  2017 U.S. Dist. LEXIS 39115, at *732 (N.D. Cal. Mar. 17, 2017) ($275 to $1,600 for partners, $150

3  to $790 for associates, and $80 to $490 for paralegals); *Schneider v Chipotle Mexican Grill, Inc.*,

4  336 F.R.D. 588, 601 (N.D. Cal. Nov. 4, 2020) ($830 to $1,275 for partners and $425 to $695 for

5  associates); *Carlotti v. Asus Comput. Int'l*, No. 18-cv-03369-DMR, 2020 U.S. Dist. LEXIS 108917,

6  at *15 (N.D. Cal. June 22, 2020) ($950 and $1,025 for partners); *Dickey v. Advanced Micro Devices,*

7  *Inc.*, No. 15-cv-04922-HSG, 2020 U.S. Dist. LEXIS 30440, at *22 (N.D. Cal. Feb. 21, 2020) ($615-

8  $1,000 for partners and $275-$575 for associates); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-

9  5923, 2015 U.S. Dist. LEXIS 67298, at *15 (N.D. Cal. May 21, 2015) ($475-$975 for partners,

10  $300-$490 for associates, $150-$430 for paralegals, and $250-$340 for litigation support); *In re*

11  *Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 U.S. Dist. LEXIS 156720, at *20

12  (N.D. Cal. Nov. 11, 2016) (up to $1,200 for senior attorneys and $290 for paralegals); *In re High-*

13  *Tech Emple. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 U.S. Dist. LEXIS 118052, at *33-34

14  (N.D. Cal. Sept. 2, 2015) ($490-$975 for partners, $310-$800 for non-partner attorneys, and $190-

15  $430 for paralegals, law clerks, and litigation support staff); *In re Anthem, Inc. Data Breach Litig.*,

16  No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137, at *122-23 (N.D. Cal. Aug. 17, 2018)

17  ($400-$975 for partners, $185-$900 for non-partner attorneys, $95-$440 for paralegals, law clerks,

18  and litigation support staff, and $270-$345 for summer law clerks). BHO's hourly rates also

19  compare favorably to reported rates charged by the law firms Defendant hired in this action. For

20  example, in *Nat'l Abortion Fedn v. Ctr. for Med. Progress*, Case No. 15-cv-03522-WHO (N.D.

21  Cal.), the Morrison & Foerster San Francisco partner Derek Foran declared (ECF No. 756-2) that

22  his standard billing rate was $1,200 per hour in 2021, that associate rates ranged from $745 for 2018

23  graduates to $925 for 2014 graduates, and paralegals billed at $295 to $400 per hour. These hourly

24  rates were approved as reasonable. *Nat'l Abortion Fedn v. Ctr. for Med. Progress*, 2021 U.S. Dist.

25  LEXIS 245090, at *16 (N.D. Cal. Dec. 23, 2021). In *Planned Parenthood Fed'n of Am., Inc. v. Ctr.*

26  *for Medical Progress*, No. 3:16-cv-00236-WHO (N.D. Cal. Apr. 29, 2020), the court approved (ECF

27  No. 1150, at 4) hourly rates for attorneys at Arnold & Porter ranging from $750 to $1,150 per hour

28  for partners, $910 to $1,280 per hour for senior counsel, $545 to $910 per hour for associates, and

$390 to $405 per hour for paralegals. While the litigation was venued in the D.C. Circuit, "courtesy discount rates" for Venable of up to $1,010 were approved as reasonable hourly rates. *See Ray v. CLH N.Y. Ave, LLC*, No. 19-cv-2841-RCL, 2022 U.S. Dist. LEXIS 114586, at *14 (D.C. Cir. June 29, 2022); *see also Aero Norfolk, LLC v. Philadelphia Truck Lines, Inc.*, Case No. 2:21-cv-00101-RCY-RJY (E.D. Va.) at ECF No. 23-2 (the April 11, 2022, declaration of Venable litigation partner Caroline Gately declares that Venable's standard rates "do not change depending on the locale of the matter," that she is a 1989 graduate, her 2022 standard rate is $1,000, and a 2020 law school graduate's standard rate was $440). Each of the BHO attorneys who have worked on this litigation has practiced for the following number of years: Mr. Blood – 31 years; Ms. Hurst – 26 years; Mr. O'Reardon – 15 years; Ms. Brown – 14 years; Ms. MacPherson – 22 years; Mr. Straub – 14 years; Mr Yarmolinets – 11 years; Ms. Bass – 8 years; Mr. La Val – 11; and Ms. Menaldino – 7 years. Based on the years and depth of experience of each of the attorneys and staff, the hourly rates of $280.00 to $960.00 are reasonable.

60.     The total number of hours spent on the overall Joint Juice litigation by professional staff at my firm as of August 25, 2022, is 12,734.25 hours for a total lodestar of $8,381,417.50. As described in the accompanying motion and below, the total number of hours reasonably attributable to the claims subject to this litigation as of August 25, 2022, by professional staff at my firm is 9,083.25 hours for a total lodestar of $5,980,031.25. That total lodestar is broken down as detailed in the chart below.

61.     To reasonably ensure that the present fee application represents only the time spent on the claims subject to this litigation, I exercised my professional judgment and excluded all of billable hours on the appeals of the *Sonner* action, as well as all billable hours from the date the Court entered the stay of all related actions (including *Montera*) on February 10, 2017 through May 17, 2018. This time period spanned all of the expert merits reports and trial preparation in *Sonner*, up through the Court granting Premier's motion to dismiss in *Sonner*, the filing of the notice of appeal in *Sonner* of the order of dismissal and judgment, and complete adjudication of Premier's Bill of Costs in *Sonner* on May 17, 2018. I believe this is a reasonably conservative calculation because, for example, my firm spent time during this period on expert-related tasks (e.g., relating to

Drs. McAlindon and Grande) that directly benefitted this litigation. Additionally, as described in Paragraphs 23-24 above, the time spent on the *Sonner* and *Bland* state court actions is also excluded. The resulting lodestar for professional staff at my firm is as follows:

| Attorney/Paralegal | Hours | Rate | Lodestar | Bar Admission |
|---|---|---|---|---|
| Timothy G. Blood (Partner) | 1,002.75 | $960 | $962,640.00 | 1990 |
| Leslie E. Hurst (Partner) | 303.25 | $810 | $245,632.50 | 1995 |
| Thomas J. O'Reardon II (Partner) | 2,923.25 | $710 | $2,075,507.50 | 2006 |
| Paula R. Brown (Partner) | 705.00 | $660 | $465,300.00 | 2007 |
| Jennifer MacPherson (Of Counsel) | 97.00 | $585 | $56,745.00 | 1999 |
| Craig W. Straub (Associate) | 2,302.50 | $575 | $1,323,937.50 | 2007 |
| Aleksandr J. Yarmolinets (Associate) | 11.25 | $565 | $6,356.25 | 2011 |
| Camille Bass (Associate) | 2.00 | $410 | $820.00 | 2014 |
| Geoffrey Drew La Val (Staff Attorney) | 451.50 | $335 | $151,252.00 | 2011 |
| Colette N. Menaldino (Staff Attorney) | 25.50 | $320 | $8,160.00 | 2015 |
| Michelle M. Chaseton | 237.00 | $280 | $66,360.00 | |
| Bethany C. Maxwell (Paralegal) | 21.25 | $280 | $5,950.00 | |
| Dafne Maytorena (Paralegal) | 179.00 | $280 | $50,120.00 | |
| **TOTALS** | **8,261.25** | | **$5,418,781.25** | |

62.   The hours and lodestar incurred by my firm will increase because, as Class Counsel, my firm is responsible for defending the verdict and judgment on the appeal Premier says will be filed, and thereafter, my firm will be responsible for working with a claims administrator to develop

00193761

and propose a plan of judgment allocation, oversee the claims administration process, and communicate with Class Members. This appeal and post-appeal administration process will require hundreds of hours of additional work.

63.     My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately, and such charges are not duplicated in my firm's billing rates.

64.     As detailed below, my firm has incurred a total of $1,100,289.53 in unreimbursed expenses in connection with the prosecution of this litigation from inception through August 23, 2022. The expenses incurred in this action are reflected in the books and records of my firm. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred. In light of expenses relating to matters that did not directly benefit the overall *Montera* litigation, I have reviewed these documents and invoices and reduced my firm's overall expenses of approximately $1.27 million on Joint Juice litigation to seek reimbursement of just the $1,100,289.53 detailed below.

