VENABLE LLP
Angel A. Garganta (SBN 163957)
Email: agarganta@venable.com
Steven E. Swaney (SBN 221437)
seswaney@venable.com
Amit Rana (SBN 291912)
Email: arana@venable.com
Antonia I. Stabile (329559)
Email: aistabile@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone:    415.653.3750
Facsimile:    415.653.3755

MORRISON & FOERSTER LLP
Jessica L. Grant (178138)
Email: jgrant@mofo.com
425 Market Street
San Francisco, CA 94105
Telephone:    415.268.7000
Facsimile:    415.268.7522

Attorneys for Defendant
PREMIER NUTRITION COMPANY, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION,<br><br>Defendant. | Case No. 3:16-cv-06980-RS<br><br>Hon. Richard Seeborg<br><br>**DECLARATION OF EXPERT WITNESS STEVEN A. TASHER IN SUPPORT OF PREMIER NUTRITION COMPANY, LLC'S OPPOSITION TO PLAINITFF'S MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS FOR CLASS REPRESENTATIVE**<br><br>Complaint Filed:  December 5, 2016<br>Trial Date:          May 23, 2022 |

## I.    INTRODUCTION AND SCOPE OF EXPERT OPINIONS

1.    I am the Chief Executive Officer of Wyatt Partners.  My legal background, expertise, and experience handling legal fee disputes is set forth below and in both my *Curriculum Vitae* (attached hereto as Exhibit A) and My Testifying History and other Representative Matters in California (attached hereto as Exhibit B).

2.    I have been retained by Venable LLP ("Venable") on behalf of Premier Nutrition in the above-captioned proceeding (the "Montera Class Action").  The scope of my engagement was to evaluate the fees and costs sought by Plaintiff's counsel in their motion to the Court, dated August 26, 2022 (ECF 296 to 296-4).

3.    My rate of compensation is $650 per hour.  My compensation is not contingent in any way upon the opinions expressed herein or the outcome of the Montera Class Action.

## II.    QUALIFICATIONS AND CREDENTIALS

4.    I have spent my entire legal career handling or supervising major litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees.  I have been accepted as an expert on the reasonableness of attorneys' fees and settlements in numerous courts and tribunals across the country and around the world.  Declaration testimony I provided in fee-shifting matters in the State of California was found to "help Petitioner meet the burden of production."[1]

5.    In 2009, I co-founded Wyatt Partners, a consulting firm that, among other things, provides expert analysis on the reasonableness of attorneys' fees and the reasonableness of settlements in complex litigation.  Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) of Wyatt Partners.  As a consultant on the issue of legal fees and costs, I have advised companies and law firms with respect to billing guidelines used in complex litigation and have been retained by a number of national and international law firms to assist them in their analysis of legal fees and costs in ongoing litigation.

---

[1] *Robert Broe v. SSA Terminals, LLC*, OALJ No. 2018-LHC-00423/00607 at *9 (Feb. 25, 2022) (Nordby, ALJ).

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

6.    Examples of such clients and companies include: ABB Ltd.; AGI-Shorewood, LLC; Aon PLC; Anthem Blue Cross of California; Appian Corp.; AT&T; Benihana of Tokyo; Best Medical International, Inc.; Boeing Company; Chevron-Texaco Company; Chicago Title Insurance Company; Commonwealth Land and Title Corporation; Dow Chemical Company; E.I. du Pont de Nemours & Co.; the Estate of Daniel Fegan; the Estate of Shirley West; First Horizon National Corporation; Ford Motor Company; GATX Rail Austria, GmbH; General Electric Company; Georgia-Pacific, LLC; High Point Designs, LLC; Honeywell International, Inc.; Hewlett Packard Corporation; Howard Hughes Corporation; HUB International and Equity Risk Partners, Inc.; Houston Casualty Company; Hull & Co.; International Business Machines (IBM) Corporation; Lockheed Martin Corporation; Lumber Liquidators; MiMedx Group, Inc.; Motorola Mobility, Inc.; Naturex, Inc.; Nicholas Sparks; Nikola, Inc.; Philadelphia Indemnity Insurance Company; Port Terminal Railroad Association; Plexus Cotton, Ltd.; RevHealth, LLC; Sony Pictures, Inc.; SavaSeniorCare, LLC; Stroygazmontazh (SGM Holdings); Telebrands; UBS Group AG; Ultimate Kronos Group; Union Square Ltd.; the United States Postal Service; Value Wholesale, Inc.; Wellstat Management, LLC; and Zurich Insurance Group, Ltd.  I have also been retained on behalf of multiple longshore workers in the State of California who have made claims under the Longshore and Harbor Workers' Compensations Act (LHWCA), to provide expert analysis on fee petitions to various federal agencies (including the Office of Administrative Law Judges and the Benefits Review Board) and the Ninth Circuit Court of Appeals.

7.    As an expert in attorneys' fees cases, I have been involved in the evaluation, resolution, and trial of legal fees and costs in litigations, arbitrations, and matters before federal administrative agencies throughout the United States (including Arizona, California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Michigan, Mississippi, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Tennessee, Virginia, and the Commonwealth of Puerto Rico) and internationally (including the Bahamas, Canada, Hong Kong, Italy, Mexico, and the United Kingdom).

8.    These cases have varied in nature, including many mass-tort and class action matters.  I have extensive experience analyzing the fees and/or hourly rates of firms (both large

-2-

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

and small) across the state of California, both as a consumer of legal services and as an expert evaluating the legal services performed in a diversity of matters. These matters have included firms across both Northern and Southern California and many of these matters have been in mass-tort claims or class actions (both in federal and state court). My knowledge of California (and San Francisco rates in particular) have been found sufficient for California-based firms seeking fees to meet their lodestar burden of production in a lodestar analysis.[2]

9.      I have reviewed fees in numerous class actions around the country, both on the Plaintiffs' and Defense side, including *Corona v. Sony Pictures Entertainment, Inc.*[3], *UFCW & Employers Benefit Trust v. Sutter Health*[4], *District Council 16 v. Sutter Health*[5], *In re Bluetooth Headset Products Liability Litigation*[6], *KB Home Raleigh-Durham, Inc. v. Liberty Mutual Fire Insurance Co.*[7], and *DeMaria v. Horizon Healthcare Servs.*[8] My expert testimony about the fees and hourly rates of California litigation has been accepted by courts and tribunals around the world, including the New York Supreme Court, which described such testimony as "extremely effective."[9] My expert testimony has also been accepted concerning, *inter alia*, fees and costs incurred in the Sony Data Hack Class Actions[10] and California Wildfire litigation.[11]

10.      Before forming Wyatt Partners, I had various roles handling or supervising complex litigation, as well as overseeing legal expenses internally and as a client around the world, including in California. Early in my career, as Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous government civil and regulatory cases in state

---

[2] See *Broe*, *supra.*, at FN 1.

[3] No. 2:14-cv-09600 (C.D. Cal.).

[4] 194 Cal. Report. 3d 190 (Ct. App. 2015).

[5] No. A148326 (Cal. App. 1st, July 9, 2018).

[6] 2:07-ml-01822 (C.D. Cal.).

[7] 5:10-CV-00573 (E.D.N.C.).

[8] 2:11-cv-07298 (D.N.J.).

[9] *Fox Paine & Co. v. Equity Risk Partners*, Index No. 52607/2014 (Supr. Ct. Westchester Cnty.), Trial Tr. (Aug. 3, 2021) at 292. In this matter, I was accepted as an Expert on the fees and costs incurred in nearly a dozen California Supreme Court cases (Counties of San Francisco and San Mateo) and nearly a dozen private arbitrations venued in San Francisco.

[10] The twelfth matter of my testifying history.

[11] The twenty-fourth matter of my testifying history.

-3-

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

and federal court involving, inter alia, tort and contract claims brought against the State, election fraud, eminent domain law and other real estate disputes, transportation issues, and environmental matters, including criminal prosecutions for environmental matters. I argued numerous appellate matters before the Appellate Division of the New Jersey Superior Court and the Supreme Court of New Jersey.

