BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:16-CV-06980 RS<br><br>**DECLARATION OF THOMAS J. O'REARDON IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF NONTAXED EXPENSES**<br><br>**CLASS ACTION**<br><br>Date:      May 11, 2023<br>Time:     1:30 p.m.<br>Judge:    Honorable Richard Seeborg<br>Courtroom: Courtroom 3, 17th Floor<br><br>Complaint Filed:  December 5, 2016<br>Trial Date:       May 23, 2022 |

BLOOD HURST & O' REARDON, LLP

Case No. 3:16-cv-06980-RS
O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................................1

II.   INDEX OF EXHIBITS TO THIS DECLARATION AND IN SUPPORT OF THE
      RENEWED MOTION ...............................................................................................2

III.  SUMMARY OF LITIGATION HISTORY .............................................................3

      A.    Pretrial Investigation, Discovery, Experts and Motion Practice .................3

      B.    Preparing for Trial in *Montera*, Including Additional Expert Discovery   and
            Motion Practice .............................................................................................9

      C.    The *Montera* Jury Trial and the Post-Trial Motions ...................................11

      D.    Summary of Plaintiff's Counsel's Efforts to Achieve the Successful   Result
            at Trial ..........................................................................................................14

IV.   THE REQUESTED FEES .....................................................................................14

      A.    Qualifications of Class Counsel and Their Roles in This Litigation..........15

      B.    Class Counsel's Reasonable Lodestar Incurred Since 2013 .....................21

V.    THE REQUESTED EXPENSES ..........................................................................29

VI.   SUMMARY OF PLAINTIFF'S COUNSEL'S REQUESTED FEES AND
      EXPENSES ...........................................................................................................46

BLOOD HURST & O' REARDON, LLP

00197658

I, THOMAS J. O'REARDON, declare:

1. I am a partner in the law firm Blood Hurst & O'Reardon, LLP, one of counsel for Plaintiff in this action. I am court-appointed Class Counsel pursuant to Federal Rule of Civil Procedure 23(g) in the above-entitled matter. I have personal knowledge of the matters set forth in this declaration or believe them to be true based on facts and events made available to me and would be competent to testify as to them.

## I.    INTRODUCTION

2. I submit this declaration in support of Plaintiff's Renewed Motion for Award of Attorneys' Fees and Reimbursement of Nontaxed Expenses. Pursuant to Local Rule 54-5(a) the parties met and conferred for the purpose of resolving any disputed issues relating to attorneys' fees. The parties were not able to come to an agreement.

3. I believe the requested fees and costs are fair and reasonable under controlling law, particularly considering the results realized for the Class and the time and expense spent by Plaintiff's Counsel to achieve the results.

4. The outstanding result at trial was reached after extensive litigation spanning nearly ten years from the start of pre-filing investigation. The motion practice was substantial and included motions for class certification, a motion for summary judgment, motions to exclude expert declarations in connection with class certification and summary judgment, a motion for judgment on the pleadings, two motions for decertification, motions *in limine*, and numerous *Daubert* motions to exclude expert testimony in connection with class certification, summary judgment, and at trial. All the motions were heavily contested and fully briefed, with some involving multiple rounds of briefing. The litigation also involves substantial discovery. Plaintiff's Counsel work included (1) conducting and defending 49 depositions, including those of Defendant's corporate designees, its CEO, current and former marketing, operations, and science employees, and scientific, marketing and damages-related experts; (2) reviewing over 500,000 pages of documents produced by Defendant; and (3) serving 23 subpoenas on third parties with involvement in marketing and retail sales issues who produced thousands of pages of documents. Plaintiff's Counsel also responded to discovery served on Plaintiff, defended the deposition of Ms. Montera and eleven other named

BLOOD HURST & O' REARDON, LLP

1    Case No. 3:16-cv-06980-RS

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

plaintiffs whose testimony was used throughout the litigation, and worked with more than eleven of their own expert witnesses and additional consultants to prepare for class certification, summary judgment, and trial, including preparing and exchanging expert reports and conducting and defending expert depositions. 43 expert reports or declarations were exchanged by the parties at various stages of the litigation. After a nine-day trial the jury came back after just 2.5 hours and awarded Plaintiff and the Class full recovery on both consumer fraud claims. Plaintiff's Counsel's collective, years'-long efforts led to this result, which I believe was the largest class action jury verdict in the field of consumer product false advertising in at least the past decade. On February 15, 2023, the Los Angeles Daily Journal listed the result as one of the top verdicts of 2022.

5.    Given the protracted nature of the litigation and the sophistication of counsel involved, the litigation also changed, refined, and became more challenging over time as defense counsel adjusted and responded to our positions and as we adjusted and responded to theirs.

## II.    INDEX OF EXHIBITS TO THIS DECLARATION AND IN SUPPORT OF THE RENEWED MOTION

6.    Attached to this declaration are the following exhibits submitted in support of this Renewed Motion:

- Exhibit 1: Firm Resume for Blood Hurst & O'Reardon, LLP ("BHO");
- Exhibit 2: Lodestar Detail
- Exhibit 3: Photocopying Detail
- Exhibit 4: Postage / FedEx / Messenger Detail
- Exhibit 5: Service of Process Detail
- Exhibit 6: Depositions / Transcripts / Videographers Detail
- Exhibit 7: Experts / Consultants Detail
- Exhibit 8: Electronic Document Management Detail
- Exhibit 9: Online Research Detail
- Exhibit 10: Conference Calls Detail
- Exhibit 11: Transportation, Hotels and Meals – Detailed Itemization
- Exhibit 12: Transportation, Hotels and Meals – Invoices and Credit Card Statements

- Exhibit 13: Miscellaneous Costs Detail

- Exhibit 14: Class Notice and Outreach Detail

- Exhibit 15: Mediation Fees Detail

## III.    SUMMARY OF LITIGATION HISTORY

### A.    Pretrial Investigation, Discovery, Experts and Motion Practice

7.    Beginning in 2012 and 2013, my firm began investigating whether the advertising claims about Joint Juice were false or misleading. We are a small contingency-only plaintiffs firm and are very selective in the cases we bring. We carefully research them before filing. The work from the beginning was used in the *Montera* trial, which was tried as a type of bellwether for the overall litigation. Despite the number of cases, the litigation was mostly treated as one matter, except for some notable exceptions, because of the shared facts, common science, and very similar legal claims. The investigation included a review of the scientific evidence analyzing Joint Juice's ingredients, glucosamine hydrochloride, chondroitin sulfate, and several vitamins. There was a large amount of science and Plaintiff's Counsel determined that the clear consensus showed that Joint Juice did not work. We also obtained as much advertising as possible and informally sought out various opinions about the implicit meaning of the advertising.

8.    On March 21, 2013, the initial complaint was filed on behalf of a nationwide class. Dkt. No. 1 at 15. Premier answered on May 21, 2013. Dkt. No. 21. Soon after, Plaintiff's Counsel began formal discovery and prepared and proposed a detailed ESI protocol, but Premier refused to discuss it. *See* Dkt. No. 42. The parties discussed the possibility of settlement and exchanged limited discovery related to the scientific studies Premier relied on to support its advertising claims and Joint Juice sales data in advance of a November 2013 mediation held in San Francisco. We analyzed Premier's science in preparation for the mediation. Despite a full day of mediation, it went nowhere.

9.    Discovery then began in earnest. Pursuant to the parties' later agreement, all the discovery taken in the initial part of the litigation could be and was used in the bellwether case. In 2014, Plaintiff's Counsel subpoenaed documents from Eleven Inc. and R2C Group to obtain market research and other marketing-related documents about Joint Juice and Premier's marketing strategy. The documents from these third parties were used by experts throughout the litigation, including at

BLOOD HURST & O' REARDON, LLP

3                                          Case No. 3:16-cv-06980-RS

BLOOD HURST & O' REARDON, LLP

trial. Plaintiff's Counsel also subpoenaed ten retailers that sold Joint Juice. From these subpoenas, Plaintiff's Counsel received over 2,000 pages of valuable marketing documents and comprehensive retail sales data for the Joint Juice products.

10. Starting in June 2014, Plaintiff's Counsel deposed six Premier employees. The depositions included CEO Darcy Horn, Joint Juice Brand Manager Lance Palumbo, and Dr. Kevin Stone, the creator of Joint Juice. Premier also designated Mr. Palumbo as a Rule 30(b)(6) witness. Given the number of topics and amount of testimony, his deposition took place over three days. These depositions were used in preparing the *Montera* trial and to impeach the Premier executives and employees at trial.

11. Also in 2014, Plaintiff's Counsel retained various expert consultants to help guide them in the case. These include Dr. Jeremiah Silbert, Dr. Steven R. Graboff, Dr. Lynn R. Willis, and Mark Keegan. Each of these experts helped Plaintiff's Counsel understand various aspects of the case to allow them to formulate theories and arguments used throughout the litigation. They also gave us the foundation to adapt, change and refine theories as both sides approach to the litigation became for sophisticated and nuanced. They further led us to additional experts that were ultimately used in connection with trial.

12. In the first part of 2015, the parties retained experts and exchanged expert reports to be used for class certification, summary judgment, and the first scheduled trial. The parties each retained science, marketing, survey, and damages experts. In April 2015, the parties participated in a second mediation in San Francisco. Once again, the mediation failed. Expert discovery continued with the depositions of five expert witnesses.

13. Premier then filed a motion for summary judgment (Dkt No. 85), and Plaintiff moved for class certification (Dkt. No. 88). Both motions were heavily briefed and involved a large amount of evidence. The orders resulting from these motions have been repeatedly used by the parties and the Court, including in connection with motions filed shortly before, during and after the *Montera* trial. Plaintiff's motion sought a nationwide class or alternatively, a multi-state class which included the New York class here. Premier opposed a nationwide class and any grouping for a multistate

class. Dkt. No. 98. Each party also filed *Daubert* motions to exclude aspects of the other side's expert opinions.

14.    On April 15, 2016, the Court issued its order denying Premier's motion for summary judgment and granting portions of plaintiff's motions to exclude Premier's marketing and science experts. *See Mullins*, 178 F. Supp. 3d 867 (N.D. Cal. 2016). The Court found that the full refund damages model was appropriate, found that Premier targeted arthritis sufferers and utilized Dr. Stone in advertisements to add credibility to the Joint Juice advertising message, and noted that Plaintiff's Counsel had "identified many significant issues to address during cross-examination" with Premier's outside survey expert. *Id.* at 876, 878, 906. The Court excluded Premier's expert's opinions related to treatment protocols and injectable glucosamine. *Id.* at 904. Plaintiff has continually relied on this order throughout the litigation, including to exclude certain opinion testimony of Premier's Dr. Grande, whose testimony was so limited by the time of the *Montera* trial that Premier did not call him as a witness. *See* Dkt. No. 180 at 16-18. The Court granted class certification of the California class and requested further briefing from the parties related to the multi-state class. *See Mullins*, 2016 U.S. Dist. LEXIS 51140 (N.D. Cal. Apr. 15, 2016).

15.    The experts and consultants retained by Plaintiff's Counsel in the litigation were crucial in developing Plaintiff's litigation and trial strategy and combating the convincing pseudo-science Premier developed. For example, Dr. Silbert was retained to show that physiologically the active ingredients never made it to one's joints. Dr. Silbert was the world's leading researcher in this area. He passed away last year. Even then, Dr. McAlindon used Dr. Silbert's research and insights in his trial testimony. *See e.g.*, Trial Tr. 109. Dr. Silbert's assistance also was the genesis of Plaintiff's Counsel presentation at trial about the misleading nature of Premier's advertisements that showed or implied that Joint Juice was absorbed into the joint.  Premier's summary judgment motion was so thoroughly repudiated that aspects of it have been used throughout the litigation and that was the only summary judgment motion Premier brought.

16.    Dr. Graboff also helped Plaintiff's Counsel develop the facts and arguments about the hierarchy for treating osteoarthritis and professional medical societies' guidelines recommending against the use of glucosamine and chondroitin supplements for osteoarthritis, which

BLOOD HURST & O' REARDON, LLP

00197658

also was used at trial. His testimony was cited in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 885, 893 (N.D. Cal. 2016).

17.    Dr. Willis helped Plaintiff's Counsel understand and formulate arguments used throughout the litigation about clinical research, meta-analyses, treatment protocols, and in vitro and animal study research. He helped counsel locate additional experts used in the litigation and was cited extensively by the Court in the order denying Defendant's motion for summary judgment: *Id*. at 883-86, 895.

18.    Mr. Keegan helped Plaintiff's Counsel understand Premier's consumer research, the Joint Juice advertising message, and the faults with Premier's survey expert's, Hal Poret, opinions. Mr. Keegan's expert testimony was cited in the orders granting class certification and denying Defendant's motion for summary judgment *See, e.g.*, *Id*. at 867, 879-82 and 2016 U.S. Dist. LEXIS 51140, at *9 (N.D. Cal. Apr. 15, 2016).

