# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:16-CV-06980 RS<br>Honorable Richard Seeborg, U.S.D.J.<br><br>SUPPLEMENTAL EXPERT WITNESS DECLARATION OF **STEVEN A. TASHER, ESQ.** |

1

## I.    INTRODUCTION AND SCOPE OF EXPERT OPINIONS

1.    I am the Chief Executive Officer of Wyatt Partners.  My legal background, expertise, and experience handling legal fee disputes is set forth below and in both my *Curriculum Vitae* (attached hereto as **Exhibit A**).  My rate of compensation is $650 per hour.  My compensation is not contingent in any way upon the opinions expressed herein or the outcome of the Montera Class Action.

2.    I have been retained by Venable LLP ("Venable") on behalf of Premier Nutrition Corp. in the above-captioned proceeding (the "Montera Class Action").  The scope of my engagement was to evaluate the fees and costs sought by Plaintiff's counsel in their renewed motion to the Court, dated April 4, 2023 (ECF No. 328 *et seq.*).  I previously submitted a Declaration in connection with Class Counsel's prior fee petition (ECF No. 306-4) ("Original Tasher Decl.").

## II.    QUALIFICATIONS AND CREDENTIALS

3.    I have spent my entire legal career handling or supervising major litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees.  In 2009, I co-founded Wyatt Partners, a consulting firm that, among other things, provides expert analysis on the reasonableness of attorneys' fees and the reasonableness of settlements in complex litigation.  Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) of Wyatt Partners.

4.    As an expert on the issue of legal fees and costs, I have advised companies and law firms with respect to billing guidelines in complex litigation and been retained by national and international law firms and companies such as ABB Ltd.; Aon PLC; Anthem Blue Cross of California; Appian Corp.; Benihana of Tokyo; Boeing Company; Chevron-Texaco Company;

2

Dow Chemical Company; E.I. du Pont de Nemours & Co.; Ford Motor Company; GATX Rail Austria, GmbH; General Electric Company; Georgia-Pacific, LLC; Honeywell International, Inc.; Hewlett Packard Corporation; Howard Hughes Corporation; HUB International; IBM; Lockheed Martin Corporation; Port Terminal Railroad Association; Sony Pictures, Inc.; Telebrands; UBS; and the United States Postal Service.

5.      I have served as an expert on attorneys' fees and settlements in litigation, arbitration, and administrative hearings across the United States (including cases pending in California and fifteen other states) and internationally (including Canada and the United Kingdom) and have been accepted as an expert on the reasonableness of attorneys' fees and settlements in courts and tribunals across the country and around the world.  I have extensive experience reviewing the fees and/or hourly rates of firms across California, both as a consumer of legal services and as an expert evaluating the legal services performed in a diversity of matters, including many mass-tort claims or class actions (both in federal and state court).  My knowledge of California (San Francisco rates in particular) have been found sufficient for California-based firms seeking fees to meet their lodestar burden of production in a lodestar analysis.[1]  My testifying history and other relevant experience is attached hereto as **Exhibit B**.

6.      I have reviewed fees in numerous class actions around the country, both on the Plaintiffs' and Defense side, including *Corona v. Sony Pictures Entertainment, Inc.*[2], *UFCW & Employers Benefit Trust v. Sutter Health*[3], *District Council 16 v. Sutter Health*[4], *In re Bluetooth Headset Products Liability Litigation*[5], *KB Home Raleigh-Durham, Inc. v. Liberty Mutual Fire*

---

[1]     *Robert Broe v. SSA Terminals, LLC*, OALJ No. 2018-LHC-11 00423/00607 at *9 (Feb. 25, 2022).
[2]     No. 2:14-cv-09600 (C.D. Cal.).
[3]     194 Cal. Report. 3d 190 (Ct. App. 2015).
[4]     No. A148326 (Cal. App. 1st, July 9, 2018).
[5]     2:07-ml-01822 (C.D. Cal.).

*Insurance Co.*[6], and *DeMaria v. Horizon Healthcare Servs.*[7]  My expert testimony about the fees and hourly rates of California litigation has been accepted by courts and tribunals around the world, including the New York Supreme Court, which described such testimony as "extremely effective".[8]  My expert testimony has also been accepted concerning, *inter alia*, fees and costs incurred in the Sony Data Hack Class Actions[9] and California Wildfire litigation.[10]

7.      Before forming Wyatt Partners, I had various roles handling or supervising complex litigation, as well as overseeing legal expenses internally and as a client around the world, including in California.  Early in my career, as Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous government civil and regulatory cases in state and federal court involving, inter alia, tort and contract claims brought against the State, election fraud, eminent domain law and other real estate disputes, transportation issues, and environmental matters, including criminal prosecutions for environmental matters.  I argued numerous appellate matters before the appellate courts of New Jersey.

8.      In 1980, after my tenure as Deputy Attorney General for the State of New Jersey, I served as an in-house attorney at E.I. DuPont De Nemours & Co. ("DuPont") at DuPont's headquarters in Wilmington, Delaware.  During my time in the DuPont law department, I supervised a diverse litigation portfolio as a member of Special Litigation section of the law department, which supervised outside counsel on major litigation against the company seeking,

---

[6]        5:10-CV-00573 (E.D.N.C.).
[7]        *DeMaria v. Horizon Healthcare Servs.*, 2016 U.S. Dist. LEXIS 143941 (D.N.J. Oct. 18, 2016).
[8]        *Fox Paine & Co. v. Equity Risk Partners*, Index No. 52607/2014 (Supr. Ct. Westchester Cnty.), Trial Tr. (Aug. 3, 2021) at 292.  In this matter, I was accepted as an Expert on the fees and costs incurred in nearly a dozen California Supreme Court cases (Counties of San Francisco and San Mateo) and nearly a dozen private arbitrations venued in San Francisco.
[9]        The twelfth matter of my testifying history.
[10]       The twenty-fourth matter of my testifying history.

inter alia, equitable or injunctive relief, asbestos claims, toxic tort claims, corporate disputes, contract disputes, and major personal injury claims.

9.    In 1983, I became a Partner at the firm of Donovan, Leisure, Newton & Irvine, and in 1988, I became a Partner at the Firm of Willkie Farr & Gallagher.  At those firms, I represented companies like AT&T, Ashland Chemical, Arco, Cummins, Inc., E. I. du Pont de Nemours, Texas Instruments, and the Walt Disney Company in transactional or litigation matters, many of which were mass-tort or multi-party matters throughout the United States.  I tried many cases throughout the Ninth Circuit, including in the Northern District of California on behalf of my client, NL Industries, in matters pertaining to their lead smelting operations.   While most of my representations were conducted on an hourly basis, on the occasions where I undertook matters on a contingent fee basis (such as on behalf of a citizens group seeking injunctive relief in the United States District Court for the Eastern District of New York), I was responsible for ensuring that my team accurately contemporaneously recorded their time for any possible fee applications.

10.    In 1992, I became Vice President and Associate General Counsel at Wyeth and, in 2002, Senior Vice President of its pharmaceutical division.  At Wyeth, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation.  One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history.  In that Multi-District Litigation, 63,000 lawsuits were filed in virtually every state (including thousands in the State of California and New York) by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues.  Wyeth had reserved over $20 billion dollars for these claims.  To respond to the thousands of claims brought in the State of California, Wyeth engaged and supervised a team of law firms led by Gordon & Rees in San Francisco to defend the claims.

5

11.    My responsibilities at Wyeth included the evaluation and analysis of the quantum and value of actual or potential liabilities, the administration of claims associated with them, and providing status reports to Wyeth's Board of Directors as well as its Law and Regulatory Review Committee (the corporate committee vested with the oversight of all the Company's liabilities), of which I was a member.  These included the evaluation of thousands of claims brought throughout the States of California and New York.  At Wyeth, I had responsibility for the supervision of five operating departments of the Company.

12.    Throughout my career, I have reviewed billions of dollars in legal spend in three capacities: (a) as a provider of legal services, in California and around the country, (b) as a consumer of legal services, in California and around the world, and (c) as an expert on the subject of legal services, in California and around the world.

## III.    **EXECUTIVE SUMMARY OF OPINIONS**

13.    I have reviewed **$8,274,516.60** in fees and costs sought by Class Counsel, and it is my opinion that these fees are objectively excessive and unreasonable in many respects.  However, the multitude of Class Counsel's unreasonable billing practices and overcharges are not precisely quantifiable, either because of the manner in which they invoiced the time worked, because of the entries' overly general nature, and/or a general lack of billing judgment whereby Class Counsel seeks to shift fees that objectively no paying client would accept or pay.

14.    Such practices pervading throughout Class Counsel's request include: excessive staffing (generally, at meetings, on tasks, and on communications); top-heavy administration of work; clerical and administrative work; non-working travel; patently unreasonable expenses; and a general lack of care or concern regarding the invoices.

15.    I shall address all of these issues, explain the nature and extent of the excessive and unreasonable charges, and discuss an appropriate percentage reduction to account for them.  As I

will explain below, it is my opinion that a percentage reduction is warranted to account for both the cumulative and pervasive effect of the lack of billing judgment as well as Class Counsel's "no-cost-is-too-great" attitude, which produced facially unreasonable charges.

16.     I also note that, based on my review of all three firms comprising Class Counsel, I have no issues with the staffing, administration of the work, or generally the fees of Iredale & Yoo, in light of their lean and efficient staffing, role in the matter, and manner in which their time records are clear about the work they performed.  As such, I will not be recommending any sort of reduction to the fees sought for reimbursement by the Iredale Firm.  In many respects, by contrast, the Iredale Firm's fees underscore the grossly unreasonable staffing, administration of work, and lack of billing judgment of the remaining two firms comprising Class Counsel

## IV.     **FACTUAL BACKGROUND AND INFORMATION CONSIDERED**

17.     The *Montera* Class Action is one of nine related cases pending before the United States District Court for the Northern District of California pertaining to Premier Nutrition's promotion of Joint Juice, a line of liquid joint health dietary supplements.[11]

18.     Each of these class actions has identical allegations but each has a different plaintiff from different states, and the *Montera* Class Action pertains to plaintiffs from the State of New York, pursuant to GBL §§ 349 and 350.[12]  The *Montera* Class Action was originally filed in late 2016,[13] and proceeded to trial in May 2022.[14]  Other related class actions include *Mullins v. Premier Nutrition*, the first of the related cases filed by Class Counsel that ended with a dismissal

---

[11]     Order Denying Defendant's Motion for Judgment as a Matter of Law, Denying Defendant's Motion to Decertify, and Granting Plaintiff's Motion for Entry of Final Judgment ("Aug. 12, 2022 Order") at p. 2.
[12]     *Id.* at pp. 2-3.
[13]     ECF No. 1 (Dec. 5, 2016) (Complaint).
[14]     Aug. 12, 2022 Order at p. 2.

with prejudice and judgment being entered in favor of Premier that was affirmed on appeal by the Ninth Circuit.[15]

19.    At trial, a jury found for plaintiff and awarded $1,488,078.49 in actual damages.[16] Plaintiff moved for judgment to be entered in the amount of $140,025,765.74 based on statutory damages and pre-judgment interest under the GBL § 349 and $ § 350.

