BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:16-CV-06980 RS<br><br>**DECLARATION OF THOMAS J. O'REARDON II IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION FOR AWARD OF ATTORNEYS' FEES, AND REIMBURSEMENT OF NONTAXED EXPENSES**<br><br>**CLASS ACTION**<br><br>Date:  June 29, 2023<br>Time:  1:30 p.m.<br>Judge:  Honorable Richard Seeborg<br>Courtroom:  Courtroom 3, 17th Floor<br><br>Complaint Filed:  December 5, 2016<br>Trial Date:  May 23, 2022 |

Case No. 3:16-cv-06980-RS

BLOOD HURST & O' REARDON, LLP

I, THOMAS J. O'REARDON, declare:

1. I am a partner in the law firm Blood Hurst & O'Reardon, LLP, one of counsel for Plaintiff in this action. I am court-appointed Class Counsel pursuant to Federal Rule of Civil Procedure 23(g) in the above-entitled matter. I have personal knowledge of the matters set forth in this declaration or believe them to be true based on facts and events made available to me and would be competent to testify as to them.

2. I submit this declaration in support of Plaintiff's Reply in Support of Renewed Motion for Award of Attorneys' Fees and Reimbursement of Nontaxed Expenses.

3. **Premier's Fee Reduction Computation:** Premier's algebraic method to reduce BHO's fee award to less than *29%* of its already voluntarily reduced lodestar is as follows:

- *First*, begin by reducing BHO's submitted lodestar of $6,210,890.00 by $583,572.50 to $5,627,317.50 for "non-compensable time" that is supposedly "relating to the depositions of the class representatives in the related actions and for *Mullins* trial preparation";

- *Second*, "[a]fter removing non-compensable tasks" ($583,572.50) then equally apportion the "compensable" lodestar for work before November 2, 2021 among eleven cases ($2,912,493.75 total or $264,772.15 for each of 11 cases);

- *Third*, add the 1/11th apportioned amount ($264,772.15) to BHO's post-November 2, 2021 lodestar for a total of $2,979,595.90;

- *Fourth*, decrease the balance across-the-board by 40%, resulting in a total lodestar for BHO of $1,787,757.54; and

- *Fifth*, apply no multiplier to the resulting lodestar.

*See* ECF No. 331-1 (Swaney Declaration) at ¶ 8.

4. Premier employs a similar approach to propose reducing Lynch Carpenter's lodestar by *95%* – from $392,392.50 to $20,842.77. Opp. at 21-22.

5. **Premier's Math is Incorrect**: In addition to the incorrect approach proposed by Premier for "removal of non-compensable fees," the 1/11th apportionment, and any across-the-board cuts, Premier's math is also incorrect. The *Montera* complaint was filed on December 5, 2016.

1                                          Case No. 3:16-cv-06980-RS

ECF No. 1. Yet, Premier argues to apportion all of Plaintiff's Counsel's "compensable" hours among eleven cases for all times before November 2, 2021. That date is when *Montera* was set for trial. Using the 2021 date *and* accepting Premier's idea of what is "compensable" (i.e., removing $528,627.50 from the equation) results in apportioning $2,912,493.75 among "eleven" cases for a per-case amount of $264,772.15. That math makes no sense for several reasons, including:

- First, there are ten certified cases – not eleven.

- Second, $528,627.50 should not be removed from any equation.

- Third, November 2, 2021 should not be used as the end date for apportioning time. *If* any date was to be used as the end date for apportionment – and none should – that date would be December 5, 2016, when *Montera* was filed. Premier's misuse of November 2, 2021, results in slashing **millions** of dollars from Plaintiff's Counsel's lodestar.

  1. BHO's lodestar for non-*Mullins* work done before **December 5, 2016**, is $1,433,517.50.

  2. BHO's lodestar for non-*Mullins* work before **November 2, 2021**, is $3,496,066.25.

  3. BHO's lodestar for non-*Mullins* work done on or after **November 2, 2021**, is $2,714,823.75.

  4. BHO's total non-*Mullins* lodestar with the Renewed Motion is $6,210,890.00.

  5. *If*, the non-*Mullins* lodestar before *Montera* was filed on December 5, 2016 was apportioned among the ten class cases, it would result in an apportioned amount of $143,351.75 for each of the ten class cases.[1] In other words, it would still result in an apportionment-based lodestar reduction of $1,290,165.75.[2]

---

[1]    $1,433,517.50 / 10 = $143,351.75

[2]    $1,433,517.50 - $143,351.75 = $1,290,165.75

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

6. Adding the apportioned lodestar amount ($143,351.75) to the lodestar incurred on or after December 5, 2016 ($4,777,372.50) results in a total BHO lodestar in *Montera* of $4,920,724.25.[3] $4,920,724.25 would still be a reduction of over 20% of BHO's submitted lodestar.[4] A multiplier of just *1.26* on $4,920,724.25 would result in an award equaling BHO's lodestar from the Renewed Motion.

7. Applying the same methodology above to Lynch Carpenter's time (i.e., adding a 1/10th apportionment of all time before 12/5/16 to its lodestar incurred after 12/5/16) results in a Lynch Carpenter lodestar in *Montera* of $112,200.[5] $112,200 would still be a reduction of over 76% of Lynch Carpenter's submitted lodestar.[6]

6.    **Plaintiff's Methodology to Exclude / Include Hours:** Paragraphs 24, 73 and 74 of my previous declaration explained how we performed an entry-by-entry analysis to determine if: (1) the billed time benefitted *Montera* (and is thus, properly included time); (2) the time did not benefit *Montera* because it concerned e.g., the *Sonner I* or *Sonner II* appeals (and is thus, excluded time); or (3) the time entry related to both. To be conservative, we excluded all entries where the description included both included and excluded work.

7.    **2017 "Trial Preparation" Work:** With Plaintiff's original fee motion, we utilized a wholesale exclusion methodology based upon time periods. One of the results of using this overly conservative methodology was the exclusion of *all* work done in 2017 around the time of preparing for the anticipated trial in *Mullins*. Now, with the Renewed Motion, we performed a more rigorous

---

[3]    Even if the Court was to adopt Premier's argument and slash 40% from the post-apportioned time, the result would be a BHO lodestar of $2,866,423.50, which is still more than a million dollars greater than what Premier says is reasonable. A 2.16 multiplier of that amount would result in an award equaling BHO's lodestar from the Renewed Motion.

[4]    $4,920,724.25 / $6,210,890.00 = 79.23%.

[5]    One-tenth of the submitted lodestar incurred before December 5, 2016 ($311,325) equals $31,132.50. That "apportioned" amount plus the submitted lodestar incurred on or after December 5, 2016, equals $112,200.

[6]    $112,200 / $392,392.50 = 23.28%.

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

BLOOD HURST & O' REARDON, LLP

00202645

entry-by-entry analysis combing through all of the thousands of billing entries. Through this effort, it became apparent that the bulk of BHO's 2017 trial preparation-related time ultimately benefited *Montera*. Therefore, that time was properly included in the lodestar submission with the Renewed Motion. Nevertheless, we still exercised conservative billing judgment by excluding any 2017 hours where the benefit to *Montera* was unclear. This included instances such as working on jury instructions for the *Mullins* case that pertained to UCL and CLRA claims not relevant in *Montera*, despite the overlap in false advertising themes. As other examples, and even though there is a factual and legal overlap with *Montera*, we also excluded hours relating to the verdict forms in *Mullins*, the final pretrial conference statement in *Mullins*, and drafting and opposing motions in limine in *Mullins*. BHO's approach was not limited to excluding hours only on issues specific to California law or retail sales but extended to ensure that the hours performed in 2017 included with the Renewed Motion lodestar benefited the 2022 trial preparation, discovery, expert selection, and motion strategy and were otherwise directly applicable to the facts, witnesses, documents, studies, themes, and demonstratives used in *Montera*. Thus, our efforts remained based on a conservative, over-***exclusive*** methodology that aimed to ensure that only the most relevant work was included in the lodestar with the Renewed Motion.

8.    **<u>Swaney Decl., ¶ 9</u>:** Defense counsel states that "Class Counsel should not recover any expert fees or costs for the following experts, who were not disclosed in this action (*Montera*) and only did work in *Mullins*…" As discussed in the reply brief, we disagree with the fundamental principle that these expert-related costs are not recoverable here. However, there is an error in Mr. Swaney's statement about what cost amount Plaintiff seeks. Below is the cost chart appearing in Mr. Swaney's declaration. There are two incorrectly stated costs, which are highlighted below.

00202645

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

BLOOD HURST & O' REARDON, LLP

| Expert | Deposition Date | Deposition Cost (ECF 328-7) | Expert Fee Sought (ECF 328-8) | Total Expense That Should Be Disallowed |
|---|---|---|---|---|
| Mark Keegan | 6/10/2015 | $1,253.17 | $68,159.09 | $69,412.26 |
| Jeremiah E. Silbert | 7/2/2015 | $1,124.60 | $58,692.50 | $59,817.10 |
| Lynn R. Willis | 7/10/2015 | $1,204.56 | $26,500.00 | $27,704.56 |
| Steven R. Graboff | 7/28/2015 | $957.63 | $40,612.50 | $41,570.13 |
| | | | TOTAL: | $198,504.05 |

*See* ECF No. 331-1 (Swaney Declaration) at page 4.

