# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ALPHONSE A. DEMARIA, *et al.*, for      :
themselves and certified Classes,      :
     :
                 *Plaintiffs,*      :
            - v. -      :
     :       Case No. 2:11-cv-7298(WJM)(MF)
HORIZON HEALTHCARE SERVICES,      :
INC. d/b/a HORIZON BLUE CROSS      :
BLUE SHIELD OF NEW JERSEY, *et al.*,      :
     :
                *Defendants.*      :
     :

## <u>DECLARATION OF STEVEN A. TASHER</u>

### <u>Introduction</u>

I have been retained by Zuckerman Spaeder LLP ("Zuckerman") in the above-captioned litigation ("the Litigation" or "the Matter") to offer this Declaration regarding the reasonableness of the attorneys fees incurred by Zuckerman and other Counsel (collectively, "Class Counsel") who represented the class of New Jersey Chiropractors as described below ("the Class") during the Litigation, as well as the hourly rates charged by same. I have prepared this Declaration pursuant to Rule 26 of the Federal Rules of Civil Procedure.

I have reviewed all materials provided to me (as described below) in the context of the New Jersey Rules of Professional Conduct ("NJRPC"), applicable principles regarding the reasonableness of legal fees and relevant case law, ethics, customs, the practice of law, as well as over 40 years of experience as a litigator and in-house attorney responsible for evaluating and assessing the reasonableness of fees, expenses, and hourly rates billed by numerous law firms. In this Declaration, I will identify and describe my observations with regard to the fees/expenses incurred in connection with the Litigation as well as my independent opinions regarding the legal fees and expenses Class Counsel incurred during the Litigation (and the hourly rates charged).

### <u>Litigation and Expert Witness Background</u>

I have spent my entire legal career handling or supervising litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees. My current CV is attached hereto as Exhibit A.

As Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous cases in state and federal court involving, *inter alia*, tort and contract claims brought against the State, election fraud, eminent domain and transportation issues, debarment of state contractors and environmental matters.

1

While a partner at Donovan, Leisure, Newton & Irvine and Willkie, Farr & Gallagher (in their New York and Washington offices), I litigated several complex, multiple party environmental matters throughout the United States. I was national coordinating counsel for NL Industries in federal and state court proceedings associated with environmental and tort claims regarding NL's lead smelting operations. In addition, I served as national coordinating counsel for Chemical Leaman Tank Lines, a nationwide common carrier transporter, defending environmental and tort claims involving the transportation of hazardous materials and environmental remediation claims arising out of the operation of terminal facilities throughout the United States. I also served as liaison counsel in numerous multiple party actions brought by the United States Department of Justice throughout the country under the Comprehensive Environmental Response Compensation Liability Act (CERCLA) and the Resource Conservation Recovery Act (RCRA) on behalf of companies such as AT&T, Ashland Chemical, Arco, E. I. du Pont de Nemours, Texas Instruments, and IBM.

While Vice President and Associate General Counsel at Wyeth and Senior Vice President of its pharmaceutical division, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation. One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history. In that litigation, 63,000 lawsuits were filed in virtually every state by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues. Wyeth was defended by more than 220 law firms around the country and had reserved over $20 billion dollars for these claims.

Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) and Managing Director of Wyatt Partners, a consulting firm which, among other things, provides expert analysis on the reasonableness of attorneys' fees and expenses in complex litigation. As a consultant on the issue of legal fees and expenses, I have advised companies and law firms with respect to billing guidelines used in complex litigation. I have also been retained by a number of national and international law firms to assist them in their analysis of legal fees and expenses in ongoing litigation. Examples of such companies include Chicago Title Insurance Company, Motorola Mobility, Inc., Plantronics, Inc., GN Netcom, A/S., Philadelphia Indemnity Insurance Company, Plexus Cotton, Ltd., AGI-Shorewood, LLC, and Honeywell International, Inc.

As an expert in attorneys' fees cases, I have been involved in the trial, resolution and evaluation of legal fees and expenses in many jurisdictions throughout the United States and Europe, including California, Colorado, Delaware, the District of Columbia, Florida, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Virginia, the Commonwealth of Puerto Rico, and the United Kingdom. These cases have varied in nature, covering legal disciplines such as breach of contract/fiduciary duty, criminal law, intellectual property, securities fraud, bankruptcy, construction disputes (both defect and delay), environmental torts and remediation, tort actions related to pharmaceutical products, employment disputes, real estate, and unfair business practices/false advertising. Three of these cases were class action lawsuits. One was a products liability matter in federal court in California, in which I was asked to provide an opinion as to the reasonableness of Class Counsel's fees in connection with a proposed settlement agreement. In the other two state court actions, I provided analysis on the reasonableness of counsel's fees in a restaurant wage/hour class action and an employment-

2

related Qui Tam action—both of which settled via mediation before I was disclosed as the testifying expert. All of these matters have provided me with significant experience in representing both plaintiffs and defendants, in both justifying the reasonableness of legal fees as well as assessing/quantifying unreasonably billed fees and expenses. My testifying history has been attached hereto as Exhibit B.

## Statement of Compensation

I charge $425 per hour for my expert witness services.

## Materials Reviewed

My opinions are based on a review and analysis of the following information:

- The Docket Sheet in the Litigation;
- The Settlement Website for the Litigation (including all relevant pleadings), available at www.njchiroclassaction.com;
- Billing records of Class Counsel in the Litigation (and corresponding Exhibits prepared by Class Counsel as described below);
- Information contained on the websites of Class Counsel and opposing counsel, Epstein Becker & Green, P.C. ("Epstein");
- Discussions with Class Counsel regarding the legal fees, expenses, background, and case management of the Litigation; and
- Fee awards in similar cases (with corresponding citations in this Declaration).

## Statement of the Case

For a comprehensive background statement of the case (including the origination of the matter, the procedural history, and the settlement agreement), I hereby incorporate by reference the section entitled "Factual Background" of Class Counsel's September 1, 2016 Memorandum in Support of Unopposed Motion For Award of Attorneys' Fees and Costs, pages 2-10, which I believe provides a fair and accurate summary of the Matter.

## Executive Summary

It is my opinion that Class Counsel's request for attorneys' fees[1] equal to one-third (33⅓ %) of the settlement fund (or $11 million) is both <u>warranted</u> (based on the nature of the Litigation, the services performed by Class Counsel, and the ultimate results obtained by Class Counsel in connection with same) and <u>supported</u> by attorneys' fees awards in similar cases.

Over the course of five years, this Litigation was comprehensively investigated, litigated, and ultimately settled by a group of experienced, diligent, and well-credentialed attorneys from several law firms – each of whom brought unique expertise and skill sets to the factual and legal

---

[1] Class Counsel also seeks an award of their out-of-pocket litigation expenses of $91,055.47.

3

issues and the workload that was required to obtain what was, in my opinion, an extraordinary result and benefit to New Jersey chiropractors who suffered significant damages resulting from Defendants' (Horizon HealthCare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey and Horizon HealthCare of New Jersey, Inc., d/b/a Horizon HMO (collectively "Horizon")) "bundling" policy.

