# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| K.E., individually and on behalf of | ) | |
| M.L., a child with a disability, | ) | Civil Action No.: 21-cv-02815 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DECLARATION OF |
| v. | ) | STEVEN A. TASHER, ESQUIRE |
| | ) | CHIEF EXECUTIVE OFFICER |
| NEW YORK CITY | ) | WYATT PARTNERS |
| DEPARMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, Steven A. Tasher, Esq., declare as follows:

1. I have been retained by the Cuddy Law firm, PLLC (the "Firm" or the "Cuddy Firm") on behalf of Plaintiff in the above-captioned proceeding to provide my expert opinions regarding the fees and costs sought by the Firm in connection with three separate but related matters: two Demands for Due Process Hearings, Cases No. 175911 and 194397, brought before two separate Impartial Hearing Officers by Plaintiff on behalf of her minor child (the "Due Process Matters"), and an action brought in the Southern District of New York (the "Federal Action") brought pursuant to the Individuals with Disabilities Education Act ("IDEA") against the New York Department of Education (the "DOE"). My expert opinions are set forth in this "Declaration".

2. My address is P.O. Box 358, Berkeley Heights, NJ 07922. I am being compensated at my standard hourly rate of $595 per hour.

**LITIGATION AND EXPERT WITNESS BACKGROUND**

3. I have spent my entire legal career handling or supervising major litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness of attorneys' fees.

4. I have been accepted as an expert on the reasonableness of attorneys' fees and settlements in numerous courts and tribunals across the country and around the world, including (without limitation) the United States District Court for the Southern District

1

of New York, United States District Court for the Eastern District of New York, the Supreme Court of New York (Counties of New York, Queens, and Westchester), and various private arbitrations venued in the State of New York.

5. My current CV is attached hereto as **Exhibit A** and my current Testifying History is attached hereto as **Exhibit B**.

6. As Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous cases in state and federal court involving, *inter alia*, tort and contract claims brought against the State, election fraud, eminent domain law and other real estate disputes, transportation issues, and environmental matters. I also argued numerous appellate matters before the Appellate Division of the New Jersey Superior Court and the Supreme Court of New Jersey. I personally litigated many precedent-setting workers' compensation matters on behalf of the State of New Jersey and its Second Injury Fund, including *Paul v. Baltimore Upholstering Co.*, 328 A.2d 610 (1974), *Katz v. Township of Howell I*, 335 A.2d 14 (1975); *Katz v. Township of Howell II*, 343 A.2d 417 (1975); and *Shepley v. Johns-Manville Products Corp.*, 358 A.2d 485 (1976). Both *Katz* decisions and the *Paul* decision established broadened definitions of permanent and total disability in the area of work-related cardiac injuries, and the *Shepley* case was the first workers' compensation case in New Jersey to link exposure to asbestos with cancer of the larynx. Over the past several decades, each of these cases has been frequently cited with favor in expanding compensation for injured workers. See *e.g. Cantrambone v. Bally's Park Place*, 2015 N.J. Super LEXIS 2601 (App. Div. Nov. 12, 2015) (providing Petitioner with nearly $30,000 additional benefits under *Paul v. Baltimore Upholstering Co.*, which the Court referred to as a "*Paul* Calculation").

7. While a Partner at Donovan, Leisure, Newton & Irvine and Willkie Farr & Gallagher (as resident in their respective offices in New York City and the District of Columbia), I litigated several complex, multi-party environmental matters throughout the United States. I was national coordinating counsel for NL Industries in federal and state court proceedings associated with environmental and tort claims regarding NL's lead

smelting operations. In addition, I served as national coordinating counsel for Chemical Leaman Tank Lines, a nationwide common carrier transporter, defending environmental and tort claims involving the transportation of hazardous materials and environmental remediation claims arising out of the operation of terminal facilities throughout the United States. I also served as liaison counsel in numerous multiple party actions brought by the United States Department of Justice throughout the country under the Comprehensive Environmental Response Compensation Liability Act (CERCLA) and the Resource Conservation Recovery Act (RCRA) on behalf of companies such as AT&T, Ashland Chemical, Arco, E. I. du Pont de Nemours, Texas Instruments, and IBM. I also handled numerous appellate matters before the New Jersey Appellate Division and courts in the Third Circuit, including *Piccolini v. Simon's Wrecking et al.*,[1] *Superior Air Prod. Co. v. NL Industries Inc.*[2]; *Wheaton Industries v. United States EPA*[3]; and *Student PIRG of New Jersey v. AT&T Bell Laboratories*.[4]

8.  While Vice President and Associate General Counsel at Wyeth and Senior Vice President of its pharmaceutical division, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation. One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history. In that Multi-District Litigation, 63,000 lawsuits were filed in virtually every state (including thousands in the State of New York) by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues. Wyeth had reserved over $20 billion dollars for these claims. To respond to the thousands of claims brought in the Supreme Court of the State of New York (*In re: New York Diet Drug Litigation*, Index No. 700000/98), I engaged and supervised the firms of Arnold & Porter and Simpson, Thacher & Bartlett to defend Wyeth. At Wyeth, I had responsibility for the supervision of five operating departments of the Company.

---

[1] 686 F. Supp. 1063 (M.D. Pa. 1988).
[2] 522 A.2d 1025 (N.J. App. 1987).
[3] 791 F.2d 354 (3rd Cir. 1986).
[4] 842 F.2d 1436 (3rd Cir. 1988).

9. Wyatt Partners is a consulting firm that, among other things, provides expert analysis on the reasonableness of attorneys' fees and costs in complex litigation. Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) of Wyatt Partners. As a consultant on the issue of legal fees and costs, I have advised companies and law firms with respect to billing guidelines used in complex litigation. I have also been retained by a number of national and international law firms to assist them in their analysis of legal fees and costs in ongoing litigation, including numerous cases in the State of New York.

10. Examples of such companies include ABB Ltd.; AGI-Shorewood, LLC; Aon PLC; Anthem Blue Cross of California; AT&T; Benihana of Tokyo; Boeing Company; Chevron-Texaco Company; Chicago Title Insurance Company; Commonwealth Land and Title Corporation; Dow Chemical Company; E.I. du Pont de Nemours & Co.; the Estate of Daniel Fegan; the Estate of Shirley West; First Horizon National Corporation; Ford Motor Company; GATX Rail Austria, GmbH; General Electric Company; Georgia-Pacific, LLC; High Point Designs, LLC; Honeywell International, Inc; Hewlett Packard Corporation; HUB International and Equity Risk Partners, Inc.; Houston Casualty Company; International Business Machines (IBM) Corporation; Lockheed Martin Corporation; Lumber Liquidators; MiMedx Group, Inc.; Motorola Mobility, Inc.; Naturex, Inc; Philadelphia Indemnity Insurance Company; Port Terminal Railroad Association; Plexus Cotton, Ltd.; RevHealth, LLC; Sony Pictures, Inc.; SavaSeniorCare, LLC; Stroygazmontazh (SGM Holdings); Telebrands; UBS Group AG; the United States Postal Service; Value Wholesale, Inc.; Wellstat Management, LLC; and Zurich Insurance Group, Ltd. I have also been retained on behalf of multiple longshore workers in the State of California who have made claims under the Longshore Harbor Workers' Compensation Act, to provide expert analysis on fee petitions to various federal agencies (including the Office of Administrative Law Judges and the Benefits Review Board) and the Ninth Circuit Court of Appeals. In addition, I have been retained by parents of children with disabilities in the State of New York who have

4

prevailed on enforcement actions brought on behalf of children deprived of Free Appropriate Public Education (FAPE), to provide expert analysis on fee petitions to various federal agencies and the federal courts of New York (including the United States District Court for the Southern District of New York).

11. As an expert in attorneys' fees cases, I have been involved in the evaluation, resolution, and trial of legal fees and costs in litigations, arbitrations, and before federal administrative agencies throughout the United States (including California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Michigan, Mississippi, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Virginia, and the Commonwealth of Puerto Rico) and internationally (including the Bahamas, Canada, Italy, Mexico, and the United Kingdom). These cases have varied in nature, covering legal disciplines such as: bankruptcy, breach of contract, class actions, construction disputes (both defect and delay), corporate divorce, corporate governance, criminal law, education disputes, employment disputes and ERISA matters, energy, environmental torts/remediation and natural disasters (including property damage from Hurricane Katrina), intellectual property rights, medical malpractice, railroad disasters, real estate disputes (including alienation, condemnation/eminent domain, and quiet title), securities and securitized assets, and unfair business practices/false advertising.

12. In addition to my work with Wyatt Partners, I currently serve as General Counsel of Case Medical, Inc., a global manufacturer and supplier of medical instruments, sterile products, and medical devices. In that capacity, I have been extensively involved in and provided counsel to the Company on issues involving intellectual property, product quality, product recalls, product safety, consumer safety, product labeling, transportation, and distribution, and workers' compensation. I have negotiated Master Supply and Master Quality Agreements with many of the leading global pharmaceutical companies in the world on behalf of Case Medical, Inc. In addition, Case Medical, Inc. has assigned me to manage and supervise its portfolio of litigation for claims preserving and defending challenges to the patents, trademarks, trade dress, and other intellectual

property rights of its products around the world. I am also responsible for the supervision and handling of Case Medical, Inc.'s employment disputes and litigation.

## DOCUMENTATION

13. In preparing this Declaration, I have discussed the matter with the Firm's attorneys and reviewed and relied upon relevant pleadings from the Due Process Matters and the Federal Action, as well as all other documents cited herein (including, but not limited to, the time entries recorded contemporaneously by the Firm's attorneys and non-attorney timekeepers).

## METHODOLOGY AND STANDARDS OF REVIEW

14. The starting point for the calculation of a "reasonable" attorney fee under a federal fee-shifting act is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate", also known as the "lodestar". *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

15. "A 'reasonable' fee is one that is sufficient to induce a capable attorney to undertake the representation" in a case of public interest. *Purdue v. Kenny A. Ex. Rel. Winn*, 130 S. Ct. 1662, 1672 (2010).

16. The reasonableness of the fee must also be construed in light of a series of factors (commonly known as the "Johnson" factors), which factors include the time and labor required, the complexity of the case, the experience and credentials of the attorneys (on both sides), the risk of non-payment, the stakes of the litigation, and the success obtained. *Hensley*, 461 U.S. at 430, citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

17. As to what constitutes a reasonable hourly rate, the Second Circuit has joined with many of its peers (including the Third[5] and Ninth Circuits[6]) in holding that a reasonable rate is that which is "charged to clients of private law firms" in the location. *Miele v. NY State Teamsters Conf. Pen. & Ret. F.*, 831 F.2d 407, 409 (2nd Cir. 1987).

---

[5] *Student Public Int. Res. Group of New Jersey, Inc. v. AT&T Bell Lab*. 842 F.2d 1436, 1443 (3rd Cir. 1988) (citing *Miele*) (note, I was counsel of record for AT&T Bell Laboratories in this matter).
[6] *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1066 (9th Cir. 2021) (also citing *Miele* at 409).

18. I understand that the IDEA is a remedial statute, to be construed broadly in favor of children with disabilities, especially those without the means to afford costly counsel to represent their interests against government bodies with significantly greater resources at their command ("It is true that remedial statutes like the IDEA are to be construed liberally." *Collingsgru v. Palmyra Bd. Of Educ.*, 161 F.3d 225, 232 (3rd Cir. 1998)).

19. Such a statutory intent and remedial construct are consistent with other fee-shifting statutes, including environmental statutes (See *e.g. Piccolini v. Simons Wrecking*[7], 868 F. Supp. 1063, 1068 (M.D. Pa. 1988) (holding that recoverable costs under CERCLA were to be "interpreted liberally" due to the remedial nature of the statute)), and Federal Longshore statutes like the LHWCA (See *e.g. Christensen v. Stevedoring Services of America*, 557 F.3d 1049, 1053-54 (9th Cir. 2009)).

20. The determination of fees "should not result in a second major litigation", nor should courts "become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011), citing *Hensley* at 437.

### FACTUAL BACKGROUND/STATEMENT OF THE CASE

21. These matters pertain to actions brought by Plaintiff, K.E., ("Plaintiff"), to secure the appropriate educational needs and related services for her son, M.L. (Born in 2009), a minor child diagnosed with Autism, Attention Deficit Hyperactivity Disorder ("ADHD") and a specific learning disorder.[8]

22. **M.L.'s Due Process Claim #1 (Case No. 175911)**: The following summarizes the history of Plaintiff's claim. Unless otherwise noted, the following is taken from the Plaintiff's Demand for Due Process Hearing dated August 28, 2018; and/or the Findings of Fact and Decision issued by Impartial Hearing Officer Michael Kennedy Lloyd ("IHO Kennedy Lloyd") dated June 13, 2019.

---

[7] In this matter, I was counsel of record for the Defendant, Simons Wrecking.

[8] Prior to the two Due Process Claims I evaluate in this Report, Plaintiff (via the Firm) filed two additional actions against the DOE on behalf of M.L. One was Case Number 159983 (filed in March 2016) and the other was Case Number 163263 (filed in September 2016). Those two earlier actions are not the subject of this Report.

7

a. At the time of the hearing request, M.L. was a nine-year-old boy classified as a student with Autism.

b. The impartial hearing request for M.L. alleged a denial of free appropriate public education ("FAPE") for the 2017-2018 and 2018-2019 school years, specifically alleging the DOE's failures as follows (all taken directly from the Demand for Due Process Hearing):

    i. Failure to timely, appropriately, and comprehensively evaluate M.L.;

    ii. Failure to develop goals for assistive technology;

    iii. Failure to provide an appropriate program;

    iv. Failure to consider and recommend an appropriate class setting;

    v. Failure to make adequate provisions for parent training and counseling;

    vi. Issuing a predetermined IEP;

    vii. Failure to consider/provide teaching methodology;

    viii. Failure to reasonably calculate the May 8, 2018 IEP to enable M.L. to make progress in light of his circumstances; and

    ix. Failure to respond in any way regarding the parent's request for an Independent Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP").

c. On September 28, 2018, IHO Kennedy Lloyd held a pendency hearing via telephone for purposes of determining what would constitute M.L.'s special education program during the pendency of the administrative proceeding.

d. On October 8, 2018, Plaintiff and DOE entered into a partial resolution agreement which resolved Plaintiff's request for a social history assessment and classroom observation.

e. On October 28, 2018, IHO Kennedy Lloyd issued an Interim Order on Pendency, which ordered DOE to provide funding for related services, assistive technology, and a 1:1 paraprofessional at M.L.'s then current placement (an order with which DOE failed to comply).

8

f.  The matter was heard over five hearing dates that took place on November 9, 2018, January 9, 2018, February 1, 2019, April 5, 2019 and May 2, 2019.  Attorney Nina Aasen attended all five hearings in person on Plaintiff's behalf.

g.  Over the course of the hearing dates (contested by DOE), the Plaintiff presented 41 (forty-one) pieces of documentary evidence into the record as well as four witnesses in support of her case. The DOE submitted 5 (five) pieces of documentary evidence into the record and presented two witnesses

h.  Both sides submitted closing briefs (Plaintiff's was 15 pages, DOE's was 13 pages).

i.  Attorney Nina Aasen of the Cuddy Firm attended all five hearings in person on Plaintiff's behalf.

j.  On June 13, 2019 IHO Kennedy Lloyd ordered that the DOE had provided M.L. with a FAPE for the 2018-2019 school year, but awarded relief in the form of a 1:1 paraprofessional after finding that the DOE failed to timely implement his October 28, 2018 Interim Order on Pendency.

k.  Plaintiff appealed IHO Kennedy Lloyd's decision.

l.  On August 23, 2019, the State Review Officer reversed IHO Kennedy Lloyd's June 13, 2019 Findings of Fact and Decision on two fronts, finding that:

    i.  DOE did <u>not</u> offer M.L. a FAPE during the 2018-2019; and

    ii.  M.L. was, in fact, entitled to an FBA by an independent evaluator at DOE's expense.

m.  As such, the State Review Officer ordered the DOE to do the following:

    i.  Conduct an assistive technology evaluation of M.L. within thirty days of the decision;

    ii.  Fund an FBA assessment by an independent evaluator;

    iii.  Convene an CSE meeting upon completion of the aforementioned assistive technology evaluation and FBA.

n.  On January 8, 2021, Plaintiff, through the Firm, submitted a demand for attorneys' fees and costs to Defendant's Office of Legal Services.

9

23. **M.L.'s Due Process Claim #2 (Case No. 194397)**:  The following summarizes the history of Plaintiff's claim.  Unless otherwise noted, the following is taken from the Plaintiff's Demand for Due Process Hearing dated June 12, 2020; and/or the Findings of Fact and Decision issued by Impartial Hearing Officer Helen Peyser ("IHO Peyser") dated December 1, 2020.

   a. At the time of this hearing request, M.L. was an eleven-year-old boy classified as a student with Autism, Attention Deficit Hyperactivity Disorder ("ADHD") and a specific learning disorder.

   b. The impartial hearing request for M.L. alleged a denial of free appropriate public education ("FAPE") for 2019-2020 and 2020-2021 school years, specifically alleging the DOE's failures as follows (all taken directly from the Demand for Due Process Hearing):

      i. Failure to conduct a neuropsychological evaluation;

      ii. Failure to authorize the parental request for an independent educational evaluation;

      iii. Failure to recommend an appropriate program/placement for both 2019-2020 and the 2020-2021 school years;

      iv. Failure to recommend assistive technology, including a touchscreen with word prediction, auditory feedback, document scanning, and e-text reading capabilities as recommended by the DOE's evaluator;

      v. Failure to recommend evidence-based methodologies as recommended by M.L.'s neuropsychological evaluation report;

      vi. Failure to recommend integration of related services as recommended by M.L.'s neuropsychological evaluation report;

      vii. Failure to develop appropriate annual goals in favor of ones that are vague, immeasurable, overly ambitious, and that fail to address all areas of need and deficit;

      viii.  Failure to provide related services during the 2019-2020 school year, including necessary speech-language, occupational, and physical therapy; as well as parent counseling/training; and

      ix.  Failure to provide social skills training.

c.  DOE did not engage in any efforts or attempts to settle the matter with Plaintiff.

d.  The matter was heard on December 1, 2020.

e.  Over the course of the hearing dates, the Plaintiff presented 14 pieces of documentary evidence into the record, including affidavits from Plaintiff and the psychologist who had conducted a neuropsychological evaluation of M.L. The DOE submitted 4 pieces of documentary evidence into the record but did not offer testimony from any witnesses.

f.  Attorneys Kevin Mendillo and Erin Murray of the Cuddy Firm attended the hearing telephonically on Plaintiff's behalf (although the Firm did not charge for Attorney Murray's time).

g.  The same day of the hearing, after careful consideration of the facts and the law, IHO Peyser ordered the DOE to reimburse the Plaintiff or directly pay for the following:

      i.  Funding of an independent neuropsychological evaluation performed by a physician at a rate of no greater than $5,000.00;

      ii.  Funding of compensatory services of 600 hours of 1:1 academic tutoring services at a rate of up to $152/hr (a value of almost $100,000 in compensatory services);

      iii.  A reconvene of the CSE within 30 days of the Decision in order to amend M.L.'s IEP and offer placement in compliance with the recommendations made in the independent neuropsychological evaluation.

h.  After the decision was rendered, the DOE did not appeal. Implementation efforts continued for some time.

