BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

MARY BETH MONTERA,
individually and on behalf of all others
similarly situated,

Plaintiff,

v.

PREMIER NUTRITION
CORPORATION f/k/a JOINT JUICE,
INC.,

Premier.

Case No. 3:16-CV-06980 RS

**DECLARATION OF RICHARD M. PEARL IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION FOR AWARD OF ATTORNEYS' FEES, AND REIMBURSEMENT OF NONTAXED EXPENSES**

**CLASS ACTION**

Date:           June 29, 2023
Time:          1:30 p.m.
Judge:         Honorable Richard Seeborg
Courtroom:  Courtroom 3, 17th Floor

Complaint Filed:  December 5, 2016
Trial Date:          May 23, 2022

00203133

DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

I, Richard M. Pearl, declare:

1.     I am an attorney at law licensed and duly admitted to practice before all the California State and federal courts. In this case, I have been retained by Plaintiff's Counsel to express my expert opinion regarding the reasonableness of the attorneys' fees that Plaintiff's Counsel are requesting in this matter. If called as a witness, I could and would competently testify to the following:

2.     I am a member in good standing of the California State Bar. I am in private practice as the principal of my own law firm, the Law Offices of Richard M. Pearl, in Berkeley, California. My practice almost exclusively involves issues related to the subject of attorneys' fees, including the representation of parties in fee litigation and appeals, consultation and expert witness services, and the mediation and arbitration of disputes concerning attorneys' fees and related issues.

3.     Briefly summarized, my background is as follows: I am a 1969 graduate of Boalt Hall School of Law (now Berkeley Law). I took the California Bar Examination in August 1969 and passed it in November of that year, but because I was working as an attorney in Atlanta, Georgia for the Legal Aid Society of Atlanta (LASA), I was not admitted to the California Bar until February 1970. I worked for LASA until the summer of 1971, when I went to work in California's Central Valley for California Rural Legal Assistance, Inc. (CRLA), a statewide legal services program. From 1977 to 1982, I was CRLA's Director of Litigation, supervising more than fifty attorneys. In 1982, 1 went into private practice, first in a small law firm, then as a sole practitioner. Martindale Hubbell rates my law firm "AV." I also have been selected as a Northern California "Super Lawyer" in Appellate Law for 2005, 2006, 2007, 2008, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 25 2021, 2022, and 2023. A copy of my Resume is attached hereto as **Exhibit A**.

4.     Since 1982, my practice has been a general civil litigation and appellate practice, with an emphasis on cases and appeals involving court-awarded attorneys' fees. I have lectured and written extensively on court-awarded attorneys' fees. I have

1                           Case No. 3:16-cv-06980-RS

been a member of the California State Bar's Attorneys' Fees Task Force and have testified before the State Bar Board of Governors and the California Legislature on attorneys' fee issues. I am the author of *California Attorney Fee Awards* (3d ed Cal. CEB 2010) and its 2011- 2023 annual Supplements. I also was the author of *California Attorney Fee Awards*, 2d Ed. (Calif. Cont. Ed. of Bar 1994), and its 1995 - 2008 annual Supplements. I also authored the 1984 -1993 annual Supplements to its predecessor, CEB's California Attorney's Fees Award Practice. In addition, I authored a federal manual on attorneys' fees entitled Attorneys' Fees: A Legal Services Practice Manual, published by the Legal Services Corporation. I also co-authored the chapter on "Attorney Fees" in Volume 2 of CEB's Wrongful Employment Termination Practice, 2d Ed. (1997).

5.    The California courts have repeatedly referred to my CEB attorney fee treatise as "[t]he leading California attorney fee treatise." *Calvo Fisher & Jacob LLP v. Lujan*, 234 Cal.App.4th 608, 621 (2015). *See also Int'l Billing Servs., Inc. v. Emigh*, 84 Cal.App.4th 1175, 1193 (2000) ("the leading treatise"); *Orozco v. WPV San Jose, LLC*, 36 Cal.App.5th 375, 409 (2019) ("a leading treatise on California attorney's fees"). My treatise has also been cited by the California Supreme Court and Court of Appeal on many occasions. *See, e.g., Graham v. DaimlerChrylser Corp.,* 34 Cal.4th 553, 576, 584 (2004); *Lolley v. Campbell*, 28 Cal. 4th 367, 373 (2002); *In re Conservatorship of Whitley*, 50 Cal.4th 1206, 1214-15, 1217 (2010)); *Yost v. Forestiere*, 51 Cal.App.5th 509, 530 n. 8 (2020); *Doe v. Regents of Univ. of California*, 51 Cal.App.5th 531, 547 (2020); *Highland Springs Conference & Training Ctr. v. City of Banning*, 42 Cal.App.5th 416, 428 n. 11 (2019); *Orozco v. WPV San Jose, LLC*, 36 Cal.App.5th 375, 409 (2019); *Sweetwater Union High Sch. Dist. v. Julian Union Elementary Sch. Dist.,* 36 Cal.App.5th 970, 988 (2019); *Hardie v. Nationstar Mortg. LLC*, 32 Cal. App. 5th 714, 720 (2019); *Stratton v. Beck*, 30 Cal.App.5th 901, 911 (2018); *Syers Props III, Inc. v. Rankin*, 226 Cal.App.4th 691, 698, 700 (2014). California Superior Courts also cite the treatise with approval. *See*,

*e.g.*, *Kaku v. City of Santa Clara*, No. 17CV319862, 2019 WL 331053, at *3 (Santa Clara Cty. Super. Ct. Jan. 22, 2019), *aff'd* 59 Cal.App.5th 385, 431 (2020); *Davis v. St. Jude Hosp.*, No. 30201200602596CUOECX, 2018 WL 7286170, at *4 (Orange Cty. Super. Ct. Aug. 31, 2018); *Hartshorne v. Metlife, Inc.,* No. BC576608, 2017 WL 1836635, at *10 (Los Angeles Super. Ct. May 02, 2017). Federal courts also have cited it. *See In re Hurtado*, No. 09-16160-A-13, 2015 WL 6941127 (E.D. Cal. Nov. 6, 2015); *TruGreen Companies LLC v. Mower Brothers, Inc.,* 953 F.Supp.2d 1223, 1236 nn.50, 51 (D. Utah 2013).

6. Currently, nearly my entire practice is devoted to issues involving attorneys' fees in all their forms – statutory, contractual, equitable, as damages, and to a more limited extent, attorney-client disputes. As an advocate, I have been counsel of record in over 200 attorneys' fee applications in state and federal courts, primarily representing other attorneys. I also have briefed and argued more than 40 appeals, at least 30 of which have involved attorneys' fees issues. In that role, I have successfully handled five cases in the California Supreme Court involving court-awarded attorneys' fees: (1) *Maria P. v. Riles*, 43 Cal. 3d 1281 (1987), which upheld a C.C.P. section 1021.5 fee award based on a preliminary injunction obtained against the State Superintendent of Education, despite the fact that the case ultimately was dismissed under C.C.P. section 583; (2) *Delaney v. Baker*, 20 Cal. 4th 23 (1999), which held that heightened remedies, including attorneys' fees, are available in suits against nursing homes under California's Elder Abuse Act; (3) *Ketchum v. Moses*, 24 Cal. 4th 1122 (2001), which held, *inter alia*, that contingent risk multipliers remain available under California attorney fee law, despite the United States Supreme Court's contrary ruling on federal law (in *Ketchum*, I was primary appellate counsel in the Court of Appeal and "second chair" in the Supreme Court); (4) *Flannery v. Prentice*, 26 Cal. 4th 572 (2001), which held that in the absence of an agreement to the contrary, statutory attorneys' fees belong to the attorney whose services they are based upon; and (5) *Graham v. DaimlerChrysler Corp*., 34 Cal. 4th 553 (2004), which I handled,

along with trial counsel, in both the Court of Appeal and Supreme Court. I also represented and argued on behalf of amicus curiae in *Conservatorship of McQueen*, 59 Cal. 4th 602 (2014), presenting the argument relied upon by the Court. Along with the Western Center on Law and Poverty, I also prepared and filed an *amicus curiae* brief in *Vasquez v. State of California*, 45 Cal. 4th 243 (2009). I also have handled numerous other appeals involving attorneys' fees, including: *Davis v. City & County of San Francisco*, 976 F. 2d 1536 (9th Cir. 1992); *Mangold v. CPUC*, 67 F. 3d 1470 (9th Cir. 1995); *Velez v. Wynne*, 2007 U.S. App. LEXIS 2194 (9th Cir. 2007); *Camacho v. Bridgeport Financial, Inc.*, 523 F. 3d 973 (9th Cir. 2008); *Center for Biological Diversity v. County of San Bernardino*, 185 Cal. App. 4th 866 (2010); *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection et al.*, 190 Cal. App. 4th 217 (2010); and *Heron Bay Home Owners Assn. v. City of San Leandro*, 19 Cal. App. 5th 376 (2018). For an expanded list of my appellate decisions, *see* Exhibit A, pages 4-8.

7. In addition to fees-related advocacy at the trial and appellate levels, I frequently serve as an expert witness on attorneys' fee issues, and numerous courts and arbitrators have cited my testimony on fee issues favorably. In federal forums, *see*, *e.g.*:

- *Wit v. United Behav. Health*, 578 F.Supp.3d 1060, 1079 (N.D. Cal. Jan. 5, 2022) (an ERISA case, in which the Court stated that "the Court places significant weight on Pearl's opinion that the rates charged by all of the timekeepers listed above are reasonable and 'in line with the standard hourly noncontingent rates charged by Bay Area law firms that regularly engage in civil litigation of comparable complexity.'… Pearl has extensive experience in the area of attorney billing rates in this district and has been widely relied upon by both federal and state courts in Northern California (including the undersigned) in determining reasonable billing rates." (Citations omitted).

- *Human Rights Defense Center v. County of Napa*, 2021 U.S. Dist. LEXIS 59778, at *32, 2021 WL 1176640, 20-cv-01296-JCS (N.D. Cal. March 28, 2021) ("Mr. Pearl has extensive experience in the area of attorney billing rates in this district and has been widely relied upon by both federal and state courts").

- *Andrews v. Equinox Holdings, Inc*., N.D. Cal. No. 20-cv-00485-SK (November 9, 2021) ("Court similarly finds Pearl's opinions well supported and persuasive").

- *Prison Legal News v. Ryan* (9th Cir. 2023) No. 19-17449, Order filed March 21, 2023, at 4.

- *Antoninetti v. Chipotle Mexican Grill, Inc*., No. 08-55867 (9th Cir. 2012), Order filed Dec. 26, 2012, at 6.

- *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (the expert declaration referred to is mine).

- *Roe v. SFBSC Mgmt., LLC*, 2022 U.S.Dist. LEXIS 215122 (N. D. Cal. Nov. 29, 2022).

- *Independent Living Center of S. Cal. v. Kent*, 2020 U.S.Dist. LEXIS 13019 (C.D. Cal. 2020).

- *Ridgeway v. Wal-Mart Stores, Inc.,* 269 F. Supp. 3d 975 (N.D. Cal. 2017), *aff'd* 269 F.3d 1066 (9th Cir. 2020).

- *Beaver v. Tarsadia Hotels*, 2017 U.S.Dist. LEXIS 160214 (S.D. Cal. 2017).

- *Notter v. City of Pleasant Hill*, 2017 U.S.Dist. LEXIS 197404, 2017 WL 5972698 (N.D. Cal. 2017).

- *Villalpondo v. Exel Direct, Inc.*, 2016 WL 1598663 (N.D. Cal. 2016).

- *State Compensation Insurance Fund v. Khan et al*., Case No. SACV 12-01072-CJC(JCGx) (C.D. Cal.), Order Granting in Part and Denying in

00203133    DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

Part the Zaks Premiers' Motion for Attorneys' Fees, filed July 6, 2016 (Dkt. No. 408).

- *In re Cathode Ray Tube Antitrust Litig.*, Master File No. 3:07-cv-5944 JST, MDL No. 1917 (N.D. Cal. 2016) 2016 U.S. Dist. LEXIS 24951 (Report And Recommendation Of Special Master Re Motions (1) To Approve Indirect Purchaser Plaintiffs' Settlements With the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, And Technologies Displays Americas Premiers, and (2) For Award Of Attorneys' Fees, Reimbursement Of Litigation Expenses, And Incentive Awards To Class Representative), Dkt. 4351, dated January 28, 2016, *adopted in relevant part*, 2016 U.S. Dist. LEXIS 88665.

- *Gutierrez v. Wells Fargo Bank*, 2015 U.S. Dist. LEXIS 67298 (N.D. Cal. 2015).

- *Holman v. Experian Information Solutions, Inc.*, 2014 U.S. Dist. LEXIS 173698 (N.D. Cal. 2014).

- *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, MDL No. 1827 (N.D. Cal.), Report and Recommendation of Special Master Re Motions for Attorneys' Fees And Other Amounts By Indirect-Purchaser Class Plaintiffs And State Attorneys General, Dkt. 7127, filed Nov. 9, 2012, *adopted in relevant part*, 2013 U.S. Dist. LEXIS 49885 (N.D. Cal. 2013).

- *Walsh v. Kindred Healthcare*, 2013 U.S. Dist. LEXIS 176319 (N.D. Cal. 2013).

- *A.D. v. California Highway Patrol*, 2009 U.S. Dist. LEXIS 110743, at *4 (N.D. Cal. 2009), *rev'd on other grounds*, 712 F.3d 446 (9th Cir. 2013), *reaffirmed and additional fees awarded on remand*, 2013 U.S. Dist. LEXIS 169275 (N.D. Cal. 2013).

- *Hajro v. United States Citizenship & Immigration Service*, 900 F. Supp. 2d 1034, 1054 (N.D. Cal. 2012).

- *Rosenfeld v. United States Dep't of Justice*, 904 F. Supp. 2d 988, 1002 (N.D. Cal. 2012).

- *Stonebrae, L.P. v. Toll Bros., Inc.,* 2011 U.S. Dist. LEXIS 39832, at *9 (N.D. Cal. 2011) (thorough discussion), *aff'd* 2013 U.S. App. LEXIS 6369 (9th Cir. 2013).

- *Armstrong v. Brown*, 2011 U.S. Dist. LEXIS 87428 (N.D. Cal. 2011).

- *Lira v. Cate*, 2010 WL 727979 (N.D. Cal. 2010).

