BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY BETH MONTERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PREMIER NUTRITION CORPORATION f/k/a JOINT JUICE, INC.,<br><br>Defendant. | Case No. 3:16-CV-06980 RS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION ON REMAND TO REASSESS STATUTORY DAMAGES AWARD**<br><br>**CLASS ACTION**<br><br>Date:  January 30, 2025<br>Time:  1:30 p.m.<br>Judge:  Honorable Richard Seeborg<br>Courtroom:  Courtroom 3, 17th Floor<br><br>Complaint Filed:  December 5, 2016 |

*(vertical left margin)* BLOOD HURST & O' REARDON, LLP

1

## NOTICE OF MOTION

2 **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3 **PLEASE TAKE NOTICE** that on January 30, 2025, at 1:30 p.m. in Courtroom 3, 17th

4 Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, plaintiff Mary Beth Montera will and

5 hereby moves this Court to reassess and enter an order awarding statutory damages to Montera and

6 the class in the amount of $83,124,500.

7 This motion is based upon this notice of motion, plaintiff's memorandum in support of this

8 motion, the declaration of Timothy G. Blood and the exhibits thereto, the complete file and record

9 in this action, in the related actions, and on the appeal, and such other evidence and argument as

10 may be presented at or before the hearing on this motion.

11 Respectfully submitted,

12 Dated: December 9, 2024                    BLOOD HURST & O'REARDON, LLP

13

14 By:        *s/  Timothy G. Blood*
TIMOTHY G. BLOOD

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................................1

II.  SUMMARY OF THE TRIAL AND THE APPEALS ........................................................2

III. ARGUMENT ....................................................................................................................4

    A.   The Due Process Analysis for Aggregated Statutory Damages: *Wakefield* ..............4

    B.   The *Williams* Factors ............................................................................................6

        1.   The Statutes' Public Importance and Deterrence Goals................................6

        2.   The Opportunities for Committing the Offense .............................................9

        3.   Need to Secure Uniform Adherence to the Statutes ....................................10

    C.   *Six Mexican Workers* Factors ..............................................................................11

        1.   The Amount Awarded Per Class Member ...................................................12

        2.   The Total Award .........................................................................................13

        3.   Nature and Persistence of the Violations, the Substantive or Technical Nature of the Violations, and the Extent of Premier's Culpability ...........13

        4.   Damages Awards in Similar Cases .............................................................15

IV.  CONCLUSION ................................................................................................................16

BLOOD HURST & O' REARDON, LLP

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Basic Books Inc. v. Kinko's Graphics Corp.*
    758 F. Supp. 1522 (S.D.N.Y. 1991) ....................................................................... 8

*Beliz v. W.H. McLeod & Sons Packing Co.*,
    765 F.2d 1317 (5th Cir. 1985) ............................................................................... 11

*Capitol Records, Inc. v. Thomas-Rasset*,
    692 F.3d 899 (8th Cir. 2012) ................................................................................ 12

*Gessele v. Jack in the Box, Inc.*
    No. 3:14-CV-01092-HZ, 2023 U.S. Dist. LEXIS 54892 (D. Or. Mar. 30, 2023) ................. 12

*Havana Docks Corp. v. Carnival Corp.*
    No. 19-cv-21724, 2022 U.S. Dist. LEXIS 233783 (S.D. Fla. Dec. 30, 2022) ........................ 8

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    302 F. Supp. 2d 455 (D. Md. 2004) ........................................................................ 8

*Montera v. Premier Nutrition Corp.*,
    111 F.4th 1018 (9th Cir. 2024) ......................................................................*passim*

*Plavin v. Grp. Health Inc.*,
    35 N.Y.3d 1 (App. Div. 2020) ............................................................................ 6, 7

*Six (6) Mexican Workers v Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ......................................................................*passim*

*St. Louis, I.M. & S.R. Co. v. Williams*,
    251 U.S. 63 (1919) ..................................................................................*passim*

*State Farm Mut. Auto. Ins. Co. v. Campell*,
    538 U.S. 408 (2003) .......................................................................................... 3

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) ......................................................................*passim*

**Statutes**

Farm Labor Contactor Registration Act (FLCRA)
    7 U.S.C.S. § 1801 ...................................................................................... 10, 11

General Business Law (GBL)
    § 349 ................................................................................................*passim*
    § 350 ................................................................................................*passim*

BLOOD HURST & O' REARDON, LLP

00220759

N.Y. Civil Practice Law and Rules (CPLR)
    § 901(b) .................................................................................................................. 3

BLOOD HURST & O' REARDON, LLP

00220759

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REASSESS STATUTORY DAMAGES AWARD

BLOOD HURST & O' REARDON, LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Premier Nutrition Corporation defrauded its customers. Premier sold Joint Juice by targeting joint pain sufferers and advertising that Joint Juice helps joint pain and function. Premier knew of the leading scientific studies, including those of the NIH, proving that glucosamine and chondroitin have no effect on joint pain or function. Premier nonetheless chose to falsely advertise Joint Juice and reacted to the science by disparaging the studies and increasing its marketing in an effort to harvest every available dollar from consumers desperate for joint pain relief.