65.     The out-of-pocket litigation expenses incurred by BHO are reasonable in amount and were necessary for the effective and efficient prosecution of the litigation. In addition, I believe the expenses are of a type that normally would be charged to a fee-paying client in the private legal marketplace and have been charged by my firm to fee-paying clients. They are also the categories of expenses that have been awarded to my firm and other plaintiff's counsel in other class action lawsuits, including in the following cases: *Yamagata v. Reckitt Benckiser Llc,* No. 3:17-cv-03529-VC (N.D. Cal.); *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171 FMO (FFMx) (C.D. Cal. 2017); *Murr v. Capital One Bank (USA), N.A.*, No. 1:13-cv-01091-LMB-TCB (E.D. Va. 2015); *In re: Hydroxycut Mktg. and Sales Prac. Litig.*, MDL No. 2086 (S.D. Cal. 2014); *Serochi v. Bosa*, No. 2009-00096686 (S.D. Super. Ct. 2014); *Hartless v. Clorox Co.*, No. 06-cv-02705 (S.D. Cal. 2011); *Johnson v. Gen. Mills, Inc.*, No. 10-cv-00061 (C.D. Cal. 2013); *Grabowski v. Skechers U.S.A., Inc.*, No. 12-cv-00204 (W.D. Ky. 2013); *Schwartz v. Reebok Int'l Ltd*., No. 10-cv-12018 (D. Mass. 2012); *Nelson v. Mead Johnson & Co., LLC*, No. 09-cv-61625 (S.D. Fla. 2012); and *Gemelas v. The Dannon Co., Inc.*, No. 08-cv-00236 (N.D. Ohio 2011).

BLOOD HURST & O' REARDON, LLP

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

00193761

66.     As of August 23, 2022, my firm's out-of-pocket litigation expenses for which we seek reimbursement or taxation are $1,100,289.53. Of this amount, $132,096.79 has been sought as taxable expenses with a Bill of Costs filed this same date. The nontaxable amount of $968,192.74 being sought with this fee application is described below.

| Expense Category | Total | Nontaxable Portion | Taxable Portion |
|---|---|---|---|
| Photocopying / Printing | $19,206.20 | $19,206.20 | $0 |
| Filing Fees | $400 | $0 | $400 |
| Service of Process | $5,102.30 | $5,102.30 | $0 |
| Experts / Consultants | $613,343.90 | $609,582.93 | $3,760.97*[1] |
| Depositions / Transcripts / Videographers | $115,082.67 | $21,6077.15 | $93,475.27 |
| Court Reporters' Transcripts | $34,117.70 | $0 | $34,117.70 |
| Mediation Fees | $24,300.00 | $24,300.00 | $0 |
| Electronic Document Management | $113,276.62 | $113,276.62 | $0 |
| Postage / FedEx / Messenger | $4,489.54 | $4,489.54 | $0 |
| Online Research (LexisNexis, PACER, TransUnion, White Pages Premium) | $13,055.57 | $13,055.57 | $0 |
| Conference Calls | $303.25 | $303.25 | $0 |
| Transportation, Hotels & Meals | $120,523.24 | $120,523.24 | $0 |
| Miscellaneous | $1,420.58 | $1,077.98 | $342.60 |
| Class Notice and Outreach | $35,667.86 | $35,667.86 | $0 |
| **TOTAL** | **$1,100,289.53** | **$968,192.74** | **$132,096.79** |

67.     The following is additional information regarding these expenses:

(a)     Photocopying/Printing: The requested copy costs (96,031 pages) were incurred in connection with providing the Court with hard copies of filings and additional in-house copies for hearing preparation, printing case law when necessary, analyzing certain documents produced in discovery, in connection with expert reports and declarations, including printing the scientific studies cited by experts and providing our experts with report binders, and printing copies of documents for use in the many depositions throughout this case. For example, 284 exhibits were

---

[1]      $3,760.97 was paid to VideoTrack, one of Plaintiff's consultants, for three sets of all pre-marked exhibits in three-ring binders as required by the Court. Plaintiff has sought taxation of this amount pursuant to Local Rule 54-3(d)(4).

BLOOD HURST & O' REARDON, LLP

introduced during the 11 depositions taken of Defendant's employees, class certification involved 175 exhibits, and trial involved 750 exhibits, 109 of which were admitted. These figures do not include the many studies and other exhibits necessarily printed and used in the course of preparing for, taking and defending expert depositions. To help minimize copy expenses, we agreed with counsel for Defendant to serve documents by electronic mail only and used electronic copies of exhibits at some depositions. Each time our copy machine is used, our billing system requires that a case code be entered. For each page copied or printed, my firm charges 35 cents, but here we only seek reimbursement of 20 cents per copy. This is the rate charged to all clients, including non-contingency clients. The rate is determined by calculating the approximate cost to my firm per page, without any mark-up. The calculation includes the monthly copy machine rental, the price-per-page charged by our vendor and paper and toner costs, which are not included in the price-per-page cost. The average is approximate because it varies each month depending upon the number of photocopies made for a particular month, but 20 cents is significantly less than the approximate average over time. The per-page amount is higher than an outside copy service because we print relatively few copies as part of an effort to use less paper. While the per-page amount may be higher, the overall cost is lower than if we printed more copies at a rate that would lower the per-page cost.

(b) <u>Filing Fees</u>: $400 was paid to file the complaint in this action. All other court filing and docket fees paid in connection with litigating the other related Joint Juice actions, including complaint, motion, and appellate filing fees, are not subject to this fee application.

(c) <u>Postage / FedEx / Messenger</u>: These costs relate to postage and delivery services, including providing courtesy copies of filings as required by the courts in this action and sending documents for Plaintiff's witnesses to review before depositions. Plaintiff does not presently seek reimbursement of $747.55 spent to mail documents to Drs. Silbert and Graboff in connection with their Rule 26 testimony in *Mullins*, or required courtesy copies sent to the courts in connection with the motion for leave to amend to file a second amended complaint and the subsequent motion to dismiss in *Mullins*, the Ninth Circuit appeals in *Mullins*, or filings in the state court related actions.

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

BLOOD HURST & O' REARDON, LLP

00193761

(d)     <u>Service of Process</u>: These costs relate to service of process of subpoenas for documents and/or testimony on the major retailers of Joint Juice (Walmart, Walgreens, Costco, Target, BJ's Wholesale Club, Albertsons, Kroger, SuperValue, Safeway, Rite Aid, and CVS), and companies that supplied Defendant with marketing services for Joint Juice (Eleven Inc. and R2C Group). Service costs were minimized because certain of these retailers agreed to accept email service of subsequent subpoenas in this action.

(e)     <u>Depositions / Transcripts / Videographers</u>: These costs include court reporter and/or videographer fees in connection with forty-eight (48) depositions in this litigation. Plaintiff's counsel saved significantly on deposition and travel costs by taking twenty-two (22) of these depositions remotely. Plaintiff does not presently seek reimbursement for costs in connection with Dr. Silbert's 2017 deposition ($1,874.06), Dr. Lippiello's 2017 deposition ($3,448.25), Dr. Graboff's 2017 deposition ($1,040.70), or Dr. Maronick's 2017 deposition ($2,373.94). *Pursuant to L.R. 54-3(c), Plaintiff has sought taxation of $93,475.27 of the $115,082.67 reasonably spent on depositions. The nontaxable portion of these deposition costs ($21,607.40), which include standard incidental costs and deposition features in complex litigation such as Realtime feeds, are reasonable expenses that are typically paid by the fee-bearing client and properly recovered by the prevailing party. Further, if the Clerk deems any portion of $93,475.27 as nontaxable deposition costs, Plaintiff requests that such costs be awarded by this Court pursuant to this motion.

(f)     <u>Court Reporters' Transcripts</u>: $34,117.70 was spent to obtain transcripts from the January 27, 2016 hearing on class certification, summary judgment and motions to exclude expert testimony ($127.80), the November 21, 2019 hearing on class certification ($30.45), the May 6, 2022 final pretrial conference and hearing on motions in limine ($196.20), and the daily trial transcripts ($33,921.50). *Pursuant to L.R. 54-3(b), Plaintiff has sought taxation of this entire amount. If the Clerk deems any portion of the $34,117.70 as nontaxable reporter transcript costs, Plaintiff requests that such costs be awarded by this Court pursuant to this motion. Plaintiff does not presently seek reimbursement of $7,827.21 spent on court reporters' transcripts from any other hearings, including the motion for leave to file a second amended complaint in *Mullins*, and the state court related action hearings and status conferences.