11. In 1980, after my tenure as Deputy Attorney General for the State of New Jersey, I served as an in-house attorney at E.I. DuPont De Nemours & Co. ("DuPont") at DuPont's headquarters in Wilmington, Delaware. During my time in the DuPont law department, I supervised a diverse litigation portfolio as a member of Special Litigation section of the law department, which supervised outside counsel on major litigation against the company seeking, inter alia, equitable or injunctive relief, asbestos claims, toxic tort claims, corporate disputes, contract disputes, and major personal injury claims.

12. In 1983, I became a Partner at the firm of Donovan, Leisure, Newton & Irvine, and in 1988, I became a Partner at the Firm of Willkie Farr & Gallagher. At those firms, I represented companies like AT&T, Ashland Chemical, Arco, Cummins, Inc., E. I. du Pont de Nemours, Texas Instruments, and the Walt Disney Company in transactional or litigation matters, many of which were mass-tort or multi-party matters throughout the United States. I tried many cases throughout the Ninth Circuit, including in the Northern District of California on behalf of my client, NL Industries, in matters pertaining to their lead smelting operations.

13. In 1992, I became Vice President and Associate General Counsel at Wyeth and, in 2002, Senior Vice President of its pharmaceutical division. At Wyeth, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation. One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history. In that Multi-District Litigation, 63,000 lawsuits were filed in virtually every state (including thousands in the State of New York) by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues. Wyeth had reserved over $20 billion dollars for these claims. To respond to the thousands of claims brought in the State of California, Wyeth engaged and supervised a team of law firms led by Gordon & Rees in San

-4-

Francisco to defend the claims.  My responsibilities at Wyeth included the evaluation and analysis of the quantum and value of actual or potential liabilities, the administration of claims associated with them, and providing status reports to Wyeth's Board of Directors as well as its Law and Regulatory Review Committee (the corporate committee vested with the oversight of all the Company's liabilities), of which I was a member.  These included the evaluation of thousands of claims brought throughout the States of California and New York.  At Wyeth, I had responsibility for the supervision of five operating departments of the Company.

14.  Throughout my career, I have reviewed billions of dollars in legal spend in three capacities: (a) as a provider of legal services, in California and around the country, (b) as a consumer of legal services, in California and around the world, and (c) as an expert on the subject of legal services, in California and around the world.

## III.    EXECUTIVE SUMMARY OF OPINIONS

15.  My opinion is that Class Counsel's fee request is a grossly inflated sum that is (a) disproportionate to both the Ninth Circuit's established 25% benchmark for class counsel recovery of a common fund and the size of the judgment in this matter; and (b) in no way supported by the meager documentation Class Counsel has submitted in support of their request, which consists only of attorney declarations without exhibits or supporting records.

16.  Despite significant authority that Class Counsel's fee request should not eat away the majority of a class's Fund, Class Counsel's fee request asks the Court to award them over 61% of the roughly $12 million in the Fund.  In doing so, Class Counsel substantially departs from the methodology they themselves have utilized in prior fee requests, but provide no substantive basis (either in the "degree of success obtained" or in the risks of this litigation) for doing so.

17.  In addition, Class Counsel have refused to provide their time records in support of their lodestar request, something another Judge in this very District has required them to do.  In my experience, it is highly unusual for a party to seek its fees and not provide any time records or other substantive evidence documenting the hours worked and nature of the work performed.  Regardless, even without those time records, I observed numerous deficiencies in Class Counsel's

-5-
DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

lodestar request on its face, which leads me to the conclusion that their lodestar request is excessive and unreasonable.

18.     When considering all of the relevant information and data available to me as of the undersigned date, it is my opinion that a reasonable fee for Class counsel would be between $3.2 to $3.7 million.

## IV.     FACTUAL BACKGROUND

19.     The *Montera* Class Action is one of nine related cases pending before the United States District Court for the Northern District of California pertaining to Premier Nutrition's promotion of Joint Juice, a line of liquid joint health dietary supplements.[12]  Each of these class actions has identical allegations but each has a different plaintiff from different states. The *Montera* Class Action pertains to a plaintiff from the State of New York, pursuant to GBL §§ 349 and 350.[13] The *Montera* Class Action was originally filed in late 2016,[14] and proceeded to trial in May 2022.[15] Other related class actions include *Mullins v. Premier Nutrition*, the first of the related cases filed by Class Counsel that ended with a dismissal with prejudice and judgment being entered in favor of Premier that was affirmed on appeal by the Ninth Circuit.[16]

20.     At trial, a jury found for plaintiff and awarded $1,488,078.49 in actual damages.[17] Plaintiff moved for judgment to be entered in the amount of $140,025,765.74 based on statutory damages and pre-judgment interest under the GBL § 349 and $ § 350.

21.     The Court granted judgment for the statutory damages under GBL § 349 but denied it for the statutory damages under GBL § 350, finding that such an award would be "so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable".[18]

---

[12] Order Denying Defendant's Motion for Judgment as a Matter of Law, Denying Defendant's Motion to Decertify, and Granting Plaintiff's Motion for Entry of Final Judgment ("Aug. 12, 2022 Order") at p. 2.
[13] *Id.* at pp. 2-3.
[14] ECF No. 1 (Dec. 5, 2016) (Complaint).
[15] Aug. 12, 2022 Order at p. 2.
[16] *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS (N.D. Cal).
[17] Aug. 12, 2022 Order at p. 4.
[18] Aug. 12, 2022 Order at p. 11.

Accordingly, the Court awarded $8,312,450.00 in statutory damages and $4,583,004.90 in prejudgment interest.[19]

22.    On August 27, 2022, Class Counsel filed a Motion for Attorneys' Fees, Reimbursement of Expenses, and Services Awards for Class Representative (the "Fee Motion").[20] Four documents accompanied the Fee Motion, one being a declaration from Plaintiff and the other three being declarations from an attorney at each of Class Counsel's law firms.

    a.    Attorney Timothy G. Blood filed a declaration (the "Blood Decl.") on behalf of his firm, Blood Hurst & O'Reardon, LLP ("BHO"), claiming a total lodestar amount of 8,261.25 hours and $5,418,781.25 in fees among thirteen (13) timekeepers;

    b.    Attorney Eugene G. Iredale filed a declaration (the "Iredale Decl.") on behalf of his firm, Iredale & Yoo, APC (the "Iredale Firm"), claiming a total lodestar amount of 806.8 hours and $598,210.00 in fees among two (2) timekeepers; and

    c.    Attorney Todd D. Carpenter filed a declaration (the "Carpenter Decl.") on behalf of his firm, Lynch Carpenter, LLP ("Lynch Carpenter"), claiming a total lodestar amount of 567 hours and $392,392.50 in fees among three (3) timekeepers.

23.    Class Counsel's Fee Motion requests an award of $6,806,031.96 in fees and $1,001,697.98 in nontaxable costs.[21]    Class Counsel assert that "New York law governs the award of attorney's fees."[22]    They assert that $6,409,284.75 is their Lodestar calculation.[23]

24.    Class Counsel did not provide any time records in support of their Fee Motion.  I understand that on September 1, 2022, Premier's counsel requested that Class Counsel provide time records, and that Class Counsel refused to do so.  On September 1, 2022, Premier's counsel sent to Class Counsel a meet & confer letter identifying a number of costs that are not recoverable

---

[19] *Id.* at p. 15.
[20] See ECF Doc. No. 296.
[21] Notion of Motion at p. (i).
[22] Fee Motion at p. 10.
[23] *Id.* at p. 1.

because, among other things, such costs were incurred in actions other than the Montera Class Action.[24] As of this time, Class Counsel have not responded to the meet & confer letter.

## V. METHODOLOGY AND STANDARDS OF REVIEW

25. The starting point for my analysis in connection with the reasonableness of attorneys' fees and costs is always a set of factors contained in applicable case law and in the pertinent jurisdiction's Rules of Professional Conduct. While these factors may vary in name, they are substantially similar across all jurisdictions. Cal. R. Prof. Cond. 1.5(b) lists thirteen factors to determine the propriety of a fee. N.Y. R. Prof. Cond. 1.5(a) lists eight similar factors.