19.    The summary judgment and class certification orders have been central to the litigation and extensively relied upon by the parties in *Montera*. *See e.g.*, Dkt. No. 290 at 7-8, 13-14, 16, 18 (Plaintiff's opposition to decertification motion); (Plaintiff's opposition to decertification motion); Dkt. No. 264 at 6 (Plaintiff's objections to final jury instructions); Dkt No. 227 (Premier's opposition to motion *in limine*); Dkt No. 224 at 1-2, 9-10 (Plaintiff's motion *in limine*); Dkt No. 222 at 5 (Plaintiff's trial brief); Dkt No 208 at 3, 7 (Plaintiff's opposition to motion *in limine*); Dkt. No. 190 at 2-3 (same); Dkt. No. 166 (same); Dkt. 165 at 1, 2-3 (same); Dkt No. 188 at 1 (same); Dkt. No. 184 at 1, 5, 11 (Plaintiff's opposition to the motion to exclude opinions of Dr. Dennis at trial); Dkt. No. 166 at 2 (Plaintiff's motion *in limine*); Dkt No. 165 at 1, 2, 3 (same); Dkt No. 145 at 1 (Premier's opposition to motion to exclude Dr. Grande's testimony at trial); Dkt No. 129 at 1, 3-4 (Plaintiff's motion to exclude Dr. Grande's testimony at trial); Dkt. No. 124 at 4 (Plaintiff's motion to exclude e Dr. Silverman's testimony at trial); Dkt. No. 193 at 53 (Plaintiff's proposed jury instructions).

20.    As a result of positions taken by Premier and consistent with the Court's class certification ruling, between November 18, 2016, and January 5, 2017, Plaintiff's Counsel filed the additional state-only class actions, including the New York action that became *Montera*.

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

21.    At the February 9, 2017, case management conference, Premier made an oral motion to stay the related actions until after the *Mullins* trial. *Montera*, Dkt. No. 170. Counsel for plaintiffs objected, but the Court granted the motion to stay. *Id.* Premier then requested a continuance of the expert disclosures deadline, which was granted. *Id.*

22.    As a result of the passage of time and as the case developed because of the hard-fought and protracted nature of this litigation, Plaintiff retained additional experts because others were no longer able to testify or people with different backgrounds became more useful given the posture of the litigation, the positions we wanted to advance, and our responses to positions taken by Premier, its lawyers, and their experts. These included retaining Dr. McAlindon, one of the world's leading scientific experts on osteoarthritis, in 2016. Picking up on work done by earlier experts, Dr. McAlindon provided extensive analysis of the scientific evidence behind the Joint Juice ingredients. Dr. McAlindon systematically reviewed the applicable scientific studies and produced an expert report exceeding one-hundred pages. He also developed detailed rebuttal reports to refute the assertions of Premier's experts, Drs. Grande, Lippiello, and Silverman. These reports provided the framework for his trial testimony and were utilized in developing several of the trial demonstratives used with the jury.

23.    Plaintiff also retained Colin Weir in 2017 to rebut expert opinions of Premier's economics expert, Dr. William Choi, as defendant developed its theme that Joint Juice provided multiple benefits and people purchased Joint Juice for multiple reasons. Because of this rebuttal work, Dr. Choi substantially limited the related expert report done shortly before the *Montera* trial. Although Plaintiff's Counsel also retained Mr. Weir to rebut Dr. Choi, given the weakness of Dr. Choi's opinions, Plaintiff's Counsel decided the rebuttal testimony was not needed. Instead, Mr. Weir's trial testimony was limited to the retail sales data analysis he performed.

24.    Plaintiff's Counsel are not including the *Sonner*-specific trial work performed in connection with the then-anticipated May 10, 2018, trial on behalf of the California class, plaintiff Sonner's claim for injunctive relief which was eventually dismissed for lack of personal jurisdiction, work relating to the bill of costs filed by Premier in *Sonner*, or work performed in the subsequent *Bland* and *Sonner* state court actions (currently pending in Alameda County Superior Court) relating

7                    Case No. 3:16-cv-06980-RS

to the complaints in those actions, removal, remand, the 2020 and 2021 state court motions for class certification, Premier's motion to stay in *Sonner*, class notice in *Bland*, or third-party retailer subpoenas served in August 2022 in *Bland*. We will file future fee motions as appropriate, and as a result, we have also not presently included the time spent on this renewed motion or work on the Ninth Circuit appeals filed post-trial in this action. Plaintiff also is not seeking reimbursement for fees or expenses related to the work pertaining to the various *Sonner* appeals, as that work did not directly benefit the New York Class in *Montera*.

25.    In September 2018, the Court lifted the stay in the related actions, including the New York action, and shortly thereafter, Premier answered the ten complaints. *Montera*, Dkt. No. 36. Because the actions are all based on the same facts and assert similar state statutory consumer protection claims presenting largely the same issues, the parties agreed to streamline discovery by sharing the discovery obtained up to that date. *Montera*, Dkt. No. 28. All of the work done up to this time was used in *Montera*, other than the time excluded as described above, for the work unique to *Sonner*.

26.    On July 18, 2019, Premier moved for judgment on the pleadings again arguing the FDA preempted the state law claims because Joint Juice was not advertised to treat or prevent arthritis or joint pain. *See Montera*, Dkt. No. 48. The Court denied the motion noting that "the prior order denying summary judgment in *Mullins* found that plaintiff had successfully raised triable issues of fact regarding both [implied prevention and treatment of arthritis] claims." *Mullins*, 2019 U.S. Dist. LEXIS 153698, at *12 (N.D. Cal. Aug. 29, 2019). Premier deposed the other named plaintiffs. The testimony from these named plaintiffs has been used throughout the litigation, including by Plaintiff and the Court in connection with the motion for leave to substitute Ms. Montera as the Class Representative. *Montera*, Dkt. No. 134 at 5-6.

27.    On August 29, 2019, Plaintiffs filed an omnibus motion for class certification after Premier refused to stipulate that the class certification requirements were met. *See Montera*, Dkt No. 60-3. Despite its refusal that required us to fully brief class certification again, in the end, and given the work we did in obtaining the prior order granting class certification of the California class, Premier did not oppose the motion other than on a minor issue about the length of some of the class

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

00197658

BLOOD HURST & O' REARDON, LLP

periods. *See Mullins*, 2019 U.S. Dist. LEXIS 229365, at *2-3 (N.D. Cal. Dec. 17, 2019) ("In light of the class of California consumers previously certified in this action, [citation] Premier does not substantively oppose class certification."). The Court also acknowledged that "Plaintiffs have provided hundreds of pages of factual discovery demonstrating that Premier engaged in a coordinated advertising campaign which caused customers to buy Joint Juice because of its purported health benefits." *Id*. at *4.

28.    Next, from June 2019 to December 2021, Drs. Guilak, Dennis, and Rucker were retained to consult, prepare Rule 26 reports, and testify as needed. Dr. Guilak, an expert in basic science research on osteoarthritis, tissue engineering, and biomechanics, was retained to refute one of Premier's central science experts, Dr. Grande and address topics previously addressed by Dr. Silbert. Dr. Guilak was also retained to rebut another of Premier's former science experts, Dr. Lippiello, whom Premier ultimately chose to not use.

29.    Plaintiff retained Dr. Dennis to conduct a consumer survey concerning the advertising message conveyed by Joint Juice. The Court noted that Dr. Dennis' survey "bolstered" the evidence that Plaintiff developed in the prior class certification briefing. *See* 2019 U.S. Dist. LEXIS 229365, at *4. Dr. Rucker, a highly published researcher in the science of marketing, advertising, and psychology, described the marketing elements which are implemented by brands and analyzed Premier's marketing documents to analyze Premier's strategy and conclude that a reasonable consumer purchases Joint Juice to address their joint issues such as joint pain and stiffness. *See* Dkt. No. 127-2 at 35. Drs. Guilak, Dennis, and Rucker also scrutinized Premier's experts in their rebuttal reports.

30.    On September 24, 2020, a third all-day mediation session was held. The mediator, Judge Layne Phillips, concluded after half a day that continuing further would not result in a resolution.

### B.    Preparing for Trial in *Montera*, Including Additional Expert Discovery and Motion Practice

31.    In April 2021, the Court directed the parties to propose trial dates and selected a first case for trial. *See Montera*, Dkt. No. 96. The parties reached agreement on possible trial dates but

00197658    O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

not on the first case to try. *Montera*, Dkt No. 97. In November 2021, the Court issued an order setting the trial date in *Montera* for May 23, 2022. Dkt. No. 98. Class Notice was disseminated on December 28, 2021. The parties prepared for trial, worked with the science, marketing, survey, and damages consultants and experts, completed expert discovery, and plaintiffs requested and received updated fact discovery related to sales data.

32.     While preparing for trial, Class Counsel learned that the original named plaintiff had been found to be an inadequate class representative in another action. *See Montera*, Dkt. No. 106. Class Counsel believed that ethically they had no choice but to seek to substitute the class representative, even though the named plaintiff had done an excellent job in this case. Accordingly, on February 28, 2022, Class Counsel moved for leave to substitute Ms. Montera and requested that the Court appoint her as the new Class Representative. *Id.* Premier opposed the motion and requested that the Class be decertified or alternatively, that the trial be delayed. *Montera*, Dkt. No. 111. The Court granted the motion for leave, appointed Ms. Montera as the Class Representative, and held firm on the trial date. *Montera*, Dkt No. 134. We made Ms. Montera available for deposition on May 4, 2022.

33.     On March 24, 2022, Premier again sought to decertify the Class, arguing causation was lacking because consumers purchase Joint Juice for "many reasons having nothing to do with Premier's advertising" and a full refund was not available because Joint Juice provides non-joint health benefits such as taste and hydration. *Montera*, Dkt. No. 130 at 1, 3, and 8.

34.     From January 12, 2022, to February 14, 2022, the parties designated 12 experts and exchanged 20 expert reports. The parties prepared and took 11 expert witness depositions. *Id.* Thereafter, the parties collectively filed eleven *Daubert* motions, with corresponding opposition and reply briefs to each.

35.     On April 26, 2022, the Court denied another of Premier's motions to decertify the class and granted in part and denied in part the parties *Daubert* motions. *Montera*, 2022 U.S. Dist. LEXIS 75843 (N.D. Cal. Apr. 26, 2022). As a result of the years of work done, the strategic positions we took, and our efforts to impact the positions Premier's experts were forced to take, the order was overwhelmingly favorable to Plaintiff. The Court agreed with Plaintiff that statutory damages under

BLOOD HURST & O' REARDON, LLP

the GBL are to be assessed on a "per transaction" basis. *Id*. at *21. The Court excluded Premier's lead scientific expert, Dr. Silverman, from testifying on the human microbiome and the bioavailability of the active ingredients in Joint Juice, personal observations about his patients' use of glucosamine, the importance of alternative osteoarthritis treatments, and regulatory matters. *Id*. at *22-26. The Court also precluded Premier's other science expert, Dr. Grande, from testifying about bioavailability because it was based on "speculation." *Id*. at *26-28. Plaintiff's Counsel were able to limit and truncate Dr. Grande's testimony so much that Premier never called him at trial, even though it kept saying it would so Plaintiff's Counsel would have to spend time preparing the cross-examination. The Court also found that the consumer survey conducted by Premier's expert has "limited probative value" and "numerous shortcomings" which could be addressed on cross-examination. *Id*. at *31-32. The Court precluded Premier's two non-retained experts, Dr. Stone and Palumbo, from providing expert testimony. *Id.* at *34-36. Premier's motion to decertify the class was also denied. *Id*. at *37-44 (holding "Plaintiff has presented common evidence that Premier's marketing statements caused class members to purchase Joint Juice," and "Plaintiffs may pursue a full refund theory of liability.").

### C.   The *Montera* Jury Trial and the Post-Trial Motions

36.   After a nine-day class trial, the jury reached a unanimous verdict in just two and half hours. *See Montera*, 2022 U.S. Dist. LEXIS 144491, at *7-8 (N.D. Cal. Aug. 12, 2022). The jury found that Premier engaged in deceptive acts and practices in violation of GBL § 349 and that Joint Juice was falsely advertised in violation of GBL § 350. *Id.* The jury found that full refunds should be awarded to Ms. Montera and the Class, rejecting Premier's applicable arguments and expert opinion testimony. *Id*. at *8.

37.   Thereafter, Premier filed an unsuccessful motion for judgment as a matter of law. *Id.* The Court also granted Plaintiff's motion for entry of judgment, awarding $50 for each purchase of Joint Juice in the amount of $8,312,450 in statutory damages and $4,583,004.90 in prejudgment interest, for a total of $12,895,454.90. *Id.* at *26.

38.   On August 26, 2022, Plaintiff's Counsel filed a motion for an award of attorneys' fees, reimbursement of expenses, and a service award for the Class Representative, Ms. Montera.