20.    The Court granted judgment for the statutory damages under GBL § 349 but denied it for the statutory damages under GBL § 350, finding that such an award would be "so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable".[17] Accordingly, the Court awarded $8,312,450.00 in statutory damages and $4,583,004.90 in prejudgment interest, a fraction of the $140,025,765.74 sought.[18]

21.    On August 27, 2022, Class Counsel filed a Motion for Attorneys' Fees, Reimbursement of Expenses, and Services Awards for Class Representative (the "Initial Fee Motion").[19]   In connection with the Initial Fee Motion, sought recovery of $6,806,031.96 in a percentage of the fund fee, or alternatively, $6,409,284.75 in a lodestar.[20]  Class Counsel did not provide any time records to support its claimed lodestar, which the Court ruled was "'insufficient' to conduct a fulsome lodestar analysis."[21]  Consequently, the Court held that (a) the lodestar was the proper method to calculate Class Counsel's fee request[22] and that "Plaintiff will be directed to refile its motion with contemporaneous time records."[23]

---

[15]    *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271-RS (N.D. Cal).
[16]    Aug. 12, 2022 Order at p. 4.
[17]    Aug. 12, 2022 Order at p. 11.
[18]    *Id.* at p. 15.
[19]    See ECF Doc. No. 296.
[20]    *Montera v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 190146 at *7 (N.D. Cal. Oct. 18, 2022).
[21]    *Id.* at *12, citing *In re Optical Disk Drive Prods. Lit.*, 2021 WL 4124159 at *1 (N.D. Cal. Sept. 9, 2021).
[22]    *Id.* at *11, citing *In re Bluetooth*, 654 F.3d at 492.
[23]    *Id.* at *12.

22.    Class Counsel's refiled Motion (the "Refiled Fee Motion") is supported by three attorney Declarations, one from BHO (the "O'Reardon Decl."), one from the Carpenter Firm (the "Carpenter Decl."), and one from the Iredale Firm (the "Iredale Decl.").

23.    While the Court directed Class Counsel to file contemporaneous records, none of the attorney declarations assert that the attached records were contemporaneous (and Class Counsel's Refiled Fee Motion's only reference to contemporaneous records is its fifth footnote, telling the Court it was wrong to require them).

24.    Class Counsel now seeks an increased lodestar of $7,201,393.50 as follows:

     a.    $6,210,890.00 for BHO (up 15% from $5,418,781.25[24]);

     b.    $392,392.50 for the Carpenter Firm (unchanged);[25] and

     c.    $589,210.00 for the Iredale Firm (unchanged).

25.    Class Counsel also seeks $1,073,123.10 in nontaxed expenses.[26]

## V.    METHODOLOGY AND STANDARDS OF REVIEW

26.    The "'lodestar method' is the fundamental starting point in determining a 'reasonable attorney's fee.'"[27]    This calculates a reasonable number of hours times a reasonable hourly rate.[28]    The "lodestar method' is appropriate in class actions brought under fee-shifting statutes … ."[29]

---

[24]    The original lodestar reflected time through August 25, 2022.  Blood Decl., ¶¶ 60-61.
[25]    The Carpenter Firm's time and fees has not changed, but it added a new partner, Attorney Ciolko, since the Carpenter Firm "mistakenly … attributed [24.2 hours]" of his hours to Attorney Carpenter.  Carpenter Dec., ¶ 12.
[26]    ECF 328, pp. 24-25.
[27]    *Christensen v. Stevedoring Sers. Of Am.*, 557 F.3d at 1053, citing *Burlington v. Dague*, 505 U.S. 557, 562 (1992).  *See*, also, *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003) ("the court 'must calculate awards for attorneys' fees using the 'lodestar' method'").
[28]    *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).
[29]    *Mary Beth Montera v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 190146 at *11 (N.D. Cal. Oct. 18, 2022), citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).

27.    The lodestar was created to provide an alternative to the "common fund" doctrine of awarding percentages of recovery in citizens' suits when plaintiffs' lawyers operated on a contingent or alternative fee arrangement.[30]  This is because, in class actions, citizens suits, civil rights cases, and other similar matters where counsel took the case on a contingency basis (or where the applicable statute does not permit private fee arrangements), courts developed the lodestar method because there is no "real" hourly rate, and the hours have never been evaluated via a market-based check by a paying client rejecting unreasonable fees or costs.[31]

28.    On the surface, Plaintiff's motion recognizes this fact.  *See* ECF 328 at p. 10 ("'At bottom, the goal of the lodestar figure is to roughly approximate the fee the prevailing party would have received from a paying client.' *Roberts v. City of Honolulu*, 938 F.3d 1020, 1024 (9th Cir. 2019).").

29.    One of the most important "ingredients" of a reasonable fee is the concept of "Billing Judgment," a phrase that comes from the United States Supreme Court case *Hensley v. Eckerhart*.[32]  Billing Judgment requires that a consumer of legal services treat every dollar it asks a third-party to pay as if the consumer were paying out of its own pocket.  Or, as the United States Supreme Court put it, "[h]ours that are not properly billed to one's *client* are also not properly billed to one's *adversary*".[33]

30.    As a result, the essential goal of the lodestar analysis is to "produce[] an award that approximates the fee the prevailing attorney would have received for representing a paying client

---

[30]    Alba Conte, ATTORNEY FEE AWARDS §§ 1:10, 2:03 (3d ed. 2004).

[31]    *See*, *generally*, *Attorneys' Fees in the Agent Orange Litigation: Modifying the Lodestar Analysis for Mass Tort Cases*, 14 N.Y.U. REVIEW OF LAW & SOCIAL CHANGE 613-631, 617 ("To avoid either under-or overcompensating class representatives, the courts have developed and refined the so-called 'lodestar' method of measuring the reasonable value of an attorney's services benefitting the class."); *see also Burlington v. Dague*, 505 U.S. 557, 559-560 (1992).

[32]    461 U.S. 424 (1983).

[33]    *Id*. at 434 (emphasis in original).

who was billed by the hour in a comparable case." *Purdue v. Kenny A. ex rel Winn*, 559 US 542, 551 (2010). *See*, *also*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 552 F.3d 182, 184 (2nd Cir. 2007) (the lodestar is "what a reasonable, paying client … who wishes to pay the least amount necessary to litigate the case effectively … would be willing to pay"); *Orser v. Wholesale Fuel Distributors-CT, LLC*, 108 N.Y.S.3d 675, 686-87 (N.Y. Sup. Ct. 2018), aff'd, 173 A.D.3d 1519 (N.Y. App. Div. 2019) ("a paying client would seek efficient prosecution of his case and that fees that would be rejected as exorbitant by a paying client may not be passed along to one's adversary under a fee-shifting statute.").

31.    The Ninth Circuit has held that "This Circuit requires that courts reach attorneys' fees decisions by considering some or all of the twelve relevant criteria set forth in *Kerr v. Screen Extras Guild, Inc.*" *Carter v. Caleb Brett LLC*, 757 F.3d 866, 869 (9th Cir. 2014). The *Kerr* factors set forth by the Ninth Circuit and adopted by the United States Supreme Court establish the critical criterion that must be considered to evaluate the reasonableness of a fee.

32.    The propriety of a fee under New York law is evaluated under the "*Freeman* Factors," *In Re Matter of Freeman*, 34 N.Y. 2d 1, 9 (1974). These factors include the time and labor involved, the complexity of the matter, the reputation and skills of the attorneys performing the work, the stakes of the matter and results the attorney(s) obtained for the client, and the nature of the relationship with the client. The *Freeman* factors are substantially the same as the *Kerr* Factors, as both reflect the factors set forth in Cal. R. Prof. Cond. 1.5 and N.Y. R. Prof. Cond. 1.5.

33.    In conjunction with the *Freeman*/*Kerr* factors, I also consider certain other professional obligations of attorneys, including the nature and extent of communications between client and counsel (Cal. R. Prof. Cond. 1.4; N.Y. R. Prof. Cond. 1.2, 1.4) and the nature and extent

11

of supervision by client and by counsel of fellow attorneys and staff (Cal. R. Prof. Cond. 5.1-5.3; N.Y. R. Prof. Cond. 5.1 – 5.3).

34.     Accordingly, I evaluate the reasonableness of Plaintiff's fee request having been both a provider of legal services in both relevant jurisdictions (California and New York) as well as having been a paying client in both jurisdictions.

****

## OPINIONS AND ANALYSIS

35.     I have reviewed the fees and costs submitted by BHO and the Carpenter Firm and believe them to contain a myriad of excessive and unreasonable billing practices throughout the entire litigation.

36.     In New York, for fee requests, "where it is unrealistic . . . to evaluate and rule on every entry . . . courts have endorsed percentage cuts as a practical means of trimming fat" from a fee request. *New York State Ass'n for R. Child., Inc. v. Carey*, 711 F.2d 1136, 1146 (2nd Cir. 1983); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 57 (S.D.N.Y. 2015) (applying a 30% percentage fee reduction based upon multiple challenged billing practices in addition to other discounts); *Concrete Flotation Systems, Inc. v. Tadco Const. Corp.*, 2010 WL 2539661, at *1 (E.D.N.Y. June 17, 2010) (25% across-the-board reduction in compensable hours after excluding recovery for other categories of expenses the court deemed unreasonable).

37.     Percentage reductions are utilized when the invoices are replete with block-billing and vague time entries, especially where the fees run into the millions of dollars, so evaluating each line item is less practical or reliable.  New York Courts have accepted my testimony recommending percentage reductions for the very reasons I recommend one in this matter.[34]

---

[34]     *See*, *Lee David Auerbach P.C. v. Richard Delgatto*, in which the court reduced the fees by approximately 40%, noting: "It is also evident that significant time was expended on legal research.  As [Mr. Tasher] points out,

38.     One of the most important "ingredients" of a reasonable fee is the concept of "Billing Judgment," a phrase from the United States Supreme Court case *Hensley v. Eckerhart*, 461 U.S. 424 (1983).  Billing Judgment requires that a party asking a third-party to pay its fees treat every dollar as if that party were paying out of its own pocket.  Or, as one New York Supreme Court Justice put it: "fees that would be rejected as exorbitant by a paying client may not be passed along to one's adversary under a fee-shifting statute." *Orser v. Wholesale Fuel Distributors-CT, LLC*, 108 N.Y.S.3d 675, 686-87 (N.Y. Sup. Ct. 2018), *aff'd* 173 A.D. 3d 1519 (3rd Dep't, 2019).  *See*, *also*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 552 F.3d 182, 184 (2nd Cir. 2007) (the lodestar is "what a reasonable, paying client … who wishes to pay the least amount necessary to litigate the case effectively … would be willing to pay").

39.     In contrast, it is my experience that parties who believe they ultimately do not have to pay for some or all of its legal bills tend to be more relaxed about billing judgment.  Many courts have held that the reasonableness requirement for fees works as a "guard against moral hazard"—the hazard, most eloquently explained by the United States Court of Appeals for the Seventh Circuit, is "the tendency to take additional risks (or run up extra costs) if someone else pays the tab." *Medcom Holding Co. v. Baxter Travenol Laboratories*, 200 F.3d 518, 521 (7th Cir. 1999).  In my experience, this concept of "moral hazard" also extends to a lack of care about the bills themselves, such as double-billed time entries or manipulated billing records.

40.     Nothing better demonstrates Class Counsel's complete lack of billing judgment than two statements it has made in its fee motions in this matter:

---

having relatively senior attorneys doing basic research . . . unreasonably increased the costs to the client."  The Court also found the staffing was "top-heavy", "considerable time was expanded on office conferences and telephone conferences between the attorneys as well as . . . certain amount of overlap in the work assignments of the attorneys, which contributed to duplicative work."  Index No. 69908/2015, at *20-21 (Supr. Ct. Westchester Cty., July 7, 2017).

a.    First, in its original fee reply (ECF 311 at p. 11), Class Counsel has asserted that there "was no overbilling or overstaffing, and certainly ***not to a degree that would matter***." (emphasis added).

b.    Second, in the instant motion (ECF 328 at p. 24), Class Counsel petitions the Court that should "the court reduce either Plaintiff's Counsel's time or rates, Plaintiff requests a multiplier sufficient to raise the award to the amount requested here."