The Court should disregard the chart from Mr. Swaney's declaration. The two cost amounts highlighted in yellow above are the ***entire*** expert costs charged by Dr. Silbert and Dr. Graboff. *However*, as stated in the Renewed Motion, Plaintiff does ***not*** request reimbursement of the entire expert costs charged by Dr. Silbert and Dr. Graboff. Instead, Plaintiff only seeks reimbursement of their fees charged in connection with class certification and summary judgment, and not their fees charged for the later Rule 26 reports for trial in *Mullins*. Thus, Mr. Swaney's chart overstates the amount sought by $31,587.50 that Plaintiff has voluntarily excluded from the Renewed Motion. *See* O'Reardon Decl., ¶¶ 81(g)(vi) and 81(g)(vii) (explaining that Plaintiff does not seek reimbursement of the full costs charged by Dr. Graboff and Dr. Silbert). The two other experts in Mr. Swaney's chart, Mark Keegan and Lynn Willis, only performed work in connection with class certification and summary judgment and so Plaintiff seeks full reimbursement of their fees.

9.    **Tasher Decl., ¶¶ 24, 43 (Plaintiff's Lodestar is Greater in the Renewed Motion):** Tasher correctly observes that BHO's lodestar submitted with this Renewed Motion is up 15% from the prior fee motion. For very good reason – the method to exclude hours used in the prior fee motion was overly conservative. *See* O'Reardon Decl., ¶¶ 73-74. Premier demanded time records and so for this Renewed Motion we went tediously through the time associated with over 3,600 timeslips. The result proved the previous method excluded too much time that benefited this matter. To determine which records to submit and the resulting lodestar to include, Plaintiff's Counsel again

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

has utilized a conservative methodology following the same logic as before – to include only time benefitting this action for the lodestar calculation. But where Class Counsel previously cut with a cleaver, this time Class Counsel analyzed the time (entry by entry) with a scalpel. As before, Plaintiff's Counsel's method was to exclude at least all time spent on the *Sonner* appeals, and work that benefitted only *Mullins* or the subsequent state court actions. For example, going entry by entry, Plaintiff's Counsel's excluded the time spent on briefing class certification in the state court *Bland* action (which occurred after *Montera* was certified), work on jury instructions from *Mullins* that concerned UCL and CLRA claims not at issue in *Montera* (although similar consumer fraud, false advertising themes existed), the motion to compel Vincent Mullins to travel to San Francisco for his deposition, the motion to substitute in Ms. Sonner for Mr. Mullins, the motion for leave to amend to file the Second Amended Complaint in *Sonner* to drop the request for damages under the CLRA and the subsequent motion to dismiss filed by Defendant, all time working with expert Robert Wallace regarding California class damages in *Mullins*, all time working with Dr. Thomas Maronick in connection with his marketing opinions and deposition provided in *Mullins*, and 2017 *Mullins*-only trial work regarding Drs. Graboff, Silbert and Lippiello. Class Counsel has also excluded from this lodestar any particular time records that in any way expressly referred to a task that did not benefit *Montera* – even if that same time entry also (and often primarily) *did* also include work that benefitted *Montera*. *Id*. Further excluded is any time spent on this Renewed Motion and time spent so far on the post-trial appeals in this matter. We plan to file additional fee motions as appropriate in the future. Because this more precise method of billing judgment was used with the Renewed Motion, BHO's lodestar submitted with this Renewed Motion is up 15% from the prior fee motion.

10.    **Opposition at 17 (BHO Excluded Over $2.17 Million in Lodestar):** Premier incorrectly states that BHO "does not even represent that they made [] an effort here" to exclude unnecessary or redundant hours. In the exercise of billing judgment described above, we removed *over 3,000 hours* and *over $2.17 million* in lodestar for purposes of this Renewed Motion. *See* O'Reardon Decl., ¶¶ 72-74; ECF No. 311-1 (Blood Declaration) at ¶ 60 (BHO's total lodestar on the overall Joint Juice litigation as of August 2022 was 12,734.25 hours for lodestar of $8,381,417.50).

11.    **Tasher Decl. ¶ 52; Opposition at 15 (Plaintiff's 19 Timekeepers Is Not Overstaffing "On its Face"):** Tasher claims that Plaintiff's Counsel overstaffed the case with a "little army" by using three firms, with a total of 19 timekeepers.

12.    Premier has been represented in this litigation by *four AmLaw 100 firms* (Arnold & Porter, Venable, Morrison & Foerster, and Faegre Drinker Biddle & Reath), and *at least 22 attorneys*[7] and an untold number of paralegals.

13.    Out of the 19 timekeepers for the Plaintiff, 15 were attorneys – a number fewer than those utilized by Premier, and the remaining four were paralegals. BHO, which assigned 10 attorneys and three paralegals to this case, never assigned more than one paralegal concurrently. Furthermore, out of the ten BHO attorneys, three were assigned specific, limited tasks, and each billed less than 26 hours.

14.    Premier was often represented at hearings and depositions by more attorneys than Plaintiff.

    a.    **Deposition Staffing:** Premier's in-house counsel attended most of the depositions. Not including in-house counsel or Premier's outside counsel who attended but did not appear on the record, the following chart demonstrates the staffing during depositions:

[7]    Trenton Norris (Partner), Anton Ware (Partner), Angel Garganta (Partner), Jessica Grant (Partner), Steven Swaney (Partner), Alexis Amezcua (Partner), Christopher Waldon (Partner), Daniel Blynn (Partner), Aaron Van Oort (Partner), Mark Taticchi (Partner), George Langendorf (Associate), Daniel Lassen (Associate), Yuhan Chi (Associate), Rachel Chanin (Associate), Amit Rana (Associate / Counsel), Antonia Stabile (Associate), Guido Toscano (Associate), Brian Featherstun (Associate), John Vazquez (Associate), Jonathan Koenig (Associate), Hannah Leiendecker (Associate), Ashlee Paxton-Turner (Associate).

BLOOD HURST & O' REARDON, LLP

00202645

BLOOD HURST & O' REARDON, LLP

| Date | Deponent | Plaintiff's Counsel | Defendant's Counsel |
|---|---|---|---|
| 6/6/2014 | Ritterbush, David | Thomas O'Reardon | Angel Garganta |
| 6/12/2014 | Taft, Katrina | Todd Carpenter | Anton Ware |
| 6/13/2014 | Stone, Kevin, M.D. | Thomas O'Reardon | Angel Garganta |
| 7/25/2014 | Horn Davenport, Darcy | Thomas O'Reardon | Anton Ware |
| 11/13/2014 | Sonner, Kathleen | Todd Carpenter | Angel Garganta |
| 11/18/2014 | Palumbo, Lance | Todd Carpenter, Thomas O'Reardon | Angel Garganta |
| 11/19/2014 | Palumbo, Lance | Todd Carpenter, Thomas O'Reardon | Angel Garganta |
| 12/5/2014 | Irving, Stewart | Thomas O'Reardon | Anton Ware |
| 12/9/2014 | Palumbo, Lance | Todd Carpenter | Angel Garganta |
| 6/10/2015 | Keegan, Mark | Thomas O'Reardon | Anton Ware |
| 6/11/2015 | Poret, Hal | Thomas O'Reardon | Anton Ware |
| 7/2/2015 | Silbert, Jeremiah E., M.D. | Timothy Blood, Thomas O'Reardon | Jessica Grant, Angel Garganta |
| 7/10/2015 | Willis, Lynn R. Ph.D | Timothy Blood, Thomas O'Reardon | Jessica Grant, Angel Garganta |
| 7/28/2015 | Graboff, Steven, M.D. | Thomas O'Reardon, Colette Menaldino | Jessica Grant, Angel Garganta |
| 7/7/2017 | Choi, William, Ph.D. | Thomas O'Reardon | Jessica Grant |
| 7/11/2017 | Graboff, Steven, M.D. | Paula Brown | Jessica Grant |
| 7/12/2017 | Silverman, Stuart M.D. | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 7/14/2017 | McAlindon, Timothy, M.D., M.P.H. | Thomas O'Reardon | Jessica Grant |
| 7/19/2017 | Poret, Hal | Thomas O'Reardon | Jessica Grant |
| 7/20/2017 | Weir, Colin | Thomas O'Reardon | Jessica Grant, John Vazquez |
| 7/21/2017 | Silbert, Jeremiah E., M.D. | Thomas O'Reardon | Jessica Grant |
| 7/25/2017 | Lippiello, Louis Ph.D. | Thomas O'Reardon | Jessica Grant |
| 7/26/2017 | Maronick, Thomas Ph.D. | Thomas O'Reardon | Jessica Grant |
| 7/28/2017 | Grande, Daniel A., Ph.D | Thomas O'Reardon | Jessica Grant, Brian Featherstun |
| 8/21/2019 | Fishon, Eric | Paula Brown | Jessica Grant, Amit Rana |
| 8/23/2019 | Avery, Beverly | Paula Brown | Jessica Grant, Amit Rana |
| 9/10/2019 | Ravinsky, Annette | Ed Ciolko | Amit Rana |
| 9/17/2019 | Dent, Sandra | Paula Brown, Craig Peters | Angel Garganta |
| 9/18/2019 | Lux, Donna | Paula Brown | Angel Garganta |
| 9/19/2019 | Trudeau, Mary | Paula Brown | Angel Garganta |
| 9/20/2019 | Caiazzo, Susan | Ed Ciolko | Amit Rana |
| 9/25/2019 | Spencer, Marilyn | Paula Brown | Amit Rana |
| 1/9/2020 | Horn Davenport, Darcy | Thomas O'Reardon, Craig Peters | Angel Garganta, Amit Rana |
| 1/16/2020 | Stiritz, Nicholas - FRCP 30(b)(1) | Thomas O'Reardon | Angel Garganta, Christopher J.C. Waldon, Antonia Stabile |
| 1/16/2020 | Stiritz, Nicholas - FRCP 30(b)(6) | Thomas O'Reardon | Angel Garganta, Amit Rana, Antonia Stabile |
| 1/31/2020 | Cornille, Douglas | Todd Carpenter, Craig Straub | Christopher J.C. Waldon, Amit Rana, Antonia Stabile |
| 2/13/2020 | Imes, Donna Marie | Thomas O'Reardon | Jessica Grant, Amit Rana |
| 5/5/2020 | Bland, Patricia | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 5/6/2020 | White, Edward | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 2/16/2022 | Stone, Kevin, M.D. | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 2/23/2022 | Choi, William, Ph.D. | Paula Brown, Craig Straub | Antonia Stabile, Amit Rana |
| 2/24/2022 | Grande, Daniel A., Ph.D | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 3/2/2022 | Poret, Hal | Thomas O'Reardon, Craig Straub | Alexis Amezcua |
| 3/4/2022 | Silverman, Stuart M.D. | Thomas O'Reardon, Craig Straub | Jessica Grant |
| 3/7/2022 | Guilak, Farshid, Ph.D. | Thomas O'Reardon | Jessica Grant, Antonia Stabile |
| 3/7/2022 | Steckel, Joel Ph.D. | Timothy Blood, Craig Straub | Amit Rana |
| 3/8/2022 | McAlindon, Timothy, M.D., M.P.H. | Thomas O'Reardon | Jessica Grant, Antonia Stabile |
| 3/9/2022 | Rucker, Derek Ph.D. | Timothy Blood | Amit Rana |
| 3/10/2022 | Dennis, J. Michael, Ph.D. | Thomas O'Reardon | Alexis Amezcua |
| 3/11/2022 | Weir, Colin | Thomas O'Reardon, Craig Straub | Steven Swaney |