My Declaration has been divided into three sections. The first section, "Services Provided and Fees/Expenses Incurred During the Litigation," confirms my understanding of the breakdown of actual services, fees, and expenses provided by time, category, and law firm. The second section, "Analysis of Fees/Expenses Sought by Class Counsel," analyzes those services, fees, and expenses in the context of the standards set forth by the applicable Rules of Professional Conduct, law, facts, and circumstances surrounding this Litigation – all of which support my conclusion that Class Counsel's requested amount is warranted and reasonable. Finally, in the third section, "Hourly Billing Rates of Class Counsel," I address the issue of Class Counsel's billing rates, which, in my opinion, for the multiple reasons articulated below, were reasonable.

In sum, in this complex and labor-intensive Litigation, Class Counsel achieved an outstanding result for the represented Class – a $33 million Settlement Fund. This result is impressive given the risks to both the Class and Class Counsel that the litigation would not be successful and that no payment would be received whatsoever. But this result is particularly notable given that the only remedy which the Court held would be available to members of the Class would be an order compelling Horizon to reprocess each and every claim of the class members. Thus, but for the Settlement achieved by Class Counsel, the best Class members could have hoped for was a return to the Horizon claim adjudication process, with all the delays, costs, and other administrative burdens associated therewith.

This outstanding result was accomplished despite the myriad of factual and legal obstacles Class Counsel faced. Class Counsel conducted the required workload and addressed the multitude of factual and legal issues that arose diligently, appropriately, and in a highly competent manner (from the investigation phase through settlement). Additionally, Class Counsel faced a well-credentialed adversary counsel who was highly experienced in healthcare litigation and who vigorously represented Horizon with an equal level of diligence. Class Counsel therefore seeks a sum of fees/expenses commensurate not only with their efforts/results and risk of nonpayment, but with similar awards routinely granted to other class counsel in the District of New Jersey, the Third Circuit, and other jurisdictions.

### Services Provided and Fees/Expenses Incurred During the Litigation

For purposes of conducting my reasonableness analysis, Class Counsel has provided me with information regarding the law firms, timekeepers, rates, hours, and corresponding fees/expenses for this Litigation. Throughout my Declaration, I will rely on, describe, and incorporate numerical breakdowns and summaries of information contained within specific Exhibits created by Class Counsel (which have helped inform my opinions and conclusions). When appropriate, I will reference specific Exhibits.

5617442.6

Exhibit D to the Leardi Declaration ("Leardi Decl.") is a Categorical Summary Chart of the Fees generated by the two law firms that served as Class Counsel in this Litigation (Zuckerman Spaeder and Buttaci, Leardi & Werner ("BLW" or "Buttaci firm"); and three other firms that assisted in this matter, Pomerantz LLP ("Pomerantz"); Callagy Law, P.C. ("Callagy Law"); and The Maul Firm, P.C. ("Maul Firm")). As set forth in the Leardi Decl. and Exhibit D, Class Counsel has broken down their time entries (and corresponding fees) into 15 (Fifteen) categories of work that was performed over the course of the Litigation. These categories range in nature from Pre-Litigation Investigating/Fact Gathering, to multiple Discovery-related activities (depositions, interrogatories, etc.), to Class Certification efforts, to Meetings and Conferences. For each of these categories, Class Counsel has designated (by respective law firm) a total number of hours and corresponding amount of fees to demonstrate what was done and by whom, and the fees associated with the work.

Exhibit E to the Leardi Decl. is a Summary Breakdown of each timekeeper who performed work over the course of the Litigation. This Exhibit provides the following information about Class Counsel's individual timekeepers: 1) the names of each timekeeper (organized by law firm); 2) their hourly billing rates; 3) the total number of hours the timekeeper billed to the Litigation; and 4) the total number of fees the timekeeper incurred in the Litigation.

Finally, Exhibit F to the Leardi Decl. is a Summary Breakdown of all Expenses incurred by Class Counsel over the course of the Litigation. Such Expenses have been organized by categories, ranging from copies/duplication to travel, to court-related costs such as transcripts and/or mediation services.

I have conducted an independent review and analysis of the time records and expenses of all Class Counsel in this Matter. Based upon this review, I have concluded that the information contained within Exhibits D, E, and F to the Leardi Decl. fairly and accurately reflect the fees, time, tasks, and expenses incurred by Class Counsel during this Matter.

In sum, my independent analysis of the time records and the information contained within these Exhibits demonstrate the following key pieces of information about Class Counsel's efforts:

- Class Counsel and the three other law firms devoted 4,153.23 total combined hours to the Litigation;
- 38 individual Timekeepers[2] billed time to the Litigation;
- Class Counsel (BLW and Zuckerman Spaeder) and three other law firms incurred a combined $2,522,544.25 in fees—or "lodestar"—over the course of the 56-month Litigation (including Pre-Litigation Investigation), calculated by multiplying hours billed times current billing rates; and
- The five law firms incurred $91,055.47 total in Expenses.

In the section below, "Analysis of the Fees/Expenses Sought by Class Counsel," I shall utilize the information derived from my independent analysis of the time records and the information contained within Class Counsel's Exhibits to support my overall conclusions that the

---

[2] This total number accounts for two timekeepers who worked at more than one of the five firms over the course of the Litigation.

5617442.6

fees/expenses incurred by Class Counsel in the Litigation were reasonable and appropriate, and that the amount sought by Class Counsel in the settlement agreement is not only fair, but warranted.

### Analysis of the Fees/Expenses Sought by Class Counsel

A.  Methodology

In analyzing the reasonableness of an attorneys' fee application in a common fund case, courts in the Third Circuit apply both the NJRPC Rule 1.5(a) factors as well as seven particular factors as set forth in *Gunter v. Ridgewood Energy Corp*, 223 F.3d 190, 195 n.1 (3rd Cir. 2000) (the "*Gunter* Factors") – most of which overlap and correspond respectively with one another. For purposes of conducting a complete and comprehensive analysis, I took into consideration all such factors and describe/organize them below per the *Gunter* Factors as follows:

1. The size of the fund and number of persons benefitted;
2. The presence or absence of substantial objections by members of the class;
3. Skill and efficiency of the attorneys involved;
4. Complexity of the case and duration of the litigation;
5. The risk of nonpayment;
6. The amount of time devoted to the case by plaintiffs' counsel; and
7. Awards in similar cases.

I will describe and analyze these seven factors in greater detail in the sections below – particularly as they apply to the facts, legal issues, and overall fees/expenses incurred over the course of this Litigation.

B.  Size of the Fund and Number of Persons Benefitted (Amount Involved/Results Obtained)

Based on my understanding of the number of active chiropractors who were affected by Horizon's bundling policy during the Class Period, there could be upwards of 9,000 (Nine Thousand) individuals who may be eligible to benefit from the settlement in this Matter. It is my opinion that the results Class Counsel obtained in this Matter were a tremendous success for several reasons:

First, Class Counsel succeeded in obtaining a $33 million monetary settlement. Class Counsel worked for nearly five years facing the possibility of recovering nothing against a well-funded and highly-skilled adversary, achieving an extraordinarily successful result for the Class. Horizon has already deposited the $33 million into an escrow account, which, upon final approval of the settlement, the net amount of which will be immediately available for distribution to Class members.