11

    i.   On January 8, 2021, Plaintiff, through the Firm, submitted a demand for attorneys' fees and costs to Defendant's Office of Legal Services.

24. **The Federal Action**

    a.   When the DOE failed to respond to Plaintiff's January 8, 2021 demand for attorneys' fees and costs or engage in any communication to resolve the claim, the Firm (on behalf of Plaintiff) filed a Federal Complaint on April 1, 2021, seeking fees, costs, and post judgment interest.[9]

    b.   On August 27, 2021 the DOE filed an Offer of Settlement pursuant to 20 U.S.C. §1415(i)(3)(B) in response to the Firm's April 1, 2021 Federal Complaint. DOE offered the sum of $67,500.00 a nearly 50% reduction of fees and costs incurred by the Firm thus far to litigate the Due Process and Federal Actions (without any substantive rationale for such reduction).

25. **The Individuals with Disabilities in Education Act**

    a.   The Individuals with Disabilities Education Act, which is codified in 20 U.S.C. §1415, is the federal law that supports special education and related programs for children with disabilities. This important federal law was established to ensure that children with disabilities have access to and receive a free appropriate public education in the least restrictive environment ("LRE").

    b.   When Congress enacted the legislation, it stated that "disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. 33, §1400(C)(1).

    c.   Among other things, the IDEA ensures that all children with disabilities: receive special education and related services to address their individual needs; are

---

[9] The Firm has continued to incur fees/costs in the Federal Action since the filing of the Complaint. My Declaration and the opinions contained herein evaluates/includes all such supplemental fees/costs incurred by the Firm since such filing.

12

prepared for employment and independent living; have their rights protected under the law and affords a mechanism for skilled counsel to assist with procuring and protecting the rights and entitlements afforded under the statute; and provides compensation through statutory fee-shifting to those counsel who stand at the vanguard of protecting these rights under the IDEA.

d. The IDEA also contains a comprehensive set of requirements, which school systems must effectuate to provide a focus and protection of student's rights and delineates the responsibilities of schools to children with disabilities. Among other things, it provides for: an entitlement to free public education for all, appropriate evaluation of children with disabilities, individualized educational plans for children with disabilities, establishment of least restrictive environment ("LRE") to ensure education alongside non-disabled peers to the maximum extent appropriate, parental participation in the process, and appropriate procedural safeguards.

e. More recent amendments focused on "speed[ing] the resolution time so that children with disabilities obtain the needed services in a timely manner", emphasizing the importance of timeliness in the process  H.R. Rep. No. 108-77, at 85-86 (2003).

f. As of the most recent amendment, approximately 11.5% of children in school had a disability covered by the IDEA.  White, *Where to Place the Burden: Individuals with Disabilities Education Act Administrative Due Process Hearings*, 84 N.C. L.Rev. 1013, 1013-1014 (2006).

g. A key reason for the IDEA's protections was the recognition that "school systems have a natural advantage" over parents "because of easier access to witnesses, expertise, and resources." *Id.* at 1040.

26. **Plaintiff's Fees Sought**: To date, the Firm seeks reimbursement for a total of $150,450.00 in fees and $4,077.24 in costs incurred in connection with the Plaintiff's three matters, pursuant to the fee-shifting provisions of the IDEA.

27. **Case No. 175911**: The contemporaneously recorded hours sought, as broken down by timekeeper, are as follows for fees (from 2018 – 2020) in connection with the **Case No. 175911**, for a total of 238 hours claimed (**$94,257.50**). In the exercise of billing judgment, the Firm has elected to write off and not seek reimbursement for certain time incurred by Attorneys Benjamin Kopp, Andrew Cuddy, Justin Coretti, Nina Aasen, and Jason Sterne; and paralegals Allison Bunnell, Amanda Pinchak, Burhan Meghezzi, Emma Bianco, John Slaski, Sarah Woodard, and Raul Velez in the collective amount of $7,425.00. The breakdown of the amount sought is as follows:

   a. For Attorney Andrew Cuddy ($550/hr): 1.6 hours ($880.00);

   b. For Attorney Jason Sterne ($550/hr): 37.2 hours ($20,460);

   c. For Attorney Benjamin Kopp ($425/hr): 14.9 hours ($6,332.50)

   d. For Attorney Justin Coretti ($425/hr): .1 hours ($42.50);

   e. For Attorney Nina Aasen ($550/hr): 70.7 hours ($38,885.00);

   f. For Attorney Nina Aasen (Travel) ($90/hr): 1 hour ($90.00);

   g. For Attorney Nina Aasen (Travel) ($275/hr): 45.1 hours ($12,402.50);

   h. For Paralegal Allison Burnell ($225/hr): 4.8 hours ($1,080.00);

   i. For Paralegal Amanda Pinchak ($225/hr): 23.3 hours ($5.242.50);

   j. For Paralegal John Slaski ($225/hr): 0.4 hours ($90);

   k. For Paralegal Raul Velez ($225/hr): 1.7 hours ($8,235.00);

   l. For Paralegal Shobna Cuddy ($225/hr): 2 hours ($450.00); and

   m. For Paralegal Sarah Woodard ($225/hr): .3 hours ($67.50).

28. **Case No. 194397**: The contemporaneously recorded hours sought, as broken down by timekeeper, are as follows for fees (from 2020 – 2021) in connection with the **Case No. 194397**, for a total of 83.6 hours claimed (**$33,175.00**). In the exercise of billing judgment, the Firm has elected to write off and not seek reimbursement for certain time incurred by Attorneys Andrew Cuddy, Justin Coretti, Kevin Mendillo, Erin Murray, Raul Velez, and Jason Sterne; and paralegals Allyson Green, Burhan Meghezzi, Cailin O'Donnell, Emma

14

Bianco, and Shobna Cuddy in the collective amount of $5,652.50.  The breakdown of the amount sought is as follows:

   a.  For Attorney Andrew Cuddy ($550/hr):  2.2 hours ($1,210.00);

   b.  For Attorney Kevin Mendillo ($450/hr):  54.8 hours ($24,660.00);

   c.  For Attorney Raul Velez ($375/hr):  8.8 hours ($3,300.00);

   d.  For Paralegal Allyson Greene ($225/hr):  4.4 hours ($990.00);

   e.  For Paralegal Burhan Meghezzi ($225/hr):  1.6 hours ($360.00);

   f.  For Paralegal Cailin O'Donnell ($225/hr):  5.8 hours ($1,305.00);

   g.  For Paralegal Emma Bianco ($225/hr):  3.8 hours ($855.00); and

   h.  For Paralegal Shobna Cuddy ($225/hr):  2.2 hours ($495.00).

29. The contemporaneously recorded hours sought, as broken down by timekeeper, are as follows for fees in connection with **The Federal Action** (all timekeepers below performed work solely in 2021) for a total of 52.7 hours **($23,017.50**)  In the exercise of billing judgment, the Firm has elected to write off and not seek reimbursement for certain time incurred by Attorneys Kevin Mendillo, Britton Bouchard, and Justin Coretti and Paralegal Shobna Cuddy in the total collective amount of $612.50  The breakdown of the amount sought is as follows:

   a.  For Attorney Andrew Cuddy ($550/hr):  3.9 hours ($2,145.00);

   b.  For Attorney Kevin Mendillo ($450/hr):  17.3 hours ($7,785.00);

   c.  For Attorney Justin Corettti ($425/hr):  30 hours ($12,750.00); and

   d.  For Paralegal Shobna Cuddy ($225/hr):  1.5 hours ($337.50).

30. As noted, in its exercise of billing judgment, the Firm has elected to write off and not seek reimbursement for fees in the amount of $13,690.00 (collectively between the three matters).

## EXECUTIVE SUMMARY

31. Based upon my review, this case is about three core points:

   a.  A required workload that happened (and continued to increase) because of the ongoing conduct of DOE to avoid fulfilling their obligations under the IDEA

15

(conduct that has recently been noted and sanctioned by the Southern District of New York);

b.  A case that involved litigating two separate Due Process Claims (separate and apart from the two prior proceedings (dating back to 2016) for which the firm represented Plaintiff on behalf of her son for related services DOE failed to provide); five separate Implementation Phases based on a series of agreements/decisions that spanned over a year-long period (proceeding simultaneously with the Due Process Claims); and a successful appeal based on the Firm's skills and diligence; and

c.  A Firm full of highly skilled, experienced professionals who perform a critical service to underserved special needs families in enforcing their rights, one that demonstrated an objectively outstanding set of legal skills and obtained objectively outstanding results for a child deprived of his right to a quality education.

32. I have reviewed the hours sought, rates sought, and fees sought in these matters and believe them to be reasonable in light of the skills required to litigate these cases, the importance of the rights being enforced, the required workload, and the objectively outstanding results obtained for M.L. (both from a monetary/non-monetary standpoint).

33. Furthermore, I view the hours, rates, and fees sought in the context of the statutory construction and well-established principles of fee-shifting, which is to entice competent counsel to eschew representing only clients of means or serving as defense counsel for guaranteed payment and take on the representation of needy children given the high risk of receiving no compensation for all their hard work.  In that context, I believe the hours, rates, and fees sought are reasonable.

### OPINION I: THE FIRM'S HOURS ARE REASONABLE

34. It is my expert opinion that the hours sought by the Firm in connection with the Plaintiff's matters are reasonable and appropriate.

35. Based upon my experience when evaluating total hours spent in connection with certain work, the most relevant factors I consider are (A) the "time and labor required" and (B) the skills required to perform the work.

16

36. In this case, I also have to examine certain conduct of the opposition, as it is my expert opinion that a significant number of hours (and related fees) incurred by the Firm resulted from ongoing actions and/or lack of actions on the part of DOE.

37. Finally, I consider case management and supervision by the Firm in connection with staffing, work delegation, and review of the bills for reasonableness/billing judgment in connection with the work performed and fees incurred.

38. I reviewed the contemporaneous time records of each timekeeper who billed to these matters. In my expert opinion, these are the tasks I would expect to see at each stage of the case and there was an appropriate amount of time spent in connection with these tasks.

39. **Due Process Matter #1 (Case No. 175911)**: I reviewed the contemporaneous time records of each of the timekeepers who billed to the Case No. 175911. In my expert opinion, these are the tasks I would expect to see at each stage of the case and there was an appropriate amount of time spent in connection with these tasks.

40. The critical tasks I observed in connection with Case No. 175911 were as follows:

    a. THE INTAKE PHASE: This primary phase involved initial contact with the clients, including interviews with Plaintiff-Parent K.E.

    b. Paralegals at the Firm gathered and organized records from multiple sources (multiple schools, medical providers, the parent, etc.) from the prior several years, including but not limited to:

        i. M.L.'s prior file from Case Nos. 159983 and 163262;

        ii. Occupational therapy records;

        iii. Teacher Progress reports;

        iv. Prior FBAs, BIPs, and IEPs;

        v. Speech Language records;

        vi. Physical Therapy records;

        vii. Assistive Technology referrals;

        viii. Physical examinations;

        ix. Psycho-educational evaluation records;

      x.   Social history reports;

      xi.   Encounter attendance records;

      xii.   Neuropsychological evaluations;

      xiii.   2017-2018 progress reports;

      xiv.   Audiological evaluations/hearing aid medical clearances;

      xv.   Child outcome summary forms;

      xvi.   Classroom observation records; and

      xvii.   Other Miscellaneous Student Documents.

c.   During the intake process, Attorney Nina Aasen served as the primary attorney on the matters. It is important to note that Attorney Aasen was also the attorney of record in Plaintiff's two prior Due Process matters against the DOE (Case Nos. 159983 and 163263), and thus had the background and institutional knowledge of the underlying circumstances and the relationship with Plaintiff.

d.   Once the records were gathered (including follow-up required to obtain missing records), Attorney Aasen reviewed and evaluated them in order to determine the legal issues in question, the strength of the case, and the scope of representation.

e.   Attorney Aasen also took steps to secure a necessary independent evaluation for M.L. prior to the filing of the hearing request.

f.   This intake process took nearly three months (April – June 2018), requiring a multitude of follow up efforts to obtain missing documents and information.

g.   <u>THE HEARING REQUEST</u>: Once the intake process was complete, the Firm entered into an engagement agreement with the client on behalf of M.L., and Attorneys Aasen and Kopp began preparing the hearing request/Due Process Complaint. These tasks included:

      i.   Preparing/filing the requests with the District and the NYS Ed. Dept on August 28, 2018.

18

    ii.    The DOE provided a response on September 6, 2018 – one that contained no substantive information to allow Plaintiff and the Firm to evaluate the DOE's position on the claims asserted in the Due Process Complaint.

h.   <u>PENDENCY HEARING AND PARTIAL RESOLUTION AGREEMENT</u>:

    i.    The Firm prepared for and attended a telephonic Pendency hearing on September 28, 2018 in order to determine what would constitute M.L.'s special education program during the pendency of the matter. This involved the Firm having to evaluate and prepare the information to present to IHO Kennedy Lloyd to secure M.L.'s necessary services so that he didn't fall further behind as he was waiting for the matter to be resolved.

    ii.    The Firm also had to negotiate and prepare the terms of the Partial Resolution Agreement entered into with the DOE on October 8, 2018 – which ultimately resolved Plaintiff's request for a social history assessment and classroom observation.

    iii.    The Firm subsequently had to evaluate and prepare the terms of the Interim Order on Pendency issued by IHO Kennedy Lloyd on October 28, 2018 that secured funding for related services, assistive technology, and a 1:1 paraprofessional for M.L during the pendency of the matter.

i.   <u>PREPARATION FOR AND ATTENDANCE AT HEARINGS</u>

    i.    Hearing preparation for M.L. involved identifying and interviewing the respective witnesses, preparing them to testify (and in some instances, drafting affidavits), coordinating testimony re: direct and cross-examinations, preparing cross-examinations of the DOE representatives, and preparing exhibits for the hearing.

    ii.    Attorney Aasen took the primary role in preparing opening/closing statements, selecting exhibits, drafting questions for the witnesses, going through the documents in detail in order to draft questions for witnesses,

19

> while the paralegals prepared the exhibits, the exhibit lists, and coordinated the clients/witnesses.

    iii. Attorney Aasen also took the primary role in preparing two parent's pendency disclosures, which also included coordinating necessary affidavits and related exhibits for same.

    iv. M.L.'s hearing lasted five days; Attorney Aasen attended in person all five days.

  j. POST-HEARING BRIEFING AND DECISIONS

    i. After the hearing, the Firm engaged in the post-hearing briefing process, with Attorney Velez performing the majority of the work related to the post-hearing brief with supervision from Attorney Aasen and assistance from support staff as necessary.

  k. APPEAL

    i. Plaintiff chose to appeal IHO Kennedy Lloyd's June 17, 2019 Findings of Fact and Decision. As such, the Firm then began taking all necessary steps to do so.

    ii. These efforts included filing necessary notices, conducting legal and factual research, preparing a brief in support of same to the State Review Officer, reviewing DOE's response, and reviewing the State Review Officer's decision granting Plaintiff's appeal. Most of the appeal work was done by Attorney Jason Sterne, as he has significant experience preparing/arguing these appeals before the State Review Officer, and was able to perform the work in a cost-effective, appropriate manner.

41. **Due Process Matter #2 (Case No. 194397)**: I reviewed the contemporaneous time records of each of the timekeepers who billed to the Case No. 194397. In my expert opinion, these are the tasks I would expect to see at each stage of the case and there was an appropriate amount of time spent in connection with these tasks.

42. The critical tasks I observed in connection with Case No. 194397 were as follows:

a. <u>THE INTAKE PHASE</u>: This primary phase involved initial contact with the client, including interviews with Plaintiff-Parent K.E.

b. In December 2020, Plaintiff contacted the Firm to initiate a new matter, as the DOE was not providing certain services to which M.L. was entitled.

c. Paralegals at the Firm gathered and organized updated records in connection with M.L.'s prior matter, including the same materials described above from Case No. 175911.

d. During the intake process, Attorney Raul Velez served as the primary attorney on the matters.

e. Once the records were gathered (including follow-up required to obtain missing records), Attorney Velez reviewed and evaluated them in order to determine the legal issues in question, the strength of the case, and the scope of representation. It is important to note that Attorney Velez had to review and evaluate all documentation in connection with case No. 175911 to ensure that all such pleadings were accurate, consistent, and included all such appropriate requests for services to which M.L. was entitled.

f. Attorney Velez also took steps to secure a necessary independent evaluation for M.L. prior to the filing of the hearing request.

g. This intake process took nearly three months, requiring a multitude of follow up efforts to obtain missing documents and information (December 2019 through March 2020).

h. <u>THE HEARING REQUEST</u>: Once the intake process was complete, the Firm entered into an engagement agreement with the client on behalf of M.L., and Attorney Mendillo began preparing the hearing request/Due Process Complaint (given the recent departure of Attorney Velez from the Firm). These tasks included:

    i. Attorney Mendillo prepared and filed the requests with the District and the NYS Ed. Dept on June 12, 2020.

    ii. Attorney Mendillo also evaluated the DOE's proposed partial resolution for the independent neuropsychological evaluation Plaintiff was seeking, which was ultimately deemed unacceptable given the financial cap of $1,000 that was well below the rate being sought by Plaintiff in the Due Process Complaint.

i. <u>PREPARATION FOR AND ATTENDANCE AT HEARINGS</u>

    i. Hearing preparation for M.L. involved identifying and interviewing the respective witnesses, preparing them to testify (and in some instances, drafting affidavits), coordinating testimony re: direct and cross-examinations, preparing cross-examinations of the DOE representatives, and preparing exhibits for the hearing.

    ii. Attorney Mendillo took the primary role in preparing opening/closing statements, selecting exhibits, drafting questions for the witnesses, going through the documents in detail in order to draft questions for witnesses, while the paralegals prepared the exhibits, the exhibit lists, and coordinated the clients/witnesses.

    iii. M.L.'s hearing took place on December 1, 2020; Attorneys Mendillo and Murray attended the hearing telephonically (although the Firm did not charge for Attorney Murray's time).

    iv. IHO Peyser issued her decision on December 1, 2020 (same day as the hearing) in Plaintiff's favor. DOE did not appeal.