- *Californians for Disability Rights, Inc. v. California Dep't of Transportation*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010).

- *Nat'l Federation of the Blind v. Target Corp.*, 2009 U.S. Dist. LEXIS 67139 (N.D. Cal. 2009).

- *Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095 (N.D. Cal. 2008).

- *Bancroft v. Trizechahn Corp.*, No. CV 02-2373 SVW (FMOx), Dkt. 278 (C.D. Cal. Aug. 14, 2006).

- *Willoughby v. DT Credit Corp.*, No. CV 05-05907 MMM (CWx), Dkt. 65 (C.D. Cal. July 17, 2006).

- *Oberfelder v. City of Petaluma*, 2002 U.S. Dist. LEXIS 8635 (N.D. Cal. 2002), *aff'd* 2003 U.S. App. LEXIS 11371 (9th Cir. 2003).

8.   My testimony also has been cited favorably in several reported California state court decisions, including:

- *Sonoma Land Trust v. Thompson*, 63 Cal.App.5th 978, 986 (2021).

- *Wood v. Los Angeles Comity Waterworks Dist. No. 40* (Antelope Valley Groundwater Cases), 2021 Cal.App. Unpub. LEXIS 5506 (2021).

- *Kerkeles v. City of San Jose*, 243 Cal.App.4th 88 (2015).

00203133

- *Habitat and Watershed Caretakers v. City of Santa Cruz*, 2015 Cal. App. Unpub. LEXIS 7156 (2015).

- *Laffitte v. Robert Half Int'l Inc.*, 231 Cal.App.4th 860 (2014), *aff'd* (2016) 1 Cal.5th 480.

- *In re Tobacco Cases I*, 216 Cal.App.4th 570 (2013).

- *Heritage Pacific Financial, LLC v. Monroy*, 215 Cal.App.4th 972, 1009 (2013).

- *Wilkinson v. South City Ford*, 2010 Cal. App. Unpub. LEXIS 8680 (2010).

- *Children's Hospital & Medical Center v. Bonta*, 97 Cal.App.4th 740 (2002).

- *Church of Scientology v. Wollersheim*, 42 Cal.App.4th 628 (1996).

- *Kaku v. City of Santa Clara*, No. 17CV319862, 2019 WL 331053, at *3 (Santa Clara Cty. Super. Ct. Jan. 22, 2019), *aff'd* 59 Cal.App.5th 385, 431 (2020).

- *Davis v. St. Jude Hosp.*, No. 30201200602596CUOECX, 2018 WL 7286170, at *4 (Orange Cty. Super. Ct. Aug. 31, 2018).

- *Hartshorne v. Metlife, Inc.*, No. BC576608, 2017 WL 1836635, at *10 (Los Angeles Super. Ct. May 2, 2017).

These are just some examples. Many other trial courts and arbitrators also have relied on my testimony in unreported fee awards.

## A Summary of My Opinion

9.     In this case, I have been asked by Plaintiff's Counsel to express my opinion as to the reasonableness of the attorneys' fees they are requesting be awarded, and to address the objections to Plaintiff's requested fee award presented in Premier's Opposition, especially those presented by Steven A. Tasher, Premier's fee expert.

10.    Having reviewed Plaintiff's fee motion and Premier's Opposition, including the declaration of Tasher dated May 4, 2023, as well as various merits

8                                      Case No. 3:16-cv-06980-RS

pleadings and orders, and based on my extensive experience and expertise on similar matters, it is my opinion that the attorneys' fees and expenses requested by Plaintiffs' Counsel for their highly successful work in this are reasonable when measured against the extensive record they have presented and the applicable legal standards.

11.     In support of that opinion, I first address the very limited issues Premier and Tasher have raised regarding Counsel's requested rates. I then address the various complaints Premier and Tasher have raised regarding the well-documented hours for which Plaintiff's Counsel request compensation, including Premier's shopworn challenges to Counsel's timekeeping practices and efficiency, as well as their claim that Counsel should only be compensated for 1/11th of their work. Next, I briefly address Counsel's alternative request for a very modest lodestar multiplier in the event any part of their lodestar request is denied. I will then briefly address challenges to Counsel's claimed expenses. Finally, I address Mr. Tasher's previous opinions in other cases and how they undermine the opinions he provides in this matter.

### Tasher's Substantive Opinions

12.     Initially, Premier and Mr. Tasher's opinion that Plaintiff's Counsel should recover only 29% of their documented lodestar is at heart irreconcilable with this Court's prior fee Order that "it would be patently unreasonable to award Plaintiff's counsel less than half of their proffered lodestar amount" (ECF No. 320 at 6).

13.     Moreover, in my opinion, the justifications Premier and Tasher propose for such a drastic reduction are seriously flawed both in terms of their reliance on inapplicable legal standards and their lack of evidentiary support in the record, which I now address.

### **Counsel's Hourly Rates**

14.     In my opinion, the hourly rates requested by Plaintiff's Counsel here are squarely in line with the 2022 hourly rates charged and awarded for comparable services by comparably qualified attorneys and paralegals in the San Francisco Bay

00203133

Area legal marketplace. See *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ("requested hourly rates" reasonable if they are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."). Indeed, Counsel's requested rates are particularly reasonable given that statutory attorneys' fees are customarily based on current rates (*see*, *e.g.. Davis*, 976 F.2d at 1548) whereas Plaintiff's Counsel here have exercised billing judgment by basing their request on their *2022* rates, not their current 2023 rates. That is a considerable reduction. The available evidence shows that Bay Area law firms (and indeed, throughout the country) have increased their rates in 2023 by between 5-10% to reflect market conditions and the unusually high rate of inflation in 2022. *See* Bloomberg Law (Bureau of National Affairs, Inc.), "Rising Rates Are Law Firms' Salve as Layoffs and Pay Cuts Surge" (Jan. 19, 2023) (new 2023 hourly rates for some commercial firms reflect averaged increases over 2022 rates of 10%).[1]

15.    In this case, Tasher's only challenge to Counsel's hourly rates concern associate attorney Craig Staub, a 2007 Bar Admittee, and in particular, his hourly billing rate before he became an associate at BHO in August 2018. Tasher claims, however, all Mr. Staub's time should be compensated as a "contract attorney" because some of his time was devoted to document review. As Mr. O'Reardon explains, however, his actual role at all times went far beyond that of a contract attorney assigned to document review. O'Reardon Reply Decl., ¶ 28. Nonetheless, BHO has voluntarily reduced his pre-August 2018 rate to $240 per hour. *Id.*

---

[1]    *See also Planned Parenthood Federation of America, Inc. v. Center for Medical Progress,* 2020 U.S. Dist. LEXIS 241035, at 13 (N.D. Cal. Dec. 22, 2020) (applying 25% rate increase for period from 2016 to 2020); "*What We're Watching – Alarming Rates?*", Law.Com Morning Minute, Jan. 25, 2022 (rates rose 4% in 2021 and likely to rise "as much or more" in 2022); *Aggressive Billing Rate Increases Appear Likely, but Can Clients Stomach It?* Maloney, The American Lawyer (Jan. 24, 2022) (rates rose "nearly 4%" in 2021; Simons, *Big Law Should Raise Partner Billing Rates 10+ Percent Now*, The Recorder (Nov. 15, 2018) at 3 ("In a normal year, partner rates would go up around 5 or 6 percent").

00203133

16.    Moreover, his $575 hourly rate is well below the rates charged by the great majority of attorneys with comparable experience and responsibility. For example, the 2021 Real Rate Report by Wolters Kluwer, excerpts of which are attached hereto as **Exhibit B,** describes at page 22 the 2021 rates charged by 150 San Francisco partners and 108 associates who practiced "Litigation." For that category, the 2021 litigation hourly rate for the Third Quartile of surveyed attorneys was $961 per hour for partners and $628 per hour for associates, and rates have increased substantially since then. The rate for Mr. Straub is patently "in line with" these surveyed rates.

17.    Relatedly, Tasher objects that BHO failed to bill Mr. Straub's hours "at a real contract attorney rate," which he suggests is generally in the $50 per hour range for "first-level document review" when reviewers "flag documents of interest for a more 'core' team to review." As Mr. O'Reardon explains, BHO does not conduct first-level document review. O'Reardon Reply Decl., ¶ 28. In my experience, that is generally true of smaller plaintiffs'-side firms. This is because plaintiffs are more often the recipients of documents and not the party needing to cull a larger universe of potentially responsive documents (but mainly irrelevant documents) for production. Given that the documents have already been reviewed for responsiveness and relevance by the time they are received by the plaintiff, it would often be inefficient and wasteful to conduct "first-level document review." Instead, as was part of Mr. Straub's role in this case, for plaintiff's counsel the first review is actually done by the "core team" and used in connection with depositions and motion practice.

18.    Further, Tasher's challenge is directly at odds with the actual practice in the San Francisco legal community. In my experience, the great majority of Bay Area law firms employing contract attorneys bill for their services at market rates for that work, not at the firm's cost. *See*, *e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 2018 U.S. Dist. LEXIS 140137, at *127-29, 133 (N.D. Cal. Aug. 17, 2018) (rejecting any "rule that contract [] attorneys must be billed at cost," "recogniz[ing] that counsel may

be entitled to a reasonable markup," and approving $240.00/hour because it was a "rate [that] has been previously judicially approved in this district"); *Nevarez v. Forty Niners Football Co., LLC*, 474 F. Supp. 3d 1041, 1050 (N.D. Cal. 2020) (same). Indeed, in my experience, many litigation firms charge significantly more than the $240 rate approved five years ago in the *Anthem* case but still charged here.

## Tasher's Objections to Counsel's Hours Lack Merit

19.    From a macro viewpoint, it is my opinion that, with some minor exceptions that Plaintiff's Counsel have acknowledged, the number of hours for which Counsel request compensation appears to be both well-documented and appropriate for a case of this great length, complexity, intensity, and successful result. It is my understanding that throughout the 9+-year history of this case, it has been strenuously opposed by Premier and vigorously litigated. The result has been extensive discovery including 49 depositions and over 500,000 pages of documents produced by Premier, law and motion practice including at class certification and summary judgment, the designation of 12 experts who exchanged 20 opening and rebuttal FRCP 26 reports, a heavily contested nine-day jury trial with testimony from six experts, followed by extensive post-trial briefing, and vigorously contested post-trial proceedings that are now on cross-appeal at the Ninth Circuit. In my opinion, any certified class action case that is so vigorously litigated for more than nine years against a well-funded defendant like Premier and results in highly successful "full refund" relief is, by any reasonable measure, extremely complex and difficult litigation requiring an efficient and effective team of experienced attorneys to achieve such an excellent result. By all accounts, that is what Plaintiff's Counsel's team of highly-experienced class action lawyers accomplished here.

20.    The proper standard for determining whether to compensate the time spent by counsel is whether "the hours billed were truly the result of advocacy *reasonably calculated to advance the [client's] interests* as opposed to those of [the client's] lawyers,..." *Irvine Unified School Dist. v. K. G.*, 853 F.3d 1087, 1095 (9th

Cir. 2017). Tasher suggests, however, that attorneys working on a contingent fee basis in cases like this one are unconstrained by the oversight that a fee-paying might provide (at ¶ 39), but that view has been firmly rejected by many courts. As the Ninth Circuit has recognized:

> "It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

21. In my opinion, nothing in this record or in Premier's opposition supports a finding that any of the Class Counsel's efforts were undertaken for any reason other than to advance the Plaintiff's interests. To the contrary, Premier and Tasher present little in the way of supportable objections. Their large, percentage-based reductions are unsupported by either the record or the case law. The more specific objections present only shopworn claims raised in virtually every fee opposition: that Plaintiff's employed too many attorneys, that too much work was performed by partner-level attorneys, that Counsel engaged in unnecessary intra-office conferencing, and that they have presented "vague" and "block-billed" time entries to obscure their work in order to run up their fee claim. None of those objections support the significant reductions Premier seeks.

22. Tasher's "too many attorneys" objection rings hollow. Contrary to his opinion, federal cases generally recognize that a team approach is often necessary in litigation and that fees should be denied for duplication "only if the attorneys are *unreasonably* doing the *same* work." *Johnson v University College*, 706 F.2d 1205, 1208 (11th Cir. 1983). Once Counsel's well-documented time records were presented, the burden shifted to Premier to present specific instances of unreasonable

duplication. *McGrath v County of Nevada,* 67 F.3d 248, 255 (9th Cir. 1995) (fee opponent "bears the burden of providing specific evidence to challenge the accuracy and reasonableness of the hours charged"). In the absence of specific instances, "duplication" or "inefficient staffing" are not a proper basis for imposing large cuts— *i.e.*, more than a 10 percent "haircut" to Counsel's fee request. *See Moreno,* 534 F.3d at 1112. *See also Vargas v Howell*, 949 F.3d 1188, 1197 (9th Cir. 2020) ("We have held that a court may not reduce a fee award based on 'speculation as to how other firms would have staffed the case' or 'whether it would have been cheaper to delegate the work to other attorneys,'" quoting *Moreno*, 534 F.3d at 1114).

23.    In addition to his unfounded assumptions about Plaintiff's Counsel's motives, Tasher's proposed 40% reduction to Class Counsel's well-documented hours also is based on erroneous legal standards and unsupported by the record. As noted, under federal law, to sustain an objection based on objections like "duplication" or "block-billing", a fee opponent must identify the specific time being challenged. In the absence of such specificity, a percentage reduction exceeding a 10% "haircut" is improper. *Moreno*, 534 F.3d at 1112.

24.    Neither Premier nor Tasher provide that specificity here. Rather, even though Plaintiff's Counsel have filed 700+ pages of documentation and thousands of time entries (2,296 for BHO), Tasher plucks only 69 entries to ostensibly support his "block-billing" claim (Tasher Ex. F) and 46 entries for his unfounded objection to Counsel's fee motion work (Tasher Ex. E). Instead of listing the specific entries being challenged as "block-billing", he misleadingly claims that BHO's records showed "frequent use" of block-billing – BHO's entries "are largely long block of 8-10 hours" (Tasher ¶¶ 106, 108) -- from which he then proposes a 40% across-the-board reduction based on these tiny percentages of the evidence. The case law does not permit this type of extrapolation: "Nit-pick[ing]" a relatively few time entries "do[es] not warrant a 'haircut.'" *SEC v. San Francisco Reg'l Ctr. LLC*, No. 17-cv-00223-RS, 2022 U.S. Dist. LEXIS 189090, at *13 and n.2 (N.D. Cal. Oct. 17, 2022). No fee-

paying client could refuse to pay 40% of an attorney's bill based on such flimsy evidence.