These facts are no longer in dispute. After a nine-day trial, the jury found that Premier's advertising of Joint Juice was deceptive in violation of New York consumer protection laws and that Joint Juice was valueless for its advertised purpose.

Premier appealed everything; the judgment and all the Court's orders and rulings subsumed therein. The Ninth Circuit affirmed this Court on all issues except its award of prejudgment interest. *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1043 (9th Cir. 2024).

Montera appealed the district court's reduction of aggregate statutory damages. On Montera's appeal, the Ninth Circuit vacated the award of statutory damages (reduced on Premier's due process challenge) and remanded with direction to "reassess Premier's substantive due process challenge to the award of statutory damages in light of the factors identified in *Wakefield* [*v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022)]." *Id*.

By this motion, Montera requests that the Court reassess damages, deny Premier's due process challenge and enter judgment for statutory damages in the amount of $83,124,500 ($500 per violation). Under *Wakefield,* the court must enter judgment in the full amount provided by statute except in the "most egregious of circumstances." *Id.* at 1124. That is not this case. Under the factors identified in *Wakefield* and the circumstances here, an $83 million classwide award does not implicate substantive due process limitations. Rather, the New York Legislature's reasons for providing statutory damages would be undermined if the award is reduced by the court.

///

///

## II.    SUMMARY OF THE TRIAL AND THE APPEALS

The nine-day jury trial was held May 23 through June 7, 2022. Montera's evidence showed that "Premier targeted its Joint Juice advertising to people who suffer joint pain as a result of osteoarthritis." *Montera*, 111 F.4th at 1026. Montera's scientific evidence showed that Premier's advertising regarding the joint health benefits of Joint Juice was false; that "glucosamine and chondroitin had no effect on joint health." *Id*. "[T]he jury found that Joint Juice was entirely 'valueless for its advertised purpose.'" *Id.* at 1032.

The jury returned a verdict for Montera, finding that Premier "'engaged in an act or practice that [was] deceptive or misleading in a material way' and that 'Montera and the class suffered injury as a result.'" *Id*. at 1027. The jury found that 166,249 units of Joint Juice has been sold in New York during the class period. *Id*.

"GBL §§ 349 and 350 require courts to award the greater of actual damages or statutory damages of $50 or $500, respectively." *Id*. (citing GBL §§ 349(h) and 350-e). In this case, statutory damages are greater than actual damages and because the jury found Premier liable under both §§ 349 and 350, Montera initially sought $550 per unit sold, totaling $91,436,950. *Id*.

Premier did not assert that the *per-violation* amount under either statute was unconstitutional. Premier argued that an *aggregated* award of $91,436,950 violated its right to substantive due process and the award should be reduced to $50 per unit sold—the amount available under GBL § 349 only. *Montera*, 111 F.4th at 1027.

Premier also argued that because its violations of §§ 349 and 350 were based on the same facts, the class could not obtain a "double recovery," *i.e.*, the class could not recover under GBL § 349 *and* § 350. Dkt. 280 at 2. This Court did not rule on the "double recovery" issue. Dkt. 293 at 12 n.3. The double recovery issue is obviated on remand because Montera here seeks statutory damages of $500 per violation in the total amount of $83,124,500, an amount equivalent to the statutory damages provided by one of the statutes Premier violated.

Initially, the Court—without the benefit of the Ninth Circuit's intervening decision in *Wakefield*—granted Premier's due process challenge and reduced the damages award to $8,312,450, the amount advocated by Premier. On Montera's appeal, the Ninth Circuit directed the Court to

reassess Premier's due process challenge in light of the factors identified in its intervening *Wakefield* decision. *Montera*, 111 F.4th at 1043.

The *Montera* court provided some guidance on applying *Wakefield* to this case. First, the panel agreed with the Court that the policy goals of the New York Legislature are important in the due process analysis. However, the policy goals that are relevant are the Legislature's goals in enacting GBL §§ 349 and 350, not the policy behind CPLR § 901(b), a New York procedural rule that does not apply in federal proceedings. The panel wrote:

> Here, the district court considered the New York Legislature's goals in barring aggregate damages in class actions pursuant to § 901(b) and concluded that the Legislature's intent to limit aggregation of statutory penalties supported reducing the total damages award. With the benefit of *Wakefield*, the relevant statutory goals for the district court to consider on remand include the Legislature's "compensation and deterrence" goals in enacting GBL §§ 349 and 350—the statutes that authorized the statutory damages at issue.