BLOOD HURST & O' REARDON, LLP

(g)     Experts / Consultants: This cost includes fees charged by experts and consultants utilized in this litigation. In addition to the costs detailed below spent on experts and consultants retained by Plaintiff, pursuant to the parties' agreement, Plaintiff's Counsel paid $4,025.00 to Defendant's expert, Hal Poret, for his time when being deposed.

(i)     Timothy McAlindon, MD, MPH: Plaintiff seeks reimbursement of $121,256.94 paid to Dr. McAlindon for his expert testimony and consulting throughout this litigation. Plaintiffs retained Dr. McAlindon to provide analysis of scientific issues, including Joint Juice and its various ingredients to support joint health and treat arthritis and its symptoms, and to provide trial testimony in this litigation. Dr. McAlindon is a physician rheumatologist at Tufts Medical Center, where he holds the positions of Chief of the Division of Rheumatology and Natalie V. Zucker and Milton O. Zucker Chair in Rheumatology. He charges $500/hour for his expert services. Dr. McAlindon's medical, clinical and academic experience is in the fields of arthritis and rheumatic disease, including studying potential interventions for arthritis and its symptoms. Dr. McAlindon also worked directly on a number of the scientific studies and medical professional guidelines at issue in this litigation. Dr. McAlindon provided Rule 26 reports and his work product and expert declarations were used in connection with fact witness and expert depositions, in support of Plaintiff's motions for class certification and in opposition to Defendant's motion for summary judgment. Dr. McAlindon traveled to San Francisco on May 21, 2022, assisted with trial preparation and strategy, and testified at trial on May 24-25, 2022.

(ii)    Farshid Guilak, Ph.D.: Plaintiff seeks reimbursement of $20,400.00 paid to Dr. Guilak for his expert testimony and consulting throughout this litigation. Plaintiff retained Dr. Guilak to provide analysis of scientific issues specifically including to opine on the physiology of the joint, to discuss in vitro studies he conducted on glucosamine and chondroitin supplements, to rebut the opinions of Defendant's scientific experts, Drs. Grande and Silverman, and to provide trial testimony in this litigation. Dr. Guilak is a Professor in the Department of Orthopaedic Surgery at Washington University and Director of Research for the Shriners Hospitals for Children – St. Louis Shriners. I am also the co-director of the Washington University Center of Regenerative Medicine and have appointments in the Departments of Developmental Biology and

BLOOD HURST & O' REARDON, LLP

00193761

Biomedical Engineering. He charges $500/hour for his expert services. Dr. Guilak's scientific and academic experience is in the fields of osteoarthritis, tissue engineering, and biomechanics, including studying the etiology and pathogenesis of osteoarthritis, as a basis for the development of new therapies. Dr. Guilak provided Rule 26 reports, his work product was used in connection with fact witness and expert depositions, trial testimony, and in connection with motions to strike expert testimony. Dr. Guilak also assisted with trial strategy and examination of Defendant's witnesses at trial.

(iii)     <u>Derek D. Rucker, Ph.D.</u>: Plaintiff seeks reimbursement of $98,700.75 paid to Dr. Rucker for his expert testimony and consulting throughout this litigation. Plaintiff retained Dr. Rucker to provide analysis of marketing and advertising issues and trial testimony in this litigation. Dr. Rucker is the Sandy & Morton Goldman Professor of Entrepreneurial Studies in Marketing, Northwestern University and a Professor of Marketing at the Kellogg School of Management, Northwestern University. He charges $900/hour for his expert services. Dr. Rucker is a highly published researcher, has been a reviewer for more than 25 journals, served as an Associate Editor for the *Journal of Consumer Research* and the *Journal of Consumer Psychology*, and is currently the co-editor for *Consumer Psychology Review*. Dr. Rucker received his Ph.D. in psychology from The Ohio State University and his academic research interests include the study of advertising, persuasion, and consumer behavior. Dr. Rucker provided Rule 26 reports in this matter and also assisted with trial preparation and deposition strategy. Dr. Rucker traveled to San Francisco and testified at trial on May 27, 2022.

(iv)     <u>Colin B. Weir</u>: Plaintiff seeks reimbursement of $73,691.80 paid to Mr. Weir for his expert testimony and consulting throughout this litigation. Mr. Weir holds a Master of Business Administration, with honors, from the High Technology program at Northeastern University. He has qualified as an economic damage expert witness on many occasions in various state and federal courts. He has consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, furniture, and computers. We are charged $725/hour for Mr. Weir's services in this action. Mr. Weir provided expert analysis and expert reports relating to economic

BLOOD HURST & O' REARDON, LLP

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

damages, and assisted with rebutting and deposing Defendant's damages expert, including analyzing the hedonic regression opinions by Dr. Choi, Defendant's economic valuation expert. Mr. Weir assisted with deposition and trial strategy and testified at trial on May 31, 2022.

(v)   J. Michael Dennis, Ph.D.: Plaintiff seeks reimbursement of $87,516.50 paid to Dr. Dennis for his expert testimony and consulting throughout this litigation. We engaged Dr. Dennis to conduct a consumer survey concerning the advertising message conveyed by Joint Juice. We were charged $450/hour for his services. Dr. Dennis has designed and conducted hundreds of statistical surveys using the internet mode of data collection for over 19 years. Since joining in 2014, Dr. Dennis has been a Senior Vice President leading the online panel survey research business for National Opinion Research Center ("NORC") – affiliated with the University of Chicago. Dr. Dennis' survey and expert analysis, including his expert reports were critical to one of the major issues in the case and to rebutting Defendant's multiple marketing and survey experts. Dr. Dennis assisted with deposition and trial preparation and strategy, and testified at trial on May 27, 2022.

(vi)   Steven R Graboff, M.D.: Plaintiff seeks reimbursement of $30,062.50 paid to Dr. Graboff for his expert testimony and consulting in connection with class certification and summary judgment. We were charged $475/hour for his services. The testimony from Dr. Graboff was cited by the Court in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 885, 893 (N.D. Cal. 2016) (Discussing, for example, that "Dr. Steven Graboff, plaintiff's expert, a practicing orthopedic surgeon, confirms that 'glucosamine and chondroitin sulfate are not part of the general hierarchy of treatment for arthritis.'"). Plaintiff does not presently seek reimbursement of the additional $10,550.00 charged by Dr. Graboff in connection with the later Rule 26 reports and related depositions, and preparation for trial in *Mullins*.

(vii)   Jeremiah E. Silbert, M.D.: Plaintiff seeks reimbursement of $37,655.00 paid to Dr. Silbert for his expert testimony and consulting in connection with class certification and summary judgment. We were charged $450/hour for his services. The expert testimony from Dr. Silbert regarding the bioavailability and efficacy or glucosamine and chondroitin and his analysis of Dr. Grande's opinions was cited extensively by the Court in the order denying

BLOOD HURST & O' REARDON, LLP

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

BLOOD HURST & O' REARDON, LLP

1    Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 886-87, 893, 895-98 (N.D. Cal.

2    2016) ("Silbert offers evidence that Premier's general health claims are false because ingested

3    glucosamine and chondroitin are not bioavailable in joint tissue in sufficient quantity to confer any

4    benefit."). Plaintiff does not presently seek reimbursement of the additional $21,037.50 charged by

5    Dr. Silbert in connection with the later Rule 26 reports and related depositions, and preparation for

6    trial in *Mullins*.

7                  (viii)   <u>Lynn R. Willis, Ph.D.</u>: Plaintiff seeks reimbursement of $26,500.00

8    paid to Dr. Willis for his expert testimony and consulting in connection with class certification and

9    summary judgment. We were charged $500/hour for his services. The expert testimony from Dr.

10   Willis regarding the clinical research, meta-analyses, treatment protocols, in vitro and animal study

11   research relating to the ingredients in Joint Juice was cited extensively by the Court in the order

12   denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 883-86, 895 (N.D. Cal.

13   2016) (noting Dr. Willis "offered principles critiques" of the scientific literature and that "[a] review

14   of the meta-analyses reveals that the effects of glucosamine and chondroitin are similar to placebo,

15   and therefore clinically insignificant").

16                 (ix)   <u>Mark Keegan</u>: Plaintiff seeks reimbursement of $68,159.09 paid to

17   Keegan & Donato Consulting, LLC for their expert testimony and consulting in connection with

18   class certification and summary judgment. We were charged $275 to $350/hour for these services.