26. I understand that Class Counsel assert that "New York law governs the award of attorney's fees."[25] The propriety of a fee under New York law is evaluated according to the "Freeman Factors," from *In Re Matter of Freeman*, 34 N.Y. 2d 1, 9 (1974). These factors include the time and labor involved, the complexity of the matter, the reputation and skills of the attorneys performing the work, the stakes of the matter and results the attorney(s) obtained for the client, and the nature of the relationship with the client. These are substantially the same factors utilized in the Ninth Circuit known as the "Kerr Factors" (from the Ninth Circuit case *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Circ. 1975).[26]

27. In conjunction with the *Freeman*/*Kerr* factors, I also consider certain other professional obligations of attorneys, including the nature and extent of communications between client and counsel (Cal. R. Prof. Cond. 1.4; N.Y. R. Prof. Cond. 1.2, 1.4) and the nature and extent of supervision by client and by counsel of fellow attorneys and staff (Cal. R. Prof. Cond. 5.1-5.3; N.Y. R. Prof. Cond. 5.1 – 5.3).

## VI. DOCUMENTATION CONSIDERED

28. In forming my opinions, I have reviewed and relied upon the Fee Motion and three Declarations of Class Counsel attached hereto.

[24] Attached as Exhibit C hereto (Meet & Confer Letter).

[25] Fee Motion at p. 10.

[26] The Ninth Circuit has held that "This Circuit requires that courts reach attorneys' fees decisions by considering some or all of the twelve relevant criteria set forth in *Kerr v. Screen Extras Guild, Inc.*" *Carter v. Caleb Brett LLC*, 757 F.3d 866, 869 (9th Cir. 2014).

29.     I have also reviewed and relied upon several prior fee motions or Declarations of Timothy Blood filed by BHO in other matters, and attached hereto as the corresponding exhibit to this Declaration listed in the following chart:

| Ex. | Case | Date Filed | Court |
|---|---|---|---|
| D | *Yamagata v. Reckitt Benckiser LLC* | 09/14/21 | N.D. Cal. |
| E | *Terry v. JPMorgan Chase Bank, N.A.* | 11/21/17 | S.D. Cal. |
| F | *Warner v. Toyota Motor Sales USA, Inc.* | 2/22/17 | C.D. Cal. |
| G | *In re Adobe Systems Inc. Priv. Lit.* | 6/24/15 | N.D. Cal. |
| H | *Dennis v. Kellogg Company* | 07/26/13 | S.D. Cal. |

## VII.   OPINION I: CLASS COUNSEL'S COMMON FUND FEE REQUEST IS EXCESSIVE AND UNREASONABLE UNDER THE CIRCUMSTANCES

30.     I have been asked to provide my opinions concerning the reasonableness of Class Counsel's application of the "Common Fund" percentage in this matter.[27] To do so, I informed myself regarding Class Counsel's (especially BHO's) prior fee motions under the Common Fund (or other similar) doctrine in the Ninth Circuit, set forth in Exhibits C - H.

31.     The purpose of this review was to inform myself as to Class Counsel's requests in light of the risks to them in those other matters, the results obtained, the percentages asked for in those matters in light of the risks and results obtained, as well as the method of calculating the Common Fund percentage.

32.     My review is mindful of the Ninth Circuit's 25% benchmark for Common Fund (and similar) fee requests so as not to dissipate the contents of a Fund for the class.

### Common Fund Fee Methodology and Factors to Consider

33.     As Class Counsel noted in their filings, the level of scrutiny paid to a fee award depends significantly on whether the matter is being settled or litigated, with far more scrutiny being owed to the latter (such as here) than the former, where courts favor settlements.[28]

---

[27] I understand that the Lodestar or a variation of it is the preferred method of calculating fees under GBL §§ 349-350, see *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2nd Cir. 1992), and any opinions concerning the common fund doctrine are without prejudice to any arguments Defense Counsel may offer in this regard.

[28] Ex. G (Adobe Motion) at p. 4, citing *Staton v. Boeing Co.*, 327 F.3d 938, 966 (9th Cir. 2003) ('Ordinarily,

-9-

34.    The Ninth Circuit has established 25% of a common fund as a benchmark award for attorney's fees,[29] a benchmark that Class Counsel previously stated was "presumptively reasonable."[30]  The factors to be evaluated in determining whether "special circumstances" exist to warrant departing from this 25% benchmark are: "(1) the results achieved; (2) the risk involved in the litigation; (3) incidental or nonmonetary benefits conferred by the litigation; and (4) financial burden of the case on counsel."[31]

35.    The purpose of the 25% benchmark, explained the Ninth Circuit, was to prevent the class's Fund from being overly eaten away by counsel's fees, and preserve the fund so that "plaintiff class should ordinarily receive 75% of the wealth the attorneys brought them."  *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir. 1997).  Applying this, the Ninth Circuit further explained that the "fact that forty-seven percent of total award in [common fund] would be paid to attorneys was 'disturbing').[32]

**Class Counsel's Common Fund Request in this and other Prior Matters**

36.    Traditionally (and as recently as last year), Class Counsel has adhered to two aspects of Common Fund doctrine: (1) adhering to the 25% or less benchmark and (2) calculating the Common Fund Fee by taking the presumptive benchmark 25% of the actual size of the fund (in other words, taking the overall fund and dividing it by four), rather than adding in their sought fees and costs on top of the underlying judgment and taking the percentage of that.

37.    Here, Class Counsel seeks $6,806,031.96, which they calculate by taking 33% (not 25%) of $20,438,534.42 (which they assert is "the sum of the judgment amount ($12,895,454.90), costs ($1,133,794.77), and the proposed fee award ($6,806,031.96)."[33]

---

when fee provisions are scrutinized under Rule 23(e), "the court need not inquire into the reasonableness of the fees even at the high end with precisely the same level of scrutiny as when the fee amount is litigated.").

[29] *In re Bluetooth*, 654 F. 3d 935 (9th Cir. 2011), citing *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

[30] Ex. D (Yamagata Motion) at pp. 4-5, citing *Six Mexican Workers at 1311.*

[31] *In re Hydroxycut Mktg. & Sales Practices Litig.*, MDL No. 2087, 2014 U.S. Dist. LEXIS 162106, at pp. 15-16 (S.D. Cal. Nov. 18, 2014).

[32] *State of Fla. v. Dunne*, 915 F.2d 542, 546 (9th Cir. 1990).

[33] Fee Motion at pp. 12-13.

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

38.     Thus, in this case, Class Counsel has broken with their own traditional methodology in prior requests, first by asking for 32% more than the presumptive benchmark of 25%, and second by adding their sought fee and cost request *on top of the underlying judgment*. The operative effect is that Class Counsel seeks an award of nearly $8 million ($7,939,826.73), or **61.6%** of the overall class Fund (31% more than the 47% that the Ninth Circuit found to be "disturbing").[34]

39.     The contrast in Class Counsel's prior fee requests to their instant fee request further illustrates the grossly disproportionate magnitude of the sought fees in this matter. The following table sets forth the case (and corresponding exhibit hereto), the size of the fund created (*i.e.* the benefit conferred/results obtained), the percentage of the overall fund sought, whether Class Counsel sought the percent of the fund as a "Straight" percentage (*i.e.* it took it cleanly off the overall judgment/settlement) or as an "Add On" (*i.e.* it added their putative fee request onto the judgment/settlement before taking the percentage), and the lodestar hours claimed in that matter:

| Case (Ex.) | Date | Fund Size | % Sought | Method | Hours |
|---|---|---|---|---|---|
| *Montera* | 8/26/22 | $12.89 million | 33% | Add On | 9,635.05 |
| *Yamagata* (Ex. D) | 09/14/21 | $50.0 million | 25% | Straight | 8,278.65 |
| *JPMorgan* (Ex. E) | 11/21/17 | $4.3 million | 25% | Straight | 1,541.20 |
| *Toyota* (Ex. F) | 2/22/17 | $3.4 billion | 0.3% | Straight | 7,021.00 |
| *Kellogg* (Ex. H) | 7/26/13 | $4.0 million | 25% | Straight | 1,940.00 |

40.     Next, I adjusted the percentage sought to show the "Effective Percentage" of the Fund by having all the requests utilize the same methodology and showing how much of the overall fund that Class Counsel's fee request eats away.