BLOOD HURST & O' REARDON, LLP

00197658

Montera, Dkt. No. 296. Based on either the percentage-of-the-fund or lodestar method, Plaintiff's Counsel requested a fee award of $6,806,031.96, which is equal to 33% of the gross benefit to the Class ($20,438,534.42). This amount also represented a 1.06 multiplier on the conservative attribution of the portion of Plaintiff's Counsel's lodestar benefitting the *Montera* lawsuit. *See Montera v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 190146, at *7 (N.D. Cal. Oct. 18, 2022). Plaintiff's Counsel also sought $1,133,794.77 in reimbursed expenses, and a $25,000 service award for Ms. Montera. *Id.* at 13. Premier responded by contending that Plaintiff's Counsel was only entitled to fees equal to 25% of the Class's judgment ($3,223,863.73), and the fee award must come from and draw down the Class's judgment. *Montera*, Dkt. No. 306. Premier also contended that Plaintiff's Counsel's expenses must be apportioned equally among all related Joint Juice actions and so they are only entitled to reimbursement of $197,852.36 in expenses. *Id.* Premier did not contest the proposed service award to Ms. Montera. *Id.*

39.    Also on August 26, 2022, Plaintiff's Counsel filed a Rule 54(d)(1) bill of costs seeking $132,096.79 in taxable costs. *Montera*, Dkt. No. 295. Premier opposed most of these costs and argued based on an apportionment theory that the Court deduct at least $82,611.20 from the requested taxable costs. *Id.*, Dkt. No. 307. Pursuant to a stipulated schedule, Plaintiff's Counsel filed a reply on September 30, 2022. *Id.*, Dkt. No. 310.

40.    On October 10, 2022, the Clerk issued an order taxing costs of $54,455.74. *Montera*, Dkt. No. 314 (the "Taxation Order"). The Taxation Order contains a mathematical error. The order correctly states that Plaintiff's Counsel sought $132,096.79 in total taxable costs. However, there appears to be a mathematical mistake in the order because it also states that $82,611.20 in costs relating to deposition transcripts / video recordings were disallowed. Additionally, the Taxation Order did not state whether the $342.60 in requested visual aid costs (Civil LR 54(d)(5)) was allowed or disallowed. Premier did not oppose taxing the $342.60 requested. *Montera*, Dkt. No. 307. Below is a chart of the requested and awarded items and amounts. However, the possible error is likely a moot issue. That is because in the accompanying Renewed Motion for fees and expenses Plaintiff's Counsel seeks reimbursement of all nontaxed expenses. This amount is $1,073,123.10,

BLOOD HURST & O' REARDON, LLP

00197658

which is equal to the total expenses incurred in this litigation of $1,127,578.85 less the $54,455.74 taxed by the Clerk on October 10, 2022.

| Cost Item | Amount Claimed | Amount Allowed | Disallowed | Disallowance Reason |
|---|---|---|---|---|
| Filing Fees and Docket Fees | $400.00 | $400.00 | | |
| Transcripts for appeal | $34,117.70 | $34,117.70 | | |
| Deposition transcript/video recording | $88,162.77 | $10,864.32 | $82,611.20 | D-Disallowed as unrecoverable under 28 U.S.C. Section 1920 |
| Deposition exhibits | $4,799.25 | $4,799.25 | | |
| Notary & reporter attendance fees | $513.50 | $513.50 | | |
| Trial exhibits | $3,760.97 | $3,760.97 | | |
| Visual Aids | $342.60 | **NOT STATED** | **NOT STATED** | |
| **TOTAL** | **$132,096.79** | **$54,455.74** | **$82,611.20** | |

41.      On October 18, 2022, after full briefing, the Court issued an order granting in part and denying in part the motion. *Montera v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 190146 (N.D. Cal. Oct. 18, 2022). The Court granted the unopposed request for a $25,000 service award to Ms. Montera, held that the GBL fee-shifting statutes apply and that fees shall be shifted in this action, that Premier must pay the fee award directly and on top of the Class's judgment, but denied, without prejudice, Plaintiff's Counsel's requested fee and expense award. *Id.* at *6-14. The Court determined that the lodestar method serves as the relevant guide for the fee award in this action, and therefore Plaintiff's Counsel should resubmit a fee and expense request with more detailed documentation about the lodestar and expenses. *Id.* at *10-13.

42.      On September 9, 2022, Premier filed a Rule 59 Motion for a New Trial (*Montera*, Dkt. No. 304), and a Rule 50(b) Renewed Motion for Judgment as a Matter of Law (*Id.*, Dkt. No. 302). In its new trial motion, Premier argued a new trial was necessary because of issues relating to

BLOOD HURST & O' REARDON, LLP

00197658

jury instructions, admitted evidence, improper argument, the Seventh Amendment, and that the jury verdict was contrary to the weight of the evidence. In its Rule 50(b) motion, Premier made arguments that it possessed scientific substantiation that precluded liability as a matter of law under the GBL, that civil liability is prohibited by the First Amendment and New York Constitution, and that Plaintiff failed to establish injury, causation, and materiality elements of the GBL claims. To protect the verdict and judgment, Plaintiff's Counsel opposed both motions. *Id.*, Dkt Nos. 308, 309. On October 18, 2022, the Court issued an order denying Premier's motion for a new trial and renewed motion for judgment as a matter of law. *Montera v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 190146 (N.D. Cal. Oct. 18, 2022).

### D.    Summary of Plaintiff's Counsel's Efforts to Achieve the Successful Result at Trial

43.    This case was the bellwether trial for this litigation. In all, Plaintiff's Counsel took 25 depositions, defended and prepared witnesses for 24 depositions, and served 23 subpoenas; eleven sets of discovery requests were exchanged by the parties, well-over half a million pages of ESI were produced by Premier, and 43 expert reports or declarations were exchanged by the parties at various stages of the litigation; Plaintiff's Counsel successfully opposed  a summary judgment motion, a motion for judgment on the pleadings, a motion for judgment as a matter of law, two motions to decertify the class, and brought two class certification motions; the parties brought 29 written motions *in limine* and 17 *Daubert* motions; the Court issued nearly 100 orders over the course of the litigation; and the trial transcript consisted of 1,705 pages of trial proceedings.

44.    While more work lies ahead, to date Plaintiff's Counsel has expended significant resources that all led to achieving the outstanding result at trial.

## IV.    THE REQUESTED FEES

45.    My firm prosecuted this litigation on a pure contingent basis with no guarantee of recovery. Primarily my firm, but also along with co-counsel, incurred 100% of the risk in pursuing the litigation. Over the course of nearly ten years, my firm advanced well over a million dollars in expenses with the understanding that we would be paid a fee and receive reimbursement for expenses only if successful. We took on and prevailed against a publicly traded, billion-dollar

BLOOD HURST & O' REARDON, LLP

00197658    O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

company that was supported by a team of a highly experienced class action and trial attorneys from three AmLaw 100 law firms: Arnold & Porter, Venable, and Morrison & Foerster. Following the trial verdict, a fourth AmLaw 100 law firm, Faegre Drinker Biddle & Reath, appeared as additional counsel for Premier.

46. My firm passed on other employment opportunities to devote the time and resources necessary to pursue this litigation.

47. My firm has been involved in every aspect of the litigation from inception through the present. I played a primary role in prosecuting this litigation and was responsible for day-to-day litigation activity, including pursuing discovery from Defendant and third parties, responding to and drafting motions, including at the summary judgment, class certification and *Daubert* stages, working with each of Plaintiff's experts in preparing declarations and Rule 26 reports, and attending trial where I helped prepare witnesses, aided in devising direct and cross examination strategies, and helped create opening and closing statements and the trial demonstratives.

**A.    Qualifications of Class Counsel and Their Roles in This Litigation**

48. The backgrounds and qualifications of the BHO attorneys who worked on the matter are set forth in the Firm Resume, a true and correct copy is attached as **Exhibit 1** to this declaration. BHO has significant experience prosecuting consumer protection class actions, including class actions involving the false advertising of consumer products. We have been appointed class counsel by state and federal courts throughout the country, have worked on a number of appeals resulting in decisions presenting consumer protection law issues relevant to this action, and frequently give continuing legal education lectures at seminars about class actions, consumer protection and related issues. BHO has developed an expertise in dietary supplement false advertising cases, and in particular, class actions challenging the truthfulness of health benefit claims made on the labels and advertising of dietary supplements and other consumer products. We are responsible for obtaining landmark appellate decisions in this field and for securing the largest, all-cash settlement in a dietary supplement class action. *See Yamagata v. Reckitt Benckiser* (N.D. Cal. 2021) ($50 million settlement in action challenging the truthfulness of glucosamine/chondroitin joint health claims); *Kroessler v. CVS Health Corp.*, 977 F.3d 803 (9th Cir. 2020) (no FDA preemption of state law

BLOOD HURST & O' REARDON, LLP

00197658

15                                                    Case No. 3:16-cv-06980-RS

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

claims challenging labeling of dietary supplements); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989 (9th Cir. 2018) (plaintiff's burden of proof when challenging dietary supplement labeling claims as false or misleading under state consumer protection laws); *Rikos v. P&G*, 799 F.3d 497 (6th Cir. 2015) (class certification when challenging dietary supplement labeling claims as false or misleading under state consumer protection laws); *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011) (same).

49.     Described below are the general roles and responsibilities of each professional at BHO who worked on this litigation.

50.     I took a lead role on thirty-two (32) depositions of party and non-party witnesses and outside experts. I took the depositions of Defendant's current and former employees and Rule 30(b)(6) designee who played various roles in the marketing, sales, scientific substantiation of Joint Juice, taking the depositions of Defendant's outside experts on matters of science, damages, marketing, and consumer surveys, and defending the depositions of experts on matters of marketing, consumer surveys, damages and science. I also took the lead role on subpoenas to 17 third parties (with many receiving multiple subpoenas), and negotiating with each of their in-house or outside counsel to obtain relevant information. The information obtained from the third parties was utilized in connection with fact witness and expert depositions, expert reports, class certification, summary judgment, and trial. I also attended the trial where I helped prepare witnesses, aided in devising direct and cross examination strategies, and helped create opening and closing statements and the trial demonstratives. I have substantial experience litigating consumer product false advertising cases, including over fifteen years working with scientific experts on matters of the scientific veracity of health benefit claims. As a result of this experience, which includes years of experience litigating deceptive health benefit claims on the labels of dietary supplements in general, and glucosamine product cases in particular, I was able to litigate this matter efficiently and effectively from the filing of the complaint, through discovery, class certification, summary judgment, expert retention and workup of their reports and the review of opposing expert work, trial preparation, and the class trial itself.

BLOOD HURST & O' REARDON, LLP

51.     My partner, Timothy Blood, oversaw each aspect of the litigation and had primary responsibility for overall litigation strategy. He was personally involved in drafting every substantive pleading in this litigation, including class certification, summary judgment and *Daubert* motions, taking the lead role at all oral arguments, closely coordinating with me, Paula Brown, and Craig Straub about discovery and expert strategy to efficiently delegate and allocate responsibilities based on seniority, billing rate and expertise, defended three depositions of Plaintiff's experts, took the deposition of one of Defendant's marketing experts, worked with Plaintiff's retained experts, assisted with trial preparation, and took a lead role at trial where he cross-examined one of Defendant's primary consumer survey experts. Mr. Blood also took the lead on mediation efforts. There were numerous formal and informal attempts to reach a settlement before and after class certification and while engaging in substantial discovery and motion practice. These attempts included use of three separate mediators, but all were unsuccessful. *See also Montera*, Dkt. No. 296-1 (Blood Decl.) at ¶¶ 39, 46 (same).

52.     My partner, Leslie Hurst, is an appellate attorney who has authored numerous trial and appellate briefs on relevant issues relating to scientific substantiation and efficacy, structure / function and implied disease claims, the scope of preemption under the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), and rights to pursue equitable relief in federal courts. For instance, Ms. Hurst argued before the Ninth Circuit Court of Appeals in *Sonner v. Schwabe North America, Inc.*, No. 17-55261 (argued May 16, 2018; op. filed Dec. 26, 2018), *Sonner v. Premier Nutrition Corp.*, No. 18-15890 (argued Dec. 3, 2019; amended op. filed Aug. 20, 2020), *Kroessler v. CVS Health Corp.*, No. 19-55671 (argued July 8, 2020; op. filed Oct. 9, 2020), *Seegert v. Rexall Sundown, Inc.*, No. 20-55486 (argued Sept. 3, 2021; op. filed Feb. 1, 2022), *Sonner v. Premier Nutrition Corp.*, No. 21-15526 (argued May 23, 2022). Here, besides taking the lead role on the appeals in *Sonner* and post-trial in this action, which time is not included in the lodestar being submitted with this motion, Ms. Hurst worked on the briefing relating to Defendant's summary judgment, Defendant's motion for judgment on the pleadings, the motions for class certification, Plaintiff's motion for entry of judgment, and Defendant's motion for judgment as a matter of law.

BLOOD HURST & O' REARDON, LLP

53.     Paula Brown is a partner at BHO. Ms. Brown has significant experience litigating false advertising cases relating to dietary supplements. Ms. Brown's experience also includes trying certified class actions. In this litigation, Ms. Brown played a central role in prosecuting this litigation including defending or taking eight depositions including defending six named plaintiff depositions which took place around the country, taking the deposition of one of Defendant's primary expert witnesses, and defending one of Plaintiff's experts, preparing the named plaintiffs for their depositions, drafting motions *in limine* before trial, at the summary judgment stage, and as the rest of the team was working simultaneously at the class trial, worked on the summary judgment-related briefing, including as primary drafter of motions to exclude the testimony of Defendant's experts, and worked on trial-related briefing, including as the primary drafter of the jury instructions, verdict form, and motions to exclude expert testimony of Defendant's expert William Choi and others.