41.    The former demonstrates a callous disregard for the reasonableness standard. Overbilling always matters. *See,* Wolfram, MODERN LEGAL ETHICS § 9.3.1 ("Similarly, a lawyer's breach of the fee contract by charging for work not done is an attempt to exact a fee that is by definition excessive and unreasonable.").  Having been a paying client of legal services, if counsel ever told DuPont or Wyeth it overbilled us, but "not to a degree that would matter", it would be that counsel's final day performing legal services for the company.

42.    Similarly, the latter statement asks the Court to reward Class Counsel for seeking excessive and unreasonable fees. *See*, *Clemens v. New York Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 403 (3rd Cir. 2018) (internal citations omitted) ("a fee petition … is not the 'opening bid in the quest for an award.'").[35]  Indeed, Class Counsel's request is the very reason that the Supreme Court prohibited risk multipliers in lodestar cases in *Burlington v. Dague*, 505 U.S. 557 (1992).[36]

43.    What stands out as even more egregious is the fact that after Class Counsel's initial fee petition was challenged, BHO added back in nearly $800,000 in fees and costs (the

---

[35]    A task force commissioned by the Third Circuit (the Circuit that initially created the Lodestar) was critical of the "manipulation by [courts] who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount."  See, Court Awarded Attorneys Fees: Report of the Third Circuit Task Force, 108 FRD 237, 246 (3rd Cir. 1985).

[36]    Martha Pacold, *Attorneys' Fees in Class Actions Governed by Fee-Shifting Statutes*, 68 U. CHI. L. REV. 1007, 1019. *Burlington v. Dague*, 505 U.S. 557, 565 1992).

overwhelming majority from the time period prior to the trial, during the discovery phase), including its *Sonner/Mullins* work.[37]

44.    Accordingly, the record reflects Class Counsel's concession that it abdicated its responsibility to ensure reasonable fees, and every one of the unreasonable billing practices detailed herein all reflect Class Counsel's attitude that it can throw anything and everything into its fee request and it must be awarded every single penny, regardless of reasonableness.

45.    Thus, when Class Counsel submits double billed time entries and expenses, it expects to be fully paid for it, since it "would [not] matter". ECF 311 at p. 11.  When Attorney Blood asks to be paid for a 25-hour day of "trial preparation" on May 19, 2022[38], Class Counsel expects to be fully paid for it, since it "would [not] matter".  When Class Counsel submits lavish expenses (with hotel rooms at over $1,000 per night for a grossly overstaffed trial team, $500 dinners with multiple alcoholic beverages and wagyu orders, and non-coach airfare in direct contradiction to its sworn statements), it expects to be fully paid, since it "would [not] matter". *Id.* No paying client would tolerate these billing practices, yet Class Counsel demands the Court charged Class Counsel's adversary "[h]ours that are not properly billed to one's client".[39]

46.    In contrast, every firm that I engaged or supervised on these types of matters understood the importance of the collaborative nature of the process and agreed to rules of the road that ensured lean and efficient staffing, reasonable expenses, and proper administration of the workload.  No firm suggested it could bill whatever it pleased, regardless of reasonableness.

---

[37]    O'Reardon Decl. at ¶ 74.
[38]    *See*, ECF 328-3 at p. 163 (two 9.5-hour entries and one 6.0-hour entry).  This is on top of a 2.0-hour court attendance that day.  Attorney Blood purports to have billed 27.0 hour that day.
[39]    *Cf*, *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (emphasis in original) ("Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.").

47.    At least one of Class Counsel's firms (the Carpenter Firm) has private fee-paying clients, and knows this to be the case.  Carpenter Decl. at ¶ 17.  Thus, Class Counsel's complete lack of meaningful industry standard constraints cannot be attributed to Class Counsel's unawareness of these expectations, or their inability to follow them.  Indeed, both the Carpenter and Iredale Firm have been admonished for their prior failures to utilize such industry standard practices such as the delegation of work.  *See*, *Marino v. Coach, Inc.*, 2021 WL 827647 at p. 7 (S.D.N.Y. Mar. 3, 2021) (Carpenter) and *Medina v. Metro. Interpreters & Translators, Inc.*, 139 F. Supp. 3d 1170, 1180-81 (S.D. Cal. 2015) (Iredale) (25% reduction).  Rather, the lack of constraints can only be attributed to the willful lack of implementing or enforcing them.

48.    From a big picture, the issues most discernable from reviewing Class Counsel's request include: excessive staffing (generally, at meetings, on tasks, and on communications); top-heavy administration of work; clerical and administrative work; non-working travel; patently unreasonable expenses; and a general lack of care or concern regarding the invoices.

49.    Below, I identify some of the most notable high-level billing practices and suggest a percentage reduction based on these practices.  Such a percentage reduction is warranted to account for two things: (1) the cumulative and pervasive effect of the lack of billing judgment and (2) Class Counsel's "no-cost-is-too-great" attitude, which produced facially unreasonable charges.

### General Overstaffing of the Matter

50.    When Class Counsel asks a third-party to award its fees, those fees must be objectively reasonable.  *HomeAway.com, Inc. v. City of New York*, 523 F. Supp. 3d 573, 592 (S.D.N.Y. 2021) ("governing test of reasonableness is objective; it is not dictated by a particular client's subjective desires or tolerance for spending.  The test is whether [it] 'spen[t] the minimum

necessary to litigate the case effectively.'"). Paying clients place constraints on staffing and attendance at hearings and trials.

51.     This mandate is belied by Class Counsel's "little army of lawyers." *Metro Data Sys., Inc. v. Durango Sys. Inc.*, 597 F. Supp. 244, 245 (D. Ariz. 1984) (discussing as unreasonable the use of a "little army of thirteen lawyers . . . three paralegals and one law clerk to defend against plaintiff's claims"). *In accord*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 419 F. Supp. 2d. 206, 211 (N.D.N.Y. 2005) ("Just as it was excessive for plaintiffs to seek compensation for the attendance of five attorneys at the appellate argument before the Circuit, it is excessive for them to seek reimbursement for time expended in this case by eight attorneys and two paralegals.").

52.     Here, Class Counsel's "little army" of timekeepers included nineteen (19) people, (13 from the Blood Firm, 4 from the Carpenter Firm, and 2 from the Iredale Firm). This level of staffing and number of timekeepers is excessive and unwarranted on its face. The problem with failing to staff a case efficiently (as Class Counsel failed to do here) is that it leads to "duplication of effort" and waste. *Microsoft Corp. v. United Comput. Res. of NJ*, 216 F. Supp. 2d 383, 385 (D.N.J. 2002); *see also Benihana Inc. v. Benihana of Tokyo*, 2016 WL 3647638 at *7 (S.D.N.Y. June 29, 2016) (discount in fees where overlapping "work was performed, or at least reviewed in some detail, by each of the five attorneys who worked on th[e] matter.").

53.     **Overlap and Duplication of Efforts by Multiple Firms**: Class Counsel's "little army" consisted of three law firms, which led to overlap and duplication of efforts. *New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.*, 79 F. Supp. 2d 331, 343 (S.D.N.Y.1999) (use of two firms led to "duplication [… and] warrant some reduction of the amount requested.").

17

54.     Class Counsel's attorney declarations make this very clear.  Paragraph 6 of the Iredale Decl. is illustrative in this regard: "My associate, Grace Jun, and I have been involved in every aspect of the trial from trial preparation to post-trial proceedings.  I oversaw each aspect of the trial and had responsibility for overall trial strategy and trial presentation.  Ms. Jun and I prepared extensively for trial."  However, so did every else at BHO:

a.     Attorney Blood ($960 per hour) "personally …assisted with trial preparation, and took a lead role at trial where he cross-examined one of Defendant's primary consumer survey experts."  O'Reardon Decl., ¶ 51;

b.     Attorney O'Reardon ($710 per hour) worked on "trial preparation, and the class trial itself."  *Id.* at ¶ 50;

c.     Attorney Straub ($575) "attending trial where he created trial demonstratives, prepared trial exhibits, and developed memorandum, binders, and strategy for direct and cross-examination of the trial witnesses."  *Id.* at ¶ 55.

55.     These statements are inconsistent with the O'Reardon Decl.'s statement "There has been no unreasonable duplication of services for which my firm and my co-counsel now seek compensation."[40]  It is evident that the addition of two additional law firms (one charging up to $1,050 per hour for Partner services and one that billed 95% of its fees at the partner level) did not mean *more efficient or less work* for BHO.  To the contrary, it meant that BHO was also doing, to some degree, the *same work* as the other firms.  There clearly has been, and the time records reflect this as well.

56.     One clear example of overlap and duplication is the Carpenter Firm's work performing "Research regarding potential MIL on statutory penalties/damages pursuant to GBL

---

[40]     O'Reardon Decl. at ¶ 65.

349-350"[41] and a double-billed time entry for 3.1 hours on Mar. 4, 2022 ("Drafted Memo regarding MIL on statutory penalties/damages pursuant to GBL 349-350"). *Id.* However, BHO also performed this exact same research in June of 2022. Starting on June 9, 2022, both Attorneys O'Reardon and Straub devoted several days researching and drafting memos on the same issue:

        a.      June 17, 2022 (O'Reardon, 1.25 hours): "research…GBL 349 and 350 regarding statutory damages";

        b.      June 20, 2022 (Straub, 4.75 hours): "search, collect, and summarize case law regarding statutory damages";

        c.      June 21, 2022 (Straub, 9.5 hours): "Search, collect, and summarize all case law related to statutory damages and due process concerns to be used in Reply motion for entry of judgment."

        d.      June 22, 2022 (O'Reardon, 6.0 hours, block-billed): "researching statutory damages case law in anticipation of Premiers opposition due Thursday and update memos about same".

57.      Thus, not only were both the Carpenter Firm and BHO overlapping and duplicating each other, but BHO timekeepers are overlapping and duplicating *each other*. This was excessive and wasteful, and paying clients would reject such overlap and duplication.

58.      Several other examples of overlapping or excessive work I saw included:

        a.      <u>The Palumbo Deposition</u>: The Carpenter Firm spent over 150 hours (mostly of a partner doing document review and preparing a deposition outline, as well as attending the deposition), while the Blood Firm had at least three timekeepers also working on this deposition, including: (i) Attorney La Val performing document review for this deposition[42]; (ii) Attorney

---

[41]     See, ECF 328-20, p. 37 (time entries of T. Malamphy, Mar. 16-23).
[42]     ECF 328-3 at p. 13.