Case No. 3:16-cv-06980-RS

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

00202645

BLOOD HURST & O' REARDON, LLP

b.    **Hearing Staffing:** Civil Minutes for 13 hearings appear on the *Mullins* Master Docket. At 7 of 13 hearings, Premier had at least one more attorney than did Plaintiff. Plaintiff never had more attorneys than Premier at any of the hearings.

| ECF | Date | Event | Plaintiff's Counsel | Premier's Counsel |
|---|---|---|---|---|
| 33 | 12/12/13 | Initial Case Management Conference | Timothy Blood | Angel Garganta, Rachel Chanin |
| 54 | 8/14/14 | Motion to Compel | Thomas O'Reardon | Angel Garganta |
| 124 | 1/27/16 | Class Certification / Summary Judgment | Timothy Blood, Thomas O'Reardon | Angel Garganta, Anton Ware, Jonathan Koenig |
| 142 | 9/1/16 | Case Management Conference | Timothy Blood, Thomas O'Reardon | Angel Garganta, George Langendorf |
| 169 | 2/9/17 | Case Management Conference | Timothy Blood | Trenton Norris, George Langendorf, Jessica Grant, Angel Garganta |
| 199 | 8/24/17 | Motion for Leave to file Second Amended Complaint | Timothy Blood, Craig Peters | Jessica Grant, Angel Garganta |
| 223 | 12/21/17 | Motion to Dismiss/ Case Management Conference | Timothy Blood | Jessica Grant, Brian Featherstun |
| 238 | 3/1/18 | Case Management Conference | Timothy Blood | Angel Garganta, Jessica Grant, Brian Featherstun |
| 259 | 7/19/18 | Case Management Conference | Timothy Blood, Craig Peters | Angel Garganta, Jessica Grant |
| 265 | 9/20/18 | Case Management Conference | Timothy Blood, Craig Peters | Angel Garganta, Brian Featherstun |
| 278 | 8/22/19 | Motion for Judgment on the Pleadings | Timothy Blood | Angel Garganta |
| 290 | 11/21/19 | Class Certification | Timothy Blood | Angel Garganta, Amit Rana |
| 318 | 1/29/21 | Motion for Permanent Injunction / Motion to Quash | Timothy Blood | Angel Garganta, Antonia Stabile, Jessica Grant |

15.    **Tasher's Expert Opinions in *DeMaria*:** Tasher previously endorsed a fee petition for plaintiff's counsel in *DeMaria v. Horizon Healthcare Services, Inc.*, No. 2:11-cv-07298-WJM-MF (D.N.J.), which involved five law firms and 38 timekeepers. Tasher's August 24, 2016, declaration from *DeMaria* is attached as **Exhibit A**. *DeMaria* was resolved after only 4.5 years, without the need for experts, summary judgment or trial, and involved far fewer depositions and documents than our current case. In *DeMaria*, Tasher declared being "particularly impressed by the

00202645    DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

efficiency of Class Counsel" who billed 4,153.23 hours, stating "it would not have been surprising if Class Counsel had expended twice that number of hours." **Ex. A** at p. 12. Tasher also declared it was reasonable for plaintiff's counsel to receive a 33.3% fee of $11,000,000, which amounted to a 4.36 lodestar multiplier. *Id.* at pp. 5-7. Class Counsel's blended hourly rate of $691.93 in *DeMaria* was also higher than Class Counsel's here of $650.53.

16.    **Tasher Decl., ¶¶ 54-55 (Trial Preparation Staffing):** Tasher criticizes the fact that Plaintiff's Counsel declared that Iredale, Jun, Blood, O'Reardon, and Straub each worked on trial preparation. Tasher says these statements make it "very clear" there was duplication when it came to trial preparation. He could not be more wrong in his speculation. His overly simplistic opinion is also misleading. Trial preparation in this case involved a substantial number of issues. None were simple. Factually, trial preparation involved a wide range of scientific, advertising, marketing, and sales-related issues. Joint Juice was launched nationwide in 2009, but what started as a single-product company was founded (by Dr. Kevin Stone – I deposed him twice) about a decade prior to that. The scientific story behind glucosamine and chondroitin also spans decades, continents and is rife with industry influence and controversy. Each of these factual issues implicated a large volume of document discovery (over 500,000 pages produced by Premier) and hundreds of scientific studies that we had to sift through, organize, focus, and make understandable for a jury. Premier also claims to not have all of the retail sales data for Joint Juice and so we had to subpoena many third-party retailers for their data. That was no easy task, but we, including Mr. Straub, successfully obtained the data. Beyond just the mountain of documents, all these varied factual topics implicated numerous fact and expert depositions (49 were taken) and multiple retained experts who provided dozens of lengthy declarations and reports. The fact depositions in this case were taken at various times between 2014 and 2022, and many of the parties' experts have provided Joint Juice-related testimony over the years in connection with class certification, summary judgment, and for Rule 26 merits purposes. Mr. Straub knew Premier's 500,000 pages of documents better than anyone and I was the most familiar with the scientific literature. Because the case and our opponent demanded it, we retained and worked with one or more experts on each of these issue categories: Dr. McAlindon (science), Dr. Guilak (science), Dr. Rucker (marketing and advertising), Dr. Dennis (advertising and

surveys), and Mr. Weir (retail sales). Premier also retained one or more experts on each of these issues: Dr. Grande (science), Dr. Silverman (science), Dr. Steckel (marketing and advertising), Dr. Choi (damages), and Mr. Poret (surveys). Along with Mr. Blood, I worked with every one of our experts, including defending their depositions and working with them through their various declarations and reports, both opening and in rebuttal. Mr. Blood and I also had primary responsibility for deposing Premier's experts. I had also taken most of the fact and expert witness depositions over the years (32 in all) and was familiar with every one of them. Mr. Blood, Mr. Straub and I also gained a substantial amount of unique experience and knowledge by successfully litigating another hard-fought glucosamine and chondroitin false advertising lawsuit. *In Yamagata v. Reckitt Benckiser*, No. 3:17-cv-03529-VC (N.D. Cal.) we served as class counsel. Like this case, that case involved a significant number of depositions (30), documents (303,000 pages), and experts on science, marketing and sales (15 in all). In *Yamagata*, Mr. Blood, Mr. Straub and I took the lead against a defendant who threw up many similar defenses to science and marketing that Premier did here. Dr. McAlindon, Dr. Guilak, and Dr. Grande were retained by the parties in *Yamagata*. This is all to say that Mr. Blood, Mr. Straub and I have developed an institutional knowledge not just of consumer class actions generally, but about litigating falsely advertised joint health supplements in particular. I believe were able to successfully and efficiently leverage that knowledge to help prepare for trial in *Montera*. And based on the results obtained, I believe that we each played a necessary and valuable role. In addition to the factual issues, the trial also involved a great number of legal issues on a wide variety of topics implicating both class action jurisprudence and consumer protection and false advertising laws. Mr. Blood took the lead on those issues just as he has done since the case was filed in 2013. Suffice it to say each of the attorneys who worked on trial preparation had significant, non-duplicative roles preparing for trial. We are a small, contingency firm; we need to cover a number of cases at any given time while still devoting the necessary resources towards preparing for what we knew would be a well-prepared opponent. The experience and expertise of Premier's counsel from both a trial and class action perspective also cannot be discounted. That was a factor we reasonably took into account when dedicating resources towards trial preparation and trial. We decided in the months before trial to associate in Iredale & Yoo, with

BLOOD HURST & O' REARDON, LLP

whom we have tried cases previously. We had to get Mr. Iredale and Ms. Jun up to speed, and I believe we successfully did. In my opinion we delegated the various tasks in a highly efficient manner. We had no choice but to do so.[8]

17.    **Tasher Decl., ¶ 58(a) (Palumbo Deposition):** Premier's Opposition cites three examples of what it describes as "significant overstaffing throughout the case." (Opp. at 14.) First is "250 hours" for what Premier describes as "one deposition" of Lance Palumbo. That is highly misleading. Mr. Palumbo was deposed in both 30(b)(6) and individual capacities. The deposition lasted 19.5 hours over three days, required two different trips to San Francisco, and involved introduction of 73 exhibits. Most of the exhibits were subsequently used throughout the litigation at class certification, summary judgment and during trial. Premier designated Mr. Palumbo as its 30(b)(6) witness on everything related to science, marketing and sales. Palumbo was also the first 30(b)(6) deposition in the case. Palumbo appears on over 15,000 *documents* (not pages) that Premier produced. He was a critical witness who also featured prominently at trial. Based on this record, and the time entries substantiating the time spent, the time spent preparing for and deposing Palumbo is entirely reasonable. Premier includes in the 250, 48.5 hours that Straub spent in 2020 when it was expected that Palumbo would be deposed once again. The pandemic occurred and Palumbo's fourth deposition never took place. However, Straub's work and preparation paid off because much of his work was used during Palumbo's testimony at trial.