Second, the success achieved by the $33 million settlement is even more extraordinary given that even if the Class completely prevailed in litigation, a likely remedy was the Court ordering Horizon to reprocess every single claim. This remedy would have been time consuming, costly for both parties (especially since Horizon could have demanded additional

6

documentation from Class members to support their claims), and ultimately Horizon could have denied them all in whole or in part. Put another way, Class Counsel could have completely prevailed at trial and the Class could still have walked away with no monetary remedy and an outcome resulting in further uncertainty, cost, and delay.

Finally, once the settlement is approved, members of the Class <u>do not have to do anything</u> to receive their funds. The settlement avoids any claims process, registration, production, or document submission (or the very real risk of non-payment described above). Class Counsel worked with Epiq (the fund administrator) to create an allocation process that was fair and reasonable for Class members. All Class members have to do is receive and deposit their checks from the settlement fund.

The success Class Counsel achieved in this matter was obtaining for the Class a settlement fund of considerable size that will provide benefits to the Class without any additional burdens or risks for the Class members. The work Class Counsel performed directly resulted in this successful outcome for the Class. Given the number of individuals who will benefit from Class Counsel's work and the extraordinary level of success Class Counsel achieved on behalf of the Class members, a fee award of 33⅓% of the Settlement Fund ($11 million) is reasonable and appropriate.

C. Objections by Members of the Class

It is my understanding that, to date, no objections have been filed by Class members in connection with the terms of the Settlement. To the extent that changes, I reserve the right to supplement this Declaration in response to any objections directly relating to the fees/expenses incurred and sought by Class Counsel.

D. Skill, Reputation, Ability of Attorneys Involved

As the NJRPC Rule 1.5 and the *Gunter* Factors establish, the skill, reputation, and ability of attorneys involved in class action litigation is a key factor in evaluating the reasonableness of fees/expenses incurred and/or the ultimate award sought by counsel in a settlement. I have conducted a thorough evaluation of the personnel within the five law firms involved in this matter and have concluded that Class Counsel's skills, abilities, handling of the required workload and multitude of issues that arose over the course of the matter, and ultimate success in obtaining a settlement for the Class members merit the award Class Counsel seeks from the Court.

In my evaluation, I consider many factors, including how long the attorney has been practicing law (especially in his/her particular specialty area), relevant successes the attorney has previously achieved, as well as relevant specializations that would assist with the matter, and, most importantly, whether the attorney's/firms' particular skills/credentials reflect the way in which the legal work was handled (including the results obtained). In this Litigation, each law firm (and respective attorneys) involved brought its own outstanding and unique skill sets to handle the required workload in order to bring about the tremendously successful result.

5617442.6

Based in Princeton, New Jersey, BLW specializes in legal services for health care providers and provider-related entities. BLW began working on the Litigation in 2011 (their investigation work began as early as 2009) and has served as Class Counsel through the present. Over the course of representation, the firm's timekeepers all contributed their substantial prior experience representing health care professionals.

It is my understanding that Mr. Buttaci himself has received a commendation from the International Chiropractic Association for previous legal action "on behalf of the Chiropractic Profession." One of the great complexities of this case was the manner in which the claims Data were coded. The Buttaci Firm's prior representation of health care professionals provided them with specialized knowledge that proved invaluable in understanding the Data sets in this Matter. Additionally, attorney John Leardi had a prior attorney-client relationship with one of the Class representatives on another case. It is my opinion (as per Rule 1.5(a)(6)), that where a lawyer has a pre-existing relationship with a client, I must consider whether such prior representation provided Counsel with specialized knowledge that confers additional benefits on the Class (in this matter, Mr. Leardi's experience with the complex data coding issues). That prior relationship (and the benefits it conferred to the Class) also warrants a higher billing rate.

The Pomerantz law firm also served as Class Counsel at the outset of the Litigation (from December 2010 through August 2013) – particularly during the pre-litigation investigation process. The Pomerantz team was led by Partner Brian Hufford, a highly experienced lawyer in health care class Actions, who has achieved two of the largest recoveries ever obtained in health insurance class actions (one for $350 million against United Health Care and one for $250 million against Health Net). Partner Murielle Steven Walsh, who also had significant class action experience, handled the primary drafting of the initial complaint. It was her institutional knowledge and diligence during this process that confirmed the need to investigate and pursue other potential state claims to supplement the underlying ERISA-related allegations. Anthony Maul contributed his experience in class action litigation (with a focus on health care policy and reform) both during the initial investigation/complaint process, but also during the settlement process during which his analysis of the claims data proved invaluable in bringing about the beneficial settlement terms for the Class members.[3]

In January 2014, Mr. Hufford moved his practice (and this Litigation) to Zuckerman Spaeder, a national litigation firm based in the District of Columbia (with offices in Baltimore, New York, and Tampa). Joining him in moving from Pomerantz to Zuckerman Spaeder was Jason Cowart, who had also worked with Mr. Hufford at Pomerantz in developing an ERISA-based practice. Together, Partners Hufford and Cowart head up the Healthcare Practice at Zuckerman Spaeder, using the attorneys and resources of that firm and its outstanding experience, resources, and prior success with Class Actions. For example, Counsel William Meyer, brought significant experience with successful Class Action litigation, having previously obtained one of the largest civil settlements with the State of Maryland in its history over the State's violations of Medicaid law. Mr. Meyer has also successfully represented several former NFL Players seeking disability payments in the much-publicized concussion lawsuits, along with Partner Cyril Smith. Former Zuckerman Associate Brian Mahanna is currently serving as Deputy Attorney General for the State of New York. In sum, each of the lawyers who worked

---

[3] At this phase of the Litigation, Mr. Maul had since started his own law firm, The Maul Firm, P.C.

8

on this matter were exceptionally credentialed, experienced, and brought unique skill sets, experience, and prior successes in their representation of the Class. Based on my review of the time records and discussions with Class Counsel, it is my understanding that BLW communicated and coordinated its efforts with both Pomerantz and Zuckerman Spaeder so that the work (and corresponding fees/expenses) would be carried out as effectively and efficiently as possible.

Based on my independent review of Class Counsel's time records and discussions with Class Counsel re: same, it is my understanding that all of the timekeepers assigned to work on this Litigation from the five firms involved were carefully selected based on their requisite skills and experience that enabled them to perform the tasks which they were assigned. To the extent any Associates and/or Support Staff were needed, they were carefully supervised by the Partners in charge so that the work they were performing (and the fees/expenses associated with same) was conducted reasonably, efficiently, and appropriately.