43. **The Implementation Process**: As early as September 28, 2018, when the IHO issued his first Pendency Order, the Firm began implementation efforts with regard to the multitude of services to which M.L. was entitled. The required implementation efforts expanded and evolved over time based on a series of events that clarified and/or changed them, including the terms negotiated in the October 8, 2018 Partial Resolution Agreement; the October 28, 2018 Pendency Order; the Findings of Fact Decisions issued by IHOs Kennedy Lloyd and

Peyser; and the August 23, 2019 appeal decision from the State Review Officer. These efforts included, among other things:

   a. Ongoing correspondence with Plaintiff regarding her contact with student's school and committee on special education;

   b. Conducting due diligence regarding the IHO-ordered services and evaluations (including evaluation of options, pursuit of alternative ones when necessary, and correspondence with client and respective professionals re: same);

   c. Addressing payment authorization and status issues;

   d. Engaging in regular correspondence with DOE regarding the above; and

   e. The work in connection with the ongoing implementation process was mostly performed by Attorneys Aasen and Mendillo with assistance from support staff as necessary.

44. **The Federal Action**: I reviewed the contemporaneous time records of each of the timekeepers who billed to the Federal Action. In my expert opinion, these are the tasks I would expect to see at each stage of the case and there was an appropriate amount of time spent in connection with these tasks, notably the preparation of the Complaint (after DOE failed to respond to Plaintiff's January 2021 request for attorneys' fees), engaging in some settlement discussions with DOE, evaluating DOE's Offer of Settlement, and preparing the motion in connection with the Plaintiff's attorneys' fees and costs (including all such related declarations and exhibits).

45. In my expert opinion, these are the tasks I would expect to see at each stage of the case and the appropriate staffing in connection with these tasks.

46. Additionally, in my expert opinion, the staffing in connection with the matters was lean, the time spent on the required tasks was reasonable and appropriate, and the Firm appropriately delegated the work to timekeepers with lower hourly rates to handle much of the work that was task-appropriate for those timekeepers to handle, and/or the particular timekeepers who had the most history with the case so as to minimize inefficiencies. For example, Attorney Aasen had performed the work in connection with Plaintiff's two earlier

23

Due Process Matters (Case Nos. 159983 and 163262), so her institutional knowledge of M.L.'s history and educational needs, coupled with Plaintiff's familiarity with her put Attorney Aasen in the unique position to handle the matter most efficiently for Case No. 175911.

47. To the extent senior-most Attorney Cuddy performed tasks in connection with these matters, they were typically reserved for final review of pleadings, certain necessary correspondence with colleagues or the client, and overall strategy to pursue the claims. These are precisely the appropriate tasks reserved for the senior-most partner: performing final oversight and supervision expected of a supervisory partner.

48. In my expert opinion, the delegation and administration of work reflected customary best practices in the legal industry, and supports the propriety of the hours and fees.

49. One critical factor (quite applicable here) that I will always consider when evaluating hours and workload is the conduct of the Firm's opposition counsel, as oftentimes certain actions (or inactions) can lead to an enhanced required workload or a protracted timeline of a case. Based on my review of the pleadings as well as the invoices, it is my expert opinion that a significant portion of the hours/fees incurred in the case resulted from the DOE's conduct.

50. It is also important to note the multitude of ways in which the Firm engaged in cost-effective efforts, including but not limited to: (a) submitting direct witness testimony via written affidavits in lieu of in-person appearances; and (b) maintaining an "implementation" spreadsheet in order to monitor the status of the multitude of services that the IHO ordered the DOE to provide.

51. Another critical factor I always consider when evaluating the reasonableness of legal fees/expenses is the case management, supervision, and bill review process of the supervisory attorney on the matter. Based on my understanding of the Firm's practices when it comes to billing time, reviewing bills for reasonableness, and overall case management, it is my expert opinion that the Firm's fees are reasonable.

52. The timekeepers at the Firm track time contemporaneously in a software program/app called Harvest, which resides on each employee's computers as well as their cell phones.

The Firm regularly engages in employee training and reminders to ensure that everyone complies with contemporaneous time recording as not only a best practice, but as the Firm's method of securing payments.

53. In these matters, Attorney Andrew Cuddy reviewed all of the invoices for reasonableness, applying certain discretionary reductions as he saw necessary.[10]

54. In fact, Attorney Andrew Cuddy provided collective discretionary reductions of nearly $14,000.00 of billable time, in some cases eliminating the fees of certain Firm timekeepers in their entirety. In my expert opinion, the substantial write-offs by the Firm further indicate that the hours sought are reasonable and appropriate.

55. The Firm also kept separate invoices for the three matters (the Due Process Matters and the Federal Action), which I believe is consistent with best practices.

56. Furthermore, as the Managing Attorney of the Auburn office, Attorney Andrew Cuddy corresponded with Attorneys Aasen and Mendillo as necessary on multiple issues throughout the litigation, including overall strategy, pleadings, implementation, and hearing issues. He (and Attorney Sterne as necessary) also reviewed each pleading prior to its filing, including hearing requests, closing briefs, motions, etc.

57. All of these actions further support my opinion that the Firm's hours sought in connection with these matters are reasonable and appropriate.

## OPINION II: THE FIRM'S HOURLY RATES ARE REASONABLE

58. It is my expert opinion that the hourly rates sought by the Firm in connection with these matters are reasonable.

59. Based upon my experience, the most relevant factors to this analysis are the following factors: (A) The experience, reputation, and ability of the timekeepers performing the services, (B) the complexity of the matter; (C) the hourly rates the Cuddy Firm charges to fee-paying clients; (E) the hourly rates charged to private clients in New York City; and (E) hourly rates charged by DOE's outside counsel in these cases. I also (F) utilize the

---

[10] It is also important to note that Shobna Cuddy, the Office Administrator, also reviews each invoice prior to Attorney Andrew Cuddy, so as to identify any potential issues of which he should be aware.

25

Laffey Matrix as a cross check for my analysis, and explain why I believe it is a useful cross-check.

60. In my experience, an hourly rate cannot be evaluated in a vacuum, and any attempt to do so divorced from the attorneys' credentials or the complexity of the case inherently produces a flawed analysis that is divorced from the custom and practice in the legal industry.

61. As one court aptly put it, to look solely at a rate divorced from these two factors focuses "myopically on only one of the [*Johnson*] factors, 'the fee customarily charged in the locality for similar legal services' and makes no effort to consider any of the other [*Johnson*] factors" such as "the experience, reputation, and ability" of the attorneys, "the amount involved and the results obtained", or "the novelty and difficulty of the questions involved." *In Re TransPerfect Global Inc.*, 2021 Del. Ch. LEXIS 86 at *66 to *67 (Del. Ch. Apr. 30, 2021) (Bouchard, C.).

62. Therefore, I believe that the first two factors (the credentials of the timekeepers as well as the complexity of this matter) are important to evaluate before evaluating the propriety of an hourly rate, as it contextualizes what the appropriate rate in the community is for this matter.

63. The Firm seeks approval of the following hourly rates:

    a.  For Attorney Andrew Cuddy:  $550 per hour;

    b.  For Attorney Jason Sterne:  $550 per hour;

    c.  For Attorney Nina Aasen:  $550 per hour;

    d.  For Attorney Kevin Mendillo:  $450 per hour;

    e.  For Attorney Justin Coretti:  $425 per hour;

    f.  For Attorney Benjamin Kopp:  $425 per hour;

    g.  For Attorney Raul Velez:  $375 per hour;

    h.  For Attorney Erin Murray:  $375 per hour; and

    i.  For all Support Staff:  $225 per hour.

## A. The Experience and Ability of the Timekeepers

64. To evaluate this factor, I begin first with an overview of the Firm itself, then with each of the individual timekeepers who performed work on the matters.

65. The Cuddy Firm was incorporated as a PLLC in 2014. Previously, the Firm was styled as the Law Office of Andrew K. Cuddy (1996-2012) and the Cuddy Law Firm, PC (2012-2014).

66. The Firm provides comprehensive legal services to families of loved ones with special needs, including Special Education Litigation; Special Needs Estate Planning; Guardianship; Special Needs Trust Administration; and Medicaid Fair Hearings.

67. Due to the increased demand around the country for these types of services, the Firm has become one of the largest private special education law firms in the country, having expanding its geographic reach to six offices: Valhalla, NY; Auburn, NY; Philadelphia, PA; Cleveland, OH; Waxhaw, NC; and Austin, TX.

68. The Firm currently has 18 attorneys across these six offices, 12 paralegals/non-lawyer support staff, and one law student/legal assistant working for it.

69. Attorney Andrew K. Cuddy ("Attorney Cuddy"), the Founder and Managing Attorney of the Firm, graduated from the College of the Holy Cross and received his legal degree at SUNY Buffalo Law School in 1996. He was admitted to the New York Bar that same year, and is also licensed to practice law in North Carolina and Texas.

70. After serving on active duty in the Marine Corps for nearly five years (including as a combat veteran in the First Persian Gulf War), Attorney Cuddy remained in the Marine Corps Reserves while attending law school, and was recalled to active duty for service in Somalia, attaining the rank of Captain.

71. While practicing criminal defense law at the beginning of his career, Attorney Cuddy transitioned to special education law in 2001 and has been focused in that area for the past twenty years. During that time, he has initiated Due Process hearings against over 100 school districts in New York State, all the while successfully expanding his firm's practice both substantively and geographically.

72. Attorney Cuddy and his wife, Shobna Cuddy (who serves as a Senior Paralegal as well as Office Administrator at the Firm) are also the parents of a special needs child.

73. In his spare time, Attorney Cuddy serves as president of a not-for-profit agency with a budget of over $20 million. The agency provides transitional and permanent housing, respite care, and rehabilitation and employment services to adults with mental health challenges, chemical dependencies and developmental disabilities.

74. As the Managing Partner of the Firm, Attorney Cuddy is responsible for general oversight of the matter and performance of the Supervisory Lawyer's obligations under Rules 5.1-5.3 of the New York Rules of Professional Conduct ("NYRPC") and generally directs the associates/support staff in their assignments and work. Accordingly, Attorney Cuddy generally reviews every filing before it goes out, including hearing requests, closing briefs, motions, *etc*.

75. The Attorney with primary responsibility for Due Process Matter 175911 is Attorney Nina Aasen ("Attorney Aasen"). Attorney Aasen received her law degree from Syracuse University in 1990 after serving as an elementary school teacher for thirteen years. Prior to joining the Cuddy Law Firm, she ran her own law office, practicing trial and appellate litigation, education and family law, and the supervision of Cornell law students in a child advocacy class on matters involving the IDEA. She became affiliated with the Cuddy Law Firm on an Of Counsel basis in 2014, and then transitioned to the role of senior attorney (returning to her Of Counsel role in 2018). During her time at the Cuddy Law Firm, Attorney Aasen successfully litigated hundreds of impartial Due Process hearings throughout the state of New York. In 2019, Attorney Aasen left the Firm to join another private law firm where she continues to practice special education law to this day.

76. The Attorney with primary responsibility for Due Process Matter 194397 is Attorney Kevin M. Mendillo ("Attorney Mendillo"), who received his law degree from SUNY Buffalo School of Law and was admitted to the New York Bar in 2011. Prior to joining the Firm, he practiced civil litigation in both federal and state courts. Attorney Mendillo is also licensed to practice law in the State of Ohio.

28

77. Attorney Jason Sterne ("Attorney Sterne") received his law degree from SUNY Buffalo and was admitted to the New York Bar in 1998. He is now the founding and managing partner at his own law firm in Rochester focused on special needs children. As mentioned above, Attorney Sterne has significance experience with preparing and arguing appeals before the State Review Officer, as he did in this case.

78. Attorney and former Paralegal Raul Velez ("Attorney Velez") worked as a legal assistant for the Firm from February 2017 through August 2019, at which point he was admitted to the New York State Bar. He then worked as an attorney with the Firm until April 2020.

79. Attorney Justin Coretti ("Attorney Coretti") received his law degree from Regents University School of Law, including time he spent studying law at Oxford University. Attorney Coretti was admitted to the New York Bar in 2013 and previously worked on criminal and family matters.

80. Attorney Benjamin Kopp ("Attorney Kopp") received his legal degree from Syracuse University College of Law, where he was a member of the Moot Court Honor Society and a recipient of the Mackenzie Hughes Appellate Advocacy Competition Best Brief Award. Prior to joining the Firm, Attorney Kopp worked with a general practice firm in New York where he focused on civil litigation. Attorney Kopp was admitted to both the New York and New Jersey Bars in January 2016.

81. Attorney Erin Murray ("Attorney Murray") received her legal degree from Barry University, Dwayne O. Andreas School of Law, where she was a senior editor of *Barry Law Review*. She is admitted to practice in New York, Florida, and the United States District Court for the Southern District of New York.

82. Paralegal Shobna P. Cuddy was a paralegal and office manager with the Firm's predecessor, the Law Offices of Andrew K. Cuddy, from 2007 through 2012; and since 2012, has been the firm-wide office administrator, who also participates in the training of paralegals.

83. Paralegal Cailin O'Donnell is a paralegal in the Firm's Auburn office. She holds a Bachelor of Arts degree from Houghton College.

29

84. The Auburn office also formerly employed and paralegals Allyson Greene, Emma Bianco, Burhan Meghezzi, John Slaski, Sarah Woodard, Amanda Pinchak, and Allison Bunnell.

    a. Paralegal Woodard was employed as a paralegal by the Firm from 2015 through 2018, after having been employed as a legal assistant from 1995 through 2014 by Dale R. Yates, an attorney in Weedsport, NY.

    b. Paralegal Pinchak was also employed as a paralegal by the Firm from 2016 through 2019; and in 2017. Paralegal Pinchak completed a 24-credit-hour paralegal certificate program at Cayuga Community College.

    c. Paralegal Bunnell was employed as a paralegal by the Firm from 2016 through 2019, after having gained related experience as an administrative assistant at the Cayuga County, NY District Attorney's office.

    d. Paralegal Slaski was employed as a paralegal by the Firm from May 2019 to December 2019, while preparing to take the New York State Bar Examination. He received his legal degree from Case Western Reserve University Law School.

    e. Paralegal Meghezzi was employed as a paralegal by the Firm from October 2019 to June 2020. He is a graduate of SUNY Oswego and holds a bachelor's degree in psychology.

    f. Paralegal Greene was employed as a paralegal by the Firm from July 2020 until April 2021. She earned an Associate's Degree from Cayuga Community College.

    g. Paralegal Bianco was employed as a paralegal by the Firm from November 2019 until May 2020.

## B. Complexity of the Matters

85. It is my expert opinion that this was in no way a routine or ordinary special education matter.

86. In my experience, cases such as Plaintiff's involve the intersection of the law and special education implementation issues, demanding the participation of counsel with unique skills and insight into these issues (such as those possessed by the Firm). See also *D.B. V. New York City Dept. of Educ.* 2019 WL 6831506 at *4 (S.D.N.Y. Apr. 22, 2019) (acknowledging the "increasing complexity of IDEA matters and the need for parents of children with special needs to obtain specialists in this area to effectively litigate their claims"); see also *Dallas v. Roosevelt Union Free Sch. Dist.*, 644 F. Supp. 2d 287, 292 (E.D.N.Y. 2009) (noting that "[i]n enacting the [IDEA]…Congress set forth a complex framework…"). See also, *A.M. v. New York City Dept. of Educ.*, 845 F.3d 523, 542 (2nd Cir. 2017) (acknowledging complexity of IDEA jurisprudence), citing *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 193 (2d Cir. 2012) ("one of the three students whose IDEA challenges we decided in *R.E.* exemplifies the interplay of this **complex set of directives**." Emphasis added).

87. Above all, the nature of special education litigation requires counsel to take on two legal roles: litigation experts as well as special education legal experts, given that the implementation aspect of the claim(s) requires expertise that only special education attorneys have in order to correspond with parents, professionals, DOE personnel, and a multitude of other entities to ensure that any services to which the Court has Ordered the students are entitled are ultimately provided (especially when the DOE does not comply with such Orders).

88. Furthermore, the true skill is in the attorney's review of each individual case, identifying the specific needs of each child (including those needs that are not being met), and determining the most appropriate way to secure them.

89. Additionally, the Firm's paralegals and support staff are engaging in tasks that require not only the skills of a paralegal, but also require institutional knowledge and experience with special education – specifically in connection with the implementation process (researching schools/placement options, engaging in specific correspondence with doctors,

31

educators, and other related professionals, and ensuring that all such necessary paperwork is prepared and handled appropriately).

90. In this case, the temporal overlap in these litigation/implementation phases officially began on September 28, 2018, when IHO Kennedy Lloyd issued his first Pendency Order. At that point, the Firm began implementation efforts with regard to the multitude of services to which M.L. was entitled. Every time a new order/agreement was issued, the required workload by the Firm increased, changed and/or evolved based on the new services/obligations presented to the DOE. This required significant amounts of follow up, careful coordination with Plaintiff and the school to ensure everyone was aware of the new requirements, and overall more work to ensure that these obligations/services were being provided.

91. Consequently, the Firm had to address both roles and both sets of responsibilities <u>at the exact same time</u>, in addition to researching and preparing the appeal to the State Review Officer in connection with IHO Kennedy Lloyd's June 2019 Findings of Fact Decision.

92. This is especially critical in that the caliber of services to which the students are entitled cannot be fought for/evaluated for adequacy by either the students or their parents (a) often because of language barriers, as in this case; (b) the students/parents do not know how or cannot access the necessary entities or personnel to continue negotiations; and (c) the attorney is in the best position to assess/determine whether certain services, school placements, evaluation procedures legally comply with what a Court has Ordered the DOE to provide.