**Tasher's 1/11th "Apportionment" Argument**

25.    Plaintiff's Counsel have requested compensation for the time they would reasonably have incurred on Plaintiff's case even had there not been other related class cases that remain to be tried. In response, Premier and Tasher urge the Court to award compensation for only 1/11th of Counsel's work. That position, of course, is irreconcilable with this Court's prior fee Order that "it would be patently unreasonable to award Plaintiff's counsel less than half of their proffered lodestar amount" (ECF No. 320 at 6). It also is unsound as a matter of law, fact, and the way attorneys bill for hourly work and the way fee-paying clients pay for hourly work in the legal marketplace.

26.    *First*, as a factual matter, I am informed there are ten certified class cases, not eleven. Further, Tasher expressly recognizes (at ¶ 18) that all of these related cases use "identical allegations." I am further informed there was a discovery-sharing agreement by the parties to avoid taking the same depositions over again in each one of the related cases. *Montera* is the first to have gone to trial.

27.    I also am informed of BHO's general methodology for determining whether to include or exclude particular hours from the lodestar submitted with this motion:

> In connection with this renewed motion, we performed an entry-by-entry analysis to determine if: (1) the billed time benefitted this litigation (and is thus, included time); (2) the time did not benefit this litigation because it concerned e.g., the *Sonner I* or *Sonner II* appeals (and is thus, excluded time); or (3) the time entry related to both. To be conservative, we excluded all entries where the description included both included and excluded work. For example, if a timekeeper entered one hour on a given day and the entry stated it related to working with both Dr. McAlindon and with Dr. Maronick (a marketing expert only disclosed for *Mullins* trial purposes), that entire hour was excluded from the lodestar calculation for this litigation, even though some of the time billed

benefited this case. Other examples of fully excluded lodestar is from the time spent on briefing class certification in the state court *Bland* action (which occurred after *Montera* was certified), work on jury instructions from *Mullins* that concerned UCL and CLRA claims not at issue in *Montera* (although similar consumer fraud, false advertising themes existed), the motion to compel Vincent Mullins to travel to San Francisco for his deposition, the motion to substitute in Ms. Sonner for Mr. Mullins, the motion for leave to amend to file the Second Amended Complaint in *Sonner* to drop the request for damages under the CLRA and the subsequent motion to dismiss filed by Defendant, all time working with expert Robert Wallace regarding California class damages in *Mullins*, all time working with Dr. Thomas Maronick in connection with his marketing opinions and deposition provided in *Mullins*, and 2017 *Mullins*-only trial work regarding Drs. Graboff, Silbert and Lippiello. This detailed, entry-by-entry analysis confirmed the prior stated belief that our previous estimate of 9,083.25 hours by my firm on work benefitting this litigation was reasonably conservative.

O'Reardon Declaration at ¶ 74; *see also id.* at ¶ 24 ("Plaintiff's Counsel are not including the *Sonner*-specific trial work performed in connection with the then-anticipated May 10, 2018, trial on behalf of the California class, plaintiff Sonner's claim for injunctive relief which was eventually dismissed for lack of personal jurisdiction, work relating to the bill of costs filed by Premier in *Sonner*, or work performed in the subsequent *Bland* and *Sonner* state court actions (currently pending in Alameda County Superior Court) relating to the complaints in those actions, removal, remand, the 2020 and 2021 state court motions for class certification, Premier's motion to stay in *Sonner*, class notice in *Bland*, or third-party retailer subpoenas served in August 2022 in *Bland*. We will file future fee motions as appropriate, and as a result, we have also not presently included the time spent on this renewed motion or work on the Ninth Circuit appeals filed post-trial in this action. Plaintiff also is not seeking reimbursement for fees or expenses related to the work pertaining to the various *Sonner* appeals, as that work did not directly benefit the New York Class in *Montera*.").

28. Thus, any time (or expense) was excluded that was not either: (1) specifically related to *Montera*, or (2) did not benefit *Montera* because it did not relate to general tasks to pursue these "identical allegations." As an additional measure of conservative billing judgment, BHO represents that it excluded all hours for any entry "where the description included both included and excluded work." These efforts resulted in removing over *3,186.75* hours and over *$2.17* million from Counsel's fee request here for work that has been performed in connection with one or more of the related cases.[2]

29. Tasher does not challenge Counsel's exclusion methodology or otherwise argue that it fails to capture and exclude categorically-uncompensable work. Instead, Tasher objects (at ¶ 43) that it is "egregious [] that after Class Counsel's initial fee petition was challenged, BHO added back in nearly $800,000 in fees and costs (the overwhelming majority from the time period prior to the trial, during the discovery phase), including its Sonner/Mullins work." As Mr. O'Reardon's declaration (at ¶¶ 73-74) explains, however, the "previous wholesale exclusion method" to excluding hours (based on time periods and not individual billing records) was overly conservative and "resulted in over-exclusion of time benefitting this litigation,"; with the renewed motion, Counsel "performed an entry-by-entry analysis" to determine which individual time entries represented work that benefitted *Montera*. This tedious analysis reflects a thoughtful, reasoned and appropriate billing

---

[2] In paragraph 60 of Timothy Blood's declaration dated August 26, 2022, filed in support of the original fee motion, he stated that "The total number of hours spent on the overall Joint Juice litigation by professional staff at my firm as of August 25, 2022, is 12,734.25 ours for a total lodestar of $8,381,417.50." In his declaration dated April 4, 2023, Mr. O'Reardon states (at ¶ 74) that after exclusion of hours, the total lodestar submitted with the renewed fee motion is 9,547.50 hours for a total lodestar of $6,210,890.00. Thus, BHO's billing judgment resulted in a reduction of at least 3,186.75 hours for a lodestar amount of $2,170,527.50.

00203133    DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

judgment approach that while erring on the side of over-exclusion, is perfectly consistent with the legal marketplace.

30.    *Second,* in support of their allocation argument, neither Premier nor Tasher dispute Counsel's testimony that all of the time being requested here would be compensable if there had been no other cases. In these circumstances, their position that the time reasonably spent on this case must be divided pro rata because it might also be useful in other cases has been squarely rejected as a matter of law.

31.    Under federal law, the fact that the same work might also be useful for other claims or matters does not support any lodestar reduction. Instead, the focus must be on the case at bar, not other matters: In determining whether Plaintiff's request for attorneys' fees is reasonable, "[t]he district court's inquiry must be limited to determining whether the fees requested by this particular legal team are justified **for the particular work performed and the results achieved in this particular case.**" *Moreno*, 534 F.3d at 1115 (emphasis added). Premier's claim that without apportionment, Class Counsel will face "little risk" litigating the other cases is simply irrelevant: any speculation about an effect on the riskiness of future cases cannot influence the current motion seeking compensation for past work. *See, e.g., Z.F. v Ripon Unified Sch. Dist.* No. 2:10–cv-00523–TLN–CKD, 2017 U.S. Dist. LEXIS 40809, at *12 (E.D. Cal., Mar. 21, 2017) (no reduction for time spent against non-settling defendants or to account for possible future fee recoveries against them).

32.    *Third*, the "mathematical approach" Tasher proposes has been expressly rejected in other contexts because it says little about how much work was reasonably spent to win *this* case: "We agree with the District Court's rejection of 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon.' … *Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors.*" *Hensley v. Eckerhart*, 461 U.S. 424, 435 n11 (1984) (emphasis added). *See Vargas*, 949 F.3d at 1196; *Ryan v Editions Ltd. W.*. 786 F.3d 754, 765 (9th Cir. 2015) (reversing district court's pro rata "partial

18                                    Case No. 3:16-cv-06980-RS

success" reduction, noting claims "highly interrelated"); *Flitton v Primary Residential Mortgage, Inc.*, 614 F.3d 1173, 1178 (10th Cir 2010) (rejecting defendant's proposed "mechancial approach" for reducing prevailing attorney's lodestar); *Planned Parenthood Fed'n, Inc. v Center for Med. Progress*, No. 16-cv-00236-WHO, 2020 US Dist Lexis 241035, at *14–16 (N.D. Cal. Dec. 22, 2020) (work on all unsuccessful and nonfee-shifting claims overlapped with successful claims; proportionality argument rejected both as matter of law and on facts).

33.     *Fourth*, in the legal marketplace, attorneys regularly produce work-product that is useful for other cases. In doing so, they invariably bill the client for whom that work was originally produced for the entire effort. If it is later used for a different client or case, that subsequent client is not charged for the initial work but only for the time spent adapting that work to the later client's case. In my experience, that is simply the nature of legal practice. Given that Plaintiff's Counsel have assured the Court and Premier that they will not bill for any work compensated here in the other cases, just as in the legal marketplace, they should be entitled to compensation for the work reasonably done on behalf of their client here.

## Tasher's Specific Objections

34.     Tasher's more specific objections also are also factually unsupportable and legally unsound. Taken individually or as a whole, they fail to meet Premier's burden of showing that Plaintiff's fully-documented fees are unreasonable.

## Plaintiff's Case Was Not Overstaffed

35.     Tasher suggests that hundreds of hours of time that Class Counsel spent preparing for and attending trial should go uncompensated because their litigation team was too large. Contrary to Tasher's opinion, however, just such a team approach is often, indeed usually, necessary in heavily resisted, complex class action litigation like this case: "The use in involved litigation of a team of attorneys who divide up the work is common today for both plaintiff and defense work …". *Johnson v. Univ. College, supra,* 706 F.2d at 1208.

36.     In my opinion, Counsel's staffing here was entirely consistent with how the legal marketplace actually works in similarly complex, consequential, and hard-fought cases. As the Ninth Circuit has made clear, the winning attorneys' judgment as to how successful attorneys staff their case in order to win it is entitled to substantial deference. *Moreno*, 534 F.3d at 1112. Had the successful counsel staffed the case too leanly, they might not have won. *Id.* And, as *Moreno* also recognizes, as contingent fee lawyers, there was no financial incentive to overstaff the case. *Id.*

37.     In light of the rule that fees should be denied for duplication "only if the attorneys are *unreasonably* doing the *same* work" (*Johnson v University College*, 706 F.2d at 1208 (emphasis in original)), it was Premiers' burden to show *specific instances* of multiple attorneys who were unreasonably doing the same work. *See, e.g.*, *McGrath v County of Nevada, supra,* 67 F.3d at, 255.

38.     Although Tasher and Premier complain about overstaffing trial preparation and three BHO attorneys (Blood, O'Reardon and associate Straub) traveling to the San Francisco trial, as Plaintiff's Counsel have explained, as Mr. O'Reardon explains, there was nothing unreasonable about Plaintiff's use of multiple attorneys for trial preparation or at trial: their staffing was fully justified by the complexity and magnitude of a class plaintiff trial after 10 years of hotly-contested litigation, with millions of dollars at stake. O'Reardon Decl., ¶¶ 4, 51, 52, 55; O'Reardon Reply Decl., ¶¶ 16, 21-24. The pre-trial and trial burden on Plaintiff's Counsel was immense: they had the burdens of proof and persuasion, there were numerous experts to prepare for, and the majority of the evidence was controlled by Premier and its mega law firms. *Id.* In these circumstances, each attorney who billed time had a specific and necessary role; none were "unreasonably doing the same work". *Id.* "[N]ecessary duplication--based on the vicissitudes of the litigation process--cannot be a legitimate basis for a fee reduction. It is only where the lawyer does *unnecessarily* duplicative work that the court may legitimately cut the hours." *Moreno*, *supra*, 534 F.3d at 1113 (emphasis the court's). It would have been very

00203133

surprising to me if Plaintiff's Counsel had *not* utilized multiple attorneys for events like key depositions, hearings, meetings, trial preparation, and the nine-day jury trial.

39.    Nor was there unnecessary duplication among Plaintiff's firms. Trial counsel from Iredale & Yoo were brought on mere months before trial and are not class action lawyers. *See* Declaration of Eugene G. Iredale in Support of Plaintiff's Renewed Motion for Award of Attorneys' Fees and Reimbursement of Nontaxed Expenses, at ¶¶ 3, 5. Given that BHO got the case through class certification, summary judgment, Daubert motions, knew the 500,000 pages of documents, had deposed all the witnesses, and worked with all the experts, their presence was an absolute necessity.

40.    Critically, Premier and Tasher each wholly ignore the highly probative fact that *Premier* itself frequently had the same or more attorneys at the same events. *See* O'Reardon Reply Decl., ¶ 14. When, as here, the fee opponent also uses multiple attorneys, the argument that the number of attorneys used by the successful party are excessive is even less persuasive. *See Democratic Party of Wash. v Reed,* 388 F.3d 1281, 1287 (9th Cir. 2004) (noting that a comparison to the losing party's hours "can be…a useful guide in evaluating the appropriateness of time claimed….Litigation has something of the tennis game, something of war, to it; if one side hits the ball, or shoots heavy artillery, the other side necessarily spends time hitting the ball or shooting heavy artillery back").

41.    Here, the record does not show that Tasher knew or even asked how many hours Premier's four mega law firms spent in Premier's defense,[3] even though that fact would have been "a useful guide" in assessing the reasonableness of Plaintiff's Counsel's hours. In my experience, fee opponents regularly tout the number of hours their attorneys spent and hide that fact when they are the same or

---

[3]    *See* O'Reardon Reply Decl., ¶ 12 (Arnold & Porter, Venable LLP, Morrison & Foerster, and Faegre Drinker Biddle & Reath).

DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

00203133

higher than the winning party's. The obvious inference here is that had Premier's attorneys' hours been significantly lower than Plaintiff's Counsel's, Premier and Tasher certainly would have raised it.

## Counsel's Time Spent Conferring

42.    Tasher also makes the standard objection that Plaintiff's Counsel spent too much time conferring with each other and that time should not be compensated. In my opinion, however, the time spent conferencing here was both reasonable and necessary.