*Montera*, 111 F. 4th at 1041 n.13.

*Montera* further affirmed:

> In *Shady Grove Orthopedic Associates v. Allstate Insurance*, 559 U.S. 393, 445 (2010), the Supreme Court held that because §901(b) is procedural, not substantive, it has no application in federal diversity suits such as this.

*Id*. at 1038 n.8.

Second, *Montera* confirmed that the constitutionality test for punitive damages articulated in *State Farm Mut. Auto. Ins. Co. v. Campell*, 538 U.S. 408 (2003) does *not* apply to statutory damages. *Montera*, 111 F. 4th at 1041 (in *Wakefield*, "[w]e declined to endorse the application of the *State Farm* factors outside of the punitive damages context ..."). The Ninth Circuit has thus excluded a ratio comparison between actual and statutory damages (the second factor in the *State Farm* test) because the validity of statutory damages "is not to be tested in that way." *St. Louis, I.M. & S.R. Co. v. Williams*, 251 U.S. 63, 67 (1919) (*Williams*).

Instead, *Wakefield* directs courts to evaluate due process limits to aggregate statutory damages using the factors and considerations articulated by the Supreme Court in *Williams* and by

3

Case No. 3:16-cv-06980-RS

the Ninth Circuit in *Six (6) Mexican Workers v Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990). *Wakefield*, 51 F.4th at 1120–24.

With the benefit of *Wakefield* and *Montera*, and applying the factors from *Williams* and *Six Mexican Workers*, Montera asks the Court to reject Premier's due process challenge and award statutory damages to Montera and the New York class in the amount of $500 per violation for a total award of $83,124,500.

## III.    ARGUMENT

### A.    The Due Process Analysis for Aggregated Statutory Damages: *Wakefield*

In *Wakefield*, the Ninth Circuit answered whether aggregated statutory damages could violate substantive due process when the per-violation amount did not. Considering and applying the due process test set out in *Williams*, the Ninth Circuit concluded that aggregated statutory damages awards "in certain extreme circumstances" can exceed constitutional limitations even though the per-violation amount does not. 51 F.4th at 1121. The Ninth Circuit reasoned that although *Williams* did not consider an aggregated award (*Williams* assessed an individual statutory penalty), the constitutional due process test set out in that case applied because *Williams* "[did] not turn on the amount of the per-violation penalty" rather the Court "evaluated the importance of the proscribed conduct ... and the likelihood of violations." *Wakefield*, 51 F.4th at 1122. "Thus, evaluation of an award's relationship to the 'offence' requires consideration of the statute's public importance and deterrence goals." *Id.* (citing *Williams*). The "public importance and deterrence goals" are also articulated in terms of: (i) the public interest; (ii) the opportunities for committing the offense; and (iii) the need for securing uniform adherence to the statute. *Williams*, 251 U.S. at 67.

In addition to *Williams*, the Ninth Circuit found that its decision in *Six Mexican Workers* "provides further guidance for determining whether a particular statutory damages award is disproportionately punitive in the aggregate." *Wakefield*, 51 F.4th at 1123. Although *Six Mexican Workers* considered a different issue—the statute there dealt with the reduction of per-violation damages to an amount within a statutory range—*Wakefield* determined that the case "points courts to factors to help assess proportionality and reasonableness and so can guide trial courts in determining when an award is *extremely* disproportionate to the offense and 'obviously'

unreasonable." *Id*. at 1123 (emphasis original; citing *Williams*, 251 U.S. at 67).

Before applying the *Williams* and *Six Mexican Workers* factors to this case, it is important to note *Wakefield*'s fundamental message. The Ninth Circuit expressly "stress[ed]" and repeatedly emphasized that given the "exacting" *Williams* standard, substantive due process limitations are reached only in extreme cases. Except for the very rare case, courts must award the damages that the legislature determined were necessary to achieve the compensatory, deterrent and punitive goals of statutory damages. The *Wakefield* court wrote:

> We stress that only very rarely will an aggregated statutory damages award meet the exacting *Williams* standard where the per-violation amount does not. Legislatures are empowered to prescribe purely punitive penalties for violations of statutes.
>
> ***
>
> Constitutional limits on aggregate statutory damages awards therefore must be reserved for circumstances in which a largely punitive per-violation amount results in an aggregate that is gravely disproportionate to and unreasonably related to the legal violation committed.

51 F.4th at 1123–24; *see also id.* at 1121 ("certain extreme circumstances"), 1122 ("extreme circumstances"), 1123 ("extreme situations")

The Ninth Circuit explained: "[L]egislatures enjoy broad discretion in awarding damages" and statutory damages exceed due process limits only in "certain extraordinary circumstances ..." *Id*. at 1120. It stated that a court "can only interfere with such legislation" if the damages imposed are "grossly excessive." *Id*. It found that in *Williams* the Supreme Court "directed that the constitutional inquiry focus on extreme cases" and "stressed that a constitutional limit would be found only in rare cases in which the award was 'severe and oppressive' ..." *Id*. at 1121.