19   The expert testimony from Mr. Keegan was cited extensively by the Court in the order denying

20   Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 879-82 (N.D. Cal. 2016)

21   (discussing and quoting Mr. Keegan's analysis of the consumer research, opinion about Joint Juice's

22   implied advertising message, and critique of the survey Mr. Poret commissioned for Defendant). In

23   its order granting class certification, the Court cited Mr. Keegan "interpret[ation] [of] the results of

24   Premier's marketing research and consumer survey," and rejected Defendant's argument that

25   "substantiating consumer reliance is not amenable to common proof because Joint Juice users cite

26   the advice of doctors or friends as the reason they tried Joint Juice in the first place." 2016 U.S. Dist.

27   LEXIS 51140, at *9 (N.D. Cal. Apr. 15, 2016). Mr. Keegan also assisted with preparation for

28   deposing Defendant's expert, Hal Poret.

(x)     <u>VideoTrack   Litigation   &   Trial   Support</u>:   Plaintiff   seeks reimbursement of $49,140.07 paid to VideoTrack for trial presentation services and consulting in this action. This amount includes VideoTrack's hourly consulting fees (369.5 hours at average rate of $112/hour) and reimbursing VideoTrack for trial exhibit binder preparation and printing (4 sets for $5,014.62), trial presentation equipment rental ($1,977.75), and travel expenses/transportation ($701.45). Debbie Burk from VideoTrack assisted in trial preparation, attended the entire trial and provided trial presentation services throughout the trial.

(xi)     <u>Chopra Koonan Litigation Consulting</u>: Plaintiff seeks reimbursement of $5,236.25 paid to Chopra Koonan Litigation Consulting for witness preparation and jury consulting services by Karen Jo Koonan. We were charged $425/hour for these services. Ms. Koonan has served as a trial consultant at the National Jury Project and worked on more than 1,600 cases over the last 35 years. Ms. Koonan assisted with jury selection, assisted with pretrial preparation of witnesses, and case theme development.

(h)     <u>Electronic Document Management</u>: As of July 21, 2022, $113,276.62 has been paid to e-discovery specialists, Epiq (f/k/a DTI Global) and Ankura Consulting, for monthly hosting, storage and management of documents produced in this litigation. Defendant and various third parties produced over 500,000 pages of discovery, including emails. Thus, it was necessary for my firm and co-counsel to be able to search, review, code, and organize these documents on secure, Internet-based electronic databases. The Relativity and Casepoint document platforms hosted by Epiq and Ankura are standard ESI tools used in complex litigation involving large data productions. These online platforms also allowed us to efficiently coordinate document review and coding and access the documents in connection with motions, depositions, experts, and trial preparation.

(i)     <u>Online Research</u>: $5,961,52 was paid to LexisNexis for legal research, $4,206.00 was paid to the Administrative Office of the United States Courts for PACER research of federal court filings, and $2,680.00 was paid to TransUnion and $208.05 to White Pages Premium for background research on deponents, witnesses and Class Members. LexisNexis is used to obtain access to legal research, factual databases, and for cite-checking of briefs. The expense amount

BLOOD HURST & O' REARDON, LLP

00193761

detailed herein represents the out-of-pocket costs incurred by my firm in connection with use of these services in connection with this litigation. My firm has a flat-rate contract with LexisNexis for use of its services. When my firm utilizes LexisNexis services, a billing code is entered for the specific case being researched. At the end of each billing period in which a service is used, BHO's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period. As a result of the flat fee we negotiated with LexisNexis, we do not charge the "market rate" for *a la carte* use of online legal research services, which some law firms charge their clients. We also do not otherwise mark-up LexisNexis bills, as some firms do.

(j)     <u>Conference Calls</u>: Conference call charges were incurred to make or host conference calls in this litigation. The conference call charges are allocated to each case by punching in a case code after accessing the conference call number. The case code is mandatory to host a conference call. At the end of each billing period, the conference call charges for each case are entered into our billing system.

(k)     <u>Transportation, Hotels and Meals</u>: These travel costs were in connection with hearings, formal and informal mediations and settlement meetings, depositions, and the trial in this litigation. Attorneys at BHO took the lead role in each hearing before this Court, had first-chair responsibility for deposing or defending 45 witnesses, and assisted in each deposition. My partners, Thomas O'Reardon and Paula Brown, traveled to take or defend 23 of these depositions in-person. Mr. O'Reardon and I also traveled to take the lead role in status conferences and oral argument with this Court and to participate in two mediations. Mr. O'Reardon, Mr. Straub, and I also traveled to participate in the jury trial. When practicable and reasonable, my firm minimized travel costs by taking depositions of out-of-town deponents via videoconference. The mediation session during the pandemic was also conducted via videoconference. Airfare was booked in coach class, and to save on hotel expenses, we often flew up and back to San Francisco the same day and/or the morning of matters that took place in San Francisco. For the second, formal mediation, which took place in Los Angeles, we drove up the morning of the mediation and returned later that day. During trial we stayed in standard-size rooms at the Intercontinental San Francisco. The trial team did not need to

BLOOD HURST & O' REARDON, LLP

00193761

1    rent office space during the almost three weeks spent in San Francisco. This too saved a substantial

2    amount of money.

3              (l)    Miscellaneous: $1,420.58. This includes $442.20 incurred to obtain Joint

4    Juice-related scientific publications from peer-reviewed journals and their publishers (e.g., Elsevier,

5    Inc.). These publications were used throughout the litigation, including in connection with expert

6    discovery. $16.00 was paid to the New York State Library for research concerning GBL §§ 349 and

7    350. $495 was spent for access to CVN.com, which provides archived video coverage of trials

8    categorized by attorneys and parties. We paid $92 to the National Institutes of Health in connection

9    with a FOIA request for materials relating to the GAIT trial. $342.60 was paid to ARC Document

10   Solutions for the demonstratives used during closing argument, and $30.78 for product exemplars

11   used in connection with factual research, depositions, trial preparation, and the trial.

12             (m)    Class Notice and Outreach: On February 2, 2017, the Court granted

13   Plaintiff's unopposed motion for approval or class notice and ordered notice of pendency to be sent

14   pursuant to Fed. R. Civ. P. 23(c)(2)(B). Plaintiff retained JND Legal Administration, an experienced

15   class notice and claims administrator, to implement and disseminate the class notice and opt-out

16   requests. Pursuant to the Court's Order (Dkt. No. 102), the Court-approved notice of pendency was

17   disseminated    via    publication    methods    and    included    a    class    notice    website

18   (www.JointJuiceNYLawsuit.com) that JND created and has maintained and updated through the

19   present date. As of August 19, 2022, notice of pendency services have cost $27,367.86. Plaintiff

20   also seeks reimbursement of $8,300 spent through Top Class Actions ($8,000.00) and Facebook

21   ($300.00) on additional outreach to Class members. Premier will also be required to pay for the cost

22   of noticing the Class and allocating the judgment. This significant expense will benefit the Class

23   and has not been included in the judgment value calculation.

24             (n)    Mediation Fees: These costs were paid by my firm relating to the December

25   3, 2013, mediation with Mr. Martin Quinn (JAMS), the April 9, 2015 mediation with Hon. Carl

26   West (JAMS), and the September 24, 2020 mediation with Hon. Layn R. Phillips (Ret.).

27

28

BLOOD HURST & O' REARDON, LLP

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR ATTORNEYS' FEES, EXPENSES

68.     Collectively, with this fee application, Plaintiff's Counsel seek reimbursement of $1,133,794.77 in out-of-pocket, nontaxable expenses from this litigation. As stated in their respective declarations, the firms have each expended the following amounts:

| Firm | Expenses Requested |
|---|---|
| Blood Hurst & O'Reardon, LLP | $968,192.74 |
| Lynch Carpenter, LLP | $8,709.80 |
| Iredale & Yoo, APC | $24,795.44 |
| **TOTAL** | **$1,133,794.77** |

69.     Based on the information provided in the concurrently filed declarations of Plaintiff's Counsel, the total number of hours spent on this litigation by Plaintiff's Counsel is 9,635.05, for a total lodestar of $6,409,284.75.

| Firm | Hours | Lodestar |
|---|---|---|
| Blood Hurst & O'Reardon, LLP | 8,261.25 | $5,418,781.25 |
| Lynch Carpenter, LLP | 567.00 | $392,293.50 |
| Iredale & Yoo, APC | 806.80 | $598,210.00 |
| **TOTAL** | **9,635.05** | **$6,409,284.75** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 26, 2022, at San Diego, California.