41.     The following table shows the total fees and costs sought (and the total ask by Class Counsel in each matter) and what the Effective Percentage is for each.

42.     In my opinion, this shows just how out of line and excessive Class Counsel's 61.57% Common Fund request is in this case. Indeed, it is an outlier and substantial departure from their ordinary practice:

---

[34] *State of Fla. v. Dunne*, 915 F.2d 542, 546 (9th Cir. 1990).

| Case | Fees | Costs | Total Ask | Fund Size | Eff. % |
|---|---|---|---|---|---|
| *Montera* | $6,806,031.96 | $1,133,794.77 | $7,939,826.73 | $12.89 million | 61.57% |
| *Yamagata* | $12,500,000.00 | $658,050.95 | $13,158,050.95 | $50.0 million | 26.32% |
| *JPMorgan* | $1,075,000.00 | $20,247.63 | $1,095,247.63 | $4.3 million | 25.47% |
| *Toyota* | $9,750,000.00 | $117,500.00 | $9,867,500.00 | $3.4 billion | 0.29% |
| *Kellogg* | $1,000,000.00 | $23,866.33 | $1,023,866.33 | $4.0 million | 25.6% |

43. Here, Class Counsel's fee request is more than twice the Effective Percentage they sought in any of these other cases, and eats away a supermajority of the Fund. Thus, it is my opinion that Class Counsel's Common Fund fee request is exorbitant and excessive on its face.

**Do Any of the Relevant Factors Justify a Departure from the 25% Benchmark?**

44. I have been asked, assuming the Court wishes to apply the percentage of recovery method to calculate Class Counsel's fee instead of the lodestar approach, whether either core factors (success achieved or risks to Class Counsel) were so "special" or "extraordinary" as to warrants a departure from the Ninth Circuit's 25% benchmark?[35] It is my opinion that neither factor is so extraordinary or substantial.

45. In my opinion, the results do not compel an upward adjustment from the 25% benchmark. As an initial note, it is well-established that the "degree of success obtained" is the "most critical factor" in evaluating the fee.[36]

46. Notably, Class Counsel found the 25% benchmark sufficient to compensate for their work when they created funds as low as $4 million (see *Kellogg*) and as high as $50 million (see *Yamagata*), and many fund sizes in-between those amounts (which is where this matter falls). For example, in *Yamagata*, Class Counsel sought the 25% benchmark of the fund in what they described as "the largest achieved in a food or supplement false advertising case."[37]

47. Here, the result Class Counsel achieved is no better than in *Yamagata*. Instead of receiving in excess of $140 million, as sought, Class Counsel conferred a $12 million benefit on

[35] See *In re Hydroxycut Mktg. & Sales Practices Litig.*, MDL No. 2087, 2014 U.S. Dist. LEXIS 162106, at *pp. 15-16 (S.D. Cal. Nov. 18, 2014).

[36] Fee Motion at p.15, citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

[37] Ex. D (Yamagata Motion) at p. 6.

the class.[38]  In *Yamagata*, Class Counsel believed the degree of success justified an award of 25% of the fund, and there is nothing about the result here that would warrant a higher percentage.

48.    Where success is at issue (as it inherently is in any Common Fund fee request), it is the "degree of success obtained" that matters most.[39]  In my opinion, the degree of success obtained does not compel an upward departure from the presumptive benchmark.

49.    As to the "risk factor," New York courts have held that the "plaintiffs' bar is presumably selective enough with the cases they take on to win a recovery in at least half of them."[40]

50.    With this in mind, it is my experience that the biggest risks inherent in contingency cases like this are the resources needed to devote to the case and the length of delay in the case, both of which are generally best reflected in the number of hours invested in the matter.

51.    Assuming, *arguendo*, that Class Counsel's number of hours sought here reasonably reflect their time spent *only in this case* (and not in other related matters), the number of hours here are roughly 9,600 from the filing of the Class Action Complaint (in December 2016) to their fee application in August 2022, or 68 months (about 140 hours per month).  *Yamagata* also had a substantial number of hours, roughly 8,300 from the filing of the complaint in June of 2017 to their fee application in October 2021, or 52 months (about 160 hours per month).

52.    Given the clear connection between risk and required resources/hours to be incurred, I see no reason to deviate from the Ninth Circuit's 25% benchmark in this case – especially given Class Counsel's application of that benchmark in *Yamagata*.  In *Yamagata*, Class Counsel had to devote, on average, nearly 20 hours more per month than in this matter (mostly during the same time window), spread in this case among 18 timekeepers (or an average of 8 hours per month of time across the life of the matter, or 0.25 hours per day in a 30-day month for the life of this matter).  Effectively, the time devotion to each matter per day was nearly the same.

---

[38] Aug. 12, 2022 Order.

[39] *Hensley*, 461 U.S. at 436.  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F. 3d 657 (9th Cir. 2017).

[40] *Fujiwara v. Sushi Yasuda*, 58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014).

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

53. Additionally, given the clear connection between risk and hourly rates, I see no reason to deviate from the Ninth Circuit's 25% benchmark in this case (and as applied by Class Counsel in *Yamagata*). Class Counsel's Fee Motion concedes that they account for this risk in the hourly rates they seek. See Fee Motion at p. 19 ("'It is an established practice in the private legal [world] to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases.' *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)."). Indeed, it is my experience that Class Counsel typically accounts the risk of non-payment by setting higher hourly rates.[41]

54. Interestingly, Class Counsel sought the same hourly rates in *Yamagata* that they seek in this matter,[42] which indicates to me that Class Counsel did not view the risks to be substantially higher in this matter than in *Yamagata*, since they claim to "bake" the litigation risks into their rates, and my experience is that most lawyers under contingent fee arrangements do the same. This leads me to conclude that it is reasonable to award Class Counsel a similar percentage of the recovery that they received in *Yamagata*.

55. Accordingly, it is my opinion that neither the results obtained, nor the risks of the matter are so "special" or "extraordinary" as to compel departure from a presumptive benchmark that Class Counsel have utilized on several prior occasions in matters where they were no less successful and where they viewed the risks to be no greater than this matter.

**VIII.  OPINION II: CLASS COUNSEL'S LODESTAR CLAIM IS EXCESSIVE ON ITS FACE, BUT WITHOUT THE CONTEMPORANEOUS TIME RECORDS, THERE IS NO MEANINGFUL WAY TO EVALUATE THE LEVEL OF EXCESSIVENESS**

56. Despite Class Counsel's refusal to provide any time records in support of their Fee Motion, I was able to identify no less than four issues with their fees: (a) the inclusion of fees and costs for unsuccessful work or work unrelated to the *Montera* Class Action; (b) Class Counsel's

---

[41] *Santiago v. Equable Ascent Fin*. 2013 WL 3498079, at *3 (N.D. Cal. July 12, 2013) (higher rates appropriate for contingent lawyers due to risk of non-payment).

[42] See Ex. I (Declaration of Timothy G. Blood in *Yamagata v. Reckitt Benckiser LLC*) at ¶ 21 (compare to Blood Decl. at ¶ 61 in this matter).

very partner-heavy administration of the work; (c) excessive charges for document review; and (d) duplication of work between the three law firms comprising Class Counsel.

57.    I have spent my legal career reviewing and approving payment of legal invoices. During that time, I have reviewed billions of dollars in legal spend.  While in private practice, I was responsible for sending out clear, thorough, contemporaneous, and timely invoices to my clients.  As an in-house counsel for three companies, I was responsible for reviewing and approving these documents as the paying client.