54.     Jennifer MacPherson is Of Counsel at BHO where she works as a full-time salaried attorney. Before joining BHO in 2012, Ms. MacPherson spent years litigating class actions, including at the law firm Milberg Weiss (now Robbins Geller Rudman & Dowd, LLP). Ms. MacPherson's work on this litigation included assisting with obtaining discovery from subpoenaed retailers of Joint Juice (a unique task she has experience with from other consumer product class actions), drafting briefing relating to evidence submitted at summary judgment, and assisting Ms. Hurst in the two *Sonner* appeals and with class certification briefing. As true with Ms. Hurst (and all other Plaintiff's Counsel), Ms. MacPherson's time spent on *Sonner* appeal-related matters is not included in the lodestar submitted with this motion.

55.     Craig Straub was an associate at BHO. Mr. Straub and I were the attorneys at BHO responsible for the day-to-day litigation of these cases. In these actions, Mr. Straub was tasked with reviewing and analyzing the hundreds of thousands of pages of documents produced by Defendant and third parties. Mr. Straub had primary responsibility for organizing this large volume of data and identifying "hot" documents in connection with class certification, summary judgment, fact and expert depositions, expert review, focus groups, and trial preparation including drafting the trial exhibit list. Mr. Straub drafted numerous memoranda about these key documents and other factual and evidentiary issues he identified and met with the other attorneys on the team throughout the

00197658      O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

litigation to apprise them of these facts. Since joining my firm in 2016, Mr. Straub was also the primary attorney tasked with organizing and preparing potential exhibits for nearly every deposition conducted by my firm and co-counsel in this litigation. Mr. Straub assisted as second chair for eleven depositions throughout the litigation. Mr. Straub assisted with propounding subpoenas and discovery requests, meeting and conferring to obtain relevant discovery from Defendant and third parties, communicating with Class Members including retaining Ms. Montera and other Class Representatives in the related actions, working with Plaintiff's retained experts on matters of science, sales and marketing, analyzing data for trial purposes, attending a mediation session, drafting the class certification and judgment on the pleadings briefing including compiling all exhibits in support thereof, briefing motions to exclude Defendant's non-retained experts and several motions *in limine* in connection with the jury trial, drafting the oppositions to Defendant's motions for decertification, and attending trial where he created trial demonstratives, prepared trial exhibits, and developed memorandum, binders, and strategy for direct and cross-examination of the trial witnesses. At BHO, Mr. Straub spent most of his time litigating class actions involving the health benefit advertising of consumer products in general and glucosamine supplements in particular. Thus, while Mr. Straub had a significant load of responsibility in this litigation, I believe his knowledge, background and experience, and by closely working with me to identify issues and avoid duplicative efforts, allowed him to accomplish these tasks efficiently and effectively.

56.    In addition to BHO attorneys listed in the Firm Resume, BHO's senior paralegal, Dafne Maytorena, has extensive experience. Prior to joining BHO in 2018, Ms. Maytorena spent six years with the law firm Kessler Topaz Meltzer & Check LLP, focusing on class action litigation. Before that, Ms. Maytorena gained additional experience as a paralegal at several other law firms that also specialize in class action litigation: Robbins Arroyo, LLP, Faruqi & Faruqi, LLP, and Bernstein, Litowitz, Berger & Grossman, LLP. Ms. Maytorena earned her Paralegal Certificate from the University of San Diego in 2002, and her bachelor's degree from the University of California, San Diego in 2002.

57.    Michelle M. Chaseton is the former senior paralegal at BHO. Ms. Chaseton received her paralegal certificate from the University of San Diego, a Bachelor of Arts in Criminal Justice

BLOOD HURST & O' REARDON, LLP

from University of Nevada, and a professional certificate in intellectual property from the University of California, San Diego. Ms. Chaseton gained significant experience as a paralegal at Milberg Weiss Bershad Hynes & Lerach, a firm that specialized in class actions.

58. Bethany C. Maxwell is a former paralegal at BHO. Prior to joining BHO, Ms. Maxwell spent ten years with the law office of Buchalter Nemer, P.C. in San Francisco, focusing on litigation. Ms. Maxwell earned her Paralegal Certificate at San Francisco State University, where she was awarded Highest Honors and the Delmar Legal Studies Award for excellence in legal research. She also holds a dual Bachelor's degree from Smith College. Ms. Maxwell handled document management, prepared pleadings, discovery, and correspondence, and obtained documents to respond to discovery. Ms. Maxwell was also responsible for preparing the billing and expenses for the litigation and profiling and organizing court filings.

59. Aleksandr J. Yarmolinets was an associate at BHO. Mr. Yarmolinets earned his B.S., magna cum laude from Embry Riddle Aeronautical University, his J.D. cum laude from California Western School of Law, his LLM from Georgetown University Law Center, and was admitted to the State Bar of California in 2011. Mr. Yarmolinets' primary responsibilities were obtaining discovery from third parties, including drafting third-party subpoenas, and meeting and conferring with the retailers' counsel to obtain sales data for this litigation.

60. Camille Bass is a former associate at BHO. Ms. Bass earned her B.S. from Arizona State University, her J.D. from St. John's University School of Law, and she was admitted to the State Bar of California in 2014. Ms. Bass was responsible for researching discrete legal issues, communicating with absent class members and synthesizing those communications for the team.

61. Geoffrey Drew La Val is a former staff attorney at BHO. Mr. La Val earned his B.A., cum laude, from the University of California, Berkely, his J.D. from California Western School of Law, and he was admitted to the State Bar of California in 2011. He was primarily responsible for document review and analysis and assisting in deposition preparation. Mr. La Val helped locate potential exhibits and otherwise prepare me and co-counsel Todd Carpenter for the 2014 depositions of Kevin Stone (6/13/14), Darcy Horn Davenport (7/25/14), David Ritterbush (6/6/14), Katrina Taft (6/12/14), and Lance Palumbo (11/18/14, 11/19/14, and 12/9/14). Mr. La Val played an important

BLOOD HURST & O' REARDON, LLP

role in formulating search terms for the collection of ESI, coding and identifying relevant documents which were utilized throughout the litigation. Mr. La Val also developed in-depth memorandum on specific topics while working with my partner, Mr. O'Reardon, which included analysis of the foreign regulations relating to glucosamine, timelines of relevant events and people with citations to specific documents produced by Defendant, and summaries of scientific articles related to the ingredients in Joint Juice.

62.    Colette N. Menaldino is a former staff attorney at BHO. Ms. Menaldino earned her B.A. and J.D. from the University of Pittsburgh. She was admitted to the State Bar of Pennsylvania in November 2013, and the State Bar of California in August 2015. Ms. Menaldino was primarily responsible for document review and analysis, preparing exhibits for motions, and assisting in deposition preparation.

**B.    Class Counsel's Reasonable Lodestar Incurred Since 2013**

63.    The services rendered and work performed by my firm's attorneys and staff covered every aspect of this extensive, hard-fought litigation. My firm took the lead at every stage of the action from working up the case including analysis of hundreds of scientific manuscripts, propounding and pursing discovery, class certification, summary judgment, motion for judgment on the pleadings, two motions for decertification, the motion for judgment as a matter of law, the renewed motion for judgment as a matter of law, the motion for a new trial, fact depositions, document review, third-party subpoenas, discovery motions, expert declarations and reports, trial preparation, and the jury trial. The motion practice in this litigation was substantial and related to, *inter alia*, motions to compel discovery responses, Plaintiff's motions for class certification, cross-motions to exclude expert testimony submitted by the parties in connection with class certification, summary judgment, and before trial, and eight motions *in limine* to exclude evidence to be presented at trial, and post-trial, motion for entry of judgment, motion for decertification, motions for judgment as a matter of law, and the motion for a new trial. Even as to the sealing of evidence and scheduling matters, these motions were heavily contested. This litigation also involved substantial discovery. Plaintiff's counsel conducted significant pre-suit investigation and analysis of the scientific basis for Defendant's advertising claims; conducted and defended 48 depositions,

including those of Defendant's corporate designee, current and former marketing, science and regulatory employees, scientific experts, and third-party scientists; reviewed over 500,000 pages of documents produced by Defendant; and subpoenaed documents and testimony from 17 third parties who produced thousands of pages of documents. Plaintiff's counsel also responded to extensive discovery served on Plaintiffs, defended the depositions of eleven Plaintiffs and worked with more than seven of their own expert witnesses and additional consultants to prepare for class certification, summary judgment, and trial, including preparing and exchanging expert declarations and Rule 26 reports and conducting and defending expert depositions.

64.    I am thoroughly familiar with the quality and quantity of work done in this case by all lawyers representing Plaintiff and the Class. Along with Mr. Blood, I have endeavored to ensure there was no unnecessary work or duplication of effort. I also note that my firm does not have a billable hour requirement and does not award bonuses or raises based on billed hours.

65.    I believe the time expended by my firm in this litigation was reasonable and necessary considering the amount of work required to litigate and try to *Montera* action. My firm was lead counsel and played the primary role in briefing and arguing every motion, pursuing discovery, working with experts, preparing for trial, and conducting the class trial. There has been no unreasonable duplication of services for which my firm and my co-counsel now seek compensation. In the situations in which two or more attorneys participated in any matter, the participation was reasonable because of the complexity of the issues involved and the time constrains which existed. I believe tasks were delegated appropriately among senior attorneys, junior attorneys, and paralegals according to their complexity.

66.    The following information regarding my firm's time and out-of-pocket expenses is taken from time and expense records prepared and maintained by the firm in the ordinary course of business. The time records were prepared daily or shortly thereafter by each attorney or paralegal working on the litigation. The expense records are prepared from receipts, expense vouchers, check records and other documents, and are an accurate record of the expenses. Throughout the litigation I assisted in reviewing and approving for payment these out-of-pocket expenses.

BLOOD HURST & O' REARDON, LLP

67.     The schedule below provides a summary of the hours expended by timekeepers from my firm who performed work in this litigation. The schedule includes the name of each person who worked on the case, hourly billing rates, the number of hours expended, the resulting lodestar, and the bar passage year for each timekeeper.

68.     The lodestar calculation is based on the firm's current billing rates, other than those no longer employed by the firm, in which event their billing rate at the time they stopped working at the firm is used. These rates have been determined to be reasonable by numerous other courts in class action litigation. A sample of courts that have approved BHO's standard billing rates and attorneys' fees as reasonable include:

- *Yamagata v. Reckitt Benckiser Llc,* No. 3:17-cv-03529-VC, 2021 U.S. Dist. LEXIS 244276, at *12 (N.D. Cal. Oct. 28, 2021) (approving BHO rates as "reasonable, and that the hours expended were reasonable");

- *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171 FMO (FFMx), 2017 U.S. Dist. LEXIS 77576, at *42-43 (C.D. Cal. May 21, 2017) (approving BHO rates as reasonable given "the prevailing rates in the community for lawyers of comparable skill, experience, and reputation");

- *In re Hydroxycut Mktg. & Sales Practices Litig.*, MDL No. 2087, 2014 U.S. Dist. LEXIS 162106, at *192 (S.D. Cal. Nov. 18, 2014) (approving hourly rates of Blood Hurst & O'Reardon, LLP as "typical rates for attorneys of comparable experience");

- *Hartless v. Clorox Company*, 273 F.R.D. 630, 644 (S.D. Cal. 2011) (overruling objections to hourly rates, stating that BHO's hourly rates "have been accepted in other class action cases and are comparable to rates approved by other district courts in class action litigation");

- *In re Skechers Toning Shoe Prods. Liab. Litig.*, MDL No. 2308, 2013 U.S. Dist. LEXIS 67441, at *51-52 (W.D. Ky. May 13, 2013) (approving BHO's hourly rates, stating that "a lodestar cross-check demonstrates the reasonableness of the fees award");

23                                    Case No. 3:16-cv-06980-RS

- *Dennis v. Kellogg Co.*, No. 09-cv-1786-L (WMC), 2013 U.S. Dist. LEXIS 163118, at *22-23 (S.D. Cal. Nov. 14, 2013) (approving BHO's hourly rates as "fall[ing] within typical rates for attorneys of comparable experience");

- *Johnson v. General Mills, Inc.*, No. SACV 10-00061-CJC(ANx), 2013, U.S. Dist. LEXIS 90338, at *19-21 (C.D. Cal. June 17, 2013) (approving hourly rates and time spent by BHO, stating "[t]he Court has considered class counsel's rates and finds they are reasonable because of the experience of the attorneys and prevailing market rates") (citing BHO firm resume);

- *Blessing v. Sirius XM Radio, Inc.*, No. 09 CV 10035 (HB), 2011 U.S. Dist. LEXIS 94723, at *17 (S.D.N.Y. Aug. 24, 2011) (approving fee award as "reasonable under both the lodestar and percentage method of calculation");

- *In re Adobe Systems Inc. Privacy Litig.*, No. 5:13-cv-05226-LHK, Doc. No. 107 (N.D. Cal. Aug. 13, 2015) (approving hourly rates and time spent by BHO, finding "counsel's hourly rates to be reasonable and in line with the prevailing rates in the community for complex litigation").