O'Reardon preparing for and attending the deposition[43]; and (iii) Attorney Straub collecting exhibits for a second Palumbo deposition in January of 2020, that never took place.[44]

b.      Class Certification Brief: Work on this brief was done by three partners and one "of counsel" at BHO, including Attorneys Blood O'Reardon, Hurst, and MacPherson.[45]

c.      Motion for Entry of Judgment: Work on this was done by the following timekeepers at BHO: Attorneys Blood, Brown, Hurst, O'Reardon, Straub, and Paralegal Maytorena.[46]  That is four partners, one associate, and a paralegal working on it.  Notably, this is the very motion that involved the statutory penalties under GBL §§ 349 and 350 that the Carpenter Firm had already researched and prepared memoranda on months prior.[47]

d.      Class Counsel's Unsuccessful Initial Fee Petition: Class Counsel seeks recovery of nearly 318.25 hours and $215,000 in fees (which I have compiled into a chart attached as **Exhibit E**) of time entries spent referencing work on its initial fee petition.  This is a staggering amount, especially in light of the fact that it did not produce a single time record (in my experience, the main source of fees in a fee petition), and in light of the fact that Class Counsel's initial petition was not successful and it devoted most of its time seeking to be paid on a percentage of the fund basis, rather than the lodestar.

59.     Class Counsel's time entries also contain numerous gross errors, such as double-billed entries (such as Attorney Blood's 27-hour day on May 19, 2022), Attorney Blood's double-billed 12-hour entries on May 25, 2022, and Attorney MacPherson's double-billed 6.75-hour

---

[43]    *Id.* at pp. 14-19.
[44]    *Id.* at p. 109 ("Searched and collected potential exhibits to be used at deposition of Palumbo").
[45]    *Id.* at pp. 33-43.
[46]    *Id.* at pp. 170-174.
[47]    See, ECF 328-20, p. 37 (time entries of T. Malamphy, Mar. 16-23).

entries on April 28, 2016. This speaks to a genuine lack of care regarding reasonableness or consideration for cost, and is symptomatic of time that is not contemporaneously recorded.

60.    Moreover, having reviewed billions of dollars in legal billings (both for private firms and for public-interest and class firms), I observe that Class Counsel's time records are often recorded in a strange and unusual manner (as will be illustrated below), unlike its peer firms that represent classes.

61.    To illustrate, I reference Attorney Carpenter's July 10, 2014 records—there are three of them, all of which repeat the exact same canned entry "Evaluated document production; identified hot and relevant docs". Two of these entries are for identical 2.3-hour windows, and the third is for 3.2 hours. On June 4, 2014, he does the same—using the same a canned entry across four entries (4.4 hours, 1.2 hours, 3.2 hours, and 4.6 hours). Yet, there are other days he will use a vague entry for 7.6 hours and not chop up the time (see March 15, 2013—"Drafted Complaint").

62.    BHO's time records suffer from similar deficiencies. For example, BHO timekeeper Camille Bass recorded a time entry on July 31, 2017, in which she billed for "Meeting with Tim Blood, Attorney T. O'Reardon, Attorney P. Brown, and Craig Straub". However, none of Attorney Blood, Brown, or Straub billed for a meeting on that date.

63.    Accuracy of time records is an essential component of any fee application, much as it is for attorneys charging paying clients. When I previously discussed the reasons behind the importance of maintaining contemporaneous time records[48], it is precisely to maintain the accuracy of the application and to prevent these types of deficiencies and inaccuracies seen here from pervading a fee petition. Paying clients insist upon accurate and contemporaneous time records, and would not pay for fees suffering from this myriad of inaccuracies and unusual billings.

---

[48]    Original Tasher Decl., ¶¶ 58-59.

64.    **Class Counsel's Overstaffing of the Trial**: The most glaring example of overstaffing and duplication is Class Counsel's trial staffing.  For example, at the trial on May 25, 2022, the following timekeepers billed to attend the trial: Attorneys Blood (twice, with two 12-hour entries), Carpenter, Iredale, Jun, O'Reardon, and Straub.  Only Attorneys Blood, Iredale, and Jun appeared on the record.  Attorney Straub sat in the back of the courtroom and, in his own words in the time records, "attend[ed] jury trial and take notes".  Attorneys Carpenter (who flew in the day before) and O'Reardon did the same thing.  *See*, May 23, 2022 time entry of Attorney Straub.  Attorney Brown also billed that day for trial work.  The combined hourly rate for those billing to the trial that day was $4,545 per hour ($5,205 including Attorney Brown's rate).

65.    Put simply, paying clients do not pay for three attorneys (Carpenter, O'Reardon, and Straub) to sit in the back of the court and take notes, deeming it to be wasteful and excessive, especially with three timekeepers already on the record.  Indeed, I understand that Premier only had three timekeepers billing during the trial, and only two attended court that day.  Premier's counsel did not have multiple note-takers charging from the back of the courtroom, because its paying client would not pay for it.

66.    The excessive and unreasonable trial staffing did not just run up the fees sought unnecessarily, but also expenses.  When Class Counsel is staying in $1,000 per night hotel rooms, adding *more* $1,000 per night hotel rooms for note-takers further increases the excessive and unreasonable fees.[49]  The meals also become more excessive, with $500 or more dinners with drinks and Wagyu orders as more and more people partake in the festivities.[50]  Thus, by adding 2-3 more unnecessary timekeepers to the trial to "take notes" in the back of the courtroom, Class Counsel effectively doubled the already excessive travel costs.

---

[49]    *See*, ECF 328-15 at p. 243-244 ($1,089 per night at the Intercontinental).
[50]    *Id.* at p. 40 (listing) and 44 (receipt).

67.     **Overstaffing Events and Multiple Attendance**: This is especially true when considering how Class Counsel staffed meetings, the trial, and other events.  See, *e.g.*, *Mendez v. Radec*, 907 F. Supp. 2d 353, 359 (W.D.N.Y. 2012) (70% "reduction in the number of hours requested is necessary" for "having several attorneys and/or staff members appear at Court proceedings."); *Arbor Hill*, 419 F. Supp. 2d. at 211 ("attendance of five attorneys" at argument "was excessive"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,* 188 F. Supp. 3d 333, 342 (S.D.N.Y. 2016) (collecting cases discounting attorneys' fee awards due to excessive internal conferences or overstaffing).

68.     Here, meetings would take place with up to five Blood Firm timekeepers billing (sometimes with members of the other firms).  For example, on July 31, 2017, Attorneys Bass, Blood, Brown, O'Reardon, and Straub conferenced, at a combined hourly rate of $3,315 per hour.  On December 2, 2016, Attorneys Blood, Brown, Hurst, and O'Reardon, conferenced, at a combined hourly rate of $3,410 per hour.  On October 21, 2021, Attorneys Blood, Brown, O'Reardon, and Straub conferenced, at a combined hourly rate of $2,905 per hour.  On April 15, 2022, Attorneys Blood, Brown, O'Reardon, and Straub conferenced, along with Attorneys Iredale and Jun, at a combined hourly rate of $4,455 per hour.  On May 24, 2022, Attorney Carpenter flew up to San Francisco for a day, so that six timekeepers could conference: from BHO, Attorneys Blood, O'Reardon, and Straub; from the Iredale Firm, Attorneys Iredale and Jun; and from the Carpenter Firm, Attorney Carpenter, at a combined hourly rate of $4,545 per hour.  As becomes evident, these excessive conferences occurred throughout the representation, part and parcel of the excessive staffing.

69.     In my experience, the more timekeepers that are placed onto a matter, the costlier and more wasteful internal conferencing tends to be (and the expenses associated therewith), and

23

Class Counsel's invoices demonstrate this principle in their full display of excess. Excessive internal communication among lawyers is evidence of inefficient management of lawyers, and paying clients tend to place limits on the levels of internal communications. New York courts "have applied reductions of up to 75% for such excessive interoffice communications."[51]

70. **Overstaffing as It Pertains to Reasonable Hourly Rates**: This overstaffing also pertains to the hourly rates being sought. In much the same vein as an attorney "cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law"[52], a firm cannot demand high hourly rates by claiming significant expertise in a legal field, yet at the same time claim it is not capable of handling the case on its own without the assistance of multiple additional firms.

71. On its website, BHO claims that "Blood Hurst & O'Reardon, LLP is a nationally recognized consumer protection class action law firm dedicated to recovering money for those who have been cheated and correcting corporate wrongdoing. We have obtained record results on behalf of consumers, insurance policy holders, homeowners, employees, small businesses and investors in state and federal courts throughout the country."[53] Accordingly, BHO seeks high hourly rates for its claimed expertise in these areas.

72. Indeed, BHO asks to be compensated according to the same hourly rates as Venable.[54] But BHO was not responsible for trying the case, a task which commands the highest hourly rates and requires the most expertise, and which fell to the Iredale Firm in this case.

---

[51] See, *Love & Madness, Inc. v. Claire's Holdings, LLC*, Case No. 21 Civ. 1913 (SLC) (ECF No. 144) at *23 (S.D.N.Y. Oct. 5, 2022), citing *Williams v. Metro-N R.R. Co.*, 2018 WL 3370678 at *10 (S.D.N.Y. June 28, 2018.

[52] *Ursic v. Bethlehem Mines*, 719 F. 2d 670, 677 (3rd Cir. 1983) (referring to the practice as "double dipping").

[53] Original Tasher Decl., Ex. L (Blood Firm Website).

[54] *See*, ECF 328-1 at ¶ 70 ("BHO's hourly rates also compare favorably to reported rates charged by the law firms Defendant hired in this action.").

Moreover, there remains no explanation for why BHO needed two other firms when it claims that it was "lead counsel".  O'Reardon Decl. at ¶ 65.

73.      **Ancillary Timekeepers**: Part and parcel of this excessive staffing is the significant number of "ancillary" timekeepers, which are timekeepers who bill a *de minimis* amount of time to the file.  In my experience, Ancillary Timekeepers are often symptoms of an overstaffed case and they tend to generate excessive and unnecessary fees, as shuttling in non-core, ancillary timekeepers with little to no experience on the case for short stints tends to be inefficient and increase costs unnecessarily.

74.      Here, BHO placed four timekeepers who billed a *de minimis* amount of time on the matter, performing largely duplicative work.  For example, Attorney Bass billed only 11.5 hours talking to other attorneys or performing work the other attorneys were already doing (like class member outreach—performed by attorney Hurst).  Attorney Menaldino billed 22.5 total hours, including preparing for and attended the Graboff Deposition that Attorney O'Reardon defended.[55] Attorney Yarmolinets billed only 9 total hours updating a database and reviewing documents. Paralegal Maxwell spend only 21 hours, largely working on a discovery log on which one of the primary paralegals (Maytorena) was already working.

75.      Adding more timekeepers to a case, as Class Counsel did here, rather than staffing it with a lean, dedicated team, generates unreasonable fees for shuttling in new attorneys for short stints and leads to duplication and wasted time on internal conferences and meetings.  It also means fewer persons have full knowledge of the matter, and that more team members need to be included in any decision-making, producing further inefficiencies.  Thus, by divvying up the work across

---

[55]      ECF 328-3 at p. 30.  Attorney Menaldino did not appear on the record or anywhere in the transcript.

so many unnecessary timekeepers, Class Counsel produced significant inefficiencies and waste, which paying clients do not tolerate.

76.    It is my opinion that Class Counsel overstaffed the matter, especially the trial phase of the matter, which is clear through the excessive number of timekeepers attending hearings and other events (including the trial itself), ancillary timekeepers, overworking certain tasks and projects, excessive conferencing, and duplication of efforts on a number of projects, in a manner that a paying client would not tolerate.  As a result, Class Counsel's lodestar is significantly excessive and unreasonable for BHO and the Carpenter Firm, and a percentage reduction is warranted to reach a "reasonable" fee.