18.    **Tasher Decl., ¶ 58(d) and Ex. E thereto; Opposition at 18 (Fees on Fees):** Tasher and Premier object that we include 318.25 hours for $215,488.75 in lodestar relating to the initial fee motion. Premier concedes the time establishing the right to a fee award is compensable but asserts without any detail that BHO's time "is excessive on its face." Premier does not detail a proper amount of time. Premier opposed every aspect of the fee motion, including whether there was any right to fee-shifting and whether any award should come out of the Class judgment or be paid on top of that amount. The briefing was managed in an efficient and sensible way, with the three

---

[8]    Relatedly, Premier also claims that Mr. Blood billed "between five and eight hours every day" after trial for "trial preparation." Opp. 14. That is incorrect. As the submitted time records demonstrate, he billed an average of 4 hours and 49 minutes when off-record on trial days.

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

BLOOD HURST & O' REARDON, LLP

00202645

attorneys knowing the case and issue best being assigned to it (myself, Mr. Straub and Mr. Blood), and the highest billing partner (Mr. Blood) billing less than 13.5% of the associated hours. Further, as the entries in Tasher Exhibit E demonstrate, the 318.25 hours include not just "the initial fee motion" (Opp. at 19), but also the hours working on the separate bill of costs, which was opposed and also required comprehensive briefing and documentation. About three percent of Class Counsel's total hours was spent on the successful fee motion, which established the right to shift significant fees and expenses to Premier. I believe this was a reasonable and appropriate number of hours particularly given the magnitude of the issues and the results achieved. Additionally, BHO's hours for this renewed motion are not included in the lodestar submitted.

19. **Tasher Decl., ¶ 59; Swaney Decl., ¶ 2 (Erroneously Duplicated Hours):** Premier and Tasher identify entries from four days (from nearly a decade of litigation) that are duplicative. Premier's proposal to remove both the duplicate and the non-duplicate is unreasonable. Plaintiff agrees to remove the inadvertent duplication. It results in a reduction of 45.25 hours for $37,443.75 in BHO's lodestar.

| Inadvertent Duplicate Entries | | | | |
|---|---|---|---|---|
| Timekeeper | Date | Hours | Rate | Lodestar |
| MacPherson | 4/28/2016 | 6.75 | $ 585.00 | $ 3,948.75 |
| Straub | 3/2/2022 | 9 | $ 575.00 | $ 5,175.00 |
| Blood | 5/19/2022 | 9.5 | $ 960.00 | $ 9,120.00 |
| Blood | 5/19/2022 | 2 | $ 960.00 | $ 1,920.00 |
| Blood | 5/19/2022 | 6 | $ 960.00 | $ 5,760.00 |
| Blood | 5/25/2022 | 12 | $ 960.00 | $ 11,520.00 |
| TOTAL | | 45.25 | | $ 37,443.75 |

20. **Tasher Decl., ¶ 62 (July 31, 2017 entries):** Tasher says Ms. Bass billed 0.75 hours for a meeting on July 31, 2017 with Blood, O'Reardon, Brown and Straub, but nobody else billed for a meeting on that date. Tasher has purportedly read the time entries. He is wrong and his conclusion about them is highly misleading. The entries appear as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Bass, Camille | Associate | 0.75 | $410.00 | $307.50 | 7/31/2017 | Meeting with Tim Blood, Attorney T. O'Reardon, Attorney P. Brown, and Craig Straub regarding presentation tomorrow |
| Brown (Roach), Paula | Partner | 9.50 | $660.00 | $6,270.00 | 7/31/2017 | trial preparation |
| Straub, Craig | Associate | 8.00 | $575.00 | $4,600.00 | 7/31/2017 | Created memo concerning Premier's consumer research and consumer perception of Joint Juice at direction of partner T. O'Reardon. |
| O'Reardon, Thomas | Partner | 9.00 | $710.00 | $6,390.00 | 7/31/2017 | meet with team about strategy and work on science presentation |

BLOOD HURST & O' REARDON, LLP

*See* ECF No. 328-3 at p. 65.

21.    **Tasher Decl., ¶¶ 64-66 (Class Counsel's "Overstaffing" At Trial):** Premier criticizes Mr. Straub and me for billing during the trial. The on record time at trial was 46 hours and 29 minutes. The resulting lodestar for Mr. Straub was $26,593.75, and for me, it was $32,837.50, making a combined total of $59,431.25. However, attending the trial and actively participating were necessary and beneficial to our roles, as explained.

22.    Mr. Straub and I played significant roles in helping present the case at trial. We were the most familiar with the case. We prepared witnesses, reviewed and culled evidence, and constructed questioning, themes, and demonstratives. Attending trial helped us better do our jobs.

23.    I believe trial observation is essential to have a comprehensive understanding of the proceedings. By being physically present in the courtroom Mr. Straub and I were able to closely follow the presentation of evidence, witness testimony, and the arguments. By directly observing the trial, we gained valuable insights and firsthand knowledge that could not be adequately captured through second-hand reports or transcripts alone. This real-time assessment was crucial for adapting trial strategies, adjusting witness examination techniques, and making informed decisions during the trial. Effective trial advocacy demands constant evaluation and adjustment and being present in the courtroom allowed Mr. Straub and I to do just that.

24.    Our active involvement during the trial extended beyond mere observation. Or just "sit[ting] in the back of the court" as Tasher describes my role. Our deep familiarity with the case allowed us to actively support Mr. Blood, Mr. Iredale and Ms. Jun, help prepare witnesses and evidence, and contribute to the overall trial strategy. In complex litigation like this, where numerous documents, depositions, and experts are involved, having a well-coordinated and fully engaged trial team is imperative. Our active participation in the trial proceedings ensured a thorough and comprehensive representation of the Class's interests and bolstered the overall strength of the case. The trial required our continuous engagement and on-the-spot assessments, which ultimately served the best interests of the Class and the pursuit of a favorable outcome. Tasher's simplistic analysis overlooks the inherent complexity of trial preparation and the significant role played by all members

of the trial team. The presence and active involvement of all members of our trial team contributed to the collective effort in presenting a compelling and well-prepared case. Dismissing the value and contributions of Mr. Straub and I based on the fact we did not question a witness before the jury fails to acknowledge the multidimensional nature of trial advocacy—particularly in complex litigation—and the dynamic interactions necessary for a comprehensive and effective representation.

25.    **Overstaffing. Tasher Decl., ¶ 68:** Tasher says BHO overstaffed with up to five timekeepers on five days. Coordination leads to efficiency and non-duplication. In complex litigation, meeting to divide responsibilities is essential.

a.    **July 31, 2017:** Attorneys Bass, Blood, Brown, O'Reardon, and Straub met for 45-minutes to coordinate efforts and prepare for an all-hands, in-person science-strategy meeting that was scheduled for the next day. As mentioned above, the large volume of science was complex and presenting it to a jury was a daunting task. Meetings like this one were reasonable and necessary.

b.    **December 2, 2016:** Blood, Brown, Hurst and O'Reardon did not just "conference" on this date. As the records demonstrate, we worked on discrete tasks this day.

c.    **October 21, 2021:** Blood, Brown, O'Reardon and Straub met for 30 minutes about dividing responsibilities for the *Montera* trial preparation, which Plaintiff proposed to the Court just days earlier. *See* ECF No. 97.

d.    **April 15, 2022:** Blood, Brown, O'Reardon and Straub met with Jun and Iredale on this day one month before the trial. We met at BHO's office to among other tasks, discuss scientific study issues, strategize about science slides for demonstratives, set up meetings with experts, work on the pretrial statement, had a meet and confer with defense counsel about the pretrial statement, and review and arrange the hundreds of trial exhibits.

e.    **May 24, 2022:** The trial team including Mr. Carpenter worked out of the San Francisco war room, including with Dr. McAlindon about his testimony set for the following day. We did not simply all "conference" as Tasher implies. Nor did we all work on the same task. As my time entry describes, besides helping with Dr. McAlindon's preparation, I also met with Mr. Iredale and helped prepare him for questioning Premier's Lance Palumbo.

26.    **Tasher Decl., ¶ 73 ("Ancillary Timekeepers"):** On the one hand, Tasher believes 19 timekeepers over 10 years was too many. On the other hand, Tasher believes four of these timekeepers who each billed less than 25 hours should not be included. Ms. Bass, Ms. Menaldino, and Mr. Yarmolinets were each lower-billing attorneys who performed non-duplicative work at my direction. Ms. Maxwell was a paralegal at BHO who worked on this lawsuit during a time when no other paralegal worked on it. All four performed non-duplicative work and just because they worked a relatively few number of hours is not a reason to exclude their time. In *DeMaria*, where Tasher praised their billing "efficiency" class counsel included *18* timekeepers who each billed less than 25 hours. *See DeMaria*, ECF No. 94-2 (Declaration of Class Counsel) at Pages 30-32.