It is my opinion this group of firms/attorneys brought about a significant ERISA class action settlement – having conducted a comprehensive and thorough investigation, reviewing and analyzing significant volumes of claims data, hundreds of thousands of pages of other documents, conducting their own discovery process, as well as surviving two motions to dismiss, oppositions to class certification, a Rule 23(f) petition to the Third Circuit, and two mediations to settle the matter. As discussed above, Class Counsel investigated, litigated, and settled this class action as professionally and efficiently as I would have expected from a group of attorneys as credentialed and skilled as the ones described above. As pointed out in Class Counsel's fee application (and as I have independently reviewed), this Litigation consisted of a minimal amount of motions, no unnecessary discovery disputes between counsel, and a series of successful pleadings that brought about a remarkable result for the Class members. Therefore, given the skill, ability, efficiency in handling the required workload, and ultimate success of the two firms who served as Class Counsel in this Litigation, it is my opinion that a fee award equal to one-third of the Settlement Fund—or $11 million—is appropriate, reasonable, and warranted.

E. Complexity of the Case (including Required Workload) and Duration of the Litigation

One of the key factors in my analysis (both under NJRPC Rule 1.5 and the *Gunter* factors) is the time and labor required, the complexity and difficulty of the case, and the necessary skill to perform the legal services. This factor strongly supports the reasonableness of Class Counsel's fee request in this Matter.

This Matter was extremely complex and multi-faceted. Due to several factors, including the legal issues involved, the magnitude of the work required (particularly the investigative work and discovery process), the financial stakes for the class members, as well as a strong and well-resourced opposition, this Matter required a highly skilled legal team. As set forth *supra* in section D, each firm performing work on this Matter brought to the table a broad range of expertise in the pertinent legal subjects, performed a masterful job confronting and resolving the factual and legal hurdles facing members of the Class, and were highly successful in negotiating a beneficial settlement for the Class members.

5617442.6

This Matter spanned nearly a five year period (with previous factual investigation lasting an additional two years). During that time period, Class Counsel had to engage in a multitude of tasks to obtain the tremendous results achieved. Class Counsel conducted a comprehensive and exhaustive background investigation into Horizon's bundling policy to evaluate whether a cause of action could be asserted against Horizon and, if so, to craft an appropriate cause of action. The investigation required Class Counsel to analyze previous regulatory proceedings before the New Jersey Department of Banking and Insurance. Class Counsel interviewed extensive numbers of chiropractors affected by Horizon's bundling policy and reviewed a multitude of documents relevant to potential causes of action.

Upon completion of the preliminary factual investigation, Class Counsel had to frame an appropriate cause of action and craft the appropriate legal documents to commence the action. Every step of the way, Class Counsel faced vigorous opposition from Horizon, including two comprehensive Motions to Dismiss, opposition to class certification, and a Rule 23(f) petition to the Third Circuit. Class Counsel had to confront many complex legal issues, including: Plaintiff's standing to bring the case (and other legal impediments such as arbitration clauses), entitlement to monetary/equitable relief under ERISA, entitlement to monetary/equitable relief under state law claims, exhaustion of administrative remedies, the effect of a prior settlement and release by a member of the Class, and Plaintiffs' satisfaction of the Class certification requirements.

Class Counsel had to undertake significant and exhaustive discovery, both to resolve the merits of the case as well as to defeat Horizon's opposition to class certification. Class Counsel reviewed more than 15,000 documents (containing approximately 200,000 pages) and also reviewed over 19 million records of claims data. The manner in which the claims data were coded is extremely complex and required knowledgeable Counsel (experience that BLW possessed due to its prior representation of medical professionals, including one of the Class Representatives) and locating a qualified expert witness on the data coding. Counsel also took or defended 20 depositions (17 noticed by Plaintiffs and 3 noticed by Horizon) over 14 months.

A critical component of the workload was Class Counsel's participation in the settlement negotiations, which ultimately resulted in a tremendous settlement for the Class. After Class Counsel successfully obtained certification of the Class, Class Counsel attended two mediation sessions with Horizon (one in October, 2015 and one in April, 2016). Between the two mediation sessions, Class Counsel discovered a glitch in Horizon's coding methodology that enabled them to increase the settlement obtained on behalf of the Class. Class Counsel had to assess the possibility that success at trial could likely result in Horizon reprocessing and then re-denying all of Plaintiff's claims. Ultimately, Class Counsel was highly successful during the settlement stage and achieved an outstanding result for the Class.

Finally, Class Counsel had to establish a plan of allocation and distribution of the funds established as a result of the settlement. Class Counsel had to create a process that was equitable to the Class members. The resulting process requires no effort for Class members beyond cashing their checks, thus avoiding reprocessing of claims by Horizon, and the associated time consuming and resource intensive claims process, with no certainty of reimbursement.

5617442.6

A review of the novelty and required workload of this Matter demonstrates that this was a difficult and complex matter and required the significant resources of Class Counsel in its successful prosecution of this Matter. In my opinion, the complexity and required workload of this Matter strongly supports the reasonableness of Plaintiff's fee request.

F. The Risk of Nonpayment (Whether the Fee is Fixed or Contingent)

The risk of nonpayment is another key factor I consider in evaluating the reasonableness of Counsel's fees and expenses. Both the NJRPC and the *Gunter* factors include this factor to "recogniz[e] the importance of a financial incentive to entice qualified attorneys to devote their time to complex, time-consuming cases in which they risk non-payment." See *Gunter*, 233 F.3d at 198. In my opinion, the risk of nonpayment Class Counsel faced in this Matter further supports the reasonableness of Class Counsel's fee request, for several reasons:

First, since Class Counsel was handling the Matter on a contingent fee basis, Class Counsel had to achieve monetary success for the Class in order to be compensated. Monetary success in this Matter, however, was far from certain. As described in several other portions of this Declaration, this Matter was highly complex (both factually and legally) and Class Counsel risked a loss at several key junctures of the case. Several of the risks Class Counsel faced included: securing standing; establishing Horizon's liability on the bundling policy; surviving Horizon's two motions to dismiss, opposition to class certification, and a Rule 23(f) petition to the Third Circuit; and either successfully handling two mediations (to obtain an appropriate settlement) or having to prevail on the merits of the case if the matter proceeded to trial. Counsel for Horizon skillfully and vigorously opposed Class Counsel at every turn. Based on all these factors, Class Counsel faced a significant risk of receiving no compensation for all the time and effort Class Counsel devoted to representing the Class.

Second, even had Class Counsel fully prevailed in litigation, one likely remedy was the Court ordering Horizon to reprocess all of the claims. This process could have taken a substantial amount of time. Horizon then could have denied all of the claims after both sides devoted significant time and resources to this process. Had this occurred, Class Counsel would have won a Pyrrhic victory, conferring no monetary benefit on the Class. Even worse, Class Counsel might have had to wait years for the reprocessing to learn whether they conferred any monetary benefit on the class to calculate a contingent fee. Nevertheless, Class Counsel still proceeded with this time-consuming and complex litigation, while facing this risk of nonpayment.