93. In my expert opinion, this is especially salient in that Attorney Cuddy is not just a lawyer who specializes in the law for special needs children, he and his wife are also parents to a special needs child and is uniquely suited to be able to navigate the complex legal and factual issues from both the attorneys' side, but also from the perspective of a parent.

94. Based upon my experience, navigating through these critical and complex special education issues requires a high level of legal acumen, and the successful outcome in favor of the Plaintiff speaks volumes to the skill and ability of counsel handling the matter.

32

95. In my expert opinion, these legal and factual issues warrant attorneys with the skills of the Cuddy Firm's timekeepers to handle this matter.

**C. Rates Charged by the Firm to Paying Clients**

96. As the Second Circuit held in *Miele*, the "prevailing market rate" in the community for similar services "must be exercised on the basis of rates charged to clients of private law firms. Otherwise, the concept of 'prevailing market rates' would mean less for legal services organizations than for law firms, a position the Supreme Court has rejected." 831 F.3d at 409.

97. In my experience, the best evidence of "market rates" for a law firm is what they are able to command in the marketplace, *i.e.* the rates they actually charge to private clients. See *Vilkhu v. City of New York*, 2009 WL 1851019 at *13 to *14 (E.D.N.Y. June 26, 2009) ("the best measure of the cost of an attorney's time is what the attorney could earn from paying clients").

98. Often, for public interest counsel, this information is not available since those types of firms do not have hourly rates it charges to private clients.

99. However, here, I have reviewed upward of fifteen (15) separate engagement letters and corresponding invoices that the Cuddy Firm has entered into with private clients, ranging from 2015 to 2021, reflecting the rates that the Cuddy Firm actually charges these clients "of means" in IDEA and other education law matters.

100. These engagement agreements and invoices were submitted to the United States District Court for the Southern District of New York in another matter (*Board of Education of the Yorktown Central School District v. C.S. and S.S.*, No. 19-270). See Decl. of A.A. attached to Plaintiff's Motion for Summary Judgment for Attorneys' Fees and Associated Costs.

101. In my expert opinion, this is the most relevant and strongest evidence that the rates sought here are reasonable, in several respects:

    a. First, I believe that what a paying client is willing to pay the Cuddy Firm for their services is the best evidence as to the market worth of those services.

33

b. Second, if the purpose of the fee-shifting mechanism is to "attract competent counsel" against well-funded adversaries (*Blum v. Stenson*, 465 U.S. 886, 893-894 (1984)), then I believe compensating the Cuddy Firm at less than what they could receive by only taking on private clients of means (or switching sides and representing only school districts) and regularly being paid at these rates (with no risk of non-payment) fundamentally falls short of the Supreme Court's mandate, and will ultimately drive out competent counsel from representing families like Plaintiff's in the long run.

c. Third, if anything, I believe that the rates paid by private clients actually under-value the services in this particular matter, and the reason is consideration of the risk of non-payment to the Cuddy Firm. As described later in this Declaration, when the Cuddy Firm is able to charge private clients, it is all but assured of compensation, while in this case, there was no compensation unless the Firm won.

102. Thus, it is my expert opinion that the rates the Cuddy Firm actually charges private clients is the best evidence of the market rate for these services. As the Honorable Charles Sifton, U.S.D.J. held, "A judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community." *Vilkhu* at *14.

103. These engagement agreements reflect that the rates sought here are well in line with the rates the Cuddy Firm commands from private, fee-paying clients (many of whom are actually paying these rates in Westchester County). Specifically:

a. Since 2017, the senior partners of the firm (including an attorney admitted to the New York Bar in 2005) have charged paying clients $550 per hour. The rate sought by the senior partners in this matter is the same rate actually charged to paying clients by the senior attorneys at the Cuddy Firm in 2017. In my expert opinion, this strongly supports the reasonableness of the rates of Attorneys Cuddy, Aasen, and Sterne, both of whom were admitted to the bar prior to the attorneys at the Firm who charged $550 per hour in 2017.

34

b. Since 2016, Associates at the Firm have charged fee-paying clients $350-$450 per hour. This includes $350 per hour for a first-year associate in 2019 (Attorney Mark Gutman, barred in 2018) and $400 per hour in 2016 for a third-year associate (Kerry McGrath, barred in 2013). In my expert opinion, this strongly supports the reasonableness of Attorneys Coretti, Mendillo, Kopp, Velez, and Murray.

c. Since 2015, the Firm's paralegals/support staff have charged paying clients $225 per hour. This rate charged by the Firm's paralegals to actual paying clients six years ago is the same rate sought for them today. In my expert opinion, this strongly supports the reasonableness of the paralegals/support staff.

104. One final factor that several states (including New York) consider is the "responsibility involved". *In Re Matter of Freeman*, 34 N.Y. 1, 9 (1974). The importance of this factor is salient here, where one attorney (Attorneys Aasen in one case and Mendillo in another) took on the primary responsibility for this case, and was responsible for achieving an outstanding outcome for his client. While I believe the rates in general are eminently reasonable in this matter, it is my expert opinion that this is especially true for Attorneys Aasen and Mendillo, who ought be compensated at an hourly rate commensurate with the responsibilities they had for the outstanding results.

105. Having reviewed the hourly rates the Cuddy Firm commands with private clients in this type of work over the past several years, it is my expert opinion that the rates sought are well in line with the rates the Firm charged several years ago, strongly indicating that they are reasonable for the community for similar legal services.

**D. Rates Other Firms Charge to Fee Paying Clients in or Near New York City**

106. As a cross-reference, I have also examined the rates charged by other firms who practice education or school law in and around New York City.

107. I am familiar with the rates charged by lawyers and firms practicing in the Southern District of New York, having been one myself for many years at two law firms, having engaged many of them as in-house counsel at Wyeth, and having reviewed the invoices of

35

many New York City law firms (large and small) as a fee expert, including of firms with an education law practice.

108.     In my experience, firms who practice in the Southern District of New York are among the highest charging firms in the nation.  As I noted in written testimony given to the Eastern District of New York[11], even many solo or two-person firms in and around New York City charge a minimum of $500 or $600 per hour (I have seen solo practitioners in Westchester charge $600 per hour several years ago).

109.     Here, I have chosen to examine three law firm examples, which have regular rates they charge to fee-paying clients (either to parents of means who can afford to pay for lawyers to protect their children's rights, or for firms who represent and defend school districts in education and IDEA matters).

110.     In my expert opinion, the rates charged by these firms are very useful reference points for three reasons:

   a. They are strong evidence of what rates lawyers who represent parents of children with disabilities who can afford to pay for their lawyers will command for this type of work;

   b. They are strong evidence of what rates lawyers who represent school districts who use private firms will command for this type of work; and

   c. They are strong evidence of what rates the members of the Cuddy would be able to command if they ceased public interest practice and went to work only in private interest practice (*i.e.* what it takes to entice a public interest attorney away from a lucrative private interest job that guarantees payment instead of public interest work with the corresponding risk of non-payment).

111.     I have identified several such firms where I am familiar with their rate structure, either because I have engaged or reviewed the fees of these firms before, or because these firms were awarded fees for their successful prosecution of IDEA or other similar educational related claims in the past, especially firms in and around New York City.

---

[11] In *Value Wholesale v. KB Ins. Co.*, Case No. 18-cv-5887 (KAM) (SMG) (E.D.N.Y).

112.     **Milbank, LLP**: One firm that has worked on IDEA matters before in this locality is Milbank, LLP, which was awarded $600 per hour for a partner (33 years of experience) and $375 for a 9th-10th year associate in an IDEA matter in 2010 (based upon my experience, those would amount to about $750 for the partner and about $475 for associates in current rates), rates that Milbank noted were discounted from what those lawyers usually charged. *LV v. New York City Department of Education*, 700 F. Supp. 2d 510, 519 (S.D.N.Y. 2010). Milbank's paralegals were compensated at $150 per hour (in today's rate, that would come out to about $215 per hour). *Id.* at 523. In my expert opinion, this confirms that the Cuddy Firm's rates are reasonable for IDEA practice in New York City.

113.     **Shipman & Goodwin**: Another firm that has a "School Law" practice is Shipman & Goodwin, a firm I have worked with on numerous occasions.

    a. S&G is based in Connecticut (although has a New York City office) and sets its rates primarily on Connecticut market rates (generally lower than New York City).

    b. S&G notes that its "School Law" practice focuses on, among other things, representing and defending school districts in IDEA matters.[12]

    c. In my experience, S&G partners generally charge in the $450 to $600 per hour range, and their associates generally charge in the $300 to $450 per hour range.

    d. These rates are, again, below what I believe New York City market rates would be in this matter, given that S&G is on the defense side (so bears no risk of non-payment) and are located in Connecticut (with a lower market rate structure).

    e. In my expert opinion, this confirms that the Cuddy Firm's rates are reasonable for IDEA practice in New York City (especially plaintiff's work).

114.     **Riker Danzig Scherer Hyland & Perretti LLP ("Riker Danzig")**: Another firm that I am very familiar with is Riker Danzig, a New Jersey firm that also has offices on Fifth Avenue in New York City. I have engaged Riker Danzig on numerous occasions over the years and am very familiar with its rate structure.

---

[12] *See* https://www.shipmangoodwin.com/services/practices/school-law/index.html (accessed on November 1, 2021).

a. Through its prominent School Law Practice, Riker Danzig has represented boards of education in New Jersey for nearly 50 years – both public education clients as well as private schools. Riker Danzig represents, among other clients, the school districts of Newark, the largest city in the State of New Jersey.

b. Riker's School Law group advises clients on issues such as student discipline, special education, school district governance, school ethics, labor and employment, public school contracting, as well as the full range of regulatory and administrative issues.[13] Riker defends school districts against claims brought by children with autism and other learning disabilities.[14]

c. Thus, this is a firm that represents "the other side" for the very same issues present in this matter.

d. As with S&G, Riker Danzig's rates would typically be slightly below market for New York City, being located primarily in New Jersey.

e. The average hourly rate for partners at Riker Danzig was $455 per hour in 2014 (about $575 per hour in today's rates) and the average hourly rate for associates was $250 per hour in 2014 (about $300 per hour in today's rates).[15]

f. Again, these are New Jersey rates (lower than New York City rates) charged to private clients with no risk of non-payment.

g. To the extent attorneys at the Cuddy Firm ultimately decided to forego this ongoing risk of nonpayment, it is my expert opinion that Riker Danzig's hourly rates are the rates the Firm's attorneys could recognize.

h. In my expert opinion, this confirms that the Cuddy Firm's rates are reasonable for IDEA practice in New York City, especially for public-interest work.

---

[13] See https://riker.com/legal-services/school-law (accessed on November 1, 2021).
[14] *Id.* ("Whether your child is on the autistic spectrum, has severe learning disabilities, has a developmental disability, suffers from vision problems, including blindness, or hearing deficiencies, including deafness, has school phobia that prevents him or her from attending school in person, or has any of the other disabilities recognized in state and federal law, we have the experience and expertise to advise you on whether to seek a private school placement, on how to approach your child study team, and, if the child study team does not agree to the private school placement, how to prevail in a challenge before an administrative law judge."
[15] ALM's 2014 NLJ Billing Survey.

115.     In my expert opinion, all three of these firms corroborate my opinion that the rates sought by the Cuddy Firm are well within the reasonable range of rates actually charged by law firms who perform IDEA work (generally, on the defense side, as well as for clients with the means to pay).

116.     Moreover, as anyone familiar with the legal industry understands (and as most courts recognize), plaintiffs' firms are generally compensated at a higher rate than defense lawyers performing equivalent work.

117.     The reasons for this are several, with the two key ones in my experience being the fact that firms like the Cuddy Firm risk non-payment if they lose, while firms who represent school districts do not, and the bulk buying power of large school districts (or, in some instances, their insurers) able to obtain steep discounts off rack rates.

118.     As one court noted, "the market for lawyers who represent plaintiffs on consumer actions, and often work on a contingency basis, demand a higher rate than what is appropriate for defense attorneys." *Santiago v. Equable Ascent Fin.*, 2013 WL 3498079, at \*3 (N.D. Cal. July 12, 2013).

119.     I note that several more local courts have specifically noted this in connection with IDEA and other school-based litigation: See *C.G. by Mr. and Mrs. G. v. New Haven Bd. of Educ.*, 988 F. Supp. 60, 68-69 (D. Conn. 1997) (rejecting opposition to plaintiffs' fee request based on affidavits of attorneys who represented boards of education); see also *P.G. v. Brick Township*, 124 F. Supp. 2d. 251, 262 (D.N.J. 2000) (noting that court had previously "rejected defendant's argument for a lower rate based on the rate charged by school board attorneys").

**E. Attorney Rates Charged by Outside Counsel for DOE**

120.     It is my understanding that, on occasion, the City of New York's Law Department (the "Department") engages the services of outside legal counsel for certain DOE cases assigned to the General Litigation unit, which would include these types of special education matters.  Based upon my review of a recent Engagement Letter (dated December 30, 2020) between the Department and the law firm of Hoguet, Newman, Regal & Kenney,

LLP ("Hoguet Newman", a New York City-based boutique) the Department has taken the position that rates of $400 per hour for Partners and $300 per hour for Associates are reasonable, as these are the agreed upon rates in this signed and executed Engagement Letter (attached As Ex. D to Decl. of A.C. in support of Plaintiff's Motion for Summary Judgment for Attorneys' Fees and Costs)**.**

121.     I have also reviewed publicly available Hoguet Newman engagements in other matters (including their engagement agreement for the firm's client named David Rubin (the "Rubin Engagement", dated January, 2010, attached hereto as **Exhibit C**) and the firm's client named Dan Lowe (the "Lowe Engagement", dated December, 2019, attached hereto as **Exhibit D**).  The purpose of this review is to ascertain what Hoguet Newman's customary rates and expense practices are for non-specialized (*i.e.* bulk work for a public entity) clients.

122.     My review of these other engagements confirms that the Hoguet Newman's customary rates exceed its bulk discount for the DOE and exceed the rates charged and sought in this matter by the Cuddy Firm.

    a. Hoguet Newman charged Mr. Rubin $750 per hour for partners, $325 per hour for associates, and $150 per hour for non-lawyer support staff in 2010.  See Rubin Engagement Agreement, available on PACER in Case No. 1:11-cv-05377-JFK, Doc. No. 1-1.  This engagement also notes that "We will not charge for **normal office expenses typically charged by law firms, such as telephone, fax, and secretarial services**."  Emphasis added.

    b. Hoguet Newman charged Mr. Lowe $825 per hour for partners, $450 per hour for associates, and $175 per hour for paralegals from 2019-2020.  See Rubin Engagement Agreement, available on PACER in Case No. 1:21-cv-01048-VSB, Doc. No. 1-1 to 1-4.  Hoguet Newman also charged Mr. Lowe for an $848.93 stay at a Ritz Carlton hotel. *Id.* at Doc. No. 1-3.

123.     In other words, these are the "customary" hourly rates (without the risk of non-payment) charged by firms that the DOE utilize for these types of services.

124.     As previously noted, the risk of non-payment for the Cuddy Firm does not exist with the DOE lawyers.  See *C.G. by Mr. and Mrs. G. v. New Haven Bd. of Educ.*, 988 F. Supp. 60, 68-69 (D. Conn. 1997) (rejecting opposition to plaintiffs' fee request based on affidavits of attorneys who represented boards of education); see also *P.G. v. Brick Township*, 124 F. Supp. 2d. 251, 262 (D.N.J. 2000) (noting that court had previously "rejected defendant's argument for a lower rate based on the rate charged by school board attorneys").

125.     These customary hourly rates significantly exceed those charged and sought by the Cuddy Firm.  In my expert opinion, these rates strongly support the hourly rates sought, especially given the wide recognition of the fact that "the market for lawyers who represent plaintiffs on consumer actions, and often work on a contingency basis, demand a higher rate than what is appropriate for defense attorneys." *Santiago v. Equable Ascent Fin.*, 2013 WL 3498079, at *3 (N.D. Cal. July 12, 2013).

**F.  Cross-Check of the Laffey Matrix**

126.     In my expert opinion, one additional useful cross-check here is the Laffey Matrix, which is an hourly-rate index for the Washington, D.C. Metropolitan area commonly used in Federal Fee-Shifting Statutes.

127.     I find (and many courts in major metropolitan areas agree) that the Laffey Matrix is useful as a cross-check against the rates sought, as fee-shifting counsel often seek rates above their Laffey Matrix rate counterpart.

128.     As noted, the Laffey Matrix reflects rates for the Washington, D.C. Metropolitan area.  A review of IDEA matters in the District of Columbia reflect that the "vast number of district court cases awarding IDEA fees" to the Cuddy Firm's D.C. peers are customarily awarded rates at 75% of the Laffey Matrix.  *Reed v. Dist. Of Columbia*, 134 F. Supp. 3d 122, 131 (D.D.C. 2015).  However, for cases with more complexity than an average IDEA case, the Cuddy Firm's D.C. peers are customarily awarded full Laffey Matrix rates. *McNeil v. District of Columbia*, 2015 WL 5921901 at *6 (D.D.C. 2015).

129.     Having been a partner in both the District of Columbia and New York City offices of two law firms, it is my experience that the hourly rates for New York City (especially Southern District practice) attorneys is generally slightly higher than their D.C. counterparts.

130.     This comparison has generally been reflected in my experience as a fee expert, that New York City-based attorneys are customarily paid on par with, if not slightly higher than their peers in the District of Columbia, when controlling for the firm and experience level.

131.     As I have previously opined, I find the Laffey Matrix often *depresses* the hourly rates in certain metropolitan areas, especially so with attorneys who have practiced for 25 years or more (such as both Attorneys Cuddy and Attorney Sterne).

132.     While it is my expert opinion that the success achieved here and the complexity of this matter (as described above) warrant compensation at full Laffey Matrix rates, even assuming only the 75% Laffey Matrix ratio applied, it is my expert opinion that the rates sought are eminently reasonable, especially of the senior partners.

133.     To illustrate, 75% of the 20+ year of experience Laffey Matrix rate is $685 per hour, well above the $550 per hour sought for both Attorneys Cuddy and Attorney Sterne. Full Laffey Matrix compensation would put them at $914 per hour, nearly twice the rates sought.

134.     For the Associate attorneys, the 75% Laffey Matrix rates range from $300 per hour (for a first-year attorney) to $504 per hour (for an eighth-year associate), while the full rates are $378 to $672 per hour. The associate rates sought here are $375 to $450 per hour, which is well within the range of both sets (at the bottom end of the range).