43.    In my experience, complex, unique, representative actions like this one *require* regular conferencing and communication among counsel for both efficiency and effectiveness. The case law supports my view. Reductions for "conferencing" are only appropriate for time that is "obviously and convincingly excessive under the circumstances." *See*, *e.g.*, *Continental Illinois Securities Litigation*, 962 F.2d 566, 570 (7th Cir. 1992) (because of its value, conferencing time should not be arbitrarily slashed); *Ramos v. Lamm*, 632 F. Supp. 376, 383 (D. Colo. 1986) ("In any complex litigation, efficiency derives from organization and coordination rather than lawyers operating independently."); *Charlebois v Angels Baseball, LP*, No. SACV 10-0853 DOC(ANx), 2012 U.S. Dist. LEXIS 91069, at *38 (C.D. Cal. May 30, 2012). Neither Premier nor Tasher has made anything close to such a showing here.

44.    Instead, Tasher relies on generalized objections about attorneys communicating with each other and a few isolated examples to justify their proposed 40% cut. In my opinion, however, reasonable conferencing time is essential to complex class action cases like this one. In terms of efficiency, the amount of work necessary to win cases like *Montera* requires a team of attorneys. Strategizing, sharing information, and dividing tasks are essential parts of the process. In the legal marketplace, fee-paying clients expect that such communication will occur and compensate attorneys for doing it. *See* American Bar Association, Section of Business Law, Task Force on Lawyer Business Ethics, Statements of Principles (1995), p. 14

(participation in conferences by multiple attorneys is often necessary and beneficial, and therefore billable to clients); *Wit v. United Behav. Health*, 578 F. Supp. 3d 1060, 1086 (N.D. Cal. 2022) ("[T]he importance of coordinating strategy and optimizing the specific areas of expertise of the attorneys who served as Class Counsel in this difficult and complicated case justifies the time sought by Plaintiffs for conferencing among Class Counsel.").

45.    In terms of effectiveness, communication among counsel is crucial to sharing vital information and ideas, as well as to effectively strategize. Indeed, without communication among the team, it is far too easy for counsel to duplicate efforts unnecessarily or overlook important points. Again, this work is routinely and properly billed to clients, whose primary interest is to win the case.

46.    Tasher makes no attempt to sum up the hours or lodestar involving conferencing that he believes are excessive. Instead, he discusses select entries from just five days of decade-long litigation. Tasher Declaration at ¶ 68. With even those five days he only adds up the involved counsel's hourly rates – he makes no mention of why the hours were "obviously and convincingly excessive under the circumstances," rather than entirely appropriate coordination of efforts in complex litigation. *See*, *e.g.*, *Riverside v. Rivera*, 477 U.S. 561, 573 n.6 (1986) (approving 197 hours (10% of time) spent by plaintiffs' two attorneys conferring with each other); *Davis*, 976 F.2d at 1545 (affirming award for 3500 hours spent in conferencing – 38% of total hours – because defendants failed to show that conferences were duplicative or unproductive); *Charlebois*, *supra*, 2012 U.S. Dist. LEXIS 91069, at *38 (conferencing time equaled 12.3% of total fee award).

**Counsel's Documentation Readily Meets the Applicable Standards**

47.    At the Court's request, Plaintiff's Counsel have produced 183-pages of time records with 2,296 individual billing entries documenting every hour for which they are requesting compensation, excluding the thousands of hours that in the exercise of billing judgment they have chosen not to claim. (Ironically, Premier

decries the large volume of time entry documentation that Counsel submitted. Opposition at 10.) Nonetheless, Tasher bases much of his opinion on shopworn objections to that documentation -- "block-billing", "vague" entries, and an alleged failure to allocate time to the other pending cases. The last objection has been addressed previously in paragraphs 25-33, *ante*. The others equally are lacking.

48. In my opinion, Counsel's time records, declarations, and charts presented with this motion allow the Court to assess the amount of time devoted to various tasks and events in the lawsuit and therefore provide all the information required to determine whether Plaintiff's attorneys' and professional staff's hours were reasonably expended.

49. The case law does not require more. Parties seeking statutory attorneys' fees are not required to specify every detail of counsel's work: they need only identify "the general subject matter of [counsel's] time expenditures." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2001). *See also Hensley*, 461 U.S. at 437 n.12 ("[P]laintiff's counsel…is not required to record in great detail how each minute of his time was expended."). Attorneys "need only 'keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.'" *United Steelworkers of Am. v. Retirement Income Plan for Hourly-Rated Emps. of ASARCO, Inc.,* 512 F.3d 555, 565 (9th Cir. 2008) (citations omitted); *Davis*, 976 F.2d 1536, *rev'd on other grounds*, 984 F.2d 345 (9th Cir. 1993) (time records must be viewed in context). Indeed, the Ninth Circuit has expressly "warn[ed] against imposing too high a standard of documentation on fee claimants." *Gates v. Gomez*, 60 F.3d 525, 535 (9th Cir. 1995).

50. Tasher's objections to counsel's documentation here cannot be squared with these well-established principles. I have reviewed the billing practices of innumerable attorneys, from sole practitioners to mega law firms. In my opinion, counsel's time records here are at least as descriptive as the majority of time records that I have seen.

51.     Nevertheless, Tasher asserts that an unquantified number of Plaintiff's attorneys' time entries and billing practices are somehow inadequate. Based in part on these objections, he suggests that Plaintiff's Counsel should not be compensated for 40% of the hours they undeniably spent. When combined with Premier's "apportionment" argument, the net result would be that Class Counsel would be paid less than 29% of their submitted lodestar and Lynch Carpenter just 5% of its lodestar. To the extent that Premier's and Tasher's objections are based on highly inaccurate and misleading factual assertions about the record here, I refer the Court to Mr. O'Reardon's Reply Declaration, filed this day, which addresses these arguments and inaccuracies. To the extent their objections are based on the notion that Counsel's time records are somehow an inadequate basis on which to compensate Counsel's work, I strongly disagree.

### Counsel's Time Entries Are Sufficiently Specific

52.     Premier complains that Counsel's time entries for "trial preparation" are "vague", warranting an unquantified lodestar reduction. Opposition at 13. Tellingly, its expert has no vagueness objections. Presumably that is because the time records filed here are perfectly adequate under both federal and marketplace standards.

53.     Under federal law, to justify a statutory fee award, counsel's time records need only identify "the general subject matter of [counsel's] time expenditures." *See*, *e.g.*, *Fischer,* 214 F.3d at 1121, citing *Hensley*, 461 U.S. at 437. As the court explained in *Jordan v. U.S. Dept. of Justice*, 691 F.2d 514, 520 (D.C. Cir. 1982): "It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted. To enable opposing counsel adequately to assess the merits of the motion, and the court to fulfill its obligations, no more is necessary than fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiation, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, [and] associates …." (Internal citations and quotations omitted.)

54. Time records also must be viewed in context. *See*, *e.g.*, *Davis*, 976 F.2d at 1542 (holding that a "time record describing several hours as having been spent at a counsel's meeting that occurred less than a month before the plaintiff's complaint was filed and at which a host of issues were discussed in connection with the filing conveys information sufficient to pass muster under the *Hensley* standard.")

55. In my experience, both the courts and fee-paying clients readily accept descriptions like Plaintiff's Counsel's here. For example, courts have granted fees for entries including "legal research re hearing issue" or "legal research" where the surrounding time entries for that or nearby days "sufficiently identify how the time was spent." *LaToya A. v. San Francisco Unified Sch. Dist.*, No. 3:15-CV-04311-LB, 2016 WL 344558, at *8 (N.D. Cal. Jan. 28, 2016); *see also Prison Legal News v. Schwarzenegger*, 561 F. Supp. 2d 1095, 1103 (N.D. Cal. 2008).

56. The only vagueness examples Premier complains about are those for "trial preparation." Opposition at 13. In my experience, however, time entries for "trial preparation" are perfectly common and acceptable in the legal marketplace and by the courts. *See*, *e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 U.S. Dist. LEXIS 24951, at *309 (N.D. Cal. 2016), adopted in relevant part at 2016 U.S. Dist. LEXIS 88665, *306 (accepting time entries for "trial prep"); *O'Bannon v. NCAA,* No. 09-cv-03329-CW (NC), 2015 U.S. Dist. LEXIS 91514, at *27 (N.D. Cal. 2015), adopted in relevant part, 2016 U.S. Dist. LEXIS 44131, at * 28 (entry titled "preparation for hearing" reasonable in context); *Jaramillo v. County of Orange*, 200 Cal. App. 4th 811, 830 (2011) (time records included very general descriptions, *e.g.* "trial prep", "T-C Client").

57. As these cases implicitly recognize, "trial preparation" is often the most hectic and intense period in a case, with counsel frequently moving between one task and another. How that time was divided between reviewing documents, preparing witnesses, drafting motions or oppositions to motions, planning direct or cross examination, or any of the other myriad tasks involved, is a matter of personal style

00203133

and experience; every attorney and every case is different. Rather than require attorneys to waste time recording each sub-task, both clients and courts can assess whether the total time spent on trial preparation was reasonable in light of the demands of the trial, the attorneys' performance, and the results achieved: the proof is in the pudding. In my opinion, invaluable trial preparation time that is otherwise compensable should not go uncompensated simply because attorneys do not stop working after each sub-task to record how many minutes were spent.

**Quarter-Hour Billing**

58.     Premier and Tasher also have proposed an across-the-board reduction to Class Counsel's lodestar for billing in quarter-hour increments. Opposition at 14 and Tasher Decl., ¶¶ 118-119. Again, that objection is unsupportable, for several reasons.

59.     First, in the legal marketplace, billing in quarter-hour increments is not improper and is acceptable to many fee-paying clients. *See* STATEMENTS OF PRINCIPLES, American Bar Association, Section of Business Law, Task Force on Lawyer Business Ethics, January 12, 1995, at p. 13 ("For convenience, lawyers generally keep track of time spent using standards increments of time, commonly six minutes (0.1 hour) or fifteen minutes (1/4 hour). *This approach is essential and should not be objectionable unless the increments are unreasonably large or are used in an abusive manner.*") (Emphasis added.)

60.     In fact, Tasher concedes that not all clients require billing in lesser increments. Tasher Decl., ¶ 118. Mayer Brown, Sidley Austin, and Morrison Foerster (a firm representing Premier) are three examples of mega law firms that bill in quarter-hour increments. In *Guidiville Rancheria of Cal. v. United States*, No. 12-cv-1326 YGR, 2015 U.S. Dist. LEXIS 109057, at *11 n.6 (N.D. Cal. Aug. 18, 2015) the court rejected objections to Morrison & Foerster block-billing and billing in quarter-hour increments. In *U.S. v. Vandewater Int'l Inc.*, No. 2:17-cv-04393-RGK-KS, 2022 U.S. Dist. LEXIS 111527, at *5 (C.D. Cal. May 13, 2022), the court overruled objections to Mayer Brown billing in 15-minute increments instead of 6-minute increments. In

00203133

*In re USA Gymnastics*, No. 18-9108-RLM-11, 2020 Bankr. LEXIS 2612, at \*31 (Bankr. S.D. Ind. Sept. 29, 2020), the court describes what it found to be "credible and reliable expert" testimony from Gene School, who "worked at Sidley Austin for approximately 37 years and during most of that time, he focused on nationwide complex mass tort and products liability litigation." Rejecting an objection to quarter-hour billing, the court stated, "Mr. Schoon testified that quarter-hour billing was the default for his Sidley Austin clients the entire time he was at that firm." *Id.* at \*51.

61.     Third, there is no reason to assume that billing in quarter hours invariably involves rounding up, or to assume that every task billed in quarter hours is overbilled by 10%. Of course, when the amount of time billed is approximately 15, 30, 45, or 60 minutes, no question of overbilling at all is involved; it is more precise than billing only tenths of an hour. In my experience, moreover, attorneys who bill by the quarter hour generally round up *or down* to the nearest quarter. Here, Plaintiff's principal counsel do not bill for any task that involves less than 15 minutes, and the many short tasks that in a tenth-hour system would be billed as .1 have not been billed at all. *See* O'Reardon Reply Decl., ¶¶ 34-35.

62.     Lastly, billing solely in .1 increments may lead to even more time being claimed, a frowned upon practice known as "chipping". For example, an attorney reading 4 or 5 related emails in a 15-minute period and billing each at .1 would bill *more* than an attorney who lumps them all in one .25 minute entry.

63.     For these reasons, billing in 15-minute increments is deemed acceptable evidence of time spent. *See In re Cathode Ray Tube Antitrust Litig.*, *supra*, 2016 U.S. Dist. LEXIS 24951, at \*309 (rejecting objections to block-billing and billing in quarter-hour increments), adopted in 2016 U.S. Dist. LEXIS 102408, at \*78 (N.D. Cal, Aug. 3, 2016); *Base v. FCA US LLC*, No. 17-cv-01532-JCS, 2019 U.S. Dist. LEXIS 166130, at \*9 (N.D. Cal. Sep. 25, 2019) (rejecting objection to quarter-hour billing because what matters is the total time spent, rather than billing increment); *Obrien v. FCA US LLC*, No. 17-cv-04042-JCS, 2019 U.S. Dist. LEXIS 181987, at

00203133          DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

*13-14 (N.D. Cal. Oct. 18, 2019) ("Nor do the 15-minute billing increments used by HDMN appear to have resulted in excessive fees."); *Bobol v. HP Pavilion Mgmt.*, No. C 04 00082 JW (RS), 2006 U.S. Dist. LEXIS 21125, at *16-18 (N.D. Cal. Apr. 10, 2006) ("As the total number of hours allowed under this order are reasonable, there is no cause to assume that the quarter hour billing increments resulted in a net increase to a degree that would warrant further adjustment.").[4]

## Tasher's "Block-billing" Objections

64.    Another of Premier's purported bases for reducing Counsel's fees by 40% is Tasher's claim that Class Counsel "block-billed" for 69 "travel-related" entries. *See* Tasher Decl., ¶¶ 108 – 114 and Exhibit F. I strongly disagree. In my opinion, Plaintiff's attorneys' billing practices were entirely reasonable and appropriate, and any objection based on "block-billing" should not be sustained, for several reasons.