Indeed, in *Williams*, the Supreme Court concluded that the statutory penalty did *not* violate the due process clause even though it was more than 113 times greater than the damages suffered by the plaintiffs because the validity of a statutory penalty "is not to be tested in that way." 251 U.S. at 67. And in *Wakefield*, the Ninth Circuit did *not* conclude that the aggregated statutory damages award of $925,220,000 was constitutionally excessive. Rather, it remanded the matter to the district court for assessment. 51 F.4th at 1125.

Here, the aggregated statutory damages award of $83,125,500 does not present the "most

egregious of circumstances" or "greatly outmatch any statutory compensation and deterrence goals." *Wakefield*, 51 F.4th at 1122, 1124. The Court should not disregard the plain statutory language directing it to award a prevailing plaintiff "actual damages or five hundred dollars, whichever is greater ..." GBL section 350-e.

**B.    The *Williams* Factors**

The factors discussed in *Williams* are the (1) the statute's public importance and deterrence goals, (2) opportunities for committing the offense, and (3) need for securing uniform adherence to the statute. Premier's burden under the *Williams* standard is rigorous and exacting, permitting reduction of statutory damages only when carefully justified as a rare, extreme circumstance.

**1.    The Statutes' Public Importance and Deterrence Goals**

In 1970, the New York Legislature enacted GBL § 349, which declared unlawful any "'[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state.'" *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 9 (App. Div. 2020) (quoting GBL § 349(a)). "Similarly, General Business Law § 350, enacted in 1963, states that '[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state' shall be unlawful. New York's consumer protection laws were passed in response to an 'urgent need for legislation striking down all forms of deceptive acts and practices' (L 1970, ch 43, Attorney General's Mem, 1970 NY Legis Ann at 92; *see* Letter from NY Dept of Law at 1, Bill Jacket, L 1963, ch 813 [§ 350 was enacted 'to provide needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State'])." *Plavin*, 35 N.Y.3d at 9.

The Legislature enacted GBL § 350 "based on a comprehensive study and report prepared by the New York State Bar Association Special Committee to Study the Antitrust Laws of New York .…" RJN, Doc. 1 at 1. In a comment seemingly aimed at this case, the State Bar reported:

> There is no effective general statute of statewide application in this field. A gap exists in our law. For example, the Arthritis and Rheumatism Foundation has reported that through fraudulent advertising people suffering from such painful diseases as arthritis are being duped out of 250 million dollars annually.

*Id.*

BLOOD HURST & O' REARDON, LLP

GBL § 350 was also enacted to promote the important public interest goals of protecting honest businesses and deterring dishonest business practices.

> This bill borrows the substantive standards of the Federal Trade Commission Act and applies them to intrastate transactions in New York. Thus interstate and intrastate competitors are placed upon equal footing. Many in the latter group now use methods which under-cut ethical merchants in interstate commerce who must and do abide by Federal Trade Commission regulations.

*Id.*

GBL § 350 thus serves the intersecting public interests of protecting consumers from fraud, protecting a level playing field among competing businesses and deterring and punishing dishonest merchants.

The deterrence goals of GBL § 350 are of particular importance to New York legislators. "[I]nitially only the Attorney General's Office could sue to enforce the statutes ... ." *Montera*, 111 F.4th at 1040 (quoting *Plavin*, 35 N.Y.3d at 9). "In 1980, recognizing 'the inability of the New York State Attorney-General to adequately police false advertising and deceptive trade practices,' [citation], the New York Legislature 'amended both section 349 and 350 to add a private right of action ... , allowing injunctive relief and damages, as well as reasonable attorney's fees.'" *Id.* (quoting *Plavin*, 35 N.Y.3d at 9). "The Legislature authorized statutory damages to 'encourage private enforcement' and to 'add a strong deterrent against deceptive business practices.'" *Id.* (quoting *Beslity v. Manhattan Honda*, 467 N.Y.S.2d 471, 474 (App. Div. 1983) (quoting Mem. of Gov. Carey, On Approving L.1980, chs. 345 and 346, 1980 N.Y. Sess. Laws 1867 (June 19, 1980)).

In 2007, the New York Legislature increased the statutory damages amount in GBL § 350-e from $50 to $500 because "[c]urrent limits are too low to be effective." *Montera*, 111 F.4th at 1040 (quoting N.Y. State Senate Introducer's Mem. in Support for Bill No. S4589). In short, the deterrence aspect of statutory damages under GBL § 350 are of particular importance to the New York Legislature.