By:          *s/ Timothy G. Blood*
                TIMOTHY G. BLOOD

# EXHIBIT 1



501 West Broadway, Suite 1490 | San Diego, CA 92101
T | 619.338.1100  F | 619.338.1101
www.bholaw.com

# FIRM RESUME



Blood Hurst & O'Reardon, LLP focuses in the nationwide prosecution of complex class actions. The firm represents the interests of consumers, insurance policy holders and investors in state and federal trial and appellate courts throughout the country. The principals of Blood Hurst & O'Reardon come from a large firm that represented plaintiffs in class action litigation, where they formed the core of the consumer and insurance practice group. Blood Hurst & O'Reardon's principals have been appointed lead counsel and have held other leadership positions in a wide variety of class action matters.

### Timothy G. Blood

Mr. Blood is the firm's managing partner. His practice has focused on complex litigation, including class action litigation, since the early 1990's. Mr. Blood has tried class action cases and is highly regarded in the field of consumer protection law, including California's Unfair Competition Law and Consumers Legal Remedies Act.

Mr. Blood has represented millions of retail consumers, holders of life, automobile and homeowner insurance policies, data breach victims, mortgagors, credit card customers, homeowners, and victims of race discrimination. He practices in both state and federal courts throughout the country and has represented the interests of consumers formally or informally before the Federal Trade Commission, the U.S. Consumer Products Safety Administration, the California Department of Justice, the California Legislative Analyst's Office and the California Department of Insurance. He has worked with the Federal Trade Commission to obtain record setting recoveries for consumers. In *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.), Mr. Blood's work with the Federal Trade Commission resulted in the largest consumer recovery in a false advertising action in FTC history. Other large and record-setting recoveries for consumers include a $3.4 billion settlement in 2017 for owners of certain Toyota vehicles and the largest false advertising recovery in the history of the food industry.

Since 2010, some of Mr. Blood's court-appointed leadership positions include: Court appointed lead counsel in *Warner v. Toyota Motor Sales* (C.D. Cal); Federal Rule of Civil Procedure 23(g) counsel in *In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, and Prods. Liability Litig.* (D.N.J.); Federal Rule of Civil Procedure 23(g) counsel in *Yamagata v. Reckitt Benckiser* (N.D. Cal.); Federal Rule of Civil Procedure 23(g) counsel in *Mullins v. Premier Nutrition Corp.* (N.D. Cal.); Federal Rule of Civil Procedure 23(g) Class Counsel in *Corvello v. Wells Fargo Bank, N.A.* (N.D. Cal.); Executive Committee member in *Snyder v. the Regents of the University of California*, JCCP No. 589243 (Cal. Super. Ct., Los Angeles Cnty., Hon. John Shepard Wiley, Jr.); Federal Rule of Civil Procedure 23(g) Class Counsel in *Rikos v. The Procter & Gamble Co.*, (S.D. Ohio; Federal Rule of Civil Procedure 23(g) Class Counsel in *Godec v. Bayer Corp.* (N.D. Ohio); Federal Rule of Civil Procedure 23(g) Class Counsel in *Johns v. Bayer Corp.* (S.D. Cal.); Federal Rule of Civil Procedure 23(g) Class Counsel in *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.); Plaintiffs' Liaison Counsel and Steering Committee member by the United States District Court for the Southern District of California in the multidistrict litigation *In re Sony Gaming Networks and Customer Data Sec. Breach Litig.*; Class Counsel by the district court for the District of Massachusetts in *In re Reebok Easytone Litig.*; Class Counsel in *Serochi v. Bosa Dev. Cal.* by the San Diego Superior Court; Co-Lead Class Counsel by the Los Angeles Superior Court in *In re Toyota*

*Motor Cases*, (Toyota Unintended Acceleration Consolidated Litigation); Co-Lead Class Counsel by the United States District Court for the Southern District of California in the multidistrict litigation *In re Hydroxycut Mktg. and Sales Practices Litig,*; Co-Lead Class Counsel by the United States District Court for the Central District of California in *Johnson v. Gen. Mills, Inc.*; Co-Lead Class Counsel by the United States District Court for the Northern District of Ohio in *Gemeles v. The Dannon Co.*; Co-Lead Class Counsel by the United States District Court for the Southern District of California in *Hartless v. Clorox Co.*; and Class Counsel by the United States District Court for the Southern District of Florida in *Smith v. Wm. Wrigley, Jr. Co.*.

Mr. Blood has litigated many data breach privacy actions, including leading as Co-Liaison Counsel and member of the Plaintiff's Steering Committee *In re Sony Gaming Networks and Customer Data Security Breach Litigation*, MDL 2258 (S.D. Cal.), one of the largest data breach cases at the time. He represents the City of San Diego in *People for Experian Data Corp.* Case No. 37-2019-01047183 (Cal. Super. Ct., Orange Cnty) in data breach notification action on behalf of the People of the State of California against a leading consumer credit reporting and data aggregation company and represented plaintiffs in *Patton v. Experian Data Corp*., No. SACV 15-1871 JVS (C.D. Cal.), a multi-state data breach notification action against arising out of the same conduct. Mr. Blood is a member of the Plaintiff's Executive Committee in *Snyder v. the Regents of the University of California*, JCCP No. 589243 (Cal. Super. Ct., Los Angeles Cnty), among others.

Mr. Blood has also drafted legislation aimed at modernizing data breach and related privacy laws, including drafting portions of, lobbying for and testifying before both houses of the California Legislature in support of the landmark California Consumer Privacy Act of 2018. The CCPA passed unanimously through both houses of the California legislature and provides the most sweeping digital privacy protection in the United States. It is a model for other proposed state and federal laws.

Mr. Blood has acted as lead counsel in a number of "functional food" false advertising class actions, including cases against General Mills and The Dannon Company filed in federal courts around the country. The *Dannon* litigation resulted in the largest settlement in food industry history for false advertising.

He was lead trial counsel in *Lebrilla v. Farmers Ins. Grp., Inc.* (Cal. Super. Ct., Orange Cnty.) a multistate class action which settled on terms favorable to the class after a month long trial and just before closing arguments. He was also co-lead trial counsel in *In re Red Light Photo Enf't Cases* (Cal. Super. Ct. San Diego Cnty.), an action brought on behalf of California motorists.

Mr. Blood has represented millions of purchasers of food, food supplements and over-the-counter drugs arising out of various advertising claims made by manufacturers and retailers. He has also represented owners of motor vehicles in product liability cases and consumer credit and mortgage borrowers against a number of major lending institutions, including Bank of America, Washington Mutual, Countrywide, GMAC and Wells Fargo.

Mr. Blood has wide-ranging experience litigating against life, auto and other insurance carriers on behalf of consumers. His experience litigating against life insurance companies includes representing owners, holders and beneficiaries of industrial life insurance in race discrimination cases (with class periods dating back to the late 1800's). He also represented those holding traditional life insurance policies in market conduct actions such as the "vanishing premium" life insurance actions. Mr. Blood was responsible for one of only two litigated cases where classes where certified in the vanishing premium series of cases. He was one of the few plaintiffs' attorneys to obtain class-wide recoveries in the "imitation parts" automobile insurance actions. Insurance companies against whom Mr. Blood has litigated include the American General companies, Farmers Insurance Group of companies, Mercury Insurance Group, Allstate, State Farm, Great Southern Life, Metropolitan Life, United Life Insurance Company, Midland National Life Insurance Company and General American Insurance Company.

Mr. Blood has also represented consumers in traditional false advertising actions, those victimized by so-called "negative option" sales practices, and owners of a variety of different types of faulty computer equipment and software from manufacturers. Some of these retailers and manufacturers include Apple, Dell, IBM, Procter & Gamble, General Mills, The Dannon Company, Bayer, AG, Bosa Development, Kellogg Company and General Dynamics.