58.    The importance of keeping and maintaining a contemporaneous record of my time was paramount, regardless of whether I charged my clients on an hourly basis or on a contingent basis. My ability to fulfill my roles under both circumstances depended upon the quality, accuracy, timeliness, and thoroughness of the invoices.  This was most especially true in those representations under which I was on a contingent fee arrangement, when I understood that my time records might be subject to judicial scrutiny by the Court.

59.    It is my experience that original and contemporaneous recordation of time is the most reliable source of information in evaluating legal fees and time entries, for several reasons:

a.    Contemporaneous records are the most accurate recordation of time spent;

b.    Contemporaneous records do not require Counsel to recall (months or even years later) what work an attorney performed on a specific day;

c.    Reconstructed time may suffer from bias of the person(s) performing the reconstruction, since those persons(s) are the ones seeking to maximize a fee award;

d.    Reconstructed time entries often suffer from vague and block-billed time entries that afford a trier of fact little insight into the actual work performed, thereby possibly hindering assessing whether the time spent and work performed were reasonable; and

e.    It is difficult for a supervisory lawyer to perform his/her required duties under Rules 5.1-5.3 (see Cal. R. Prof. Cond.; N.Y. R. Prof. Cond.) to review reconstructed bills for reasonableness months or years after the work was performed.

60.    While it is sometimes the case that counsel cannot or did not record hours contemporaneously, it is a best practice, most especially so when there is a statutory fee right.  In

-15-

the select instances where I took on contingent or other alternative fee representations in private practice, I always recorded my time contemporaneously and instructed my subordinates to do so.

61.    As one court put it, where counsel was "experienced in similar litigation", it would be "presumed to recognize the importance of maintaining accurate records of services rendered in a case with the potential for a fee award."[43] As can be seen from Exs. D-H and J, this is not Class Counsel's first time seeking fees, and at least one court (in this very District) expressed to Class Counsel the importance of providing time entries in connection with a fee application.

62.    There can be no dispute that reviewing the original and contemporaneously recorded time records is the best practice.[44] In a Lodestar (or similar) analysis, the original and contemporaneous time records are essential as a starting point. In my experience as an expert, where fees are being contested, and the requesting attorneys have contemporaneous billing records, the attorneys have always provided those records to the court and opposing counsel. I have never seen a situation where attorneys have refused to provide existing contemporaneous billing records to support their lodestar calculation.[45]

63.    Here, Class Counsel did not provide **any** time records to evaluate (contemporaneous or otherwise). I understand that on September 1, 2022, Premier's counsel requested that Class Counsel provide time records, and that Class Counsel refused to do so. Furthermore, on September 1, 2022, Premier's counsel sent a meet and confer letter identifying a number of costs that are not recoverable, thereby putting class counsel on notice of deficiencies of their fee request and the importance of producing their records.[46] It is my understanding that Class Counsel did not provide any time entries in response.

[43] *Young v. Alden Gardens of Waterford, LLC*, 30 NE 3d 631, 651 and 656 (Ill. App. Ct. 2015).
[44] See State Bar of California Arbitration Advisory 2016-02, <u>Analysis of Potential Bill Padding and Other Billing Issue</u>, Mar. 25, 2016 at p.3 ([it is] ("universally acknowledged that contemporaneous records are the best practice").
[45] See *Hensley v. Eckerhart*, 461 U.S. 424, 437 ("[T]he fee applicant bears the burden of … documenting the appropriate hourly rates"). [W]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 433. *United States v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1105 (9th Cir. 2015) ("applicant … must 'produce satisfactory evidence [that] must include … detailed documentation of the hours worked."). See also *Kerr v. HSBC Bank, USA, N.A.*, 13-CV-68 (JMA) (E.D.N.Y. Dec. 11, 2014) at *8, citing *Hensley* (same in fee request under N.Y. Gen. Bus. Law § 349).
[46] See Ex. C.

64.     Class Counsel are clearly aware of the importance of producing time records, having cited *Hensley* in their own brief (at p. 15 and 21), and having been previously ordered by another Judge in this District to produce time records for their fee requests: "The Court has reviewed Plaintiffs' submissions, including the Gibbs Declaration, ECF No. 86-5, and concludes that they provide an insufficient basis for the Court to approve Plaintiffs' award of $1.18 million in attorney's fees pursuant to the terms of the settlement.  Accordingly, the Court hereby ORDERS Plaintiffs to file a motion for attorney's fees containing, at a minimum, (1) contemporaneous billing records, including a breakdown of hours spent on specific tasks by each attorney in this matter; (2) each attorney's, paralegal's, and staff member's billing rates; and (3) justifications for those billing rates."[47]  Moreover, Class Counsel have asserted to this Court that such records are ready and available, so their production should not be any burden.[48]

65.     Moreover, Judge Koh's Order mandating production of time records was in a settled case, in which Class Counsel concedes that "the court need not inquire into the reasonableness of the fees even at the high end with precisely the same level of scrutiny as when the fee amount is litigated."[49]  Here, Class Counsel's fee petition is not under the auspices of a settlement with generally consenting parties all around.  Rather, this is an actively disputed litigation with non-consenting parties being asked to pay for something they have not even seen.

66.     The importance of evaluating the time records for the Lodestar can be seen from the expressed criteria for evaluating the reasonableness of fees in a GBL §§ 349 and 350 litigation.

[47] See *In re Adobe Systems Inc. Priv. Lit.*, Case No. 513-cv-05226-LHK, Order of Judge Koh dated June 10, 2015 (ECF 90, attached as Ex. J).

[48] See Blood Dec. at ¶ 49 ("The following information regarding my firm's time and out-of-pocket expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. The time records were prepared daily or shortly thereafter by each attorney or paralegal working on the litigation."); Iredale Dec. at ¶ 10 ("The following information regarding my firm's time and out-of-pocket expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. Ms. Jun and I prepared the time records."); Carpenter Dec. at ¶ 13 ("The following information regarding my firm's time and out-of-pocket expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. The time records were prepared daily or shortly thereafter by each attorney or paralegal working on the litigation.").

[49] Ex. G (Adobe Motion) at p. 4, citing *Staton v. Boeing Co.*, 327 F.3d 938, 966 (9th Cir. 2003) ("Ordinarily, when fee provisions are scrutinized under Rule 23(e), 'the court need not inquire into the reasonableness of the fees even at the high end with precisely the same level of scrutiny as when the fee amount is litigated.'").

-17-

*See Blue Cross and Blue Shield, NJ v. Phillip Morris*, 190 F. Supp. 2d 407, 419 (E.D.N.Y. 2002) (reversed on other grounds), which provides as follows: (a) "[T]he court should attempt a melding of appropriate criteria, looking to the purpose of the statute at issue. It should consider the time and skill required in litigating the particular case, the complexity of the issues, the customary fee for the work, the results achieved, the lawyer's experience, ability and reputation, the amount in dispute, the potential benefit to the client, the benefit to society, and the responsibility assumed by the lawyer; (b) "Unnecessary inefficiency or wasteful overstaffing, or duplicative work should not be rewarded"; and (c) fees should be proportionate "to the probable value of the case".

67.     My review of Class Counsel's fee petition reveals several reasons why a review of the time records is essential to evaluating the reasonableness.

**The Ability to Identify and Exclude Work on Unrelated and/or Unsuccessful Claims**

68.     The first issue with not having Class Counsel's contemporaneous time records is the inability to parse out what work was performed on successful or unrelated claims. *See, e.g., Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 133 (E.D.N.Y. 1998) ("The Court perceives several problems with the plaintiff's fee request [under GBL § 349-350]. First among these problems is the Court cannot discern which attorney hours were spent on unsuccessful claims and actions taken.").

69.     As identified in the September 1, 2022, meet and confer letter from Premier's counsel to Class Counsel, Class Counsel's request includes costs identified as specifically attributable "solely to the *Mullins* litigation" for which "Premier was the prevailing party".[50] These include:

a.     $127.80 sought to obtain transcripts from the January 27, 2016 hearing on class certification, summary judgment, and motions to exclude expert testimony;

b.     $73,691.80 in fees for Colin Weir's work, the description of which pertained to rebutting Dr. Choi, an expert in the *Mullins* case (Mr. Weir did not rebut Dr. Choi in the *Montera* Class Action); and

[50] Ex. C at p. 2.