69.     Further, based on my knowledge of the class action plaintiff's bar nationwide, the rates charged by my firm are in line with or lower than the rates charged by other firms that handle class actions of similar size and complexity. *See Orthopaedic Hosp. v. Encore Med., L.P.*, No. 3:19-cv-00970-JLS-AHG, 2021 U.S. Dist. LEXIS 225014, at *40 (S.D. Cal. Nov. 19, 2021) (2020 and 2021 partner rates of $925-$1,225, associate rates of $770-$1,065); *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 U.S. Dist. LEXIS 213045, at *38 (N.D. Cal. Dec. 17, 2018) (approving rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 39115, at *732 (N.D. Cal. Mar. 17, 2017) ($275 to $1,600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals); *Schneider v Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 601 (N.D. Cal. Nov. 4, 2020) ($830 to $1,275 for partners and $425 to $695 for associates); *Carlotti v. Asus Comput. Int'l*, No. 18-cv-03369-DMR, 2020 U.S. Dist. LEXIS 108917, at *15 (N.D. Cal. June 22, 2020) ($950 and $1,025 for partners); *Dickey v. Advanced Micro Devices, Inc.*, No. 15-cv-04922-HSG, 2020 U.S. Dist. LEXIS 30440, at *22 (N.D. Cal. Feb. 21, 2020) ($615-

BLOOD HURST & O' REARDON, LLP

$1,000 for partners and $275-$575 for associates); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-5923, 2015 U.S. Dist. LEXIS 67298, at *15 (N.D. Cal. May 21, 2015) ($475-$975 for partners, $300-$490 for associates, $150-$430 for paralegals, and $250-$340 for litigation support); *In re Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 U.S. Dist. LEXIS 156720, at *20 (N.D. Cal. Nov. 11, 2016) (up to $1,200 for senior attorneys and $290 for paralegals); *In re High-Tech Emple. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 U.S. Dist. LEXIS 118052, at *33-34 (N.D. Cal. Sept. 2, 2015) ($490-$975 for partners, $310-$800 for non-partner attorneys, and $190-$430 for paralegals, law clerks, and litigation support staff); *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137, at *122-23 (N.D. Cal. Aug. 17, 2018) ($400-$975 for partners, $185-$900 for non-partner attorneys, $95-$440 for paralegals, law clerks, and litigation support staff, and $270-$345 for summer law clerks).

70.    BHO's hourly rates also compare favorably to reported rates charged by the law firms Defendant hired in this action. For example, in 2022, "courtesy discount rates" for Venable of up to $1,010 were approved as reasonable hourly rates. *See Ray v. CLH N.Y. Ave, LLC*, No. 19-cv-2841-RCL, 2022 U.S. Dist. LEXIS 114586, at *14 (D.C. Cir. June 29, 2022); *see also Aero Norfolk, LLC v. Philadelphia Truck Lines, Inc.*, Case No. 2:21-cv-00101-RCY-RJY (E.D. Va.) at ECF No. 23-2 (the April 11, 2022, declaration of Venable litigation partner Caroline Gately declares that Venable's standard rates "do not change depending on the locale of the matter," that she is a 1989 graduate, her 2022 standard rate is $1,000, and a 2020 law school graduate's standard rate was $440). In *Nat'l Abortion Fedn v. Ctr. for Med. Progress*, Case No. 15-cv-03522-WHO (N.D. Cal.), Morrison & Foerster San Francisco partner Derek Foran declared (ECF No. 756-2) that his standard billing rate was $1,200 per hour in 2021, that associate rates ranged from $745 for 2018 graduates to $925 for 2014 graduates, and paralegals billed at $295 to $400 per hour. These hourly rates were approved as reasonable. *Nat'l Abortion Fedn v. Ctr. for Med. Progress*, 2021 U.S. Dist. LEXIS 245090, at *16 (N.D. Cal. Dec. 23, 2021). In *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Medical Progress*, No. 3:16-cv-00236-WHO (N.D. Cal. Apr. 29, 2020) (ECF No. 1150 at 4), the court approved hourly rates for attorneys at Arnold & Porter ranging from $750 to $1,150 per hour for

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

partners, $910 to $1,280 per hour for senior counsel, $545 to $910 per hour for associates, and $390 to $405 per hour for paralegals.

71.     Each of the BHO attorneys who have worked on this litigation has practiced for the following number of years: Mr. Blood – 32 years; Ms. Hurst – 27 years; Mr. O'Reardon – 16 years; Ms. Brown – 15 years; Ms. MacPherson – 23 years; Mr. Straub – 15 years; Mr Yarmolinets – 12 years; Ms. Bass – 9 years; Mr. La Val – 12; and Ms. Menaldino – 8 years. Based on the years and depth of experience of each of the attorneys and staff, the hourly rates of $280.00 to $960.00 are reasonable. These hourly rates do not take into account any contingency enhancement.

72.     As described in the accompanying motion and below, after factoring in exclusion of certain time entries (*see* paragraph 74 below), the total number of hours reasonably attributable to the claims subject to this litigation as of March 8, 2023, by professional staff at my firm is 9,547.50 hours for a total lodestar of $6,210,890.00. That total lodestar is broken down as detailed in the chart below. Additionally, the detailed time entries for which my firm seeks compensation are in **Exhibit 2** attached. The time entries are organized chronologically and include the date, timekeeper name, timekeeper hourly rate, a detailed description of the work done, and the number of hours.

73.     As stated in the original fee request, the total number of hours reasonably attributable to the claims subject to this litigation as of August 25, 2022, by professional staff at my firm was 9,083.25 hours. Mr. Blood's previous declaration described how the previous wholesale exclusion method represented a conservative approach that resulted in over-exclusion of time benefitting this litigation:

> To reasonably ensure that the present fee application represents only the time spent on the claims subject to this litigation, I exercised my professional judgment and excluded all of billable hours on the appeals of the *Sonner* action, as well as all billable hours from the date the Court entered the stay of all related actions (including *Montera*) on February 10, 2017 through May 17, 2018. This time period spanned all of the expert merits reports and trial preparation in *Sonner*, up through the Court granting Premier's motion to dismiss in *Sonner*, the filing of the notice of appeal in *Sonner* of the order of dismissal and judgment, and complete adjudication of Premier's Bill of Costs in *Sonner* on May 17, 2018. I believe this is a reasonably conservative calculation because, for example, my firm spent time during this period on expert-related tasks (e.g., relating to Drs. McAlindon and Grande) that directly

BLOOD HURST & O' REARDON, LLP

00197658     O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

benefitted this litigation. Additionally, as described in Paragraphs 23-24 above, the time spent on the *Sonner* and *Bland* state court actions is also excluded.

*See* Dkt. No. 296-1 at ¶ 61.

74.    In connection with this renewed motion, we performed an entry-by-entry analysis to determine if: (1) the billed time benefitted this litigation (and is thus, included time); (2) the time did not benefit this litigation because it concerned e.g., the *Sonner I* or *Sonner II* appeals (and is thus, excluded time); or (3) the time entry related to both. To be conservative, we excluded all entries where the description included both included and excluded work. For example, if a timekeeper entered one hour on a given day and the entry stated it related to working with both Dr. McAlindon and with Dr. Maronick (a marketing expert only disclosed for *Mullins* trial purposes), that entire hour was excluded from the lodestar calculation for this litigation, even though some of the time billed benefited this case. Other examples of fully excluded lodestar is from the time spent on briefing class certification in the state court *Bland* action (which occurred after *Montera* was certified), work on jury instructions from *Mullins* that concerned UCL and CLRA claims not at issue in *Montera* (although similar consumer fraud, false advertising themes existed), the motion to compel Vincent Mullins to travel to San Francisco for his deposition, the motion to substitute in Ms. Sonner for Mr. Mullins, the motion for leave to amend to file the Second Amended Complaint in *Sonner* to drop the request for damages under the CLRA and the subsequent motion to dismiss filed by Defendant, all time working with expert Robert Wallace regarding California class damages in *Mullins*, all time working with Dr. Thomas Maronick in connection with his marketing opinions and deposition provided in *Mullins*, and 2017 *Mullins*-only trial work regarding Drs. Graboff, Silbert and Lippiello. This detailed, entry-by-entry analysis confirmed the prior stated belief that our previous estimate of 9,083.25 hours by my firm on work benefitting this litigation was reasonably conservative. As further detailed in the lodestar documentation that is attached as **Exhibit 2** to this declaration, as of March 8, 2023, the lodestar by professional staff at my firm on work benefitting this litigation is as follows:

| Attorney/Paralegal | Hours | Rate | Lodestar | Bar Admission |
|---|---|---|---|---|
| Timothy G. Blood (Partner) | 1,136.75 | $960 | $1,091,280.00 | 1990 |
| Leslie E. Hurst (Partner) | 223.75 | $810 | $181,237.50 | 1995 |
| Thomas J. O'Reardon II (Partner) | 3,335.50 | $710 | $2,368,205.00 | 2006 |
| Paula R. Brown (Partner) | 765.75 | $660 | $505,395.00 | 2007 |
| Jennifer MacPherson (Of Counsel) | 100.75 | $585 | $58,938.75 | 1999 |
| Craig W. Straub (Associate) | 2,917.25 | $575 | $1,677,418.75 | 2007 |
| Aleksandr J. Yarmolinets (Associate) | 9.00 | $565 | $5,085.00 | 2011 |
| Camille Bass (Associate) | 11.50 | $410 | $4,715.00 | 2014 |
| Geoffrey Drew La Val (Staff Attorney) | 443.00 | $335 | $148,405.00 | 2011 |
| Colette N. Menaldino (Staff Attorney) | 25.50 | $320 | $8,160.00 | 2015 |
| Michelle M. Chaseton | 391.75 | $280 | $109,690.00 | |
| Bethany C. Maxwell (Paralegal) | 21.00 | $280 | $5,880.00 | |
| Dafne Maytorena (Paralegal) | 166.00 | $280 | $46,480.00 | |
| **TOTALS** | **9,547.50** | | **$6,210,890.00** | |

75. The hours and lodestar incurred by my firm will increase because, as Class Counsel, my firm is responsible for defending the verdict and judgment on the appeal Premier has filed, and thereafter, my firm will be responsible for working with a claims administrator to develop and propose a plan of judgment allocation, oversee the claims administration process, and communicate with Class Members. This appeal and post-appeal administration process will require hundreds, if not thousands of hours of additional work.

BLOOD HURST & O'REARDON, LLP

00197658

76.    My firm's lodestar figures are based on the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately, and such charges are not duplicated in my firm's billing rates.

## V.    THE REQUESTED EXPENSES

77.    As detailed below, my firm's out-of-pocket nontaxed litigation expenses for which we seek reimbursement with this motion are $1,040,420.50. The expenses incurred in this action are reflected in the books and records of my firm. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred. In light of expenses relating to matters that did not directly benefit the overall *Montera* litigation, I have reviewed these documents and invoices and reduced my firm's overall expenses on Joint Juice litigation to seek reimbursement of just the $1,040,420.50 detailed below.

78.    The out-of-pocket litigation expenses incurred by BHO are reasonable in amount and were necessary for the effective and efficient prosecution of the litigation. In addition, I believe the expenses are of a type that normally would be charged to a fee-paying client in the private legal marketplace and have been charged by my firm to fee-paying clients. They are also the categories of expenses that have been awarded to my firm and other plaintiff's counsel in other class action lawsuits, including in the following cases: *Yamagata v. Reckitt Benckiser LLC,* No. 3:17-cv-03529-VC (N.D. Cal. 2021); *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171 FMO (FFMx) (C.D. Cal. 2017); *Murr v. Capital One Bank (USA), N.A.*, No. 1:13-cv-01091-LMB-TCB (E.D. Va. 2015); *In re: Hydroxycut Mktg. and Sales Prac. Litig.*, MDL No. 2086 (S.D. Cal. 2014); *Serochi v. Bosa*, No. 2009-00096686 (S.D. Super. Ct. 2014); *Hartless v. Clorox Co.*, No. 06-cv-02705 (S.D. Cal. 2011); *Johnson v. Gen. Mills, Inc.*, No. 10-cv-00061 (C.D. Cal. 2013); *Grabowski v. Skechers U.S.A., Inc.*, No. 12-cv-00204 (W.D. Ky. 2013); *Schwartz v. Reebok Int'l Ltd*., No. 10-cv-12018 (D. Mass. 2012); *Nelson v. Mead Johnson & Co., LLC*, No. 09-cv-61625 (S.D. Fla. 2012); and *Gemelas v. The Dannon Co., Inc.*, No. 08-cv-00236 (N.D. Ohio 2011).