### "Top-Heavy" Administration of the Workload

77.    In my opinion, the staffing was unreasonably "top-heavy," with many basic tasks (such as initial drafting, legal research) being performed by attorneys at the highest billing rates. This is contrary to expected custom and practice in the industry.  It also fundamentally ties to the hourly rates.  It is axiomatic that an attorney "cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law." *Microsoft Corp. v. United Computer Resources of N.J.* 216 F. Supp. 2d 383, 392 (D.N.J. 2002).

78.    All three firms constituting Class Counsel demand high hourly rates, with the rates sought for Partners being between $660 and $1,050 per hour.  While this range of rates may not, per se, be unreasonable for the relevant market for similar work, it is excessive depending upon the nature of the work being performed.  Put another way, a rate of $1,050 per hour for lead trial counsel trying the case to a successful verdict may not be unreasonable, but if that same timekeeper is performing legal research, drafting, photocopying, or a host of other tasks, then $1,050 per hour is an excessive hourly rate for that work.  *See*, Alba Conte, ATTORNEY FEE AWARDS, § 4:09 (3d

ed. 2004) ("An attorney's rate should reflect and individual's experience and reputation as well as the economic reality that **various activities have different rates of reasonable compensation**.") (emphasis added).

79.    Thus, the value is not of the timekeeper performing the work, but the work itself. *See*, *In re Navidea Biopharmaceuticals Litig.*, 2021 WL 2323380 at *6 (S.D.N.Y. Apr. 21, 2021) (adopted 2021 WL 2156276 at *4 (S.D.N.Y. May 27, 2021)) ("Even when a requested hourly rate would ordinarily be found appropriate … the court may reduce that rate if records show that the work actually performed by that attorney could have been performed by someone more junior.") (reducing rate for solo practitioner for work on legal research, drafting, and discovery tasks).

80.    Having been a provider and consumer of legal services in California (and New York) for decades, while clients may be willing to pay premium rates (like the ones sought here) for a senior partner performing senior partner work, they are generally not willing to pay for a senior partner to perform legal research, first-level drafting, or document review, absent an explained need for the partner to do this work.

81.    Recalling that the lodestar is designed to calculate a fee Class Counsel would receive from a paying client, "[c]lients commonly demand that legal work be 'pushed down' to the timekeeper with the lowest billing rate who is able to capably perform that work, so as to keep legal fees manageable." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d at 51.  In another matter, Justice Alan Scheinkman of the New York Supreme Court ruled: "As Defendant's expert [Mr. Tasher] points out, having relatively senior attorneys doing basic research . . . unreasonably increased the costs to the client." *Lee David Auerbach P.C. v. Richard Delgatto*, 69908/2015, at p. 21 (Supr. Ct. Westchester Cty., July 7, 2017).

82.    This is where hourly rates are especially relevant.  BHO asks to be paid on the basis of Venable's rates.[56]  Having hired many peer firms to Venable before, paying clients do not pay $1,000 per hour for Venable partners to perform associate-level tasks, but rather pay associates (at rates 25-50% lower).  Even BHO's attorney declaration acknowledges this, where the Venable partners charge $1,000 for their work, and associates $440 per hour for their work.[57]  Thus, when Attorney Blood asks to be paid $960 per hour for doing "factual and legal research"[58], Venable would not be paid at $960 per hour for this work by its clients, rather it would be charging less than half that ($440 per hour, as BHO's attorney declaration concedes).

83.    Class Counsel is not unaware of the need to delegate work, as both Carpenter and Iredale Firms have been previously criticized for top-heavy administration of the work.  *See*, *Marino v. Coach, Inc.*, 2021 WL 827647 at p. 7 (S.D.N.Y. Mar. 3, 2021) "The Court finds the reported lodestar to be of limited value [because Class Counsel] failed to justify the large number of partner hours spent as an overall percentage of the claimed hours.") (Carpenter Firm).  *See*, *also*, *Medina v. Metro. Interpreters & Translators, Inc.*, 139 F. Supp. 3d 1170, 1180-81 (S.D. Cal. 2015) (25% reduction to the Iredale Firm because "many of the tasks performed by Mr. Iredale at $850 per hour could be reasonably performed at a lower partner or associate hourly rate, particularly with respect to the amount of client communication time, drafting the complaints, responses to motions to dismiss, responses to the summary judgment, and discovery related matters.").

84.    The record reflects that these industry-standard mandates were disregarded here, in another example of lack of cost control or billing judgment.  Collectively, 58% of the hours (and

---

[56]    *See*, ECF 328-1 at ¶ 70 ("BHO's hourly rates also compare favorably to reported rates charged by the law firms Defendant hired in this action.").

[57]    *Id.*

[58]    ECF No. 328-3, Jan. 6, 2016 time entry of Timothy Blood.

67% of the fees sought) were performed by Partners, with the overwhelming minority of the sought amount (31.5% of hours and 26.8% of fees) having been performed by firm Associates.[59]

85.    Of the three firms, only the Iredale Firm did not administer the work in a notably top-heavy manner, with the majority of its hours being performed by an associate (Attorney Jun). In contrast, BHO's share of the work was top-heavy, with 57% of hours (67% of fees) performed by BHO Partners, and only 30.8% of hours/27% of fees performed by BHO Associates.  Most astounding is the Carpenter Firm, for which 87.5% of its hours (95% of its fees) are sought for firm Partners, with only 7.3% of firm hours (4.2% of firm fees) sought by Firm Associates. With the exception of the Iredale Firm, Class Counsel's fee request is partner-heavy on its face.

86.    When considering the roles of each firm, the top-heaviness is even more stark. During the earliest phases of the litigation (preparing the complaint, discovery, document review, and motion practice), I would expect counsel to utilize a much higher percentage of associates and lower-cost billers, with partners taking a higher load during the trial process.  *See, also*, *Beastie Boys*, 112 F. Supp. at 51 ("In the Court's experience, such lopsidedly partner-heavy bills are quite unusual in the context of litigation work.  It is common, particularly with respect to discovery and other pretrial tasks, that associates shoulder much of the work, under the active supervision of partners, and that partners take lead roles as to projects for which their expertise adds value. The ratio of associate to partner hours on pretrial work typically reflects more associate than partner hours — often significantly more [… i]n contrast, trial work tends to be more partner-intensive, befitting partners' greater trial expertise.").

87.    Thus, one would reasonably expect the Carpenter Firm (whose role was to prepare the complaint and conduct early discovery) to have the least partner-heavy billing, with the Iredale

---

[59]    I included Attorney Straub as an associate in these calculations, despite BHO identifying him as a "Contract Attorney" during time periods in which he purportedly worked on the case. Original Tasher Decl., Ex. K, ¶ 8.

Firm (who actually tried the case) to have the most partner-heavy billing.  Yet, just the opposite is true: the Iredale Firm was the only firm whose associate-level timekeepers billed a majority of the hours, while the Carpenter Firm had 95% of its fees generated by partners to prepare the initial complaint, conduct early document review, and conduct a few depositions.

88.    This ratio is astonishing, and no paying client would pay 95% partner fees to draft a complaint or perform document review.  Moreover, the fact that the Iredale Firm's partner-to-associate hours ratio is majority associate *for the trial itself* (when there should be the most partner work) underscores how unreasonable both BHO and the Carpenter Firm's unreasonable distribution of work was.

89.    A review of the time records makes it clear why the partner-to-associate ratio is so skewed and top-heavy for both BHO and the Carpenter Firm: both firms utilized their partners for what is associate level work.  Examples of such top-heavy work include:

a.    <u>Preparation of the Complaint</u>: mostly drafted and prepared by two partners (Attorneys Blood and O'Reardon, along with Attorney Carpenter);

b.    <u>Drafting mediation briefs/letters</u>: Mostly performed by two partners (Attorneys Blood and O'Reardon);

c.    <u>Drafting Discovery Responses</u>: Mostly performed by a partner (Attorney O'Reardon);

d.    <u>Document Review</u>: Substantial document review performed by partners, including Attorney Carpenter;

e.    <u>Legal Research</u>: Substantial legal research performed by multiple partners, including Attorneys Blood, Hurst, and O'Reardon, along with Attorney Carpenter.

f.	Brief and Motion Drafting: Substantial brief and motion drafting performed by multiple partners, including Attorneys Blood, Hurst, O'Reardon.

g.	Drafting Witness Outlines: Witness outlines drafted by multiple partners, including Attorneys Blood and O'Reardon, along with Attorney Carpenter.

90.	In my opinion, one of the poster-child examples for the unreasonably top-heavy administration of the work is Attorney Carpenter's work on the Palumbo and Taft Depositions.

a.	Palumbo Deposition: Between October 30, 2014 and December 9, 2014, Partner Todd Carpenter billed 151.2 hours ($113,400.00) at $750 per hour in connection with preparing for and taking the Palumbo Deposition, including (i) 26.6 hours drafting the deposition outline; (ii) 48.5 hours of block-billed time block billed time finalizing the outline for, travelling, preparing, taking, and conferring about the Palumbo deposition; (iii) 74.1 hours performing document review for this deposition; and (iv) two hours conferring with co-counsel on this deposition.  Most (if not all) of these tasks could and should have been performed by associates or lower-cost timekeepers.  BHO also had several timekeepers working on this very same deposition.

b.	The Taft Deposition:  Between June 2 and June 12, 2014, Partner Todd Carpenter billed 87.5 hours ($65,625.00) at $750 per hour singlehandedly preparing for and taking the deposition of Katrina Taft.  These efforts involved the following: (i) approximately 60 hours of document review using the same canned time entry of "Evaluated document production and identified relevant docs for Taft deposition"; (ii) approximately 14 hours preparing the deposition outline; (iii) 8.4 hours finalizing the outline and taking the deposition, not including travel time. No other timekeeper at the Carpenter Firm spent any time on this deposition.  Most (if not all) of these tasks could and should have been performed by associates or lower-cost timekeepers.  It is my understanding that Ms. Taft was not called at trial.

31

91.     In its prior reply brief, Class Counsel has suggested that "[t]he associates v. partners argument makes no sense when applied to small firms." ECF 311 at p. 10.  That suggestion is incorrect.  I have engaged and worked with hundreds of smaller firms over the years, and every single one delegated this work to its associates, and they were expected to do so.  It is not the timekeeper whose value is reflected in the bill, but the character of the work.  Alba Conte, ATTORNEY FEE AWARDS, § 4:09 (3d ed. 2004) ("An attorney's rate should reflect and individual's experience and reputation as well as the economic reality that various activities have different rates of reasonable compensation.").  *In re Navidea Biopharmaceuticals Litig.*, 2021 WL 2156276 at *4 (S.D.N.Y. May 27, 2021) (reducing attorney's hourly rate because he "engaged in [] tasks, such as legal research, preliminary drafting . . . that could have [] been billed at a lower rate . . . by junior attorneys . . . but were not").

92.     In *Auerbach v. Delgatto*, a New York Supreme Court Justice rejected this very same argument, holding that "the fact that there were no junior attorneys available to do basic legal work at a lower hourly rate does not make it reasonable for Plaintiff to charged Defendant for basic legal work at a higher rate." *Id.* at p. 21.  The firm in question in *Delgatto* had only three partners and a paralegal, which is smaller than any of the firms comprising class counsel here other than the Iredale Firm (which happens to have three attorneys, only two of whom billed on this matter).