27.    **Tasher Decl., ¶ 90 ("Top-Heavy" Administration of Work):** Tasher says the "poster-child examples for the unreasonably top-heavy administration of the work is Attorney Carpenter's work on the Palumbo and Taft Depositions."

a.    **Palumbo Deposition:** There was not "one" Palumbo Deposition. In 2014, Mr. Palumbo was deposed in both 30(b)(6) and individual capacities. The depositions lasted 19.5 hours over three days, required two different trips to San Francisco, and involved introduction of 73 exhibits. Most of the exhibits were subsequently used throughout the litigation at class certification, summary judgment and during trial. Given the number and breadth of PMK topics for which Premier designated Palumbo (everything related to science, marketing and sales), Carpenter and O'Reardon each took discrete portions of the deposition. Palumbo was also the first 30(b)(6) deposition in the case. He was a critical witness who also featured prominently at trial. In 2020, Mr. Straub from BHO spent 48.5 hours when it was expected that Palumbo would be deposed once again. The pandemic occurred and Palumbo's fourth deposition never took place. However, Straub's work and preparation paid off because much of his work was used during Palumbo's testimony at trial.

b.    **Taft Deposition:** Katrina Taft was the second person deposed in this case, preceding Darcy Horn Davenport and Lance Palumbo. Premier's suggestion that, in hindsight, the deposition was inconsequential or insignificant is contradicted by its own responses to interrogatories, where Premier identified Ms. Taft as one of the seven people responsible for creating the Joint Juice advertising. Premier's interrogatory responses are attached hereto as **Exhibit B**. At

BLOOD HURST & O' REARDON, LLP

page 11, and in response to Interrogatory No. 7, Premier identifies Ms. Taft as one of seven individuals at the company "involved in the creation of advertisements for Joint Juice." Her name also appears in over 1,500 documents (not pages) produced by Premier. Given the importance of Ms. Taft's deposition, particularly as the initial step in marketing discovery, the 87.5 hours for preparation and deposition is entirely reasonable. Tasher suggests it was unreasonable for Mr. Carpenter to depose Taft and Palumbo. Getting an associate up to speed would have been time-consuming and inefficient, and frankly not a wise decision given the gravity of these depositions. Tasher's criticism also rings hollow considering that Premier used partners from Arnold & Porter and Venable to defend the depositions of Palumbo and Taft.  Premier also used senior partners from Venable and Morrison & Foerster (Mr. Garganta and Ms. Grant) to take basic depositions of class representatives. On two of those occasions, a senior associate, Amit Rana, attended with Ms. Grant.

28.     **Tasher Decl., ¶ 101; Opp. at 12 (Craig Straub's "Contract Attorney" Work):**

a.     Craig Straub became an associate at BHO in August 2018. As declared and as the time records demonstrate, Mr. Straub's role was never limited to document review. *See* O'Reardon Decl., ¶ 55; ECF No. 328-3. Instead, the scope of his work was that of a full associate attorney. He worked at the office full time. From the outset of his time on this case, Mr. Straub worked on substantive tasks that no "first-level reviewer" would do. For example, in June 2017 Mr. Straub assisted with the deposition of Dr. Silverman. During this time (before becoming an associate) he also analyzed the scientific studies, worked with experts, and wrote legal memoranda. *See* ECF No. 328-3. Nevertheless, to minimize disputes, for Mr. Straub's work on this case that preceded August 2018 we agree to seek a reduced rate of $240/hour, which results in a reduction of ***$209,961.25*** in BHO's lodestar. Mr. Straub's revised lodestar is as follows:

| Time Period | Hours | Rate | Lodestar |
|---|---|---|---|
| Before August 2018 | 626.75 | $240 | $150,420.00 |
| August 2018 to Present | 2,290.50 | $575 | $1,317,037.50 |
| Revised Straub Lodestar | | | $1,467,457.00 |
| Voluntary Reduction | | | $209,961.25 |

BLOOD HURST & O'REARDON, LLP

00202645

b.    "First-level review." Tasher displays his lack of knowledge by arguing Plaintiff's Counsel could have hired anyone to conduct "first-level review." First-level review is a concept for producing parties – not plaintiffs in class actions. First-level reviewers are tasked with culling a giant universe of documents to just what is relevant. From there, more senior attorneys review the culled universe for privilege and production purposes. By the time we received the documents, Premier had already performed first-level review. It would be inefficient and wasteful for BHO to hire first-level reviewers or to conduct first-level review. Mr. Straub never conducted "first-level" document review.

29.    Tasher is being misleading that Mr. Blood billed for document review. Mr. Blood took depositions in this case and worked on many fact-laden motions. So, although it is of course true that he "reviewed documents" in connection with his work, that did not consist of tagging documents in a database as Tasher implies. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1114-15 (9th Cir. 2008) ("The district court may have been right that a larger firm would employ junior associates who bill at a lower rate than plaintiff's counsel, but a larger firm would also employ a partner--likely billing at a higher rate than plaintiff's counsel--to supervise them. And the partner in charge would still have had to familiarize himself with the documents, a step that plaintiff's counsel avoided by reviewing the documents herself. Moreover, lead counsel can doubtless complete the job more quickly, being better informed as to which documents are likely to be irrelevant, and which need to be examined closely.").

30.    **Tasher Decl., ¶ 108:** Tasher states, "[t]he Court may observe that Class Counsel's time records are largely long blocks of 8-10 hours of time (especially for BHO and the Carpenter Firm)." As the time records show, the average time entry for BHO was 4.16 hours and for Lynch Carpenter it was 3.24 hours. *See* ECF No. 328-3 (BHO's time records have 2,296 entries for 9,547.50 total hours); ECF No. 328-20 at pages 32-38 (Lynch Carpenter's time records have 175 entries for 567 total hours).

31.    **Tasher Decl., ¶ 112 and Ex. F thereto:** Tasher Exhibit F is "all of the travel time entries for BHO." As the 69 entries demonstrate, all of the travel-related hours were for performing work *in this case*.

BLOOD HURST & O' REARDON, LLP

32.    **Tasher Decl., ¶ 116 (Straub's "Clerical Work"):** Without stating how he reached the calculation, Tasher argues Mr. Straub "spent nearly $100,000 worth of block-billed time entries in which he is preparing binders, and/or mailing materials to and from the trial." Tasher cites one example – from May 20, 2022 (less than one week before trial) where the description of 9.0 hours of work states: "***Edit and revise pocket brief related regarding consumer satisfaction/FDA defense; collect and summarize documents for cross examine of all witnesses;*** create binder for cross examine of Silverman for trial counsel; pack all materials [for] trial and have them mailed." ECF No. 328-3. First, Tasher entirely omits the portion of the billing description that is bolded and italicized. That is highly misleading. Second, "create binder" is not the clerical (hole-punching) aspect of creating a binder. Mr. Straub was tasked with researching Dr. Silverman's background and testimony, and substantively coming up with potential cross-examination areas. Nine hours for these tasks on May 20, 2022, is exceedingly efficient.

33.    **Tasher Decl., ¶ 117 (Maytorena's "Clerical Work"):** Tasher argues he cannot tell how much time paralegal Dafne Maytorena spent "to go to the Fedex store and mail the binder" in the following entry from September 3, 2020: "Prepare binder for mediation and sent via fedex; Download and save defendant's confidential mediation statement and exhibits." The answer is that she spent no time *going to* FedEx. FedEx does a pickup at BHO's office. Tasher is being misleading. Tasher also says he cannot tell how Ms. Maytorena split up her 6 hours between "Calendar expert depositions; Edit trial exhibit list" on February 17, 2022. Less than 15 minutes was for calendaring all of the many expert depositions (a compensable task) and the rest of her billed time that day was spent working on the trial exhibit list, which contained hundreds of documents that needed to be de-duplicated and cross-referenced with every pleading and deposition they were used with. Tasher's third example is Ms. Maytorena's entry on April 13, 2022 of 2 hours for "Gather, print and organize NY cases in binder for T. Blood." Tasher says this is improper because "[p]rinting the cases is clerical" and she did not separate out that time. Again, this is misleading. While searching for caselaw, Ms. Maytorena pushes the print button on her computer – being fully descriptive in a billing entry should not be counted against us. *See Palomares v. Astrue*, 2012 U.S. Dist. LEXIS 178851, at *26 (N.D. Cal. Dec. 18, 2012) ("For the entry that states draft civil cover, cover to clerk and mail it,

19                                    Case No. 3:16-cv-06980-RS

counsel likely spent the majority of this time drafting and could have easily made this entry just say "draft civil cover." Similarly, downloading and reviewing the ECF orders could have easily been depicted as "review ECF orders," as downloading the orders would constitute a de minimis amount of time. Counsel should not be punished for being meticulous and honest.").

34.    **Tasher Decl., ¶¶ 118 – 119 (Quarter-Hour Billing):** My firm bills in quarter-hour increments and it has always been our default, standard practice to bill in that increment. It is a practice we adopted from the firm we were previously with (now called Robbins Geller Rudman & Dowd). While there, Mr. Blood trained me not to bill for quick tasks like placing phone calls or answering brief emails unless their collective time reached a quarter hour. He also stressed that it was my responsibility to take a conservative approach to recording time. As a result, I often do not bill time spent on small tasks for a case. This practice has become part of my professional approach to timekeeping, including for this case, and I believe that the other lawyers at BHO working on this case adopted this approach. By way of example, Mr. Straub billed 0.25 on just three occasions (out of his 461 entries) and each of those tasks reasonably took at least 15 minutes. *See* ECF No. 328-3 at entries dated 1/3/19 ("Prepared for Joint Juice trial prep meeting including printouts and computer setup"), 3/12/19 ("Call with Kate Mullen regarding Rite Aid subpoena"), and 3/14/19 ("Call with CVS counsel concerning subpoena"). Mr. Blood's 15-minute billing entries in this case are also similarly substantive and describe tasks that take at least a quarter-hour. As a result, I believe that billing in quarter hour increments properly accounts for time spent working on matters and oftentimes understates the actual time spent. In billing in quarter hour increments, we only bill for substantive time spent on the case; and not for the countless dozens of minor tasks that occur on a daily basis.