One other pertinent factor contained within NJRPC is Rule 1.5(a)(2), requiring consideration of the likelihood "that the acceptance of the particular employment will preclude other employment by the lawyer." Notably, BLW devoted a substantial portion of its resources to this Matter for five years while facing the very real possibility of receiving nothing for all of its time and effort. At Zuckerman, several senior attorneys (most notably Mr. Meyer, Mr. Hufford, and Mr. Cowart) devoted significant time and effort to this matter much as the lawyers at BLW did. All of these billers could have spent their time devoted to other matters in which they were guaranteed financial compensation. Instead, they devoted their time to a Matter in which they brought a significant benefit to a large class of individuals, and both the NJRPC and

11

*Gunter* factors recognize the importance of encouraging and adequately rewarding that contribution.

One additional reason I consider the risk of nonpayment when analyzing the reasonableness of Class Counsel's fees is the incentive that risk creates to bill reasonably. When Counsel undertakes a representation without the expectation of payment (especially when Counsel is not paid a guaranteed hourly rate), it provides Counsel with a strong incentive to work economically and efficiently in undertaking its representation. In my opinion, this incentive creates a strong presumption that Counsel's hours and fees were reasonable and necessarily incurred (and my independent review of the bills confirms this presumption).

Class Counsel faced the very real risk of receiving no compensation for all their extraordinary work over the course of five years. Despite this risk, Class Counsel proceeded with the representation and conferred a significant benefit on a large class of individuals. Both the NJRPC and *Gunter* factors recognize this risk as a factor in assessing the reasonableness of Class Counsel's fees. In my opinion, this risk of non-payment and preclusion of other work in which Class Counsel would have been guaranteed compensation strongly support the reasonableness of a fee award of 33⅓% of the Settlement Fund (or $11 million).

G.  Amount of Time Devoted to the Case by Class Counsel

In the above section entitled "Services Provided and Fees/Expenses Incurred by Class Counsel," I have already provided a breakdown of the key information contained in Class Counsel's Exhibits. When analyzed alongside my own independent review of Class Counsel's time records, as well as the NJRPC Rule 1.5 and *Gunter* Factors (as I have done above in the prior sections), it is clear that the amount of time devoted to the case by Class Counsel was reasonable and necessary. Considering the complexity of the case, the risk involved, and the required workload, Class Counsel achieved an outstanding result for the represented Class commensurate with the amount of time and resources they devoted to the Litigation. Furthermore, the time and resources devoted in the context of the outcome were particularly appropriate given a) the likely remedy of reprocessing each and every claim of the class members (and the administrative burdens in connection with same) and b) the ultimate risk to both the Class and Class Counsel of receiving no payment whatsoever.

I was particularly impressed by the efficiency of Class Counsel. The 4,153.23 hours expended over more than five years of litigation was substantial, but given the complexity and duration of this litigation, it would not have been surprising if Class Counsel had expended twice that number of hours to achieve this result.

I therefore conclude that the time and resources devoted to the Litigation by Class Counsel is commensurate with the sum of fees/expenses they currently seek from the Settlement Agreement.

H.  Awards in Similar Cases

12

One of the *Gunter* factors to be considered is "Awards in Similar Cases."  I have reviewed the recoveries from several class action cases within the Third Circuit (both ERISA based claims and non-ERISA based claims) and, in my opinion, those awards further justify the reasonableness of an $11 million award (or 33⅓% of the Settlement) in this Matter.

In *Demmick v. Cellco Partnership d/b/a Verizon*[4], the District of New Jersey approved over $19 million in attorneys fees for Class Counsel (30% of the Settlement).  In the decision, the Court noted that "The Third Circuit has noted with approval percentage-of-recovery attorneys' fees awards ranging […] to as much as 45% of the recovery" (citing the Third Circuit case *In re Gen. Motors*, 55 F.3d at 819, n. 38).  The Court further stated that "Many district courts in this Circuit have chosen to award attorneys' fees at the 33⅓% level – which is the approximate median of the range recognized as acceptable by the Third Circuit (citing 3 other New Jersey cases awarding this level of recovery for Class Counsel.[5]

In addition to the *Demmick* case, I have reviewed the recoveries from several other cases within the Third Circuit, in which awards of 30% or greater were approved for Class Counsel.[6] These eight diverse cases saw a wide range of benefits conferred upon the class (both greater and less than the $33 million benefit conferred in this Matter) and these similar awards provide further justification for the substantial benefit conferred upon the Class in this complex Matter.[7]

The award of 33⅓ % of the Settlement in this Matter is right in line with countless other cases (both ERISA and non-ERISA claims) within the Third Circuit.  Indeed, it is the exact amount the Third Circuit claims has approved as the "typical" percentage often used within the Circuit as a reasonable amount in awarding fees to successful Class Counsel, and far less than the 45% amount the Third Circuit has previously allowed.  It is my opinion that awards in other Third Circuit class actions strongly justify the reasonableness of a 33⅓% award (or $11 million) to Class Counsel in this Matter.

### Hourly Billing Rates of Class Counsel

It is my opinion that the hourly rates charged by Class Counsel over the course of the Litigation were reasonable, appropriate, and within the range of hourly rates I would expect to be charged by the experienced litigators in a matter of this complexity, breadth, and length.  I base this conclusion on the following four factors:

---

[4] Case No. 2:06-cv-02163-JLL-MF (Document 183, Page 7).

[5] *Rowe v. E.I. Dupont de Nemours & Co.*, 2011 WL 3837106, at *22 (D.N.J. August 26, 2011), *Milliron v. T-Mobile USA Inc.*, 2009 WL 3345762 at *8 (D.N.J. Sept. 10, 2009), and *McGee v. Cont'l Tire N. Am., Inc.*, 2009 WL 539893, at *13 (D.N.J. Mar. 4, 2009).

[6] *See in Re Aetna Inc.* MDL No. 1219, 2001 WL 20928, at *4 (E.D. Pa., Jan. 4, 2001) (30% recovery), *Martin v. Foster Wheeler Energy Corp.*, No. 3:06-CV-0878, 2008 WL 906472 (M.D. Pa. March 31, 2008) (30% recovery) *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa., April 22, 2005) (30% recovery), *McCoy v. Health Net, Inc. et al.*, 569 F. Supp. 2d 448 (D.N.J. 2008) (32.48% recovery under an ERISA Claim), *In re Merck & Co. Inc Vytorin ERISA Litig.*, 2010 WL 547613 (D.N.J Feb 9, 2010) (33⅓% recovery under an ERISA Claim), *In re Schering-Plough Corp.*, 2012 WL 1964451 (D.N.J. May 31, 2012) (33⅓% recovery under an ERISA Claim), and *Kirsch v. Delta Dental of New Jersey*, No 12-1684 (3rd Cir. 2013) (36% recovery).

[7] I also wish to note that in not one of these eight cases did Class Counsel provide the level of benefits to the Class per hour worked than Class Counsel did in this Matter ($7,946 here, i.e., $33 million divided by 4,153 hours).