135.     It is my expert opinion that, as a cross-check, the Laffey Matrix (both at 75% and full) support the reasonableness of the hourly rates sought here.

## G. A Comment Regarding Prior Rate Awards in Other Matters

136.     I have reviewed awards in prior cases for the Cuddy Firm, and it is my expert opinion that such awards do not reflect the accurate market rate for the Firm nor are they persuasive evidence of same.

42

137. There are several reasons for this opinion:

   a. The first is that I have seen evidence of the Firm's actual market rates charged to private clients and I view no reason to warrant any deviation from those rates.

   b. Second, as every litigator knows, and as the Johnson Factors reflect, each case is unique and different. This is precisely why those Johnson Factors must be considered in the context of each individual case's circumstances, notably the complexity, required workload, and level of success.

   c. Thus, in a prior case, where the Cuddy Firm's work was deemed more routine (*i.e.*, did not involve litigation/implementation at the same time and did not involve a level of "contumacy" by the DOE that required significant additional work by the Firm, or where the Cuddy Firm success was merely average, then the previously awarded rates are every bit as likely to reflect the *Johnson* factor analysis for that matter, and be of little to no relevance to this matter. The case at hand was a difficult and complex matter, required significant work over several years (including a successful appeal), and the success achieved here was outstanding.

   d. Third, in my experience, a prior decision may not accurately reflect the determination of a market rate, but rather the caliber of presented evidence regarding rates in that one particular matter. A fee applicant bears an initial burden of production (to provide evidence of the rate), while its opponent bears the burden of rebuttal. Thus, a prior awarded rate merely may simply reflect that the applicant was not robust in providing its evidence in that prior particular case. In my experience, that is not persuasive evidence of a market rate (or, more importantly, the value of the relief obtained by counsel in a particular case), but rather merely the level and quantum evidence that was provided on another occasion. Put another way, in my expert opinion, using rates awarded in prior cases where insufficient proof was provided to the court locks a firm into a potentially inaccurate, non-market rate, and overly punishes a fee applicant by effectively precluding them from learning from past mistakes and following the court's instructions to do better

43

in its proofs.  In my expert opinion, such cannot be the result in a "remedial" statute that is designed to "attract competent counsel" to represent the public interest.

e.  The final reason for my opinions derives from my experience in fee petitions around the country, especially in the Third and Ninth Circuits, which generally discourage or do not permit prior awards to be used to reduce rates by themselves, without further evidence that those awards actually reflect market rates rather than any of the other issues I referenced (*e.g.* bad proof in another case).  See *e.g. Van Skike v. Director, OWCP*, 557 F.3d 1041, 1047 (9th Cir. 2009) (citing *Student Pub. Interest Research Group of N.J. v. AT&T Bell Labs.*, 842 F.3d 1436, 1446 (3rd Cir. 1988) ("Courts that try to establish public interest market rates by looking to the going rate for public interest work therefore do not examine an independently operating market governed by supply and demand, but **rather recast fee awards made by previous courts into 'market' rates ... [thereby] ... perpetuat[ing] a court-established rate as a 'market' when that rate in fact bears no necessary relationship to the underlying purpose of relying on the marketplace: to calculate a reasonable fee sufficient to attract competent counsel**.") (emphasis added).  In other words, relying solely on prior awards creates what I would refer to as an artificial feedback loop that is divorced from the actual market rates and merely serves to depress rates for public interest counsel in the long run – while also undermining the purpose of fee-shifting statutes to attract competent counsel to enforce important civil rights.

138.  For these reasons, while I did review and consider prior rates awarded to the Firm, I found them to be unpersuasive evidence of the market rate in this case when much more persuasive evidence exists here and believe that the true market rate is more properly reflected in the rates sought.  This especially includes prior awards in which the Court awarded the Firm $200/hr for certain associates.  In my experience as a fee expert, that rate is well below the rates I know are charged by even the most junior attorneys in New York City and does not accurately reflect the market value of their services.

## H. Conclusion Regarding Hourly Rates

139.     For all these reasons, it is my expert opinion that the Firm's hourly rates sought in connection with this Fee Application are reasonable and appropriate.

### OPINION III: THE FIRM'S OVERALL FEES ARE REASONABLE

140.     Applying the lodestar method, the reasonable number of hours times a reasonable hourly rate creates a presumptively reasonable fee of $150,450.00.

141.     I hereby incorporate by reference all of the reasons articulated above in Opinions I and II regarding both the Firm's hours and rates in further support of my expert opinion that the Firm's overall fees are reasonable.

142.     However, there remain a few additional factors that merit consideration to evaluate the overall reasonableness of the fee.  Based upon my experience, the most relevant additional factors are: (A) the general intent of the statute (B) results obtained; and (C) the risk of non-payment and preclusion of other work for the attorney.

143.     In my expert opinion, these three additional factors strongly support the propriety of the presumptively reasonable lodestar amount. I take each of these as follows:

## A. The Amount Involved and the Results Obtained

144.     Based upon my experience, a critical factor when evaluating the overall reasonableness of the fee is the results obtained by the Firm.  See *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (in a Lodestar analysis, the "most critical factor is the degree of success obtained.").

145.     This factor works in tandem with the "amount involved", or, put another way, the stakes of the litigation.

146.     In my experience, the stakes in statutory fee-shifting cases are rarely about money, and the law recognizes that vindication of fundamental rights may be every bit the important stakes as a high-dollar complex commercial litigation.  *Hensley v. Eckerhart*, 461 U.S. 424, 453 (1983) (emphasizing that the "measure of success" is not "monetary", but rather "vindicat[ion] of the plaintiff's rights").

45

147.       Here, I believe both factors <u>strongly</u> justify the presumptively reasonable lodestar amount and <u>strongly</u> warrant against any reduction in that amount. I take each issue in turn:

148.       **The Stakes of the Litigation**

    a. It is well established that "education is perhaps the most important function of state and local governments." *Mills v. Board of Ed. Of District of Columbia*, 348 F. Supp. 866, 874 (D.D.C. 1972), citing *Brown v. Board of Education of Topeka*, 347 U.S. 483, 493 (1954).

    b. In the IDEA, Congress found that "an **<u>essential</u>** element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. 33, §1400(C)(1). Emphasis added.

    c. As Judge Vyskocil recently held when granting the Firm a Preliminary Injunction in another special education case against the DOE: "The public interest is always 'best served' by ensuring constitutional and civil rights are upheld after a plaintiff has shown a likelihood of success on the merits." See March 26, 2021 Opinion and Order at *8 in *Y.S., on behalf of Y.F. and S.F. v. New York City Department of Education*, Case No. 1:21-cv-00711 (United States District Court for the Southern District of New York) (Dkt. 15)**.**

    d. Under the Second Circuit's well-established test for injunctive relief, "where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. HP Hood & Sons*, 596 F.2d 70, 72 (2nd Cir. 1979), citing *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2nd Cir. 1966).

    e. It is my expert opinion that the stakes of special education matters are of the highest order: ensuring that children are provided the full quantum of educational opportunities to which the law entitles them.

f. In this particular case, the DOE's consistent failure and delay in providing necessary services to which M.L. was entitled interfered with the following non-exhaustive, basic quality of life factors:

    i. M.L.'s ability to process and learn information alongside his fellow students;

    ii. M.L.'s ability to develop and utilize basic communication skills with his teachers, his fellow students, and his family (including the ability to write legibly);

    iii. M.L.'s ability to develop and utilize adaptive living skills, including the ability to tie his own shoes;

    iv. M.L.'s ability to develop and utilize social skills in order to make friends/foster relationships both in and out of school;

    v. M.L. and his family's right to safety and well-being both at school and at home, as his disability involves spasms/shaking (symptoms that required tests for epilepsy) as well as hitting his siblings;

    vi. M.L.'s basic ability to hear what is going on around him in the school environment, as his disability involves audio issues that require hearing education services;

    vii. Plaintiff's ability to meaningfully participate in this developmental process with her son based on DOE's failure to include her and provide her with necessary training to do so.

g. Furthermore, each of these factors/required services are incredibly time sensitive to the family. Each delay or failure to provide/respond is, <u>at minimum, a several-month setback</u> for the family – and, in most cases (as with this one), the time adds up to the equivalent of a half a school year, a summer, an entire school year, or longer – all going without necessary services to which M.L. is entitled, and thus leaving him behind.

h. The bottom line is that no amount of money can make up for these delays or failures to provide these educational opportunities to Plaintiff's child.

i. To me, this shows the stakes are of paramount concern to the Plaintiff going against a government agency of the largest city in the nation, which commands significantly greater resources than Plaintiff does.

j. This is especially true for parents who are unable to afford tuition to private schools or to turn to alternative schooling. As a former product of the New York City Public School System at M.L.'s age, I am acutely aware of the importance of providing quality educational opportunities to all New Yorkers, especially those in the outer boroughs like Plaintiff and her child (both of whom reside in Brooklyn, where I was born).

k. Because the stakes of this matter were of the highest importance, it necessitated the involvement of highly skilled and tenacious counsel to go toe-to-toe with and prevail against a well-resourced government agency with far greater resources.

l. In my expert opinion, the significant stakes involved further support the reasonableness of the fees sought and warrants against any reduction of the presumptively reasonable lodestar amount.

149. **The Results Obtained**

a. In my expert opinion, the Firm has achieved and continues to achieve objectively outstanding results for its client.

b. Simply the service-related benefits that Plaintiff received in connection with the claims for her child, particularly in light of the ongoing failures of the DOE on a myriad of issues, demonstrates how much Plaintiff and her son have benefitted from the Firm's work and skilled representation.

c. The DOE was ultimately required to provide Plaintiff with all reasonable and necessary services for M.L., to which he was entitled. Putting aside the value of a child being able to participate in a developmental, social, and educational process

48

to which he is entitled, the Firm secured him additional services with an ultimate monetary value of <u>nearly one hundred thousand dollars</u>.

d. The Firm also managed to obtain a reversal of IHO Kennedy's Lloyd's Findings of Fact Decision, which secured certain vital assistive technology services to M.L. (to be provided within 30 days), the funding of an appropriate FBA, and further attention by the CSE to evaluate the ongoing FBA.

e. In my expert opinion, the Firm's representation has put M.L. and his mother in a far better position by virtue of its work, and this outstanding result will continue to bear fruit in the years to come.

f. In addition, I believe this outstanding result must be viewed in conjunction with the widely accepted purposes of the statute referenced above (*i.e.* to entice competent and skilled counsel to take on cases such as Plaintiff's by rewarding them for a fee award commensurate with the work performed and success achieved).

g. In my experience, this is most true when the monetary "pot of gold" is not as significant, as in those kinds of cases, the pot of gold will entice counsel to take on such cases with the hope of a large pay day.

h. Put another way, it is in cases such as this that the remedial purpose of the Statute is most evidently necessary, that is to entice law firms such as the Cuddy Firm to continue ensuring that individuals like Plaintiff (and her child) receive the vital educational services to which they are entitled and that they deserve.

i. The level of success is especially notable in light of the well-recognized fact that "school systems have a natural advantage" in IDEA due process hearings because of easier access to witnesses, expertise, and resources. *Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 453 (4th Cir. 2004), citing *School Comm. Of Burlington v. Dep't of Educ. Of Mass.* 471 U.S. 359, 368 (1985).

j. This also reflects the natural advantage a government agency has generally in proceedings, with substantially more resources and the "prestige of the people" behind it.

k. I have substantial experience with this factor, having represented numerous departments and agencies of government in New Jersey, as well as defending clients against those same departments and agencies. Having to go up against the "prestige of the people" can be a daunting task for a single parent without substantial resources, and the Firm enabled Plaintiff to do so with great success.

l. In my expert opinion, the outstanding results obtained for Plaintiff, especially against the well-resourced DOE of the largest city in the United States further support the reasonableness of the fees sought and warrants against any reduction to the presumptively reasonable lodestar amount.

## B. The Provisions and General Intent of the Statute

150. I consider the provisions, purpose, and intent of the Statute as an important factor, not as a question of law, but as a framework against which I consider the reasonableness of the fees. I therefore consider the lodestar amount of $150,450.00 in the context of two aspects of the Statute's intent.

151. First, I understand the Statute is remedial, to be construed broadly in favor of children with disabilities, especially those who are unable to afford high-priced counsel to represent their interests against government bodies with significantly greater resources at their command ("It is true that remedial statutes like the IDEA are to be construed liberally." *Collingsgru v. Palmyra Bd. Of Educ.*, 161 F.3d 225 232 (3rd Cir. 1998)). These resources are noted in a recent Sanctions Order issued by Judge Vyskocil against DOE – the same case cited above in which she granted the Firm's Preliminary Injunction. See June 17, 2021 Order in *Y.S., on behalf of Y.F. and S.F. v. New York City Department of Education*, Case No. 1:21-cv-00711 (United States District Court for the Southern District of New York) (Dkt. 57).

152. Second, I understand that the Statute is to be construed as are other fee-shifting statutes (such as environmental protection statutes), to "calculate a reasonable fee **sufficient to attract competent counsel**" against well-funded adversaries. *Blum v.*

50

*Stenson*, 465 U.S. 886, 893-894 (1984). *Purdue v. Kenny A. Ex. Rel. Winn*, 130 S. Ct. 1662, 1672 (2010). Emphasis added.

153. Taken together, it is my expert opinion that these statutory intents strongly warrant against any reduction from the presumptively reasonable lodestar calculation, as to do so would discourage well-credentialed and experienced attorneys (which, in my opinion, includes every single attorney at the Cuddy Law Firm) from taking on complex and difficult matters (such as Plaintiff's).

154. In contrast, it is my expert opinion that failing to adequately compensate skilled counsel like the Cuddy Firm would only serve to discourage them from taking on clients like Plaintiff who need their services the most.

155. It is therefore my expert opinion that this factor warrants against any reduction of the presumptively reasonable lodestar amount of $150,450.00 in fees and $4,077.24 in costs.

156. Furthermore, the IDEA expressly states, in 20 USC §1415(i)(3)(G), that the provision "Reduction in the amount of attorneys' fees" (including for reasons of reasonableness) "shall not apply" in situations where "the court finds that the State or local educational agency unreasonably protracted the final resolution of the action or proceeding".

157. The Southern District has clearly agreed with this statement, including Judge Vyskocil in the *Y.S.* case cited above, in which she ultimately sanctioned the DOE for failing to diligently and timely comply with the terms of the preliminary injunction she granted to the Firm's clients three months prior. As Judge Vyskocil stated: "[c]oercive sanctions are appropriate in this case and that sanctions are supported by (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the DOE's financial resources and the consequent seriousness of the sanction's burden." Dkt. 57.

158. In these matters, the DOE displayed multiple actions of contumacy, including but not limited to:

    a.   <u>For Case No. 175911</u>

        i.  Failing to acknowledge M.L.'s right to pendency and failing to issue an injunction for the last agreed upon placement program. This necessitated a hearing for pendency services, for which the Cuddy Firm had to prepare. Cuddy Decl. ¶48; and

        ii.  Failing to make any offer on fees for over three months subsequent to the Firm's submission of its billing statement and demand for attorneys' fees after the Firm's successful appeal to the SRO. Cuddy Decl. ¶¶ 67-73.

    b.   <u>For Case No. 194397</u>

        i.  Failing to appoint an IHO for five months. Mendillo Decl. ¶16;

        ii.  Failing to offer a resolution agreement for over six months after the Firm's filing of the Due Process Complaint – which DOE is required to do within 30 days of such filing as per the Regulations of the Commissioner of Education of the State of New York. Id. ¶17; and

        iii.  Failing to make any offer on fees for over three months subsequent to the Firm's submission of its billing statement and demand for attorneys' fees after the Firm's successful appeal to the SRO. Cuddy Decl. ¶¶ 67-73.

159.    As to the latter point, having practiced law for nearly fifty years, no responsible lawyer would show up to a hearing assuming that it will be "uncontested". Indeed, such a course of conduct would be tantamount to malpractice. Rather, any responsible attorney would be "ready for bear". I find such a suggestion that an attorney is not ethically obligated to fully prepare for a matter to border on the frivolous.

160.    In my expert opinion, this anti-contumacy provision of the IDEA further warrants against any reduction in the presumptively reasonable lodestar amount of $150,450.00 in fees and $4,077.24 in costs, given the well-documented "contumacy" of the DOE in this particular matter.

**C. The Risk of Nonpayment, Preclusion of Other Work, and Time Limitations Imposed**

161.     One other crucial factor that I consider is the risk of nonpayment, the preclusion of other employment for the attorney performing the services, and the time limitations imposed. Based upon my experience, these three factors work in tandem along with the "results obtained" and intent of the statute.

162.     In my expert opinion, this factor strongly supports the reasonableness of the fees sought.

163.     The Statute, along with the RPC and the *Johnson* Factors recognize and acknowledge the importance of incentivizing skilled lawyers such as the ones at the Cuddy Law Firm to represent special needs students (whose parents often who do not have the financial resources to assert their rights against the DOE) through a final determination against a government agency that has "the DOE's financial resources".

164.     The Firm took on Plaintiff's case with no certainty of receiving any compensation for its work. In order to be compensated for its work, the Firm had to win or obtain a favorable resolution, and to do so in the face of "continued contumacy" by the DOE.

165.     Plaintiff's case was not going to be easy or a guaranteed success. The matter would take a considerable amount of time to achieve a result, and it required tremendous skill by the Firm's attorneys and staff, who had to successfully navigate a myriad of legal and implementation issues in order to prevail (including an ultimately successful appeal). In the end, as noted previously, by dint of these skilled efforts, the Firm achieved a very favorable result for its client.

166.     The Firm could always have declined Plaintiff's case, choosing instead to handle more lucrative cases with a guaranteed compensation (such as representing only clients of means, whose parents can and would pay the Firm on an hourly basis, or representing school districts with considerably more resources to expend on lawyers and carrying the "prestige of the people" instead of going against it).

167.     The Firm did not do so. Rather, it took on a difficult case for over five years (including the two prior cases on Plaintiff's behalf in 2016) without the certainty of

53

receiving any compensation, against the well-resourced DOE of the largest city in the nation, continuing to achieve outstanding results for its client.

168. In my expert opinion, these factors <u>strongly</u> warrant against any reduction to the presumptively reasonable lodestar amount.