---

[4]    *See also United States v. Sixty-One Thousand Nine Hundred Dollars & No Cents*, 856 F. Supp. 2d 484, 491-92 (E.D.N.Y. 2012) (noting there is no "requirement that lawyers in fee-shifted cases must use a particular billing format if they want to collect," refusing an across-the-board reduction for quarter-hour billing, and determining that "the tasks undertaken were reasonable; the amount of time spent on them each day was reasonable; and the total amount of time spent on the case was reasonable"); *United States v. $ 60,201.00 United States Currency*, 291 F. Supp. 2d 1126, 1131 (C.D. Cal. 2003) ("standard billing practices" include quarter-hour billing); *United States v. 4,432 Mastercases of Cigarettes*, 322 F. Supp. 2d 1075, 1079 (C.D. Cal. 2004) (same); *In re: Cathode Ray Tube Crt Antitrust Litig.*, No. C-07-5944 JST, 2017 U.S. Dist. LEXIS 236359, at *76 (N.D. Cal. Feb. 28, 2017) (same); *Love v. Mail on Sunday*, No. CV 05-7798 ABC (PJWx), 2007 U.S. Dist. LEXIS 97061, at *26 (C.D. Cal. Sep. 7, 2007) (same); *Long v. Colvin*, No. 13-cv-05716-SI, 2015 U.S. Dist. LEXIS 82231, at *8 (N.D. Cal. June 24, 2015) (quarter billing does not equate to excessive time); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, No. C 07-05278 SI, 2008 U.S. Dist. LEXIS 44050, at *15 (N.D. Cal. June 4, 2008) (same); *Guidiville Rancheria of Cal.*, *supra*, 2015 U.S. Dist. LEXIS 109057, at *11 n.6 (refusing "an across-the-board reduction" for 15-minute billing by attorneys at Morrison & Foerster); *Mendez v. County of San Bernardino*, No. CV 04-7131 SVW (RCx), 2009 U.S. Dist. LEXIS 142253, at *11 (C.D. Cal. July 1, 2009) (same).

65.    *First*, in my experience, "block billing" continues to be the prevailing practice among California law firms, a fact that Tasher never denies. Over the last several years, I have reviewed the billing records of hundreds of California law firms, large and small. Most, if not the great majority, of these firms submit billing records that describe each time-keeper's daily activities but provide only a single daily numerical total for each timekeeper's activities – so-called "block billing." Such records are accepted both by clients who pay by the hour and by courts that must determine reasonable fees. *See*, *e.g.*, *Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221 EMC, 2011 U.S. Dist. LEXIS 39832, at *29 (N.D. Cal. April 7, 2011) ("Block-billing is a typical practice in this district, and blocked-bills have been found to provide a sufficient basis for calculating a fee award"), *aff'd* 521 Fed. App'x 592 (9th Cir. 2013); *In re Cathode Ray Tube Antitrust Litig.*, *supra*, 2016 U.S. Dist. LEXIS 24951, at *309 ("Having himself recorded time for almost 50 years, the Special Master is aware how silly it is to insist (as insurance companies sometimes do) on showing a specific amount of time on each action taken during a day."); *Oberfelder v. City of Petaluma*, No. C-98-1470 MHP, 2002 U.S. Dist. LEXIS 8635, at *9 (N.D. Cal. Jan. 29, 2002) (block billing "does not undermine the compensability of time reasonably expended where the billing statement meets the basic requirement of listing the hours and identifying the general subject matter of time expenditures"), *aff'd* 2003 U.S. App. LEXIS 11371 (9th Cir. June 4, 2003). As the court stated in *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 130 F. Supp. 3d 1331, 1340 (C.D. Cal. 2015):

> *The [block-billed] entry is representative of commonly used billing practices…* It appears that Plaintiff seeks "task billing," allocating every moment of attorney time to a plethora of specific tasks. That level of specificity improperly creates "a pretense of mathematical precision" criticized by Justice O'Connor. *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 189. It also improperly makes trial courts "green-eyeshade accountants" seeking accounting precision rather than rough justice. *Fox*, 131 S.Ct. at 2216. It is inefficient…. [A] court may include amounts "block-billed" without a reduction "because

00203133

counsel 'is not required to record in great detail how each minute of his time was expended.'" *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd.,* 668 F.3d 677, 690 (9th Cir. 2012) (quoting *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933). [Emphasis added].[5]

66.     In my view, to deny the prevailing parties' attorneys' compensation for hundreds of thousands of dollars' worth of work just because its law firm used the billing practice that prevails in the legal community greatly undermines the purpose of the fee-shifting statutes.

67.     *Second*, any reductions for block-billing are only properly applied to block-billed entries, not the entire lodestar. *Perfect 10, Inc.*, 2015 U.S. Dist. LEXIS 54063, at *81 ("Even if such entries could be construed as 'block billing,' it would be

---

[5]     *See also United Steelworkers v. Retirement Income Plan*, 512 F.3d 555, 565 (9th Cir. 2008) (rejecting Premier's arguments that fees should have been reduced for insufficient description and block billing); *O'Bannon*, *supra*, 2016 U.S. Dist. LEXIS 44131, at *26 (same); *Sunstone Behavioral Health, Inc. v. Alameda Cty. Med. Ctr.*, 646 F. Supp. 2d 1206, 1214 (E.D. Cal. 2009) (court assessed reasonableness of time billed despite some block-billing); *Tech Props. v. Canon Inc.*, 2017 U.S. Dist. LEXIS 219618, at *9 (N.D. Cal. April 12, 2017) (block-billing challenge to Jones Day's fee request rejected because entries "sufficiently detailed to assess the reasonableness of the time spent on [specific] tasks"); *Perfect 10, Inc. v Giganews, Inc.*, No. CV 11–07098–AB, 2015 U.S. Dist. LEXIS 54063, at *80 (C.D. Cal. Mar. 24, 2015) (entries not actually block-billed because they described each task performed), *aff'd* (9th Cir 2017) 847 F.3d 657, 676; *Ridgeway v Wal-Mart Stores Inc.*, No. 08–cv–05221–SI, 2017 U.S. Dist. LEXIS 149440, at *21 (N.D. Cal. Sept. 14, 2017) (rejecting block-billing objection); *Lewis v County of San Diego*, No. 13-CV-02818-H-JMA, 2017 U.S. Dist. LEXIS 203457, at *24 (S.D. Cal. Dec. 8, 2017) (block-billing objection rejected); *Dragu v Motion Picture Indus. Health Plan*, 159 F. Supp. 3d 1121, 1129 (N.D. Cal. 2016) (entries not actually block-billed because all pertained to same task); *Latoya A. v San Francisco Unified Sch. Dist.*, No. 3:15-cv-04311-LB, 2016 U.S. Dist. LEXIS 11048, at *26 (N.D. Cal. Jan. 28, 2016) (same); *Cruz v. Starbucks Corp.*, No. C-10-01868 JCS, 2013 U.S. Dist. LEXIS 79231, at *20 (N.D. Cal. June 5, 2013) (rejecting challenge because block-billed entries adequate to allow determination whether time was reasonable); *Sweetwater Union High Sch. Dist. v Julian Union Elementary Sch. Dist.*, 36 Cal. App. 5th 970, 996 (2019) (rejecting challenge in light of work product filed). *See also* Pearl, Cal Fee Awards, § 9.88.

00203133

improper to apply an across-the-board reduction to *all* of Defendants' requested hours, because the vast majority of the time entries reflect time statements for discrete tasks.") (emphasis in original). Here, Tasher has identified only 69 supposedly block-billed entries out of the 2,296 presented. (¶ 108) As to any others, he can only say that "Class Counsel's time records are largely long block of 8-10 hours of time throughout the matter." No evidence or quantification supports that assertion. Yet, he claims that a 40% reduction should applied to Class Counsel's entire lodestar. In my opinion, no such reduction would ever be appropriate in the legal marketplace. Reductions for block-billing are not a "penalty" for using supposedly unclear time entries. Rather, they are based on the notion that they prevent an assessment of whether the time spent on various separate tasks was reasonable. It makes no legal or practical sense to apply them to non-block-billed time. In a block billing objection, it is not enough to simply point to a small sample of records, then extrapolate it to all of counsel's time entries. *Dytch v. Lazy Dog Rests., LLC*, No. 16-cv-03358-EDL, 2019 U.S. Dist. LEXIS 143298, at *17-18 (N.D. Cal. Aug. 16, 2019) (rejecting defendants' request for a 15% across-the-board cut of all hours for block-billing because "the Ninth Circuit has held that the use of block billing by itself does not justify an across-the-board reduction or rejection of all hours" and "Defendants have not provided the Court with a detailed list of block billed entries but, instead, only a sample of six entries that are purportedly 'block billed.'").

68.     *Third*, many of the 69 specific entries Tasher cites are not even improper block-billing by any definition. For example, Mr. Blood's 12/3/13 time entry for 12.0 hours is described as "Prepare for and participate in mediation and travel to and from San Francisco." Mr. O'Reardon's 6/6/14 time entry for 11.0 hours is described as "take deposition of D Ritterbush and travel to SD." His 6/4/22 time entry for 9.75 hours is described as "fly back to SF and meet with team and prepare for closing argument." *See* Tasher Declaration at Ex. F. There is no conceivable reason these entries could be considered improper "block billing": they simply describe related,

00203133

compensable tasks. *Perfect 10, Inc.*, 2015 U.S. Dist. LEXIS 54063, at \*80 (hours not "block-billed" when all tasks performed on same day described); *Pierce v. County of Orange*, 905 F. Supp. 2d 1017, 1043 (C.D. Cal. 2012) (improper block billing does not include entries that encompass time "devoted to associated tasks"); *Unicolors, Inc. v. Urban Outfitters*, No. CV 14-01029 SJO (VBKx), 2015 U.S. Dist. LEXIS 200427, at \*11-12 (C.D. Cal. May 14, 2105) (rejecting argument for 20% reduction due to including travel time in block-bills: "Even though travel time is included in these entries, the entries are sufficiently clear and discrete for the Court to assess what the attorneys were working on and whether they expended an unreasonable amount of time."). Premier's attorneys attended the events described in the entries. Premier's attorneys knew how much time was spent on them and how much time a flight ordinarily takes. Premier and Tasher do not object that these entries contain an unreasonable number of hours for the related tasks reported. No fee-paying client would or could object to such entries.

69.    *Lastly*, based on my experience, block billing does not impede the determination of whether hours were reasonably spent in most cases because the important issue is not how much time was spent on a particular task – *i.e.*, research, drafting, conferring, etc. – but on how much time was spent on a particular document, phase, or event. *See Jordan v. U.S. Dep't of Justice*, *supra*, 691 F.2d at 520. Whether the time spent in a day consisted of 6 hours of drafting and 1 hour of conferring with co-counsel, or 5 hours of drafting and 2 hours conferring with counsel, makes no difference at all in that determination; different lawyers have different approaches to winning their clients' cases. Further, as a practical matter, it is both unduly time-consuming and cost inefficient to interrupt a day spent working, for example, on a summary judgment brief to separately record the time spent on each phone call about the brief, or the time spent actually writing the brief versus time spent on legal or factual research, or the exact amount of time spent on each section of the brief as it is being drafted. Generally, all of these tasks are intermixed, and the crucial question is

whether the total time spent on the brief was reasonable, not how that time was divided up.

70. Moreover, the courts have recognized that block-billing objections are especially meritless when, as here, there is no need to apportion time spent on distinct unrelated claims. Here, all of counsel's time is compensable because Plaintiff's attorneys presented only one general claim: that Premier's advertising regarding Joint Juice violated the law, a claim that it won unequivocally. And, all time that would have been non-compensable – *i.e.*, the time spent solely on the *Mullins* case – has already been excluded from Plaintiff's request here.

71. In my experience, "block billing" is seldom intended to or results in "padding" the bill. The vast majority of lawyers are honest. Lawyers are just as likely to understate the total number of hours spent on a case by "block billing" as they are to overstate it. Indeed, if lawyers listed every separate task as a .1, such as reading each of a series of emails, they could be accused of "chipping," *i.e.*, padding their time by separately billing .1 hours for each of a series of short tasks.

**Tasher's Other Objections Are Similarly Flawed**

**<u>Travel Time</u>**

72. Tasher also proposes unquantified reductions for Counsel's necessary travel time, but those objections also are neither legally nor factually supportable. The federal case law is clear: reasonable attorney travel time is fully compensable if that is the practice in the local legal community. *Davis v City & County of San Francisco*, *supra*, 976 F.2d at 1543. "Generally, courts in this Circuit do not compensate travel time at a lower rate than the time billed for other tasks, so long as the travel time is reasonable." *Pearson v. Green Tree Servicing, LLC*, No. 14-cv-04524-JSC, 2015 U.S. Dist. LEXIS 18297, at *29 (N.D. Cal. Feb. 13, 2015); *see also Dytch v. Maxaco,* LLC, No. 17-cv-00438-SI, 2019 U.S. Dist. LXIS 73836, at *7 (N.D. Cal. May 1, 2019) ("Attorneys' fees may include reasonable travel time."); *Piping Rock Partners, Inc. v. David Lerner Assocs.*, No. 12-cv-04634-SI, 2015 U.S. Dist. LEXIS 109016, at *13

(N.D. Cal. Aug. 18, 2015) ("hours billed for travel to oral argument are compensable"); *Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1177 (N.D. Cal. 2012) ("this district has long granted prevailing parties their full hourly rate for travel time").

73.    In my experience, full compensation for reasonable travel time *is* the prevailing practice in the San Francisco Bay Area legal community. Although some clients and insurance companies may limit it, usually by compensating it at a lower rate, the great majority of firms would expect to be paid in full for their reasonable travel time in cases such as this one, *i.e.*, where the attorneys are litigating a case away from their home office. In my opinion, the few examples that Tasher cites would not support a fee-paying client's refusal to pay for reasonable travel time and do not support a lodestar reduction here.

**Time Spent On the Original Fee Motion**

74.    Premier and Tasher also object to the amount of time counsel have spent on the original fee motion: "nearly 318.25 hours and $215,000 in fees." Opposition at 18; Tasher Decl., ¶ 58.d and Exhibit E. As Plaintiff's Counsel explain, however, that time was fully justified by the long duration of the case, and most of all, by the Premier's vigorous opposition throughout the case. *See*, *e.g.*, O'Reardon Reply Decl., ¶ 18. I also note that in a further exercise of billing judgment, Class Counsel have not included their otherwise compensable time spent preparing the renewed fee motion in their lodestar submission.