Given the importance of the New York laws and the intersecting goals they are designed to protect, an award of $83 million is not gravely disproportionate to the legal violation. Rather, the prospect of $500 per violation has had little deterrent effect on Premier. Despite its impending

BLOOD HURST & O' REARDON, LLP

00220759

1   liability for statutory damages, Premier continued to sell Joint Juice in New York and elsewhere,

2   undeterred, through trial and the jury verdict against it. When Premier finally ceased sales of Joint

3   Juice in October 2022 it was not because it was deterred by the jury verdict or statutory damages

4   but because Premier's largest retailers declined to sell Joint Juice at the 28% price increase Premier

5   was demanding. Ex. 1 at 57:17–59:3, Ex. 2 at 357294, Ex. 3 at 357316.[1]

6       Indeed, Premier does not view its liability for statutory damages (now upheld by the Ninth

7   Circuit) as having a material adverse financial or operational impact. Premier's parent, BellRing

8   Brands,[2] in its most recent financial report of November 19, 2024, stated: "The Company continues

9   to vigorously defend these [Joint Juice] cases and intends to appeal any adverse judgments and

10  awards of damages. The Company does not believe that the ultimate resolution of these cases will

11  have a material adverse effect on its consolidated financial condition, results of operations or cash

12  flow." Ex. 4 at p. 64.

13      In addition, "[t]he wealth of the defendant has been widely recognized as relevant to the

14  deterrent effect of a [statutory] damages award." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F.

15  Supp. 2d 455, 461 (D. Md. 2004). In *Basic Books Inc. v. Kinko's Graphics Corp.*, the court

16  "conclude[d] that substantial damages are necessary to deter Kinko's from repeating the conduct

17  proved in this case." 758 F. Supp. 1522, 1545 (S.D.N.Y. 1991). It awarded statutory damages of

18  $510,000 for just 15 violations having considered the defendant company's income and assets. *Id.*

19      In *Havana Docks Corp. v. Carnival Corp.*, the court applied *Williams* to defendants' due

20  process challenge to aggregate statutory damages, and found that an award of over $100 million was

21  "certainly reasonable" and not unconstitutional because a lower award "would not effectively serve

22  a deterrent purpose, since a lesser award could conceivably be considered merely a cost of doing

23  business." No. 19-cv-21724, 2022 U.S. Dist. LEXIS 233783, at *19 (S.D. Fla. Dec. 30, 2022).

24      Here, Premier is part of a wealthy corporation, BellRing Brands (NYSE:BRBR), that had

25

26  _____

    [1]    "Ex." refers to the exhibits attached to the concurrently filed Declaration of Timothy G.
    Blood.

27  [2]    Premier is a subsidiary of BellRing Brands, Inc. and is included in BellRing Brands financial
    reports. Premier's former president, former V.P. of Marketing, and architect of the Joint Juice fraud,

28  Darcy Horn Davenport, is currently the President and CEO of BellRing Brands.

BLOOD HURST & O'REARDON, LLP

8                                    Case No. 3:16-cv-06980-RS

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REASSESS STATUTORY DAMAGES AWARD

net sales of $2 billion for the 12 months ending September 30, 2024 (an increase of $330 million over the previous year). Premier accounted for over 85% of those sales. BellRing Brands' operating profit for the same period was $388 million (an increase of $100 million over the previous year). As of September 30, 2024, it had $85 million in cash and cash equivalents, with an additional $250 million available to borrow. During the fiscal year, the company repurchased 2.6 million shares for $146.6 million. Ex. 4 at pp. 7, 37, 46. BellRing's current market capitalization exceeds $10.1 billion.[3] Statutory damages totaling $83 million for over ten years' of violations is only 21% of the last one year's profit and a fraction of the last year's sales. In these circumstances, a lower statutory damages award would have no deterrence and as is, may have little deterrent effect given BellRing's statement that the Joint Juice cases are projected to be immaterial to its finances or operations.

New York's false advertising and deceptive business practices laws are based on strong public policies to protect consumers, protect honest businesses and protect the level playing field critical to commerce by deterring and punishing dishonest businesses that violate these laws. This factor weighs against any due process reduction of the amount set by statute.

**2.      The Opportunities for Committing the Offense**

In *Williams*, the Court considered the fact that the defendant had "numberless opportunities for committing the offense" because individuals rode the defendant's railway line regularly. *Williams*, 251 U.S. at 67.