Mr. Blood has been involved in many precedent-setting appellate decisions in areas which include consumer and insurance law and class action procedure. These appellate decisions include: *Kuhns v. Scottrade, Inc*., 868 F.3d 711 (8th Cir. 2017)(first 8th Circuit decision finding Article III standing in a data breach case); *Rikos v. The Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) (class certification) *cert. denied*, 2016 U.S. LEXIS 2244 (U.S. Mar. 28, 2016); *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013) (consumer protection and banking); *Fitzpatrick v. Gen. Mills, Inc.,* 635 F.3d 1279 (11th Cir. 2011) (class certification, consumer law and false advertising); *Westwood Apex v. Contreras*, 644 F.3d 799 (9th Cir. 2011) (CAFA jurisdiction)*; Kwikset Corp. v. Super. Ct. (Benson)*, 51 Cal. 4th 310 (2011) (consumer law and false advertising); *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549 (9th Cir. 2010) (banking and preemption); *Troyk v. Farmers Grp., Inc*., 171 Cal. App. 4th 1305 (2009) (insurance law); *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n*, 148 P.3d 1179 (Haw. 2006) (health insurance); *McKell v. Wash. Mut. Bank, Inc*., 142 Cal. App. 4th 1457 (2006) (banking law and consumer law); *Santiago v. GMAC Mortg. Grp., Inc*., 417 F.3d 384 (3d Cir. 2005) (consumer and banking law); *Lebrilla v. Farmers Grp., Inc*., 119 Cal. App. 4th 1070 (2004) (automobile insurance and class action procedure); *Moore v. Liberty Nat'l Life Ins. Co*., 267 F.3d 1209 (11th Cir. 2001), *cert. denied*, 535 U.S. 1018 (2002) (life insurance and civil rights); *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49 (2d Cir. 2004) (consumer and banking law); and *Lavie v. Procter & Gamble Co*., 105 Cal. App. 4th 496 (2003) (consumer law and false advertising).

Mr. Blood has testified before the California State Assembly and State Senate Judiciary Committees, as well as the Assembly and Senate Committees on Banking, Finance & Insurance. He has worked at both the state and federal level with lawmakers and government agencies to shape legislation to protect consumer rights, including lobbying on the Class Action Fairness Act of 2005 and working to defeat a California state ballot initiative designed to weaken the class action device.

BLOOD
HURST &
O'REARDON | LLP

Mr. Blood is a frequent continuing legal education speaker on topics which include complex litigation, class action procedure, data breach and privacy litigation, consumer fraud, false advertising, financial fraud litigation and insurance litigation. He has been an invited speaker for American Bar Association practice groups, the Practicing Law Institute, University of California at Irvine School of Law; University of San Diego School of Law, University of Arizona Sandra Day O'Connor School of Law, Loyola Law School, Chapman University School of Law; the Grocery Manufacturers Association, the American Association of Justice, Consumer Attorneys of California, ALI-ABA, the Practising Law Institute, Bridgeport Continuing Education, Law Seminars International, and the Consumer Attorneys of San Diego, for which he has chaired multi-day seminars on class action litigation.

Mr. Blood is frequently consulted by the media. He has appeared on Good Morning America, ABC World News Tonight, and major network affiliates on behalf of his clients. He has been interviewed for stories featuring consumer rights issues and his cases by *The New York Times*, *The Wall Street Journal*, *Bloomberg*, Reuters, the Associated Press, *The Los Angeles Times*, National Public Radio, the *Daily Journal*, *Adweek*, the *Los Angeles Daily News*, CNBC, Fox News, the Korean Broadcasting Service and others.

Mr. Blood is a member of the Board of Directors of the Consumer Attorneys of California and a member of its executive board from 2014 to 2016. He was the 2015 President of the Consumer Attorneys of San Diego and a member of the CASD Foundation, a charitable giving non-profit. In 2018 he received the statewide Marvin E. Lewis Award by the Consumer Attorneys of California for his "guidance, loyalty and dedication, all of which have been an inspiration to fellow attorneys." He also was awarded the 2018 Consumer Advocate of the Year by Consumer Attorneys of San Diego. In 2007, he was a finalist for the Consumer Attorneys of California Lawyer of the Year award for his trial work in a multistate class action against Farmers Insurance. He has been named a "Super Lawyer" since 2006 and has achieved an "AV" rating by Martindale Hubbell. In 2014, Mr. Blood was named a "Titan of the Plaintiff's Bar" by the national legal publication Law360. Mr. Blood was elected a Fellow of the American Bar Foundation. Mr. Blood is also the Legislative Column Editor for *Trial Bar News*. Mr. Blood is also a founding member of the San Diego ESI Forum, a group of judges and lawyers devoted to teaching legal professionals in federal and state court about electronic discovery.

Mr. Blood was a founding partner of the firm now known as Robbins Geller Rudman & Dowd, LLP.

Mr. Blood is admitted to practice in the state of California, as well as the U.S Supreme Court, the United States Courts of Appeal for the Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth and Eleventh Circuits, and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California, the Eastern and Western Districts of Arkansas, the District of Colorado, the Northern District of Illinois, and the Eastern District of Michigan. Before starting Blood Hurst & O'Reardon, Mr. Blood was a partner in Milberg Weiss Bershad Hynes & Lerach, LLP and a founding partner in the firm now known as Robbins Geller Rudman & Dowd, LLP. Mr. Blood received his Juris Doctor from George Washington University in 1990 and his Bachelor of Arts with honors in Economics from Hobart College in 1987.



## Leslie E. Hurst

Ms. Hurst is a co-founding partner of the firm. Prior to founding the firm, Ms. Hurst was a partner in Coughlin Stoia Geller Rudman & Robbins, LLP and an associate at Milberg Weiss Bershad Hynes & Lerach, LLP.

Her practice has focused on complex class action lawsuits, including federal multi-district litigation and California Judicial Council Coordinated Proceedings, with an emphasis on consumer fraud, false advertising, and insurance cases under California's consumer protection statutes.

Ms. Hurst works in a number of practice areas, including areas focusing on cases against: (1) life insurers for misrepresenting the terms of vanishing premium life insurance; (2) auto insurers for repairs with non-OEM parts, diminished value claims, improper collection of installment service charges and breach of contract, and against auto manufacturers for sale of defective vehicles; (3) financial institutions for a variety of conduct; (4) insurance companies for race-based discrimination in the sale of small value "industrial" or "burial" insurance policies; (5) consumer goods manufacturers for false and deceptive advertising; (6) real estate developers for fraud and false advertising; and (7) improper collection and over collection of fees from residents by the City of Los Angeles.

Ms. Hurst is instrumental in the firm's appellate practice. She has argued before the Second, Seventh, Eighth and Ninth Circuit Courts of Appeal and before California and Missouri Courts of Appeal.  She obtained reversals of the trial courts in *Bell v. Publix Super Mkts., Inc*. (7th Cir.); *Kroessler v. CVS Health Corp*. (9th Cir); *Sonner v. Schwabe International* (9th Cir.); *Corvello v. Wells Fargo Bank, NA* (9th Cir.); *Goodman v. Wells Fargo Bank, NA* (Cal. 2d DCA), and *Guerra v. San Diego Gas & Elec*. (Cal. 4th DCA).  Ms. Hurst also briefs most of the firms appeals including *Rikos v. The Procter & Gamble Co*. (6th Cir.); *In re Enfamil LIPIL Mktg. & Sales Practices Litig.* (11th Cir.); *Hartless v. Clorox Co.* (9th Cir.); *Garcia v. Sony Comput. Entm't* (9th Cir.); *Gutierrez v. Wells Fargo Bank, N.A.* (9th Cir.), various SLUSA appeals in the 2nd, 8th and 9th Circuits, and *Sonner v. Schwabe International* (9th Cir.); *Sonner v. Premier Nutrition Corporation* (9th Cir.); *Heier v. Fire Ins. Exchange* (Cal. 2nd DCA); *Reed v. Dynamic Pet Products* (Mo. Ct. App.).

The most recent settlements on which Ms. Hurst was instrumental include: *Adlouni v. UCLA Health Systems* (Cal. Super. Ct., Los Angele Cnty.) (over $25 million in free identity theft insurance in data breach case); *Austin v. Western Concrete* (S.D. Cal.) (backpay in employment case); *Serochi v. Bosa Dev.* (Cal. Super. Ct., San Diego Cnty.) ($16.75 million settlement to condominium purchasers for square footage misrepresentations by the developer); *Chakhalyan v. City of Los Angeles* (Cal. Super. Ct., Los Angeles Cnty.) (full refunds of overcharges and a revamping of L.A. billing practices); *Hartless v. Clorox Co.* (S.D. Cal.) (nationwide settlement in excess of $10 million that provided 100% recovery of damages to class members); *In re Enfamil LIPIL Mktg. & Sales Practices Litig.* (S.D. Fla.) (nationwide settlement in excess of $8 million involving false advertising of infant formula); *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.) (nationwide settlement of $45 million); *Weight v. The Active Network, Inc.* (Cal. Super. Ct., San Diego Cnty.) (full refunds plus a multiplier); *Bransford v. City of Los Angeles*

(Cal. Super. Ct., Los Angeles Cnty.) (full refunds); *Warner v. Toyota Motor Sales, U.S.A., Inc.* (C.D. Cal.) (warranty extensions, refunds and free vehicle inspections).