-18-

c.        $3,193.92 in costs for Mr. Weir's 2017 deposition.

70.    In addition, Class Counsel included a number of charges for experts who were not disclosed or involved in the *Montera* Class Action, including:

a.        $31,036.13 in fees and costs pertaining to Dr. Graboff;

b.        $38,779.60 in fees and costs pertaining to Dr. Silbert;

c.        $27,704.56 in fees and costs pertaining to Dr. Willis; and

d.        $69,412.26 in fees and costs pertaining to Mr. Keegan.

71.    In addition, if Class Counsel is including the costs of these experts (despite their representation that "Plaintiff's Counsel do not here seek … various work related only to *Mullins*"[51]), there is no way to determine what *Mullins* fees may also be included without evaluation of the time entries.

72.    Given that a fee award under GBL §§ 349 and 350 is not automatic, but purely discretionary on the Court's part,[52] and that awards must take into account "time spent on unsuccessful claims and actions taken,"[53] Class Counsel's refusal to provide their time records precludes the ability of identifying how much time was spent.[54] *See also*, *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 50 (S.D.N.Y. 2015) ("Courts should exclude 'hours dedicated to severable unsuccessful claims.'").

**Class Counsel's Top-Heavy Administration of Work and Billing Rates**

73.    The second issue with Class Counsel's failure to provide their contemporaneous time records is the inability to evaluate the staffing and delegation of work.  This issue is also

---

[51] Fee Motion at p. 18.

[52] *Koch v. Greenberg*, 14 F. Supp. 3d 247, 280 (S.D.N.Y. 2014) ("Sections 349(h) and 350-e of the GBL provide that the court 'may award reasonable attorney's fees to a prevailing plaintiff.' As reflected in the statute's use of the word 'may,' the 'fee award … is left to the discretion of the trial court in all circumstances.'").

[53] *Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 133 (E.D.N.Y. 1998) ("The Court perceives several problems with the plaintiffs' fee request … leading to the view that it must be 'substantially reduced,' as forewarned in the earlier decision. First among these problems is that the Court cannot discern which attorney hours were spent on unsuccessful claims and actions taken…. This problem stems from counsels' time sheets, which do not indicate the nature of the work performed.").

[54] *Koch v. Greenberg*, 14 F. Supp. 3d at 280 ("In terms of the attorney's fees incurred, the case was litigated in a manner more typical of a nine-figure case than a six-figure case.").

fundamentally related to the propriety of Class Counsel's billing rates.

74.    Having been a consumer of legal services in California (and New York) for decades, while clients may be willing to pay premium rates (like the ones sought here) for a senior partner performing senior partner work, they are generally not willing to pay for a senior partner to perform legal research, first-level drafting, or document review, absent an explained need for the partner to do this work.[55]

75.    It is axiomatic that an attorney "cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law."[56]

76.    Thus, the question is not necessarily whether Class Counsel's rates are reasonable (as viewed in a vacuum), or whether class counsel has put forth "satisfactory evidence" of what market rates in the community are, but whether the tasks performed here require **six** partners at up to $1,050 per hour performing these tasks.  Notably, the Iredale Firm put forth zero evidence of how its rates are in line with market rates and BHO solely relies upon old cases, a disfavored practice in the Ninth Circuit as it provides no evidence to the relevant question of "rates charged to clients of private law firms."[57]

77.    Here, all three firms constituting Class Counsel demand high hourly rates, with the rates sought for Partners being between $660 and $1,050 per hour.  While this range of rates may not, *per se*, be unreasonable for the relevant market for similar work, it may be depending upon the nature of the work being performed.  Put another way, a rate of $1,050 per hour for lead trial counsel trying the case to a successful verdict may not be unreasonable, but if that same timekeeper is performing legal research, drafting, photocopying, or a host of other tasks, then $1,050 per hour is an excessive hourly rate for that work.

---

[55] See *Beastie Boys*, 112 F. Supp. 31 at 51 ("In the Court's experience, such lopsidedly partner-heavy bills are quite unusual in the context of litigation work.").

[56] *Microsoft Corp. v. United Computer Resources of N.J.* 216 F. Supp. 2d 383, 392 (D.N.J. 2002).

[57] *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1076 (9th Cir. 2021).

-20-

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

78.     One of the critical elements of reasonableness is that the work was performed by timekeepers with task-appropriate hourly rates.  *See, e.g., Lee David Auerbach P.C. v. Richard Delgatto*, Index No. 69908/2015, at p. 21 (Supr. Ct. Westchester Cty., July 7, 2017) (New York Law) ("As [Mr. Tasher] points out, having relatively senior attorneys doing basic research . . . unreasonably increased the costs to the client."); *Beastie Boys*, 112 F. Supp. 3d at 51 (reduction necessary for "lopsidedly partner-heavy bills"); *Plummer v. Chemical Bank*, 592 F. Supp. 1168, 1172 (S.D.N.Y. 1984) (50% reduction for "inefficiencies" that included "partners doing work easily and ordinarily performed by junior associates"); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 301-302 (S.D.N.Y. 2001) ("35% across-the-board reduction" for, among other things to account for failure to delegate work).

79.     Here, the amounts sought by Class Counsel are extraordinarily top-heavy on their face.  Collectively, between the three firms, 60% of the hours (accounting for 70% of the fees) claimed were spent by firm Partners, while only 29% of the hours (and 24.5% of the fees) claimed were spent by firm Associates.[58]  The result is a Partner to Associate ratio of greater than 2/1 for hours and 2.85/1 for the fees.  For the Carpenter Firm, the ratio is even more staggering, with 87.5% of hours (95% of fees) generated by firm Partners, and a Partner to Associate ratio of 12/1 for hours and 22.6/1 for fees.[59]

80.     In *Beastie Boys*, the Court found a 2.5/1 partner/associate ratio was unreasonable. 112 F. Supp. 3d at 51.  Another Court found a 1.15/1 partner/associate ratio required a 50% reduction.  *Does v. District of Columbia*, 448 F. Supp. 2d 137, 144 (D.D.C. 2006).  On its face, Class Counsel's fee request is excessively partner -heavy.

81.     However, the best and most appropriate way to evaluate the basis for such partner-heavy staffing is to evaluate the tasks being performed in the time records.  In *Auerbach v. DelGatto* (*supra*), when the Court agreed with and adopted my conclusion that the staffing was

[58] The Blood Firm seeks the largest number of hours, and its Partner-Associate fees breakdown is 69%-25% (2.76/1).

[59] I have included Attorney Straub as an associate in these calculations, despite BHO identifying him as a "Contract Attorney" during time periods in which he purportedly worked on the case.  See Ex. K (Blood Decl. in *Terry v. JPMorgan Chase Bank, N.A.*) at ¶ 8.

-21-

DECLARATION OF STEVEN A. TASHER
Case No. 3:16-cv-06980

"top-heavy" and "unreasonably increased the costs to the client", both the Court and I had the benefit of reviewing the time records and observing the specific tasks (legal research, basic drafting, and other associate-level tasks) being performed by three separate partners.[60]

82.    Here, however, without Class Counsel's time records, no such ability exists. Nevertheless, Class Counsel's fee request is still extraordinarily top-heavy on its face, as detailed below, and Class Counsel provides no explanation as to the need for such partner-dominated fees. Accordingly, it is my opinion that that Class Counsel's lodestar request is excessive and unreasonable, due to the extraordinarily top-heavy work.

### Class Counsel's Time Spent on Document Review

83.    Class Counsel's attempt to recover high hourly rates for document review is objectively unreasonable.  Courts today recognize that "[t]here is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys) -- and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes."  *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013).  Thus, billing "$295 to $435" for document review is unreasonable, when contract lawyers are available for "$60 per hour." *City of Pontiac Gen. Empls. v. Lockheed Martin*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (for contract attorneys in a class action).