79.    My firm's nontaxed, out-of-pocket litigation expenses for which we seek reimbursement through this Renewed Motion are $1,040,420.50. This amount is separate from and

00197658

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

does not include any of the costs (totaling $54,455.74) that were taxed by the Clerk on October 4, 2022. *See* Dkt. No. 314. The nontaxed amount being sought with this application is described below.

| Expense Category | Total | Nontaxed Portion Sought Here | Taxed Portion (Dkt. 314) |
|---|---|---|---|
| Photocopying / Printing | $20,220.80 | $20,220.80 | $0 |
| Filing Fees | $400 | $0 | $400 |
| Service of Process | $5,102.30 | $5,102.30 | $0 |
| Experts / Consultants | $613,343.90 | $609,582.93 | $3,760.97[1] |
| Depositions / Transcripts / Videographers | $115,082.67 | $98,905.85 | $16,177.07[2] |
| Court Reporters' Transcripts | $34,117.70 | $0 | $34,117.70 |
| Mediation Fees | $24,300.00 | $24,300.00 | $0 |
| Electronic Document Management | $110,682.95 | $110,682.95 | $0 |
| Postage / FedEx | $4,399.07 | $4,399.07 | $0 |
| Online Research (LexisNexis, PACER, TransUnion, White Pages Premium) | $11,360.97 | $11,360.97 | $0 |
| Conference Calls | $192.97 | $192.97 | $0 |
| Transportation, Hotels & Meals | $115,098.65 | $115,098.65 | $0 |
| Miscellaneous | $1,882.22 | $1,882.22 | $0[3] |
| Class Notice and Outreach | $38,691.79 | $38,691.79 | $0 |
| **TOTAL** | **$1,094,876.24** | **$1,040,420.50** | **$54,455.74** |

80.   Additional backup detail regarding these expenses is attached to this declaration within the following exhibits:

---

[1]   $3,760.97 was paid to VideoTrack, one of Plaintiff's consultants, for three sets of all pre-marked exhibits in three-ring binders as required by the Court. The Clerk taxed this amount pursuant to Local Rule 54-3(d)(4) and so that portion of costs is not sought here. *See Montera*, Dkt. No. 314.

[2]   As discussed, there appears to be a small mathematical mistake in the Clerk's Taxation Order (Dkt. No. 314). Assuming the total amount awarded of $54,455.74 is accurate, that means $77,641.05 was the total amount disallowed and not the $82,611.20 that is stated in the Taxation Order. This disallowed amount all relates to deposition expenses. (*Id.*). Thus, assuming $16,177.07 of deposition costs *were* taxed by the Clerk's Taxation Order, Plaintiff now seeks reimbursement of $98,905.85, which is the balance of the relevant deposition costs incurred.

[3]   The Clerk's Taxation Order did not tax the requested $342.60 for visual aids used during trial was taxed pursuant to Civil LR 54(d)(5). (Dkt. No. 314). Instead, the Clerk's Taxation Order appears to have mistakenly skipped that line item, which Premier did not oppose taxing. (*Id.*; Dkt. No. 307). Accordingly, that cost is included within the "miscellaneous" category of costs sought here.

30                                    Case No. 3:16-cv-06980-RS

BLOOD HURST & O' REARDON, LLP

00197658

BLOOD HURST & O' REARDON, LLP

- Exhibit 3: Photocopying Detail

- Exhibit 4: Postage / FedEx / Messenger Detail

- Exhibit 5: Service of Process Detail

- Exhibit 6: Depositions / Transcripts / Videographers Detail

- Exhibit 7: Experts / Consultants Detail

- Exhibit 8: Electronic Document Management Detail

- Exhibit 9: Online Research Detail

- Exhibit 10: Conference Calls Detail

- Exhibit 11: Transportation, Hotels and Meals – Detailed Itemization

- Exhibit 12: Transportation, Hotels and Meals – Invoices and Credit Card Statements

- Exhibit 13: Miscellaneous Costs Detail

- Exhibit 14: Class Notice and Outreach Detail

- Exhibit 15: Mediation Fees Detail

81.     The following is additional information regarding these expenses:

(a)     Photocopying/Printing: The requested copy costs total $20,220.80 (101,104 pages through December 31, 2022) were incurred in connection with providing the Court with hard copies of filings and additional in-house copies for hearing preparation, printing case law when necessary, analyzing certain documents produced in discovery, in connection with expert reports and declarations, including printing the scientific studies cited by experts and providing our experts with report binders, and printing copies of documents for use in the many depositions throughout this case and for trial preparation. For example, 284 exhibits were introduced during the 11 depositions taken of Defendant's employees, class certification involved 175 exhibits, and trial involved 750 exhibits, 109 of which were admitted. These figures do not include the many studies and other exhibits necessarily printed and used in the course of preparing for, taking and defending expert depositions. To help minimize copy expenses, we agreed with counsel for Defendant to serve

31                                    Case No. 3:16-cv-06980-RS

00197658

documents by electronic mail only and used electronic copies of exhibits at some depositions. Each time our copy machine is used, our billing system requires that a case code be entered. For each page copied or printed, my firm charges 35 cents, but here we only seek reimbursement of 20 cents per copy. This is the rate charged to all clients, including non-contingency clients. The rate is determined by calculating the approximate cost to my firm per page, without any mark-up. The calculation includes the monthly copy / scanner machine rental, the price-per-page charged by our vendor and paper and toner costs, which are not included in the price-per-page cost. The average is approximate because it varies each month depending upon the number of photocopies made for a particular month, but 20 cents is significantly less than the approximate average over time. The per-page amount is higher than an outside copy service because we print relatively few copies as part of an effort to use less paper. While the per-page amount may be higher, the overall cost is lower than if we printed more copies at a rate that would lower the per-page cost. Each time a copy is made either directly at a copy machine or from a firm computer, our Sharp copy system requires than an account code be entered. The Sharp copy system records the page counts and associated account codes. **Exhibit 3** reflects the expense record documentation of our in-house copies made using the Joint Juice case account code. As stated above, we only seek reimbursement of 20 cents per copy. At that reduced rate, the total in-house copy cost through December 31, 2022, is $20,220.80.

(b)      Filing Fees: $400 was paid to file the complaint in this action. This amount was taxed in full by the Clerk and so it is not sought with this motion. *Montera*, Dkt. No. 314. All other court filing and docket fees paid in connection with litigating the other related Joint Juice actions, including complaint, motion, and appellate filing fees, are not presently sought with this fee application.

(c)      Postage / FedEx / Messenger: $4,399.07 total. These costs relate to USPS postage ($239.48 through August 30, 2022) and delivery services ($4,159.59 through July 1, 2022), including providing courtesy copies of filings as required by the courts in this action and sending documents for Plaintiff's witnesses to review before depositions. Plaintiff does not presently seek reimbursement of $747.55 spent to mail documents to Drs. Silbert and Graboff in connection with their Rule 26 testimony in *Mullins*, or for the required courtesy copies sent to the courts in

BLOOD HURST & O' REARDON, LLP

connection with the motion for leave to amend to file a second amended complaint and the subsequent motion to dismiss in *Mullins*, the Ninth Circuit appeals in *Mullins*, or filings in the state court related actions. Additional documentation for these expenses is attached to this declaration as **Exhibit 4**.

(d)    Service of Process: These costs ($5,102.30) relate to service of process of subpoenas for documents and/or testimony on the major retailers of Joint Juice (Walmart / Sam's Club, Walgreens, Costco, Target, BJ's Wholesale Club, Albertsons, Kroger, SuperValue, Safeway, Rite Aid, and CVS), and companies that supplied Defendant with marketing services for Joint Juice (Eleven Inc. and R2C Group). Service costs were minimized because certain of these retailers agreed to accept email service of subsequent subpoenas in this action. These subpoenas were served to obtain sales and marketing information that directly benefitted *Montera*. Costs to serve subpoenas in 2022 to obtain California-specific sales data for the *Bland* state court matter are not included. The amount sought here also includes costs of serving subpoenas on James Speed (who sent documents to CalRecycle on behalf of Premier) and on certain of Premier's experts and former employees: Hal Poret, Kevin Stone, David Ritterbush, Stewart Irving, William Choi, and Booker Lucas. Additional documentation for these expenses is attached to this declaration as **Exhibit 5**.

(e)    Depositions / Transcripts / Videographers: Plaintiff requests reimbursement of $98,905.85 in deposition costs. These costs include court reporter and/or videographer fees in connection with forty-six of the fifty depositions in this litigation. Plaintiff's counsel saved significantly on deposition and travel costs by taking twenty-two (22) of these depositions remotely. Plaintiff does not presently seek reimbursement for costs in connection with Dr. Silbert's 2017 deposition ($1,874.06), Dr. Lippiello's 2017 deposition ($3,448.25), Dr. Graboff's 2017 deposition ($1,040.70), or Dr. Maronick's 2017 deposition ($2,373.94). *Pursuant to L.R. 54-3(c), Plaintiff sought taxation of $93,475.27 of the $115,082.67 reasonably spent on depositions. The remaining portion of these deposition costs ($21,607.40), which include standard incidental costs and deposition features in complex litigation such as Realtime feeds, are reasonable expenses that are typically paid by the fee-bearing client and properly recovered by the prevailing party. On October 4, 2022, the Clerk taxed $16,177.07 of the $93,475.27 in requested deposition costs. *Montera*, Dkt.

33    Case No. 3:16-cv-06980-RS

No. 314. On March 9, 2022, in the lead up to trial here, we also paid $1,507.00 to obtain a copy of the e-transcript from the deposition of one of Premier's primary experts, Dr. Grande, taken in 2019 in a separate glucosamine supplement lawsuit titled *Seegert v. Rexall* (S.D. Cal.). Although BHO and Lynch Carpenter were counsel in the *Seegert* matter, we had not obtained a copy of the e-transcript and our trial support consultant in this case needed the e-transcript version. The *Seegert* action is now dismissed. Previously, we have not sought or obtained reimbursement for the cost of that e-transcript. It was reasonably necessary to obtain the e-transcript of Dr. Grande's deposition for purposes of the *Montera* trial because Dr. Grande was one of Premier's main science experts, we planned to use Dr. Grande's testimony from *Seegert* while questioning him on the stand at trial, and I was informed that our trial support vendor required the e-transcript version for display purposes. Ultimately, Premier's counsel informed us the night before he was scheduled to testify that Dr. Grande would not be testifying. As demonstrated in the accompanying deposition invoices attached as **Exhibit 6**, and taking into account the mathematical error discussed in Paragraph 40 above, the amount disallowed by the Clerk ($77,641.05) is comprised of standard deposition costs charged by the reporting services which are routinely charged by the fee-bearing client and recovered by the prevailing party. Accordingly, Plaintiff requests that such deposition costs of $98,905.85 (equal to the $77,641.05 disallowed as taxable by the Clerk plus the $21,607.40 that Plaintiff did not seek to tax) be awarded by this Court pursuant to this motion.

(f)  Court Reporters' Transcripts: $34,117.70 was spent to obtain transcripts from the January 27, 2016 hearing on class certification, summary judgment and motions to exclude expert testimony ($127.80), the November 21, 2019 hearing on class certification ($30.45), the May 6, 2022 final pretrial conference and hearing on motions *in limine* ($196.20), and the daily trial transcripts ($33,921.50). This amount was taxed in full by the Clerk. *Montera*, Dkt. No. 314. Plaintiff does not presently seek reimbursement of $7,827.21 spent on court reporters' transcripts from any other hearings, including the motion for leave to file a second amended complaint in *Mullins*, and the state court related action hearings and status conferences.

(g)  Experts / Consultants: This cost includes fees charged by experts and consultants utilized in this litigation. In addition to the costs detailed below spent on experts and

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

consultants retained by Plaintiff, pursuant to the parties' agreement, Plaintiff's Counsel paid $4,025.00 to Defendant's expert, Hal Poret, for his time when being deposed. I believe these expert and consultant costs were reasonably incurred in furtherance of this litigation, and that the assistance and testimony from each of the experts discussed below helped lead to the successful prosecution of Plaintiff's claims. Additionally, the hourly rates charged by Plaintiff's experts and consultants are in line with standard testimony rates charged by science, marketing and damages experts in class action litigation and are generally lower than the hourly rates Premier paid its outside experts, including Dr. Silverman ($850/hour), Dr. Grande ($400/hour), Mr. Poret ($800/hour), Dr. Steckel ($1,225/hour), and Dr. Choi ($900/hour). *Compare with* hourly rates charged by Dr. McAlindon ($500/hour), Dr. Guilak ($500/hour), Dr. Dennis ($450/hour), Dr. Rucker ($900/hour), and Mr. Weir ($725/hour). Additional documentation for these expenses is attached to this declaration as **Exhibit 7**.

(i)     Timothy McAlindon, MD, MPH: Plaintiff seeks reimbursement of $112,256.94 paid to Dr. McAlindon for his expert testimony and consulting throughout this litigation. Plaintiffs retained Dr. McAlindon to provide analysis of scientific issues, including Joint Juice and its various ingredients to support joint health and treat arthritis and its symptoms, and to provide trial testimony in this litigation. Dr. McAlindon is a physician rheumatologist at Tufts Medical Center, where he holds the positions of Chief of the Division of Rheumatology and Natalie V. Zucker and Milton O. Zucker Chair in Rheumatology. We were charged $500/hour for Dr. McAlindon's expert services. Dr. McAlindon's medical, clinical and academic experience is in the fields of arthritis and rheumatic disease, including studying potential interventions for arthritis and its symptoms. Dr. McAlindon also worked directly on a number of the scientific studies and medical professional guidelines at issue in this litigation. Dr. McAlindon provided a Rule 26 opening report spanning 115 pages that systematically analyzed nearly 200 scientific studies, and a 42-page Rule 26 rebuttal report responding to the reports proffered by Premier's scientific experts Dr. Silverman and Dr. Grande. Dr. McAlindon's work product and expert declarations were used in connection with fact witness and expert depositions, in support of Plaintiff's motions for class certification, in support of Plaintiff's motions to exclude testimony from Dr. Silverman and Dr. Grande, in

00197658

opposition to Defendant's motions for summary judgment and decertification, and during trial including portions of the PowerPoint presentations shown to the jury during opening and closing. Dr. McAlindon traveled to San Francisco on May 21, 2022, assisted with trial preparation and strategy, and testified for two days at trial on May 24-25, 2022. Of the $112,256.94 total charged by Dr. McAlindon, $60,006.94 related to his work performed in *Montera* between January 18, 2022, and May 25, 2022.