93.     Moreover, Class Counsel knows this argument to be incorrect, as it previously tried arguing it (unsuccessfully).  In *Medina v. Metro. Interpreters & Translators, Inc.*, 139 F. Supp. 3d 1170, 1180-81 (S.D. Cal. 2015), the court applied a 25% reduction to the Iredale Firm's fees due to its inefficient partner-heavy administration of the work[60], notwithstanding the Iredale Firm's

---

[60]     "The court notes that the distribution of labor, as reflected in the time records, does not demonstrate the most efficient use of the time of Iredale, Yoo, and Jun.  For example, any of the tasks performed by Mr. Iredale at $850 per hour could be reasonably performed at a lower partner or associate hourly rate, particularly with respect to the amount

claim that "[d]ue to the size of the firm…we were often required to expend partners' time in these tasks [discovery, research, and brief writing]."[61]

94.     As previously noted, I have seen reductions generally ranging from 25-50% for partner heavy staffing and believe such a reduction is warranted here.  To further support this range for the reduction is the difference that Class Counsel concedes is the difference between what Venable charges its clients for partners vs. associates ($1,000 vs. $440).[62]   Considering the difference had Attorneys Brown, Hurst, and O'Reardon (who generally functioned in associate-level roles throughout the matter) billed at Venable's associate rate of $440 per hour, the difference alone would be a nearly 20% reduction of BHO's fees (over $1.15 million).  That 20% figure includes no reduction for associate level tasks performed by Attorney Blood, no reduction for excessive document charges by Attorney Blood, and no reduction for general excessiveness, which would make that 20% figure far greater.  If even ¼ of Attorney Blood's time were billed at the same associate rate, it would increase the BHO reduction to $1.3 million.

**<u>Class Counsel's Excessive Charges for Document Review</u>**

95.     One of the most discrete and big-picture examples of Class Counsel's top-heavy administrative of its work is its objectively excessive and unreasonable charges for document review. Courts today recognize that "[t]here is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys) -- and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013).

---

of client communication time, drafting the complaints, responses to motions to dismiss, responses to the summary judgment, and discovery related matters."
[61]     Case 3:12-cv-00460-JM-MDD, ECF No. 319-2, ¶ 26.
[62]     *See*, ECF 328-1 at ¶ 70 ("BHO's hourly rates also compare favorably to reported rates charged by the law firms Defendant hired in this action.").

Thus, billing "$295 to $435" for document review is unreasonable, when contract lawyers are available for "$60 per hour." *City of Pontiac Gen. Empls. v. Lockheed Martin*, 954 F. Supp.2d 276, 280 (S.D.N.Y. 2013) (for contract attorneys in a class action).

96.      In fact, during my tenure as Associate General Counsel at Wyeth, the company engaged contract attorneys who billed at a rate between $35–$40 per hour to perform tasks associated with early-to-mid stages of document review, often in mass-tort or class action litigation. These were licensed and experienced attorneys who were far more cost-effective and experienced than utilizing expensive junior associates for this work.[63]

97.      Having been involved in numerous fee matters where law firms did engage contract attorneys, the market rate for them today is generally in the $50 per hour range, across a wide diversity of litigation subject matters. Several examples will illustrate:

a.      *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 962-970 (N.D. Cal. 2014) (firm engaged contract attorneys in complex corporate dispute "at $47 and $59 per hour");

b.      *City of Pontiac Gen. Empls.' v. Lockheed Martin*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) ($60 per hour actual cost for contract attorneys in class action);

c.      *Dial Corp. v. NewsCorp*. 317 F.R.D. 426, 438 (S.D.N.Y. 2016) ("average rate of $39/hour" for contract attorneys in class action);

d.      *In Re Wells Fargo & Co. Shareholder Lit.*, 445 F. Supp. 3d 508, 527 (N.D. Cal. 2020) (Judge Tigar found that 2020 rates for contract attorneys are "between $35 and $50 per hour" and applied $42.50 for their document review work);

---

[63]      See, also, David Degnan, *Accounting for the Costs of Electronic Discovery*, 12 MINN. J.L. SCI. & TECH. 151, 164 (2011) (recognizing the cost for staffing document review attorneys ranged from $40-65 per hour, with a mid-range of $52.50).

e.    *Lawson v. Spirit Aerosystems, Inc.*, 2020 WL 6343292 (D. Kan. Oct. 29, 2020) (collecting cases nationally and finding hourly rates for contract attorney service called Legility being at $55 per hour for first-level review); and

f.    *United Supreme Council v. United Supreme Council of Ancient Accepted Scottish Rite for 33 Degree of Freemasonry*, 2019 WL 3848784, at *2 (E.D. Va. Aug. 15, 2019) ($46 per hour for contract attorneys conducting document review).

98.    I have reviewed the rates of contract attorney fees from a wide variety of other agencies. Representative examples include Compliance Discovery, Consilio, HireCounsel, Legalpeople, and Tower Legal (consistent with the above cases, these agencies billed hourly rates ranging from $42-$63 per hour, generally around $50 per hour).[64]

99.    Class Counsel asserts that document review was an essential component of its work. O'Reardon Decl. at ¶ 4 ("Plaintiff's counsel … review[ed] over 500,000 pages of documents produced by Defendant"), ¶ 61 ("Mr. La Val played an important in formulating search terms for the collection of ESI, coding and identifying relevant documents which were utilized throughout the litigation").[65]

100.    It is evident that Class Counsel did not utilize contract attorneys to review the significant volume of documents, thereby unreasonably increasing the cost of the document review process. Instead, Class Counsel utilized far more costly timekeepers at multiples of the market price to perform this work. In Attorney Straub's case, his hourly rate to review documents is nearly ten times the market price for contract attorneys performing this same work. Compare Judge Tigar's opinion in *Wells Fargo* (445 F. Supp. 3d at 527-531) ("The mark-up up document review work to "$295-$415 is,

---

[64]    I am aware that Class Counsel's document service, Epiq (O'Reardon Decl. at ¶ 81(h)), offers such review services: https://www.epiqglobal.com/en-us/services/ediscovery-litigation-investigation-services/document-review.
[65]    Attorney Straub, who the Firm previously identified as a "Contract Attorney" in other matters (*see* Original Tasher Decl., Ex. K) (*Terry v. JPMorgan*) also performed document review in this case, but at $575 per hour. O'Reardon Decl. at ¶ 55.

35

to say at the least, 'striking'" and applying $42.50 for this work). This is especially the case when Attorney Straub was, in fact, a "contract attorney" for some portion of this matter.[66]

101.    Class Counsel's prior reply brief made two misleading assertions regarding its non-use of contract attorneys, both of which lack merit:

a.    First, it argues that the Court should not "substitute its own judgment for that of [Class] Counsel on whether associates—as opposed to contract attorneys or paralegals—should have reviewed documents."[67]  Putting aside the fact that the test of "objective reasonableness" inherently requires consideration of what a reasonable, paying client would pay, there is a more fundamental issue with Class Counsel's rejoinder: BHO made this very same judgment in assigning the work to a contract attorney: Craig Straub. Attorney Straub was not a firm associate throughout the entire discovery process. He was not listed on the firm's website in either 2017 or 2019.[68]  Rather, BHO identified him as a "Contract Attorney" in other matters at this time.[69] Attorney La Val is the same: he was also not a firm associate.[70]  It was Class Counsel whose judgment assigned the document review to a "Contract Attorney" rather than a firm associate[71], only Class Counsel asks the Court to make Premier pay for his document review work at more than ten times the market rate that paying clients pay for Contract Attorney services.

b.    Second, it argues that the documents were purportedly used "to great effect because they were reviewed by lawyers familiar with the case, and not low-level document reviewers who played no other role in the matter."[72]  This argument is nonsense in two respects. First, if it were true, no firm would ever use contract attorneys, yet their use is abundant in the

---

[66]    See Original Tasher Decl. at Ex. K (Blood Decl. in *Terry v. JPMorgan Chase Bank, N.A.*), ¶ 8.
[67]    ECF No. 311 at p. 16.
[68]    Attached as **Exhibits C – D** are copies of BHO's website from December, 2017 and March, 2019.
[69]    Original Tasher Decl., Ex. K) (Blood Decl., *Terry v. JPMorgan*) at ¶ 8 ("Craig Straub, Contract Attorney").
[70]    O'Reardon Decl. at ¶ 61 ("Geoffrey Drew La Val is a former staff attorney at BHO").
[71]    BHO did have associates at this time, who did not do this work.
[72]    ECF No. 311 at p. 16.

legal industry, especially in class action matters.  In my experience, there is no scenario where every person on the case team needs to have knowledge of the universe of production documents. If so, there would be no such thing as "first-level review".  To the contrary, the entire purpose of first-level document review is for the reviewers to flag documents of interest for a more "core" team to review.  It is here that contract attorneys are most essential and useful (and cost-effective). Second, Class Counsel's assertion is simply untrue.  To use Attorney La Val as an example, he billed 443 hours, and "was primarily responsible for document review and analysis and assisting in deposition preparation."[73]  His final time entry for the entire matter was in January of 2015. Quite literally, he "played no other role in the matter" going forward[74] and is no longer at BHO.[75]

102.    One of the issues here (as with many other issues) is that Class Counsel extensively block-billed its time (especially BHO and the Carpenter Firm).  Thus, while it is evident that several timekeepers performed document review (including Attorneys Blood, Carpenter, Laval, O'Reardon, and Straub), there is no way to calculate a precise figure for this work.

103.    To explain why, I respectfully refer the Court to Attorney O'Reardon's April 23, 2014 time entry, wherein he block-bills "review docs produced by eleven" with "prepare and serve 2d set of RFPs".  The former is not appropriate work for a partner, while the latter also could have been done by an associate at a lower rate.  There is no way to ascertain how much of this time entry should be allocated to document review or prepare a set of RFPs.  While it is impossible to calculate a precise figure, this is not a small quantum.

104.    To illustrate the extent of this issue, I look at Attorney Straub's time.  Recall that he was, up to a certain point, a contract attorney by Attorney Blood's own prior sworn statements

---

[73]    O'Reardon Decl., ¶ 61.
[74]    *Cf*, ECF No. 311 at p. 16.
[75]    O'Reardon Decl., ¶ 61 ("Geoffrey Drew La Val is a **former** staff attorney at BHO.").  Emphasis added.

and was not an associate at the firm at least through 2019 (half of the litigation—he started billing on the case in 2017). Attorney Straub billed 2,917.25 hours, and Class Counsel seeks $575 per hour for all of his work (even when he was a contract attorney). The following illustrates the impact this has on the overall fees:

a.    If only half of Attorney Straub's hours were billed at a real contract attorney rate (with the remaining half of the hours at the $575 per hour), this alone would reduce BHO's lodestar by approximately $765,000 less (about 12.5% overall).

b.    If only half of Attorney Straub's hours were billed at double a market contract attorney rate (with the remaining half of the hours at the $575 per hour), this alone would reduce BHO's lodestar by approximately $690,000 less (about 10.5% overall).

c.    Neither of these reductions includes Attorney La Val's time, which was contract attorney work billed at $335 per hour. If his fees were also charged at a market contract attorney rate, it would reduce BHO's lodestar by approximately $125,000 more.

105.    In my opinion, a percentage reduction is warranted to account for the excessive document review charges, many of which are block-billed into other time entries.