35.    Therefore, our billing records, including those in this case, do not even begin to account for all the time spent working on cases like this one. Countless hours of oversight work were performed on the case. For example, many emails were exchanged in this case. However, as the Court can readily observe, I did not bill for most of the time spent reviewing these emails. Additionally, my office does not generally bill for minor inter-office conferences or discussions. Daily, our attorneys discuss case strategy and consider actions and responses. This time does not

get billed. If anything, this practice leads to billing less time than what could reasonably be claimed in cases like this.

36.    Tasher objects that paralegal Dafne Maytorena should not have billed 0.25 for calendaring various deadlines. I have no doubt that Ms. Maytorena spent at least 15 minutes on the tasks at issue, however, to minimize disputes we agree to remove those 11 entries, which reduces BHO's lodestar by $770.

37.    Quarter-hour billing is a common and standard billing practice, including at some of the country's largest and most prestigious law firms: Morrison & Foerster, Sidley Austin, and Mayer Brown. Attached as **Exhibit C** is the Declaration of Christopher J. Carr in Support of the City of Richmond's Motion for Attorneys' Fees and Costs dated February 17, 2015, in *Guidiville Rancheria of California v. United States*, Case No. 4:12-cv-01326-YGR (N.D. Cal.) (ECF No. 260). At the time, Mr. Carr was a partner at Morrison & Foerster LLP. Paragraphs 18 and 21 of the Carr Declaration make clear that all Morrison & Foerster attorneys billed in quarter-hour increments. This includes San Francisco partners, including Arturo González, chair of the firm's Trial Practice Group. In *Guidiville*, Judge Gonzalez Rogers refused to reduce Morrison & Foerster's lodestar for billing in quarter-hour increments. *See Guidiville*, 2015 U.S. Dist. LEXIS 109057, at *11 n.6 (N.D. Cal. Aug. 18, 2015). In *In re USA Gymnastics*, Gene Schoon, a partner who worked at Sidley Austin for 37 years and focused on complex litigation, including consumer product class action false advertising cases, "testified that quarter-hour billing was the default for his Sidley Austin clients the entire time he was at that firm." 2020 Bank. LEXIS 2612, at *51 (Bankr. S.D. Ind. Sept. 29, 2020). In May 2022, Judge Klausner in the Central District of California rejected objections to Mayer Brown's practice of billing in quarter-hour increments. *See United States v. Vandewater Int'l Inc.*, 2022 U.S. Dist. LEXIS 111527, at *4-5 (C.D. Cal. May 13, 2022).

38.    **Tasher Decl. ¶ 121; Swaney Decl. ¶ 18 (Excessive Photocopying Charges):** Tasher states that "in his experience" BHO's discounted rate of $0.20 per page for photocopying is "two to four times the price that paying clients typically pay for photocopying charges (usually 5-10 cents per page)." Defense counsel Steven Swaney, a partner at Venable LLP, also states that 20 cents per page is too high. ECF No. 331-1 (Swaney Decl.) at ¶ 18.

BLOOD HURST & O' REARDON, LLP

00202645

a.      Premier paid its counsel here similar and higher rates. Following the *Mullins* judgment, Premier submitted a Bill of Costs. Angel Garganta declared the following copying costs were "necessarily incurred in this action, and that the services for which fees have been charged were actually and necessarily performed" (*Mullins*, ECF No. 249-1 at page 2):

- $0.25 per page. *See Mullins*, ECF No. 249-10 at page 3.

- $0.15 black and white, $0.65 color. *Id.* at pages 116-123

- $0.75 per page for in-house color copies. *Mullins*, ECF No. 249-3 (all entries with description that includes "SF-Xerox-Color" or "LAXeroxColor").

- "Daniel Blynn: 1191 color copies @ .25". *Id.* at page 132.

b.      Twenty cents per page is also supported by the caselaw. *See Wit v. United Behav. Health*, 578 F. Supp. 3d 1060, 1093 (N.D. Cal. 2022) (rejecting argument the charge was "excessive" and awarding $0.20 per page as reasonable for in-house photocopies); *Keegan v. Am. Honda Motor Co., Inc*, 2014 U.S. Dist. LEXIS 197404, at *86-88 (C.D. Cal. Jan. 21, 2014) (photocopy charges of $0.20 and $0.25 per page were reasonable); *In re Am. Apparel, Inc. Shareholder Litig.*, 2014 U.S. Dist. LEXIS 184548, at *95 (S.D. Cal. July 28, 2014) (assuming $0.20 per page is reasonable).

39.      **Tasher Decl. ¶ 122 ("Double Billed" Charges):** Tasher claims he "observed multiple instances of expenses sought twice." Tasher identifies charges from one day (1/26/16) that had three duplicated charges: coffee at "Boba Guys" ($6); Pabu Ramen ($324.21); and a taxi charge for $55. We agree to remove the inadvertent duplicates for a total reduction of $385.21.

40.      **Tasher Decl., ¶ 122 ("Phantom" Charges"):**

a.      Tasher states that BHO seeks $233.63 for Max's restaurant on 6/7/22 (ECF No. 328-12 at p. 22), but says the receipt shows $193.63 (including gratuity) (ECF No. 328-15 at p. 237). Tasher cites page 237 of ECF 328-15. As indicated on the immediately preceding ECF page, the associated credit card statement demonstrates the total charged was $233.63. (ECF No. 328-15 at p. 236).

BLOOD HURST & O' REARDON, LLP

00202645

b.    Tasher states that plaintiff Donna Lux's hotel receipt for two nights' stay at a hotel shows four nights of internet. (ECF 328-14 at p. 161). It appears to be an error. $9.95 was charged four times all at the same time. We agree to remove three of the four charges for a total reduction of $29.85.

41.    **Tasher Decl., ¶ 123:** ("Class Counsel has also changed the dates of several of the more lavish meals or expenditures"): To construct an offensive argument that Class Counsel are trying to "mak[e] it appear that they only partook in one lavish meal on July 9, 2015," Tasher points to cash register receipts for two restaurants from July 9, 2015 (Spoke & Steele, and St. Elmo's), and says the date on the itemized expense spreadsheet we submitted "changed the Spoke & Steele record to July 11, 2015, thus making it appear that they only partook one lavish meal on July 9, 2015." Tasher's argument and implication is baseless. The dates on the itemized expense spreadsheet (ECF No. 328-12) are input by a bookkeeper and are *all* based on the "transaction date" reported on the associated credit card statements and not cash register receipt dates. *See* ECF No. 328-13 at p. 103 (Union Bank credit card statement for O'Reardon identifying "transaction date" of 7-11 for Spoke & Steele and 7-9 for St. Elmo). Mr. Blood and I met with Dr. Willis (one of the science experts) at Spoke & Steele, the hotel restaurant, to have a meal and prepare for his deposition the next day (we do not have an office in Indianapolis, and it would have been excessive to rent a meeting room). Mr. Blood and I went to St. Elmo's restaurant that night. Mr. Tasher omits that the cost of the "lavish" meal at "renown steakhouse" St. Elmo's. It was $89.62 for two people. *See* ECF No. 328-13 at page 118.

42.    **Tasher Decl., ¶¶ 126, 128; Opposition at 23-24 ("Lavish Lifestyle Expenses"):**

a.    Premier argues Class Counsel "opted to stay at luxury hotels, often paying over $1,000 a night." Opp. at 23. Of the dozens of nights Class Counsel had to travel and stay in hotels during the litigation, the only room ever costing over $1,000 a night was on 2 of 18 nights during trial. That hotel, the Intercontinental on Howard Street, was chosen because it was near the courthouse and trial war room with availability for 18 nights. The rooms were standard sizes, with a nightly rate from $299 to $1,089, and averaging $471.78 over the 18 nights. Just 3 of 18 nights even exceeded $469.00 per night.

b.      "$324 at Pabu for two dinners." Premier knew this was an inadvertent duplicate. As noted above, we agree to withdraw this cost. It was a dinner for several people the night before the class certification and summary judgment hearing.

c.      "$514.08 at Izakaya Hon for Wagyu steaks." Tasher adds (¶ 126) that this meal also involved "multiple alcoholic beverages." This dinner, on the Saturday before trial began, involved seven people who collectively consumed two beers and two orders of Wagyu steak at $26/each. The receipt was filed. *See* ECF 328-15 at p. 44.

d.      "$303.32 [at] Chao Pescao." This restaurant is conveniently located next to the courthouse. "Lavish" it is not. This meal for eight was during trial.

e.      An instance where "30% of cost of meal is alcohol." The Chieftain is the closest place open late near where the trial team stayed. After working late, Blood, O'Reardon and Straub had dinner and four drinks total. The total cost of the meal, including four drinks for $30 was $100.24 – $120.24 with gratuity. The Chieftain is not lavish. It is less costly than most places in the area.

f.      "$750 per night or greater hotel charges at the Hotel Adagio." Ms. Brown and certain of the named plaintiffs stayed at this mid-level Marriott hotel located in The Tenderloin, which features free coffee in the lobby. As happens in San Francisco, in-town conventions significantly impact hotel prices. Oracle's OpenWorld 2019 convention was happening at the time of these depositions and made hotels scarce and expensive. Over our request that the depositions be conducted remotely, Premier insisted that these plaintiff depositions occur in person and in San Francisco.

g.      "Paula Brown's $54.14 room service followed by a $91.96 dinner at Bob's Steak & Chop House." The meals were for two people, Ms. Brown and former plaintiff Eric Fishon. This restaurant is in the hotel booked in connection with Mr. Fishon's deposition in this action.

h.      "Non-coach airfare" on June 30, 2015 and May 21, 2022: Class Counsel always flew in coach class for this case. Tasher (¶ 126) states that two instances disprove that assertion. He is wrong.