13

- My experience at Wyeth supervising complex litigation (including class actions and multi-district litigation) of the magnitude and caliber of this Litigation (including hiring, supervising, and evaluating the hourly rates of respective counsel);
- My experience as an fee expert analyzing the rates of attorneys (and support staff) in New Jersey, across the United States, and internationally from 2009 to the present;
- The factors listed in Rule 1.5(a) of the NJRPC (and as similarly articulated by the *Gunter* Factors); and
- Hourly rates customarily charged by adversary counsel, Epstein Becker.

Based on all these factors, it is my conclusion that the rates charged by Class Counsel in this Litigation are reasonable and appropriate.

A. Range of Rates Charged by Class Counsel

It is my understanding that the majority of the work in this Litigation was performed by two law firms: BLW and Zuckerman Spaeder. Please see Exhibit E to the Leardi Decl. for a chart containing the full details on the rates of all of Class Counsel.

Based in Princeton, New Jersey, BLW specializes in legal services for health care providers and provider-related entities. BLW began working on the Litigation in 2011 and did not once raise their rates through the conclusion of the matter. The firm assigned 7 timekeepers to work on this Litigation. From October 2009 through present, three BLW Partners all billed at $550 per hour, one Associate at $325 per hour, and three Support Staff within the range of $185 to $225 per hour.

It is my understanding that the Pomerantz law firm also served as Class Counsel at the outset of the Litigation (from December 2010 through August 2013) – particularly during the pre-litigation investigation process. The hourly billing rates of the six attorneys working on the Litigation ranged from $475 through $975.[8]

In January 2014, Pomerantz attorney Brian Hufford moved his practice (and this Litigation) to Zuckerman Spaeder, a nationally recognized litigation firm based in the District of Columbia (with offices in Baltimore, New York, and Tampa). The majority of Zuckerman timekeepers were located in the Baltimore and New York offices. The hourly rates for Partners at Zuckerman ranged from $625 to $975, while Associates ranged from between $475 to $575 per hour, and Support Staff ranged between $145 to $330 per hour.

During the settlement negotiation phase of this matter, named Plaintiff Dr. James Proodian retained the Callagy Firm to assist in his evaluation of various settlement proposals. The Callagy Firm worked closely with Class Counsel and greatly assisted Class counsel in

---

[8] When attorney Anthony Maul started his own Health Law and Policy firm (based in Brooklyn, New York) and continued to work on the Litigation (from April 2014 through December 2015), he billed a rate of $600 per hour (mainly on settlement-related efforts).

5617442.6

obtaining the final Settlement. From December 2015 through February 2016, the Callagy Firm attorneys' billing rates ranged from \$300-\$585 per hour, and their Support Staff billed an hourly rate of \$100 (mainly on settlement-related issues). Based in Paramus, New Jersey (with another office in Phoenix, Arizona), the Callagy Firm is a highly-credentialed, multi-disciplinary law firm that specializes in Healthcare and Commercial Litigation. Considering the firm's experience, as well as the value added by this law firm to the settlement process, it is my opinion that the rates charged by this firm were well within the range of reasonable rates charged by counsel in this market/locality.

Additionally, it is my understanding that the majority of the work in this Litigation was performed at a senior level of the firms (i.e., Partners and Counsel). In my opinion, given the complexities of the required workload and the institutional knowledge applied by each partner addressing these complexities and workload associated with same, this was reasonable.

B. Analysis of Class Counsel's Hourly Rates Based on My Prior Experience

For the period from April of 1992 through July of 2008, in my capacity as Senior Vice President and Associate General Counsel of Wyeth, I supervised a substantial number of complex matters throughout the world comparable in size and complexity to this class action. Many of these matters were venued in federal and state court in New Jersey. My knowledge of attorney billing rates directly derives from and is informed by my evaluation of the invoices I reviewed for legal services incurred in those matters. As a result of this experience, I reviewed the invoices and developed an intimate knowledge of the billing rates of virtually every major law firm in the State of New Jersey and around the country. Since that time, my experience as a fee expert in multiple legal fee disputes in New Jersey and elsewhere has updated and sustained my knowledge of the billing rates up to date. As the NJRPC also require consideration of fees similarly charged in the area by other attorneys, my knowledge of such fees and rates confirm that the rates Class Counsel charged were within the range of rates for services provided in comparable matters.

To further confirm my opinion that the Zuckerman Spaeder rates were reasonable and appropriate, I consulted the Laffey Matrix (a survey that specifically analyzes the rates for the Baltimore – Washington Metropolitan Area)[9]. Since William Meyer performed the majority of the work at Zuckerman (and is based out of Baltimore), I cross-referenced his rates with the Laffey Matrix rates for an attorney of his experience in the Baltimore – Washington Area. Mr. Meyer charged \$750 per hour from 2014 – 2016. For those same three years, the Laffey Matrix sets forth hourly rates of \$789, \$796, and \$826 for an attorney of Mr. Meyer's experience. In each year, Mr. Meyer's rate is below the market rate listed in the Laffey Matrix, by as much as 10%. In my opinion, the Laffey Matrix provides further support that the rates charged by Zuckerman's lead biller was reasonable and appropriate, especially considering Mr. Meyer's level experience and the risk of nonpayment.

In this regard, it is also notable that Messrs. Hufford and Cowart have distinguished themselves in the field of ERISA litigation. They have extensive experience in insurance and

_____

[9] While I consulted the Laffey Matrix, I note that it often under-represents the market rate of more experienced attorneys, highly specialized counsel, or counsel operating at a risk of nonpayment (all relevant factors here).

15

health care matters under ERISA and related federal and state laws, having led litigation that resulted in two of the largest recoveries ever obtained in health insurance class actions. Their work on litigation against United Healthcare led to a $350 million settlement to reimburse providers and subscribers whose ERISA rights had been violated, and in a similar action against Health Net, resulted in a $250 million settlement. Messrs. Hufford and/or Cowart have also served as co-lead counsel in other national health care litigation against United, Aetna, WellPoint, CIGNA, and Blue Cross and Blue Shield entities. Recently, Mr. Hufford successfully argued health care appeals before the U.S. Courts of Appeal for the Second, Third and Fifth Circuits, and was lead counsel in two recent trials against Blue Cross and Blue Shield entities on behalf of providers and provider associations. This high level of specialized expertise warrants and supports the billing rates charged by the Zuckerman Spaeder attorneys.

Based upon this knowledge and information, it is my opinion that the billing rates for each of the law firms who performed work in this class action matter are within the range of rates I would have expected to have been charged and are reasonable and appropriate.

C. Analysis of the NJRPC 1.5(a) Factors (and the *Gunter* Factors)

As discussed above in Subsection A (Methodology) of "Analysis of the Fees/Expenses Sought by Class Counsel," the Third Circuit applies both the NJRPC Rule 1.5(a) and the *Gunter* Factors (which generally correspond and set forth very similar factors) when assessing reasonableness of attorneys' fees. These factors are equally applicable when analyzing the reasonableness of Class Counsel's hourly rates. As I also set forth in detail in Subsections B through I of "Analysis of the Fees/Expenses Sought by Class Counsel," this Litigation was a high-risk, complex, and labor-intensive matter involving a multitude of legal issues, substantial amounts of discovery, motion practice, and settlement negotiations that ultimately yielded an outstanding, burden-free result for the represented Class.