## <u>OPINION IV: THE FIRM'S COSTS ARE REASONABLE</u>

169. I have reviewed the costs submitted by the Firm for reimbursement and they are, in my expert opinion, reasonable and appropriate.

170. These costs include $3,675.24 in connection with M.L.'s Due Process Claims, which consist of facsimile charges, postage, printing costs, and Attorney Aasen's reasonable travel expenses to attend and participate in the five hearing sessions for Due Process Matter 175911.

171. These costs also include $402.00 for Filing Fees in connection with the Federal Action.

172. These are precisely the costs I would expect to see for this type of matter. In my expert opinion, these charges were modest, reasonable, and appropriate.

173. Moreover, these are charges that are customarily charged to fee-paying clients.

174. Private paying clients customarily pay for counsel to travel to hearings and events, including those from out of town.

175. Had a fee-paying client engaged the Cuddy Firm for its expertise in these matters, it would be expected to pay for their travel expenses.

176. In this case, counsel incurred a quite modest amount of travel expenses including for hotel rooms, meals, mileage, and parking. In my expert opinion, these are entirely reasonable charges, especially for a Firm that regularly lays out this money with no guarantee of reimbursement.

177. Having reviewed the Firm's private engagement agreements reflecting the costs it charges to paying clients, the copying costs it seeks here are the same as it charges to private, paying clients.

54

178.      One cost item that I believe bears brief explanation is the facsimile charges. While less common today, there remain certain items of business that are still done via facsimile charges, and when that is the case, fee-paying clients will pay for the facsimile charges. Indeed, based upon the engagement agreements I reviewed, the Firm actually charges private paying clients the same rate for facsimile charges sought here.

179.      It is my understanding that some DOE offices <u>require</u> the necessary educational records in connection with these special education cases to be requested <u>via fax machine</u>. In other words, in this case, in order for the Firm to begin the intake process to pursue services (and related costs) to which their clients are entitled, and which DOE is currently not providing – <u>the Firm had to do so by fax</u>.

180.      I note that the DOE's own outside counsel, Hoguet Newman, has stated in its general retainer agreement for other clients that "fax" expenses are "typically charged by law firms". Rubin Engagement.

181.      In my expert opinion, the costs charged by the Cuddy firm (which charges the Firm has outlaid at its own expense at the risk of non-reimbursement) are quite modest and reasonable, especially when considering the stakes of the litigation, the risk of non-payment, and the importance of enticing competent counsel to represent parents like Plaintiff as opposed to only taking on private fee-paying clients of means or representing school districts, both of whom would be paying for these very same costs.

## SUMMARY OF OPINIONS

182.      For all the reasons set forth in Opinion I, it is my expert opinion that the hours spent by the Firm (as listed above) in connection with Plaintiff's matters were reasonable and necessary.

183.      For all the reasons set forth in Opinion II, it is my expert opinion that the hourly rates sought by the Firm (as listed above) in connection with Plaintiff's matters were reasonable.

55

184. For all the reasons set forth in Opinion III, it is my expert opinion that the overall fees sought by the Firm in connection with Plaintiff's matters were reasonable and necessary.

185. For all the reasons set forth in Opinion IV, it is my expert opinion that the overall costs sought by the Firm in connection with Plaintiff's matters were reasonable and necessary.

****

## SIGNATURE AND ATTESTATION

All of my expert opinions stated herein are to a reasonable degree of professional certainly. I reserve the right to supplement my opinions should any additional information come available.

Respectfully submitted on November 2, 2021 in Warren, New Jersey.

_____

Steven A. Tasher, Esq.

**STEVEN A. TASHER, ESQ.**
**CEO, Wyatt Partners**
**P.O. Box 358, Berkeley Heights, New Jersey 07922**
Telephone: (908) 561-7483    Email: stasher@wyattpartners.com    Website: www.wyattpartners.com

## EXECUTIVE SUMMARY

As one of the nation's leading experts on legal fee matters whose entire legal career has focused around the handling and supervision of major litigation throughout the world, Steven Tasher evaluates the reasonableness of legal spend and settlements in complex litigation throughout the United States and the world. He also serves as an advisor to major corporations and law firms on the management of their legal spend and development and implementation of billing guidelines, litigation budget, and bill review programs.

## INDUSTRY AND LEGAL EXPERIENCE

**WYATT PARTNERS,** Berkeley Heights, NJ

2009-present    *Chief Executive Officer*

- Serve as an expert witness, auditor, and mediator with regard to litigation fees/costs of outside counsel and the reasonableness of litigation settlements;
- Assist corporations with creation and implementation of Litigation Budget & Support Programs and Outside Counsel Billing Guidelines;
- Assist international corporations with familiarization of United States litigation in the area of legal spend;
- Provide advice and counsel to major corporations on development of Environmental Health and Safety (EHS) and Energy Policies and Programs;
- Provide advice and counsel on the preservation of critical company resources by reducing the use of energy, water and waste in company operations and promotion of reuse, recycling and conservation; and
- Conduct environmental due diligence on complex transactions and acquisitions; and analysis of the costs of investigation, remediation and disposal.

**CASE MEDICAL, INC.,** South Hackensack, NJ

2017-present    *General Counsel*

- Serve as chief legal advisor to Chief Executive Officer and the company;
- Supervise all litigation and regulatory actions involving the company;
- Assist with development and review of supply and quality contracts; and
- Provide advice and legal counsel on all aspects of company operations.

**WYETH**, Madison, NJ

1992 –2008     *Vice President and*
*Associate General Counsel*
*Principal Corporate Officer*
*Senior Vice President, Pharmaceutical Division*

Strategic worldwide responsibilities for five operating departments of the company as well as Associate General Counsel responsibilities.

*Key responsibilities:*

- Oversee the Environmental and Energy Departments to assure compliance with all applicable laws and regulations regarding environmental, health and safety matters, and to ensure the most efficient use of energy at all company facilities.
- Administer the Global Real Estate Department.
- Supervise the Aviation Department, including aircraft, pilots, ground crew, and hangar facility.
- Manage Facilities Operations and Building Management.
- Serve as Associate General Counsel; supervise major legal issues affecting the corporation, including major litigation, global contract administration, and internal corporate investigations.
- Serve on the Corporate Law/Regulatory Review Committee which provides guidance to the Chairman of the Board on all issues affecting the potential liability of the corporation.
- Provide advice and direction with regard to environmental issues, health and safety compliance and assessment programs, environmental remediation, regulatory matters, legislative issues, corporate acquisitions & divestitures, and supervision and defense of environmental enforcement actions.
- Manage the company's $300 million environmental reserves as well as oversee the $103 million environmental reserves for Cytec, Inc.
- Serve as Counsel to the President of Wyeth Pharmaceuticals on global compliance issues.

*Key accomplishments:*

- Formed a world-class global Environment Health and Safety (EHS) Department in 1992, establishing a comprehensive program and set of policies designed to achieve EHS excellence.
- Guided Wyeth Pharmaceuticals through its compliance with a Consent Decree imposed by the FDA on three key manufacturing facilities and served as counsel to the President on all cGMP compliance issues.
- Served on a three-person senior leadership team which re-engineered and restructured Wyeth's supply chain organization.
- Served as Senior Vice President, Global Compliance Auditing for Wyeth Pharmaceuticals; established and supervised the audit programs for all company operations, including manufacturing and research facilities, clinical trials, medical labeling, and promotional activities.

2

- Supervised the successful litigation against a Minneapolis company and its individuals who had stolen the company's trade secret process for the extraction and purification of *Premarin*.
- Established a safety program which achieved a substantial reduction in the company's lost time incident rate and total incident rate.
- At the behest of the company's Board of Directors, created animal health and welfare programs for the care and treatment of horses involved in the production of *Premarin*; supervised the ongoing defense of attacks by animal activist organizations on the production and manufacture of the *Premarin* family of products.
- Established a Budget Program for the company's diet drug litigation. This matter required supervision of the legal spend of over 60,000 lawsuits, coordinating counsel, and 120 law firms which defended these matters.
- Supervised environmental international litigation and claims brought against the company and/or its affiliates in Europe, South America, and Asia.

**WILLKIE, FARR & GALLAGHER**, New York, NY and Washington, DC

1988 – 1992   *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**DONOVAN, LEISURE, NEWTON & IRVINE**, New York, NY and Washington, DC

1983 – 1988   *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**BAYH, TABBERT & CAPEHART**, Indianapolis, IN, and Washington, DC

1982   *Partner in charge, Environmental Practice Group*

Provided legal expertise on an international level to a wide range of corporate, banking, insurance, real estate and financial services clients.

**E.I. duPont de Nemours and Company**, Wilmington, DE

1980 – 1982   *Staff Attorney*

Served as an attorney within the Law Department, providing litigation and regulatory counsel on a wide range of issues affecting the corporation.

3

**STATE OF NEW JERSEY**, Trenton, NJ

1973 – 1980   *Deputy Attorney General*
Chief Counsel to the Commissioner of the New Jersey Department of *Environmental Protection and Commissioner of Agriculture*

Supervised all environmental litigation and counseling for the State of New Jersey. Prosecuted several of the nation's landmark environmental matters. Tried and supervised numerous cases in state and federal court involving workers' compensation, tort and contract claims, transportation and eminent domain, and debarment of state contractors.

## EDUCATION

1973   **GEORGE WASHINGTON UNIVERSITY, NATIONAL LAW CENTER**,
Washington, DC
Juris Doctor, with honors

1970   **RUTGERS UNIVERSITY**, Newark, NJ
BA, Political Science/Pre-law, with honors

## BOARD POSITIONS
- The George Washington University Law School – Member, Board of Advisors
- The Cancer Hope Network – Vice President, Board of Trustees (Past President)
- Visiting Nurse Association of Northern NJ – Member, Board of Trustees

## AWARDS AND HONORS
- Jacob Burns Award for Extraordinary Service to The George Washington University Law School – 2008
- Philanthropic Leadership Award, 2003 – Cancer Hope Network
- Corporate Leadership Award, 2003 – Visiting Nurse Association of Northern NJ
- Selected to Best Lawyers in America – New York, NY and Washington, DC, 1989-1992

## PROFESSIONAL AFFILIATIONS
- New Jersey Institute of Technology – Adjunct Faculty Member
- "Distinguished Neutral" – International Institute for Conflict Prevention & Resolution

## PRESENTATIONS AND PUBLICATIONS
- February 26, 2021: Featured Presenter at "The Ethics of Legal Fee Applications: Ethical, Procedural, and Practical Considerations" – sponsored by Lawline
- December 17, 2020: Featured Presenter at "Ethical Considerations and Best Practices When Navigating and Evaluating Litigation Settlements" – sponsored by Lawline
- June 29, 2020: Featured Presenter at "Put it in Writing: Best Practices and Ethical Considerations When Negotiating, Drafting, and Enforcing Engagement Agreements" – sponsored by Lawline
- May 12, 2020: Featured Presenter at "Best Practices and Ethical Considerations when Navigating and Evaluating Litigation Settlements" – sponsored by Clear Law Institute

- May 11, 2020:  Featured Presenter at "Put it in Writing: Best Practices and Ethical Considerations When Negotiating, Drafting, and Enforcing Engagement Agreements" – sponsored by Clear Law Institute
- December 17, 2019:  Featured presenter at "Working With Expert Witnesses: Legal and Ethical Obligations" – sponsored by Lawline
- September 20, 2019:  Featured presenter at "Put It In Writing:  Best Practices and Lessons Learned  When Negotiating, Drafting, and Enforcing Engagement Agreements" – sponsored by the Association of Corporate Counsel New Jersey Chapter
- June 11, 2019:  Featured Presenter at "In My Opinion:  Working Successfully with Expert Witnesses" – sponsored by Clear Law Institute
- December 27, 2018:  Featured Presenter at "Ethics and Best Practices When Navigating Fee Disputes" – sponsored by Clear Law Institute
- November 5, 2018:  Featured presenter at "Best Practices for Ethically Managing Legal Spend:  Before, During, and After Litigation" – Sponsored by Clear Law Institute
- October 23, 2018:  Featured presenter at "Mastering the Request for Proposal ("RFP") Process:  Best Practices and Lessons Learned" – Sponsored by Lawline
- September 21, 2018:  Featured presenter at "After the Breach is Gone:  Best Practices and Lessons Learned for In-house Counsel – Sights From the Rear View Mirror" – Sponsored by the Association of Corporate Counsel New Jersey Chapter
- August 9, 2018:  Featured presenter at "Responsible Parties and In-house Counsel on the Practical Aspects of Managing NRD Claims" – Sponsored by Farella Braun + Martel LLP and Kelley Drye & Warren, LLP at the Natural Resource Damages Conference in Santa Fe, New Mexico
- January 18, 2018:  Featured presenter at "Managing Legal Fees: Best Practices for In-House Counsel in the Ethics, Management and Recovery of Legal Fees" – Sponsored by Kelley Drye & Warren, LLP in connection with the firm's Fourth Annual Fashion and Retail Summit (InFashion)
- January 10, 2018:  Featured presenter at "Request for Proposal ("RFP") Process: Structure, Substance and Additional Considerations for Corporate and Outside Counsel" – Sponsored by the Practising Law Institute
- November 7, 2017:  Featured presenter at "Legal Fees in Environmental, Citizen Suit, Class Action, and Other Litigation: Best Practices for In-House and Outside Counsel in Ethics, Case Management, and Communication" – Sponsored by Kelley Drye & Warren, LLP
- September 15, 2017:  Featured presenter at "Mastering the Request for Proposal ("RFP") Process:  Best Practices and Lessons Learned" – Sponsored by the Association of Corporate Counsel NJ Chapter
- July 18, 2017:  Featured presenter at "Ethics of Attorney Fee Disputes" audio webinar – Sponsored by the National Business Institute
- September 21, 2016:  Featured presenter at "Best Practices & Lessons Learned for In-House Counsel on Unnecessary Legal Spend," webinar – Sponsored by the Practising Law Institute
- September 16, 2016:  Featured presenter at "Legal Fees and the Discovery Process" in Whippany, New Jersey – Sponsored by the Association of Corporate Counsel NJ Chapter

5

- April 19, 2016:  Featured presenter at "Ethics and the 'Reasonable' Legal Fee" webinar – Sponsored by the Practising Law Institute
- December 1, 2015:  Featured presenter at "Ethics Behind the Reasonable Legal Fee" in Basking Ridge, New Jersey – Sponsored by the Association of Corporate Counsel New Jersey Chapter
- September 18, 2015:  Featured presenter at "Litigating Fee Disputes:  Keeping it Reasonable" in Hanover, New Jersey – Sponsored by the Association of Corporate Counsel New Jersey Chapter
- March and June 2015:  Presenter of "Best Practices & Lessons Learned for In-House Counsel on Unnecessary Legal Spend," a CLE sponsored by the Association of Corporate Counsel New Jersey Chapter
- October 2013:  Featured speaker at the NALFA Attorney Fee Conference in San Francisco, California
- April 2013:  Presenter of two legal spend webinars (Bill Review/Litigation Budgeting Programs) with Deloitte
- June 2010: Featured speaker at the Second Annual Los Angeles Attorney Fee Conference:  "It Pays To Be Reasonable" at Southwestern Law School
- Environmental Law and Real Estate Handbook
- New York Environmental Law Handbook

**Testifying History of Steven A. Tasher**
**(Chief Executive Officer of Wyatt Partners)**
**Current as of November 1, 2021**

Engagements as Testifying Expert Witness at Trials and/or Depositions

1. *Seagate Technology LLC, Seagate Technology International, and Seagate Singapore International Headquarters PTE, LTD. v. National Union Fire Insurance Company of Pittsburgh, PA and Insurance Company of the State of Pennsylvania*, Case No. 09-04120 CV (United States District Court for the Northern District of California) (deposition taken).

2. *First Horizon National Corporation, et al., v. Certain Underwriters at Lloyds, et al.*, Civil Action No.: 2-11-cv-02608 (United States District Court for the Western District of Tennessee: Memphis Division) (deposition taken).

3. *In the Matter of the Arbitration Act of 1996 and In the Matter of an Arbitration Between GATX Rail Austria GmbH and Liberty Mutual Insurance Europe Limited* (arbitration hearing testimony provided on November 18, 2015).

4. *Diana Gladstone v. Robert Hacker*, Civil Action no. GD12-24308 (in the Court of Common Pleas, Allegheny County, Pennsylvania) (jury trial testimony provided on January 19, 2016).

5. *Joseph P. Nacchio, et al. v. Herbert J. Stern et al.*, Docket No. ESX-L-2825-11 (Superior Court of New Jersey, Law Division, Essex County) (deposition taken).

6. *IVM Corporation v. Zuellig Group et al.*, Civil Action No.: 2-13-cv-3902 (United States District Court for the District of New Jersey) (deposition taken).

7. *Lee David Auerbach, P.C., v. Richard DelGatto*, Index No. 69908/2015 (Supreme Court of the State of New York, Westchester County) (court hearing testimony provided).

8. *Fox Paine & Company, LLC and Saul A. Fox v. Houston Casualty Company, A Professional Indemnity Agency, Inc.*, Index No. 52607/2014 (Supreme Court of the State of New York, Westchester County) (deposition taken).

9. *Quinn Emanuel Urquhart & Sullivan, LLP v. Victoria Brooks, Andrew Brooks, and Elizabeth Brooks*, Case No.: 1425019922 (JAMS New York, JAMS Arbitration) (arbitration hearing testimony provided on May 23, 2017).

10. *Township of Millcreek v. Angela Cres Trust of June 25, 1998*, Case No. 12295-2005 (In the Court of Common Pleas of Erie County Pennsylvania) (court hearing testimony provided on December 20, 2017).

11. *Safeco Insurance Company of America v. M.E.S., Inc. et al*, Case No. 09-cv-3312 (PKC)(VMS) (In the United States District Court for the Eastern District of New York) (court hearing testimony provided on January 5, 2018).

12. *In the Matter of an Arbitration under the Arbitration Act of 1996 Between Sony Pictures Entertainment Inc. and Argo Re Ltd.* (arbitration hearing testimony provided on May 16, 2018).

13. *Paramount Transportation Systems, Inc. d/b/a/ R&L Carriers v. Lasertone Corporation*, Index No. 028695-06 (In the Supreme Court of the State of New York, County of Queens) (court hearing testimony provided on October 23 – 24, 2018).

14. *Hemant Shah et. al., v. 20 East 64th Street LLC, et. al.*, Index Number 156305/2015 (Supreme Court of the State of New York, New York County) (court hearing testimony provided on April 25, 2019).