75.    In my opinion, the compensation requested by Counsel for their fee motion work is eminently reasonable. Far greater amounts of time have been spent on fee motions in comparably complex cases and been found reasonable. For example, in *Wit*, 578 F. Supp. 3d at 1087, Judge Spero found that the 1,279 hours counsel had spent on their fee motion, which amounted to 4.1% of their total requested hours, was reasonable. His findings apply equally here:

00203133

Courts generally allow fees for preparation of a fee petition so long as those hours are reasonable and "'bear a rational relation to the number of hours spent litigating the merits of the case.'" *Vallejo v. Astrue*, No. 2:09-CV-03088 KJN, 2011 U.S. Dist. LEXIS 106571, 2011 WL 4383636, at *4 (E.D. Cal. Sept. 20, 2011) (quoting *Spegon v. Catholic Bishop*, 175 F.3d 544, 553-54 (7th Cir.1999)).

Class Counsel expended 1,279 hours on preparing this fee petition, constituting 4.1% of their total requested hours. [Reply Decl.]. The Court has reviewed the time billed for work on the fee petition and finds it to be reasonable." *See id.* PP106, 109-112 (describing the method Plaintiffs used to prepare the fee petition). [The expert's] opinion that the fee petition is "basic" is groundless. To the contrary, the fee petition required Plaintiffs to address fees and litigation costs incurred by three different law firms over many years in a case involving extensive motion practice and a multi-week bench trial. The fee petition was far from "basic." Therefore, the Court declines to reduce Class Counsel's hours for this reason.

*See also Independent Living Center of S. Cal. v. Kent*, No. 2:08-CV-03315-CAS(MANx), 2020 U.S. Dist. LEXIS 13019 (C.D. Cal. Jan. 24, 2020) (plaintiffs' counsel reasonably expended 1,234 hours on the fee motion); *Davis*, 976 F.2d at 1545 ("establishing the right to a fee award is compensable"), *modified on other grounds* (9th Cir. 1993) 984 F.2d 345, affirming *U.S. v City & County of San Francisco,* 748 F. Supp. 1416, 1441 (N.D. Cal. 1990) (plaintiffs' counsel reasonably spent almost 600 hours on the fee application); *Communities for Equity v Michigan High Sch. Athletic Ass'n*, No. 1:98-CV-479, 2008 U.S. Dist. LEXIS 25640, at *62 (W.D. Mich. Mar. 31, 2008) (1,172 hours reasonable for work on fee motion).

76.    Here, although this litigation was comparably complex and even more long-lasting than *Wit*, Plaintiff's Counsel spent far less than the *Wit* attorneys on their fee motion: 318 hours ($215,488.75), which represent only 4% of Class Counsel's total requested hours.

Case No. 3:16-cv-06980-RS

00203133    DECL OF RICHARD PEARL ISO PLTFS' REPLY ISO RENEWED MOTION FOR ATTORNEYS' FEES

**Top-heavy Staffing**

77.     Tasher also claims that Counsel's fee should be reduced because too much of the time Plaintiff's attorneys claim here was performed by partner-level attorneys. Opposition at 18; Tasher Declaration at ¶ 84. In my opinion, that objection also is meritless: Counsel's staffing here was perfectly consistent both with the demands of this case and common practice in similarly complex class actions.

78.     As a general matter, the type of staffing used by successful attorneys is left to the attorneys' discretion. Thus, it is generally improper for the court to "impose its own judgment regarding the best way to operate a law firm, [or] to determine if different staffing decisions might have led to different fee requests." *Moreno*, 534 F.3d at 1114. It is the "difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys— [that] must drive the district court's decision." *Id.*

79.     Fee awards must be based on the staffing pattern that the claiming attorneys actually used, not on some model (*e.g.*, a pyramidal staffing pattern) that they did not use. *Vargas*, 949 F.3d at 1197 ("We have held that a court may not reduce a fee award based on 'speculation as to how other firms would have staffed the case' or 'whether it would have been cheaper to delegate the work to other attorneys,'") (quoting *Moreno*, 534 F.3d at 1114).

80.     Tasher's objection is premised on the "pyramidal staffing pattern" that many insurance companies require their law firms to use and many larger firms adopt in part because of its "leveraging" effect. In my opinion, however, it is unclear whether the big firm pyramid model, as opposed to a smaller firm model with the partners doing much of the work themselves, is either more effective or less expensive to the client, especially when the case goes all the way up to trial. Courts have in fact struggled with this issue. For example, in *Moreno*, 534 F.3d at 1114, the Ninth Circuit reversed the district court for an abuse of discretion in reducing fees and specifically stated "the cost effectiveness of various firm models is an open question and it is by

no means clear whether a larger law firm would have billed more or less for the entire case." *See also Chabner v United of Omaha Life Ins. Co.*, No. C-95–0447 MHP, 1999 U.S.Dist.LEXIS 16552, *17 (N.D. Cal., Oct. 12, 1999), (citing cases), *aff'd* 225 F.3d 1042 (9th Cir. 2000); *Wit*, 578 F. Supp. 3d at 1080 (citing *Moreno* and stating "work that might be delegated to associates under the supervision of a partner by a large firm may sometimes be completed more quickly and effectively by a more experienced partner").

81.    In my view, nothing Tasher offers shows that any significant tasks performed by partners could have been done as efficiently and effectively had they first been delegated to a lower-rate attorney. Indeed, I agree with the *Moreno* court that is often more costly and less efficient because more-experienced attorneys can get work done more quickly and efficiently, even at their higher rates. Plaintiff's counsel' staffing here, with 77% of the hours billed by three attorneys with different levels of experience (and hourly rates) and who performed discrete non-duplicative work, reflects a perfectly common and acceptable practice in the legal community. *See* O'Reardon Decl., ¶¶ 50-51, 55, 64-65, 74.

## **Multipliers Are Properly Awarded in Fee-Shifting Cases**

82.    Plaintiff's Counsel also request that if the Court should reduce their lodestar for some reason, any difference can and should be made up with a lodestar multiplier based on the exceptional results they have obtained, the extraordinary outlay of expenses, and the protracted nature of the litigation. In response, Tasher (¶ 42) says that Plaintiff's request "asks the Court to reward Class Counsel for seeking excessive and unreasonable fees." I disagree, for several reasons.

83.    *First*, lodestar multipliers under federal law, although more rare than under California law, are permissible when extraordinary results have been achieved. *Perdue v. Kenny A.*, 559 U.S. 542, 553, 555 (2010). Here, Plaintiff's Counsel obtained a rare jury verdict in a class action false advertising lawsuit, which Mr. O'Reardon has declared "was the largest class action jury verdict in the field of consumer product

false advertising in at least the past decade." O'Reardon Decl., ¶ 4. Assuming that's true – Premier did not respond and say this was wrong – the judgment obtained here is certainly "extraordinary."

84.    *Second*, multipliers are appropriate "if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted." *Perdue*, 559 U.S. at 555. Plaintiff's Counsel here have litigated this case for ten-plus years, with no end in sight. They also have spent more than a million dollars of their own funds for costs.

85.    *Third,* contrary to Tasher's opinion, there is nothing inappropriate or inconsistent about reducing a lodestar based on some hours are non-compensable or rates are too high, while also enhancing the resultant lodestar based on extraordinary results, exceptional expenses, or protracted proceedings. The lodestar (hours times rates) and any lodestar enhancement for such matters as extraordinary results are separate, independent factors in the determination of a reasonable attorney's fee. *See Zeleny v. Becerra*, No. 17-cv-07357-RS, 2022 U.S. Dist. LEXIS 32868, at *18-19 (N.D. Cal. 2022) (reduction for unnecessary hours and a multiplier for delivering a victory would "simply be adjudged to cancel each other out").

86.    Plaintiff's Counsel request no more than their lodestar. In the exercise of billing judgment, they have not asked for a multiplier on that amount. However, if the Court reduces their hours or rates, a multiplier may and should be applied to bring their fee to what they request as their reasonable fees. In my experience, I frequently have seen courts make a similar type of determination. In my opinion, it would be appropriate here as well.

**Expense Objections**

87.    I also have been asked to opine about Plaintiff's Counsel's expenses. Those expenses – *e.g.*, travel, meals, computer research, photocopies, mediation, experts, depositions, conference calls, postage – are recoverable if they are generally billed to fee-paying clients in the local legal community. *See*, *e.g.*, *Grove v Wells*

*Fargo Fin., Inc.,* 606 F.3d 577, 580 (9th Cir. 2010). Based on my experience, that is certainly true here: all of the claimed expenses are generally billed to fee-paying clients in the Bay Area legal community.

88. Correlatively, Premier's claim (though not made by Tasher) that Plaintiff's Counsel should recover only 1/11th of their expenses fails for the same reasons as its argument about fees. *See* ¶¶ 25-33, *ante*. With limited exceptions, as a general matter, Premier does not dispute that the costs sought by Plaintiff's Counsel were necessary and beneficial in *Montera*. Examples of these necessary and beneficial costs sought by Class Counsel include $110,682.95 for electronic document management, $24,300 for mediation fees, and $4,399.07 for postage and FedEx costs. These ordinary litigation expenses did not vary in amount because there was more than one related case. In my experience, and Premier does not claim otherwise, the full amount of these costs would be incurred and billed by counsel, and paid in full by a fee-paying client, whether the cost was reasonable and necessary for one case or ten cases. Counsel are entitled to fully recover these expenses reasonably incurred to advance their client's interests in this litigation.

89. I also disagree with Tasher's assertion that Class Counsel's "disbursements further reflect a 'spare no expense' approach" (¶ 120). That statement ignores the economic reality that BHO is a small firm working this case on contingency for ten-plus years. And, if Premier's expenses were significantly lower, that most certainly would have been raised.

## **Tasher's Previous Opinions**

90. In my opinion, the nature of Mr. Tasher's legal experience, his record before other courts, and the careless and dubious practices he employs here to identify supposedly non-compensable work seriously undermine his opinions and his credibility as an expert in this matter.

91. Tasher's opinions reflect a fundamental lack of prior litigation experience involving vigorously contested trial court work undertaken on a contingent

fee basis on behalf of a class of plaintiffs. In fact, it appears that his actual experience mainly consists of serving as in-house counsel to large corporations, and or serving as an expert witness for businesses and insurance companies. In both capacities, one of his clients' principal goals would certainly have been to limit their costs of litigation to the lowest possible level. While that is their right, it is often incompatible with the goals of private attorney general fee-shifting statutes – to incentivize competent attorneys to take on cases that will benefit the public by assuring them that if they are successful, they will be fully compensated for their efforts.

92.    In contrast to Mr. Tasher's defense-oriented perspective, my experience has been first as a public-interest litigator and then as an attorneys' fees expert in numerous similar California cases, both on the merits and with respect to attorneys' fees. As paragraphs 7 and 8 above show, my testimony has been cited favorably in at least 37 reported opinions and fee orders, in addition to the many other unreported fee orders. In doing so, I believe that my testimony then and here has, unlike Tasher's, closely followed the correct legal standards while also recognizing the great demands imposed by long, hard-fought cases like *Montera* and when applicable, the goals of the fee-shifting statutes that counsel have enforced.

93.    Despite his defense orientation, there is at least one notable exception in which Mr. Tasher testified on behalf of the plaintiff's counsel in support of their fee and expense request and in which he expressed opinions that are directly contrary to many of his positions here. In *DeMaria v. Horizon Healthcare Services, Inc.*, No. 2:11-cv-07298-WJM-MF (D.N.J.), a New Jersey class action, Tasher was retained by class counsel and provided a declaration in support of their proposed fee award. The *DeMaria* litigation was nowhere near as complex as this one: it lasted only 4.5 years,[6] compared to the 10+ years here. Substantively, it involved only a motion to dismiss,

---

[6]    In *DeMaria*, the complaint was filed December 16, 2011, and preliminary approval was filed May 17, 2016.

20 depositions, 200,000 pages of documents, and unlike the long, heavily contested jury trial here, it settled following class certification, but before expert reports, summary judgment or trial. The settlement created a $33 million fund, and Tasher declared that in his expert opinion, "a fee in the amount of $11,000,000 (33 1/3% of the Settlement Fund) is reasonable and appropriate for Class Counsel's conduct in this matter." *See* Tasher's *DeMaria* Report at p. 18. As for the 4,153 hours spent by plaintiff's counsel, Tasher declared that he was "particularly impressed" and that "given the complexity and duration of this litigation it would not have been surprising" to see more than 8,000 hours billed in the litigation. *Id.* at p. 12. Tasher also opined that "[t]he out-of-pocket expenses incurred by Class Counsel (a sum of $91,055.47) were reasonable and appropriate." *Id.* at p. 18. Notably, Tasher's declaration provided no detail about these expenses in the aggregate or even the component parts and amounts; it merely declares that his client's request is reasonable, even though class counsel's declaration only stated the total expenses for each category and nothing more. *Id.* His objections here to Class Counsel's expenses, which Counsel have supported by detailed declarations and hundreds of pages of documentation, simply cannot be reconciled with his *DeMaria* opinion.

94. Tasher's inconsistency is also evidenced by his positions in a statutory fee-shifting case in New York. In that case, Tasher recognized that the primary purpose of fee-shifting" statutes is to fully compensate counsel who are willing to undertake contingency fee litigation on behalf of the public:

> Furthermore, I view the hours, rates, and fees sought in the context of the statutory construction and well-established principles of fee-shifting, which is to entice competent counsel to eschew representing only clients of means or serving as defense counsel for guaranteed payment and take on the representation of needy children given the high risk of receiving no compensation for all their hard work. In that context, I believe the hours, rates, and fees sought are reasonable.

00203133

*See* Tasher Declaration in *K.E. v. New York City Department of Education*, No. 1:21-cv-02815-KPF (S.D.N.Y.) at ¶ 33. As Tasher further explained, these statutes strongly discourage reductions to counsel's "presumptively reasonable lodestar calculation":

> Second, I understand that the Statute is to be construed as are other fee-shifting statutes (such as environmental protection statutes), to "calculate a reasonable fee **sufficient to attract competent counsel**" against well-funded adversaries. *Blum v. Stenson*, 465 U.S. 886, 893-894 (1984). *Purdue v. Kenny A. Ex. Rel. Winn*, 130 S. Ct. 1662, 1672 (2010). Emphasis added.

> Taken together, it is my expert opinion that these statutory intents strongly warrant against any reduction from the presumptively reasonable lodestar calculation, as to do so would discourage well-credentialed and experienced attorneys (which, in my opinion, includes every single attorney at the Cuddy Law Firm) from taking on complex and difficult matters (such as Plaintiff's).