Deceptive advertising of consumer products is inherently subject to large scale violation. Premier's ability to commit the offence of selling falsely advertised Joint Juice to New Yorkers was limited only by the number of individuals it could dupe into purchasing. Premier increased its opportunities by "target[ing] its Joint Juice advertising to people who suffer from joint pain as a result of osteoarthritis." *Montera*, 111 F.4th at 1026. "Premier was aware of the studies concluding that glucosamine and chondroitin have no effect on joint health but continued to sell—and increased its marketing of—Joint Juice to arthritis and joint-pain sufferers." *Id*. Premier further sought to increase its opportunities by "encourag[ing] customers to make repeat purchases, recommending

---

[3]      *See* https://bellring.com/investors/stock-info (last visited Dec. 3, 2024).

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REASSESS STATUTORY DAMAGES AWARD

BLOOD HURST & O' REARDON, LLP

00220759

that they drink a bottle a day, and with packaging that recommended purchasing on a weekly or monthly basis, depending on the size of the pack." Dkt. 293 at 10. Because of its efforts, Premier sold 166,249[4] units of Joint Juice in New York during the class period. *Montera*, 111 F.4th at 1027.

And Premier is still in the dietary supplement business. Its "Premier Protein" brand markets protein shakes and nutrition bars by "target[ing] a broad range of consumers and compete[s] in all major product forms, including ready-to-drink ('RTD') protein shakes and powders." Ex. 4 at pp. 5–6. So Premier has numberless opportunities for committing consumer fraud in the future. This factor weighs against any due process reduction.

### 3.    Need to Secure Uniform Adherence to the Statutes

If New York's false advertising law is not applied uniformly across all businesses operating in New York, unscrupulous corporations like Premier will have a competitive advantage over good corporate citizens who follow the law. In addition, non-uniform adherence to the statutory damages New York law provides could mean the failure to protect New York consumers from dishonest merchants. Companies may be emboldened to use their positions of economic superiority to reduce statutory damages to a palatable amount and a mere cost of doing business, obviating the deterrence goals of the Legislature. Or companies could do what Premier has done here—engage in scorched earth litigation where it "intends to appeal any adverse judgments and awards of damages" apparently regardless of merit, as it stated to shareholders. Ex. 4 at p. 64.

It is essential as a matter of public policy and basic fairness that New York law be uniformly applied. Application of the statute as written—awarding prevailing plaintiffs $500 per violation—treats all New York consumers and all New York merchants the same.

In sum, when considered against "the statute's public importance and deterrence goals" an award of $83,124,500 is not "wholly disproportionate to the goals of the statute" such that this case is one of the "most egregious of circumstances" subject to constitutional due process limitations. *Wakefield*, 51 F.4th at 1122, 1124.

BLOOD HURST & O' REARDON, LLP

---

[4]    166,249 units is an undercount because it only includes sales from four retailers of Joint Juice: Costco, Sam's Club, Walmart, and Rite Aid. Ex. 5 at 1087:11–19.

C.    *Six Mexican Workers* **Factors**

In *Wakefield*, the Ninth Circuit stated that "*Six Mexican Workers* provides further guidance for determining whether a particular statutory damages award is disproportionately punitive in the aggregate." 51 F.4th at 1123. *Six Mexican Workers* concerned statutory damages under the Farm Labor Contactor Registration Act (FLCRA), 7 U.S.C.S. § 1801, where the Ninth Circuit adopted the Fifth Circuit's test to evaluate whether a district court abused its discretion in setting FLCRA statutory damages. 904 F.2d at 1309 (citing *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1332 (5th Cir. 1985)). The factors are:

1)    the amount awarded to each plaintiff;

2)    the total award;

3)    the nature and persistence of the violations;

4)    the extent of defendant's culpability;

5)    awards in similar cases;

6)    the substantive or technical nature of the violations; and

7)    the circumstances of each case.

*Six Mexican Workers*, 904 F.2d at 1309.

We first note that the statute at issue in *Six Mexican Workers*, the FLCRA,[5] functioned differently than GBL §§ 349 and 350 and thus *Six Mexican Workers* "addressed a somewhat different issue." *Wakefield*, 51 F.4th at 1123. The FLCRA allowed a court to award a range of liquidated damages, up to $500 per plaintiff per violation. *Beliz*, 765 F.2d at 1332. "A district court has discretion to fix the amount of the award and it may allow a successful plaintiff less than $500." *Id*. Further, in the Ninth Circuit, FLCRA damages were not punitive in nature. *Id*.; *see also* *Wakefield*, 51 F.4th at 1123 (the FLRCA "did not contemplate punitive penalties in the calculation of liquidated damages."). Hence, the discretionary amount of damages were measured solely against the FLRCA's deterrence and compensation objectives. *Id*.

In contrast, New York law does not give the court discretion to determine the statutory

---

[5]    In 1983, the FLCRA was repealed and replaced by the Migrant and Seasonable Agricultural Workers Protection Act.