Between 2003 and 2005, Ms. Hurst took a sabbatical from law and moved to Sri Lanka where she worked for CARE International as the Coordinator for Strategic Planning with an emphasis on development of CARE's long-term strategic plan for the conflict-affected areas.

Ms. Hurst is admitted to practice in the state of California, as well as the United States Courts of Appeal for the Second, Sixth, Seventh, Eighth and Ninth Circuits, and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California. Ms. Hurst received her Juris Doctor degree from the University of California, Hastings College of the Law in 1995. She earned her Master of Arts degree in Sociology from the University of California, Berkeley and a Bachelor of Arts degree in Sociology (*cum laude*) from the University of San Diego. Ms. Hurst is an active member of the Consumer Attorneys of San Diego, and Consumer Attorneys of California.

### Thomas J. O'Reardon II

Mr. O'Reardon is a co-founding partner of the firm. His practice focuses exclusively on complex class action lawsuits involving consumer fraud, insurance fraud and antitrust violations. Mr. O'Reardon received his Juris Doctor degree from the University of San Diego School of Law and his Bachelor of Arts degree in Politics from Wake Forest University. He is admitted to practice in the state of California, as well as the United States Courts of Appeal for the Sixth, Eighth and Ninth Circuits, and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California and the Northern District of Illinois.

Prior to founding the firm, Mr. O'Reardon was an associate at Coughlin Stoia Geller Rudman & Robbins, LLP. There, Mr. O'Reardon worked on numerous complex class action litigation matters, including actions involving: annuity policies marketed and sold to senior citizens; insurer kickbacks known as "contingent commissions" in the property and casualty insurance brokerage industry; Sherman Act claims against the world's largest manufacturers of random access memory for computers; invasions of credit card holder's rights of privacy; false and deceptive advertising of consumer goods and wireless telephone services; automobile insurers' unlawful practices with respect to installment pay plans; and dangerous and defective products, including recalled children's toys. He was also part of the team representing the California Department of Insurance against five of the largest employee benefit insurance companies for violations relating to their failure to disclose payments of contingent commissions to brokers. As a result of the action, all five defendants agreed to sweeping changes in their disclosure practices.

Some of the actions on which Mr. O'Reardon has worked include: *Yamagata v. Reckitt Benckiser LLC* (N.D. Cal.) (certified class action involving false advertising of Move Free Advanced glucosamine and chondroitin supplement); *Mullins v. Premier Nutrition Corp.* (N.D. Cal.) (certified class action involving false advertising of Joint Juice glucosamine and chondroitin supplement); *Rikos v. The Proctor & Gamble Co.* (S.D. Ohio) (certified class action involving false advertising of P&G's Align probiotic, affirmed by the Sixth Circuit); *In re*

- 6 -

*Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.) (nationwide settlement of $45 million involving false advertising of Skechers' Shape-ups toning shoes products); *In re Reebok Easytone Litig.* (D. Mass.) (nationwide settlement of $25 million involving false advertising of Reebok toning footwear and apparel products); *Murr v. Capital One Bank (USA), N.A.* (E.D. Va.) (nationwide settlement in excess of $7.3 million involving 0% APR billing practices); *Dolfo v. Bank of Am.* (S.D. Cal.) (certified class action involving mortgage modification banking practices); *Johnson v. Gen. Mills, Inc.* (C.D. Cal.) (certified class action involving false advertising of General Mills' YoPlus yogurt, which resulted in a nationwide settlement of $8.5 million); *Fitzpatrick v. Gen. Mills, Inc.* (S.D. Fla.) (certified class action reviewed and approved by the Eleventh Circuit); *Johns v. Bayer Corp.* (S.D. Cal.) (certified class action involving false advertising of Bayer's One-A-Day multivitamins); *Godec v. Bayer Corp.* (N.D. Ohio) (certified class action involving false advertising of Bayer's One-A-Day multivitamins, which settled on a classwide basis); *Corvello v. Wells Fargo Bank, NA* (N.D. Cal.) (certified class action involving mortgage modification practices where order granting motion to dismiss was reversed by the Ninth Circuit in a published opinion); *Rosales v. FitFlop USA LLC* (S.D. Cal.) (nationwide settlement of $5.3 million involving false advertising of toning footwear); *Blessing v. Sirius XM Radio, Inc.* (S.D.N.Y.) (nationwide settlement valued in excess of $180 million involving monopoly price increases arising out of the merger between Sirius and XM); *In re Dynamic Random Access Memory Antitrust Litig.* (N.D. Cal.) (settlement of more than $300 million); *In re Mattel, Inc .[Toy Lead Paint Prods. Liab. Litig.]* (C.D. Cal.) (nationwide settlement valued at over $50 million); *Gemelas v. Dannon Co., Inc.* (N.D. Ohio) (nationwide settlement in excess of $45 million involving false advertising of Dannon's Activia and DanActive yogurt products); *In re Enfamil LIPIL Mktg. & Sales Practices Litig.* (S.D. Fla.) (certified class action involving false advertising of infant formula, which resulted in nationwide settlement in excess of $8 million); *Smith v. Wm. Wrigley Jr. Co.* (S.D. Fla.) (nationwide settlement in excess of $7 million involving false advertising of Wrigley Eclipse chewing gum and mints); *Duffer v. Chattem, Inc.* (S.D. Cal.) (nationwide settlement of up to $1.8 million involving false advertising of ACT Total Care mouthwash); *In re Enron Corp. Sec. Litig.* (S.D. Tex.) (settlements of $7.3 billion); *AOL Time Warner Cases* (Cal. Super. Ct., Los Angeles Cnty.) (settlements of approximately $630 million); *Morris v. CBS Broad., Inc.* (S.D.N.Y.) (nationwide settlement on behalf of purchasers of asbestos-laden children's toys); *In re Aqua Dots Prods. Liab. Litig.* (N.D. Ill.) (multidistrict litigation on behalf of purchasers of more than 4 million toxic children's toys); *Berry v. Mega Brands, Inc.* (D.N.J.) (litigation on behalf of purchasers of more than 10 million lethal children's toys); *In re Toyota Motor Cases*, (Cal. Super. Ct., Los Angeles Cnty.) (litigation on behalf of consumers who purchased vehicles subject to "sudden unintended acceleration"); and *In re Hydroxycut Mktg. and Sales Practices Litig.* (S.D. Cal.) (multidistrict litigation on behalf of purchasers of unsafe and ineffective weight-loss products, which resulted in a nationwide settlement valued in excess of $20 million). With the exception of the *Blessing v. Sirius XM Radio. Inc.* litigation, Mr. O'Reardon and/or his firm served as court-appointed Lead or Co-Lead Counsel in each of the above-mentioned class actions. In granting final settlement approval, which included appointing Mr. O'Reardon as Class Counsel, the Court's order in the *Johnson v. Gen. Mills. Inc.* (C.D. Cal.) action states that Mr. O'Reardon is "vastly experienced" in consumer class action litigation.

**BLOOD**
**HURST &**
**O'REARDON** | LLP

Mr. O'Reardon is an active member of the Consumer Attorneys of San Diego, the Consumer Attorneys of California, and a founding member of the CAOC Young Lawyers Division. In 2014-2021, Mr. O'Reardon was named a "Super Lawyers Rising Star," a designation provided to less than 2.5 percent of lawyers in California. He has also been a member of, and contributing author for, The Sedona Conference Working Group on Electronic Document Retention and Production. Mr. O'Reardon has been an invited speaker for the University of San Diego School of Law, Consumer Attorneys of California, the Consumer Attorneys of San Diego, and the San Diego ESI Forum on topics which include complex litigation, electronic discovery, and the class action settlement process.

### Paula R. Brown

Ms. Brown is a partner with the firm. Her practice focuses on all types of complex class action litigation, including cases in federal multi-district litigation and California Judicial Council Coordinated Proceedings. Ms. Brown has tried class action cases and is also involved in the firm's appellate practice.