84.    In fact, during my tenure as Associate General Counsel at Wyeth, the company engaged contract attorneys who billed at a rate between $35–$40 per hour to perform tasks associated with early-to-mid stages of document review, often in mass-tort or class action litigation.  These were licensed and experienced attorneys who were far more cost-effective and experienced than utilizing expensive junior associates for this work.

85.    Having been involved in numerous fee matters where law firms did engage contract attorneys, the market rate for them today is generally in the $50 per hour range, across a wide diversity of litigation subject matters.  Several examples will illustrate:

---

[60] The Court ended up reducing the fees by approximately 40% in its final decision.

-22-

a.    *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 962-970 (N.D. Cal. 2014) (firm engaged contract attorneys in complex corporate dispute "at $47 and $59 per hour");

b.    *City of Pontiac Gen. Empls.' v. Lockheed Martin*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) ($60 per hour actual cost for contract attorneys in class action);

c.    *Dial Corp. v. NewsCorp.* 317 F.R.D. 426, 438 (S.D.N.Y. 2016) ("average rate of $39/hour" for contract attorneys in class action);

d.    *In Re Wells Fargo & Co. Shareholder Lit.*, 445 F. Supp. 3d 508, 527 (N.D. Cal. 2020) (Judge Tigar found that 2020 rates for contract attorneys are "between $35 and $50 per hour" and applied $42.50 for their document review work);

e.    *Lawson v. Spirit Aerosystems, Inc.*, 2020 WL 6343292 (D. Kan. Oct. 29, 2020) (collecting cases nationally and finding hourly rates for contract attorney service called Legility being at $55 per hour for first-level review); and

f.    *United Supreme Council v. United Supreme Council of Ancient Accepted Scottish Rite for 33 Degree of Freemasonry*, 2019 WL 3848784, at *2 (E.D. Va. Aug. 15, 2019) ($46 per hour for contract attorneys conducting document review);

g.    I have reviewed the rates of contract attorney fees from a wide variety of other agencies. Representative examples include Compliance Discovery, Consilio, HireCounsel, Legalpeople, and Tower Legal (consistent with the above cases, these agencies billed hourly rates ranging from $42-$63 per hour, generally around $50 per hour).[61]

86.    Class Counsel assert that document review was an essential component of their work. *See* Fee Motion at p. 2; Blood Dec. at ¶ 4 ("Plaintiff's counsel … reviewed over 500,000 pages of documents produced by Defendant"), ¶ 56 ("Mr. La Val played an important [sic] in formulating search terms for the collection of ESI, coding and identifying relevant documents which were utilized throughout the litigation").[62]

---

[61] I am aware that Class Counsel's document service, Epiq (Blood Decl. at ¶ 67(h), offers such document review services: https://www.epiqglobal.com/en-us/services/ediscovery-litigation-investigation-services/document-review.

[62] Attorney Straub, who the Firm previously identified as a "Contract Attorney" in other matters (see Ex. J) (Blood Decl. in *Terry v. JPMorgan*) also performed document review in this case, but at $575 per hour. Blood Decl. at ¶ 44.

-23-

87. It is evident that Class Counsel did not utilize contract attorneys to review the significant volume of documents, thereby unreasonably increasing the cost of the document review process. Instead, Class Counsel utilized far more costly timekeepers at multiples of the market price to perform this work. In Attorney Straub's case, his hourly rate to review documents is nearly ten times the market price for contract attorneys performing this same work. Compare Judge Tigar's opinion in *Wells Fargo* (445 F. Supp. 3d at 527-531) ("The mark-up up document review work to "$295-$415 is, to say at the least, 'striking'" and applying $42.50 for this work). This is especially the case when Attorney Straub was, in fact, a "contract attorney" for some portion of this matter.[63]

88. In my opinion, this failure has unreasonably increased Class Counsel's lodestar. But, again, without the time records to evaluate the quantum of document review, there is no way to precisely quantity the level of excess.

### Class Counsel's Overstaffing and Duplication of Work Between Firms

89. As previously noted, all three firms constituting Class Counsel demand high hourly rates, with the rates sought for Partners being between $660 and $1,050 per hour. What is missing, however, from Class Counsel's fee petition is an explanation of the need to add multiple firms to the case and how class counsel avoided overstaffing or duplicative work between the firms.

90. In much the same vein as an attorney "cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law— and then run up an inordinate amount of time researching that same law," a firm cannot demand high hourly rates by claiming significant expertise in a legal field, yet at the same time claim it is not capable of handling the case on its own without the assistance of multiple additional firms. This can often lead to duplication of effort among the firms without clear coordination between them.[64]

---

[63] See Ex. K (Blood Decl. in *Terry v. JPMorgan Chase Bank, N.A.*) at ¶ 8.

[64] *New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.*, 79 F. Supp. 2d 331, 343 (S.D.N.Y.1999) (use of two firms led to "duplication [… and] warrant some reduction of the amount requested.").

91.    On its website, BHO claims that "Blood Hurst & O'Reardon, LLP is a nationally recognized consumer protection class action law firm dedicated to recovering money for those who have been cheated and correcting corporate wrongdoing.  We have obtained record results on behalf of consumers, insurance policy holders, homeowners, employees, small businesses and investors in state and federal courts throughout the country."[65]  Accordingly, BHO seeks high hourly rates for its claimed expertise in these areas.

92.    However, there is no explanation from BHO as to why such a well-credentialed and experienced class action firm like BHO felt it required the services of two other law firms, particularly one with a higher hourly rate structure that does not claim *any* experience in class actions or consumer fraud cases.[66]

93.     One practical issue with the addition of two additional firms can be illustrated from the statement in Blood Dec. at ¶ 39: "My firm has been involved in every aspect of the litigation from inception through the present."

94.    Thus, it is evident that the addition of two additional law firms (one charging up to $1,050 per hour for Partner services and one that billed 95% of its fees at the partner level) did not mean *more efficient or less work* for BHO.  To the contrary, it meant that BHO was also doing, to some degree, the *same work* as the other firms.  How much duplication existed cannot be known without the actual time entries.

95.    Paragraph 6 of the Iredale Decl. is illustrative in this regard: "My associate, Grace Jun, and I have been involved in every aspect of the trial from trial preparation to post-trial proceedings.  I oversaw each aspect of the trial and had responsibility for overall trial strategy and trial presentation.  Ms. Jun and I prepared extensively for trial."

96.    However, so did everyone else at BHO.  According to the Blood Decl., the following BHO timekeepers also worked extensively during the trial:

---

[65] Ex. L (Blood Firm Website).

[66] Iredale & Yoo's website claims that the firm provides "Legal representation for significant, high-profile, complex criminal or civil rights cases".  Ex. M (Iredale & Yoo Website).

a.    Attorney Blood ($960 per hour) "personally …assisted with trial preparation, and took a lead role at trial where I cross-examined one of Defendant's primary consumer survey experts."  Blood Decl. at ¶ 39;

b.    Attorney O'Reardon ($710 per hour) worked on "trial preparation, and the class trial itself."  *Id.* at ¶ 40;

c.    Attorney Straub ($575) "attending trial where he created trial demonstratives, prepared trial exhibits, and developed memorandum, binders, and strategy for direct and cross-examination of the trial witnesses."  *Id.* at ¶ 44.

97.    On its face, these statements are inconsistent with the Blood Decl.'s statement "There has been no unreasonable duplication of services for which my firm and my co-counsel now seek compensation."[67]  However, without Class Counsel's time records, there is no way to meaningfully evaluate the extent of the duplication between the firms.

98.    A particularly obvious example of overstaffing is Class Counsel's inclusion of Attorney O'Reardon and Attorney Straub's participation "in the trial itself."  Neither of these attorneys made an appearance on the record.  Neither addressed the Court at any time during the trial.  Neither conducted any witness examination, nor otherwise did any work in the courtroom. I am informed by defense counsel that both Attorney O'Reardon and Attorney Straub sat in the gallery during the entire trial, simply observing the proceedings.  Again, without contemporaneous billing records it is impossible to determine what trial-related tasks are being included for these two attorneys.  But combined with the three other Class Counsel attorneys who were in the courtroom during the trial, this means Class Counsel had five attorneys attending trial all day, every day—two of whom were not performing any work.  This is a clear example of overstaffing and duplication of work that courts—and paying clients—routinely reject as unreasonable.