(ii)    Farshid Guilak, Ph.D.: Plaintiff seeks reimbursement of $20,400.00 paid to Dr. Guilak for his expert testimony and consulting throughout this litigation. Plaintiff retained Dr. Guilak to provide analysis of scientific issues specifically including to opine on the physiology of the joint, to discuss in vitro studies he conducted on glucosamine and chondroitin supplements, to rebut the opinions of Defendant's scientific experts, Drs. Grande and Silverman, and to provide trial testimony in this litigation. Dr. Guilak is a Professor in the Department of Orthopaedic Surgery at Washington University and Director of Research for the Shriners Hospitals for Children – St. Louis Shriners. I am also the co-director of the Washington University Center of Regenerative Medicine and have appointments in the Departments of Developmental Biology and Biomedical Engineering. We were charged $500/hour for Dr. Guilak's expert services. Dr. Guilak's scientific and academic experience is in the fields of osteoarthritis, tissue engineering, and biomechanics, including studying the etiology and pathogenesis of osteoarthritis, as a basis for the development of new therapies. Dr. Guilak provided Rule 26 opening and rebuttal expert reports, his work product was used in connection with fact witness and expert depositions, trial testimony, and in connection with motions to strike expert testimony. Dr. Guilak also assisted with trial strategy and examination of Defendant's witnesses at trial.

(iii)    Derek D. Rucker, Ph.D.: Plaintiff seeks reimbursement of $98,700.75 paid to Dr. Rucker for his expert testimony and consulting throughout this litigation. Plaintiff retained Dr. Rucker to provide analysis of marketing and advertising issues and trial testimony in this litigation. Dr. Rucker is the Sandy & Morton Goldman Professor of Entrepreneurial Studies in Marketing, Northwestern University and a Professor of Marketing at the Kellogg School of Management, Northwestern University. We were charged $900/hour for Dr. Rucker's expert

BLOOD HURST & O' REARDON, LLP

services. Dr. Rucker is a highly published researcher, has been a reviewer for more than 25 journals, served as an Associate Editor for the *Journal of Consumer Research* and the *Journal of Consumer Psychology*, and is currently the co-editor for *Consumer Psychology Review*. Dr. Rucker received his Ph.D. in psychology from The Ohio State University and his academic research interests include the study of advertising, persuasion, and consumer behavior. Dr. Rucker provided Rule 26 opening and rebuttal expert reports in this matter and also assisted with trial preparation and deposition strategy. Dr. Rucker traveled to San Francisco and testified at trial on May 27, 2022.

(iv)    <u>Colin B. Weir</u>: Plaintiff seeks reimbursement of $73,691.80 paid to Mr. Weir for his expert testimony and consulting throughout this litigation. Mr. Weir holds a Master of Business Administration, with honors, from the High Technology program at Northeastern University. He has qualified as an economic damage expert witness on many occasions in various state and federal courts. He has consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, furniture, and computers. We were charged $725/hour for Mr. Weir's services in this action. Mr. Weir provided expert analysis and expert reports relating to economic damages, and assisted with rebutting and deposing Defendant's damages expert, including analyzing the hedonic regression opinions by Dr. Choi, Defendant's economic valuation expert. Mr. Weir assisted with deposition and trial strategy and testified at trial on May 31, 2022.

(v)    <u>J. Michael Dennis, Ph.D.</u>: Plaintiff seeks reimbursement of $87,516.50 paid to Dr. Dennis for his expert testimony and consulting throughout this litigation. We engaged Dr. Dennis to conduct a consumer survey concerning the advertising message conveyed by Joint Juice. We were charged $450/hour for his services. Dr. Dennis has designed and conducted hundreds of statistical surveys using the internet mode of data collection for over 19 years. Since joining in 2014, Dr. Dennis has been a Senior Vice President leading the online panel survey research business for National Opinion Research Center ("NORC") – affiliated with the University of Chicago. Dr. Dennis' survey and expert analysis, including his Rule 26 opening and rebuttal expert reports were critical to one of the major issues in the case and to rebutting Defendant's

BLOOD HURST & O' REARDON, LLP

multiple marketing and survey experts. Dr. Dennis assisted with deposition and trial preparation and strategy and testified at trial on May 27, 2022.

(vi)    Steven R Graboff, M.D.: Plaintiff seeks reimbursement of $30,062.50 paid to Dr. Graboff for his expert testimony and consulting in connection with class certification and summary judgment. We were charged $475/hour for his services. The testimony from Dr. Graboff was cited by the Court in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 885, 893 (N.D. Cal. 2016) (Discussing, for example, that "Dr. Steven Graboff, plaintiff's expert, a practicing orthopedic surgeon, confirms that 'glucosamine and chondroitin sulfate are not part of the general hierarchy of treatment for arthritis.'"). Plaintiff does not presently seek reimbursement of the additional $10,550.00 charged by Dr. Graboff in connection with his later Rule 26 reports and related deposition, and preparation for trial in *Mullins*.

(vii)    Jeremiah E. Silbert, M.D.: Plaintiff seeks reimbursement of $37,655.00 paid to Dr. Silbert for his expert testimony and consulting in connection with class certification and summary judgment. We were charged $450/hour for his services. The expert testimony from Dr. Silbert regarding the bioavailability and efficacy or glucosamine and chondroitin and his analysis of Dr. Grande's opinions was cited extensively by the Court in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 886-87, 893, 895-98 (N.D. Cal. 2016) ("Silbert offers evidence that Premier's general health claims are false because ingested glucosamine and chondroitin are not bioavailable in joint tissue in sufficient quantity to confer any benefit."). Plaintiff does not presently seek reimbursement of the additional $21,037.50 charged by Dr. Silbert in connection with his later Rule 26 reports and related deposition, and preparation for trial in *Mullins*.

(viii)    Lynn R. Willis, Ph.D.: Plaintiff seeks reimbursement of $26,500.00 paid to Dr. Willis for his expert testimony and consulting in connection with class certification and summary judgment. We were charged $500/hour for his services. The expert testimony from Dr. Willis regarding the clinical research, meta-analyses, treatment protocols, in vitro and animal study research relating to the ingredients in Joint Juice was cited extensively by the Court in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 883-86, 895 (N.D. Cal.

38                                  Case No. 3:16-cv-06980-RS

00197658

2016) (noting Dr. Willis "offered principles critiques" of the scientific literature and that "[a] review of the meta-analyses reveals that the effects of glucosamine and chondroitin are similar to placebo, and therefore clinically insignificant").

(ix)    Mark Keegan: Plaintiff seeks reimbursement of $68,159.09 paid to Keegan & Donato Consulting, LLC for their expert testimony and consulting in connection with class certification and summary judgment. We were charged $275 to $350/hour for these services. The expert testimony from Mr. Keegan regarding consumer research and marketing was cited extensively by the Court in the order denying Defendant's motion for summary judgment: 178 F. Supp. 3d 867, 879-82 (N.D. Cal. 2016) (discussing and quoting Mr. Keegan's analysis of the consumer research, opinion about Joint Juice's implied advertising message, and critique of the survey Mr. Poret commissioned for Defendant). In its order granting class certification, the Court cited Mr. Keegan "interpret[ation] [of] the results of Premier's marketing research and consumer survey," and rejected Defendant's argument that "substantiating consumer reliance is not amenable to common proof because Joint Juice users cite the advice of doctors or friends as the reason they tried Joint Juice in the first place." 2016 U.S. Dist. LEXIS 51140, at *9 (N.D. Cal. Apr. 15, 2016). Mr. Keegan also assisted with preparation for deposing Defendant's expert, Hal Poret.

(x)    VideoTrack Litigation & Trial Support: Plaintiff paid $49,140.07 to VideoTrack for trial presentation services and consulting in this action. This amount included $3,760.97 to VideoTrack for three sets of all pre-marked exhibits in three-ring binders as required by the Court. The Clerk taxed this amount pursuant to Local Rule 54-3(d)(4). *See Montera*, Dkt. No. 314. Here, Plaintiff requests reimbursement of $45,379.10, which is the remaining amount paid to VideoTrack for its services in this action. This amount includes VideoTrack's hourly consulting services (369.5 hours at average rate of $112/hour) and reimbursing VideoTrack for trial exhibit binder preparation and printing (1 set for $1,253.65), trial presentation equipment rental ($1,977.75), and travel expenses/transportation ($701.45). *See also Montera*, Dkt. No. 295 at 103-04 (VideoTrack invoice for $49,140.07). Shayne Davison from VideoTrack assisted in trial preparation, converted deposition video files and prepared deposition transcripts for synchronization purposes, organized video deposition materials into a trial database, and before and during trial,

BLOOD HURST & O' REARDON, LLP

00197658

created video clips for possible use during trial for testimony in lieu of live appearances, pursuant to designations, and for purposes of cross examination. Debbie Burk from VideoTrack assisted in trial preparation, traveled to San Francisco and attended the entire trial and provided trial presentation services throughout the trial, including assisting in the preparation of exhibits, PowerPoints, demonstratives, and video clips.

(xi)    Chopra Koonan Litigation Consulting: Plaintiff seeks reimbursement of $5,236.25 paid to Chopra Koonan Litigation Consulting for witness preparation and jury consulting services by Karen Jo Koonan. We were charged $425/hour for these services. Ms. Koonan has served as a trial consultant at the National Jury Project and worked on more than 1,600 cases over the last 35 years. Ms. Koonan assisted with jury selection, assisted with pretrial preparation of witnesses, and case theme development.

(h)    Electronic Document Management: As of July 21, 2022, $110,682.95 was paid to e-discovery specialists, Epiq (f/k/a DTI Global) and Ankura Consulting, for monthly hosting, storage and management of documents produced in this litigation. Defendant and various third parties produced over 500,000 pages of discovery, including emails. Thus, it was necessary for my firm and co-counsel to be able to search, review, code, and organize these documents on secure, Internet-based electronic databases. The Relativity and Casepoint document platforms hosted by Epiq and Ankura are standard ESI tools used in complex litigation involving large data productions. These costs include document hosting for 91 months (through June 30, 2022) at monthly per-Gigabyte rates ranging from $10 to $25/GB. These online platforms also allowed us to efficiently coordinate document review and coding and to access the documents in connection with motions, depositions, experts, and trial. Additional documentation for these expenses is attached to this declaration as **Exhibit 8**.

(i)    Online Research: $11,360.97 total is sought here. $4,734.52 was paid to LexisNexis for legal research conducted through September 30, 2022. LexisNexis was used to obtain access to legal research, factual databases, and for cite-checking of briefs. The expense amount detailed herein represents the out-of-pocket costs incurred by my firm in connection with use of these services in connection with this litigation. My firm has a flat-rate contract with

BLOOD HURST & O' REARDON, LLP

00197658

BLOOD HURST & O' REARDON, LLP

LexisNexis for use of its services. When my firm utilizes LexisNexis services, a billing code is entered for the specific case being researched. At the end of each billing period in which a service is used, BHO's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period. As a result of the flat fee we negotiated with LexisNexis, we do not charge the "market rate" for *a la carte* use of online legal research services, which some law firms charge their clients. We also do not otherwise mark-up LexisNexis bills, as some firms do. LexisNexis costs that were incurred when utilizing Joint Juice Bland and Joint Juice Appeal billing codes are not included in this amount sought. As an additional reduction, for purposes of this renewed motion we have now excluded the entire monthly costs of Joint Juice LexisNexis research for the 28 months when at least some legal research was done on the adequate remedy issue in *Mullins*, and for the *Sonner I* and *Sonner II* appeals.[4] This conservative approach results in over-exclusion because it removes for example, all of the May 2022 LexisNexis costs ($175.42) when we conducted legal research for the *Montera* trial in addition to a small amount (relatively speaking) of research in preparation of the *Sonner II* Ninth Circuit oral argument on May 23, 2022. The online research costs sought here also include $4,141.80 paid to the Administrative Office of the United States Courts for PACER research of federal court filings, and $2,275.00 paid to TransUnion and $209.65 for White Pages Premium for public records background research for purposes of this litigation including on deponents, witnesses and Class Members through July 31, 2022. When my firm uses PACER we are required to enter a client code associated with each search. The client code for Joint Juice, which appears on the PACER invoices, is 11813-01. Documents accessed from PACER included briefs, expert reports and declarations, orders and exhibits that were reviewed and used in connection with motion practice, expert discovery and trial, including researching sample jury instructions, motions *in limine*, and verdict forms as well as reports and declarations submitted by the parties' experts in other lawsuits that we used to confirm consistency

---

[4]     The 28 months for which LexisNexis research costs are excluded here are: November 2017, December 2017, January 2018, February 2018, March 2018, April 2018, May 2018, June 2018, July 2018, August 2018, September 2018, October 2018, November 2018, December 2018, January 2019, February 2019, March 2019, July 2019, November 2019, December 2019, May 2020, June 2020, July 2020, August 2021, September 2021, October 2021, November 2021, and May 2022.