**Block-Billing, Clerical/Administrative Time, Non-Working Travel, Billing Increments**

106.    One notable issue with Class Counsel's time records is its frequent use of "block-billing." Block-billing refers to "grouping multiple tasks into a single billing entry, so as to leave unclear how much time was devoted to each constituent task."[76] While not *per se* unreasonable, block-billing as a general practice can be disfavored under certain circumstances because "it impedes both the client's ability to understand the precise time allocable to the tasks for which it

---

[76]    *Benihana Inc. v. Benihana of Tokyo* 2016 WL 3647638 (S.D.N.Y. June 29, 2016) (Engelmayer, J.) (citing *Themis Capital v. Dem. Rep. Congo,* 2014 WL 4379100, at *6 (S.D.N.Y. Sept. 4, 2014)).

is being billed, and, in the event of a later fee application, the court's ability to assess whether the time expended on any given task was reasonable."[77]

107.    New York authorities have found block-billing to be an issue under three circumstances: (a) it is one of many issues with the invoices; (b) the blocks of time contain tasks that are not compensable or reasonable; or (c) the number of hours in the blocks is so high as to "create an unacceptable risk that the aggregated total exceeded reasonable hours worked on compensable projects."[78]  I observed all three as issues with Class Counsel's use of block billing.

108.    The Court may observe that Class Counsel's time records are largely long blocks of 8-10 hours of time throughout the matter (especially for BHO and the Carpenter Firm). However, there are numerous issues with these time records (such as the document review, top-heavy workload, non-working travel time, and clerical entries).  Thus, Class Counsel's block-billing makes it impossible to recommend precise reductions for any of these issues.

109.    While I do not believe that Class Counsel's pervasive use of block-billing warrants a complete denial of all fees associated with block-billing, I do believe that it warrants a percentage reduction in this case, to account for the unreasonable billing practices that cannot be evaluated or reduced specifically without knowing the actual amount of time devoted to each individual task (including the commingling of completely improper, duplicative, and task-inappropriate work in the blocks).

110.    Generally, the proper mechanism for addressing and remediating this type of improper block-billing is to effectuate a percentage reduction, usually "between 15-30%"[79] in New

---

[77]    *Id.*, citing *Green v. City of New York*, 403 Fed. App'x, 626, 630 (2nd Cir. 2010).

[78]    *Id.*

[79]    See also *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005) (25% reduction); *Mason Tenders Distr. Council Welfare Fund v. Gibraltar Contracting, Inc.*, 2020 WL 5904357, at *3, *9 (S.D.N.Y. October 6, 2020) (20% reduction); *Mendez v. Radec*, 907 F. Supp. 2d 353, 359 (N.D.N.Y. 2012) (70% reduction); *Benihana Inc.* (20% or 45% depending on the timekeeper in question and level of pervasiveness).

York. *Benihana Inc. v. Benihana of Tokyo* 2016 WL 3647638 at \*8, citing *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d at 57 (S.D.N.Y. 2015) ("collecting cases").

111.    **Non-Working Travel Time**: Class Counsel (especially BHO) seeks reimbursement for a significant quantum of travel time.  It is my experience that most lawyers do not charge for their pure travel time—the reason being that most paying clients will not pay for it.  "Just as non-working travel is often non-billable for private sector clients, non-working travel should not be billable for class members, who lack the opportunity to negotiate Class Counsel's billing practices".  *Grace v. Apple, Inc.* 2021 WL 1222193, at \*7 (N.D. Cal. Mar. 31, 2021).

112.    I have prepared a schedule (attached as **Exhibit F**) setting forth all of the travel time entries for BHO.  The overwhelming majority of them were block-billed with other tasks, making a precise quantification impossible.  Nevertheless, the quantum is significant, with the block-billed travel time entries coming to over $580,000 (over 9.3% of the total BHO lodestar).  Notably, just considering the travel time by Attorneys Blood and O'Reardon, the total of the block-billed entries with travel comes to over $534,000, or 8.6% of BHO's total lodestar.

113.    This best illustrates the issue of block-billing, and why a percentage reduction is the most appropriate means to address the excessive fees here, in that there is no way to tell how much of the roughly $580,000 is attributable to travel vs. substantive tasks.  However, for many of these travel entries, travel from California to Boston or New York should be the majority of the time entry.  Even if just 50% of the travel entries are attributable to travel, it would reduce the BHO lodestar by nearly 5% alone.

114.    It is my opinion that a reduction is warranted for the block-billed travel entries.

115.    **Clerical/Administrative Charges**: It is well established that "[c]lerical or secretarial services . . . are part of overhead expenses and are not generally charged to clients."

*Williams v. NYC Housing Authority*, 975 F. Supp. 317, 324 (S.D.N.Y. 1997); see also *Knoeffler v. Town of Mamakating*, 126 F. Supp. 2d 305, 317 (S.D.N.Y. 2000) (citing *Broome v. Biondi*, 17 F. Supp. 2d 230, 236 (S.D.N.Y. 1997) ("The courts in this district are in agreement that '[f]iling, delivery, service of papers and other similar administrative tasks are not usually considered recoverable expenditures of time for attorneys' fees.'")).  *In accord*, *Cortes v. Juquila Mexican Cuisine Corp.*, WL 1193144 at *6 (E.D.N.Y. Mar. 29, 2021).  Here, Class Counsel's time records include numerous administrative charges throughout, charging for printing, copying, mailing, calendar, downloading, and saving files.

116.    To use an example, Attorney Straub (at $575 per hour) spent nearly $100,000 worth of block-billed time entries in which he is preparing binders, and/or mailing materials to and from the trial.  For example, on May 20, 2022, Attorney Straub billed a nine-hour block of time, which includes the following descriptions: "create binder for cross examine of Silverman for trial counsel; pack all materials fro [*sic*] trial and have them mailed."  These tasks are paralegal work at best, and most paying clients would not pay for this work at all, viewing it to be clerical.  Every one of these entries are block-billed, making a precise qualification of this work impossible.

117.    To use another example,  I refer to Paralegal Maytorena's Sept. 3, 2020 time entry ("Prepare binder for mediation and sent via fedex; Download and save defendant's confidential mediation statement and exhibits").  This is a two-hour block-billed entry.  Of these tasks, preparing binders for mediation may be clerical, but may not be.  The other two tasks (mailing and downloading) are both clerical and are not generally charged to clients.  However, there is no way to evaluate how long it took Paralegal Maytorena to go to the Fedex store and mail the binder due to the block-billed entry.  Another example is her Feb. 17, 2022 entry "Calendar expert depositions; Edit trial exhibit list."  The former task is clerical, but the latter task is not, yet there is no way to

evaluate how much of the six hours she billed that day is devoted to which task. One final example is her two-hour entry on Apr. 13, 2022 ("Gather, print and organize NY cases in binder for T. Blood"). Printing the cases is clerical, while organizing them may not be, as it might require training to do. However, due to the block-billing, there is no way to tell how much of her two hours was spent printing vs. organizing the cases. These examples illustrate the reason for applying percentage reductions in the case of block-billing with comingled clerical tasks.

118.    **BHO's Use of Quarter-Hour Increments**: One issue that became readily apparent when reviewing the clerical time by paralegals is BHO's pervasive use of fifteen-minute increments as its minimum time increment. They are the only firm to do this, as both the Carpenter and Iredale Firms utilized the industry-standard six-minute increments as its minimum time. It is my experience that most paying clients desire six-minute increments as a minimum increment. While utilizing fifteen-minute increments is not *per se* excessive or unreasonable (especially if a task actually takes fifteen or forty-five minutes to perform), the practice becomes unreasonable where the time records make it clear that the fifteen-minute increments are being used as the minimum increment for tasks that should not take fifteen minutes.[80]

119.    For example, I looked at any time entry in which Paralegal Maytorena is "calendar"-ing dates. Each of her calendaring tasks is billed to a fifteen-minute minimum.[81] Putting dates on a calendar should take a minute or less, not fifteen. This practice tends to have an aggregate effect, even if these time entries are only of a small value. Paying clients would reject

---

[80]    *See, e.g., Houston v. Cotter*, 234 F. Supp. 392, 410 (E.D.N.Y. 2017) ("Quarter-hour billing tends substantially to overstate the amount of time spent when many tasks require only a short time span to complete and adds an upward bias in virtually all cases.").

[81]    *See, e.g.,* Sept. 20, 2018 ("Calendar CMC and discovery cut-off dates"); Oct. 14, 2020 ("Calendar CMC"); May 25, 2021 ("calendar new briefing schedule"); Nov. 15, 2021 ("Calendar trial related dates"), all 0.25 hours.

this practice as unreasonable.  Where quarter-hour billing is prohibited or otherwise discouraged in New York, it is often included in a percentage reduction.[82]

**<u>Class Counsel's Unreasonable Disbursements Show a Lack of Billing Judgment</u>**

120.    A review of Class Counsel's disbursements further reflects a "spare no expense" approach, and demonstrate an utter lack of billing judgment.  Class Counsel boldly asserts in its current Motion (at p. 25) that "[t]hese expenses were reasonably and necessarily incurred and are the sort typically billed to paying clients."  Putting aside that many of these charges are double billed, "phantom" charges (*i.e.* they do not match the receipts) or firm overhead, many of them are simply excessive and unreasonable, such that any paying client would reject them out of hand.

121.    **Firm Overhead Charges and Excessive Photocopying Charges**: While these are small-dollar items, these are further examples of charges that would not be charged to a paying client, as paying clients routinely reject these charges.  For example, charges for phone services, legal research charges[83], and office supplies are generally firm overhead[84] but are sought here.[85] Additionally, in my experience, Class Counsel's 20 cents per page for photocopying is two to four

---

[82]    *See Trs. of Buffalo Laborers' Pension Fund v. Accent Stripe, Inc.*, 2007 WL 2743441, at *4 (W.D.N.Y. Sept. 18, 2007) (10% reduction); *Thomas v. United States* 2011 U.S. Dist. LEXIS 140001, at *25, (S.D.N.Y. Dec. 5, 2011) (10% reduction for the practice); *Suk Joon Ryu v. Hope Bancorp. Inc.*, 18-cv-1236 (JSR) at *4, (S.D.N.Y. Mar. 5, 2020) (15% reduction for the practice); *Houston v. Cotter*, 234 F. Supp. 3d at 410-411 (50% reduction for this and other billing issues).

[83]    "Westlaw fees are simply an item of overhead, and as such should be built into the fees charged, rather than unbundled and reimbursed separately.*" BD v. DeBuono*, 177 F. Supp. 2d 201, 208 (S.D.N.Y. 2001) (collecting cases). New York state courts agree.  *Auerbach v. Delgatto*, *supra*, at p. 26 ("This court agrees with Chief Judge McMahon that, while the time spent by an attorney conducting legal research … is compensable, the cost of the service itself is no more compensable than the cost of buying case books or law books.").

[84]    *See N.Y.S. Teamsters Conference Pension Ret. Fund v. UPS Inc.*, 2004 WL 437474 at *14 (N.D.N.Y. Feb. 27, 2004) ("overtime and supplies are not chargeable as they fall under the scope of overhead"); *Lucky Brand Dungarees, Inc. v. Ally Apparel Res.*, LLC, 2009 WL 466136 at *6 (S.D.N.Y. Feb. 25, 2009); *Tatum v. City of New York*, 2010 WL 334975 at *13 (S.D.N.Y. Jan. 28, 2010) ("Courts in this Circuit generally decline to award costs for binders and other exhibit-related supplies").

[85]    See O'Reardon Decl. at ¶ 79 (phone calls, legal research), and FN 1 (binders).

times the price that paying clients typically pay for photocopying charges (usually 5-10 cents per page).[86]    All of these charges underscore the lack of billing judgment.