BLOOD HURST & O' REARDON, LLP

00202645

1. "[O]n June 30, 2015, Class Counsel seeks non-coach airfare." Tasher cites ECF No. 328-13 at p. 66. As the receipt makes clear, that was a flight for Mr. Blood on Southwest to Boston. Southwest does not have non-coach airfare.

2. "[O]n May 21, 2022, a non-coach airfare is sought." Tasher cites ECF No. 328-15 at p. 18. I purposefully booked Dr. McAlindon's roundtrip flight from Boston to San Francisco for trial with a coach class on the outbound and business class on the return. This decision was made considering the possibility of adjusting his return flight based on the completion of his trial testimony. The minimal price difference between coach and business class on the return flight factored into my choice. By booking in this manner, we were able to avoid additional fare charges for changing the return flight last-minute. As evidenced by the receipt, Dr. McAlindon's original return flight was scheduled for May 25, 2022. However, due to his unfinished testimony, we had to extend Dr. McAlindon's stay for another night. Thankfully, the business class booking allowed us to rebook his return flight for May 26, 2022, without incurring any extra costs. This resulted in cost savings rather than additional expenses.

i. "Attorney O'Reardon went home from May 27-29, 2022 and again on June 2, yet kept his room at the Intercontinental in San Francisco during this window." (Tasher Decl., ¶ 128(a).) The cost (including taxes) for these four nights was $1,637.21. I kept my room because the hotel was unwilling to keep the room for me for any remaining nights at the lower rate if I checked out for any one day over the 18-night period for trial preparation and trial. Checking out and then checking back in would have increased, not decreased costs.

j. "On May 25 and May 26, 2022, Class Counsel billed $303.32 and $285.7 meals at Chao Pescao. However, on May 26, 2022, both Attorneys Blood and O'Reardon's room lists them as having ordered room service dinners." Tasher Decl. ¶ 128(b). Chao Pescao is conveniently located next to the courthouse. The trial team had lunch at Chao Pescao with Dr. McAlindon. For dinner, on May 25, I ordered food from the hotel. The hotel dinner on May 26, 2022, was to Ms. Montera's room – not Mr. Blood's room.

43. **Opposition at page 24 ("Every Sundry or Fringe Expense"):** "Class Counsel also seek reimbursement from Premier for every sundry or fringe expense they encountered over this

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

decade-long litigation, including boba and coffee runs dating back to 2013." Opp. at 24. These food and coffee costs, all incurred while traveling for this lawsuit, total $162.24. I frequently work through lunch and eat a small meal at coffee shops. For example, two of the charges at Starbucks were for a drink and food. However, one entry for Boba Guys ($6.00) and one entry for Blue Bottle ($10.00) are inadvertent duplicates. We agree those two charges should be removed from the total. The remaining amounts are reasonable travel and meal expenses over the decade of litigation.

| | |
|---|---|
| Starbucks | $ 6.89 |
| | $ 12.62 |
| | $ 18.38 |
| Boba Guys | $ 6.00 |
| | $ 6.00 |
| Peets | $ 4.99 |
| | $ 4.58 |
| | $ 4.96 |
| | $ 3.50 |
| | $ 4.96 |
| Specialty's | $ 10.12 |
| | $ 5.95 |
| | $ 8.71 |
| Philz | $ 5.46 |
| Blue Bottle | $ 10.00 |
| | $ 10.00 |
| | $ 5.94 |
| | $ 8.80 |
| | $ 7.24 |
| Dunkin | $ 3.30 |
| | $ 7.99 |
| Red Bay | $ 5.85 |
| **TOTAL** | **$ 162.24** |

*See* ECF 328-12.

44.    **Opposition at page 24:** Laundry services, which were included within the hotel bills during the two-week trial totaled $582.00. We agree to remove this reasonable travel expense from the total costs sought.

45.    Any costs that benefitted only *Mullins* and were not incurred in connection with achieving the result in *Montera* were excluded from the expense request. For example, Class

26                                         Case No. 3:16-cv-06980-RS

BLOOD HURST & O' REARDON, LLP

Counsel excluded their travel costs relating to the depositions of Dr. Thomas Maronick and Dr. Louis Lippiello, travel to the *Sonner* appeal, all fees charged by Dr. Maronick, all costs relating to the 2017 *Mullins* trial testimony by Drs. Silbert and Graboff, class notice costs in *Mullins*, costs for providing courtesy copies in *Mullins*, and all filing fees other than in *Montera*.

46. **Opposition at page 22 (Dr. McAlindon's Expert Fees):** Dr. McAlindon's work and fees are fully documented. His pretrial work included a 115-page Rule 26 report that systematically analyzed 200 studies, and a 42-page rebuttal report to Premier's scientific experts Dr. Silverman and Dr. Grande. Premier deposed him twice for a total of 16 hours, and he spent time preparing for both depositions. For these pretrial efforts he billed 185 hours. Dr. McAlindon also dedicated 35.5 hours to trial-related tasks, included preparing remotely and traveling to San Francisco for four days of work, including two days in trial. O'Reardon Decl. ¶ 81(g)(i) and Ex. 7 thereto (ECF 328-8). Dr. McAlindon did not bill us for all of the time he spent on this matter and we had to repeatedly remind him to bill us for time he spent. He is not a professional expert witness. He billed in 0.5 increments because he spent at least that much time whenever he worked on this. From reviewing his invoices, I know he did not bill for any time that was less than half an hour. He would frequently respond to emails or take a telephone call without billing the case.

47. **Opposition at page 23 (Expert Invoices "Do Not Add Up"):** Premier argues expert invoices from Mr. Weir, Dr. Graboff, and Dr. Silbert "do not add up." While Plaintiff inadvertently left out one invoice each for Mr. Weir and Dr. Graboff, Premier is incorrect about Dr. Silbert's invoices.

a. **Colin Weir Invoices:** The Opposition (p.23) states that "Class Counsel seek $73,691.80 for Weir's fees, but he provided only one $5,000 invoice for Weir dated 2017." Pages 27, 29-34, 52-53, and 61 of ECF 328-8 are invoices from Mr. Weir totaling $66,435.55. Plaintiff inadvertently left out one invoice. That August 31, 2017, invoice, which was for $7,526.25 and was paid on or about September 6, 2017, is attached hereto as **Exhibit D**.

b. **Dr. Steven Graboff Invoices:** The Opposition (p.23) states that "Class Counsel provided only $28,673.50 for invoices for Graboff (while seeking $40,612.50 in fees)." Premier is mistaken. Dr. Graboff billed Plaintiff a total of $40,612.50. ***However,*** we seek only

27

Case No. 3:16-cv-06980-RS

$30,062.50, which is the amount paid to Dr. Graboff for his work in connection with summary judgment and class certification. *See* O'Reardon Decl., ¶ 81(g)(vi). Pages 3-4, 8-10, 12, 19, 23-24 of ECF 328-8 are invoices from Dr. Graboff totaling $28,673.50. Plaintiff inadvertently left out one invoice. That August 27, 2015, invoice, which was for $1,425.00 and was paid on September 9, 2015, is attached hereto as **Exhibit E**.

c.    **Dr. Jeremiah Silbert Invoices**: The Opposition (p.23) states that Class Counsel only provided "$37,655.00 in invoices for Silbert (while seeking $58,592.50 in fees)." The relevant documentation was submitted. Dr. Silbert billed Plaintiff a total of $58,592.50. ***However***, we seek only $37,655.00, which is the amount paid to Dr. Silbert for his work in connection with summary judgment and class certification. *See* O'Reardon Decl., ¶ 81(g)(vii). Pages 2, 7, 15, and 22 of ECF 328-8 are invoices from Dr. Silbert totaling $37,665.00 – the amount sought here.

48.    **Premier's Cost Apportionment Argument:** Paragraphs 13 to 19 of the Swaney Declaration (ECF No. 331-1) list *certain* expenses Premier contends should be recovered 1/11th in *Montera*. Premier concedes that *every one* of these costs were relevant to and benefitted *Montera*. Premier's apportionment math as reflected in the Swaney Declaration is below. Plaintiff's response is also included. Premier did *not* propose apportioning the requested transportation, hotel and meals costs of $115,098.65.

| Swaney Decl. (Expense Category) | Premier's 1/11th Apportionment Position | Plaintiff's Reply |
|---|---|---|
| Swaney Decl., ¶ 13 **(Fact Witness Deposition Costs)** | $23,835.45 costs for 2014 depositions should be apportioned 1/11th with $2,166.86 awarded here. | Premier concedes that each of these 2014 depositions for which costs are sought directly benefitted the *Montera* litigation. They were used in motion practice, in preparation for trial, to cross examine witnesses, or for all three of these purposes. Plaintiff's Counsel is not seeking expenses associated with depositions that only benefitted *Mullins*. |
| Swaney Decl., ¶ 14 **(Fact Witness Deposition Costs)** | $16,243.90 costs for 2020 and 2022 depositions should be apportioned 1/11th with $1,476.72 awarded here. | Premier concedes that each of these 2020 and 2022 depositions for which costs are sought directly benefitted the *Montera* litigation. They were used in motion practice, in preparation for trial, to cross examine witnesses, or for all three of these purposes. Plaintiff's Counsel is |