My analysis of Class Counsel's rates is further informed by the NJRPC 1.5 and *Gunter* factors, which I have described *supra*, specifically the complexity of the case, the significant workload required, the duration of the Matter, the credentials (and rates) of opposing Counsel, the substantial risk of non-payment, and the success achieved by Class Counsel. All of these factors further support my conclusion that the rates charged by Class Counsel in this Matter were reasonable and appropriate.

D. Hourly Rates Charged by Opposing Counsel

When evaluating hourly rates of counsel, I also examine the hourly rates charged by opposing counsel for several reasons. First, the rates charged by other attorneys involved in the same or similar cases is strong, if not presumptive, evidence of the market rate for similar legal services within the locality of the Litigation. In addition, when an adversary engages a well-credentialed and highly experienced firm for representation, a litigant is entitled to hire equally credentialed counsel with comparable skill levels and access to resources in order to match both the strength and the quality of its opposition.

16

I am familiar with rates charged by Epstein based on my supervision of complex litigation at Wyeth, when I was responsible for hiring and supervising litigation both within and outside of Northern New Jersey (albeit a few years prior to this Litigation). The rates charged by Class Counsel are within the range of rates Epstein charged during that time. I have also consulted with several independent sources to confirm the hourly rates of attorneys at Epstein. According to the 2010 National Law Journal Survey (before this Litigation started), Epstein Partners billed as high as $850 per hour in 2009, and Associates $450 per hour in 2009. In Plaintiff's Motion for Attorney Fees and Costs (Dated 6/18/10) in *Heller v. District of Columbia* (a matter in which the Epstein firm's rates were used as a benchmark), Plaintiffs note that in 2010, the Partner "High" at Epstein Becker was $855 per hour and the Associate "High" was $475 per hour (rates which, since that time, have likely increased). In *Marchuk v. Farqi & Farqi LLP et al.*, No: 1:13-cv-01669 (S.D.N.Y., 2015), a matter in which Epstein submitted a fee application seeking a range of $595 to $775 per hour for Partners who worked in the matter and up to $425 for Associates (a range of rates that the firm certified as reasonable and appropriate in such application). The Southern District "endorse[d] those rates in full," citing specifically to Epstein's size and reputation to justify its endorsement.

The hourly rates of BLW timekeepers are well within the range of Epstein's rates. The hourly rates of Zuckerman Spaeder's timekeepers (a much larger sized firm than BLW) are also within the range of the Epstein rates (especially considering the risk factor in this Litigation). Given that Class Counsel pursued this case with the possibility of never receiving any payment whatsoever, their rates are entitled to more deference than if payment for services were guaranteed.[10]

Class Counsel's rates are similar to and commensurate with the rates charged by Epstein – especially given Epstein's credentials, reputation, and access to resources that entitled the Class to obtain counsel with similar strengths and qualifications.

\*\*\*\*

In sum, for all the reasons described above, I conclude that the hourly rates charged by Class Counsel were reasonable and appropriate.

### Conclusion

Based on all the above information, it is my opinion that the fees and expenses (as well as the hourly rates) sought by Class Counsel is reasonable and appropriate. I therefore conclude that:

1. The hours incurred and the work performed by Class Counsel in this Matter were reasonable, appropriate, and what I would have expected for a case of this complexity and magnitude;

---

[10] Although Pomerantz, Callagy Firm, and the Maul Firm billed significantly less in this Litigation than Zuckerman Spaeder and BLW, my analysis and conclusions regarding Class Counsel's rates as compared to those of Epstein also applies to these three law firms.

5617442.6

2. The rates charged by Class Counsel in this Matter were reasonable and appropriate;

3. The out-of-pocket expenses incurred by Class Counsel (a sum of $91,055.47) were reasonable and appropriate;

4. Based upon the NJRPC Rule 1.5 and the *Gunter* factors (including complexity, required workload, duration of the litigation, success achieved, benefits conferred upon the Class, preclusion of other work for Class Counsel, and the risk of non-payment Class Counsel faced), a fee in the amount of $11,000,000 (33⅓% of the Settlement Fund) is reasonable and appropriate for Class Counsel's conduct of this matter.

I declare, under penalty of perjury under the Laws of the United States, that the foregoing is true and correct.

Respectfully submitted this 24th day of August, 2016.

Steven A. Tasher

18

5617442.6

# Exhibit A

# STEVEN A. TASHER, ESQ.
## CEO and Managing Director, Wyatt Partners
### P.O. Box 358, Berkeley Heights, New Jersey 07922
**Telephone:** (908) 561-7483   **Email:** stasher@wyattpartners.com  **Website:** www.wyattpartners.com

## EXECUTIVE SUMMARY

Expert on legal fee matters whose entire legal career has focused around the handling and supervision of major litigation throughout the world, Steven Tasher evaluates the reasonableness of legal spend in complex litigation throughout the United States and Europe.  He also serves as an advisor to corporations and law firms on the development and implementation of billing guidelines, litigation budget, and bill review programs.

## INDUSTRY AND LEGAL EXPERIENCE

**WYATT PARTNERS,** Berkeley Heights, NJ

2009-              Co-Chief Executive Officer and Managing Director
                   (Chief Executive Officer since mid-2013)

- Serve as an expert witness, auditor, and mediator with regard to litigation fees and costs of outside counsel;
- Assist corporations with creation and implementation of Litigation Budget & Support Programs and Outside Counsel Billing Guidelines;
- Assist international corporations with familiarization of United States litigation in the area of legal spend;
- Provide advice and counsel to major corporations on development of Environmental Health and Safety (EHS) and Energy Policies and Programs;
- Provide advice and counsel on the preservation of critical company resources by reducing the use of energy, water and waste in company operations and promotion of reuse, recycling and conservation; and
- Conduct environmental due diligence on complex transactions and acquisitions and analysis of the costs of investigation, remediation and disposal.

**WYETH,** Madison, NJ

1992 –2008       Vice President and
                 Associate General Counsel
                 Principal Corporate Officer
                 Senior Vice President, Pharmaceutical Division

Strategic worldwide responsibilities for five operating departments of the company as well as Associate General Counsel responsibilities.

Key responsibilities:

- Oversee the Environmental and Energy Departments to assure compliance with all applicable laws and regulations regarding environmental, health and safety matters, and to ensure the most efficient use of energy at all company facilities.
- Administer the Global Real Estate Department.
- Supervise the Aviation Department, including aircraft, pilots, ground crew, and hangar facility.
- Manage Facilities Operations and Building Management.
- Serve as Associate General Counsel; supervise major legal issues affecting the corporation, including major litigation, global contract administration, and internal corporate investigations.
- Serve on the Corporate Law/Regulatory Review Committee which provides guidance to the Chairman of the Board on all issues affecting the potential liability of the corporation.
- Provide advice and direction with regard to environmental issues, health and safety compliance and assessment programs, environmental remediation, regulatory matters, legislative issues, corporate acquisitions & divestitures, and supervision and defense of environmental enforcement actions.
- Manage the company's $300 million environmental reserves as well as oversee the $103 million environmental reserves for Cytec, Inc.
- Serve as Counsel to the President of Wyeth Pharmaceuticals on global compliance issues.

Key accomplishments:

- Formed a world-class global Environment Health and Safety (EHS) Department in 1992, establishing a comprehensive program and set of policies designed to achieve EHS excellence.
- Guided Wyeth Pharmaceuticals through its compliance with a Consent Decree imposed by the FDA on three key manufacturing facilities and served as counsel to the President on all cGMP compliance issues.
- Served on a three-person senior leadership team which re-engineered and restructured Wyeth's supply chain organization.
- Served as Senior Vice President, Global Compliance Auditing for Wyeth Pharmaceuticals; established and supervised the audit programs for all company operations, including manufacturing and research facilities, clinical trials, medical labeling, and promotional activities.
- Supervised the successful litigation against a Minneapolis company and its individuals who had stolen the company's trade secret process for the extraction and purification of Premarin.
- Established a safety program which achieved a substantial reduction in the company's lost time incident rate and total incident rate.
- At the behest of the company's Board of Directors, created animal health and welfare programs for the care and treatment of horses involved in the production of Premarin; supervised the ongoing defense of attacks by animal activist organizations on the production and manufacture of the Premarin family of products.

- Established a Budget Program for the company's diet drug litigation. This matter required supervision of the legal spend of over 60,000 lawsuits, coordinating counsel, and 120 law firms which defended these matters.
- Supervised environmental international litigation and claims brought against the company and/or its affiliates in Europe, South America, and Asia.

**WILLKIE, FARR & GALLAGHER**, New York, NY and Washington, DC

1988 – 1992   Partner in charge, Environmental Practice Group

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**DONOVAN, LEISURE, NEWTON & IRVINE**, New York, NY and Washington, DC

1983 – 1988   Partner in charge, Environmental Practice Group

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**BAYH, TABBERT & CAPEHART**, Indianapolis, IN, and Washington, DC

1982          Partner in charge, Environmental Practice Group

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**E.I. duPont de Nemours and Company**, Wilmington, DE

1980 – 1982   Staff Attorney

Served as an attorney within the Law Department, providing litigation and regulatory counsel on a wide range of issues affecting the corporation.

**STATE OF NEW JERSEY**, Trenton, NJ

1973 – 1980   Deputy Attorney General
              Chief Counsel to the Commissioner of the New Jersey Department of
              Environmental Protection and Commissioner of Agriculture

Supervised all environmental litigation and counseling for the State of New Jersey. Prosecuted several of the nation's landmark environmental matters. Tried and supervised numerous cases in state and federal court involving workers' compensation, tort and contract claims, transportation and eminent domain, and debarment of state contractors.

Case 2:Case-2:12-98-0968-MRS DocDocment-94-334Filed 594/015/25728ge 23age234Paf26D: 4384

## EDUCATION

1973 **GEORGE WASHINGTON UNIVERSITY, NATIONAL LAW CENTER,**
Washington, DC
**Juris Doctor**, with honors

1970 **RUTGERS UNIVERSITY**, Newark, NJ
**BA, Political Science/Pre-law**, with honors

## BOARD POSITIONS
- The George Washington University Law School – Member, Board of Advisors
- The Cancer Hope Network – Member, Board of Trustees (Past President)
- Visiting Nurse Association of Northern NJ – Member, Board of Trustees

## AWARDS AND HONORS
- Jacob Burns Award for Extraordinary Service to The George Washington University Law School – 2008
- Philanthropic Leadership Award, 2003 – Cancer Hope Network
- Corporate Leadership Award, 2003 – Visiting Nurse Association of Northern NJ
- Selected to Best Lawyers in America – New York, NY and Washington, DC, 1989-1992

## PROFESSIONAL AFFILIATIONS
- New Jersey Institute of Technology – Adjunct Faculty Member
- "Distinguished Neutral" – International Institute for Conflict Prevention & Resolution

## PRESENTATIONS AND PUBLICATIONS
- April 19, 2016: Featured presenter at "Ethics and the 'Reasonable' Legal Fee" webinar – sponsored by the Practising Law Institute
- December 1, 2015: Featured presenter at "Ethics Behind the Reasonable Legal Fee" in Basking Ridge, New Jersey – sponsored by the Association of Corporate Counsel New Jersey Chapter
- September 18, 2015: Featured presenter at "Litigating Fee Disputes: Keeping it Reasonable" in Hanover, New Jersey – sponsored by the Association of Corporate Counsel New Jersey Chapter
- March and June 2015: Presenter of "Best Practices & Lessons Learned for In-House Counsel on Unnecessary Legal Spend," a CLE sponsored by the Association of Corporate Counsel New Jersey Chapter
- October 2013: Featured speaker at the NALFA Attorney Fee Conference in San Francisco, California
- April 2013: Presenter of two legal spend webinars (Bill Review/Litigation Budgeting Programs) with Deloitte
- June 2010: Featured speaker at the Second Annual Los Angeles Attorney Fee Conference: "It Pays To Be Reasonable" at Southwestern Law School
- Environmental Law and Real Estate Handbook
- New York Environmental Law Handbook

# Exhibit B

**Testifying History of Steven A. Tasher**
**(CEO and Managing Director of Wyatt Partners)**
**Current as of August 2016**

Engagements as Testifying Expert Witness at Trials and/or Depositions

1. *Seagate Technology LLC, Seagate Technology International, and Seagate Singapore International Headquarters PTE, LTD. v. National Union Fire Insurance Company of Pittsburgh, PA and Insurance Company of the State of Pennsylvania*, Case No. 09-04120 CV (United States District Court for the Northern District of California) (deposition taken).

2. *First Horizon National Corporation, et al., v. Certain Underwriters at Lloyds, et al.*, Civil Action No.: 2-11 –cv-02608 (United States District Court for the Western District of Tennessee: Memphis Division) (deposition taken).

3. *In the Matter of the Arbitration Act of 1996 and In the Matter of an Arbitration Between GATX Rail Austria GmbH and Liberty Mutual Insurance Europe Limited* (arbitration hearing testimony provided on November 18, 2015).

4. *Diana Gladstone v. Robert Hacker*, Civil Action no. GD12-24308 (in the Court of Common Pleas, Allegheny County, Pennsylvania) (jury trial testimony provided on January 19, 2016).

5. *Joseph P. Nacchio, et al. v. Herbert J. Stern et al.*, Docket No. ESX-L-2825-11 (Superior Court of New Jersey, Law Division, Essex County) (deposition taken).

6. *IVM Corporation v. Zuellig Group et al.*, Civil Action No.: 2-13-cv-3902 (United States District Court for the District of New Jersey) (deposition taken).