15. *Guzik v. Albright*, Case No. 1:16-cv-02257 (JPO)(DCF) (In the United States District Court for the Southern District of New York) (bench trial testimony provided on July 18, 2019).

16. *Kuhlman Electric Corp., et al., v. The Travelers Indemnity Co., et al.*, Cause No. 251-07-549 CIV (Circuit Court of the First Judicial District of Hinds County, Mississippi) (deposition taken).

17. *McKee vs. Northville Lodge, et. al.*, Case No. 17-013425-NP (Circuit Court for the County of Wayne, State of Michigan) (court hearing testimony provided on December 4, 2020).

18. *Sutter Health, et al., v. Anthem Blue Cross Life and Health Ins. Co.*, Reference No. 1130006765 (JAMS California, JAMS Arbitration) (deposition taken).

19. *Balestriere Fariello vs. White Lilly, LLC, and Jonathan Bernstein*, Arbitration No. 01-18-003-5131 (American Arbitration Association) (arbitration hearing testimony provided on April 20, 2021).

20. *Fox Paine & Company, LLC and Saul A. Fox v. Equity Risk Partners, Inc and Hub International Insurance Services Inc.*, Index No. 52607/2014 (Supreme Court of the State of New York, County of Westchester) (jury trial testimony provided on August 3, 2021).

21. *SavaSeniorCare, LLC v. Starr Indemnity and Liability Co., et al.*, Case No. 1:18-cv-01991-SDG (In the United States District Court for the Northern District of Georgia) (deposition taken).

22. *Telebrands Corp. and Bulbhead.com, LLC v. Boies Schiller & Flexner, LLP, et al.*, JAMS Ref. No. 1410008543 (JAMS District of Columbia, JAMS Arbitration) (deposition taken).

2

23. *Hull & Company, Inc. v. B.W. Baker Insurance Services, Inc.*, Forum Arbitration Case No. FA200400188905658 (ADR Forum Arbitration International) (deposition taken).



## HOGUET NEWMAN REGAL & KENNEY, LLP

10 East 40th Street  Tel  212.689.8808
New York, New York 10016  Fax  212.689.5101
www.hnrklaw.com

January 19, 2010

**BY U.S. Postal Service**

Mr. David Rubin
President and CEO
CDR Financial Products
9777 Wilshire Boulevard, Suite 800
Beverly Hills, CA 90212

Dear David:

Thank you for the opportunity to be of service to you in connection with United States v. Rubin/Chambers Dunhill Insurance Services, Inc. et al. 09 Cr 1058 (SDNY). This letter describes the scope and terms of our representation.

### Scope of Representation

We agreed to act as your counsel and in the preparation for and at the trial in this matter as well as efforts to dismiss the charges and, if possible, to resolve the matter to your satisfaction without the need for a trial.

### Fees, Expenses and Billing Practices

We will charge for our legal services based upon the time dedicated to this matter at the following rates. We will charge $725 per hour for my time. The time of Mr. Adam Katz, who you met and who will be working on this matter, will be charged at $325 per hour. The time of legal assistants will be charged at $90-150 per hour, as required.

We will not charge for normal office expenses typically charged by law firms, such as telephone, fax, and secretarial services. We will bill for third party disbursements at our cost; these typically include on-line legal research, large copying jobs requiring an outside service, overnight messengers and matter-specific expenses such as deposition transcripts, expert fees, and court costs.

HOGUET NEWMAN
REGAL & KENNEY,LLP

Mr. David Rubin
January 19, 2010
Page 2

We request that you maintain a retainer balance of $25,000 to cover expenses in this matter. Any balance will be returned to you at the end of our representation.

We bill monthly, and payment is due when the bills are rendered.

For your convenience, the wiring instructions for Hoguet Newman Regal & Kenney are as follows:

Bank:                    Signature Bank
                           261 Madison Avenue
                           New York, NY 10016

| | |
|---|---|
| Account Name: | Hoguet Newman Regal & Kenney, LLP |
| Account No.: | 1500230696 |
| ABA#: | 026013576 |
| Attention: | Arlene Eliades |
| Telephone: | 1-646-822-1360 |

### Arbitration and Mediation

Although it does not seem likely, in the event that a disagreement were to arise between us concerning fees, you have the right under New York law to mandatory arbitration of many fee disputes. New York law also encourages mediation of fee disputes. We ask that you agree with us that any fee dispute that may arise between us will be first submitted to non-binding mediation and then, if necessary, to arbitration under the Rules to Facilitate the Mandatory Arbitration of Fee Disputes To Effect the Requirements of 22 N.Y.C.R.R. Part 137, promulgated by the Joint Committee on Fee Disputes and Conciliation of The New York County Lawyers Association, the Bronx County Bar Association and The Association of the Bar of the City of New York. The Rules can be found on The New York County Lawyers Association web site, at www.nycla.org.

If this agreement is satisfactory, please sign the enclosed copy of this letter and return it to me.

Mr. David Rubin
January 19, 2010
Page 3

**HOGUET NEWMAN
REGAL & KENNEY,LLP**

  We are very much looking forward to working with you and, once again, thank you for the opportunity to do so.

Very truly yours,

*John J. Kenney*

John J. Kenney

AGREED:

David Rubin

January 20, 2010
Date:



**HOGUET NEWMAN REGAL & KENNEY,**LLP

One Grand Central Place
60 East 42nd Street, 48th Floor
New York, New York 10165

Tel 212.689.8808
Fax 212.689.5101
www.hnrklaw.com

jkenney@hnrklaw.com

December 20, 2019

<u>VIA E-MAIL</u>

Dan Lowe
Legacy Development
4717 Central Street
Kansas City, Missouri, 64112

**Re:     Retention Letter**

Dear Mr. Lowe,

Thank you for the opportunity to represent you, Venture West Development, LLC ("Venture West"), and Venture West II, LC ("Venture II"), in matters related to *Dan Lowe et al., v. Michael Ebert et al.*, Dallas County, Texas, DC-19-17958, and to provide advice and counsel, as may be required.

Scope of Representation

We will represent you, Venture West, and Venture II in taking the depositions of two Third Party Witnesses, Koch and Collier, in connection with the above matter.

Fees, Expenses and Billing Practices

Our current rate scale is: $825 per hour for my time. The associate who will work on this matter will be Emily Hogan Long, whose rate will be $450, per hour, respectively. We may call

Case 1:21-cv-09058-KPF Document 82-74 Filed 02/05/23 Page 71 of 87

December 20, 2019
Page 2

**HOGUET NEWMAN
REGAL & KENNEY,**LLP

upon other attorneys or paralegals in our firm. We ask that you provide $25,000 as an initial retainer against our time charges.

Payment instructions for payment of the retainer are below.

Bank:          First Republic Bank

               111 Pine Street

               San Francisco, California 94111

Bank phone no:          212-259-3664

Account Name:          Hoguet Newman Regal & Kenney, LLP

Account No:          80007451695

ABA No:          321081669

SWIFT Code:          FRBBUS6S

We do not charge for normal office expenses typically charged by law firms such as secretarial services, in-house copying, telephone charges, and other regular office expenses. We will bill you for third party disbursements at our cost; these typically include large copying jobs and matter-specific expenses such as messengers, transcripts, filing fees, and court costs.

We bill monthly, and payment is due when the bills are rendered.

December 20, 2019
Page 3

HOGUET NEWMAN
REGAL & KENNEY,LLP

### Certain Fee Disputes

Although it does not seem likely, in the event that a disagreement was to arise between us concerning fees, you have the right under New York law to arbitration of certain fee disputes. The New York State Fee Dispute Resolution Program, 22 N.Y.C.R.R. Part 137, provides for the informal and expeditious resolution of fee disputes between attorneys and clients through arbitration. You can find a copy of that program and a downloadable Fee Dispute Brochure on the New York State Unified Court System's website at http://www.nycourts.gov/feedispute.

If this agreement is satisfactory, please sign and return one copy to me.

Thank you again for the opportunity to assist you in this important matter.

Very truly yours,

John J. Kenney

Accepted and Agreed to:

Dan Lowe

Legacy Development

**HOGUET NEWMAN REGAL & KENNEY,LLP**

One Grand Central Place
60 East 42nd Street, 48th Floor
New York, New York 10165

Tel 212.689.8808
Fax 212.689.5101
www.hnrklaw.com

TAX ID #13-3864456

February 12, 2020

Invoice No. 13305

Dan Lowe
VENTURE WEST DEVELOPMENT, LLC
VENTURE WEST II, LC

**RE:** Dan Lowe - Dan Lowe, et al., v. Michael Ebert, et al.
**PROFESSIONAL SERVICES**

| Date | Initials | Description | Hours | Amount |
|------|----------|-------------|-------|--------|
| 01/02/20 | JJK | Preparation for 11:00 am call with Sidley & Austin regarding details for Koch and Colliers subpoenas and depositions. | 1.25 | 1,031.25 |
| 01/02/20 | EH | Reviewed documents from Sidley Austin regarding Koch and Colliers and chronology in preparation for next day's call. | 0.60 | 270.00 |
| 01/02/20 | EH | Meeting with Mr. Kenney to discuss next steps. | 0.10 | 45.00 |
| 01/03/20 | JJK | Preparation and telephone conference with Sidley & Austin and Emily Hogan Long, regarding details of Koch and Colliers subpoenas and depositions. | 2.00 | 1,650.00 |
| 01/03/20 | EH | Call with Mr. Kenney and Mr. Armbruster (Sidley) to discuss factual allegations regarding Koch and Colliers and comments to subpoenas. | 0.50 | 225.00 |
| 01/03/20 | EH | Edited Kansas and Arkansas subpoenas; edited Koch subpoenas to include correct entity. | 1.30 | 585.00 |
| 01/03/20 | EH | Drafted narratives of Union and Promenade deals and identified key outstanding questions. | 2.20 | 990.00 |
| 01/06/20 | JJK | Review subpoenas to Colliers and Koch Industries. Meeting with Emily Hogan Long. | 1.00 | 825.00 |
| 01/06/20 | EH | Revised list of corporate representative topics and | 2.50 | 1,125.00 |

Case 1:21-cv-06028-SVB Document 84-34 Filed 01/05/23 Page 5 of 11

**HOGUET NEWMAN
REGAL & KENNEY,**LLP        Invoice No.     13305     Page 2

| Date | Init | Description | Hours | Amount |
|---|---|---|---|---|
| | | requests for production based on call with Sidley Austin. | | |
| 01/09/20 | EH | Researched Texas e-filing procedures. | 0.80 | 360.00 |
| 01/10/20 | JJK | Telephone conference with Tai Cheng, Barret Armbruster, and Emily Hogan Long. | 0.50 | 412.50 |
| 01/10/20 | JJK | Finalize subpoenas to Colliers and Koch. Meeting with Emily Hogan Long regarding same. Telephone call with Defense Counsel Todd Phillips. | 1.75 | 1,443.75 |
| 01/10/20 | EH | Telephone calls to Dallas County Clerk to confirm deposition subpoena procedure. | 1.00 | 450.00 |
| 01/10/20 | EH | Reviewed Texas, Arkansas and Kansas rules regarding subpoenas and met with Mr. Kenney to discuss the same. | 1.30 | 585.00 |
| 01/10/20 | EH | Call with Sidley Austin (Mr. Cheng and Mr. Armbruster) and Mr. Kenney to discuss potential motion to disqualify. | 0.50 | 225.00 |
| 01/10/20 | EH | Researched Polsinelli and Ed Novak in preparation for potential motion to disqualify. | 0.60 | 270.00 |
| 01/10/20 | EH | Revised and filed deposition subpoenas. | 1.50 | 675.00 |
| 01/13/20 | JJK | Meeting with Emily Hogan Long regarding Dan Lowe interview. Telephone call with Kathy Lowden regarding research on motion to disqualify. | 1.75 | 1,443.75 |
| 01/13/20 | KL | Discuss disqualification issue with Mr. Kenney. Review filings. Legal research regarding disqualification under Texas law. | 2.25 | 1,012.50 |
| 01/13/20 | EH | Met with Mr. Kenney to discuss case strategy. | 0.50 | 225.00 |
| 01/13/20 | EH | Drafted email to Ms. Lowden providing case background and explaining research needed for motion to disqualify. | 0.30 | 135.00 |

**HOGUET NEWMAN
REGAL & KENNEY, LLP**                           Invoice No.            13305            Page 3

| 01/14/20 | JJK | Meeting with Emily Hogan Long regarding subpoenas. Telephone call with Todd Phillips regarding response and follow up. | 1.50 | 1,237.50 |
|---|---|---|---|---|
| 01/14/20 | KL | Legal research and draft memo regarding disqualification under Texas law. | 5.75 | 2,587.50 |
| 01/14/20 | EH | Reviewed letter from Wick Phillips alleging unauthorized practice and drafted response. | 1.50 | 675.00 |
| 01/14/20 | EH | Reviewed and drafted comments on research memorandum from Ms. Lowden regarding attorney disqualification. | 0.60 | 270.00 |
| 01/14/20 | EH | Met with Mr. Kenney to discuss motion to disqualify issue. | 0.20 | 90.00 |
| 01/15/20 | JJK | Prepare for 1/16 meeting regarding deposition outline for Koch/Colliers. Prepare for telephone conference with Kathy Lowden and Emily Hogan Long regarding research on Novak disqualification. | 1.75 | 1,443.75 |
| 01/15/20 | KL | Discuss disqualification issue with Mr. Kenney and Ms. Hogan Long. Legal research and draft memos or emails regarding disqualification under Texas law: Texas Disciplinary Rules; court's power to disqualify attorneys who are not of record; whether an injunction can be issued to disqualify an attorney. | 6.25 | 2,812.50 |
| 01/15/20 | EH | Telephone call with Ms. Lowden and Mr. Kenney to discuss research regarding attorney disqualification and next research questions. | 0.30 | 135.00 |
| 01/15/20 | EH | Reviewed research memo sent by Ms. Lowden regarding attorney disqualification in Texas. | 0.40 | 180.00 |
| 01/15/20 | EH | Drafted summary of Ms. Lowden's research regarding attorney disqualification for Mr. Kenney's review. | 0.20 | 90.00 |
| 01/15/20 | EH | Called Dallas County Clerk's office regarding | 0.50 | 225.00 |

**HOGUET NEWMAN**
**REGAL & KENNEY,** LLP

Invoice No.      13305      Page 4

service of signed subpoenas.

| | | | | |
|---|---|---|---|---|
| 01/16/20 | JJK | Reviewed and revised draft for disqualification motion from Kathy Lowden. Forwarded reviewed draft to Tai Cheng. | 1.00 | 825.00 |
| 01/16/20 | JJK | Travel to Sidley Austin in Dallas, Texas for deposition preparation. | 5.00 | No Charge |
| 01/16/20 | KL | Legal research and draft memo regarding disqualification under Texas law: What must movant show? | 4.00 | 1,800.00 |
| 01/16/20 | EH | Revised pro hac vice motions to include notarized attorney verification. | 0.60 | 270.00 |
| 01/17/20 | JJK | Prepared for meeting with Dan Lowe and Sidley Austin counsel. (Notified by Tai Cheng regarding cancelled meeting with Dan Lowe.) | 1.75 | 1,443.75 |
| 01/17/20 | JJK | Continued review of case file. Meeting with Barret Armbruster at Sidley Austin; notarized Pro Hac Vice affidavit. | 1.50 | 1,237.50 |
| 01/17/20 | JJK | Returned to New York City from deposition prep in Dallas, Texas. | 5.00 | No Charge |
| 01/17/20 | KL | Legal research and draft memo regarding disqualification under Texas law: What must movant show under various disciplinary rules? Draft questions to ask client. | 4.25 | 1,912.50 |
| 01/17/20 | EH | Reviewed pleadings and documents and drafted questions for January 18 call with Mr. Lowe. | 2.80 | 1,260.00 |
| 01/20/20 | JJK | Meeting and emails regarding call to Isaac Smith (Colliers) and his lawyer, Tim Grooms. Email to Tai Cheng regarding same. | 1.50 | 1,237.50 |
| 01/20/20 | EH | Revised Colliers notice of deposition. | 0.50 | 225.00 |
| 01/20/20 | EH | Call with Mr. Kenney regarding serving | 0.20 | 90.00 |

**HOGUET NEWMAN**
**REGAL & KENNEY, LLP**                         Invoice No.        13305            Page 5

| Date | Initials | Description | Hours | Amount |
|------|----------|-------------|-------|--------|
| | | subpoenas. | | |
| 01/21/20 | JJK | Review email discussion of 1/20 email to Tai Cheng regarding strategy. | 0.75 | 618.75 |
| 01/22/20 | JJK | Meeting with Emily Hogan Long regarding Koch and Colliers subpoenas and disqualification motion. | 1.25 | 1,031.25 |
| 01/22/20 | JJK | Research regarding motions to disqualify Polsinelli. | 1.50 | 1,237.50 |
| 01/22/20 | JJK | Telephone Tim Grooms (representing Isaac Smith) for Colliers subpoena. | 0.50 | 412.50 |
| 01/22/20 | JJK | Meeting with Emily Hogan Long regarding Koch and Colliers subpoena, deposition prep, and arrangements. | 0.50 | 412.50 |
| 01/22/20 | JJK | Telephone call with Dan Lowe and Emily Hogan Long regarding status and case background. | 0.50 | 412.50 |
| 01/22/20 | KL | Legal research and draft memo regarding disqualification under Texas law. Review trust agreements, attorney notes, complaint, for evidence of confidential attorney-client relationship. | 2.25 | 1,012.50 |
| 01/22/20 | EH | Call with Mr. Kenney and Mr. Lowe to discuss documents for motion to disqualify. | 0.40 | 180.00 |
| 01/22/20 | EH | Filed notices of depositions and reviewed subpoena packets to be sent to Kansas and Arkansas courts. | 1.00 | 450.00 |
| 01/22/20 | EH | Meeting with Mr. Kenney to discuss case strategy. | 0.90 | 405.00 |
| 01/22/20 | EH | Call with Sidley (Mr. Armbruster) to discuss noticing depositions. | 0.20 | 90.00 |
| 01/23/20 | JJK | Meeting with Emily Hogan Long regarding subpoenas. Meeting with Barret Armbruster | 0.75 | 618.75 |

**HOGUET NEWMAN**
**REGAL & KENNEY,LLP**

**HOGUET NEWMAN**
**REGAL & KENNEY,LLP**                          Invoice No.          13305          Page 6

| | | | | |
|---|---|---|---|---|
| | | regarding same. | | |
| 01/23/20 | JJK | Telephone call with defense counsel regarding dates for Isaac Smith and Koch depositions. Emails with Tim Groom regarding same. | 1.25 | 1,031.25 |
| 01/23/20 | JJK | Reviewed facts and legal issues supporting disqualifications claim. | 2.25 | 1,856.25 |
| 01/23/20 | KL | Motion to disqualify:   Discuss with Mr. Kenney and Ms. Hogan Long; Review emails to and from Mr. Lowe; Review petition and other documents; Legal research regarding standards for disqualification under various disciplinary rules. | 6.50 | 2,925.00 |
| 01/23/20 | EH | Call with Mr. Armbruster and Mr. Kenney to prepare for call with opposing counsel (Mr. Mills). | 0.30 | 135.00 |
| 01/23/20 | EH | Call with Mr. Kenney and opposing counsel (Mr. Mills) to discuss deposition dates; post-call strategy discussion with Mr. Kenney. | 0.80 | 360.00 |
| 01/23/20 | EH | Review of Mr. Lowe's answers to questions regarding motion to disqualify and preparation for depositions. | 0.50 | 225.00 |
| 01/23/20 | EH | Drafted fact sheet and chronology of HNRK's case involvement. | 1.80 | 810.00 |
| 01/23/20 | EH | Exchanged emails with Mr. Lowe regarding list of questions. | 0.20 | 90.00 |
| 01/23/20 | EH | Exchanged emails with Mr. Armbruster regarding relevant agreements. | 0.20 | 90.00 |
| 01/23/20 | EH | Drafted responses to opposing counsel's (Mr. Mills) emails regarding deposition dates. | 0.30 | 135.00 |
| 01/24/20 | JJK | Telephone conference with Jacob Francis (Koch Equity Investments Director) regarding subpoena. | 0.25 | 206.25 |
| 01/24/20 | KL | Legal research and draft brief in support of | 5.50 | 2,475.00 |

**HOGUET NEWMAN**
**REGAL & KENNEY,LLP**

**HOGUET NEWMAN**
**REGAL & KENNEY,LLP**                    Invoice No.        13305        Page 7

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | disqualification. |  |  |
| 01/24/20 | EH | Drafting outline for Isaac Smith's deposition. | 1.70 | 765.00 |
| 01/27/20 | KL | Legal research and draft brief in support of disqualification. | 6.25 | 2,812.50 |
| 01/28/20 | JJK | Respond to Armbruster and Lowe regarding request for status with motion to disqualify, deposition with Isaac Smith, and Colliers/Koch subpoenas. | 1.25 | 1,031.25 |
| 01/28/20 | JJK | Reviewed draft motion to disqualify. Meeting with Emily Hogan Long. | 1.75 | 1,443.75 |
| 01/28/20 | KL | Legal research and draft brief in support of disqualification. Draft Dan Lowe Affidavit. | 6.25 | 2,812.50 |
| 01/28/20 | EH | Reviewed draft of motion to disqualify and provided comments. | 0.60 | 270.00 |
| 01/29/20 | KL | Draft Dan Lowe Affidavit. Draft preliminary statement and facts section for brief in support of disqualification. | 2.75 | 1,237.50 |
| 01/29/20 | EH | Reviewed draft preliminary statement and statement of facts in motion to disqualify and discussed with Mr. Kenney. | 0.50 | 225.00 |
| 01/29/20 | EH | Reviewed documents related to the Promenade in preparation for drafting deposition outline. | 1.00 | 450.00 |
| 01/29/20 | EH | Emailed Mr. Armbruster and Ms. Limbrick regarding Promenade documents. | 0.10 | 45.00 |
| 01/29/20 | EH | Called Isaac Smith's counsel (Mr. Grooms) regarding deposition. | 0.10 | 45.00 |
| 01/30/20 | JJK | Prepare for and telephone call regarding affidavit with Kathleen Lowden. | 1.75 | 1,443.75 |

**HOGUET NEWMAN**
**REGAL & KENNEY,** LLP

| | | | Invoice No. | 13305 | Page 8 |
|---|---|---|---|---|---|

| Date | Atty | Description | Hours | Amount |
|---|---|---|---|---|
| 01/30/20 | JJK | Follow up on Koch subpoena. | 0.50 | 412.50 |
| 01/30/20 | JJK | Telephone call with Tim Grooms regarding Isaac Smith/Colliers deposition. | 0.25 | 206.25 |
| 01/30/20 | KL | Motion to disqualify: Conference call with Mr. Kenney and Mr. Lowe; Revise Lowe affidavit; draft letter from Lowe to Novak; legal research regarding duties of a trust advisor. | 4.75 | 2,137.50 |
| 01/30/20 | EH | Called Koch legal department regarding accepting service and left message. | 0.20 | 90.00 |
| 01/31/20 | JJK | Review draft of motion to disqualify. | 1.75 | 1,443.75 |
| 01/31/20 | JJK | Telephone call with TIm Grooms regarding Isaac Smith's date for deposition. | 0.25 | 206.25 |
| 01/31/20 | KL | Revise Lowe Affidavit, preliminary statement and facts section for brief in support of disqualification. | 1.00 | 450.00 |
| 01/31/20 | EH | Called Koch legal department regarding accepting service and left message. | 0.20 | 90.00 |
| 01/31/20 | EH | Reviewed draft subpoena to KH Investment. | 0.50 | 225.00 |
| | | For professional services rendered | 135.00 | $69,093.75 |

**EXPENSES**

| | |
|---|---|
| Travel Expenses - American Airlines - JJK airfare | 1,327.06 |
| Filing Fees - Sedgwick County District Court - Issuance of Foreign Subpoena Filing Fee | 197.00 |
| Filing Fees - Sedgwick County Sheriff - Issuance of Foreign Subpoena Filing Fee | 15.00 |
| Filing Fees - Clerk of the Circuit Court | 5.00 |
| Filing Fees - Koch Industries | 35.00 |
| Experts - KH Investment Union Dallas, LLC - witness and mileage fees for deposition | 49.20 |
| Taxis and Car Services - from Dallas Fortworth to Ritz Carlton | 44.42 |

**HOGUET NEWMAN**
**REGAL & KENNEY,**LLP          Invoice No.          13305          Page 9

| | | |
|---|---|---|
| Taxis and Car Services - Communicar Inc. Invoice # 166805 - from office to LGA - (Texas) | | 71.25 |
| Hotel Expense - The Ritz Carlton - JJK night stay | | 848.93 |
| | Total costs | $2,592.86 |

## BILLING SUMMARY

| | |
|---|---|
| Professional Services | $69,093.75 |
| Total Expenses | $2,592.86 |
| Less Prepaid Applied | $14,061.25 CR |
| **Total Amount Of This Bill** | **$57,625.36** |
| Previous Balance | $0.00 |
| **Balance Due** | **$57,625.36** |

## TIMEKEEPER SUMMARY

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Kenney, John J | 34.25 | 825.00 | $28,256.25 |
| Hogan Long, Emily | 33.00 | 450.00 | $14,850.00 |
| Lowden, Kathleen | 57.75 | 450.00 | $25,987.50 |



One Grand Central Place
60 East 42nd Street, 48th Floor
New York, New York 10165

Tel  212.689.8808
Fax  212.689.5101
www.hnrklaw.com

TAX ID #13-3864456

March 09, 2020

Invoice No. 13378

Dan Lowe
VENTURE WEST DEVELOPMENT, LLC
VENTURE WEST II, LC

**RE:**  Dan Lowe - Dan Lowe, et al., v. Michael Ebert, et al.
**PROFESSIONAL SERVICES**

| | | | Hours | Amount |
|---|---|---|---|---|
| 02/03/20 | JJK | Meeting with Emily Hogan Long regarding finalizing motions to disqualify. | 0.75 | 618.75 |
| 02/03/20 | EH | Revised draft motion for disqualification. | 3.00 | 1,350.00 |
| 02/04/20 | KL | Review news articles in which Novak was quoted. | 0.25 | 112.50 |
| 02/04/20 | EH | Revised draft motion for disqualification, affidavit, and demand letter. | 3.00 | 1,350.00 |
| 02/05/20 | JJK | Reviewed and revised Affidavit, Memorandum of Law and HNRK letter to Polsinelli. | 4.50 | 3,712.50 |
| 02/07/20 | JJK | Finalize motion to disqualify affidavit and demand letter to Polsinelli. | 5.00 | 4,125.00 |
| 02/07/20 | KL | Review letter to Novak.   Review and revise Memorandum of Law and Lowe Affidavit.   Legal research and draft email regarding whether Texas Rules of Professional Conduct apply. | 2.50 | 1,125.00 |
| 02/07/20 | EH | Revised draft affidavit and circulated it to John Kenney for his review. | 0.30 | 135.00 |
| 02/07/20 | EH | Meeting with John Kenney to discuss mediation and letter to Polsinelli. | 0.80 | 360.00 |
| 02/07/20 | EH | Revised the motion to disqualify motion, affidavit, | 5.00 | 2,250.00 |

**HOGUET NEWMAN
REGAL & KENNEY,LLP**                            Invoice No.        13378         Page 2

and demand letter.

| 02/08/20 | JJK | Exchange of information with Chase Simmons regarding demand letter. | 0.75 | 618.75 |
|---|---|---|---|---|
| 02/08/20 | KL | Review and revise Memorandum of Law and Lowe Affidavit. | 0.75 | 337.50 |
| 02/10/20 | JJK | Telephone call with Tim Grooms regarding Isaac Smith's deposition and follow up. | 0.50 | 412.50 |
| 02/10/20 | KL | Legal research and draft email regarding whether Texas Rules of Professional Conduct apply to out of state attorney. | 0.50 | 225.00 |
| 02/10/20 | EH | Edited draft motion to disqualify and affidavit. | 1.00 | 450.00 |
| 02/10/20 | EH | Reviewed initial document production from Sidley for hot documents regarding Colliers. | 2.00 | 900.00 |
| 02/11/20 | JJK | Various emails with Dan Lowe and team. Telephone call with Emily Hogan Long. | 1.25 | 1,031.25 |
| 02/11/20 | EH | Meetings with Mr. Kenney to discuss updates to motion to disqualify and subpoenas. | 2.00 | 900.00 |
| 02/11/20 | EH | Telephone call with Mr. Cheng and Mr. Kenney to discuss motion to disqualify strategy. | 0.30 | 135.00 |
| 02/12/20 | JJK | Circulated final draft for comment and discussion. | 0.25 | 206.25 |
| 02/13/20 | JJK | Telephone call with Barret Armbruster regarding Mediators and status of discovery. | 0.50 | 412.50 |
| 02/18/20 | JJK | Various emails regarding Polsinelli and mediation. | 1.25 | 1,031.25 |
| 02/18/20 | JJK | Email updating Tai Cheng. | 0.25 | 206.25 |
| 02/18/20 | JJK | Telephone call with Kathy Lowden regarding new issue and motion to disqualify. | 1.00 | 825.00 |

**HOGUET NEWMAN**
**REGAL & KENNEY,LLP**          Invoice No.          13378          Page 3

| 02/18/20 | KL | Legal research and draft memo regarding waiver of right to move to disqualify; discuss issue with Mr. Kenney. | 6.75 | 3,037.50 |
|----------|-----|------|------|------|
| 02/19/20 | JJK | Various telephone calls regarding Isaac Smith and Koch depositions. | 2.00 | 1,650.00 |
| 02/19/20 | JJK | Telephone call with Kristin Westgard regarding Koch Industries subpoena and rescheduling date of deposition. | 2.25 | 1,856.25 |
| 02/19/20 | JJK | Agreement on Koch deposition scheduling. Email regarding same. | 1.25 | 1,031.25 |
| 02/19/20 | JJK | Telephone call with Tai Cheng regarding motion to disqualify. | 0.50 | 412.50 |
| 02/19/20 | EH | Telephone conference and email correspondence with Mr. Krywko (Koch) and Mr. Durst (Baker Botts) to plan for upcoming deposition. | 0.80 | 360.00 |
| 02/20/20 | JJK | Update client and Counsel regarding Isaac Smith and Koch subpoenas. | 1.25 | 1,031.25 |
| 02/20/20 | EH | Continued reviewing discovery from RED for hot documents related to Colliers. | 1.00 | 450.00 |
| 02/21/20 | KL | Review and revise Memorandum of Law and Lowe Affidavit. | 0.50 | 225.00 |
| 02/21/20 | EH | Revised motion to disqualify and affidavit. | 1.50 | 675.00 |
| 02/21/20 | ALR | Cite checked the Memorandum of Law in support of Plaintiffs' motion to disqualify. | 3.00 | 525.00 |
| 02/24/20 | JJK | Meeting with Emily Hogan Long regarding draft memorandum of law to be sent to Doug Laird and Polsinelli firm. Draft Letter to Mr. Laird. | 1.50 | 1,237.50 |
| 02/24/20 | EH | Edited draft motion for disqualification and drafted cover email to Mr. Laird (GC of Polsinelli). | 1.00 | 450.00 |

Case 8:21-cv-00248-MSS Document 823-44 Filed 10/25/23 Page 465 of 87

**HOGUET NEWMAN
REGAL & KENNEY,LLP**

| | | | Invoice No. | 13378 | Page 4 |
|---|---|---|---|---|---|
| 02/24/20 | EH | Reviewed transcripts of depositions of RED executives (Mr. Heron and Mr. Ebert). | | 1.50 | 675.00 |
| 02/24/20 | EH | Updated case chronologies. | | 1.30 | 585.00 |
| 02/24/20 | ALR | Input cite checking edits for the Memorandum of Law in support of Plaintiffs' motion to disqualify. | | 1.00 | 175.00 |
| 02/25/20 | JJK | Meeting with Emily Hogan Long regarding deposition prep for Isaac Smith and Koch. | | 0.75 | 618.75 |
| 02/25/20 | EH | Began drafting chronology of the Promenade transaction in preparation for Isaac Smith's deposition. | | 2.00 | 900.00 |
| 02/25/20 | EH | Meeting with Mr. Kenney to plan and prepare for Smith deposition. | | 0.30 | 135.00 |
| 02/26/20 | JJK | Meeting with Emily Hogan Long regarding letter to Doug Laird. | | 0.25 | 206.25 |
| 02/26/20 | EH | Continued drafting Promenade transaction chronology. | | 0.50 | 225.00 |
| 02/26/20 | EH | Email correspondce with Mr. Grooms (Isaac Smith's counsel) regarding hot documents and upcoming deposition. | | 0.40 | 180.00 |
| 02/26/20 | EH | Meeting with Mr. Kenney to discuss preparing for depositions. | | 0.30 | 135.00 |
| 02/27/20 | JJK | Meeting with Emily Hogan Long regarding Koch Document subpoena and telephone conference with Tim Durst at Baker Botts. | | 1.25 | 1,031.25 |
| 02/27/20 | JJK | Reviewed document request in Koch subpoena in preparation for Baker Botts conference. | | 0.75 | 618.75 |
| 02/27/20 | JJK | Meeting with Emily Hogan Long regarding Isaac Smith preparation for deposition. | | 0.75 | 618.75 |
| 02/27/20 | EH | Meeting with Mr. Kenney to plan and prepare for | | 0.30 | 135.00 |

**HOGUET NEWMAN
REGAL & KENNEY,** LLP                        Invoice No.          13378          Page 5

call with KH Investment.

| Date | | Description | Hours | Amount |
|------|------|-------------|-------|--------|
| 02/27/20 | EH | Reviewed documents requests to KH Investment in preparation for call with their counsel. | 1.00 | 450.00 |
| 02/28/20 | JJK | Prepare for call with Tim Durst - Baker Botts regarding Koch subpoena. | 1.25 | 1,031.25 |
| 02/28/20 | JJK | Email to Tai Cheng, Dan Lowe, and others regarding status of Koch subpoena and Isaac Smith subpoena and motion to disqualify Polsinelli. | 1.75 | 1,443.75 |
| 02/28/20 | JJK | Prepare for Durst call regarding Koch document request. | 1.25 | 1,031.25 |

For professional services rendered          77.30          $45,966.25

**EXPENSES**

| Description | Amount |
|-------------|--------|
| Federal Express - Invoice # 6-929-50360 - delivery date 1/22/2020 - sent to Clerk of District Court, Sedgwick County Courthouse - delivery date 1/23/2020 | 61.57 |
| Federal Express - Invoice # 6-929-50360 - delivery date 1/22/2020 - sent to Pulaski County Courthouse - delivery date 1/23/2020 | 38.13 |
| Federal Express - Invoice # 6-929-50360 - delivery date 1/28/2020 - sent to Colliers International - delivery date 1/29/2020 | 37.95 |
| Federal Express - Invoice # 6-929-50360 - delivery date 1/31/2020 - sent to Sedgwick County Courthouse - delivery date 2/3/2020 | 37.95 |
| Federal Express - Invoice # 6-929-50360 - delivery date 2/7/2020 - sent to Edward F. Novak, Esq. - delivery date 2/10/2020 | 79.96 |
| Federal Express - Invoice # 6-929-50360 - delivery date 2/7/2020 - sent to Chase Simmons, Esq. - delivery date 2/10/2020 | 73.47 |
| Federal Express - Invoice # 6-929-50360 - delivery date 2/10/2020 - sent to KH Investment Union Dallas - delivery date 2/11/2020 | 72.95 |

**HOGUET NEWMAN**
**REGAL & KENNEY,**LLP

| | | | |
|---|---|---|---|
| | Invoice No. | 13378 | Page 6 |
| | Total costs | | $401.98 |

## BILLING SUMMARY

| | |
|---|---|
| Professional Services | $45,966.25 |
| Total Expenses | $401.98 |
| | _____ |
| **Total Amount Of This Bill** | **$46,368.23** |
| Previous Balance | $57,625.36 |
| Payments Applied | $12,522.00 |
| | _____ |
| **Balance Due** | **$91,471.59** |

## TIMEKEEPER SUMMARY

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Kenney, John J | 32.75 | 825.00 | $27,018.75 |
| Hogan Long, Emily | 29.30 | 450.00 | $13,185.00 |
| Lowden, Kathleen | 11.25 | 450.00 | $5,062.50 |
| Rubio, Anna L | 4.00 | 175.00 | $700.00 |