*Id.* at ¶¶ 152-153; *see also* ¶ 168 (risk of nonpayment, preclusion of other work, and lengthy litigation factors "<u>strongly</u> warrant against any reduction to the presumptively reasonable lodestar amount") (emphasis in original). Tasher also testified that "the rates paid by private clients actually undervalue the services in this particular matter, and the reason is consideration of the risk of non-payment to the Cuddy Firm." *Id.* at ¶ 101.b. Yet he offers no such consideration of risk here.

95.    As further evidence of his lack of reliability, I am aware of at least seven (7) cases in which Tasher's opinions opposing fee awards were either totally or largely rejected. These include:

- *Twp. of Millcreek v. Angela Cres Trust of June 25, 1998* (Commonwealth Court of Pennsylvania Nov. 25, 2019) 222 A.3d 1199, 1213 ["The trial court's findings about the limitations of Tasher's analysis are supported by the record."];

- *O'Neill v. Sec'y of HHS* (Fed. Cl. Spec. Mstr. Apr. 28, 2015) No. 08-243V, 2015 U.S. Dist. LEXIS 620, at *60 [rejecting reimbursement for Tasher's fee opinions because "The information contained in the expert

43                                             Case No. 3:16-cv-06980-RS

report that was submitted from Wyatt Partners demonstrates their lack of familiarity and expertise with litigation in the [National Vaccine Injury Compensation Program]"];

- *Y.S. v. N.Y.C. Dep't of Educ.* (S.D.N.Y. Aug. 19, 2022) No. 1:21-cv-711 (MKV), 2022 U.S. Dist. LEXIS 149277, at *17 ["The Court has considered but gives comparatively low weight to other declarations and exhibits submitted by Plaintiff. In particular, the Court does not weigh heavily the declarations by purported attorneys' fees expert Steven A. Tasher, and IDEA practitioner Bonnie Spiro Schinagle. [ECF Nos. 79-4; 79-5; 79-6]. Mr. Tasher did not serve as counsel to Plaintiff and does not make a showing of "scientific, technical, or other specialized knowledge" related to IDEA fees litigation."];

- *K.O. v. N.Y.C. Dep't of Educ.* (S.D.N.Y. May 26, 2022) No. 20-cv-10277 (LJL), 2022 U.S. Dist. LEXIS 94947, at *30-31 ["Moreover, to the extent that Tasher's declaration does more than put factual evidence of fees charged before the Court and purport to express an opinion either on the reasonableness of rates or the reasonableness of hours, Tasher has not demonstrated he has any particular expertise on the issue of IDEA litigation and that opinion would be of limited weight. The underlying facts Tasher relies on do not support that CLF's requested rates are reasonable."];

- *S.H. v. N.Y.C. Dep't of Educ.* (S.D.N.Y. Jan. 26, 2022) No. 21-cv-4967 (LJL), 2022 U.S. Dist. LEXIS 14385, at *21-22 ["As to the three law firms Tasher mentions, the evidence before the Court fails to establish the work that they did was comparable to the work CLF was required to do in this case."];

- *N.A. v. N.Y.C. Dep't of Educ.* (S.D.N.Y. Aug. 15, 2022) No. 21 Civ. 2643 (PGG) (SLC) 2022 U.S. Dist. LEXIS 224709, at *31 ["The Court also

declines to award the 'expert fees' associated with the Tasher Report, which the Court found unpersuasive."]; and

- *K.E. v. N.Y.C. Dep't of Educ.* (S.D.N.Y. Sep. 23, 2022) No. 21 Civ. 2815 (KPF) 2022 U.S. Dist. LEXIS 172839, at *31-32 ["the Court is unwilling to hand over the reins, as it were, to Mr. Tasher to decide the ultimate issue of the reasonableness of the fees requested."].

If called as a witness, I could and would competently testify from my personal knowledge to the facts stated herein. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of May 2023, in Berkeley, California.

Richard M. Pearl

# EXHIBIT A

# RESUME OF RICHARD M. PEARL

**RICHARD M. PEARL**
**LAW OFFICES OF RICHARD M. PEARL**
1816 Fifth Street
Berkeley, CA 94710
(510) 649-0810
(510) 548-3143 (facsimile)
rpearl@interx.net (e-mail)

## EDUCATION

University of California, Berkeley, B.A., Economics (June 1966)
Berkeley School of Law (formerly Boalt Hall), Berkeley, J.D. (June 1969)

## BAR MEMBERSHIP

Member, State Bar of California (admitted February 1970)
Member, State Bar of Georgia (admitted June 1970) (inactive)
Admitted to practice before all California State Courts; the United States Supreme Court; the United States Court of Appeals for the District of Columbia and Ninth Circuits; the United States District Courts for the Northern, Central, Eastern, and Southern Districts of California, for the District of Arizona, and for the Northern District of Georgia; and the Georgia Civil and Superior Courts and Court of Appeals.

## EMPLOYMENT

LAW OFFICES OF RICHARD M. PEARL (April 1987 to Present): Civil litigation practice (AV rating), with emphasis on court-awarded attorney's fees, class actions, and appellate practice. Selected Northern California "Super Lawyer" in Appellate Law for 2005, 2006, 2007, 2008, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

QUALIFIED APPELLATE MEDIATOR, APPELLATE MEDIATION PROGRAM, California Court of Appeal, First Appellate District (October 2000 to 2013) (program terminated).

ADJUNCT PROFESSOR, HASTINGS COLLEGE OF THE LAW (January 1988 to 2014): Taught *Public Interest Law Practice*, a 2-unit course that focused on the history, strategies, and issues involved in the practice of public interest law.

PEARL, McNEILL & GILLESPIE, Partner (May 1982 to March 1987): General civil litigation practice, as described above.

CALIFORNIA RURAL LEGAL ASSISTANCE, INC. (July 1971 to September 1983) (part-time May 1982 to September 1983):

Director of Litigation (July 1977 to July 1982)
Responsibilities: Oversaw and supervised litigation of more than 50 attorneys in CRLA's 15 field offices; administered and supervised staff of 4-6 Regional Counsel; promulgated litigation policies and procedures for program; participated in complex civil litigation.

Regional Counsel (July 1982 to September 1983 part-time)
Responsibilities: Served as co-counsel to CRLA field attorneys on complex projects; provided technical assistance and training to CRLA field offices; oversaw CRLA attorney's fee cases; served as counsel on major litigation.

Directing Attorney, Cooperative Legal Services Center (February 1974 to July 1977) (Staff Attorney February 1974 to October 1975)
Responsibilities: Served as co-counsel on major litigation with legal services attorneys in small legal services offices throughout California; supervised and administered staff of four senior legal services attorneys and support staff.

Directing Attorney, CRLA McFarland Office (July 1971 to February 1974) (Staff Attorney July 1971 to February 1972)
Responsibilities: Provided legal representation to low income persons and groups in Kern, King, and Tulare Counties; supervised all litigation and administered staff of ten.

HASTINGS COLLEGE OF THE LAW, Instructor, Legal Writing and Research Program (August 1974 to June 1978)
Responsibilities: Instructed 20 to 25 first year students in legal writing and research.

CALIFORNIA AGRICULTURAL LABOR RELATIONS BOARD, Staff Attorney, General Counsel's Office (November 1975 to January 1976, while on leave from CRLA)
Responsibilities: Prosecuted unfair labor practice charges before Administrative Law Judges and the A.L.R.B. and represented the A.L.R.B. in state court proceedings.

ATLANTA LEGAL AID SOCIETY, Staff Attorney (October 1969 to June 1971)
Responsibilities: Represented low-income persons and groups as part of 36-lawyer legal services program located in Atlanta, Georgia.

**PUBLICATIONS**

Pearl, *California Attorney Fee Awards, Third Edition* (Cal. Cont. Ed. Bar 2010) and February 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, and March 2023 Supplements

Pearl, *California Attorney Fee Awards, Second Edition* (Cal. Cont. Ed. Bar 1994), and 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Supplements

*Best Practices for Litigating a Civil Code Section 1717 Motion for Attorney Fees,* with the Hon. Elizabeth R. Feffer (Ret.), California Litigation (The Journal of the Litigation Section of the California Lawyers Association, Vol. 35, No. 1, 2022)

*Graham v. DaimlerChrysler Corp.* and *Tipton-Whittingham v. City of Los Angeles*, Civil Litigation Reporter (Cal. Cont. Ed. Bar Feb. 2005)

*Current Issues in Attorneys' Fee Litigation*, California Labor and Employment Law Quarterly (September 2002 and November 2002)

*Flannery v. Prentice: Shifting Attitudes Toward Fee Agreements and Fee-Shifting Statutes*, Civil Litigation Reporter (Cal. Cont. Ed. Bar Nov. 2001)

*A Practical Introduction to Attorney's Fees*, Environmental Law News (Summer 1995)

*Wrongful Employment Termination Practice, Second Edition* (Cal. Cont. Ed. Bar 1997) (co-authored chapter on "Attorney Fees")

*California Attorney's Fees Award Practice* (Cal. Cont. Ed. Bar 1982) (edited), and 1984 through 1993 Supplements

Program materials on attorney fees for numerous trainings, including for California Continuing Education of the Bar, the California Employment Lawyers Association, the California Lawyers Association, the California Department of Fair Housing and Employment, the Environmental Law, Labor Law, and Appellate Sections of the California State Bar, the California Academy of Appellate Lawyers, and many others.

*Settlors Beware/The Dangers of Negotiating Statutory Fee Cases* (September 1985) Los Angeles Lawyer

Program Materials on Remedies Training (Class Actions), sponsored by Legal Services Section, California State Bar, San Francisco (May 1983)

Attorneys' Fees: A Legal Services Practice Manual (Legal Services Corporation 1981)

**PUBLIC SERVICE**

Member, Attorneys' Fee Task Force, California State Bar

Member, Board of Directors, California Rural Legal Assistance Foundation

Former Member, Border of Directors, Meals on Wheels of San Francisco

**RECOGNITION**

"AV" Rating -- Martindale Hubbell

Northern California "Super Lawyer" in Appellate Law: 2005 – 2008; 2010 -2023.

**REPRESENTATIVE CASES**

*ACLU of N. Cal. v. DEA*
        (N.D. Cal. 2012) 2012 U.S.Dist.LEXIS 190389

*Alcoser v. Thomas*
        (2011) 2011 Cal.App.Unpub.LEXIS 1180

*Arias v. Raimondo*
        (2018) 2018 U.S.App.LEXIS 7484

*Boren v. California Department of Employment*
        (1976) 59 Cal.App.3d 250

*Cabrera v. Martin*
        (9th Cir. 1992) 973 F.2d 735

*Camacho v. Bridgeport Financial, Inc.*
        (9th Cir. 2008) 523 F.3d 973

*Campos v. E.D.D.*
        (1982) 132 Cal.App.3d 961

*Center for Biological Diversity v. County of San Bernardino*
        (2010) 185 Cal.App.4th 866

*Children & Families Commission of Fresno v. Brown*
        (2014) 228 Cal.App.4th 45

*Committee to Defend Reproductive Rights v. A Free Pregnancy Center*
        (1991) 229 Cal.App.3d 633

4

**REPRESENTATIVE CASES (cont.)**

*David C. v. Leavitt*
(D. Utah 1995) 900 F.Supp. 1547

*Delaney v. Baker*
(1999) 10 Cal.4th 23

*Dixon v. City of Oakland*
(2014) 2014 U.S.Dist.LEXIS 169688

*Employment Development Dept. v. Superior Court (Boren)*
(1981) 30 Cal.3d 256

*Environmental Protection Info. Ctr. v Department of Forestry & Fire Protection*
(2010) 190 Cal.App.4th 217

*Environmental Protection Information Center, Inc. v. Pacific Lumber Co.*
(N.D. Cal. 2002) 229 F. Supp.2d 993, *aff'd* (9th Cir. 2004) 103 Fed. Appx. 627

*Flannery v Prentice*
(2001) 26 Cal. 4th 572

*Graham v. DaimlerChrysler Corp.*
(2004) 34 Cal. 4th 553

*Guerrero v. Cal. Dept. of Corrections etc.*
(2016) 2016 U.S.Dist.LEXIS 78796, *aff'd in relevant part,* (9th Cir. 2017) 701 Fed.Appx. 613

*Heron Bay Home Owners Assn. v. City of San Leandro*
(2018) 19 Cal.App.5th 376

*Horsford v. Board of Trustees of Univ. of Calif.*
(2005) 132 Cal.App.4th 359

*Ketchum v. Moses*
(2001) 24 Cal.4th 1122

*Kievlan v. Dahlberg Electronics*
(1978) 78 Cal.App.3d 951, *cert. denied* (1979)
440 U.S. 951

*Lealao v. Beneficial  California, Inc.*
(2000) 82 Cal.App.4th 19

5

**REPRESENTATIVE CASES (cont.)**

*Lewis v. California Unemployment Insurance Appeals Board*
(1976) 56 Cal.App.3d 729

*Local 3-98 etc. v. Donovan*
(N.D. Cal. 1984) 580 F.Supp. 714,
*aff'd* (9th Cir. 1986) 792 F.2d 762

*Mangold v. California Public Utilities Commission*
(9th Cir. 1995) 67 F.3d 1470

*Maria P. v. Riles*
(1987) 43 Cal.3d 1281

*Martinez v. Dunlop*
(N.D. Cal. 1976) 411 F.Supp. 5,
*aff'd* (9th Cir. 1977) 573 F.2d 555

*McQueen, Conservatorship of*
(2014) 59 Cal.4th 602 (argued for *amici curiae*)

*McSomebodies v. Burlingame Elementary School Dist.*
(9th Cir. 1990) 897 F.2d 974

*McSomebodies v. San Mateo City School Dist.*
(9th Cir. 1990) 897 F.2d 975

*Molina v. Lexmark International*
(2013) 2013 Cal.App. Unpub. LEXIS 6684

*Moore v. Bank of America*
(9th Cir. 2007) 2007 U.S. App. LEXIS 19597

*Moore v. Bank of America*
(S.D. Cal. 2008) 2008 U.S. Dist. LEXIS 904

*Mora v. Chem-Tronics, Inc.*
(S.D. Cal. 1999) 1999 U.S. Dist. LEXIS 10752,
5 Wage & Hour Cas. 2d (BNA) 1122

*Nadaf-Rahrov v. Nieman Marcus Group*
(2014) 2014 Cal.App. Unpub. LEXIS 6975

**REPRESENTATIVE CASES (cont.)**

*Orr v. Brame*
    (9th Cir. 2018) 727 Fed.Appx. 265, 2018 U.S.App.LEXIS 6094

*Orr v. Brame*
    (9th Cir. 2019) 793 Fed.Appx. 485

*Pena v. Superior Court of Kern County*
    (1975) 50 Cal.App.3d 694

*Ponce v. Tulare County Housing Authority*
    (E.D. Cal 1975) 389 F.Supp. 635

*Ramirez v. Runyon*
    (N.D. Cal. 1999) 1999 U.S. Dist. LEXIS 20544

*Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975 (N.D. Cal. 2017), *aff'd on merits (fees not appealed)* 269 F.3d 1066 (9th Cir. 2020)

*Robles v. Employment Dev. Dept.*
    (2019) 38 Cal.App.5th 191

*Rubio v. Superior Court*
    (1979) 24 Cal.3d 93 (amicus)

*Ruelas v. Harper*
    (2015) 2015 Cal.App. Unpub.LEXIS 7922

*Sokolow v. County of San Mateo*
    (1989) 213 Cal. App. 3d. 231

*S.P. Growers v. Rodriguez*
    (1976) 17 Cal.3d 719 (amicus)

*Swan v. Tesconi*
    (2015) 2015 Cal.App. Unpub. LEXIS 3891

*Tongol v. Usery*
    (9th Cir. 1979) 601 F.2d 1091,
    *on remand* (N.D. Cal. 1983) 575 F.Supp. 409,
    *revs'd* (9th Cir. 1985) 762 F.2d 727

**REPRESENTATIVE CASES (cont.)**

*Tripp v. Swoap*
(1976) 17 Cal.3d 671 (amicus)

*United States (Davis) v. City and County of San Francisco*
(N.D. Cal. 1990) 748 F.Supp. 1416, *aff'd in part and revs'd in part sub nom Davis v. City and County of San Francisco* (9th Cir. 1992) 976 F.2d 1536, *modified on rehearing* (9th Cir. 1993) 984 F.2d 345

*United States v. City of San Diego*
(S.D.Cal. 1998) 18 F.Supp.2d 1090

*Vasquez v. State of California*
(2008) 45 Cal.4th 243 (*amicus*)

*Velez v. Wynne*
(9th Cir. 2007) 2007 U.S. App. LEXIS 2194

**MARCH 2023**

# EXHIBIT B

# 2021 Real Rate Report®

## The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices



Wolters Kluwer

When you have to be right

PEARL0040

Wolters Kluwer

ELM Solutions

## Report Editor

Jeffrey Solomon
Senior Director, Product Management Legal
Analytics, Wolters Kluwer's ELM Solutions

## Lead Data Analysts

Carol Au
Business Systems Quantitative Analyst
Wolters Kluwer's ELM Solutions

Pankaj Saha
Data Engineer
Wolters Kluwer's ELM Solutions

## ELM Solutions Creative

David Andrews
Senior Graphic Designer
Wolters Kluwer's ELM Solutions

## Contributing Analysts and Authors

Jason Bender
Legal Analytics Product Manager
Wolters Kluwer's ELM Solutions

Deniece Bushell
Senior Product Marketing Manager
Wolters Kluwer's ELM Solutions

Nathan Cemenska
Associate Director, Product Management
Wolters Kluwer's ELM Solutions

Margie Sleboda
Lead Technology Product Manager
Wolters Kluwer's ELM Solutions

## Executive Sponsor

Barry Ader
Vice President, Product Management and
Marketing
Wolters Kluwer's ELM Solutions

© 2004 - 2021 Wolters Kluwer's ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

ELM Solutions, a Wolters Kluwer business
20 Church Street
Hartford, CT 06103 United States
ATTN: Marketing
+1-860-549-8795

### LEGAL CAVEAT

Wolters Kluwer's ELM Solutions has worked to ensure the accuracy of the information in this report; however, Wolters Kluwer's ELM Solutions cannot guarantee the accuracy of the information or analyses in all cases. Wolters Kluwer's ELM Solutions is not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Wolters Kluwer's ELM Solutions is not responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

PEARL0041

# Table of Contents - 2021 Real Rate Report

**A Letter to Our Readers • 4**

**Report Use Considerations • 5**

**Section I: High-Level Data Cuts • 9**

- Partners, Associates, and Paralegals
- Partners, Associates, and Paralegals by Practice Area and Matter Type
- Partners and Associates by City
- Partners and Associates by City and Matter Type
- Partners by City and Years of Experience
- Associates by City and Years of Experience
- Partners and Associates by Firm Size and Matter Type

**Section II: Industry Analysis • 64**

- Partners, Associates, and Paralegals by Industry Group
- Partners and Associates by Industry Group and Matter Type
- Basic Materials and Utilities
- Consumer Goods
- Consumer Services
- Financials (Excluding Insurance)
- Health Care
- Industrials
- Technology and Telecommunications

**Section III: Practice Area Analysis • 85**

- Bankruptcy and Collections
- Commercial
- Corporate: Mergers, Acquisitions, and Divestitures
- Corporate: Regulatory and Compliance
- Corporate: Other
- Employment and Labor
- Environmental
- Finance and Securities
- General Liability (Litigation Only)
- Insurance Defense (Litigation Only)
- Intellectual Property: Patents
- Intellectual Property: Trademarks
- Intellectual Property: Other
- Real Estate

**Section IV: In-Depth Analysis for Select US Cities • 175**

- Boston, MA
- Chicago, IL
- Los Angeles, CA
- New York, NY
- Philadelphia, PA
- San Francisco, CA
- Washington, DC

**Section V: International Analysis • 195**

**Section VI: Matter Staffing Analysis • 227**

**Appendix: Data Methodology • 232**

PEARL0042

# A Letter to Our Readers

**Welcome to the Wolters Kluwer's ELM Solutions Real Rate Report®, the industry's leading data-driven benchmark report for lawyer rates.**

Our Real Rate Report has been a relied upon data analytics resource to the legal industry since its inception in 2010 and continues to evolve. The Real Rate Report is powered by Wolters Kluwer's ELM Solutions LegalVIEW® data warehouse, the world 's largest source of legal performance benchmark data, which has grown to include over $150 billion in anonymized legal data.

This year, we launched our LegalVIEW Insights Report series, which explores the emerging trends behind the overall legal spend volatility seen in corporate legal departments. The insights reports coupled with the Real Rate Report are great tools to drive actionable decisions.

The legal services industry relies on internal analytics and the use of external data resources, such as the LegalVIEW® data warehouse, to support legal management strategies. The depth and details of the data in the Real Rate Report enable you to better benchmark and make more informed investment and resourcing decisions for your organization.

As with past Real Rate Reports, all of the data analyzed are from corporations' and law firms' e-billing and time management solutions. We have included lawyer and paralegal rate data filtered by specific practice and sub-practice areas, metropolitan areas, and types of matters to give legal departments and law firms greater ability to pinpoint areas of opportunity. We strive to make the Real Rate Report a valuable and actionable reference tool for legal departments and law firms.

As always, we welcome your comments and suggestions on what information would make this publication more valuable to you. We thank our data contributors for participating in this program. And we thank you for making Wolters Kluwer's ELM Solutions your trusted partner for legal industry domain expertise, data, and analytics and look forward to continuing to provide market-leading, expert solutions that deliver the best business outcomes for collaboration among legal departments and law firms.

Sincerely,

**Barry Ader**
Vice President, Product Management and Marketing
Wolters Kluwer's ELM Solutions

PEARL0043

# Report Use Considerations

### 2021 Real Rate Report

- Examines law firm rates over time
- Identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)
- Itemizes variables that drive rates up or down

All the analyses included in the report derive from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information, along with the ranges of those rates and their changes over time, highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals.

Clients might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether to modify their pricing approach.

### Some key factors[1] that drive rates[2]:

**Attorney location** - Lawyers in urban and major metropolitan areas tend to charge more when compared with lawyers in rural areas or small towns.

**Litigation complexity** - The cost of representation will be higher if the case is particularly complex or time-consuming; for example, if there are a large number of documents to review, many witnesses to depose, and numerous procedural steps, the case is likely to cost more (regardless of other factors like the lawyer's level of experience).

**Years of experience and reputation** - A more experienced, higher-profile lawyer is often going to charge more, but absorbing this higher cost at the outset may make more sense than hiring a less expensive lawyer who will likely take time and billable hours to come up to speed on unfamiliar legal and procedural issues.

**Overhead** - The costs associated with the firm's support network (paralegals, clerks, and assistants), document preparation, consultants, research, and other expenses.

**Firm size** – The rates can increase if the firm is large and has various timekeeper roles at the firm. For example, the cost to work with an associate or partner at a larger firm will be higher compared to a firm that has one to two associates and a paralegal.

### Rates increase in geographic areas with growing population

Additional analysis was performed to examine the impact of geographic location on law firm hourly rates. This report, like previous ones, shows that large, cosmopolitan legal services markets like New York City, San Francisco, and Los Angeles are associated with higher hourly rates. In addition, our analysis reveals a significant spike in hourly rates in areas of the country

---

1 David Goguen, J.D., University of San Francisco School of Law (2020) Guide to Legal Services Billing Retrieved from:
   https://www.lawyers.com/legal-info/research/guide-to-legal-services-billing-rates.html
2 Source: 2018 RRR. Factor order validated in multiple analyses since 2010

PEARL0044

# Report Use Considerations

that are currently experiencing high population growth. Significant average rate increases occurred from 2020 to 2021 in many areas, but especially Fresno, California (~15% average rate increase), Greenville, SC (~18%), Miami, FL (~9%), Nashville, TN (~11%), Oklahoma City (~13%), Phoenix, AZ (~10%), and Seattle, WA (~11%) -- all of which have experienced much higher than average population growth in recent years.

The correlation between hourly rates and population growth makes sense. When people and businesses move into an area, it creates a spike in demand for all sorts of goods and services, including legal services. However, it is hard for the supply of legal services to move as quickly as demand because attorneys looking to move into a new geographic area face high switching costs that most will refuse to pay unless they absolutely have to.

First, attorneys looking to take work in a new state have to get licensed there, which takes time and effort and is a distraction that can reduce their current income in the form of the number of hours they are able to bill to clients. Second, despite the rise in remote working, many attorneys looking to establish practices in a new geographic location may have to establish at least some physical presence there, find a new office, new lodging, and potentially uproot their entire family. Third, even if the switching costs of licensure, physically moving, etc. are paid, attorneys may fear yet another switching cost in the form of attrition of their existing clients from their original geographic locale, who may view them as no longer investing in their knowledge of the legal problems and legal solutions that are specific to the original locale.

---

3 Source: 2020 RRR. Factor order validated in multiple analyses since 2010

PEARL0045

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2021 - Real Rates for Associate and Partner**                                    **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|------|-------------|------|---|---------------|--------|----------------|------|------|------|
| San Diego CA | Litigation | Associate | 19 | $150 | $175 | $325 | $254 | $257 | $268 |
| | | Partner | 96 | $325 | $523 | $1,019 | $670 | $660 | $655 |
| | Non-Litigation | Associate | 60 | $226 | $325 | $516 | $395 | $343 | $354 |
| San Francisco CA | Litigation | Partner | 150 | $392 | $663 | $961 | $704 | $703 | $667 |
| | | Associate | 108 | $314 | $415 | $628 | $486 | $471 | $451 |
| | Non-Litigation | Partner | 223 | $468 | $669 | $942 | $730 | $753 | $721 |
| | | Associate | 145 | $345 | $465 | $730 | $539 | $536 | $485 |
| San Jose CA | Litigation | Partner | 40 | $600 | $867 | $1,056 | $876 | $880 | $796 |
| | | Associate | 27 | $435 | $550 | $745 | $587 | $542 | $471 |
| | Non-Litigation | Partner | 61 | $618 | $795 | $1,165 | $918 | $910 | $803 |
| | | Associate | 38 | $370 | $515 | $865 | $622 | $575 | $570 |
| San Juan PR | Non-Litigation | Partner | 13 | $215 | $250 | $294 | $260 | $262 | $260 |
| Seattle WA | Litigation | Partner | 91 | $436 | $535 | $741 | $596 | $506 | $498 |
| | | Associate | 67 | $370 | $507 | $535 | $476 | $410 | $405 |
| | Non-Litigation | Partner | 150 | $406 | $505 | $697 | $547 | $553 | $523 |
| | | Associate | 117 | $300 | $366 | $504 | $411 | $389 | $381 |

# Section I: High-Level Data Cuts

## Cities

By Years of Experience

**2021 - Real Rates for Partner**       **Trend Analysis - Mean**

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|
| Portland OR | 21 or More Years | 44 | $455 | $505 | $585 | $531 | $500 | $466 |
| | Fewer Than 21 Years | 15 | $300 | $378 | $455 | $397 | $427 | $408 |
| Raleigh NC | 21 or More Years | 24 | $275 | $480 | $571 | $452 | $485 | $466 |
| | Fewer Than 21 Years | 32 | $610 | $684 | $724 | $638 | $618 | $580 |
| Richmond VA | 21 or More Years | 36 | $420 | $665 | $805 | $655 | $635 | $625 |
| | Fewer Than 21 Years | 20 | $274 | $342 | $432 | $349 | $347 | $381 |
| Salt Lake City UT | 21 or More Years | 24 | $333 | $393 | $462 | $409 | $378 | $378 |
| | Fewer Than 21 Years | 27 | $395 | $540 | $945 | $663 | $552 | $507 |
| San Diego CA | 21 or More Years | 64 | $357 | $563 | $1,175 | $747 | $701 | $657 |
| | Fewer Than 21 Years | 80 | $480 | $705 | $950 | $752 | $718 | $681 |
| San Francisco CA | 21 or More Years | 158 | $535 | $694 | $960 | $757 | $778 | $737 |
| | Fewer Than 21 Years | 18 | $707 | $955 | $1,201 | $979 | $915 | $799 |
| San Jose CA | 21 or More Years | 56 | $600 | $819 | $1,153 | $915 | $918 | $841 |
| | Fewer Than 21 Years | 66 | $402 | $471 | $634 | $511 | $454 | $446 |
| Seattle WA | 21 or More Years | 90 | $467 | $571 | $698 | $583 | $573 | $547 |