Case No. 3:16-cv-06980-RS

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REASSESS STATUTORY DAMAGES AWARD

BLOOD HURST & O' REARDON, LLP

00220759

damages amount. "GBL §§ 349 and 350 **require** courts to award the greater of actual damages or statutory damages of $50 or $500, respectively," limited only by substantive due process. *Montera*, 111 F.4th at 1027 (emphasis added). Statutes like GBL §§ 349 and 350 which "set a statutory floor for damages, as opposed to a range, ... reflect punitive as well as compensatory and deterrence goals." *Wakefield*, 51 F.4th at 1123.

Thus, while *Six Mexican Workers* "can guide trial courts'" substantive due process analysis (*id*.), these differences should be kept in mind in its application.

### 1.    The Amount Awarded Per Class Member

Montera presented evidence at trial that on average 3.53 units of Joint Juice were purchased per household. Ex. 5 at 1088:16–1089:25. This average overstates the number of units purchased per *class member* because more than one person *per household* could have been buying and using Joint Juice. *Id*. Regardless, using the average of 3.53 units purchased, the average statutory damages award per household will be $1,765 ($500 x 3.53).

In *Gessele v. Jack in the Box, Inc.*, applying *Six Mexican Workers*, the court rejected a due process challenge to an average statutory penalty award of $2,000 per class member. No. 3:14-CV-01092-HZ, 2023 U.S. Dist. LEXIS 54892, at *37–38 (D. Or. Mar. 30, 2023). The court considered that in *Six Mexican Workers*, the average award of $630 per class member adjusted for inflation would be $1,472.42 in March of 2023, an amount "in line with the $2,000 per class member here." *Id*. at *38. In *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012), the Eighth Circuit (applying *Williams*) held that an aggregated statutory damages award of $222,000, comprised of $9,250 per violation which resulted in an average award of $37,000 per plaintiff, did not violate due process.

In this case, the average award of $1,765 per household is less than the per plaintiff award approved in *Gessele*, far less than the per plaintiff award in *Capitol Records,* and only slightly more than the per plaintiff award in *Six Mexican Workers*. This factor weighs against any due process reduction.

BLOOD HURST & O' REARDON, LLP

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REASSESS STATUTORY DAMAGES AWARD

BLOOD HURST & O' REARDON, LLP

### 2. The Total Award

The total aggregated damages award of $83,124,500 is not unconstitutional. The size of the award is due to Premier's success in duping its target market to repeatedly purchase a worthless product and the length of time it persevered in its violations. As shown, this total award is not excessive and may have little or no deterrence on the corporate wrongdoer valued at over $10 billion. In *Wakefield*, the Ninth Circuit did not find that a statutory damages award of $925,220,222 (over 11 times greater than the award sought here), was unconstitutional. Instead, it remanded the matter to the district court for further consideration under *Wakefield*.

### 3. Nature and Persistence of the Violations, the Substantive or Technical Nature of the Violations, and the Extent of Premier's Culpability

The nature of Premier's violations was egregious. It "target[ed] people in pain who were desperate for relief." Dkt. 293 at 11. Premier promised class members that Joint Juice would help their joints when scientific studies, including trials conducted by the National Institutes of Health, "found that glucosamine and chondroitin had no effect on joint health." *Montera*, 111 F.4th at 1026. "Evidence showed that Premier was aware of the studies concluding that glucosamine and chondroitin have no effect on joint health but continued to sell—and increased its marketing of— Joint Juice to arthritis and joint-pain sufferers." *Id*.

Premier's violations were persistent. It falsely advertised Joint Juice for over a decade— from its campaign launch in 2009 (Ex. 6 at 764:7–21) right up until it discontinued the product in October 2022 because retailers refused to keep selling it. Ex. 2 at 357294. Premier kept selling a product it knew did not work as advertised because Joint Juice had reached "harvest" mode (Premier's term), *i.e.*, Joint Juice was making money for Premier without further advertising investment. Ex. 6 at 828:16–830:11.

Premier's violations were substantive; not technical. Premier knew and represented that "'the only reason to purchase Joint Juice® supplement is for the medicinal value of the glucosamine and chondroitin it contains.'" *Montera*, 111 F.4th at 1037; *see also* Ex. 7 at 4. All the while, Premier knew "glucosamine and chondroitin have no effect on joint health ..." *Montera*, 111 F.4th at 1026.

That is, Premier advertised and sold Joint Juice when it knew Joint Juice was useless for its advertised purpose.

Premier's culpability was extensive. Premier's false advertising was not an isolated event or the result of a lower lever rouge employee. Premier hired Darcy Horn Davenport to serve as Premier's Director of Marketing for Joint Juice. She was quickly elevated to V.P. of Marketing for Premier and in 2016 she was elevated to Premier's President. Ex. 6 at 752:7–753:19. In 2019, Davenport was rewarded for her work by being named President, CEO, and member of the Board of Directors of Premier's parent, BellRing Brands, where she remains today. Ex. 4 at pp. 11–12.

The advertising of Joint Juice was orchestrated by Davenport and the Joint Juice brand director, Lance Palumbo. Ex. 6 at 752:21–25, 764:7–21. Premier bombarded its target market— joint pain sufferers—with the false message that Joint Juice benefited joint health. Premier's deceptive marketing campaign was sophisticated and well-researched, extensive and coordinated. Premier hired outside marketing firms to provide expertise in label design, branding and advertising, public events, inserts and coupons, consumer focus groups and public relations. Ex. 8 at 502:6–15, 504:5–507:3. Premier researched and ranked the types of media its target market consumed and used them all. Ex. 9 at 25. The strategy: "Joint Juice will surround the Consumer!" Ex. 9 at 28. Premier's campaign worked. Joint Juice became "the #1 joint health beverage in the US in both sales and consumer awareness." Ex. 10 at 4.

Premier's culpability went right to the top. President Davenport read the scientific studies and study abstracts and discussed clinical trials with Premier's scientific advisory board and the Joint Juice brand director, Lance Palumbo. Ex. 6 at 757:19–759:2, 760:9–761:3, 800:3–6; Ex. 8 at 561:17–564:18. And when the scientific evidence overwhelmingly showed glucosamine/chondroitin had no joint health benefits, Premier did not discontinue the product (as did some companies including Coca-Cola/Minute Maid) (Ex. 11), or change its label or other advertising. Instead, Premier worked to preserve its sales by attacking the scientific studies, increasing its public relations efforts, and blatantly put profit over veracity.

By way of example, to preserve its market share Premier added a small amount of chondroitin to Joint Juice and heralded chondroitin on the label because its competitors' products

00220759

included chondroitin and because Premier's market research showed "Chondroitin is a MUST in this category …." Ex. 12 at 21, Ex. 8 at 584:2–25. Premier knew there was no scientific evidence chondroitin was effective for joint health. Lance Palumbo wrote, "as we discussed, there is no scientific evidence for chondroitin at 200 [milligrams]." Ex. 13. Palumbo also informed President Davenport: "there is no research to support a 200 mg dose". Ex. 14 at 1; *see also Montera*, 111 F.4th at 1026 (noting same).

Premier's top-tier culpability is also illustrated by its response to the scientific trials demonstrating glucosamine/chondroitin did not work. Discussing GAIT III, Palumbo wrote to Davenport and others that the study had concluded: "G and CS no better than placebo for Arthritis." Ex. 15 at 1. In response, Palumbo advised increasing the credibility of Premier's advertising by touting that Joint Juice was developed by a doctor—Dr. Kevin Stone (Ex. 16) and used its hired scientist, Dr. Theodosakis, to disparage the GAIT III study to the media. Exs. 15 at 1, 17 at 1. When Premier considered running its own study to counter GAIT III, President Davenport wrote: "if poor—don't publish." *Montera*, 111 F.4th at 1026; *see also* Ex. 18. Premier chose not to conduct the study.

The nature and persistence of Premier's violations, that Premier's violations were substantive not technical, and the extent of Premier's culpability all weigh against a due process reduction of the damages set by statute.

### 4.    Damages Awards in Similar Cases

This type of case is rarely tried to verdict. As a result, Montera is not aware of any similar cases that would inform the court on this issue. This factor therefore is neutral and does not favor a due process reduction of the damages set by statute.

///
///
///
///
///
///

00220759

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

IV.    **CONCLUSION**

Upon reassessment as directed by *Montera*, and in accordance with *Wakefield*, *Williams*, and *Six Mexican Workers*, the district court should enter an order awarding Montera and the class statutory damages in the amount of $83,124,500.

Respectfully submitted,

Dated: December 9, 2024

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)

By:        *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Class Counsel*

IREDALE & YOO, APC
EUGENE G. IREDALE (75292)
105 W. F Street, Floor 4
San Diego, CA 92101
Tel: 619/233-1525
619/233-3221 (fax)
egiredale@iredalelaw.com

LYNCH CARPENTER, LLP
TODD D. CARPENTER (234464)
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel: 619/762-1910
619/756-6991 (fax)
todd@lcllp.com

*Additional Attorneys for Plaintiff*

00220759

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on December 9, 2024, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses denoted on the Electronic Mail Notice List.

5          Executed on December 9, 2024.

6

7                                                                *s/  Timothy G. Blood*
                                                        TIMOTHY G. BLOOD

8                                                        BLOOD HURST & O'REARDON, LLP
                                                        501 West Broadway, Suite 1490
9                                                        San Diego, CA  92101
                                                        Tel: 619/338-1100
10                                                       619/338-1101 (fax)
                                                        tblood@bholaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00220759

BLOOD HURST & O' REARDON, LLP