Ms. Brown received her Juris Doctor degree and graduated *cum laude* from California Western School of Law in 2007 and earned her Bachelor of Arts degree in Political Science from the University of Washington in 2004. While at California Western, Ms. Brown was a member of the *California Western Law Review* and authored *Parent-Child Relationship Trumps Biology: California's Definition of Parent in the Context of Same-Sex Relationships*, 43 Cal. W. L. Rev. 235 (2006). She is admitted to practice in the state of California, as well as the United States Courts of Appeal for the Eighth and Ninth Circuits, and the United States District Courts for the Northern, Eastern, Central and Southern Districts of California and the Northern District of Illinois.

Prior to joining Blood Hurst & O'Reardon, Ms. Brown was an associate at the law firm now known as Robbins, Geller, Rudman & Dowd, LLP. While there, she represented plaintiffs in a number of complex class action litigation matters involving: price-fixing claims against the world's largest aftermarket auto lighting parts manufacturers and distributors; monopoly claims against the largest seller of portable media players; price fixing claims against containerboard manufacturers; race-discrimination claims against mortgage lenders; and false and deceptive practices in the sale of defective children's products and toys.

Some of the actions on which Ms. Brown has worked include: *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation* (D.N.J.) (nationwide false advertising); *Mullins v. Premier Nutrition Corp.* (N.D. Cal.) (certified class action involving false advertising); *Huntzinger v. Aqua Lung America, Inc. et al.* (S.D. Cal.) (nationwide false advertising); *Medellin v. Ikea U.S. West, Inc.* (Cal Super. Ct., San Diego Cnty.) (consumer protection claims); *Serochi v. Bosa Dev.* (Cal. Super. Ct., San Diego Cnty.) (misrepresentations case); *Dennis v. Kellogg Co.* (nationwide false advertising); *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.) (nationwide false advertising); *In re Reebok Easytone Litig.* (D. Mass.) (nationwide false advertising); *Dremak v. Urban Outfitters, Inc.* (Cal. Super. Ct., Los Angeles Cnty.) (consumer privacy); *In re Sony Gaming Networks and Customer Data Sec. Breach Litig.* (S.D. Cal.) (consumer privacy); *In re Hydroxycut Mkt. and Sales*

**BLOOD
HURST &
O'REARDON** LLP

*Practices Litig.* (S.D. Cal.) (false advertising); *In re Apple iPod iTunes Antitrust Litig.* (N.D. Cal.) (monopoly claims); *In re Mattel, Inc. [Toy Lead Paint Prods. Liab. Litig.]* (C.D. Cal.) (nationwide sale of defective product); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.* (C.D. Cal.) (price fixing); *Payares v. JP Morgan Chase & Co.* (C.D. Cal.); *Salazar v. Greenpoint Mortg.* (N.D. Cal.); *Puello v. Citifinancial* (D. Mass.); *Morris v. CBS Broad., Inc.* (S.D.N.Y.) (defective product); *In re Aqua Dots Prods. Liab. Litig.* (N.D. Ill.) (defective product); and *Berry v. Mega Brands, Inc.* (D.N.J.) (defective product).

Ms. Brown is an active member of the Consumer Attorneys of San Diego, the Consumer Attorneys of California, Women in E-Discovery, and the American Association for Justice. Ms. Brown is a current member of the Board of Directors of the Consumer Attorneys of California and Board of Directors of Consumer Attorneys of San Diego, and is active in the Louis M. Welsh American Inn of Court.

### Jennifer L. MacPherson

Ms. MacPherson is of counsel with the firm. Her practice focuses on complex class action litigation. Ms. MacPherson received her Juris Doctor degree from the University of San Diego School of Law in 1997 with a J.D. and an L.L.M in tax and earned her Bachelor of Arts degree in International Business and Marketing from the University of Hawaii in 1994. During law school she was a summer law clerk to the Honorable Walter S. Kirimitsu (Ret.) in the Hawaii Intermediate Court of Appeals and was a research assistant to Professor C. Hugh Friedman author of *California Practice Guide: Corporations*. She is a member of the California Bar and is licensed to practice before the United States District Courts for the Central, Southern and Northern Districts of California.

For over a decade Ms. MacPherson has prosecuted class actions on behalf of consumers, policyholders, investors, employees, and medical practitioners against the nation's largest retailers and manufacturers of consumer products, insurers of homes and automobiles, banks, and employers for violations of federal and state consumer, antitrust, securities and labor laws. During this time she has actively litigated complex class action litigation matters involving: false and deceptive advertising by one of the nation's largest retail mall chains for selling gift cards subject to a monthly service fee in violation of state law; truth in lending claims against a national bank for suspending borrower's home equity lines of credit; breach of contract claims against national lenders for failing to modify borrower's home loans after successful completion of a trial period plan; product defect claims against the world's largest manufacturers of laptops and cell phones; RICO claims against the nation's largest health insurance companies for denying, delaying and reducing payments to health care providers nationwide; privacy claims against national pharmacies for allegedly using prescription information to conduct targeted marketing campaigns on behalf of drug companies; data breach lawsuits against national banks and retailers for failing to properly safeguard consumer's personal information.

Some of these actions include: *Solomon v. Anthem, Inc.* (S.D. Fla.); *In re Sony VAIO Comput. Notebook Trackpad Litig.* (S.D. Cal.); *Horvath v. LG Elecs. MobileComm U.S.A., Inc.,* (S.D. Cal.); *Kazemi v. Westfield Am., Inc. (*Cal. Super. Ct., Los Angeles Cnty.); *Frost v. LG*

BLOOD
HURST &
O'REARDON | LLP

*Elecs. Mobilecomm U.S.A., Inc.* (Cal. Super. Ct., Los Angeles Cnty.); *Shamrell v. Apple, Inc.* (Cal. Super. Ct., Los Angeles Cnty.).

### Craig W. Straub

Mr. Straub is an associate with the firm. Mr. Straub's practice involves prosecuting all types of consumer fraud in complex class action litigation, with a particular focus on false advertising of consumer products as well as complex contract and intellectual property disputes between international corporations. He graduated *magna cum laude* from California Western School of Law and earned his Bachelor of Sciences degree from Texas A&M University. While at California Western School of Law, Mr. Straub received an Academic Merit Scholarship and a Wiley W. Manuel Pro Bono Services Award. Mr. Straub is a registered patent attorney with the United States Patent and Trademark Office. He brings substantial experience in complex litigation including projects at DLA Piper, Bernstein Litowitz Berger & Grossman, LLP, Cooley LLP, and other nationally recognized firms. He has been a member of the California Bar since 2007.

Mr. Straub performed significant work on behalf of Plaintiffs in the following actions: *Warner v. Toyota Motor Sales, U.S.A, Inc.* (C.D. Cal.) ($3.4 billion settlement for owners of certain Toyota vehicles); *Mullins v. Premier Nutrition Corp.* (N.D. Cal.) (certified class action involving false advertising of Joint Juice glucosamine and chondroitin supplement); *Rikos v. The Proctor & Gamble Co.* (S.D. Ohio) (certified class action involving false advertising of P&G's Align probiotic, affirmed by the Sixth Circuit); *Terry v. JPMorgan Chase Bank, N.A* (S.D. Cal.) ($4.3 million settlement fund for the Class alleging unfair debt collection practices); *Huntzinger v. Aqua Lung America, Inc. et al.* (S.D. Cal.) (nationwide false advertising); *Yamagata and Pelardis v. Reckitt Benckiser LLC* (N.D. Cal.) (certified class action involving false advertising of glucosamine supplement).

### James M. Davis

Mr. Davis is an associate with the firm. His practice focuses on complex class action litigation with an emphasis on consumer fraud and defective products. Mr. Davis graduated from UCLA School of Law and earned his Bachelor of Arts from Davidson College.

Mr. Davis has been practicing law since 2014. Before joining the firm, Mr. Davis prosecuted class actions on behalf of consumers, unfair competition law claims on behalf of public entities, and mass torts involving pharmaceuticals. Mr. Davis also served as a prosecuting attorney at the San Diego County District Attorney's Office in its Economic Crimes Unit. In that role, he prosecuted environmental and consumer fraud civil actions, as well as environmental and consumer felonies. Mr. Davis began his career at a full-service law firm, where he represented both defendants and plaintiffs in unfair competition, environmental, and class action cases.

In addition to his professional accomplishments, Mr. Davis has worked with the University of San Diego Veterans Legal Clinic, providing representation to veterans against for-profit educational institutions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O'REARDON, LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

Executed on August 26, 2022.

s/ *Timothy G. Blood*
TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com