99.    These facts further illustrate the issue with the lack of time records.  On its face, this matter was overstaffed, with duplication of work between and within firms and too many

---

[67] Blood Decl. at ¶ 48.

-26-

timekeepers performing the same general tasks.[68]  However, the only way to properly evaluate the nature and extent of this duplication is through a review of the time entries.

100.    Another factor this often leads to is excessive amounts of internal conferencing. While internal conferencing is not, *per se*, unreasonable, and reasonable amounts of it will benefit a litigation, a bloated and overstaffed representation can lead to excessive amounts of it.  However, this is another issue that requires evaluation of the time records to ascertain whether conferences are at a proper or excessive level.[69]

101.    This analysis is also relevant to the propriety of the hourly rates.  While $1,000 per hour may be reasonable for a partner actively trying a case in San Francisco to a successful verdict, it is not reasonable for an attorney to perform associate-level work at the trial, nor is it reasonable for an attorney at $710 per hour to sit in the back of the courtroom and not actively participate.

102.    Having been a provider of and paying client for legal services in New York, San Francisco and elsewhere in California for decades, it is my experience that paying clients care about staffing decisions like this, and expect participants in trials, oral arguments, and other events to having a meaningful contribution to it.

103.    Accordingly, in my opinion, without production of and the ability to review the time records to ascertain the coordination and/or duplication between three firms, it is my opinion that Class Counsel's lodestar request is excessive and unreasonable.

---

[68] See, *e.g. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 188 F. Supp. 3d 333, 344-345 (S.D.N.Y. 2016) (30% reduction for "excessive hours and vague entries" resulting from multiple attorneys attending events, and excessive conferencing among attorneys); *Lee David Auerbach P.C. v. Richard Delgatto*, *supra.* at p. 21 "considerable time was expanded on office conferences and telephone conferences between the attorneys as well as . . . certain amount of overlap in the work assignments of the attorneys, which contributed to duplicative work."; *Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 570 F. Supp. 870, 896 (S.D.N.Y. 1983) (reducing the lodestar figure by 20% to account for over-staffing); *Walker v. Coughlin*, 909 F. Supp. 872, 880-881 (W.D.N.Y. 1995) (15% reduction for multiple attorneys appearing at depositions and internal meetings).

[69] *Auerbach v. Delgatto, supra* at p.21, agreeing with my conclusion that "considerable time was expanded on office conferences and telephone conferences between the attorneys as well as . . . certain amount of overlap in the work assignments of the attorneys, which contributed to duplicative work."

-27-

## IX. OPINION III: CALCULATING A REASONABLE FEE FOR CLASS COUNSEL

104.    For all the reasons set forth in this Declaration, it is my opinion that Class Counsel's request of $6,806,031.956 in fees and $1,001,697.98 in nontaxable costs (as well as their Lodestar calculation of $6,409,284.75) is a grossly inflated sum that is (a) completely disproportionate to the Ninth Circuit's established precedent of 25% of a common fund benchmark and the size of the fund in this matter; and (b) in no way supported by the meager documentation Class Counsel has submitted in support of their request.

105.    As I already explained, this nearly $8 million award sought by Class Counsel would eat away 61.6% of the overall post-judgment underlying Judgment. That is 31% greater than the 47% amount that the Ninth Circuit found to be "disturbing" in the *Dunne* case. Additionally, Class Counsel's request completely ignores their own agreement with and adherence to the Ninth's Circuit's 25% benchmark in each of the other matters (*Yamagata*, *JP Morgan*, and *Kellogg*) described above.

106.    Had Class Counsel adhered to the Ninth Circuit's 25% benchmark in this matter (as they have in the majority of their other cases), their award should be approximately $3.2 million (25% of $12.89 million) which is, in my opinion, a more reasonable sum than taking over 60% of the class's entire fund.

107.    Additionally, even in the absence of Class Counsel's contemporaneous time records to support their overall request and Lodestar calculation, I observed multiple billing issues amidst Class Counsel's limited documentation that, in my expert opinion, merit a significant percentage reduction of the fee request.

108.    First and foremost, it is clear that Class Counsel seek, at minimum, hundreds of thousands of dollars in combined costs either attributable to the *Mullins* action and/or charges for experts who were not disclosed or ostensibly involved in the *Montera* Class Action.  In my opinion, it would be completely fair to assume that there are other similarly unrelated charges (or costs in connection with unsuccessful efforts) that Premier would have identified via the contemporaneous time records that should not be reimbursed.

109.    Second, even without contemporaneous time records, it was abundantly clear to me that all three firms constituting Class Counsel demanded high hourly rates, particularly for the six Partners involved (who charged between $660 and $1,050 per hour) and, as I explained above in each of the individual law firm analysis, the Blood Firm Partners out-billed their Associates by a minimum of a 2.6 to 1 ratio for fees, and the Carpenter Firm Partners out-billed their Associates by an even higher ratio of 12 to 1 for hours and 22.6 to 1 for fees.  On its face, this reflects an unreasonably top-heavy administration of the workload where certain tasks should not have been billed at the rates for which Class Counsel billed them, an issue for which I recommend a reduction.

110.    Third, I would also recommend a reduction for the overcharges in connection with document review – notably due to Class Counsel's failure to utilize a cost-effective document review process, thereby increasing the cost of this process.

111.    Finally, based on Class Counsel's failure to articulate the need to have three separate law firms working on this matter as well; failure to articulate the means by which the workload was coordinated and managed to avoid overstaffing and duplication of efforts that it concedes occurred; and assertions (notably by the Blood and Iredale Declarations) that their respective firms were involved in "every aspect of the litigation from inception through the present" and or "every aspect of the trial from trial preparation to post-trial proceedings", it is my opinion that Class Counsel's Fee Motion on its face demonstrates an overstaffed matter, with duplication of work and too many timekeepers performing the same tasks.

112.    Ordinarily, in a case where I had access to contemporaneous time records in which these types of billing issues were prevalent, I would generally recommend between a 40-50% reduction for these multiple overlapping issues.

113.    Here, the lodestar amount is $6,409,284.75 in fees plus $1,001,697.98 in costs, so a 50% reduction would result in an adjusted lodestar of $3.7 million.[70]  It is my opinion, given the magnitude of these issues, coupled with the inability to provide any further precision as to their extent in light of Class Counsel's refusal to produce their time records, this would not only be

[70] Approximately $3.2 million in fees and just north of $500,000 in costs.

-29-

reasonable and appropriate, but would also result in a fee award comparable to the $3.2 million based on the Ninth Circuit's common fund benchmark

114.    It is therefore my opinion that a reasonable fee would be $3.2 to $3.7 million.

## X.    CONCLUSION

115.    For all the reasons set forth in **Opinion I**, it is my opinion that Class Counsel's Common Fund Fee request, one that would consume over 61% of the Judgement in this matter, is excessive and neither the degree of success nor risk to Class Counsel are extraordinary enough to compel departure from the Ninth Circuit's 25% benchmark of the actual Fund size.

116.    For all the reasons set forth in **Opinion II**, it is my opinion that Class Counsel's lodestar request is excessive and unreasonable due to their facially top-heavy administration of work, conceded duplication of efforts, excessive charges for document review, and inclusion of fees for unsuccessful and/or unrelated work.

117.    For all the reasons set forth in **Opinion III**, with the information available to me as of the undersigned date, it is my opinion that my opinion that a reasonable fee for Class counsel would be between $3.2 to $3.7 million.

## XI.    SIGNATURE AND ATTESTATION

All of my opinions stated herein are to a reasonable degree of professional certainty. I reserve the right to supplement my opinions should any additional information come available, including (without limitation) in the event that Class Counsel provides any time records in connection with their Fee Motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 16, 2022 at Warren, New Jersey.

_____
Steven A. Tasher, Esq.