00197658    O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

of opinions and methodology and which provided valuable insight into potential areas of inquiry for cross examination and impeachment. Additional documentation for these online research expenses is attached to this declaration as **Exhibit 9**.

(j)    Conference Calls: Conference call charges ($192.97 through May 21, 2022) were incurred to make or host conference calls in this litigation. The conference call charges are allocated to each case by punching in a case code after accessing the conference call number. The case code is mandatory to host a conference call. At the end of each billing period, the conference call charges for each case are entered into our billing system. Additional documentation for these expenses is attached to this declaration as **Exhibit 10**. The account code for Joint Juice, which appears on the conference call invoices, is 11813. The calls for which reimbursement is sought here related to work benefitting *Montera*. Plaintiff does not presently seek reimbursement for costs of conference calls relating to the *Sonner* appeals, class notice in *Mullins*, Premier's bill of costs in *Mullins*, calls with Dr. Maronick regarding his expert work, calls with defense counsel about California sales data, or the state court actions.

(k)    Transportation, Hotels and Meals: These travel costs were in connection with hearings, formal and informal mediations and settlement meetings, depositions, and the trial in this litigation. Attorneys at BHO took the lead role in each hearing before this Court, had first-chair responsibility for deposing or defending 45 witnesses, and assisted in each deposition. My partners, Thomas O'Reardon and Paula Brown, traveled to take or defend 23 of these depositions in-person. Mr. O'Reardon and I also traveled to take the lead role in status conferences and oral argument with this Court and to participate in two mediations. Mr. O'Reardon, Mr. Straub, and I also traveled to participate in the jury trial. When practicable and reasonable, my firm minimized travel costs by taking depositions of out-of-town deponents via videoconference. The mediation session during the pandemic was also conducted via videoconference. Airfare was booked in coach class, and to save on hotel expenses, we often flew up and back to San Francisco the same day that matters took place in San Francisco. For the second, formal mediation, which took place in Los Angeles, we drove up the morning of the mediation and returned later that day. During trial we stayed in standard-size rooms at the Intercontinental San Francisco. The trial team did not need to rent office space during

00197658

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

the almost three weeks spent in San Francisco. This too saved a substantial amount of money. Travel costs associated with depositions or hearings specific to *Mullins*, *Sonner*, *Bland* and *White* are not included in this request. These excluded travel costs include those related to the August 2014 motion to compel Vincent Mullins to attend deposition in California, the July 2017 expert depositions of Drs. Thomas Maronick and Louis Lippiello in Baltimore[5], the July 2017 deposition of Dr. Silbert in Boston relating to his expert merits report (and the costs incurred by my firm to travel in June 2017 to Boston to defend Dr. Silbert's deposition that was cancelled last minute by defense counsel), the motion to dismiss hearing in *Sonner* on December 21, 2017, a case management conference in *Sonner* on March 1, 2018, the Ninth Circuit oral argument in *Sonner* on December 3, 2019, and case management conferences in *Bland* on December 11, 2019 and March 10, 2020. The majority of the travel-related expenses ($60,335.58 of $115,098.65) were incurred in May and June 2022, specifically for the pretrial conference and trial in *Montera*. For instance, $46,846.93 was for hotel accommodations during trial between May 21, 2022 and June 8, 2022. This amount was paid for onsite food and beverage and standard hotel rooms for Timothy Blood, Thomas O'Reardon, Craig Straub, Mary Beth Montera, and for Debbie Burk who provided litigation and trial support. Class Counsel spent an additional $13,488.65 on airfare, meals and local transportation during trial for themselves, witnesses and co-counsel. Additional documentation for these travel-related expenses is attached to this declaration as **Exhibits 11 and 12**. Below is additional information regarding certain travel-related expenses attested to in this declaration and documented in Exhibits 11 and 12:

(i)      12/17/15, Southwest Airlines. Credit card statement shows $415.96. As indicated on the receipt emailed on December 17, 2015, this flight was originally booked for travel to Chicago for another matter. That trip was cancelled and so these funds were used to book my flight to San Francisco for the hearing on class certification and summary judgment in this litigation. That hearing was originally scheduled for January 20, 2016 and was continued to January

[5]      Plaintiff's expert Dr. Maronick and Defendant's expert Dr. Lippiello were only disclosed and deposed in the context of merits reports they provided for the trial set for 2017 in *Sonner*. These two experts were not used in connection with motions for class certification or summary judgment, and were not disclosed for trial purposes in *Montera*. These two experts were unique in these respects and so Plaintiff's Counsel does not presently seek any reimbursement relating to them.

43                              Case No. 3:16-cv-06980-RS

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

00197658

27, 2016. Thus, while the credit card statement shows $415.96, only the cost of the airfare ($397.91) for this litigation is being sought here.

(ii)    7/13/17, Southwest Airlines. T. O'Reardon took the deposition of Dr. Stuart Silverman on 7/12/17 in Los Angeles. Following the full day deposition, stayed at the Westin LA Airport and flew to Boston the morning of 7/13/17 from Los Angeles to Boston to meet with Dr. McAlindon in preparation for his deposition on 7/14/17.

(iii)    11/11/19, Southwest Airlines. T. Blood credit card statement and emailed receipt show $319.96 for a flight to San Francisco for the 11/20/19 class certification hearing with half of that cost ($159.98) being allocated to Joint Juice. Only half was allocated to Joint Juice because at the time, a hearing in another matter was scheduled for the same day in San Francisco. The hearing in the other matter was later continued. Nevertheless, only half the cost remained allocated to Joint Juice, and so is being sought here.

(iv)    1/7/20, Southwest Airlines. Credit card statement shows $243.96. This flight was originally booked and cancelled and then rebooked for the deposition of Premier witness Donna Imes that was continued from 1/28/20 to 2/13/20. Only the cost of the airfare necessary for rebooking my flight ($171 of $243.96) is being sought here.

(v)    5/5/22 flight to SFO, returning to San Diego on 5/6/22. $343.96. This was Mr. Blood's airfare to the 5/6/22 final pretrial conference. It was booked on 4/12/22 and paid for with travel funds from a previous cancelled flight in another matter. Therefore, while this charge does not appear on a credit card statement, this was an amount spent on this litigation.

(l)    <u>Miscellaneous</u>: $1,882.22. This includes $545.20 incurred to obtain sixteen Joint Juice-related scientific publications from peer-reviewed journals and their publishers (e.g., Elsevier, Inc.). These publications were used throughout the litigation, including in connection with expert discovery. Purchase documentation for these articles is attached to this declaration within **Exhibit 13**.[6] $18.19 was spent on a copy of Dr. Kevin Stone's book, "Play Forever," which was

---

[6]    Exhibit 13 contains emailed receipts for 15 of the articles. In addition, on November 17, 2014, I purchased Yang et al., *Effects of glucosamine and chondroitin on treating knee OA* (2014) from ReadCube for $35.00. My credit card statement from that time period is also included within

BLOOD HURST & O' REARDON, LLP

00197658

used during his cross-examination at trial. $52.80 was spent on a copy of Dr. Shari Diamond's book, "Trademark and Deceptive Advertising Surveys," which Mr. Poret cited in his expert rebuttal report and which we used to prepare for his deposition and to respond to arguments that he and Premier made about Dr. Dennis' survey. $16.00 was paid to the New York State Library for research concerning legislative history regarding New York GBL §§ 349 and 350. $495 was spent for access to CVN.com, which provides archived video coverage of trials categorized by attorneys and parties. This provided insight into how defense counsel would approach the trial here. We paid $92 to the National Institutes of Health in connection with a FOIA request for materials relating to the GAIT trial. $342.60 was paid to ARC Document Solutions for the demonstratives used during closing argument. We spent more than $117.96 for product exemplars used in connection with factual research, depositions, trial preparation, and the trial. We also purchased a knee joint model ($34.77) for use at trial. Premier also purchased a similar model that its counsel used with Dr. Stone during his examination and so we used that model during cross-examination of Dr. Stone. We also paid $168.00 to Specialized Legal Services Inc. for removal of 9 boxes of exhibits and other documents stored in the courtroom during trial.

(m) Class Notice and Outreach: $38,691.79 total sought. On February 2, 2017, the Court granted Plaintiff's unopposed motion for approval or class notice and ordered notice of pendency to be sent pursuant to Fed. R. Civ. P. 23(c)(2)(B). Plaintiff retained JND Legal Administration ("JND"), an experienced class notice and claims administrator, to implement and disseminate the class notice and opt-out requests. Pursuant to the Court's Order (Dkt. No. 102), the Court-approved notice of pendency was disseminated via publication methods and included a class notice website (www.JointJuiceNYLawsuit.com) that JND created and has maintained and updated through the present date. As of January 25, 2023, JND has billed $29,691.81 for these notice of pendency services. Plaintiff also seeks reimbursement of $8,999.98 spent through Top Class Actions ($8,000.00) and Facebook ($999.98) on additional outreach to Class members. Additional documentation for these expenses is attached to this declaration as **Exhibit 14**. The October 23,

Exhibit 13 and it identifies this purchase of a scientific study used throughout the litigation.

BLOOD HURST & O' REARDON, LLP

00197658

2018, invoice from Top Class Actions totaled $4,500. One-third of that cost was allocated to the Joint Juice matter. The May 12, 2020, invoice from Top Class Actions totaled $6,000. One-third of that cost was allocated to the Joint Juice matter. Premier will also be required to pay for the cost of noticing the Class and allocating the judgment. This significant expense will benefit the Class and has not been included in the judgment value calculation.

(n)     Mediation Fees: These costs ($24,300.00) were paid by my firm relating to the December 3, 2013, mediation with Mr. Martin Quinn (JAMS) ($3,275 paid by my firm), the April 9, 2015 mediation with Hon. Carl West (Ret.) (JAMS) ($3,525 paid by my firm), and the September 24, 2020 mediation with Hon. Layn R. Phillips (Ret.) ($17,500 paid by my firm). For each of these mediations, the parties agreed to divide the total mediation fees ($48,600.00) as follows: 50% to Plaintiff's Counsel and 50% to Premier. Additional documentation for these expenses is attached to this declaration as **Exhibit 15**.

## VI.     SUMMARY OF PLAINTIFF'S COUNSEL'S REQUESTED FEES AND EXPENSES

82.     Collectively, with this fee application, Plaintiff's Counsel seek reimbursement of $1,073,123.10 in out-of-pocket, nontaxed expenses incurred in this litigation. As stated in their respective declarations, the firms have each expended the following amounts:

| Firm | Nontaxed Expenses Requested |
|---|---|
| Blood Hurst & O'Reardon, LLP | $1,040,420.50 |
| Lynch Carpenter, LLP | $8,709.80 |
| Iredale & Yoo, APC | $23,992.80 |
| **TOTAL** | **$1,073,123.10** |

83.     Based on the information provided in the concurrently filed declarations of Plaintiff's Counsel, the total number of hours spent on this litigation by Plaintiff's Counsel is 10,921.30, for a total lodestar of $7,201,393.50.

| Firm | Hours | Lodestar |
|---|---|---|
| Blood Hurst & O'Reardon, LLP | 9,547.50 | $6,210,890.00 |
| Lynch Carpenter, LLP | 567.00 | $392,293.50 |
| Iredale & Yoo, APC | 806.80 | $598,210.00 |

BLOOD HURST & O' REARDON, LLP

| **TOTAL** | **10,921.30** | **$7,201,393.50** |

84. The requested attorney's fees and costs would equal 33.9% of the total recovery exceeding $21,224,427.24, should this request be granted. This consists of the $12,895,454.90 Class judgment, $54,455.74 in taxed costs, $1,073,123.10 in the requested nontaxed costs, and the $7,201,393.50 requested fee award. This total does not include accruing post-judgment interest amounts, any future fee and expense awards, and the costs for disseminating notice and allocating the judgment to the Class. As of March 27, 2023, post-judgment interest on just the Class judgment amount exceeds $250,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 4, 2023, at San Diego, California.

By:     *s/ Thomas J. O'Reardon*
THOMAS J. O'REARDON

BLOOD HURST & O' REARDON, LLP

00197658   O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

Executed on April 4, 2023.

                                        s/ *Timothy G. Blood*
                                        TIMOTHY G. BLOOD

                                        BLOOD HURST & O'REARDON, LLP
                                        501 West Broadway, Suite 1490
                                        San Diego, CA  92101
                                        Tel: 619/338-1100
                                        619/338-1101 (fax)
                                        tblood@bholaw.com

O'REARDON DECLARATION ISO RENEWED MOTION FOR ATTORNEYS' FEES & NONTAXED EXPENSES

BLOOD HURST & O' REARDON, LLP

00197658