122.    **Double Billed and Phantom Charges**: I observed multiple instances of expenses sought twice, and "phantom charges" (the charge does not match the receipt).  Three examples of charges that are double billed can be found on page 6 of ECF 238-12, dated Jan. 26, 2016.  There are two sets of entries from Pabu Ramen (a meal for over $320 for Attorneys Blood and O'Reardon)[87], two sets of entries for a taxi charge that same day, and two entries from Boba Guys that same day.  There are also "phantom charges" (charges that do not match up with the documentation).  For example, there is a receipt from Max's Opera House for $193.63 (including gratuity)[88] while Class Counsel seeks $233.63 for that meal.[89]  Donna Lux's hotel receipt at the "elevated luxury"[90] hotel Adagio has four nights of internet charged for a two-night stay.[91]

123.    Class Counsel has also changed the dates of several of the more lavish meals or expenditures.  For example, on a trip to Indianapolis, Class Counsel submitted two receipts on July 9, 2015, one for over $200 at a restaurant called Spoke & Steele[92], and the other from renown steakhouse St. Elmos[93].  Both receipts clearly state they were incurred on July 9, 2015, but Class Counsel's expense submission changed the Spoke and Steele record to July 11, 2015[94], thus making it appear that they only partook in one lavish meal on July 9, 2015.

[86]    *United States v. City of N.Y.*, 2013 WL 5542459 at *14 (E.D.N.Y. Aug. 30, 2013) (collecting cases and holding that it was "extremely skeptical that a reasonable client would pay twenty-five cents per page for photocopies, and [determined] ten cents per page to be appropriate.").  *Houston v. Cotter*, 234 F. Supp. 3d 392, 413 (E.D.N.Y. 2017) (reducing copying from 20 cents to 10 cents per page).
[87]    Only one receipt is provided, ECF 328-13, p. 138.
[88]    ECF 328-15, p. 237.
[89]    ECF 328-12, p. 22.
[90]    https://www.marriott.com/en-us/hotels/sfoak-hotel-adagio-autograph-collection/overview/.
[91]    ECF 328-14, p. 161.
[92]    ECF 238-13, p. 115.
[93]    *Id.*, pl. 118.
[94]    ECF 328-12, p. 5.

124.    Payment for these charges would be promptly rejected by any paying client.  What is clear to me is that this issue is not a strictly dollars-and-cents issue, but illustrates a complete lack of billing judgment on the part of Class Counsel.

125.    **Lavish Lifestyle Expenses**: Class Counsel's requested costs also reveal a "spare no expense" approach to this litigation (the trial in particular) and a total lack of billing judgment. Many of these charges are just excessive and unreasonable, and reflect that Class Counsel plainly "opt[ed] to pay for, and receive[d] the Cadillac Escalade, not the Honda Civic." *HomeAway.com*, 523 F. Supp. 3d at 592 (S.D.N.Y. 2021).

126.    This litany of excessive and unreasonable lifestyle expenses includes multiple hotel rooms at over $1,000 per night for the trial, lavish meals (such as a meal for over $500 including several orders of Wagyu steak and multiple alcoholic beverages during the trial[95], receipts where over 1/3 of the bill is comprised of alcoholic beverages[96]; $750 per night or greater hotel charges at the Hotel Adagio (where the hotel website invites those staying there to "[d]iscover a new level of luxury at Hotel Adagio")[97]; and nights with multiple lavish meal charges (such as Paula Brown's $54.14 room service followed by a $91.96 dinner at Bob's Steak & Chop House)[98].  Another observation I had is that while Class Counsel affirmatively represented that its "[a]irfare was booked in coach class"[99], (81(k)), this representation was not true, and I observed non-coach airfare being booked.  For example, on June 30, 2015, Class Counsel seeks non-coach airfare[100] and on May 21, 2022, a non-coach airfare is sought (the latter fare being $1,387.20).[101]

---

[95]    See ECF 328-15 at p. 44 (Izakaya Hon Receipt).
[96]    *Id.*, p. 125.
[97]    https://www.marriott.com/en-us/hotels/sfoak-hotel-adagio-autograph-collection/overview/
[98]    ECF 328-14 at p. 106.
[99]    O'Reardon Decl., ¶ 81(k).
[100]    ECF 328-13 at p. 66.
[101]    ECF 328-15 at p. 18.

127.    While this list is non-exhaustive, it is generally reflective of what I saw throughout Class Counsel's expense reimbursement request.  In my opinion, while the dollar value for many of these items may seem small, they reflect a big attitude of no cost being too great to throw onto the bill and eat, drink, and be merry on someone else's dime.  No paying client would tolerate Class Counsel's lifestyle expenses or lavishness.

128.    **Wasteful Expenses**: A number of charges were not just lavish, but also purely wasteful and would be rejected by any paying client.  Two examples will illustrate the issues with this category of disbursements:

a.    BHO timekeepers would travel to San Diego multiple times during the trial.  For example, Attorney O'Reardon went home from May 27-29, 2022[102] and again on June 2[103], yet kept his room at the Intercontinental in San Francisco during this window.[104]

b.    On May 25 and May 26, 2022, Class Counsel billed $303.32 and $285.07 meals at Chao Pescao.  However, on May 26, 2022, both Attorneys Blood and O'Reardon's room lists them as having ordered room service dinners.[105]

129.    Each of these issues is exacerbated by the level of staffing.  Had the trial been staffed with Attorneys Iredell, Jun, and Blood (the three attorneys who actually appeared on the record to try the case), the expenses would also have been much more modest.

130.    However, given the excessive staffing (and related trial expenses) of Attorneys Carpenter, O'Reardon, and Straub, the costs grew exponentially, considering the additional flights, Uber/taxi charges, meals/alcohol, and snacks brought about by these three additional timekeepers (essentially double the trial team).

---

[102]    *Id.*, pp. 16, 178.
[103]    *Id.*, p. 190.
[104]    *Id.*, p. 242.
[105]    ECF 328-15, pp. 179-180, 251.

131.    Accordingly, Class Counsel do not just seek one hotel for Attorney Blood at over $1,000 per night, but three (for example, on June 6 and June, BHO seeks payment for three hotel rooms for Attorneys Blood, O'Reardon, and Straub (two at $1,089 per night and one at $983.58 per night).[106]

132.    While the Class or Class Counsel is free to pay for whatever luxurious charges it wishes to on its own, when it asks a third-party to pay those, the "governing test of reasonableness is objective; it is not dictated by a particular client's subjective desires or tolerance for spending. The test is whether [it] 'spen[t] the minimum necessary to litigate the case effectively.'" *HomeAway.com*, 523 F. Supp. 3d at 592 (S.D.N.Y. 2021), citing *Beastie Boys*, 112 F. Supp. 3d at 52.  Here, the Class and Class Counsel plainly did not, "opt[ing] to pay for, and receiv[ing] the Cadillac Escalade, not the Honda Civic".  *Id.*

133.    In my opinion, a further percentage reduction is warranted not just off the fees, but off the expenses as well, to account for the cumulative and pervasive effect of Class Counsel's utter lack of billing judgment and "no-cost-is-too-great" attitude, which produced facially unreasonable charges (both fees and expenses).

### Conclusion Re: Further Percentage Reduction

134.    It is my opinion that a **40%** reduction off the BHO fees and costs conservatively accounts for the multiple issues identified above.  In my opinion, given the pervasive issues affecting virtually all aspects of the BHO work from drafting to internal and external meetings to loading up on unnecessary timekeepers, a reduction of 40% is conservative.

135.    The basis for my 40% reduction recommendation is as follows:

---

[106]    *Id.*, pp. 243-244, 247 (two at $1,089) and 182 ($983.58 per night).

a.    Based upon a survey conducted by one New York Court, reductions for block-billing with many of the issues present in the time entries here range "between 15-30%".[107] Since the issues within the blocks of time here are so substantial and pervasive, any reduction would necessarily begin at the upper end of that range.  For example, even just the block-billed entries with travel time come to nearly 10% of BHO's lodestar figure.

b.    The issues with the invoices go far beyond simply block billing with inappropriate work mixed into the entries.  Rather, the issues here involve a systemic lack of billing judgment and an unwarranted top-heavy administration of the work.  Thus, an appropriate reduction would start at higher than 30%.[108]

c.    As previously noted, reductions generally range from 25-50% for partner-heavy staffing in other matters, including in New York.[109]  Here, the partner-heavy staffing is especially lopsided, especially when considering the pervasive document review performed at rates of nearly 10-times the market rate, and the fact that the one firm brought in during the phase that should have the most partner-heavy time[110] was split nearly 50-50, underscoring how unwarranted the top-heavy staffing of BHO was.

d.    An appropriate reduction would therefore fall within a range of 30-50%, and be at the higher level of that range due to the pervasiveness and systemic nature that flowed

---

[107]    *Benihana Inc. v. Benihana of Tokyo*, 2016 WL 3647638 at *8 (S.D.N.Y. June 29, 2016) citing *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 31, 57 (S.D.N.Y. 2015) ("collecting cases").

[108]    See, *Mendez v. Radec*, 907 F. Supp. 2d at 359 ("After carefully reviewing the record in this case, as well as the time records submitted by the Plaintiffs, the Court finds that an across-the-board [70] percentage reduction in the number of hours requested is necessary based on Plaintiffs' failure to use billing judgment, the inclusion of redundant and unnecessary hours in their fee application and their excessive use of block billing." *Lee David Auerbach*, *supra*, at pp. 20-21 (reducing fees by 40% reduction for "having relatively senior attorneys doing basic research . . . unreasonably increased the costs", a "top-heavy" staffing with partners performing basic work, and because "considerable time was expanded on office conferences and telephone conferences between the attorneys as well as . . . certain amount of overlap in the work assignments of the attorneys, which contributed to duplicative work.").

[109]    See, *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d at 51-57 (30%); *Does v. District of Columbia*, 448 F. Supp. 2d at 144 (50%); *Medina v. Metro. Interpreters & Translators, Inc.*, 139 F. Supp. 3d 1170, 1180-81 (S.D. Cal. 2015) (25%) (Iredale Firm).

[110]    And that is the smallest as far as number of timekeepers.

directly from the evident lack of billing judgment.  Accordingly, in my opinion, a 40% reduction for BHO would conservatively reflect and account for many of the excessive charges.

136.    As to the Carpenter Firm, it is my opinion that the degree of unreasonableness, especially the overlapping and duplicative work performed, and a staffing model whereby 95% of the fees were performed by the partners at the earliest stages of the litigation, when the workload in no way warranted such a staffing.  In my opinion, a 40% reduction for the Carpenter Firm would conservatively reflect and account for many of the excessive charges

137.    As to the Iredale Firm, I have no issue with its staffing, having employed a lean and efficient team of two timekeepers and keeping the partner-to-associate ratio at a more appropriate level.  Its staffing model only underscores the unreasonableness of the other firms'.

****

## VI.    <u>CONCLUSIONS</u>

138.    For all the reasons set forth herein, it is my opinion that a **<u>40% reduction</u>** off the BHO fees and costs conservatively accounts for the multiple issues identified above.

139.    For all the reasons set forth herein, it is my opinion that a **<u>40% reduction</u>** off the Carpenter Firm fees and costs conservatively accounts for the multiple issues identified above.

## VII.   <u>SIGNATURE AND ATTESTATION</u>

140.   All of my expert opinions stated herein are to a reasonable degree of professional certainty.  I reserve the right to supplement my opinions should any additional information become available.

Dated: May 4, 2023
        Warren, New Jersey

*/s/ Steven A. Tasher*
Steven A. Tasher, Esquire
Wyatt Partners
P.O. Box 358
Berkeley Heights, NJ 07922
stasher@wyattpartners.com