BLOOD HURST & O' REARDON, LLP

00202645

BLOOD HURST & O' REARDON, LLP

| Swaney Decl. (Expense Category) | Premier's 1/11th Apportionment Position | Plaintiff's Reply |
|---|---|---|
| | | not seeking expenses associated with depositions that only benefitted *Mullins*. |
| Swaney Decl., ¶ 15 (**Expert Deposition Costs**) | $42,999.28 costs sought for expert depositions should be apportioned 1/11th with $3,909.03 awarded here. | Premier concedes that each of these expert depositions for which costs are sought directly benefitted the *Montera* litigation. They were used in motion practice, in preparation for trial, to cross examine witnesses, or for all three of these purposes. Plaintiff's Counsel is not seeking expenses associated with depositions that only benefitted *Mullins*. |
| Swaney Decl., ¶ 16 (**Expert Fees**) | $327,874.19 sought for testimony by Drs. McAlindon, Guilak, Rucker, and Dennis should be apportioned 1/11th with $29,806.74 awarded here. | Premier concedes that each of these four experts provided testimony that benefitted *Montera*. They were each deposed in connection with *Montera*, provided Rule 26 reports in *Montera*, and were listed as expert witnesses in *Montera*. Dr. Guilak, Dr. Rucker and Dr. Dennis have only provided testimony in *Montera*. Dr. McAlindon's testimony was never specific to *Mullins* and his Rule 26 report in *Montera* was an update that was built off his prior testimony in these actions. Of the $121,256.94 charged by Dr. McAlindon, $52,506.94 related to his work performed between February 1, 2022, and May 25, 2022. |
| Swaney Decl., ¶ 17 (**Service of Process**) | $5,102.30 sought. Apportioned award is $463.85. | Premier concedes these subpoenas were served to obtain sales and marketing information that directly benefitted *Montera*. Costs to serve subpoenas to obtain California-specific sales data for the *Bland* state court matter are not included. |
| Swaney Decl., ¶ 17 (**Mediation Fees**) | $24,300 sought. Apportioned award is $2,209.09. | These mediations were not specific to *Mullins* and there is no risk of duplicative recovery in the other actions. |
| Swaney Decl., ¶ 17 (**Electronic Document Management**) | $110,682.95 sought. Apportioned award is $10,062.09. | Premier concedes these ESI costs directly benefitted *Montera*. These costs are for hosting documents produced in this litigation. The costs include document hosting for 91 months at per-Gigabyte rates ranging from $10 to $25. More than 500,000 pages of documents were |

Case No. 3:16-cv-06980-RS

00202645        DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

BLOOD HURST & O' REARDON, LLP

| Swaney Decl. (Expense Category) | Premier's 1/11th Apportionment Position | Plaintiff's Reply |
|---|---|---|
| | | loaded by third-party vendors onto standard e-discovery platforms common in complex litigation with discovery productions of this volume. *See* O'Reardon Decl., ¶ 81(h). Premier used a similar platform to host documents and asked the Court award those costs in full. *See Mullins*, ECF No. 249-10. |
| Swaney Decl., ¶ 17 **(Postage / FedEx)** | $4,399.07. Apportioned award is $399.92. | Plaintiff excluded the mailing costs that did not benefit *Montera*.<br><br>As declared: "Plaintiff does not presently seek reimbursement of $747.55 spent to mail documents to Drs. Silbert and Graboff in connection with their Rule 26 testimony in *Mullins*, or for the required courtesy copies sent to the courts in connection with the motion for leave to amend to file a second amended complaint and the subsequent motion to dismiss in *Mullins*, the Ninth Circuit appeals in *Mullins*, or filings in the state court related actions." *See* O'Reardon Decl., ¶ 81(c). |
| Swaney Decl., ¶ 17 **(Online Research)** | $11,360.97 sought. Apportioned award is $1,032.82. | BHO excluded non-*Montera* online research costs from this request.<br><br>As declared: "LexisNexis costs that were incurred when utilizing Joint Juice Bland and Joint Juice Appeal billing codes are not included in this amount sought. As an additional reduction, for purposes of this renewed motion we have now excluded the entire monthly costs of Joint Juice LexisNexis research for the 28 months when at least some legal research was done on the adequate remedy issue in *Mullins*, and for the *Sonner I* and *Sonner II* appeals. This conservative approach results in over-exclusion because it removes for example, all of the May 2022 LexisNexis costs ($175.42) when we conducted legal research for the *Montera* trial |

Case No. 3:16-cv-06980-RS

00202645    DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

| Swaney Decl. (Expense Category) | Premier's 1/11th Apportionment Position | Plaintiff's Reply |
|---|---|---|
| | | in addition to a small amount (relatively speaking) of research in preparation of the *Sonner II* Ninth Circuit oral argument on May 23, 2022." *See* O'Reardon Decl., ¶ 81(i) (footnote omitted). |
| Swaney Decl., ¶ 17 (**Conference Calls**) | $192.97 sought. Apportioned award is $17.54. | The calls for which reimbursement is sought here related to work benefiting *Montera*. BHO excluded costs of conference calls relating to the *Sonner* appeals, class notice in *Mullins*, Premier's bill of costs in *Mullins*, calls with Dr. Maronick regarding his expert work, calls with defense counsel about California sales data, or the state court actions. *See* O'Reardon Decl., ¶ 81(j). |
| Swaney Decl., ¶ 17 (**Miscellaneous**) | $1,882.22 sought. Apportioned award is $171.11. | All of these costs benefited *Montera*, and none of were specific to *Mullins*.<br><br>Premier proposes apportioning all "miscellaneous" costs, including the portions for obtaining GBL legislative history ($16) and for the verdict form demonstratives used during closing argument ($342.60). An apportioned award of the New York-specific costs would be nonsensical. |
| Swaney Decl., ¶ 17 (**Class Notice and Outreach**) | $38,691.79 sought. Apportioned award is $3,517.44. | Previously, Premier did not oppose full reimbursement of the notice of pendency costs in *Montera* ($29,691.81). Now it illogically proposes awarding Plaintiff just 1/11th the cost of class notice to the New York Class.<br><br>The remaining costs relate to advertising on Top Class Actions and Facebook that benefitted *Montera*. |

49.     **Opposition at 21 (Lynch Carpenter's Lodestar):** Based on its same 1/11th apportionment argument, Premier proposes a 95% cut to Lynch Carpenter's lodestar. Premier also objects to Mr. Carpenter's 13.7 hours at trial. As his timesheets accurately describe, Mr. Carpenter

00202645     DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

actively contributed to trial strategy. ECF 328-20 at 37. Nonetheless, Lynch Carpenter agrees to withdraw the 13.7 disputed hours, which reduces its submitted lodestar by $10,275.00.

50.    Attached hereto are true and correct copies of the following exhibits:

**Exhibit A:**    Declaration of Steve A. Tasher dated August 24, 2016, in *DeMaria v. Horizon Healthcare Services, Inc.*, No. 2:11-cv-07298-WJM-MF (D.N.J.);

**Exhibit B:**    Defendant Premier Nutrition Corporation's First Amended Responses to Plaintiff's First Set of Interrogatories [relevant excerpts only];

**Exhibit C:**    Declaration of Morrison & Foerster partner Christopher J. Carr in Support of Motion for Attorneys' Fees and Costs dated February 17, 2015, in *Guidiville Rancheria of California v. United States*, Case No. 4:12-cv-01326-YGR (N.D. Cal.);

**Exhibit D:**    Invoice for expert services dated August 31, 2017, from Economic and Technology, Inc. (Colin Weir) for $7,526.25;

**Exhibit E**:    Invoice for expert services dated August 27, 2015, from Dr. Steven Graboff for $1,425.00.

**Exhibit F:**    Declaration of Steven A. Tasher dated November 2, 2021, in *K.E. v. New York City Department of Education*, No. 1:21-cv-02815-KPF (S.D.N.Y.).

51.    As discussed above, Class Counsel from Blood Hurst & O'Reardon will agree to reduce its lodestar by an additional $248,175.00 (48.00 hours). Class Counsel will also agree to reduce its requested expenses by $997.06. Plaintiff's Counsel from Lynch Carpenter will agree to reduce its lodestar by $10,275.00 (13.7 hours).

52.    Based on the above-agreed reductions and the previously submitted information in the declarations of Plaintiff's Counsel,[9] the total number of hours spent on this litigation by Plaintiff's Counsel is 10,859.60, for a total lodestar of $6,942,943.50.

[9]    These prior declarations, which were filed with Plaintiff's opening memoranda, are at ECF Nos. 328-1 (O'Reardon Decl.), 328-19 (Iredale Decl.) and 328-20 (Carpenter Decl.).

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

| Firm | Hours | Lodestar |
|---|---:|---:|
| Blood Hurst & O'Reardon, LLP | 9,499.50 | $5,962,715.00 |
| Lynch Carpenter, LLP | 553.30 | $382,018.50 |
| Iredale & Yoo, APC | 806.80 | $598,210.00 |
| **TOTAL** | **10,859.60** | **$6,942,943.50** |

53.    After factoring Class Counsel's above-agreed cost reduction and based on the previously submitted information in the declarations of Plaintiff's Counsel, reimbursement of $1,072,126.04 in out-of-pocket, nontaxed expenses incurred in this litigation is requested. As stated in their respective declarations, the firms have each expended the following amounts:

| Firm | Nontaxed Expenses Requested |
|---|---:|
| Blood Hurst & O'Reardon, LLP | $1,039,423.44 |
| Lynch Carpenter, LLP | $8,709.80 |
| Iredale & Yoo, APC | $23,992.80 |
| **TOTAL** | **$1,072,126.04** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 25, 2023, at San Diego, California.

*By:*        *s/ Thomas J. O'Reardon*

THOMAS J. O'REARDON

**CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 25, 2023.

s/ *Timothy G. Blood*

TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

DECL OF THOMAS O'REARDON ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES